EBJPMAR1                    Hearing

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     MARBLEGATE ASSET MANAGEMENT,
3    LLC, MARBLEGATE SPECIAL
     OPPORTUNITIES MASTER FUND,
4    L.P., MAGNOLIA ROAD CAPITAL
     LP, and MAGNOLIA ROAD GLOBAL
5    CREDIT MASTER FUND, L.P.,

6              Plaintiffs,

7         v.                      14 CV 8584 (KPF)
     EDUCATION MANAGEMENT
8    CORPORATION, EDUCATION
     MANAGEMENT, LLC, and EDUCATION
9    MANAGEMENT FINANCE CORP.,

10             Defendants.
     ------------------------------x
11                               New York, N.Y.
                                 November 19, 2014
12                               12:09 p.m.
     Before:
13             HON. KATHERINE POLK FAILLA,

14                               District Judge

15                  APPEARANCES

16   AKIN GUMP STRAUSS HAUER & FELD LLP
          Attorneys for Plaintiffs
17   SEAN E. O'DONNELL, ESQ.
     JOSEPH L. SORKIN, ESQ.
18   LUCY MALCOLM, ESQ.

19   WACHTELL, LIPTON, ROSEN & KATZ
          Attorneys for Defendants
20   JOHN F. LYNCH, ESQ.
     STEVEN R. DiPRIMA, ESQ.
21   EMIL A. KLEINHAUS, ESQ.

22   MILBANK, TWEED, HADLEY & McCLOY LLP
          Attorneys for Intervenor Defendants
23   ANTONIA APPS, ESQ.

24

25

1          (Case called)

2          (In open court)

3          THE COURT:  All right.  Good afternoon.  Please be

4   seated.  Okay, Mr. Lopez, you may call the case.  Thank you.

5          THE DEPUTY CLERK:  Yes, your Honor.

6          (Case called)

7          MR. O'DONNELL:  Good morning, your Honor.  May it

8   please the Court, Sean O'Donnell with Akin, Gump, Strauss,

9   Hauer and Feld on behalf of the plaintiffs.  With me today at

10  the table I have my colleague, Lucy Malcolm, and then we have

11  also our client, again, Richard Kearney.  He is one of the

12  analysts in Marblegate that I think you heard about yesterday,

13  and then we have also my colleague from Akin Gump, Chris Carty.

14         THE COURT:  All right.  Good afternoon to all of you.

15         MR. KLEINHAUS:  Good afternoon, your Honor.  Emil

16  Kleinhaus, Wachtell, Lipton, Rosen & Katz, on behalf of the

17  Education Management defendants.  I'm here with my partner,

18  Mr. Lynch, my colleague, Jasand Mock.  The Intervenors, I

19  think, will introduce themselves.  We have our client, the CEO

20  of the company, Ed West and Mick Beekhuizen here again today,

21  your Honor.

22         THE COURT:  All right.  Thank you.  Ms. Apps?

23         MS. APPS:  Antonia Apps with Milbank Tweed for the

24  Intervenors, your Honor.  Good morning.  And with me from

25  Milbank is Aaron Renenger, Gregory Bray and Eric Reimer.

1          THE COURT:  All right.  Good afternoon to all of you,

2     and I see that there are other folks.  Since we're not moving

3     around exhibits today, hopefully, you're just here to, I don't

4     know, enjoy the fruits of your labors and see where we are in

5     this case.  So you are welcome.

6          There are a few things that I would ask you to keep in

7     mind as we start this oral argument portion, and I want you to

8     think about that as you're responding to the questions that

9     I've asked.  And specifically what this is, is that I'm going

10    to outline just a couple of the -- I may call them issues, you

11    may call them concerns, but things that are keeping me up at

12    night about this case.  And, in particular -- well, keeping me

13    up, metaphorically, if not figuratively, in using or refraining

14    from using injunctive power in this case.

15         I think everybody in this room agrees that this case

16    atypical and that the confluence of several statutes and

17    regulatory structures may make it even unique.  My concern,

18    especially after I heard all the testimony yesterday, is that

19    there is a degree to which what I'm being asked to do is to

20    participate in a game of chicken, for lack of a better term.

21         What I'm really being asked to do is to choose between

22    sanctioning -- and by the term "sanction," I don't mean putting

23    people in jail; I mean in the sense of using my office to

24    acknowledge -- sanctioning an improvement in the plaintiff's

25    negotiating position with respect to the defendants and, on the

1    other hand, sanctioning a restructuring process that may well

2    have been legal.  We'll talk about that at some later date, but

3    does seem to have been a little bit on the heavy handed side.

4    It's just not clear to me that that is what rule 65 is for, but

5    that is what we're here for today.

6          Another issue that became more clear to me as a result

7    of yesterday's testimony, is that the contrast in scenarios or

8    in contemplated consequences is somewhat less stark than has

9    been presented to me in the papers.  For lack of a better term,

10   and I realize I should really know my audience before I use

11   this term, but if you'll excuse sort of the Star Trek nature of

12   this.

13         I am being presented with a series of parallel

14   universes because each idea, each scenario depends on the

15   actions and the reactions of a series of parties, including

16   EDMC, the secured lenders, the note holders, the cross-debt

17   holders, if you want to distinguish them, and the third

18   parties, such as the Department of Education and the

19   accreditation bodies.

20         Mr. West, Mr. Hannan, in particular, made clear to me

21   that while bankruptcy is available as a legal option, I don't

22   think anybody should ever say it's not available.  It is.

23   There are a number of reasons why many of the parties have all

24   but excluded it as a practical option.  So that is the concern

25   that I have.  We are operating with a lot of uncertainty.

1    You may have been involved with prior preliminary

2  injunction motions where -- I can give you the easiest

3  example -- either the house will be knocked down to build

4  something else, or it will not.  And that's pretty easy

5  because, you know, either there will be a house that's knocked

6  down or not.

7    Here, no one can really speak with specificity.  No

8  one has come to me and said, I will do X if you enjoin or I

9  will do Y.  They've all said these are things that can be done.

10  And so why I mention this to you is, first of all, so that we

11  all recognize this uncertainty and, second of all, that when

12  you talk to me about the harms that may happen to either side,

13  I think you might want to temper or at least modify your

14  remarks to accommodate some of the uncertainties that were

15  addressed in yesterday's testimony.

16    So speaking now about housekeeping matters, here's

17  what I'd like to do.  I have a list of questions for

18  plaintiff's counsel, and I would like to ask them and get

19  answers to them.  At the end of that proceeding, I'm going to

20  switch to the defendants and then the intervenors and ask them

21  questions.

22    For the folks who are speaking second and third, what

23  I would suggest is, I've tried to tailor my questions to reach

24  the specific issues that I'm concerned about with respect to

25  your positions.  But if, at the end of that, there is something

1    that you want to say in response to or in supplementation of a

2    response that plaintiff's counsel gave to a question that I

3    posed, I will let you do it.

4         Because this is plaintiff's application, they go last,

5    and I don't know that I'll have reply questions for them, but

6    I'll certainly see if I can find some.  I will give them an

7    opportunity to respond to that which defendants' counsel and

8    intervenors' counsel say to me during the argument.  So with

9    that in mind, Mr. O'Donnell, will you be taking the laboring

10   oar?

11        MR. O'DONNELL:  Yes, your Honor.

12        THE COURT:  All right.  Thank you.  We'll try and

13   figure out where is the easiest.  I mean, we can try the podium

14   and hope.  We'll see how the microphone goes, unless you want

15   to bring your own.

16        MR. O'DONNELL:  How about we do this, unless that's

17   too close.  Is that okay, your Honor?

18        THE COURT:  I'm fine.  As long as the reporter is

19   fine.

20        MR. O'DONNELL:  Are you okay with that?

21        THE REPORTER:  Yes, I'm fine.  Thank you.

22        THE COURT:  Thank you, Mr. O'Donnell.

23        Let me begin by noting that there is a degree to which

24   I agree with Ms. Apps' comment in opening, that the plaintiffs

25   may not have been perfectly consistent in articulating the

1    relief that you now seek.  I mean, I've read the papers, but

2    then I've listened to testimony from plaintiffs' witnesses and

3    I've read declaration.

4          What I really want to know, and I'm saying this with

5    all seriousness, is what do you want me to do?  Whom would you

6    like me to enjoin and from doing what?

7          MR. O'DONNELL:  Thank you, your Honor.  I'm delighted

8    to start with that question.  If I can just, first, on behalf

9    of everybody, thank the Court and the clerk for all the time

10   that you've given to us.  I know that it's been a big burden

11   and it's very obvious to all of us just how hard you all have

12   worked to get to the right results; so we're very appreciative

13   of the Court's efforts and its time.

14         THE COURT:  Thank you.

15         MR. O'DONNELL:  Thank you.  In terms of the relief

16   that we're seeking and who it is that we're seeking for that

17   relief to apply to, that's a great place to start.  Because,

18   interestingly, the intervenors are here, but we're not seeking

19   to enjoin them from doing anything at all.

20         What we're seeking to do is we're seeking to enjoin

21   the company from violating our rights under the Trust Indenture

22   Act.  So what does that mean?  Well, I think, as the Court

23   heard and as you mentioned at the very beginning of today, this

24   is not your ordinary restructuring case.  And the reason why

25   it's not your ordinary restructuring case is because of the

1    company's dependence on Title IV funding, and that means two

2    things.

3           First, as you pointed out just a minute ago, I think

4    there's a general concession that while bankruptcy is not an

5    impossibility, it's not a practical option.  I think the other

6    thing that was made very clear yesterday in court, through the

7    documents and through the testimony of the witnesses, is that a

8    foreclosure by the secureds is not a very realistic option as

9    well.

10          And why is that?  A foreclosure by the secureds is not

11   a realistic option because they don't have a lien on the

12   company's Title IV funding.  And we heard quite clearly

13   yesterday, from the CEO, that the company's ability to continue

14   to receive Title IV funding is greatly linked to the

15   change-of-control implications that we heard about.

16          THE COURT:  And just so I understand what you're

17   saying, Mr. O'Donnell, what you're saying is that while

18   certainly the secured lenders could foreclose, they may up, at

19   the end of the day, with some desks and some supplies and not

20   with the schools themselves.  And to be clear, they could make

21   a determination that they wish to operate these institutions

22   and try and obtain either the financing or the accreditation,

23   but you're saying it is unlikely that they will?

24          MR. O'DONNELL:  It's unlikely that they will, but I'm

25   also not trying to stop them from doing that.

1      THE COURT:  As long as the company is not involved?

2      MR. O'DONNELL:  What I'm saying is that the company

3   can't do it for them, and that's what the whole proposed

4   restructuring, that's what the intercompany sale is designed to

5   do.  It's designed to get around the Trust Indenture Act.  It

6   recognizes we're going to be transferring the assets to a new

7   subsidiary and it goes through the whole process.  There's the

8   August 13th, 2014, memo from the company to the regulators.

9   There's the back and forth with the company and the regulators.

10      And what that makes clear is they're stressing to the

11   regulators this whole process that we're undertaking, it's not

12   going to constitute a change in control.  It's going to be the

13   same management in place.  It's going to be the same

14   operations.  It's going to be the same parent that's running

15   everything.

16      And what did we hear also?  We heard that even getting

17   through step one of that process, that a condition for that by

18   at least some of the regulators --

19      THE COURT:  Yes, one entity thought it with was a

20   change of control that started the process.

21      MR. O'DONNELL:  And they only were going to allow for

22   this to continue without triggering the change in control if

23   the company signed the PPA agreement, where it basically said

24   we're on board with each one of these institutions.  It's still

25   the same management.  It's still owned by the same company.

1      So there's a really important link between the

2  company, right, and what the secureds and the company are

3  trying to do through the intercompany sale and through the

4  proposed restructuring.  They're seeking to basically take

5  everything and remove it from those holders who don't exchange,

6  and the secureds know they can't do that without the company's

7  help.  That's why they're here intervening.  That's why equity

8  is getting four percent.  That's why there's a management

9  incentive plan that's part of the RSA.

10      We're not saying that the secureds can't come to

11  court, can't foreclose on their remedies on their own.  We've

12  been very clear on that from the start, from the very

13  beginning.  They have their rights.  We have our rights.  They

14  have the collateral on the bricks -- they have the liens on the

15  bricks and the mortar and whatever else it is.  We're protected

16  by the Trust Indenture Act.

17      And if we talk about -- you know, I think it was the

18  opening yesterday, this whole notion that we're basically

19  upending the waterfall in traditional bankruptcy.  It's not

20  true.  First of all, I think we've now heard we're not in

21  bankruptcy.  It's not traditional.

22      It's worth noting, too, in the offering circular, I

23  think it's at Page 3, I can pull it up for you, but it says,

24  explicitly, that with respect to right to payment, the senior

25  notes are pari-passu with the senior credit facility.  So we're

1    not upending anything, and we're not stopping them from

2    exercising their rights.

3        What we're stopping is what the Court recognized in

4    Federation v. Mechala, that the company without the

5    non-consenting holders, they can't take away our rights to

6    principal and interest.  That's what we're seeking to enjoin.

7        THE COURT:  All right.  So you're saying if the note

8    holders had brought this plan to the company or brought this

9    plan on their own, without any company involvement -- and I

10   appreciate that there are a lot of things that have to go into

11   that hypothetical -- you wouldn't be able to stop them?

12       MR. O'DONNELL:  Well, just to clear the record because

13   I think you said the note holders, and I think you meant the --

14       THE COURT:  Secured lenders.  Let's go with the

15   secured, yes.

16       MR. O'DONNELL:  Right.  So I would never say never.

17   Absolutes, as you mentioned earlier, is a dangerous thing, but

18   I can say unequivocally that's not something that we're trying

19   to do here.  If they were to try to foreclose their rights,

20   just as if they were to force the company into bankruptcy, we

21   would exercise our rights and remedies and they would exercise

22   theirs.

23       But that's not what's going on right now.  This is not

24   a foreclosure by the secureds.  This is a complete

25   restructuring.  As the company said to the regulators in the

1    August 13th, 2014, memo, we're doing this to eliminate debt.

2    And as they said in the offering circular, when they tell the

3    note holders why it's important to exchange, you better

4    exchange because as part of this process, you're not going to

5    get paid interest or principal on your notes if you don't

6    exchange.  That's what we're trying to stop.  That's the relief

7    we're seeking.

8              THE COURT:  But, Mr. O'Donnell, the order that you

9    want me to write says what?  Not that I'm writing it, but the

10   order that you want me to write says what?  Defendants are

11   enjoined from proceeding with the terms of the restructuring

12   support agreement?  Defendants are enjoined from releasing the

13   guarantee?

14             I mean, is it all or nothing?  Are there intermediate

15   positions that you think are things that you can get if you

16   don't get everything?  I mean, for example, I could say, right,

17   I am enjoining the release of the guarantee.  Right?  No matter

18   what happens, the parent will be on the hook.  Now, I'm not

19   sure how that matters because the parent is going to be a

20   little bit asset free if the rest of this thing goes forward.

21   But can this be bifurcated or divided in some way?

22             MR. O'DONNELL:  So, your Honor, I want to be helpful.

23   I'm guilty once already of keeping the Court up late; so I want

24   to be sensitive to your comments before about what you're

25   focused on.  I think my answer to that is twofold, and one has

1    to do with the relief we're seeking and the other has to do

2    with the timing or the scope of that relief.

3            So, first, with respect to what it is we're seeking,

4    you know, we've learned a lot about the intercompany sale in

5    the last week.  But that was not laid out in any level of

6    detail in the offering circular and it may not surprise you,

7    I'm still scratching my head to understand all of its

8    implications.  So I if I were to have to delineate right now

9    item by item, what it is we're trying to stop the company from

10   doing, that would be difficult.

11           But we do know that what we want to stop are the

12   implications that are outlined in the offering circular, which

13   is, that when it's done, we're not going to have any ability to

14   recover our principal or interest.  So I think in terms of how

15   you would write the order, I think that, in fact, right now, as

16   the intercompany sale is structured, with the step one and the

17   step two process and the transfer of assets, that, yes, that

18   intercompany sale, right now, because there's lack of -- I have

19   a lack of clarity on how else to do it, would need to be

20   enjoined.

21           THE COURT:  What about the exchange offer?

22           MR. O'DONNELL:  So that's an interesting question.  I

23   think that if the exchange offer itself, in its entirety, is

24   enjoined -- I think if the intercompany sale is enjoined, and I

25   leave this to the secureds, but I don't believe that the

1    exchange offer will close.  I think that the parties will have

2    rights where they can essentially terminate the exchange offer.

3            And now that goes to the parade of horribles that we

4    heard about yesterday and I imagine that's one of the things

5    that's keeping you up at night, in terms of how you fashion a

6    remedy that's equitable.

7            First of all, if I can, please, there was some

8    criticism yesterday in the opening statement that we were

9    ignoring the equities.  And we addressed it in our reply brief

10   and, actually, and I know you know this, but the Second Circuit

11   recently articulated the standard a month ago.  It's cited in

12   our papers.  And it's irreparable harm and then it's either a

13   likelihood of showing a success on the merits, or it's a

14   balancing of the equities, if I show that there's a -- I'm

15   sorry.

16           THE COURT:  No, we'll talk about that, but we're kind

17   of wandering far afield from the question I asked.  I also know

18   winter exists.  It may be that the Second Circuit is just

19   thumbing their nose at it, and I don't have the ability to stop

20   them from doing that.  But winter does seem to call into

21   question, by calling into question the Ninth Circuit test, the

22   Second Circuit test as well.  We'll get to that in a moment.

23   Let's work on these preliminary.

24           MR. O'DONNELL:  Can I -- I'm sorry.

25           THE COURT:  Go ahead.  Finish your thought.

1            MR. O'DONNELL:  I think if we get to the timing, it

2    helps address some of the parade of horribles that I think can

3    also speak to the level of specificity that might be required

4    for the injunction order.  Right now, the company just

5    released, I think it was on October 29th, a press release

6    announcing that they extended the tender offer.  Under the

7    terms of the tender offer, they can unilaterally do that.

8    There's nothing to stop them from extending out the tender

9    offer, unless the Court would enjoin them from doing that.

10            The second piece of information related to timing that

11    I think would be helpful to the Court, has to do with the RSA,

12    and under the RSA, the agreement itself doesn't blow up until

13    20 business days after this Court were to enter an injunctive

14    order.

15            THE COURT:  And the significance of that, sir, is that

16    those 20 days are 20 days within which folks could try and work

17    and hammer out something?

18            MR. O'DONNELL:  Yes, your Honor.  So if this Court

19    were to find a likelihood of success on the merits and to

20    enjoin preliminarily -- because that's where we are now, a

21    preliminarily injunction -- the consummation of the

22    intercompany sale or the proposed restructuring, and set a

23    final hearing date within that 20-business-day period, that

24    would do a couple of really important things.

25            First of all, it would let people understand in this

1    game of chicken that you referred to earlier, that the Trust

2    Indenture Act, at least in the Court's mind, might mean

3    something here.  And --

4             THE COURT:  I just want to be clear that, finding to

5    the contrary doesn't mean that I don't think it means

6    something, but go ahead, please.

7             MR. O'DONNELL:  Thank you.  I apologize if that was my

8    suggestion.

9             THE COURT:  Go ahead.

10            MR. O'DONNELL:  And then, secondly, your Honor, you

11   heard about their concern of the Angelo Gordon's of the world.

12            THE COURT:  Yes.

13            MR. O'DONNELL:  Right?  So if you do that within the

14   20-day period, that's a window where the offer stays open and

15   allows for the plaintiffs, the intervenors and the company to

16   do what you appreciate, I think, is our case in the beginning,

17   is we shouldn't have taken this take it or nothing approach.

18            And that we have that dialogue, with an understanding

19   of the parties' legal rights and remedies.  There's a real, I

20   believe, likelihood that a resolution will be reached, that

21   people do act economically rationally here.

22            We heard a lot of the sideshow of LodgeNet and all of

23   the other nonsense.  This are sophisticated hedge funds that

24   understand risks.  They understand the value of a consensual

25   deal that's stressed throughout all the testimony, it's

1  stressed throughout all the papers.  And I believe it's set up

2  in the expert report that the defendants rely upon, but we've

3  all seen those pie graphs, where we're one or one to two

4  percent of the overall capital structure, depending on how you

5  look at it.

6        Well, that to me, Judge, says there's a real

7  possibility that that one or two percent, that's an immaterial

8  amount of the overall capital structure if you're the KKRs, if

9  you're the Oaktrees or the other titans in this industry.

10  That's insurance, at a minimum, that you would pay for for

11  certainty.

12        And I'm not suggesting that that means that we have to

13  get paid out at par, but that means that the parties have to

14  sit at the table and negotiate in good faith and they have to

15  reach a resolution.  I think that if we had that 20-day period

16  or something a little less than that, then that's what's going

17  to happen.

18        THE COURT:  Fair enough.  If it weren't a question of

19  likelihood of success on the merits, because I really do have

20  to address the legal issues here, yes, I could be

21  Machiavellian, and I could say, what makes sense for everybody

22  is to give enough uncertainty to the parties that forces them

23  to all sit at the table.

24        But I do want to talk about the legal issues; so let

25  me talk about those, and let me talk about maybe a few more

1    preliminary issues.  I want to talk again about the parent

2    guarantee.  If I enjoined the removal of the parent guarantee

3    or the release of the parent guarantee, what would happen, if

4    anything, to the restructuring?

5              MR. O'DONNELL:  The honest answer is, I don't know.

6              THE COURT:  Okay.

7              MR. O'DONNELL:  Because, again, there's still, I

8    think, some ambiguity.  We're still a little bit in the dark as

9    to how exactly the intercompany sale, the proposed

10   restructuring will be implemented.

11             When we got started in this case, fairly -- you know,

12   just a little while ago in pre-discovery, one thing that we

13   laid out in a complaint that was a concern of ours was that

14   there was about $50 million at the parent that, prior to the

15   September 4th exchange, where the majority of the notes

16   exchanged for PIKs and there was an extension or a waiver,

17   temporary waiver of some of the covenants under the senior

18   facility, that there was then a guarantee that was given to the

19   parent.

20             And we were concerned that that, in fact, was part and

21   parcel of trying to deny our ability to recover any interest or

22   payments under the notes.  And so that was certainly a focus of

23   our papers preliminarily, but the end result is still what

24   we're focused on, which is, it's the whole package.  Right?  So

25   what I think Federated v. Mechala says and what the offering

1    circular that's at issue in this case makes clear, is it's

2    everything all together that's being done to deny our ability

3    to receive any interest or principal on the notes, and that's

4    what we're trying to stop.

5              So if, at the end of the day, if they were to tell me

6    that the parent guarantee were to be released, but you're still

7    going to get paid or there's a reasonable likelihood -- we're

8    not making it an impossibility that you're going to recover

9    principal or interest on the notes -- then I don't think we'd

10   have an issue with it.

11             THE COURT:  Okay.  Just following this out.  I mean, I

12   guess the issue is if the parent guarantee stays, if the parent

13   guarantee is currently -- it is guaranteed by an entity that is

14   going to have, I imagine, substantially less assets if this

15   deal takes place.  So I appreciate what you're saying is that

16   if I am to adopt Judge Baer's position in Mechala, then there's

17   a view.

18             What I'm really trying to figure out is how many

19   components of the transaction I am looking at, and this was one

20   of them that I was concerned with.  If it turned out, though,

21   that I did enjoin the parent guarantee -- and just so everyone

22   is clear, I'm not saying I'm going to do it; I'm just exploring

23   the possibility -- would other note holders be able to back out

24   of the agreements that they've reached so far, the exchange

25   offer, or are they going to be bound by it?  And you can say

1   you don't know.

2          MR. O'DONNELL:  Well, I certainly don't have -- I can

3   say that I'm not certain.

4          THE COURT:  Okay.

5          MR. O'DONNELL:  And I can also say that it would

6   probably be subject to interpretation from all of the parties.

7   And so for me to assure this Court that there won't be any

8   fighting over that wouldn't be fair or honest.

9          THE COURT:  Okay.

10          MR. O'DONNELL:  But I think what I could say is an

11   argument that it shouldn't upset everything.  If that were to

12   stay in place, would be that our amount of debt is too

13   immaterial, it's such a small amount that, at a minimum, there

14   could be an argument made from the company that that -- keeping

15   that guarantee in place as it relates to this small subset of

16   notes isn't something that should upset the apple cart and blow

17   everything up.

18          THE COURT:  Because, separate and apart from

19   Marblegate and Magnolia, there remain today note holders that

20   have not consented, correct?

21          MR. O'DONNELL:  The unknowns.

22          THE COURT:  The unknowns, yes.  Is that going to tank

23   the deal, the fact that we haven't identified the unknowns?  Or

24   I don't know if unknown means -- somebody must know who they

25   are.  I don't.  You don't.  But let's say, speaking

1   counter-factually, that you guys agree to the exchange offer

2   and that leaves just this .5 percent of unknowns.  Does that

3   mean the deal can't take place?

4        MR. O'DONNELL:  It's an interesting question.  So, in

5   fairness, your Honor, right, I'm not the one to know whether

6   the unknowns are there or not.

7        THE COURT:  They'll answer it at some point.

8        MR. O'DONNELL:  But we are -- and maybe this goes to

9   the point of us wanting to sit down with the company and with

10  the intervenors and try and work something out.  Those are all

11  good questions, and whether or not there are ways to structure

12  this that doesn't make everything go away, I think is --

13  there's a unity of interest among the three parties to do that.

14        And, frankly, are better positioned than the Court to

15  try to do that on its own because they really do understand the

16  intricacies of the deal and how best to try and fashion relief

17  that would either keep the notes in place or reach some other

18  resolution that would allow for it to go forward.

19        And, you know, as you commented yesterday, there are a

20  lot of smart lawyers in the room.  I don't include myself with

21  them, but there are a lot of big firms here and, you know, it's

22  hard to imagine that there's not a way to get this done if

23  people act earnestly.

24        THE COURT:  All right.  But let's then talk to a

25  second, I guess, now preliminary, point I have.  The theme of

1    your opening yesterday was that folks should abide by their

2    commitments.  And my concern, sir, is that the testimony of

3    Mr. Milgram would seem to undercut that to a certain degree.

4         Here's what I mean.  I am in no way impugning

5    Mr. Milgram's business acumen because I think it's quite

6    impressive, and I also understand what he was saying to me

7    yesterday.  But what he said to me, in substance, was that he

8    frequently read past the language in the offering circulars.

9    He saw the risk factors and said, these are their opinions.  I

10   don't believe -- I think they're too conservative.  I think

11   they're -- my words, my initials, not his -- CYA, and there's

12   that.

13        I just think that that is something that is of

14   concern.  So if we're going to talk about agreements, you

15   actually have to be consistent and say we're going to abide by

16   them in all respects.  Because in the same breath, Mr. Milgram

17   is saying to me that the language that he read about the

18   guarantees being not worthy of assigning a value to is

19   something he didn't believe.

20        So to have you say, you know, abide by your

21   agreements, and to have an agreement where one party says --

22   and I'll talk to them about whether you can have a term with no

23   value -- but if it goes, as you want, it has to go in all

24   respects.  So Mr. Milgram has to understand that there is legal

25   significance to the things he is reading past.  And even if

1     they are unduly conservative, they are, nonetheless, binding.

2            I'll also note that, you know, in this regard,

3     defendants have said the circumstances under which the

4     guarantee could be released and the non-value of the guarantee,

5     they were expressly set forth in these written materials.  And

6     just to, again, I'm not piling on.  I'm simply trying to

7     complete the point.  I think I understood as well from

8     Mr. Milgram's testimony that he bought the debt believing that

9     the company would need to refinance its capital structure at

10    some point.

11           MR. O'DONNELL:  Yes.

12           THE COURT:  And that's their job, and that's what they

13    do.  They look for these opportunities, and I'm not saying it's

14    wrong to do that, but to say we wish to be bound, hold them to

15    their agreements, I don't think he fully expected that the

16    agreements would cover the entire term of the relationship.  He

17    assumed that there would be renegotiation at all times.

18           Even now, sir, if I asked him, I won't, but if I asked

19    him, he wouldn't say I want to be -- he would say I want to be

20    taken out at par, but he's not expecting to be.  He's expecting

21    something less than that.  So even here, the decision to be

22    bound by agreements is somewhat flexible.

23           So I just want you to understand that I'm a little bit

24    concerned about saying hold everybody to their agreements when

25    the parties aren't necessarily sticking with every term of the

1    agreement or holding them within the same regard.

2              MR. O'DONNELL:  May I respond, your Honor?

3              THE COURT:  You may.

4              MR. O'DONNELL:  Okay.  So I disagree, to some extent,

5    with what you said.

6              THE COURT:  Okay.

7              MR. O'DONNELL:  First of all the legal rights and

8    obligations are in the indentures.  The offering memorandum

9    sets forth the risks that the parties are to consider when

10   they're buying it, and there are a host of risks in there.  I'm

11   not talking about tornados or anything like that.  But what

12   Mr. Milgram told you then was with regard to the guarantee that

13   he was very cognizant, and it's clear based on Marblegate's

14   experience in this industry, that they appreciated the

15   regulatory impact, the importance of that guarantee in the

16   regulatory context.

17             So for somebody to say you shouldn't put a dollar

18   amount to it, you shouldn't value it in that respect, doesn't

19   mean that he didn't believe it was important.  But what those

20   offering risks don't say, right, and that's only if you're

21   focused on the guarantee, they don't say we're going to cut a

22   deal with the secureds, the majority lenders and structure a

23   deal where you don't get your principal, your interest, unless

24   you exchange your debt for equity.

25             That's not what the risks say in the offering

1    memorandum.  And nobody made the company issue these notes

2    under the Trust Indenture Act.  And if they didn't understand

3    the implications, they should have understood the implications.

4            And if we are going to focus on the risk factors, then

5    we need to look at them all.  And it also says in there, which

6    he wasn't crossed about, the risk factors that say that they're

7    pari-passu with the payment, with the senior facility.  That's

8    important, too, if the other one matters.

9            And so, you know, I think we could take issue if he

10   called the guarantee illusory, but to say that because they say

11   that you should ascribe no value to the guarantee, that in

12   October, on October 1st, 2014, we shouldn't be surprised when

13   the company announces either exchange your notes for equity,

14   even though you don't want to buy equity, even though we didn't

15   tell you we could pay you in equity, we've got to pay you in

16   cash, or you're not going to get anything under the indenture,

17   I don't think that's covered by those risk factors.

18           I think the rules that we're asking people to abide by

19   are what's set forth in the Trust Indenture Act and what's set

20   forth in security agreements with the secureds.  And, again,

21   we're not stopping to enjoin them from doing that.  And, more

22   importantly, your Honor, and I think you're sensitive to this,

23   is this case isn't about Mr. Milgram.  I know that they would

24   like to make it about him.

25           THE COURT:  It's not.  And it's not about LodgeNet

1    either, I understand.

2              MR. O'DONNELL:  Yeah, and it's no coincidence that

3    when Mr. Donath, who's an even smaller investor -- and

4    remember, the Trust Indenture Act was designed to protect

5    minority investors.  I mean, I won a bet.  I knew they were not

6    going to cross-examine him because they don't have an answer

7    for Magnolia.  Magnolia is a minority investor.  It has the

8    same rights that Marblegate has.  There's no allegation that

9    Magnolia had a grudge match with KKR or that has any influence.

10             THE COURT:  And I'm putting to the side, and I'll just

11   tell the parties.  I mean, folks may disagree with me, but I

12   get to find these facts at this time.  I don't this is all one

13   big revenge plot for LodgeNet.

14             I do think, and I'm not even saying it's wrong, I do

15   think that I took to heart something that Mr. Milgram said to

16   me yesterday, which is, our business is about posturing.  I

17   think there was some posturing going on.  I'm not going to say

18   whether this lawsuit is a continuation of that.  If the law

19   permits, then I will, must, whatever, allow him to use the law

20   to improve his negotiating position.  That's the point.

21             This lawsuit is about improving the position of the

22   plaintiffs.  I understand that.  And you can say, oh, no, it's

23   about making everybody stick to their commitments or law.  No,

24   no, it's really about their belief that they have not been

25   heard and that the law has not been followed as they have been

1   treated.  And I understand that.

2          So then the issue becomes whether if, legally, that's

3   something they can do.  I find it difficult to believe that all

4   of the lawyers in this room would be engaged and all the money

5   would be spent just to prove a lesson about LodgeNet.  It

6   doesn't make rational sense to me.  Not that I don't think it

7   was cited as a reason.  I do think it was.  I just don't think

8   it was a reason.  So I think in that regard, perhaps I'm more

9   like Mr. Reed.  I think Mr. Reed is the one who said he would

10  have found something else anyway.  I think that's where I come

11  out, but that's fine.

12         Let's talk about the standard for preliminary

13  injunction.  We started talking about this already.  Under what

14  circumstances may I consider the balance of equities and the

15  public interest?

16         MR. O'DONNELL:  Okay.  So thank you.  I think it is a

17  circumstance where you don't find that there's a likelihood of

18  success on the merits, that you then turn to consider the

19  balance of equities and the public interest.  And it won't

20  surprise you if I were to tell you that you should find that we

21  win on the likelihood of success on the merits.

22         And on that legal issue, you know, there are no slam

23  dunks.  But they did a lot of the work for us because they made

24  very clear in the offering circular what was going to happen,

25  and the words are "as a result of" the proposed restructuring.

1    So I feel like we can check the box on the legal merits, and

2    then it becomes interesting when you start to talk about the

3    irreparable harm.

4         And I certainly wouldn't foreclose the Court from

5    considering public policy and the equities.  So let's maybe

6    talk about that.

7         THE COURT:  Let's start with the equities.

8         MR. O'DONNELL:  Since that's what you asked me about.

9         THE COURT:  Yes.

10        MR. O'DONNELL:  So public policy, there's a complete

11   recognition that the Trust Indenture Act was intentionally

12   enacted by Congress in order to avoid exactly what happened

13   here.  You have a majority of lenders, to the exclusion of

14   minorities, who took a take-it-or-leave-it approach and said

15   this is what you get or you get nothing.  And Congress

16   intentionally enacted the Trust Indenture Act to avoid that.

17        THE COURT:  But the Trust Indenture Act seems to say,

18   if you all can't get along, go to bankruptcy court and figure

19   it out.

20        MR. O'DONNELL:  Thank you.  I agree.  And so then the

21   question becomes, well, square peg, round role.  Right?

22   Because we all agree that you can't go to bankruptcy.

23        THE COURT:  You can, but you shouldn't.

24        MR. O'DONNELL:  Thank you.  That was going to be my

25   point.  There's a couple of responses to that.  First of all,

 1    it's not a square peg, round hole.  The company intentionally

 2    issued the indenture as a qualified indenture, subject to the

 3    Trust Indenture Act.  So we didn't make this game or this

 4    puzzle.  This was designed by the company and its counsel, or

 5    whoever decided this was how they were going to issue the debt.

 6         Secondly, there is no exception under the Trust

 7    Indenture Act for for-profit education schools.  And the place

 8    to get that exception is not here.  It's in Congress.  So, you

 9    know, the mere fact that bankruptcy may not be a practical

10    resolution, just like I think foreclosing on the assets is not

11    a practical resolution, both for the same reason, because of

12    the company's dependence on Title IV funding, doesn't mean that

13    the Trust Indenture Act isn't enforceable.  It is.

14         And so, it's not that -- when you talk about public

15    policy or equities, we're not asking for an inequitable result.

16    We're asking for people to live by the rules they signed up to.

17         THE COURT:  But that's your public interest.  On the

18    other side, I don't think you can, or maybe you can, discount

19    the possibility that EDMC falls apart and that there are

20    120,000 students who are not getting the education that they

21    signed up for and that there are 20,000 people out of work.

22         And I'm sure, I'm sure actually nobody in this room

23    wants that to happen.  But is that not another public interest

24    that I must consider?  Is that not another equity that I must

25    balance?

1          MR. O'DONNELL:  Yes.  The answer is yes.

2          THE COURT:  If, indeed, I'm supposed to balance the

3     equities, and I know you have views on that.

4          MR. O'DONNELL:  Correct.  The short answer is yes, but

5     can I help with that, please, for a second?

6          THE COURT:  Of course.

7          MR. O'DONNELL:  So when you talk about the

8     possibilities, I mean, the sky might fall, and we've all

9     recognized that the absolutes are difficult and often

10    unrealistic.  And so, yes, there are risks with everything.

11    There are risks when we cross the street, and I'm not equating

12    crossing the street to people's jobs and to students.

13         But let's take this in context.  It's one of the

14    largest education companies in North America.  They're not,

15    like in CoCo -- in the Corinthian case, accused of fraud.

16    They're not accused of cooking their books.  They're accused of

17    being in a position where they need to restructure their debt.

18    And the company announced that back in May of 2014, on May 1,

19    2014, and the company's been involved in litigation since then.

20         There's been a lot that's been going on with the

21    company, where there's been uncertainties, and yes, that means

22    that they have to be in constant contact with the regulators;

23    and, yes, that means that Mr. West has been very busy

24    communicating with them; and, yes, that means that in order to

25    get a going concern analysis, they had to meet with the

1    auditors in the issue of liquidity and show them that they

2    actually could afford to pay our notes if we were in place and

3    the restructuring went forward.

4          I don't think that that means that the regulators are

5    going to shut them down.  I really don't.

6          THE COURT:  But how am I to --

7          MR. O'DONNELL:  Exactly.

8          THE COURT:  That's the uncertainty.  So are you saying

9    that balancing the equities, you still win because of that

10   uncertainty because, more likely than not, all of these pieces

11   will come together and everybody will get along?

12         MR. O'DONNELL:  You ask great questions.  So it's a

13   balancing of the equities, right?

14         THE COURT:  Yes.

15         MR. O'DONNELL:  So you have to consider the risks, as

16   you obviously are.  And when you're balancing them and you're

17   weighing them, you also have to take into account the

18   likelihood of that.  And this goes to, again, my hoping not to

19   continue to keep you up late at night, which is the timing of

20   the order.  And so if you were to say to me -- if you were to

21   say to the parties, I'm going to grant the preliminary

22   injunction, that I find that there is either a likelihood of

23   success on the merits or when you balance the equities, if you

24   balance the equities of honoring the Trust Indenture Act as

25   Congress intended and you weigh that against the likely outcome

1    that during that 20-day period the regulators are going to shut

2    this school down, I would hope you'd sleep well.

3          THE COURT:  Okay.  But I think that's a false

4    comparison because I don't think I just get to think of the

5    20-day period.  I have to think of what happens if you can't

6    get it together in those 20 days.  Then you can say, well,

7    extend it to until July because that's when the next big event

8    is going to happen, but I just think that's a little bit

9    facile.

10          MR. O'DONNELL:  Okay.  Well, I'm sorry then.

11          THE COURT:  Don't apologize.  Just answer.

12          MR. O'DONNELL:  So I think the answer, though, is that

13   the significance of that 20-day period and why that is a

14   credible period to consider, is because that's the period

15   before the RSA implodes.  And so that really is a good time

16   frame for the Court to consider.

17          And that after that, if the Court, at a final hearing

18   and the parties in the event hadn't reached some sort of

19   resolution, were to hear again that it needs to make a decision

20   as to whether or not it's going to enter a permanent injunction

21   or some other injunction, then, yes, it would be, I think, more

22   appropriate to look beyond that period and think about, you

23   know, sooner or later the regulators may say enough and they've

24   got to redo this.  But it's really important, you know, the

25   credit facility itself, the senior facility where the big

1    dollars become due, that's not until July of 2015.

2            THE COURT:  And that is the issue, because none of

3    these dates, not your 20 days, not your July, there is no

4    drop-dead date, as it were, for either side.

5            MR. O'DONNELL:  Well, except, I mean, what's

6    interesting with that is the drop-dead date that I'm aware of

7    is if the proposed restructuring were consummated because then

8    everything, I got nothing.  At that point, we don't have the --

9    the assets have been transferred and we're left with claims

10   against shell entities.  And as the defendants admit in their

11   papers, and I think they were being sincere, when that happens,

12   we don't get to recover any interest or principal.  So that, to

13   me, is a drop-dead date.

14           THE COURT:  Fair enough.  I mean, not to disagree with

15   you.  I suppose, just thinking creatively for a moment, that

16   the appeal that someone will almost certainly file from my

17   decision is yet another period within which, you know, the

18   parties may decide that accommodation or settlement is better

19   than not.

20           But this is the problem, sir.  I should not have to

21   decide based on all of these contingencies.  I may have to, but

22   I'm just saying.  So I understand everything you've argued to

23   me about how great the 20-day period would be, and I understand

24   that.  I'm saying there are other ways for the parties to have

25   incentives to try and resolve this matter, and I'm also not

1    convinced it can be.  So if I thought I could, I might be

2    exploring that path with the parties rather than having this

3    argument; so we shall not.

4         Let me switch, then, unless there's something you want

5    to conclude with on this point.

6         MR. O'DONNELL:  No, if I've answered your question.  I

7    think the point, when you're talking the balancing the

8    equities, there are a bunch of contingencies you have to

9    consider, and that includes the likely had that the regulators

10   would shut down this school in the near term.

11        THE COURT:  Right.  And, for you, the benefit of the

12   expert witness mentioning Corinthian College was because you

13   got to put in that lovely article about Corinthian Colleges and

14   how even in a place that may be rife with fraud, the Department

15   of Education is working with them because it recognizes that

16   the value to the students, the education trumps any of the

17   shenanigans going on at the company.

18        MR. O'DONNELL:  I think there are two things that the

19   regulators are concerned with.  I think one is the students,

20   and I think to that they do want to get their money back,

21   right?  That's the Title IV implications.  So I believe in the

22   same way that the accreditors are motivated to do something

23   that isn't value destructive, my hope and expectation is that

24   the regulators sit in the same position.

25        THE COURT:  Okay.  Let's talk then about irreparable

1    harm.  Following on my earlier comment about parallel

2    universes, what states of the world should I be comparing in

3    determining irreparable harm in this case?

4              MR. O'DONNELL:  I'm not sure I understand the

5    question.

6              THE COURT:  Well, I presume what I have to look at is

7    what happens if there is no exchange and no restructuring, or

8    what -- no exchange, yes restructuring or two interest payments

9    or zero interest payments?  I mean, there are an infinite

10   number of possibilities here.  Under which of those may I

11   lawfully, appropriately consider in ascertaining whether you

12   have been irreparably harmed?

13             MR. O'DONNELL:  Thank you very much.

14             THE COURT:  I'm sorry you needed the clarification.

15             MR. O'DONNELL:  I'm sorry you did too because it was a

16   point that I was trying to make in our papers, which is that I

17   really think that the other side is looking at irreparable harm

18   from the wrong vantage point.  What the other side is saying is

19   compare what the equity is worth versus, you know, what the

20   notes would be worth either before or after the restructuring.

21             And the problem with that is that that ignores what

22   law or right we're suing under.  We're suing under the Trust

23   Indenture Act, and that says you have a right to principal or

24   interest.  And so you have to look at -- and the indenture --

25   that interest or principal gets paid in cash.  It doesn't get

1  paid in equity, and you heard testimony from everybody

2  recognizing that equity and debt aren't the same thing and that

3  equity is riskier, et cetera.

4  Although, there are some people who voluntarily do

5  want equity.  They believe in the upside and they would rather

6  have equity.  I think that's part of what's going on with this

7  proposed restructure, but what the Trust Indenture Act says

8  without a note holder's consent, you can't impair their right

9  to get paid in cash on principal and interest.

10  So it's an unfair comparison, or it's not a right one

11  to say, look at the value of this equity according to my

12  expert's valuation, look at the value of this and compare that

13  to the value of your notes.  We're telling you, you should look

14  at this from a waterfall.  We're telling you that we're going

15  to foreclose or in bankruptcy you get nothing, even though we

16  don't think either of those scenarios are likely.  And so,

17  therefore, this equity is worth so much more than what the

18  notes are worth today.  And that is the wrong state of the

19  world to be looking at.

20  What the right state of the world is, what are the

21  notes worth today, pre the restructuring?  Right?  And so what

22  the notes are worth today, we think -- they're worth something,

23  that we've heard that the company has the ability, at a

24  minimum, to make the interest payments on the note, certainly

25  the interest --

1              THE COURT:  Well, the September one.

2              MR. O'DONNELL:  Certainly that one.

3              THE COURT:  You're not suggesting they can make the

4    principal payment in 2018?

5              MR. O'DONNELL:  No, that's not part of our case.

6              THE COURT:  You at least haven't given me proof from

7    which I can make such a finding.

8              MR. O'DONNELL:  No.

9              THE COURT:  I just want to make sure I understand

10   this.  They could give you -- let's hypothesize because that's

11   what we're doing in oral argument.  They could give you a

12   million dollar premium in terms of the equity value, and your

13   point to me is, we have the right to say that we want to keep

14   our debt securities and we want to keep our cash payments, and

15   even if those are obviously and patently different and our debt

16   we get less, we still have the right to have that.  We have the

17   right to make that decision that we want debt and not equity?

18             MR. O'DONNELL:  Yes.

19             THE COURT:  Yes?  So any equity here is irreparable

20   harm to you because you bargained for debt?

21             MR. O'DONNELL:  Any equity is irreparable harm to us

22   without our consent.

23             THE COURT:  Well, yes.  Okay.

24             MR. O'DONNELL:  I'm sorry.

25             THE COURT:  No, I should have make clear that was

1    assumed, yes.

2           MR. O'DONNELL:  And can I go back to something you

3    said about 2018?

4           THE COURT:  Yes.

5           MR. O'DONNELL:  Real quickly.  And that's this whole

6    notion, and I think Mr. Milgram talked about it when he was on

7    the stand, about this whole notion that come 2018, the company

8    is going to cut a check, or come 2015 it's going to -- that's

9    not what's going to happen.  The company is going to refinance

10   its debt.  And what we've heard, and if you actually look back

11   at the company's projections, they say things are going to get

12   a lot better too.

13          THE COURT:  Here's where I do get concerned.  I've got

14   nothing in this record.  Other than the very astute

15   observations of Mr. Milgram, which I credit as such, telling me

16   it's going to happen.  I mean, I have the belief that it's

17   going to happen because smart business people would do it, but

18   no one has suggested to me in these proceedings that that's

19   what's going to happen in 2018.  So I don't think I get to say

20   there will be some thing, some premium paid later on in that

21   restructuring.

22          MR. O'DONNELL:  Well, I don't think that the -- I

23   don't think that there -- again, there are no absolutes.  I

24   agree that there are no absolutes.  What I do think is that

25   even with the record that's in front of the Court, when you

1   look at the company's projections, what they issued in their

2   8K, it shows you things get better.

3          We're not disputing that they need to refinance their

4   debt.  We're not arguing that the senior structure needs to get

5   done.  We're not disputing that there needs to be something

6   either refinanced or they should work on something for 2018 as

7   well.  In fact, that's what they did in August.  They just

8   didn't do it with us.  They sat down and they talked about how

9   they're going to refinance and restructure their debts.

10         And so I'm -- I think that there is enough in the

11  Court to, at a minimum find this, going back because we're in

12  the irreparable harm context.  At a minimum, to find that the

13  notes have some value today, and that even if you were to

14  assume the -- take the evidence from the intervenor's expert

15  and say that that value is right and take the consideration

16  that's being offered to them, the value of that consideration

17  belies any notion that they're worthless pre-restructure.

18         THE COURT:  I appreciate what you're telling me, but I

19  think this is actually tangential to your argument to me.  Your

20  argument to me is the irreparable harm is the mere fact that

21  you are being forced to take equity where you want debt and,

22  more specifically, cash payments at some point.

23         MR. O'DONNELL:  Or get nothing.

24         THE COURT:  Or get nothing, yes.

25         MR. O'DONNELL:  Right.  You got it.

1          THE COURT:  So it doesn't matter.  The 2018 thing,

2    interesting but irrelevant to the argument you were making to

3    me.

4          MR. O'DONNELL:  Yes, your Honor.

5          THE COURT:  And to my hypothetical, it doesn't matter

6    to you if the equity was worth a multiple of what the debt was

7    valued at or what you're telling me because -- no, this is --

8          MR. O'DONNELL:  You're right.  You're right.

9          THE COURT:  You're telling me that any, any equity, no

10   matter how much equity, is not what you want.  You want debt,

11   and the fact that you're not getting debt is your irreparable

12   harm.  I want to understand the argument.

13         MR. O'DONNELL:  Yes, I don't think that's entirely

14   right.

15         THE COURT:  That's what you just said to me.  So tell

16   me what you mean to say.

17         MR. O'DONNELL:  Okay.  I think what I said was that we

18   can't be compelled to take equity instead of debt.

19         THE COURT:  Okay.

20         MR. O'DONNELL:  And so if they were to offer to my

21   client's a gozillion dollars of equity, my guess is they'd

22   consent to it.  And so to say that there is -- you know,

23   offering me any equity doesn't work, that's the part I take

24   issue with.

25         THE COURT:  Okay.

1      MR. O'DONNELL:  I'm not backtracking on what I said to

2  you before, which is, they can't do it without my consent.

3  They can't make me take equity without my consent.  They can't

4  do what they're doing, which is working with the secureds and

5  the majority lenders to circumvent my right to principal and

6  interest without my consent.

7      THE COURT:  Okay.  So if your client was offered the

8  rather substantial equity position and elected not to take it,

9  they could not be compelled to, that would be irreparable harm,

10  and more to the point, the valuations proposed by defendants

11  and perhaps intervenors don't matter because you, having not

12  consented to the exchange offer, you cannot be compelled to

13  take any --

14      MR. O'DONNELL:  Yes.

15      THE COURT:  -- quantity of equity?

16      MR. O'DONNELL:  Exactly.

17      THE COURT:  I understand that better now.  Thank you.

18  You mentioned Brenntag in your briefing.

19      MR. O'DONNELL:  I'm being passed a note, but I think

20  you have this, which is, just and if we don't exchange, the

21  notes go from being worth something to worth nothing.

22      THE COURT:  I do understand.

23      MR. O'DONNELL:  So I'm sorry to interrupt your

24  question.

25      THE COURT:  That's okay.  And thanks to whoever passed

1   the note.  I do understand.

2           We talked about harm because I wanted to understand

3   it, but I want to understand a little bit better irreparability

4   as well.  Brenntag is the case that you've cited to me, right,

5   for the proposition that the difficulty of establishing a

6   fraudulent conveyance means that the harm is not irreparable?

7           MR. O'DONNELL:  Ahh, yes.

8           (Continued on next page)

1      THE COURT:  Okay, so fair, I had to hum a few bars,

2   excuse me.  All right, so the issue is does your argument

3   change if -- and I'm not saying they're going to do this -- if

4   either the defendants agree or I find that they are estopped

5   from asserting the corporate veil as a defense to a fraudulent

6   conveyance action.  Your concern is you don't want to bring a

7   fraudulent conveyance action and you win and there's no one

8   there.  That's one of your concerns.

9      MR. O'DONNELL:  Of course.

10      THE COURT:  The other concern is I presume you have

11   what you perceive as a more straightforward claim now and a

12   less straightforward claim for fraudulent conveyance.

13      MR. O'DONNELL:  That's is absolutely certain.  They're

14   two different animals, two different creatures.  We have a

15   statutory right.  They as a company have conceded they're

16   violating that statutory right.  I don't think the company and

17   intervenors would concede they're guilty of fraudulent

18   conveyance.

19      THE COURT:  No.  I'm sure, yes.

20      MR. O'DONNELL:  It's an entirely different set of

21   circumstances and it's one we don't believe we should be

22   obligated to -- we shouldn't have to exchange our trust

23   indenture rights for fraudulent conveyance rights.

24      THE COURT:  Okay.  Let's talk, then, about the merits.

25   Do you believe your rights under 607 under the indenture exceed

1    in any way your rights under 316(b) of the Trust Indenture Act?

2             MR. O'DONNELL:  No.

3             THE COURT:  Given that, let's say, hypothetically, I

4    put aside 607 and put aside 316(b).  Let's say in the universe

5    we're in this does not exist.  Purely as a matter of contract,

6    is the intercompany sale valid?

7             MR. O'DONNELL:  No.

8             THE COURT:  Okay, tell me, so you have a problem with

9    either 10.06 or 9.02 of the contract?

10            MR. O'DONNELL:  Well, so 9.02, that talks I think

11   about where you can get the majority of the creditors that can

12   consent and if you go to 9.02, I think it's (h), it says that,

13   it says but not if you're going to impact 6.07.  You can't

14   impair my rights under the Trust Indenture Act.

15            THE COURT:  Let me be more clear then.  Really, sir,

16   I'm asking, put aside 607, put aside the Trust Indenture Act.

17   Really what I'm saying is does the intercompany sale otherwise

18   comport with the agreement, with the indenture?  Here's what I

19   mean by that, sir.

20            MR. O'DONNELL:  I understand.

21            THE COURT:  I want to understand your views on 10.06

22   and 9.02 and whether those, other than by operation of the

23   Trust Indenture Act, somehow prevent the possibility of the

24   intercompany sale.

25            MR. O'DONNELL:  So I would go back to, when you're

1    interpreting a contract you're supposed to harmonize all its

2    provisions so you're not rendering one superfluous and what

3    does Section 6.07 mean if you could, and maybe it's cute by

4    half, maybe it's a breach of good faith and fair dealing, maybe

5    it's Wood v. Lady Duff-Gordon, but you can't, at the end of the

6    day the goal and the point of 6.07 and the point of the Trust

7    Indenture Act is without the minority holders consent you can't

8    impair their right to payment of principal or interest and what

9    that means is you can't get an army of lawyers to come around

10   and come up with a series of transactions, you know, 10, 12,

11   whatever it is, and maybe each one of those transactions in the

12   slice is, in a vacuum, may or may not be permissible, but when

13   it is one package and it's designed to circumvent that

14   provision of the contract I don't think you can do that.

15        THE COURT:  I'm sorry, I clearly was not clear with

16   the parameters of my hypothetical because what I said was

17   setting aside 6.07, setting aside the Trust Indenture Act, is

18   there anything else in the agreement that bars the intercompany

19   sale.  That's what I was asking and I'm sorry that I've not

20   been clear in my questions.

21        MR. O'DONNELL:  So how about 6.05?

22        THE COURT:  Let's hear it.

23        MR. O'DONNELL:  "Control by majority.  Owners of the

24   majority principal amount of the then-outstanding notes may

25   direct the time, method and place of conducting any proceeding

1    for any remedy available for the trustee or of exercising any

2    trust or power conferred on the trustee.  The trustee, however,

3    may refuse to follow any direction that conflicts with law or

4    this indenture or that the trustee determines is unduly

5    prejudicial to the rights of any holder of a note that would

6    involve the trustee in personal liability."

7              THE COURT:  All right.  Let's talk about the Trust

8    Indenture Act.

9              MR. O'DONNELL:  Okay.

10             THE COURT:  And let me direct your attention to Judge

11   Kram's decision in UPIC.  Do you agree with her analysis that

12   Section 316(b) essentially distills to prohibiting use of an

13   indenture that permits modification by majority holder vote of

14   any core term of the indenture?

15             MR. O'DONNELL:  No.  I think when you're interpreting

16   indenture, you interpret each indenture by its provisions so

17   it's done on a case-by-case basis.  I think that if the point

18   that the intervenors and defendants are relying upon with UPIC

19   is that it's a legal right not a practical right, we say in the

20   reply papers, we agree that you are -- the Trust Indenture Act

21   doesn't guarantee payment but it does prohibit people from

22   structuring the transaction to guarantee it won't get paid.

23             THE COURT:  Are you arguing me on Mechala -- I'm back

24   a few steps.  I'm back on UPIC.

25             MR. O'DONNELL:  I'm sorry.  Go on, your Honor.

1          THE COURT:  My point is, another focus of the UPIC

2     decision, sir, was its belief, the Court's belief that Section

3     316(b) prohibited modification of core terms, and so it's the

4     core terms that I'm focused on, sir.  Maybe your position is,

5     and you can tell me if this is it, that any provision of the

6     indenture cannot be impaired, but I read 316(b) to be core

7     terms.  I want to say do you agree with that?

8          MR. O'DONNELL:  No -- I'm sorry.  I agree with that.

9          THE COURT:  You're thinking ahead sir.  It's okay.

10     You have to go back with me.  What, then, is a core term as you

11     conceive of it?

12          MR. O'DONNELL:  Rights to receive payment in

13     principal, principal and interest.

14          THE COURT:  On that theory to you, therefore, the

15     guarantee is a core term.

16          MR. O'DONNELL:  On that theory the guarantee could be

17     a core term.  Again, this is where it's very difficult to look

18     at any particular term in a vacuum.  You have to look at the

19     overall structure and so if you were to try and say -- again,

20     this is where I was trying to answer your question before and

21     if I didn't, I apologize.

22          THE COURT:  Stop apologizing.

23          MR. O'DONNELL:  My mom raised me that way.

24          The point is that what the Trust Indenture Act was

25     intended to guard against and what we believe 607 and the

1    indenture was intended to guard against was exactly what

2    happened here.  That you have a majority of creditors at the

3    exclusion of the minority who are deciding what's best for the

4    minority and that that's not what -- the Trust Indenture Act

5    was designed to guard precisely against that.  So it's not a

6    question of whether or not the release of one guarantee fixes

7    things.  It's a question of does the proposed restructuring, is

8    it signed in such a way and that we're never going to get our

9    principal or interest and they admit that it is.

10            THE COURT:  Let me try a slightly different way, sir.

11   Let's imagine that the Second Circuit agrees with the UPIC

12   Court that 316(b) prohibits modification absent consent of core

13   terms.  And so it seems to me, sir, you have two arguments with

14   respect to the guarantee.  All right?  One of them is that the

15   guarantee is itself a core term.  Maybe.  That's what I'm

16   asking the question about.  The second is, if it's not a core

17   term I presume you're going to argue Mechala to me, Judge

18   Baer's decision, and say that it goes to the practical ability.

19   So even if it's not per se a core term it is important because

20   the guarantee ensures your practical ability to obtain receipt.

21            So I want to know, it's really a much simpler question

22   than my initial question suggested, now that we've defined what

23   a core term is, is the guarantee a core term in this agreement?

24            MR. O'DONNELL:  I think the answer is yes.

25            THE COURT:  Okay.

1          MR. O'DONNELL:  I want to be clear that the mere fact

2     that it's a core or important term, it doesn't necessarily

3     mean, depending how an indenture is written and depending on

4     what the structure is that's at issue, whether or not it could

5     or could not be released consistent with the Trust Indenture

6     Act.  It's the overall package that really dictates whether or

7     not it's lawful.

8          THE COURT:  All right.  But again, sir, my read of

9     316(b) suggests that I'm not able to prohibit everything.  I'm

10    able to prohibit certain things and it seems to me if the

11    provision is a core provision to which, a core term, excuse me,

12    if the provision that you're challenging modifies a core term

13    and without your consent, okay, I get to do something about it.

14    Separately what you focused on is the Mechala decision which

15    really doesn't focus on core or non-core, it basically says,

16    look, if this interferes with our ability to obtain payment

17    that's enough and that implicates 316(b).  Really, what I'm

18    trying to say is under which theory would you like to proceed

19    or are you going under both?

20         MR. O'DONNELL:  Both, because I don't think that under

21    UPIC if the Court actually said if this happens I don't think

22    there was a record that you're never going to get paid.  It was

23    a subordination agreement in a vacuum so in that set of

24    circumstances it may or may not have been okay.  Our situation,

25    yes, I do come back to Mechala, is that it's very different.

1   It's the totality of what's being done and that the law doesn't

2   let people be too cute by half.  That's -- you can't, I guess

3   you can, you shouldn't be permitted to hire a team of lawyers

4   and come up with some cute way to get around the core issue

5   that the Trust Indenture Act was intended to protect, which is

6   principal and interest.

7            THE COURT:  All right, let's follow on that point.

8   Because one could argue that a problem with Mechala is that

9   there's not much of a way of a limiting principal so I

10  certainly appreciate you're going to say whatever it is it

11  covers our case.  I get that.  But the point is, I'm trying to

12  understand what is the living principle because if I go this

13  route I should be able to articulate one.  There is a set of

14  facts that Judge Baer had before him and he made the

15  determination.  Any number of judges could have any number of

16  facts of greater or lesser egregiousness and I don't know that

17  it would be appropriate for them to all invoke the same thing.

18           What I'm trying to understand is what is the limiting

19  principle that would say to someone like me, I don't know, this

20  acquisition is a little risky, better not go through with, it

21  let me stop you.  What can I use as the limit?  You sort of

22  argued a too clever by half principle and that's great, it does

23  require me to do a little bit of digging into the minds of the

24  other side.  That's great.  But I'm not sure that's

25  appropriate.  What can I use to give myself confidence that

1    Mechala will not be expanded to beyond where it was designed to

2    be?

3              MR. O'DONNELL:  Judge Baer actually answered that

4    question in Greylock.  Greylock it was another Trust Indenture

5    Act violation, except there it was not enjoined because at the

6    end of the day there wasn't a finding that they were never

7    going to get paid.

8              THE COURT:  And that's what I should be concerned

9    about?

10             MR. O'DONNELL:  That's what the Trust Indenture Act

11   says.  You can't impair the right to payment or principal, and

12   so, yeah, cases are hard, and there will continue to be burdens

13   on the Court.  There may be other hearings where you have to

14   determine whether or not this particular set of circumstances

15   makes it clear that as a result, as they say in their offering,

16   of this exchange you will not be getting your principal or

17   interest.  And so I think that is the determining factor and

18   the same judge applying the same act came out with two

19   different results between Greylock and Mechala.

20             THE COURT:  And you're saying the principal factual

21   difference is the ability to get paid?

22             MR. O'DONNELL:  Yes.

23             THE COURT:  I should use that as a limiting principle?

24             MR. O'DONNELL:  Yes.

25             THE COURT:  There was a lot of discussion yesterday on

1   what one might call the exclusion of plaintiffs and one might

2   call the non-participation of plaintiffs in the process of

3   setting up this restructuring.  Under what prongs of the

4   preliminary injunction analysis would you like me or do you

5   think I should be considering those facts?

6           MR. O'DONNELL:  I think it's more color than

7   substance, candidly.

8           THE COURT:  Yes, but we had an awful lot of color

9   yesterday.

10          MR. O'DONNELL:  We did, and a lot of witnesses, by the

11  way, in one day.  It was very impressive.  So at the end of the

12  day, "posturing" is probably the wrong word, but there's been

13  this attempt on the other side to paint us as the opportunists,

14  right, and the response to that is you sort of have no one but

15  yourself to blame because of the approach you took here.  At

16  least with regard to Marblegate they were knocking on the door,

17  they were trying to engage, they had experience with ATI, they

18  wanted to be part of the process and people said no thanks.

19  And then they said this is what you get, take it or leave it.

20  Sorry if you don't like it.

21          And so, if you have to put it in any one of the three

22  categories my guess is it would go in the equities category,

23  although Magnolia, I'll confess, I don't think was pounding on

24  the door to participate at the same level that Marblegate was

25  asking to.  They still have the same rights.  They still have

1    the right, and that actually goes to the unknowns as well.  And

2    that's actually -- and Courts have talked about this, right?

3    There's a case in Delaware I think Caspian, where the Court

4    opined, yeah, we recognize there's a possibility for

5    opportunists, hedge funds, sophisticated investors, they might

6    come in and buy and try to capitalize on the implications of

7    the Trust Indenture Act to buoy up what they would otherwise

8    receive.

9         First of all, that's not what we have here.  We have

10   people who bought back in, that started looking at the debt in

11   September of 2012.  The first purchases by Marblegate was in

12   January of 2013 and the first purchases by Magnolia was in June

13   of 2013 and the investment papers we produced and given to

14   them.  It's clear at the time they did that they thought the

15   company was doing swimmingly well, certainly enough that it had

16   a free cash flow that it was going to refinance because these

17   notes get more expensive over time.  So everybody did expect

18   that the paper was going to get refinanced.  But they didn't do

19   it because they were hoping to be here.  In fact, I think

20   there's some criticism for how long it took for us to run into

21   court.  It's a desire to avoid this, not that I haven't enjoyed

22   it.

23        So where you factor in or the relevance of people

24   being excluded from these conversations, I guess it goes

25   towards the equities, although I don't really think it's

1   dispositive.  In everything you have to consider I'm not so

2   sure that's one of the major elements.

3           THE COURT:  Okay, thank you.  Let me just ruminate

4   aloud for a moment because I get on occasion to do that.

5   Because I think Mr. Srivastava would gladly have foregone

6   cross-examination by Mr. Robbins if only the defendants said

7   okay, yeah, they didn't get to participate.  That's fine,

8   you're right, that's okay, we enjoyed that part of the

9   proceedings nonetheless.

10          All right, let me take some time to talk to folks in

11  the back table and then I'll talk to you again.

12          MR. O'DONNELL:  Thank you very much for the time.

13          THE COURT:  Thank you.

14          MR. KLEINHAUS:  Good afternoon, your Honor.  Emil

15  Kleinhaus from Wachtel Lipton.  Two points, if I might.  One is

16  to echo what Mr. O'Donnell said.  On behalf of the company, the

17  CEO, the CFO who are sitting here, this is obviously as you've

18  heard, an immensely important event for the company and without

19  making any comments about the merits for about two minutes I

20  just want to convey to your Honor the company's appreciation of

21  for the huge amount of work you put into this.  It's really

22  important to the company and we're glad to have a judge who is

23  digging into it in the deep way you have.  So thank you.

24          The second point is there were a number of things Mr.

25  O'Donnell said that I would like to respond to.  I would be

1    happy to take it in any order you would like.

2            THE COURT:  I listened very carefully to Mr. West,

3    Mr. Hannan, and they were quite vocal in expressing to me their

4    concern that they do all within their power to avoid

5    bankruptcy.  Mr. Hannan said basically all right, if this fails

6    you're going back to the blackboard is what I heard him say.

7    And I didn't have, I don't think there is a suggestion that the

8    secured lenders in this case are anxious to force the company

9    into bankruptcy or to foreclose on the assets.  So that's the

10   concern I have.

11           I'm presented with a range of options that the parties

12   could do and actions that they might take and so in your

13   initial papers to me I think there was a suggestion, look,

14   Faila, if you don't stop this crazy request for injunctive

15   relief, if you actually enjoin this transaction, bad things

16   will happen and here they are.  Instead, I think it's much more

17   uncertain.  So I want to understand the impact or the legal

18   import of that uncertainty.  That's what I'd like to know.  How

19   does that affect my analysis, particularly on the balance of

20   equities in the public interests?

21           MR. KLEINHAUS:  Sure.  Let me just start by saying I

22   think your Honor should and does under Second Circuit law need

23   to consider the balance of equities.  There is this tension

24   between the Winter decision and the Citigroup decision in the

25   Second Circuit.

1          THE COURT:  It's more than a tension.

2          MR. KLEINHAUS:  That tension primarily goes to this

3    question of whether some serious question on the merits can be

4    an alternative route when the equities are decidedly in the

5    plaintiff's favor.  Since the Citigroup decision and we cited

6    this case in our brief in the Otoe-Missoria decision from just

7    a month ago the Second Circuit said very plainly as the Supreme

8    Court reaffirmed in Winter, a plaintiff seeking a preliminary

9    injunction must demonstrate not just that they have some

10   likelihood of success on the merits and will suffer irreparable

11   harm, absent an injunction, but also that the balance of

12   equities tips in its favor and an injunction is in the public

13   interest.

14         THE COURT:  Sir, my concern about cases like that is

15   those cases are sort of the traditional public regulation,

16   public importance, things of that nature as opposed to the

17   instant business dispute.  So I wonder, you know, whether

18   Winter -- look, Winter says what it says, but you could make

19   the argument if you're the Second Circuit that Winter is really

20   sort of limited to these sort of public interest-y questions as

21   opposed to cases like this.  Because I have difficulty, as you

22   might imagine, reconciling Winter and Citigroup.  And

23   Citigroup, it's not a situation, because I thought it might be,

24   where the Second Circuit just forgot to address it.  They got

25   into it and gave the back of their hand.

1          MR. KLEINHAUS:  I don't believe I'm going to be able

2    to fully reconcile those cases for you.  There have been a

3    number of cases from Courts to try to reconcile the decisions;

4    the Winter decision, the Citigroup decision, there's a pretty

5    recent Eastern District decision as well Golden Krust Patties

6    v. Bullock that notes this tension and also finds that you do

7    have to consider the balance of the equities following Winter.

8          We think the better view of the case law is you have

9    to consider the balance of equities and the Otoe case stands

10   for this.  That's just a preliminary point as to the standard.

11         In response to your Honor's comment, the company's

12   position is not that if this deal is enjoined the next day

13   there will be a bankruptcy filing.  I think the evidence is

14   quite clear that a bankruptcy filing would not be in the best

15   interests of this company.  What the company I think has

16   presented in its evidence, including Mr. West's declaration, is

17   that there's a wide range of outcomes here and possibilities

18   other than a bankruptcy which could lead to extremely adverse

19   consequences very quickly in a world in which the regulators

20   and the students don't know that this company has a clear path

21   to financial survival.  So, for example, one thing that could

22   happen is the company currently has a 15 percent letter of

23   credit requirement which a massive amount of money.  It's

24   $300 million.  The Department of Education can change that

25   requirement at its discretion and it may well change that

1    requirement.  We're loathe to predict exactly what regulators

2    are going to do, but they have the discretion to do that and

3    clearly they have an interest in protecting students, including

4    by making sure there's a financial wherewithal on the part of

5    the company to deal with an adverse situation.

6         There are a range of regulatory consequences Mr. West

7    spoke to in his declaration and on the stand yesterday that

8    putting aside a bankruptcy could be extremely adverse for this

9    company.  In addition to the regulatory consequences --

10        THE COURT:  Let me stop you on the regulatory

11   consequences.  I've heard and appreciated everything you said,

12   but in terms of actual evidence in the record before me what I

13   have is discussion by Mr. West of the sheer number of

14   communications he's had to have with the various regulators and

15   the accrediting bodies about the continued progress of the

16   schools at issue.  I also have, and no one is disputing, nor

17   can anyone at this point refute the fact that the Corinthian

18   College agreement with the Department of Education where the

19   Department of Education is trying to keep afloat a company

20   whose principals engaged in fraud.  So what I'm saying is, I

21   don't doubt that anything can happen and one of those things

22   could be the letter of credit, but no one has given me actual

23   evidence telling me that that is likely to happen or that

24   that's maybe even a serious concern that I should have.  Maybe

25   you can help me on that.

1          MR. KLEINHAUS:  A few points.  First of all, I think

2     the burden is on the plaintiffs, but putting that aside I think

3     what there is evidence of is, and this is in the West

4     declaration --

5          THE COURT:  Just to that last point.  Mr. O'Donnell is

6     patting himself on the back for having put in that Corinthian

7     College article.

8          MR. KLEINHAUS:  Let me say something about Corinthian,

9     then.  We through Mr. West have put in substantial evidence

10    about the range of regulators that this company has to deal

11    with; the myriad of ways that any one of those regulators, on

12    the state level, the creditors, the DOE, can take action that

13    is extremely adverse to the company.

14          The only response in the trial yesterday in response

15    to all that evidence about the regulatory context in which this

16    company operates is the Corinthian example.  And what is the

17    Corinthian example?  That is and example where they did

18    basically a runoff of those colleges.  Now, Mr. West had

19    testified earlier so I didn't get a chance to ask him on the

20    stand do you think that's a good outcome for students, but I

21    don't think you need to have a PhD in education, it just as a

22    matter of common sense, Corinthian is a terrible outcome for

23    students.  People are stuck in schools that are in rundown.

24          THE COURT:  They're stuck in a school that's not going

25    to be there in a couple of years.

1          MR. KLEINHAUS:  It's a disaster.

2          THE COURT:  Sir, to your most recent point I

3   understand what you said, but to your point there being no real

4   response, I would argue, sir, that the response is that

5   Mr. West has laid out all of the contingencies and all the

6   concerns, and largely as a result of his very good work none of

7   these things have happened yet.  I'm not saying he should let

8   one of these things happen just to help your case but you see

9   what I'm saying.  There were many contingencies.

10          MR. KLEINHAUS:  There are contingencies, but there is

11   evidence in the sense that there's evidence of what's already

12   happened and what's already happened, number one, the company's

13   under provisional certification from the Department of

14   Education, that's in evidence and that has various

15   consequences.  The company has to post a massive letter of

16   credit by virtue of its financial condition.  In Mr. West's

17   declaration he provides a number of specific examples of state

18   regulators that have come to the company and said you need to

19   show us that your licensing is appropriate in light of the

20   current situation.  So there is evidence in the record as to

21   what regulators have done in the situation where there's no

22   injunction and people think there's a path forward here.

23          So based on the evidence that's in the record as to

24   regulatory responses prior to any possible injunction in a

25   situation where the company is working to deal with 98 percent

1    of its creditors to deal with its debt load, that evidence

2    certainly permits an inference as to the level of risk this

3    company faces in a situation where this restructuring is

4    enjoined, or derailed or halted for any period of time.

5            THE COURT:  Okay.  Talking about the various factors

6    for a preliminary injunction.  I gave hypos to Mr. O'Donnell,

7    I'll give them to you.  Remember, this is not indicative of

8    anything other than my desire for an answer to this

9    hypothetical.  If the plaintiffs were to demonstrate

10   irreparable harm, if they were to demonstrate a likelihood of

11   success, would you still argue that I should deny the

12   preliminary injunction because the balance of equities here in

13   your estimation just dwarfs both of those two other prongs?

14           MR. KLEINHAUS:  Clearly we disagree with those if's.

15   The answer, putting aside those if's, is absolutely yes.  Based

16   on the Supreme Court's decision in Winter, to the extent

17   there's been substantive case law which we talked about a

18   little bit earlier, we do believe that's an element of an

19   injunction case the plaintiffs have to make and based on the

20   evidence we already discussed a bit we think the evidence on

21   that issue is quite one-sided.

22           THE COURT:  Okay.  Let me then understand your views

23   on irreparable harm.  There's been a suggestion, there's been

24   an argument that the conversion of debt to equity without

25   parties' consent is harmful and indeed it's irreparable because

1     you don't have what you bargained for.  Why don't you respond

2     first to that proposition, please?

3          MR. KLEINHAUS:  I will and take a very small step in

4     doing that, which is to come back to what your Honor said about

5     a lack of evidence regarding anything but one or two interest

6     payments.  I agree with that.  What the record has shown at

7     this trial is that the only evidence in the record as to what

8     these plaintiffs might receive and might receive is one or two

9     interest payments.  That's $1.5 million or $3 million.

10         The evidence beyond that is overwhelming that they

11    will not likely get paid.  We have the CFO affidavit which says

12    that the company has no way to pay its debt in July, including

13    refinancing its debt.  They have no way to meet its

14    obligations, that includes refinancing.  We have the expert

15    testimony as to the company's value which is undisputed.  We

16    have Mr. Hannan's report which says that in a situation where

17    this deal can't go forward a very likely scenario is some kind

18    of organized sale process where secured lenders would have

19    priority to the cash that results from that process.  So

20    there's really no dispute here that the harm that we're talking

21    about is a harm at most $3 million.  And that really does

22    reorient this proceeding.

23         Because what the plaintiffs are asking you to do is

24    enjoin a $1.5 billion transaction for really a $1.5 million

25    potential interest payment that the CEO of the company said he

1  didn't know would even be made because of the uncertainty that

2  would result from an injunction.  There's a huge disparity

3  there.

4          As to that $1.5 million a few points.  Number one,

5  that $1.5 million that the evidence showed yesterday is

6  indisputably below the value of the equities that these hedge

7  funds would receive should they exchange.  That was that math

8  exercise with Mr. Kearns.

9          THE COURT:  I saw that.  I'm just wondering whether

10  I'm in the best position, whether I'm really supposed to be

11  arguing a hypothetical value of the equity versus -- given all

12  these uncertainties and what if they just want the debt?

13          MR. KLEINHAUS:  Well, number one, the evidence in the

14  record is they may not have even gotten one interest payment.

15  That one interest payment is $1.5 million.  These funds have

16  taken equity in other deals, they're distressed debt investors

17  so it's not like it's anathema to them.  They decided in this

18  situation they don't want it.

19          THE COURT:  Right, that's the point.  This is the

20  exchange Mr. O'Donnell and I had to make clear to me was the

21  fact that it had to be with their consent.  So we had our

22  discussions about whether it was wise or unwise to take equity

23  or debt.  He's saying if his guys want debt they should be

24  entitled to it.

25          MR. KLEINHAUS:  The answer to that, your Honor, is

1    putting aside the very modest hypothetical harm that we're

2    talking about, the flip side is no one is forcing them to do

3    anything.  If they don't want to take this deal despite

4    economically it being a good deal they can hold out.

5           THE COURT:  Okay.  But wait a minute.  They hold out,

6    right, the intercompany sale goes into effect, some of the

7    assets are by and large transferred away.  Can we assume

8    there's not going to be enough left in the company to pay these

9    interest payments?  You're not going to leave behind just

10   enough for one or two interest payments?

11          MR. KLEINHAUS:  This goes to the issue of an adequate

12   alternative remedy at law and the fraudulent conveyance issue.

13   Your Honor made a comment about veil piercing.  Fraudulent

14   conveyance claim is by definition a claim against the

15   transferee.  The transferee here is an entity that's going to

16   be an EDMC entity with much less leverage.  That's a better

17   defendant for them than the current defendant.

18          THE COURT:  I want to be sure I understand that

19   because let's, we can talk in a moment about whether they would

20   rather have this Trust Indenture Act claim right now before me

21   or a fraudulent conveyance claim in a couple of weeks.  But

22   fraudulent conveyance claim, they're going to file it against

23   EDMC the parent, right?

24          MR. KLEINHAUS:  I think they would file it -- I don't

25   know, it's their claim.  I think if they were going to file a

1   claim they would file it against the entities that receive

2   assets which are new EDMC entities.

3        THE COURT:  And is the company going to put up any

4   veil stipulations?  Here's the concern.  I want to be sure,

5   because you're telling me that this is an option they have,

6   that this is an option they have.

7        MR. KLEINHAUS:  I don't think veil piercing is really

8   relevant and the reason is because the defendant in a

9   fraudulent conveyance claim is the entity that gets the assets.

10       THE COURT:  Can I estop the defendants from asserting

11  certain defenses to insure that the claim you're telling me

12  they have is a claim that they have?  I'm not saying they're

13  going to win on it.  I can't estop, I can't estop you from

14  defending against, it I just want to know it's going to be cold

15  comfort to them to be told they have this claim to try to

16  present it and then you go oops, you're told you can't because

17  of these procedural bars.  I'm trying to understand how you can

18  give me comfort that they would have a claim, not talking --

19  I'm not talking about the merits.  I'm not talking about you

20  rolling over.  I'm talking about making sure they have a fair

21  chance to raise it.

22       MR. KLEINHAUS:  I think the comfort I can give you to

23  the extent I can give comfort is that there is a whole set of

24  rules that govern fraudulent conveyance claims that are laid

25  out in the New York debtor/creditor law, Pennsylvania

1    debtor/creditor law, I don't know which law would apply, that

2    sets out who can be sued on a fraudulent conveyance claim.

3         These plaintiffs in their letters to the company have

4    said we have a strong fraudulent conveyance claim.  We're going

5    to bring it in the event that this transaction goes through.

6    The Supreme Court of the United States in the Grupo Mexicano

7    case has said that fraudulent conveyance law is the appropriate

8    tool to deal with situations in which a debtor is not paying

9    its debts.  That makes sense because --

10         THE COURT:  You'll excuse me for smiling.  My husband

11   worked on that case for many years.

12         MR. KLEINHAUS:  Fraudulent conveyance laws, unlike TIA

13   316(b) it's 400 years old.  It's in all 50 states.  It sets

14   forth a set of established rules that govern exactly the type

15   of harm that the plaintiffs are alleging here, which is when is

16   it that it's inappropriate to move assets and therefore

17   frustrate an ability to pay.  That's what fraudulent conveyance

18   law deals with.  That is not what TIA 316(b) deals with.

19         I won't move this second to a discussion of the merits

20   because I want to keep the discussion organized.  Our point on

21   fraudulent conveyance law is that under the case law, and

22   Brenntag I think is a different case because Brenntag involves

23   a situation where the claim was much more difficult, much less

24   simple.  Our position, for the reason I just laid out, is that

25   a fraudulent conveyance claim is actually the much simpler,

1    straightforward, claim because fraudulent conveyance law deals

2    with the harm they're talking about.  TIA 316(b) doesn't set

3    forth any rules for this kind of action because that's not the

4    purpose of Section 316(b) of the TIA.  So what we have here in

5    a situation is fundamentally what they've been asserting all

6    along is a fraudulent conveyance claim, because as Grupo

7    Mexicano says and as reflected by the large body of law

8    governing fraudulent conveyances, there's nothing new about

9    this kind of harm, alleged harm and there's nothing new about

10   the rules to deal with this kind of harm.  If they want to

11   bring a lawsuit instead of exchanging, and I would just

12   emphasis again they can still exchange but if they want to

13   bring a lawsuit instead of exchanging --

14            THE COURT:  Just to that point, sir, if they exchange

15   are they foreclosed from bringing the fraudulent conveyance

16   lawsuit?  Yes.  Right?  No, if they participate in the exchange

17   they can still bring a lawsuit.  Yes?

18            MR. KLEINHAUS:  If they participate --

19            THE COURT:  I'm going to try this -- I'm not being

20   fair.  One can make the argument that by participating in the

21   exchange it's almost like an accord in satisfaction, they've

22   acceded to your wishes and they can't then act to erase the

23   fraudulent conveyance claim.  Seems to me if I deny the

24   injunction and they don't participate and the intercompany sale

25   takes place they got a fraudulent conveyance claim or not as

1    the case may be, if they participate in the exchange offer.

2           MR. KLEINHAUS:  No, because I think they would be

3    releasing the claims.

4           THE COURT:  That's what I figured.  All right.  My

5    concern there, sir, is what you're really asking me to do is to

6    tell the plaintiff that you have a choice between accepting

7    less money which, you know, in a quiet moment you admit this

8    intercompany sale would result in or the exchange offer, excuse

9    me, would result in, or risking no money at all if the

10   fraudulent conveyance claim fails, yes?

11          MR. KLEINHAUS:  I'm sorry, I didn't understand that.

12          THE COURT:  I'll try again.  There seems to me to be a

13   difficulty in establishing fraudulent conveyance claims if

14   you're not going to stipulate that they have established one.

15          MR. KLEINHAUS:  We are not.

16          THE COURT:  Is it not, therefore, a harm and we'll

17   talking about whether it's irreparable in a moment, to force

18   the plaintiffs to choose between accepting less money by

19   participating in the exchange or getting no money and taking

20   their chances with the fraudulent conveyance action if they're

21   subject to the intercompany sale?

22          MR. KLEINHAUS:  It's only a harm if you take the point

23   of view that you look beyond the economics of this exchange so

24   that you look beyond the fact that were they to exchange they'd

25   be getting something that according to the undisputed evidence

1    is worth more than $1.5 million of potential interest.  If you

2    look beyond that, there's a potential harm in the sense that

3    they're saying that they would prefer to have debt rather than

4    equity despite in other deals taking equity.  So our view on

5    this is there is no harm here because they're given a choice to

6    take something that has more economic value in the form of the

7    exchange.  The only thing they're pointing out in response is,

8    frankly, an extremely subtle harm in the form of a hedge fund

9    having to take equity which they can then sell.

10             THE COURT:  By subtle you mean not irreparable.

11             MR. KLEINHAUS:  Not irreparable and extremely minute

12   in terms of holding up this deal.

13             THE COURT:  Let's talk about the likelihood of

14   success.

15             MR. KLEINHAUS:  Yes.  Mr. O'Donnell said -- I don't

16   know if he called it a layup.  We could not disagree more

17   strongly with that.

18             THE COURT:  Which part of that, sir?

19             MR. KLEINHAUS:  That there's some sort of a layup or

20   slam dunk on the likelihood of success on the merits.

21             THE COURT:  He has to.  That's why they're here.

22   That's fine.  We're all entitled to our positions.  That's

23   fine.  This guarantee, I got to tell you as a judge, because as

24   you know I'm not a business person, there's something somewhat,

25   I'll use the term offensive but maybe that's too strong, about

1    having a document that says here's a guarantee and we got to do

2    this for people, regulators, government folks, but assign no

3    value to it.  I don't know what -- I know what the words mean,

4    I don't know what that means.  I find it unusual and odd that

5    you can say you have a guarantee but you should assign no value

6    to it.  Because I don't think, I don't think you are saying it

7    can be revoked at any time.  You gave only specific

8    circumstances under which it can be revoked or released which

9    suggested it had some value at some point.

10            MR. KLEINHAUS:  In terms of the specific circumstances

11   where it could be revoked and released, there's a provision of

12   the agreement here which has gotten in a day and a half here

13   virtually no play but it's absolutely critical, which is

14   10.06(a)(2) of the indenture.

15            THE COURT:  We're getting to it, but okay.

16            MR. KLEINHAUS:  The provision which, the version of it

17   in the offering circular was shown to Mr. Milgram yesterday,

18   that provision was in the original indenture and what that says

19   is that if the secured creditors have a guarantee from a

20   certain entity and they choose to release that guarantee then

21   the unsecured guarantee from the same entity is automatically

22   released.  That is a contractual limitation on whatever right

23   to payment they had that was agreed in the indenture.  Now --

24            THE COURT:  Wait, wait.  Are you going to suggest to

25   me that you could waive in advance your 316(b) claims by

1     entering into a document that basically waived your 316(b)

2     claims?

3          MR. KLEINHAUS:  It's not a waiver of a 316(b) claim

4     and the reason it's not a waiver is what 316(b) on its face

5     protects is the right to receive payment.  How does one define

6     the right to receive payment?  That right is defined in the

7     indenture, all of the terms of the indenture.  The Second

8     Circuit in the Bank of New York v. First Millennium case spoke

9     to this issue.  It said -- could you put it on the screen,

10    please?

11         THE COURT:  Really?

12         MR. KLEINHAUS:  Drop it.

13         THE COURT:  No, no.  He's paid to have it here.  Go

14    ahead, put it on the screen.  I will have a look.

15         MR. KLEINHAUS:  What the Second Circuit in the Bank of

16    New York said --

17         THE COURT:  Not only the Second Circuit, but Judge

18    Lynch, probably the smartest judge in the Second Circuit.  Just

19    letting you know.  Go ahead.

20         MR. KLEINHAUS:  Nothing in the section 316(b) or the

21    TIA in general requires that bond holders be afforded absolute

22    and unconditional rights to payment.  In the UPIC case Judge

23    Kram said something very similar but more expansive.  What she

24    said there is, the substance of the right is not changed by

25    316(b).  The parties negotiate the substance of the right.  So

1    what 316(b) does is protects the right of the negotiations in

2    the indenture.

3          THE COURT:  The reason I want to go back to this is

4    because I had a debate with my clerk about this very point and

5    maybe I'm the only one.  So maybe I -- let me understand,

6    you're saying 316(b) is what it is.  You're saying a party with

7    full knowledge goes into an agreement, looks at it and sees

8    perhaps there's some limitation or some retrenchment of what

9    would otherwise be the rights available to him under 316(b) and

10   with that knowledge actually enters into the agreement, they

11   cannot thereafter raise a 316(b) claim.

12         MR. KLEINHAUS:  Absolutely, because the scope of the

13   right has been defined.  Number one, and, number two, the party

14   has consented.  The scope of the right and 316(b) on its face

15   only protects the right to receive payment if the scope of the

16   right is defined in the indenture, as Judge Kram discussed, as

17   the Second Circuit discussed up front, that's all the right is.

18         I want to transition to a very important related point

19   here but it's right on the same issue.

20         THE COURT:  Okay.

21         MR. KLEINHAUS:  Can you put on the slide that shows

22   the --

23         VOICE:  We have a technical issue.  We can't pop it up

24   without a switch being flipped.

25         THE COURT:  All right, so the answer is no, but don't

1    worry.

2            MR. KLEINHAUS:  The Bank of New York case, the Second

3    Circuit case, is an extremely interesting case that applies

4    here.  In Bank of New York the relevant provision that dealt

5    with protection of payment said, "Notwithstanding any other

6    provision in this indenture each holder of a note shall have

7    the right which is absolute and unconditional."  That's Bank of

8    New York.

9            THE COURT:  Okay.

10           MR. KLEINHAUS:  Now, I would note also that in the

11   Mechala case, and we can talk more about that, footnote five in

12   the Mechala case speaks or summarizes, quotes the indenture

13   language there.  It's the same thing.  In Mechala the

14   plaintiffs, the note holders negotiated for language that said

15   this right is absolute and unconditional.  Now, what the Second

16   Circuit in Bank of New York also said is that's not the TIA.

17   The Second Circuit distinguished this language from TIA.  What

18   the FDIC argued in Bank of New York was you can disregard this

19   provision because it's just boilerplate TIA 316(b provision.

20   What the Second Circuit said is, no, it's not, because TIA

21   316(b) does not guarantee absolute and unconditional rights.

22   TIA 316(b) you can have a right that's not absolute and

23   unconditional.  That's in the indenture and Mechala also has

24   this absolute and unconditional language.

25           In our indenture, as Mr. O'Donnell acknowledged, all

1      they negotiated for is the 316(b) protection, 6.07.  So under

2      UPIC, under Bank of New York and just under the common

3      understanding of what a right is, having negotiated in the

4      original indenture for a right and that right being defined in

5      the indenture to include the limitation in a situation where

6      the secured creditors decide to release their guarantee, that's

7      embedded in the right.  That's consented to.  It makes no sense

8      to say that years later somebody can say, wait a second, 316

9      bars exactly what the original indenture committed the secured

10     creditors to do.

11              THE COURT:  So you're saying 316(b) does not speak to

12     and therefore does not bar ex ante consents to limitations on

13     one's right to receive payment of principal or interest?

14              MR. KLEINHAUS:  Absolutely not.  UPIC said this

15     squarely.  It says 316(b) does not affect or alter the

16     substance of a note holder's right.

17              THE COURT:  Yeah, I mean, I imagine Mr. O'Donnell is

18     going to say no, I mean, that particular provision, that

19     restricted ex ante is just simply invalid.  If the idea of the

20     Trust Indenture Act is that you do not want the majority to

21     tyrannize the minority, the notion that you could sort -- of

22     I'm going to use the term "subvert" but I don't mean it in a

23     bad way -- subvert that by agreeing at the outset to allow this

24     to happen, you think it's okay.

25              MR. KLEINHAUS:  I don't think it's subverted because

1    that's not what the parties contract to.

2         THE COURT:  If there were a provision that said a

3    majority of note holders can delay an interest payment by

4    twelve months, that speaks to the timing of an interest

5    payment, correct?  Yes, right?  Work with me on this.  Right?

6    Majority of note holders can delay an interest payment by 12

7    months if they agree to do it.  That's in the indenture.  Now,

8    that's clearly a provision that under the UPIC core terms would

9    be a core term and it does seem to track 316(b)'s language

10   about interest payments.  You're saying if that's the case they

11   can do it.

12        MR. KLEINHAUS:  I'm not saying that.  This is exactly

13   where you get to the core/non-core distinction, your Honor.

14   The statute on its face by protecting the right to payment

15   protects what it is under state law that comes to right to

16   payment which is certain amount, certain times as defined in

17   the indenture.

18        THE COURT:  I was waiting for someone to tell me this.

19   Your view of core, right, and I've read a bunch of Law Review

20   articles that said the same thing, your view of core is core

21   terms are interest amounts, principal amount, date.  Correct?

22        MR. KLEINHAUS:  Those are core terms, yes.

23        THE COURT:  Anything else?

24        MR. KLEINHAUS:  I don't know.

25        THE COURT:  Guarantee?

1          MR. KLEINHAUS:  Certainly not the release of a

2     guarantee.  Because it's ubiquitous in corporate finance to

3     have situations where secured creditors can release unsecured

4     creditor guarantees.  We have actually had an expert that said

5     this.  I know they think some of it's a legal conclusion.  He

6     put together a survey.  This is no legal conclusion.  He put

7     together a survey showing that the vast majority of the

8     corporate finance market for high yield bonds has provisions

9     that permit releases of unsecured guarantees by secured

10    creditors.

11          THE COURT:  Okay.  I wanted to talk to you about

12    10.06.  I think some of our questioning may have been subsumed

13    to this.  Let me confirm this with you.  Under your reading of

14    10.06 what percentage of the secured creditors is required to

15    release the parent guarantee of the unsecured creditors?

16          MR. KLEINHAUS:  We think it's a majority.

17          THE COURT:  Where does it say that?

18          MR. KLEINHAUS:  I think I have to consult with a

19    colleague to get the exact number.

20          THE COURT:  Please do.

21          (Pause)

22          MR. KLEINHAUS:  Your Honor, just to be clear about

23    this.  The indenture doesn't speak in terms of what is required

24    in the secured credit.  The indenture just says if the secured

25    creditors release it.

1          THE COURT:  Yes.  I totally understand.  That's

2     exactly why I'm asking the question.

3          MR. KLEINHAUS:  We're looking for the provision that

4     in the secured document that permits a majority.  It could have

5     said the secured document something other than a majority but

6     our belief is that it's a majority.

7          THE COURT:  All right, because in theory unless you're

8     going to show me this provision, it could be 1 percent, it

9     could be 99 percent, it could be anywhere in between that, and

10    so having read 10.06 I was trying to figure out how much you

11    needed because, as you know, there's still this group of

12    unknowns out there who have not been -- who are unknown.

13         MR. KLEINHAUS:  I can speak to the unknowns if you're

14    interested.

15         THE COURT:  I just want to know whether, are they

16    known?

17         MR. KLEINHAUS:  Not really.  I think it's about

18    $50,000 and it's held through a brokerage and the company has

19    been trying to figure out how to reach these people and deal

20    with it.

21         THE COURT:  Right.  And does this whole thing end

22    because they, I mean, are you unable to effect the

23    restructuring if I don't stand in your way -- I'm not going to

24    opine on that either way -- because these folks are there

25    because you wanted a hundred percent participation?

1    MR. KLEINHAUS:  I think the company is hopeful they'll

2    deal with what they view is a mechanical problem.

3        THE COURT:  All right.  That's an answer.  Okay.  All

4    right.  So 10.06 you think it's a majority.  Here's my concern,

5    sir.  Reading the circular for the new notes seems to me that

6    it at least suggests it intimates that the risk comes primarily

7    from secured creditors asserting rights that would then impair

8    those of unsecured creditors.  Do you agree?

9        MR. KLEINHAUS:  I'm sorry.

10        THE COURT:  I'll try it again.

11        MR. KLEINHAUS:  Should I look at the document?

12        THE COURT:  No, no.  Let me postulate it rather than,

13    and see if you get an agreement.  My read of the circular and

14    if I were an investor I would look at it and say, okay, my big

15    concern as an investor is not that I'm going to be harmed by

16    the company I'm investing in but that I'm going to be harmed by

17    these secured creditors, these secured lenders.  They're going

18    to assert rights, somehow that's going to affect my rights,

19    maybe we won't be pari passu, who knows.  I think as an

20    investor I would be surprised to learn that I should have

21    really more feared the company or the company's involvement

22    with, Mr. O'Donnell would say collusion with these folks in

23    order to effect the restructuring.  That's the issue.

24        MR. KLEINHAUS:  So with respect to the company's

25    involvement, our view is it's really legally irrelevant.

1   Number one, the asset sale that's going to take place there

2   hasn't been a lot of attention paid to it as opposed to the

3   guarantee.  I think the reason why there hasn't been attention

4   paid to it, I think it's impossible to say that the asset sale

5   impairs a right to payment.  It may affect the ability to

6   recover but it doesn't impair a right to payment.  So there's

7   been a lot of focus on the guarantee and as to the guarantee,

8   it's the secured creditors who are releasing that guarantee

9   under 10.06.

10          THE COURT:  That happened in concept.  The transaction

11  by which the secured folks were able to release the guarantee

12  happened two months ago.

13          MR. KLEINHAUS:  The transaction by which the secured

14  creditors received the guarantee happened?

15          THE COURT:  Yes.

16          MR. KLEINHAUS:  Your Honor, that's true, but number

17  one, nobody has asserted any cause of action with respect to

18  that transaction and I don't think they could.  The secured

19  creditors gave massive consideration for that guarantee.

20          THE COURT:  I want to make sure I understand this.  I

21  want you to tell me, again, so I feel better about this, that

22  this provision of the guarantee was not designed for the sole

23  exclusive or primary purpose of vitiating the guarantee, the

24  one thing that Mr. O'Donnell's clients had.  You're going to

25  tell me this was a bargained for transaction as a result of

1    extensive concessions made by the secureds?

2            MR. KLEINHAUS:  Yes.  They stopped taking interest on

3    $1.3 billion of debt.

4            THE COURT:  Because, you understand, the timing looks

5    a little fishy.

6            MR. KLEINHAUS:  Respectfully, I don't understand.  I

7    don't agree.

8            THE COURT:  You do understand.  You don't agree.  But

9    go ahead.

10           MR. KLEINHAUS:  Your Honor, these secured creditors,

11   99 percent of them agreed on $1.3 billion of debt to stop

12   taking cash interest.  That's a massive concession in the

13   context of an overwhelmingly consensual restructuring.  I don't

14   think there's any valid basis to think that's fishy.

15           THE COURT:  All right.  I'll hear from you more on

16   10.06 but I'd like to switch to 9.02.  If the defendants

17   purchased 51 percent of the notes themselves could they vote to

18   remove the parent guarantee from the other 49 percent of note

19   holders?

20           MR. KLEINHAUS:  Let me answer that indirectly then

21   directly.  The indirect point is these are the ways to release

22   the guarantee.  The direct answer is we believe yes.  The

23   reason we believe that is because the indenture has a specific

24   provision that deals with releasing guarantees and what that

25   specific provision says is that you need 100 percent for

1    release of guarantees from significant subsidiaries which are

2    defined, and the reason that provision says that is because in

3    contrast to this parent guarantee which was given solely for

4    reporting purposes that was the guarantee that provided the

5    credit support.

6              THE COURT:  Could we just go back to that for a

7    second?  Again, for my own edification, provided solely for

8    reporting purposes, kind of makes it sound like it's a sham.

9    Just make me feel better about that.

10              MR. KLEINHAUS:  It's not a sham, because the guarantee

11    is in legal effect and to the extent the situation played out

12    so that it wasn't released by secured creditors if we had a

13    completely different situation where -- I'm sorry, where

14    secured creditors were paid off in full, if we had a different

15    world where that guarantee was just out there and that parent

16    company had assets and the unsecured debts had a claim, yes,

17    they would have a claim on that guarantee.  It's not a sham at

18    all.  It's a perfectly valid, legitimate guarantee.  But the

19    reason in the context of the corporate transaction that

20    occurred that that guarantee was given was to facilitate a

21    reporting requirement.

22              THE COURT:  Okay.  I feel like we've covered the Trust

23    Indenture Act, but I just want to make sure I understand your

24    position with respect to the Trust Indenture Act.

25              (Continued next page)

1        THE COURT:  We talked about core terms and, again,

2   there are Law Review articles, but I'm not going to say -- let

3   me say, there's not a whole lot of case law on the issue.  We

4   all know that.

5        MR. KLEINHAUS:  There's very little.  There's this big

6   Law Review article by this guy named Professor Rowe, which

7   you're probably talking about the same one.

8        THE COURT:  Yes, and so that to the Law Review folk,

9   the core terms are the amount of interest, the amount of

10  principal and the maturity date and really not much else.

11       So I'd like to understand, because Judge Kram in UPIC,

12  adopts the definition that basically tracks the language of

13  316(b), which talks about basically anything that impairs your

14  right to receive interest or principal.  So could you harmonize

15  that for me?  I want your view as to what are core terms, even

16  if that is the analysis I should be using.

17       MR. KLEINHAUS:  Core terms are amount, timing of

18  payment.  Because what was happening when the Trust Indenture

19  Act was enacted in 1939 -- this was in the annotations to the

20  annotated Trust Indenture Act -- was that insiders of companies

21  were facilitating transactions whereby they took over a

22  majority of the bonds, and they changed the payment terms.

23       And what people were concerned about is that the

24  negotiability of those bonds would be harmed and, moreover,

25  that this was improper because people negotiated for a

1   particular amount on their debt.  So the Trust Indenture Act

2   was designed, and it specifically addresses, the right to

3   receive payment in the sense that a majority can't come along

4   and say, yesterday you were at $100, today you were at $50.

5   The majority can't come along and say yesterday your debt was

6   due tomorrow; now I'm going to take ten years.

7         Instead, whatever you negotiate for in the indenture

8   as to the amount that you're owed, you're owed that.  And if

9   the company defaults, for whatever reason, you can exercise all

10  of your remedies at state law, including fraudulent remedies,

11  including attachment remedies, successor remedies.  Any

12  remedies you have, you can exercise those remedies up to the

13  full amount that you negotiated for.  So I think that's where

14  this came from and the core terms would deal with the payment

15  terms.

16        THE COURT:  Okay.  Once again, the problem with

17  looking back at the legislative history of this act is it

18  really does seem to have a preference or a consensus for

19  bankruptcy, which we have to find an option three for here.

20        MR. KLEINHAUS:  I totally agree, but with the caveat

21  that the Legislative history speaks, in terms of these types of

22  core terms and the right to payments.  It doesn't speak in

23  terms of a standardless ability to recover test.  That's really

24  something that I think is absent from most of the law in this

25  area.

1          THE COURT:  I do understand that that's your argument,

2    absent from most of the law for everybody but Judge Baer.  All

3    right.  Do you want to talk to me about your view of Mechala?

4          MR. KLEINHAUS:  Sure.  I'd be happy to.  A few points

5    on Mechala.  I think we've already had the colloquy as to why

6    we don't think it's right; so I'm not going to go over that

7    more, and we have it in our brief.

8          But I think this Court certainly doesn't have to

9    decide that Mechala was wrong in order to rule for the

10   defendants on the merits here.  That's for a few reasons.  One

11   in, this case, unlike Mechala, we have this secured and

12   unsecured structure.  I'm not talking about a foreclosure.

13   Everybody keeps talking about a foreclosure.

14         As to the 10.06A2, that was a particular remedy that

15   was negotiated here.  It was in the original bond indenture.

16   There was nothing like that in Mechala.  In Mechala, I

17   contrast, as I discussed a few minutes ago, as footnote five of

18   the decision shows, what the plaintiffs bargained for was an

19   absolute and unconditional right, as in the Second Circuit

20   case.

21         Here, they did not bargain for such a right.  Instead,

22   what they bargained for is a right to payment that's expressly

23   limited and conditioned by the other provisions of the

24   indenture, including, in particular, the ability of secured

25   creditors to release guarantees.  That is a fundamental

1    distinction between this case and Mechala, what the language is

2    of the right to payment provision and what secured creditors

3    are explicitly permitted to do under the document.

4            Two other quick points on Mechala.  One is, in

5    Mechala, Judge Baer found that the plaintiffs had, when they

6    negotiated, when they bought the bonds, they were relying on

7    that guarantee.  Here, we have the provision, the explicit

8    provision, saying don't attach value to it.

9            Third point on Mechala.  Our view, as set forth in our

10   papers, is that even if you accept Mechala as right, on the

11   practical ability to pay, that that's the issue, what we're

12   dealing with here is a situation where these plaintiffs already

13   have no practical ability to recover their principal.  The only

14   practical ability they may have -- and emphasis on "may" -- is

15   an interest payment, possibly two interest payments; although,

16   that's even more speculative.

17           They're currently in a situation where, at most,

18   they're going to get 1.5 million or 3 million, and what they're

19   being offered is a deal where they can get something of greater

20   value.  Now, we've argued that in the context of harm and went

21   back and forth.  But in the context of practical ability to

22   pay, there's no practical ability to pay now.  At most, they're

23   going to eke out an interest payment or two.  If they go

24   through the transaction, they get something of more value.

25           So even assuming Judge Baer to be right, in this case,

1    it should come out the other way.

2            THE COURT:  All right.  But to that point, it is not

3    as though the company has a dollar in its bank accounts.  I

4    mean, if it wanted to, if directed to, it could find the money

5    to make an interest payment, right?  I just want to take issue

6    ever so slightly with your characterization that there is no

7    possibility of those interest payments being made.

8            MR. KLEINHAUS:  I didn't mean to say that.

9            THE COURT:  Let me understand that better.

10           MR. KLEINHAUS:  Sure.  I want to be very clear.  I did

11   not say, and I don't think Mr. West said yesterday, there's no

12   possibility of the interest payment being made.  I think both

13   of our witnesses were clear that the company has more than

14   $1.5 million in its bank account.

15           There's really two issues here.  One is the March

16   payment, and there's just a huge amount of contingency between

17   here and March in a situation where --

18           THE COURT:  Yes.

19           MR. KLEINHAUS:  -- this restructuring can't go

20   forward.  The other issue is the payment that was due that went

21   through the grace period.  And what Mr. West said on that

22   yesterday is in a situation where there's no deal, secured

23   creditors with $1.3 billion of debt, can potentially declare a

24   default on their debt because the company didn't go through

25   with this deal, people would have to get together and figure

1    out, is the company going to let liquidity out in a situation

2    where the secured lenders, regulators are out there and he

3    doesn't know how that would come out.  I think that was the

4    testimony and that's our position.

5              THE COURT:  Okay.  You wanted to talk to me about

6    responses that you have to some of the things that

7    Mr. O'Donnell said?

8              MR. KLEINHAUS:  Sure.

9              THE COURT:  I'd like to hear from you.  The only other

10   thing is I did not discuss with Mr. O'Donnell the quantum of

11   bond that should or should not be required if I were to enjoin

12   because I assume he'd say something very modest.  So let me

13   understand.  If I go that way, what is the bond?  And please

14   don't say $1 billion because they're not able to do that.  So

15   tell me realistically what I can impose.

16             MR. KLEINHAUS:  I covered a lot of the things that I

17   was going to say in response to Mr. O'Donnell; so let me just

18   say a few other things that I didn't quite get to.

19             One is, enjoining the release of the parent guarantee

20   on its own is, in our view, no solution here.  First of all,

21   for all the reasons we went through, we believe there's a clear

22   contractual ability on the part of the secured creditors to

23   release that guarantee.  So legally, we don't think that's

24   justified.  But beyond that, the way this deal is working

25   people are getting equity, note holders and secured lenders are

1    getting preferred equity at a parent level; so that would have

2    a very disruptive effect on this transaction.  That's one thing

3    I wanted to say.

4         I think another thing, which we covered to a large

5    extent, is this point about harms to the company.  And we

6    covered the legal point as to whether the Court should consider

7    that, and we covered the regulatory point.  I know the company

8    feels strongly, and Mr. West, I think, has conveyed this in his

9    testimony, that there is a major risk here of harm to a

10   gigantic number of students, 120,000 people.

11        And Corinthian is the opposite of an answer to that

12   harm.  And there is a serious concern on the part of the

13   company, which, as Mr. West has said, is a reputation-based

14   business, both for those students and also the effect of the

15   company of those students taking certain actions, if not having

16   new enrollment.  So students seeing, from whatever source, that

17   this company, there's question mark over its viability.

18        So the harm here, I emphasized earlier, the regulatory

19   point because I think your Honor asked me about it, but the

20   company also feels very strongly, and I think the evidence that

21   they've submitted supports harm to students here, both in their

22   own right and the effect on the company of that harm to

23   students.

24        Now, on the bond, your Honor, I think, obviously, we

25   don't want to get there.

1      THE COURT:  I know, but we have to plan for all

2  eventualities.

3      MR. KLEINHAUS:  Sure.  If your Honor were to issue an

4  injunction, we do think a bond should be substantial.  Your

5  Honor just said, you're not ordering a bond of the full of

6  one-point-something billion dollars and, frankly, there is a

7  big question mark over the enterprise value in a situation

8  where this company can't undertake the restructuring that it

9  agreed to with 98 percent of its creditors.

10      So we do think there would be a basis here for a bond

11  in the realm of the enterprise value, which, based on the

12  Houlihan report, is $1.05 billion.  There are other ways that

13  you could slice this.

14      So for example, right now, the evidence, including in

15  the Hannan report, showed that the secured debt is trading at

16  44 cents on the dollar.  So in the marketplace, that's how much

17  people in the market think the secured debt is worth.  If you

18  take the value of the secured debt, it comes to like 44 cents

19  on the dollar.  That's about $570 million in the current

20  distress situation.

21      Another way to potentially calculate it would be to

22  take the value, the fair market value as estimated by Houlihan,

23  which is $1.05 billion, and subtract out the market value of

24  unsecured debt in this distress situation.  There are various

25  options here.

1          Another thing your Honor could do is take the amount

2     of that secured debt, the market value of it, and treat that as

3     the amount of the bond because, based on the market perception,

4     44 cents on the dollar is what the secured debt is worth.

5     That's what's being put at risk.

6          THE COURT:  My concern, sir, and the reason why I

7     said -- I didn't mean to come off glibly -- that I wouldn't do

8     the full billion-plus amount is it seems to me if I'm going

9     that road, the comparison is really the enterprise value now

10    and the enterprise value subsequent to a sale in bankruptcy, a

11    sale of the assets in bankruptcy or foreclosure of the assets.

12    So I think there would be a deduction.  But I'm not sure and

13    you're not sure --

14         MR. KLEINHAUS:  Right.

15         THE COURT:  -- how much that's going to be.

16         MR. KLEINHAUS:  That's why I tried to estimate a

17    delta; so that the estimated value now, according to Houlihan,

18    is $1.05 billion.  If this deal can't get done, the estimated

19    value would have to be a much more distressed number.  So I

20    tried to estimate that number by the trading value of the

21    secured debt.

22         And I would just note that, I expect you could ask me

23    about the bond, there's a Seventh Circuit decision from Judge

24    Posner.  There's a case called Salinger, 607 F.3d at 79 -- I'm

25    sorry.  I'm looking at the wrong case.  It's Habitat Education

1    Center v. U.S. Forest Service, 607 F.3d 453, where Judge Posner

2    said, when setting the amount of security, the Court should err

3    on the high side.  And the reason he gave is that the cost to a

4    plaintiff of wrongly being required to post a bond is, "not

5    serious," whereas, "an error in the other direction produces

6    irreparable injury because the damages for an erroneous

7    preliminary injunction cannot exceed the amount of the bond."

8              And, here, the company feels that the damages of a

9    preliminary injunction could be very substantial, and I'm sure

10   secured creditors agree.  So --

11             THE COURT:  But may I follow that thread with you,

12   please?  I have two sides to consider here, and I certainly

13   understand the argument that you have made that if I allow the

14   injunction, very bad things will happen to this company.  All

15   right.  Let me try that again.  If I enjoin and I'm wrong, I

16   could potentially be affecting an enormous diminution of value,

17   not intentionally, just unfortunately.

18             MR. KLEINHAUS:  Of course.

19             THE COURT:  By the same token, if I don't enjoin the

20   matter and I'm wrong, what does the plaintiff get, other than,

21   you know, an "I'm sorry" at some later date from me?

22             MR. KLEINHAUS:  What they lose is probably, at most,

23   $1.5 million.  What they get is the opportunity to participate

24   in the exchange, which the evidence shows is worth more than

25   $1.5 million, or the opportunity to bring a claim.

1    THE COURT:  Try this again.  If I do not enjoin, he'll

2    take it up on appeal.  And so will this remain in stasis for

3    the pendency of the appeal?  Will you go forward with the

4    restructuring, and then hope for the best?  I'm just wondering.

5    Maybe the answer is you haven't thought through that yet.

6    MR. KLEINHAUS:  I can't tell you precisely what will

7    happen.  We've been focused on this.  I will say if the deal is

8    not enjoined, the company plans to go forward.  And there are

9    some, as you know from the testimony, some outstanding -- a

10   couple of outstanding regulatory approvals, but the company

11   does plan to move forward with its 98 percent of creditor

12   support if it can.

13   THE COURT:  Okay.  All right.  Thank you.  Sometimes I

14   don't think about other people, and that's not by way of

15   apology.  That's just by way of saying since I have to hear

16   from Ms. Apps and I also have to hear again from Mr. O'Donnell,

17   it might make sense now, as we enter into our third hour of

18   discussions, it might make sense to take a small break.  Is

19   that all right with everyone?  All right.  Then we will do

20   that.  Again, I'd like everybody back as soon as the lines

21   permit.

22   MR. O'DONNELL:  Thank you, Judge.

23   (Recess)

24   THE COURT:  Thank you very much.  Please be seated.

25   All right.  Ms. Apps, I'm going to start in a completely

1    different direction than I have previously.  Yesterday, some of

2    the witnesses talked about the possibility of resuming

3    negotiations, or you heard the expression returning to the

4    blackboard or trying to figure out alternate situations.

5          And Mr. Milgram yesterday testified, I believe, about

6    plaintiff's willingness to come back to the table, indeed, a

7    desire to have been included at the table in the first

8    instance.  You speak for other parties that have been involved

9    in the negotiations, and in your opening to me yesterday, you

10   indicated that if I were to enjoin the restructuring plan as

11   currently contemplated, the parties were, I believe the word

12   was, unlikely to reach another deal.

13         So I'm wondering if you can elaborate on that because

14   one of the things that I said before I began talking to the

15   parties was that the reason I wasn't pushing some sort of

16   short-of-injunction resolution because I didn't think it could

17   be achieved.  Mr. O'Donnell is asking me, actually, to, in

18   part, impose an injunction with the effect that it might cause

19   the parties to come to a resolution.  I just want to know, if I

20   enjoin this, what are your clients going to do?

21         MS. APPS:  I think we're here because the parties are

22   at an impasse, essentially.  And, in fact, Mr. O'Donnell

23   referenced a 20-day period as if the parties could somehow be

24   forced into making some deal in the 20 days, but there was more

25   than 30 days before they filed their lawsuit when they were

1    talking to each other.

2          And I think if -- you referenced some of Mr. Milgram's

3    testimony about how they would listen to the other side.  I

4    think there have been discussions between the parties and

5    they're simply unable to reach a deal as between these

6    plaintiffs and the secured lenders.

7          I think the larger point, though, is that this was a

8    highly negotiated transaction over a period of months in which

9    all constituencies were consulted, in which bondholders were

10   consulted, in which revolver lenders were consulted, and all of

11   the secured lenders were consulted.  It was the best deal that

12   came out of an enormous amount of work.  I should say, also,

13   the company was consulted.  An enormous amount of work over

14   several months.

15         Clearly, there's an involved process with the

16   Department of Education.  It's not so simple just to go back to

17   the blackboard.  And you heard Mr. Srivastava talk about if

18   these plaintiffs, these bondholders, even though they only own

19   10 percent, are allowed to get out of the restructuring deal,

20   essentially, then similarly situated bondholders, who likewise

21   report to investors, will say I need to get -- I can't stay in

22   this deal any longer.  I need to get what they got, and that's

23   where this all falls apart.

24         THE COURT:  And that's my question.  Thank you.

25   Because it seems if I were to enjoin the transaction, is there

1    something that keeps those folks who have agreed to the

2    exchange offer, agreeing to the exchange offer, or can they

3    simply take themselves out?

4              MS. APPS:  As a technical matter, under section 7, I

5    think it's C, of the restructuring agreement, an injunction,

6    if -- the Court issues an injunction, there's an automatic

7    termination of the restructuring agreement.

8              Now, two-thirds of the lenders can agree to amend that

9    provision and so, obviously, I understand your Honor is asking

10   exactly that.  Will two-thirds of the lenders get together?

11   And the reason nobody has really come to you and said, I will

12   do X, is precisely because it's a large group of people, and

13   once you start having one party pull out of the transaction,

14   everybody wants to reconsider whether they can get a better

15   deal.

16             And that's why it's a little bit of an all-or-nothing

17   proposition because there's no way to control so many parties

18   and see what they're going to do and whether they're going to

19   try to go back to the table and figure something out.

20             And the problem is time.  It took several months to

21   get to this place, and to start again, I think, you know, you

22   have is to assume it's going to take a good period of time to

23   go back to the drawing board and start again.  And that's

24   really the problem that the company is facing because, for the

25   reasons that, you know, the defendant has articulated, that's a

1    very difficult process.

2           Facing -- in light of the liquidity issues that they

3    face and the insolvency -- well, I misspoke.  Insolvency is not

4    the right word.  The liquidity issues, they face in which you

5    have a valuation of a company undisputed, at a little over a

6    billion, and you have existing debt at 1.5, and that's the very

7    dilemma that the company is in.

8           THE COURT:  All right.  And I guess just following on

9    one of your points.  The folks who have signed on or agreed to

10   the exchange offer, I think I'm hearing you say that it's not

11   necessarily that they would walk away from it.  They may make a

12   decision that even though the plaintiff may have received some

13   sweetener to -- plaintiffs may have received some sweetener to

14   cast their votes for the exchange offer.  They may still

15   believe that the deal they have is the best that they're going

16   to achieve.

17          What you're going to say is it will just be rendered

18   uncertain because everybody is going to rethink what they've

19   given up, what they've gotten and whether there is a different

20   balance to be drawn?

21          MS. APPS:  Right.  I think once you allow one person

22   out, you essentially pull the string in the tapestry and the

23   whole thing unravels.  Your question is a separate one.  Will

24   those same people, those same groups of people, exercise common

25   sense and somehow come to the table?

1           THE COURT:  Yes, that is the question.

2           MS. APPS:  And I can't stand here and say to you that

3     parties we don't represent, together with parties who we do

4     represent, who are numerous, will all come to the table and

5     say, it's okay, we'll let them out for a little bit more and

6     somehow have differential treatment for other people.  Don't

7     forget, Mr. Srivastava's testimony about the one other

8     unsecured -- not one other, but another unsecured only holder.

9           THE COURT:  This is the Angelo Gordon entity?

10          MS. APPS:  Yes.  The notion that they didn't really

11    want to support the deal if there were differential treatment

12    amongst the bondholders.  Now, again, we don't speak for -- we

13    don't speak for them.  Obviously, they're represented by Paul

14    Weiss, and they have not intervened in this action, but that is

15    just an example of the difficulty of bringing so many parties

16    to the table in a very complex transaction like this one.

17          THE COURT:  And the reason for these questions is

18    because I'm following up on your use of the term "unlikely"

19    yesterday.  So when you told me it was unlikely, is that based

20    on, without revealing privileged communications, your

21    discussions with your clients, or your common sense, or the

22    review of -- what is it that -- because if I'm going to accept

23    the proposition that a deal is unlikely to be reached

24    post-injunction, I want to understand why.

25          MS. APPS:  I think that your Honor can sort of take

1    into consideration the testimony of Mr. Srivastava to that very

2    effect, the difficulties that would be faced, and it is

3    unlikely that they would get to the table fast enough,

4    renegotiate the entire deal, deal with the regulators, in order

5    to come up with a new restructuring transaction.

6            Which actually, you know, and again, this is a

7    restructuring transaction involving everybody.  Right?  This is

8    a deal where bondholders actually do get something, secureds

9    get something, the revolvers get something, and everybody took

10   a haircut.  And, in fact, I do come with some handouts.

11           We don't need to focus on this, but this is just a

12   handy chart, which summarizes the before and after for the

13   restructuring.  And it's just helpful because it just lists in

14   a single table -- we don't have to dwell on this, but it lists

15   in a single table the haircuts that the different parties are

16   taking.

17           You heard Mr. Srivastava say the secureds are taking a

18   haircut too.  They're not getting 100 cents on the dollar, and

19   if -- and we should come back to the point about exercising the

20   rights of private sale, which is a very big theme for the

21   secured creditors that the Court, if it were to fashion any

22   kind of relief, not trample on rights and agreements with the

23   secured creditors to which the bondholders are not a party.

24           But if you come back to those particular rights, the

25   secured creditors could exercise their private sale rights,

1    subject to your Honor's -- the terms of your injunction, and if

2    they did, because of the way that the company is valued, taking

3    Mr. Taylor's valuation, the bondholders would get nothing.

4            Now, clearly, some of the secured creditors who have

5    bonds, as well, the crossovers, wouldn't want that because they

6    don't get any money for their bonds.  And so that may work into

7    incentives as to whether you can come together for a deal.  But

8    in the shortness of time that's available, the secured

9    creditors could just exercise their rights of private sale, and

10   then the bondholders would have nothing.

11           So if a deal can't be reached, then they would do

12   that, but of course, that depends on the relief that the

13   plaintiff seeks in this case.

14           THE COURT:  I understand that, but I want to explore

15   that with you a little bit more.  Because I thought one of the

16   themes of yesterday was that was, if you'll excuse the

17   expression, a nuclear option that people would not want to

18   engage in.

19           So I certainly understand it exists as a legal

20   possibility, and I'm trying to ascertain the degree to which it

21   exists as a practical possibility.  But you're saying that your

22   clients may just decide it is better to foreclose any assets.

23   And why I ask about this is because I heard a fair amount of

24   testimony, and I saw evidence in the declarations and the

25   exhibits, that suggest that the value of the assets is

1    substantially less than they would have if, for example, you

2    could continue to operate the schools.

3          So I'm sorry if I'm sounding glib in this, but we

4    could -- each of your clients, each of the secured debt holders

5    or secured lenders, could get an art institute of their own.

6    But they're not going to be able to run it.  They're not going

7    to be able to get the accreditation for it.  So I want to

8    understand what you mean by asset sale.

9          MS. APPS:  Your Honor, I don't think it's quite that

10   clear, and also, just to step back a second, I think it's very

11   important to understand there's been a lot of talk about

12   something called the intercompany sale.

13         What the restructuring agreement does is use the

14   mechanism of the private sale, which is a preexisting right

15   belonging to the secured creditors, and then puts that in the

16   context of everybody taking a haircut so that everybody,

17   including the bondholders, can get some value out of the

18   transaction.  Right?

19         But the ultimate mechanism of exercising a private

20   sale is still one that belongs to the creditors.  I don't

21   think -- I think the dichotomy that the plaintiffs seek to

22   draw, where it's bankruptcy or nothing, is not quite accurate

23   on the record.  There is no question that the RSA is designed

24   to maximize the value of the assets and of the recovery for the

25   company -- for all parties, the company, the secureds and the

1    bondholders.  But that doesn't mean the secureds wouldn't

2    otherwise have the rights to exercise the private sale.

3          And there was a discussion, actually -- and there's

4    two points that were raised with your Honor's questions of the

5    plaintiff's counsel.  And one is, what relief are you seeking?

6    And Mr. O'Donnell's argument, I think is we're not really

7    trying to enjoin the lenders.  We just want to stop the company

8    from cooperating with the lenders.  And I'm getting to your

9    point about whether they can do this and how the assets would

10   be maximized.

11         But I think the cooperation notion is actually

12   something that is just incidental, I would submit, to the

13   lenders' rights under Article 9 of the UCC and the rights to

14   have a private sale.  If it were not in an education context,

15   the company -- normal and regular rights incidental to an

16   Article 9 private sale would allow the lenders to require the

17   borrower, the company, to sign documents, to hand over the

18   assets.

19         Now, in the case of EDMC, what the company has to do

20   is more than just sign documents.  It has to deal with the

21   Department of Education, or if it wasn't the company, the

22   provisions of the agreements would allow the lenders to, for

23   example, sell all of the schools together to a single buyer,

24   who would deal with the Department of Education.

25         In other words, there are scenarios where if the

 1    lenders exercise their rights of private sale or sold it to

 2    another buyer, they could work with the Department of Education

 3    and do what's necessary to be done.  But in the very credit

 4    agreements that give the secured lenders those rights, there

 5    are also contractual provisions requiring the company to do

 6    what it needs to do to assist.

 7            And so there is a world in which you're not in

 8    bankruptcy, you could exercise a private sale, you could sell

 9    it to another buyer, or the lenders could have it and which you

10    could still get your approval from the regulators, you could

11    have your Title IV funding.

12            The problem is it's an uncertain world, and those

13    things take a long time.  And so there is a difficulty there in

14    achieving that result.  But it's not something that's

15    impossible, and that's why -- and it's not something the Court

16    should enjoin.  So even if the Court is going to take some

17    action here, it shouldn't go so far as to enjoin or effect in

18    any way the rights of the secured lenders to exercise their

19    rights, the private sale rights, and that includes demanding

20    the cooperation of the company.

21            THE COURT:  I see.  So whereas some could argue to me

22    that the company's involvement in the negotiations of the past

23    several months were -- and I'm just going to make the most

24    egregious argument -- were collusion between the company and a

25    select group of folks to whom it owned money in order to effect

1    a restructuring of the debt to eliminate most of the debt,

2    you're saying that were that not the case, if this were just

3    the secured lenders acting in their own self-interests, they

4    might decide to require the company or its management to help

5    them out because they have that right.  They have that

6    prerogative to say since we don't know how to operate these

7    schools, you, management, must participate?

8         MS. APPS:  Right.  It's more than could they ask.  For

9    some reason I only have two of these agreements, but I think

10   it's worth handing these up to you.  This is an earlier version

11   of the credit agreement, and I flagged and marked sections

12   5.14.  And, again, I'm focusing in on the existing rights in

13   the credit agreements.

14        And there's another one, your Honor, that's relevant

15   here.  It's called the Pledge and Security agreement.  It also

16   has a provision that's relevant to this question of existing

17   rights, and it's section 6.1.

18        And what these provisions do, you will see, is they

19   talk about requiring company cooperation with certain

20   administrative proceedings or what I will call things that are

21   incidental to the exercise of the Article 9 rights and require

22   the company cooperation.  These are contractual provisions that

23   existed prior to any restructuring in 2014.

24        THE COURT:  Okay.  But let's talk about what is

25   incidental.  You're saying to me that requiring management to

1    grease the skids, as it were, with the regulators and with the

2    accreditation bodies, you would construe that as incidental?

3            MS. APPS:  When I say incidental to the Article 9

4    rights, Article 9, I know you didn't necessarily want a full

5    sort of PowerPoint display.

6            THE COURT:  This is true.

7            MS. APPS:  But these are provisions that are in

8    Article 9 as well, where they talk about, you know, encouraging

9    private sale and encouraging borrowers to cooperate with the

10   private sale and do whatever is necessary.

11           And, yes, the argument is here, okay, it's an

12   education institution and it's more complex, but these are

13   things that are still incidental to the exercise of the secured

14   lenders' rights under preexisting agreements.

15           THE COURT:  Are you then distinguishing things that

16   might be extremely important and critical to the continued

17   operation of EDMC and, yet, those very things could still be

18   incidental to the Article 9 rights?  Is that what you're

19   saying?

20           That there are things, for example, asking the company

21   to intervene or to broker or to pave the way with the

22   regulators and with the accreditation agencies.  I might

23   consider that incredibly important to the operation of EDMC,

24   and you're saying, yes, it is, but in this context, it is

25   incidental to the secureds' exercise of their Article 9 rights.

1    "Incidental" sounds like it's not so important.

2            MS. APPS:  Yes.  And something can be -- I know it

3    sounds like a paradox, can be both incidental to the exercise

4    of Article 9 rights, and important to the ultimate success of

5    the company.  That's all I'm trying to say.

6            THE COURT:  Okay.

7            MS. APPS:  I think that the -- as provided in

8    preexisting contractual arrangements, the company has an

9    obligation to do those things that are necessary to allow the

10   assets that are transferred to survive, essentially.  And in

11   this case, that would require whatever pieces of paper you need

12   to give to the Department of Education and the State

13   regulators, for them to give approval and accreditation so that

14   they could continue with Title IV funding.

15           And let me just step back a minute.  I mean, that's

16   essentially part of what the restructuring agreement tries to

17   do, essentially sells a lot of assets to a new company and has

18   the company cooperate with that transition so that there is no

19   interruption to Title IV funding, there is no interruption to

20   the business and everything keeps going as a going concern with

21   just a new debt load.

22           You know, the other side of the ledger, essentially,

23   of the restructuring agreement is that everybody took a haircut

24   on the debt load so that the going concern company wouldn't be

25   so burdened with an enormous amount of debt and liquidity

1    problems.

2              THE COURT:  Okay.  No, I understand that.  Thank you.

3    Go ahead.  You may continue.

4              All right.  Let me ask this.  I had a very interesting

5    discussion with Mr. Kleinhaus about the Trust Indenture Act,

6    and for me, the most interesting part -- and I'll ask

7    Mr. O'Donnell this at some point too -- is this notion that one

8    can, if you will, ex ante contract away or consent, consent

9    because that is the issue there.

10             Do you hold the same view as he, and if so, I'd like

11   to hear a little bit more about it.

12             MS. APPS:  Absolutely.  I think we a hundred percent

13   agree with Mr. Kleinhaus' arguments on that.  In fact, I'd take

14   it one step further, and it really turns on an issue that your

15   Honor identified, which is, there is no natural limit on Judge

16   Baer's ability-to-pay formulation of the test and that's why,

17   in part, it doesn't make sense and why subsequent cases, I

18   would submit, have focused on the right to payment is not the

19   same as the ability to payment.

20             And the guarantee is exactly an example or an

21   illustration of why that is.  And Mr. Kleinhaus alluded to

22   this, but the report of Mr. Gadsden, which is the expert on the

23   trust indenture law, and he talks about industry practice as to

24   guarantees, I think really underscores this point.

25             There are not only a host of actual indentures out

1   there with guarantee provisions that are automatically

2   released, like ours, and in which case the bargain-for right

3   that you got was a right to receive payment subject to a

4   guarantee that could be released without you doing anything or

5   anybody's consent.  I misspoke.  It's not anybody's consent

6   because you're already consenting by signing onto the document.

7          THE COURT:  That makes more sense to me.  Thank you.

8          MS. APPS:  But there's also a whole host of industry

9   agreements out there that talk about releasing guarantees on

10  majority vote, on majority consent of the bondholders and less

11  than a hundred percent, essentially.  A reading of Judge Baer's

12  decision in the manner in which plaintiff's advocate, would

13  render all of those types of indenture provisions, wherever

14  those indentures have a trust, a qualified Trust Indenture Act

15  indenture, void.

16         THE COURT:  Fair enough.  Although, a couple of

17  thoughts I have about that.  One is, you could make a different

18  argument -- and I'm not saying it's any more or less

19  successful, it's just differently formulated -- and that is

20  that the guarantee is not, in fact, a core term.  And,

21  therefore, it is not something that is subject to the Trust

22  Indenture Act.  And, therefore, it's not something you can

23  consent to ex ante.  It's just something you don't have to

24  consent to.

25         Again, I'm just offering that's an alternate

1    formulation.  Or it could be, because it would not be the first

2    time this has happened, that a party has signed on to an

3    agreement believing, sort of in the back of their minds, that

4    if they don't like the way a particular action is headed, they

5    sort of have in their back pockets the ability to say, I'm not

6    going to consent and, therefore, there is this statutory

7    provision that would keep you from being able to implement this

8    provision.

9            So I understand what you're saying.  You're talking to

10   me about the significance that I should ascribe to the fact

11   that throughout the market, these provisions exist all over the

12   place.  It may be that because, as Mr. Kleinhaus suggested, you

13   can consent ex ante.  It may be because this isn't something

14   that 316(b) applies to at all.  It may be that no one has ever

15   really squarely confronted the issue, and we're just going to

16   have to deal with it now.  Any one of these things.

17           MS. APPS:  The other thing is really to say the same

18   thing that Mr. Kleinhaus said in a slightly different way is if

19   you enter into a bargain with an indenture, with respect to an

20   indenture, and you know that your guarantee has no value -- I

21   understand your Honor has some qualms about why that language

22   is in there, but those are the provisions that are in the

23   offering circular and the indenture that Mr. Milgram understood

24   he was purchasing.

25           He may have attributed lesser business significance to

1    the probability of the company defaulting, or whatever it is

2    for whatever reason he did, and that's a judgment that may have

3    turned out to be wrong, but whatever that is, those are the

4    provisions that he bought into.  And what they're trying to do

5    with their reading of the Trust Indenture Act, supported by

6    Judge Baer's -- solely, I would submit, by Judge Baer's -- some

7    of the language in Judge Baer's decision is to bootstrap over

8    that and get yourself rights you never had, to sort of create

9    rights that were beyond the scope of what you originally were

10   given.

11          And don't forget, of course, the market is very

12   sophisticated about these things.  These things are all in the

13   pricing, are reflected in the pricing in some way or form as I

14   think Mr. Gadsden makes this point.  The market understands

15   that when you have a provision of a release of a guarantee

16   that, you know, is affected automatically, as in this case,

17   when the parent releases the guarantee to the secured lenders,

18   that could be reflected in the price of the bonds or the coupon

19   payment or whatever it is.

20          Those are things which are all part of the fabric of

21   how these deals are negotiated, and the market is sophisticated

22   and understands that.  It is clearly a situation where if you

23   can have an automatic release of a guarantee and you know that

24   going in, there's a risk to payment, a risk to interest

25   payment, a risk to principal payment, and you know that going

1    in.

2          THE COURT:  All right.  Let me make an argument that

3    perhaps Mr. O'Donnell is going to make to me in a little while

4    on the ex ante point, and that is, it seems to me -- well,

5    withdrawn.

6          You could argue that 316(b) provides certain things

7    that you can consent to and certain things that you can't, or

8    more pointedly, there are just some things you can't contract

9    around.  I believe, I don't think anyone is arguing, that in

10   these indentures you could ask for certain contingencies.  You

11   could ask to have your payments all on Monday.  You could do

12   things.  And in so doing, you would be effecting your right to

13   receive a payment, but no one's going to complain about that.

14         The issue is, I have a little bit of concern, and

15   maybe this is why my clerk and I had the debate that we did,

16   about allowing in advance, or consenting in advance, to

17   majority control.  And maybe the answer is, yeah, you can, but

18   that's my concern.  I'm not sure that 316(b) was not put into

19   place to prevent that from happening.

20         See, I think 316(b) is designed to, on some level,

21   prevent tyranny of majority, and it seems to me that is

22   undercut by allow looing you to contract that away or consent

23   in advance, but I'll hear from you on that.

24         MS. APPS:  I think that there's only a conflict if you

25   ascribe the very broad interpretation to 316(b).  I think if

1    you ascribe a very narrow interpretation to 316(b), you don't

2    have that conflict.  I think on a very simplistic level the

3    argument between the ability to pay and the right to pay is

4    sort of where all of those arguments meet.

5            I understand the different levels and layers that your

6    Honor has just laid out, but at some level, if the company

7    continues to be a going concern, you can't have a majority just

8    unilaterally decide you're going to get less interest payments

9    or less of a principal payment.  But that doesn't mean that you

10   have a guarantee on payment because the company ultimately

11   defaults or -- in a non-education system, education scenario

12   goes into bankruptcy, or just doesn't have the money to pay.

13           There's no -- you know, you can't guarantee a hundred

14   cents on the dollar on these things, and I think, another way

15   to sort of gut check that, is if you could guarantee that, what

16   you would do in every situation is invert the normal capital

17   structure because you'd be putting your bondholders at the top

18   of the structure, getting a hundred cents on the dollars, and

19   the secureds getting what's left.

20           THE COURT:  Right.  Although, here, the real issue is,

21   the inversion comes about, if at all, because of Title IV and

22   because of the practical fact that this company does not wish

23   to go into bankruptcy.

24           MS. APPS:  I actually respectfully disagree with that,

25   I think, in some sense.  Because what you're -- if I understand

1    this correctly, what I think you're conflating there is the

2    business potential of using leverage, as Mr. Milgram seemed to

3    grasp in his decisions to buy into the notes, even when he knew

4    that there could be a restructuring.  So his ability to use

5    leverage in a transaction versus, you know, the actual rights

6    to receive payment, and what the legal document says about the

7    extent of those rights.

8             Because I think what's very important, and what I

9    would have started out saying if your Honor hadn't asked

10   questions, is the very important thing, from the lender's

11   perspective is, there is a security agreement, security and

12   pledge agreement and a credit facility, which all preexisted

13   the notes even being issued.  And those -- it's not about sort

14   of bankruptcy versus non-bankruptcy.  Those security agreements

15   give the lenders the right to recover over certain assets.

16   They give the first priority to those security lenders over the

17   assets of the company.

18             And, in fact, I think the relevant provisions of those

19   security agreements -- withdrawn.  The relevant provisions of

20   the credit agreements basically grant the lenders right, title

21   and interest in all -- largely all of the assets of EDMC.  And

22   if you look then to the language of the notes, some of which we

23   put in front of Mr. Milgram, but certainly not all of it, the

24   notes specifically state that there are preexisting, what's

25   called, permitted liens.  It's section 4.12.  Subsection (a)

1   talks about permitted liens and the definition, you have to

2   cross-reference to the definition, which is 1.01.  And it talks

3   about liens that the senior creditors have.

4          So in other words -- and that was the -- and we looked

5   at the offering circular with Mr. Milgram, where it talked

6   about the notes being effectively junior to the secured

7   lenders, and Mr. Milgram had an issue with the word

8   "effectively."  The reason for that is because, effectively,

9   junior is, by virtue of all of the security in the pledge

10  agreement and the credit facility, that the lenders already

11  have.

12         So the capital structure is not inverted just because

13  we're out of bankruptcy.  True, in bankruptcy, note holders are

14  at the bottom, but that is also true here, outside of

15  bankruptcy, by virtue of the preexisting pledge agreement and

16  security agreement and credit facility giving the lenders first

17  dibs on every single asset of the company, basically.

18         THE COURT:  Okay.  Could you comment on then

19  Mr. O'Donnell's argument to me earlier that, actually, I should

20  consider all of the lenders secured, in otherwise to run in

21  pari-passu?

22         MS. APPS:  Yes.  In fact, what he did was he

23  referenced a provision of the offering circular, I think, which

24  I don't know if I have another copy of the offering circular.

25         THE COURT:  That's okay.

1          MS. APPS:  Sorry.  Right beneath, it says:  The notes

2     will be pari-passu in right of payment with or senior to other

3     indebtedness of the issuers, including borrowings on the credit

4     facilities.

5          But the next bullet point is, will be effectively

6     subordinated to all secured indebtedness of the issuers,

7     including borrowers, to the extent that the value of the assets

8     securing such indebtedness.  So we're pari-passu, except we're

9     subordinated to all the secured lenders, to the extent they

10    have security in interests.  Security in the assets, by the

11    documents I just gave you, and they mention, the lenders have

12    security over the assets.  So, by definition, they are

13    subordinated, the note holders are effectively subordinated to

14    the secured lender's claims.

15          THE COURT:  Okay.

16          MS. APPS:  And that's Page 74 of the offering

17    circular.

18          THE COURT:  Okay.  A few moments ago, before I

19    derailed you, you mentioned the Mechala case, and you talked

20    about the fact that subsequent cases do not appear to have

21    followed the right ability dichotomy that Judge Baer

22    articulated.  I'm neither agreeing nor disagreeing with that.

23    I'll simply note that there aren't many cases out there.  I

24    have a feeling, and I don't think you guys are going to dispute

25    me, we've got them all cited in this case.

1          You can say you disagree with him, and that's fine.

2    And you can say that you agree more with Judge Kram or with

3    someone else, but I mean, other than the Delaware court and the

4    Kansas court, I think there are two courts that have looked at

5    it.  Very few have cited it, but no one has really done what I

6    would consider to be an extensive, point by point, rebuttal of

7    his arguments.  So if you want to, go ahead.

8          MS. APPS:  I think that, of course, if your Honor

9    doesn't want to reach the decision about whether or not Judge

10   Baer's decision was correctly decided or incorrectly decided or

11   however --

12         THE COURT:  So that I don't insult his memory?  Yes,

13   go on.

14         MS. APPS:  I think there's plenty of points on which

15   this case is very distinguishable, and I think the most obvious

16   one was that -- is this whole guarantee issue.  And it's very

17   much a feature of Judge Baer's decision.  And I think

18   Mr. Kleinhaus talked about this probably more eloquently than I

19   will, but in that case, the guarantee, change in the guarantee

20   was to be affected solely by an amendment to the indenture.

21         Here, by contrast, the release of the guarantee

22   happens automatically when the parent releases the guarantee to

23   the secureds, and it was already in the indenture and fully

24   disclosed in the offering circular in the risk factors to any

25   investor who wished to credit the statements of the company

1    Okay?

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. APPS:  And so, that is a really fundamental

2     distinction and I think it comes back to the argument and the

3     dialogue you were having with Mr.  -- it comes back to the

4     dialogue that you were having with Mr. Kleinhaus about the

5     different, the language in the indenture.  Sorry, I lost my

6     train of thought for a second.  Let me start again.  Of course

7     as Mr. Kleinhaus said the other issue is in footnote 5 of

8     Mechala --

9          THE COURT:  Judge Baer's decision, yes.

10          MS. APPS:  It is a very different provision okay.  But

11     I think even apart from that the guarantee provision here,

12     which is an automatic release provision, means that you don't

13     have the same issues that are raised with respect to what

14     actually happened in the Mechala decision and I think, again,

15     your Honor could also conclude per the discussion you had first

16     whether it's a core term or not a core term and those sorts of

17     things.

18          My point is only to conclude that Section 316(b)

19     allows a plaintiff or a bond holder to get around the

20     pre-existing or the rights that were already delineated in its

21     indenture is not something that even Mechala would have

22     anticipated and on that basis it's distinguishable.

23          THE COURT:  To prioritize the arguments of the folks

24     at the back table I suppose the argument is, to the extent it

25     applies it's been consented to already.  If it hasn't been

1    consented to already it's not a core term.  If it is a core

2    term it doesn't matter, the right/ability dichotomy doesn't

3    matter, the right hasn't been impaired irrespective of whether

4    the ability has and other than that it's distinguished from

5    these other judge's cases.  Am I right?  Is that your argument?

6              MS. APPS:  I think speaking for myself -- I see a nod.

7              THE COURT:  I have a nod from Mr. Kleinhaus.

8    Ms. Apps, obviously I asked a lot of questions of Mr. Kleinhaus

9    and I can repeat them all, but I'm not sure I need to.  Why

10   don't you tell me if there are things that have not been

11   addressed or resolved by Mr. O'Donnell in my discussions with

12   him and by Mr. Kleinhaus in my discussions with him.

13             MS. APPS:  A couple of things.  I think and really

14   some of these are argument points that you're well aware of,

15   but I think it is really important the fact that the plaintiff

16   is not willing to say here, says, okay, we know we can't enjoin

17   the intercompany sale, but somehow we want you, Judge, to tie

18   the hands of the company and not allow it to cooperate and

19   proceed with the restructuring.  I think those two things are

20   mutually inconsistent.  If you tie the hands of the company you

21   are effectively, I would submit, tying the hands of the secured

22   lenders.  I don't think the plaintiff can have their cake and

23   eat it too.  If they wanted to go provision by provision and

24   say which provisions won't affect the secured lenders' exercise

25   of their rights, that's one thing, but I don't think they're

1    willing to do that.  And I think that's a fundamental problem,

2    because if you grant an injunction constraining the company or

3    enjoining the company from cooperating, again, I think you

4    trample respectfully on the Article 9 rights and the

5    pre-existing contractual rights in the credit agreement and the

6    pledge facility and so forth.

7            I did want to just address briefly a comment that your

8    Honor made at the outset of the proceedings and you alluded to

9    it a couple of times about the perception that the plaintiffs

10   were somehow excluded from the negotiations.  Obviously, your

11   Honor sat through all the testimony, but I will say that I

12   submit to you that the evidence really didn't bear that out.

13   And there are a couple of very important things.  I think

14   really the plaintiffs, certainly Mr. Milgram who was on the

15   witness stand in part chose not to participate in the

16   restructuring because of course the consequences are that they

17   become restricted.

18           THE COURT:  Sure, but he also said to me -- let's be

19   clear at the outset that I don't know that any -- either

20   plaintiffs or defendants think that resolution of this issue is

21   going to decide the case.  So I understand that.  So therefore

22   I don't want us to argue about it too much.  But it seems to me

23   I understood what Mr. Milgram was saying, which is, I let it be

24   known that I was available if they wanted my help.  I got a

25   lovely note from Mr. Srivastava telling me that there was a

 1    lenders committee and I wasn't on it, and after that I made a

 2    calculated decision that it was not worth it to not be a

 3    participant and be restricted.

 4           MS. APPS:  But here's the thing.  There was not just

 5    a, he wasn't a secured lender, whether he really seriously

 6    believed big L or small L, whatever it is, he wasn't a secured

 7    lender.  The group that Mr. Srivastava was on was the secured

 8    lenders group.  There was a bond holder group represented by

 9    Paul Weiss.  The record, in terms of fact findings to the

10    extent your Honor makes any findings of fact with respect to

11    this, I do think it's important, the secured lenders strongly

12    believed there was no sort of conspiracy or collusion to keep

13    them out.

14           THE COURT:  All they had to do was call Paul Weiss?

15           MS. APPS:  They were in constant contact with Houlihan

16    Lokey.  Paul Weiss represented the bond holders.  There was

17    some reference by the plaintiffs, I think, to their size being

18    too small, but Mr. Srivastava testified that he engaged with

19    CNH, which is a bond holder holding approximately 10 million in

20    bonds, smaller than the plaintiff's current holdings.  I don't

21    think there was any sense by the secured side or any of the

22    other constituents to exclude the plaintiffs.  And if I could

23    just rattle off a couple of citations to that effect.

24           THE COURT:  Please.

25           MS. APPS:  The Winthrop declaration, paragraphs 3 and

1    4, which is Houlihan Lokey reaching out to Marblegate;

2    Mr. Srivastava's declaration to the extent that he reached out

3    to bond holders; Milgram's testimony regarding the restrictive

4    matter, which, of course, is transcript pages 75;

5    Mr. Srivastava's testimony about Paul Weiss, transcript page

6    260, and those are just some of the references essentially.

7             But I think there was a lot of evidence to suggest

8    they weren't excluded and they didn't want to ask Houlihan

9    Lokey for the bond terms because that would have made it

10   restricted.  So I'll just leave it there, your Honor.

11            Just one moment.  Is there any other question that

12   you --

13            THE COURT:  I've had a lot of questions for people.  I

14   think I'm okay.  But certainly I don't want to keep you or

15   restrict you from making sure I'm aware of any clarifying

16   information you may have.

17            MS. APPS:  Just give me one minute.  The only other

18   thing, a lot of back and forth about Corinthian and this was

19   not a case of fraud.  I want to point out, I think this is

20   referenced in the Taylor report, the industry averages on the

21   amount of debt to equity ratio is something like 15 to 85.  I

22   think the EDMC ends up being a much higher debt to equity

23   ratio, so admittedly no fraud situation, but this is

24   nonetheless a very serious situation.

25            THE COURT:  Sure.  Different concerns.

456

1          MS. APPS:  Exactly.  Different concerns.

2          Just give me one minute, your Honor.

3          THE COURT:  Yes.

4          MS. APPS:  I'll leave it at that, thank you.

5          THE COURT:  Mr. O'Donnell, just give her a moment to

6    clear out?

7          MR. O'DONNELL:  Yes.

8          THE COURT:  Thank you.

9          When we began this, my thought was this would be your

10   opportunity to sort of comment to the extent you didn't have an

11   opportunity to respond to questions I asked of your

12   adversaries.  But I also do want to talk to you a little bit

13   about what I'm probably improperly calling this ex ante defense

14   idea.  Because I'm not sure I perceived from this extensive

15   briefing, I think I understand, I'm sure you understand the

16   argument and I hope I didn't do violence to any response I

17   might get with my attempts at that.  But I'd like to understand

18   your response to that argument.

19         MR. O'DONNELL:  Thank you and I'm happy to provide

20   that, although I don't know if it's going to be any better than

21   what you gave before.  You did a good job.  That's precisely

22   the point.  The Trust Indenture Act was designed to go against

23   the majority, and it's designed to protect the minority from

24   having the majority.  I think as Mr. Kleinhaus actually talked

25   about during his argument when it was enacted it was enacted

1    with an understanding you didn't want to have this potential

2    group of insiders doing detriment to the minority creditors.

3    That I think, I thought was the theme of our case, following by

4    the rules.

5              Now, the ex ante provision, can the parties in some

6    instances contract around certain provisions so that the Trust

7    Indenture Act might not apply or the protections that are

8    afforded to principal and interest?  I guess so, although I

9    would say that that's not here.  It's an academic question.  I

10   was too quick to say yes.  The Court, I think the Trust

11   Indenture Act protects payments of interest and principal,

12   absolutely.  But if we were to even want to opine on whether or

13   not that could or could not be the case, I submit that that's

14   academic.  Take a look at what is Section -- in the indenture,

15   6.07 of the indenture.  It says rights of holders of notes to

16   receive payment, and it begins by saying, "Notwithstanding any

17   other provision of this indenture the right of any holder of a

18   note to receive payment of principal premium if any and

19   additional interest if any and interest on the note," and it

20   goes on, "shall not be impaired."

21             THE COURT:  Right and I should give the appropriate

22   amount of deference or importance to the notwithstanding

23   provision?

24             MR. O'DONNELL:  Exactly.

25             THE COURT:  Because your point is "notwithstanding"

1   means notwithstanding.

2           MR. O'DONNELL:  That's right.

3           THE COURT:  Does it not suggest, though, that these

4   other contractual provisions are somewhat -- are they illusory?

5   Are they ineffectual?  Are they effectual when you consent and

6   otherwise not?

7           MR. O'DONNELL:  You have to provide harmony to the

8   various provisions, I agree with that.

9           THE COURT:  Exactly.

10          MR. O'DONNELL:  There's been some talk about release

11  of guarantees and I believe Ms. Apps in her argument referred

12  to Section 9.02 of the indenture.  If you take a look at it,

13  can you pull that out, Jamie?  9.02 begins by talking about --

14  it starts on 117.

15          THE COURT:  All right.

16          MR. O'DONNELL:  So if you look at the beginning on

17  page 117, your Honor, it says, "With the consent of holders of

18  notes," and it talks about some things that may be amended such

19  as the notes, guarantees, the indenture by a majority of the

20  principal of the notes.  But then, your Honor, if you keep

21  going, page 118, it begins by saying, "Without the consent of

22  each affected holder of notes any amendment or waiver under

23  this Section 9.02 may not (with respect to any notes held by a

24  non-consenting holder)," and then if you turn the page, "(h)

25  impair the right of any holder to receive payment of principal

1    or interest."

2           THE COURT:  I think Mr. Kleinhaus would say you have

3    consented and you're just saying, no, I haven't and even if I

4    did I didn't because of 6.07.

5           MR. O'DONNELL:  Yes.

6           THE COURT:  Okay.  I understand that.  What else would

7    you like to tell me in response to their -- I do not have

8    specific questions for you.  I've asked a lot of questions, but

9    I imagine you may have reactions to or clarifications that

10   you'd like to propose to me in light of the answers that you

11   heard from Ms. Apps and Mr. Kleinhaus, so tell me now.

12          MR. O'DONNELL:  Thank you and I'll be as brief as I

13   can.  I don't want to impose more than we already have.

14          THE COURT:  But you understand, sir, I want to get it

15   right more than I want to get it done quickly.

16          MR. O'DONNELL:  If there's one thing that's become

17   abundantly clear to everybody in this courtroom is you want to

18   get this right so we're really appreciative of that.

19          If I could first address this notion of fraudulent

20   conveyance, there's been discussions about whether or not

21   that's a substitute for the rights that are afforded under the

22   Trust Indenture Act and I think actually Mr. Kleinhaus in its

23   argument said that the fraudulent conveyance law was 400 years

24   old.  He's right, but Congress still chose to enact the Trust

25   Indenture Act and that's because there are different rights

1   that are afforded under fraudulent conveyance law versus what

2   rights are protected under the Trust Indenture Act. And as an

3   example with fraudulent conveyance if you were to assert that

4   claim a defense to that could be, well, I gave out value. In

5   fact, we heard that used when there was a discussion as to why

6   the parent guarantee was given to the secureds in September

7   which we contend, your Honor, was done in connection with the

8   proposed restructuring, but then there was discussion that

9   there was fair value given for that guarantee. That's not the

10  test under the Trust Indenture Act. The Trust Indenture Act

11  doesn't say you can impair my notes and stop me from getting

12  interest or principal if you give me equity in the company.

13          THE COURT: Is what you're saying, sir, under a no

14  harm/no foul theory of the world you may well lose.

15          MR. O'DONNELL: In a fraudulent conveyance, that's

16  right. That's right. And that's the defense that I think

17  they're asserting. Their argument that you're getting more

18  than you would have gotten otherwise is as you've heard before

19  when you ask in what state of the world should we view this,

20  that's not how we view it. We have rights. Under the

21  principal and interest of the notes those rights are worth

22  something today, they're not going to be worth anything after

23  the proposed restructuring unless this Court takes action.

24          There was also some discussion about the Second

25  Circuit case Bank of New York v. First Millennium. We talk

1    about that in our reply brief also.  That's not a Trust

2    Indenture Act case.  It's a fight between two indenture holders

3    and the FDIC.  The FDIC as part of its argument tried to say

4    that there was a provision very much like 316(b) and the Court

5    said the contract's unambiguous.  We're not going to look to

6    whether or not the parties intended to incorporate 316(b)

7    because that's not what it did and it went on and it said that

8    absolute an unconditional right to repayment that is under

9    316(b) conflicts with the express provisions in that case

10   within that indenture which was a limited recourse provisions

11   of the indenture which the Court said obviously had no relation

12   to the purpose of preventing the oppression of minority

13   holders.  So I don't see the relevance of the case at all, your

14   Honor.

15           THE COURT:  Well, did you not also say, sir, that the

16   language in there was dicta?

17           MR. O'DONNELL:  Yes, I did.

18           THE COURT:  I'm neither agreeing or disagreeing with

19   that.  I want to make sure I'm on the same page with this case.

20           MR. O'DONNELL:  That's what we said in our reply

21   brief.  There is also the talk about there's really the need to

22   find an option three, an option three for this Trust Indenture

23   Act.  I agree that is essentially what people are asking.

24   They're saying we've got to find an option three here because

25   this is a for-profit education company.  You've heard our

1    position.  There is no exception under the Trust Indenture Act

2    for for-profit education companies and if we look at an option

3    three the place to look for that is in Congress, not in the

4    courtroom.

5            Very briefly, your Honor, there was some discussion

6    about the Hannan report and I was tired at the end of yesterday

7    but I also thought the points were coming across, which was

8    that Mr. Hannan stands to gain quite a bit.

9            THE COURT:  No, I understand.  There's an interesting

10   fact/expert witness dichotomy there.  I am aware of it.  No,

11   there is -- look, my prior experience is more in the criminal

12   law context than with fact/expert witness but I do understand

13   the bias.

14           MR. O'DONNELL:  Separate and apart from the bias, it's

15   really interesting because when I was asking about that success

16   fee the financial advisor's response was oh, if this doesn't

17   happen, we'll just go back to the drawing board and we'll come

18   up with something else, and yet we're supposed to understand

19   that that's an impossibility.  It's not an impossibility.

20   We're going to go back to the drawing board and something's

21   going to get done.

22           Very briefly, again, there's nothing incidental about

23   the intercompany sale and I think the Court appreciates that

24   and our argument at least that the secureds, I'm not seeking

25   to, we are not, excuse me, seeking to enjoin an Article 9

1  foreclosure sale for the secureds.  They can do that.  What

2  they can't do is bargain for the cooperation of the companies

3  where we're going to deliberately get around the note holders'

4  rights, transferring assets, giving equity and management

5  incentive plans to the company so that we can circumvent the

6  Trust Indenture Act rights.  That's what we're seeking to

7  preclude.

8        THE COURT:  So if they had simply said here is our

9  plan for the foreclosure of assets and we're going to revoke

10  our rights under these pre-existing agreements to call back

11  management to help us effect that, you would be okay with that?

12        MR. O'DONNELL:  I don't think they have those rights

13  under the pre-existing agreement so they can't compel

14  management to do that, first of all, and there's a reasonable

15  limitation in the cooperation agreement that Ms. Apps cited and

16  they can't compel management to go to the regulators and tell

17  the regulators don't worry we're going to still be here and

18  don't worry we're going to sign the PPA, these are still going

19  to be the same people you trusted before.  If they could do

20  that, they would have done that.  And if they could do that

21  they wouldn't be here seeking to stop us from enforcing our

22  rights under the Trust Indenture Act.

23        Your Honor, unless you have other questions the only

24  other point is just to stress again on behalf of everybody how

25  appreciative we are of your time and effort.

1          THE COURT:  Thank you, although -- all right, well,

2     then, that is it.  All right, we do report that oral argument

3     is ended mercifully after a scant three hours, which is okay.

4     Let me do as I did yesterday in complimenting the parties.  I

5     feel awkward when you compliment me, so don't.  Some of you may

6     know in my prior life I have a lot of experience with oral

7     arguments and it is my favorite part, was my favorite part of

8     being a lawyer.  I don't get to do it in my current position.

9     Doesn't mean I'm going to give this up, this job is great, but

10    I do, really, my favorite part of this job is this, oral

11    argument and what is even better-er, if such a word exists, is

12    to have oral argument with people who are prepared and who care

13    and who are well prepared by other folks in the back who are

14    actually doing all the work and who come forward with well

15    thought out arguments that are clearly the product of thought

16    and preparation and research and mooting and consultation with

17    others.

18          So as complicated and as time intensive as this was

19    for all, it was both very important to me in my decision and I

20    thank you for that.  This is the cherry on the top of this

21    particular sundae.  So I very much thank you for this

22    particular oral argument today.

23          I know what you really want to know is how long it's

24    going to take me to do this.  The answer is I don't know.  We

25    are working with the appropriate amount of diligence to get

1    this done promptly and correctly.  I do have this intervening

2    Thanksgiving thing next week.  I don't think you're getting

3    something next week, but I recognize that folks are basically

4    waiting for me to respond and keep that in mind.  So for now

5    I'm going to ask you to please get the transcript to me as

6    quickly as we can.  I will think about everything that you've

7    given me and I will give you an answer as soon as I can.  So

8    with that, you can all go bill for other things now.

9              Thank you so much.

10              (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25