# Exhibit A

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Sean E. O'Donnell
Joseph L. Sorkin
Christopher Carty
Lucy C. Malcolm

*Counsel for Plaintiffs Marblegate Asset Management, LLC, Marblegate Special Opportunities Master Fund, L.P., Magnolia Road Capital LP, and Magnolia Road Global Credit Master Fund, L.P.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------X

| | | |
|---|---|---|
| MARBLEGATE ASSET MANAGEMENT, LLC, MARBLEGATE SPECIAL OPPORTUNITIES MASTER FUND, L.P., MAGNOLIA ROAD CAPITAL LP, and MAGNOLIA ROAD GLOBAL CREDIT MASTER FUND L.P., | : | |
| Plaintiffs, | : | 14 Civ. 8584 (KPF) |
| v. | : | |
| EDUCATION MANAGEMENT CORP., EDUCATION MANAGEMENT LLC, and EDUCATION MANAGEMENT FINANCE CORP., | | |
| Defendants. | | |

-------------------------------------------------------------------------------X

**DECLARATION OF DIRECT TESTIMONY OF ANDREW MILGRAM**

I, Andrew Milgram, hereby declare pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States of America that the following is true and correct:

**Personal Background and Professional Experience**

1. I am a Founder, Managing Partner and Chief Investment Officer of Marblegate Asset Management ("Marblegate"). Prior to forming Marblegate, I was a Principal at Epic Asset Management where I was responsible for generating, evaluating, executing, and managing investments in a portfolio of distressed and special situation assets across a variety of industry sectors. Before joining Epic, I was part of the capital markets businesses at Deutsche Bank Alex Brown and Bank of Tokyo Mitsubishi, and prior to Bank of Tokyo Mitsubishi, I worked briefly at Skyscout. I began my career at Swiss Bank Corp. (now UBS) where I was part of the global emerging markets team responsible for the bank's proprietary investments in Russia, Africa and the Middle East.

2. I hold the Chartered Financial Analyst designation and graduated from Colby College with a BA in economics and international studies. I am the Council President of the Greenwich Council of the Boy Scouts of America. I also serve on the Board of Directors at Temple Shalom of Greenwich. And I live in Greenwich, Connecticut with my wife and three children.

**Marblegate**

3. Marblegate was founded in February 2009. Marblegate is an investment management firm focused on event-driven distressed corporate credit restructuring, deep value investing and other special situations, primarily in the United States middle markets. Its general investment strategy is to combine detailed fundamental credit analysis with differentiated sourcing and in-depth due diligence to select investments and define multiple ways to unlock

value. [redacted][1]

4. [redacted][2]

5. [redacted][3]

**Marblegate's Initial Investment in EDMC**

6. Marblegate's First Quarter 2013 Investor Letter—which Marblegate contemporaneously shared with its investors and potential investors—outlines Marblegate's investment strategy concerning EDMC.[4] Previously, in 2011, Marblegate had played a lead role in the private restructuring of ATI Enterprises, which is a competitor of EDMC in the for-profit

---

[1] Pls.' Ex. 56, at 2.

[2] Pls.' Ex. 56, at 7.

[3] Pls.' Ex. 53.

[4] See Pls.' Ex. 99, at MAM0019542–45. "EDMC" refers to defendant Education Management Corporation and its subsidiaries, including defendants Education Management LLC and Education Management Finance Corp. Unless otherwise defined herein, capitalized terms shall have the same meaning as used in Plaintiffs' Complaint for Declaratory and Injunctive Relief.

education space. This experience with ATI provided Marblegate with firsthand knowledge of and experience with the regulators, specialist legal counsel, competitors, critical vendors and sector-focused sponsors in the for-profit education industry.[5] This experience also led Marblegate, in or around September 2012, to begin exploring investing in EDMC.

7. EDMC has been in operation for over 40 years and it is one of the largest for-profit education companies in North America. As of October 2013, the Company reported having approximately 125,560 enrolled students in 110 schools located across the United States and Canada. It reports that its schools offer both online and campus-based education in a variety of fields, including the arts and humanities, business, law, psychology and behavioral sciences, and health science, among others.

8. EDMC was a public company until being taken private by a consortium of private equity funds on June 1, 2006. These sponsors paid $3.4 billion for the business, financing $1.9 billion of the purchase price with debt. At the close of the transaction, EDMC had, approximately, (i) a $1.2 billion term loan facility, (ii) a $300 million revolving credit facility, (iii) $375 million of $8.75% senior notes due June 1, 2104, and (iv) $385 million of 10.25% senior subordinated notes due June 1, 2016.

9. Despite its significant debt load, EDMC thrived under private ownership. From 2007 to 2009, revenue grew at an average of 20% annually with EBITDA growing at more than 25% per year, from $319 million in the fiscal year ended June 30, 2007, to $431 million in fiscal 2009. With these spectacular results, the sponsors took the Company public in October 2009 to raise cash to redeem the subordinated notes. After the Company was taken public in 2009,

[5] See Pls.' Ex. 99, at MAM0019542.

EDMC had, approximately, (i) a $1.2 billion term loan facility, (ii) a $300 million revolving credit facility, and (iii) $375 million of 8.75% senior notes due June 1, 2014.

10. In 2012, EDMC experienced a decline in its financial position. The prices of its debt instruments also declined. However, when Marblegate evaluated EDMC in September 2012, we determined that its net leverage through the indenture notes was only 2.6x (debt net of cash to earnings before taxes, depreciation, and amortization or EBITDA) and that the Company was generating significant free cash flow. The Company was well below its senior leverage covenant of 3.5x, it had no borrowings under its revolving credit facility, and it had approximately $200 million of unrestricted cash. [redacted][6]

11. Most significantly, before purchasing EDMC senior unsecured notes, Marblegate came to understand (i) that the Company depended almost entirely on funding from Title IV programs under the Higher Education Act for its revenue, (ii) the Company could not file for bankruptcy without jeopardizing its ability to receive such Title IV funds, and (iii) the notes were qualified under the Trust Indenture Act, which meant that the interest and principal payments due on the notes, as well as the right to sue for those payments, could not be impaired without the noteholders' consent. In addition, Marblegate noted the absence of any inter-creditor or subordination agreement between the secured lenders and the holders of notes. Marblegate thus concluded, before purchasing these notes, that it was highly unlikely that the Company or its secured lenders could legally compel the noteholders against their will to compromise the amounts owed under the notes.

[6] Pls.' Ex. 99, at MAM0019543.

12. In other words, although Marblegate generally prefers to invest in first lien debt, as demonstrated above, the protections afforded the notes under the Trust Indenture Act and the unique position of EDMC as being unable to file for bankruptcy, led Marblegate to believe that its investment in the notes would essentially rank equally with EDMC's secured creditors. With this belief in mind, Marblegate began purchasing notes in January 2013.

**EDMC's 2013 Exchange Offering**

13. On or about February 1, 2013, following negotiations with its secured lenders and bondholders, EDMC issued an exchange offer. Bondholders participating in the 2013 Exchange Offer received a cash pay down of approximately 45% of their claim under the notes and the remaining 55% of their claim was reinstated in newly issued Notes (which are the Notes subject to the instant litigation). Notably, holders who declined to participate in the exchange were paid in cash 100% of the principal and interest owed on their notes per their original terms.

14. The Company similarly issued the new Notes under the Trust Indenture Act. The Company remained dependent on Title IV funding. And there was no subordination or inter-creditor agreement in place making the Notes junior to the secured loans. In other words, Marblegate believed that any refinancing of the new Notes – like the exchange offer for the old notes – would have to be consensual and, as a result, all stakeholder classes would share in the risks of the Company equally. With this in mind, Marblegate exchanged the Old Notes for the new Notes and has purchased additional Notes since the 2013 Exchange Offer.

**Marblegate is a Minority Investor in EDMC**

15. Presently, Marblegate owns $14,306,501 of Notes and it has approximately $375 million under management. While Marblegate is a small creditor compared to EDMC's three largest creditors, KKR, Oaktree Capital, and Eaton Vance, this is one of Marblegate's larger

investments and comprises approximately 3.5% of its assets under management. As of July 24, 2014, KKR has approximately $98.0 billion under management[7] and owns approximately $272 million of EDMC's capital structure.[8] As of September 30, 2014, Oaktree has approximately $93.224 billion under management[9] and owns approximately $152 million of EDMC's capital structure.[10] And Eaton Vance has approximately $293.6 billion under management[11] and owns approximately $147 million of EDMC's capital structure.[12] Marblegate owns approximately 7% of EDMC's senior unsecured Notes. Marblegate's position comprises less than 1% of EDMC's overall capital structure.

**EDMC's Sudden Draw-Down of $220 Million and its Commencement of Restructuring Efforts**

16. During EDMC's third quarter earnings call on May 1, 2014, EDMC's Chief Executive Officer Ed West stated that the Company was "in the midst of an unprecedented operating environment" and that it had "initiated a process with [its] lenders with the ultimate goal of aligning [EDMC's] capital structure to the current environment to promote both near- and long-term operational success."[13] During the same call, the Company's Chief Financial Officer, Mick J. Beekhuizen, stressed: "It's important to remember that our debt is solely related to the acquisition of EDMC in 2006 and does not fund the operations of our schools. In fact, we have paid down more than $650 million of our debt since 2006." Mr. Beekhuizen went on to explain that as of March 31, 2014, the Company was in compliance with its financial covenants, but in light of the Company's current outlook, they did not believe that it would satisfy the financial

[7] Pls.' Ex. 52.
[8] Pls.' Ex. 120.
[9] Pls.' Ex. 54.
[10] Pls.' Ex. 162.
[11] Pls.' Ex. 51.
[12] Pls.' Ex. 57.
[13] Pls.' Ex. 203, at 2.

covenant compliance ratios as of June 30, 2014.  Accordingly, Mr. Beekhuizen explained: "[w]e've initiated conversations with our lenders and engaged a financial advisor to aid us in these discussions as we work to address the covenants with the ultimate goal of aligning the capital structure with the current operating environment."[14]

17.     As part of its restructuring efforts, and in order to gain leverage with its lenders, on April 29, 2014, the Company drew down approximately $220 million on its secured revolving credit facility.  During the investor call, Mr. Beekhuizen closed this part of the discussion by emphasizing that the $220 million was not to fund operations: "It is important to note that the revolver draw was not to fund operations."[15]

**Marblegate's Exclusion from EDMC's Restructuring Discussions**

18.     On or about May 12, 2014, Marblegate received a presentation created by Houlihan Lokey outlining EDMC's current situation and alternatives for restructuring its debt.[16] At that time, it was our understanding that Houlihan Lokey had been hired by some or all of EDMC's secured lenders to provide financial analysis and advice in this matter.

19.     At that time, we also became aware of an emerging ad hoc group of the Company's creditors, which was coming together to discuss a possible restructuring process.  We understood that Milbank, Tweed, Hadley & McCloy was acting as lead counsel for this group, which was comprised of KKR, Oaktree, Eaton Vance and, potentially, Angelo Gordon.

20.     We were decidedly interested in participating in any creditor discussions regarding EDMC and believed we could be of particular assistance with EDMC's restructuring efforts because of our aforementioned experience in the for-profit education space successfully

---

[14] Pls.' Ex. 203, at 6.
[15] Pls.' Ex. 203, at 6.
[16] Pls.' Ex. 91.

restructuring the debts of ATI. In fact, during the early stages of the restructuring discussions, Houlihan called Marblegate on several occasions hoping to capitalize on Marblegate's familiarity with the for-profit education industry. Houlihan, for example, asked my colleague, Richard Kearney, and me to recommend regulatory counsel for the ad hoc group of lenders to retain as part of their restructuring efforts with the Company.

21. But the Secured Lenders refused to let Marblegate participate meaningfully in the restructuring negotiations. Richard Kearney and I repeatedly asked Houlihan representatives if we could join the creditor discussions. We were told that Houlihan Lokey was not in the position to make this decision. Subsequently, I reached out to Nikhil Srivastava of KKR on May 12, 2014, and wrote: "to the extent that there are upcoming meetings or conference calls that we can join we would be happy to lend some of what we have learned to the process." On May 14, 2014, I once again reached out to Mr. Srivastava expressing Marblegate's interest in meeting with the ad hoc group of creditors. At that time, he informed me that the meetings were limited to "steering committee" members. He noted that this group included Eaton Vance, Oaktree, Oak Hill, Regiment, GSO, certain unspecified revolver banks, and KKR.[17] We did not receive any subsequent invitations from the "steering committee" to participate in discussions or negotiations regarding the EDMC restructuring.

**The "Take it or Get Nothing" Offer**

22. Rather than allowing Marblegate to participate in the restructuring discussions, the Company and its Secured Lenders elected to pursue the "take it or get nothing" approach. First, they continued to exclude Marblegate from the restructuring discussions. Indeed, it was not until August 27, 2014, that Marblegate first began to learn some of the details of the Company's Proposed Restructuring. And it was not until October 1, 2014, when the Company

[17] Pls.' Ex. 92.

released its Offering Circular, that the Company and the Secured Lenders first issued their ultimatum that Marblegate and the other minority lenders accept the exchange or get nothing for their Notes:

> As a result [of the Proposed Restructuring], we anticipate that such Holders [of the Notes] will not receive payment on account of their Notes, including then accrued and unpaid interest, from and after the date the Proposed Restructuring is consummated.[18]

23. Notwithstanding the ultimatum, Marblegate continued to try and have a dialogue with EDMC and its other creditors, but our efforts were to no avail.

**Plaintiffs' Efforts to Protect Their Statutory Rights**

24. On October 9, 2014, Plaintiffs' counsel wrote to the Company, among other things, to (i) advise the Company that Plaintiffs did not intend to tender their Notes in the Exchange Offer,[19] (ii) state Plaintiffs' position that the Exchange Offer violates § 316(b) of the Trust Indenture Act, (iii) request that the Company refrain from consummating the Proposed Restructuring, and (iv) inform the Company of Plaintiffs' intention, absent a resolution of our dispute, to seek judicial relief in order to avoid being irreparably harmed by the Exchange Offer.[20] By letter dated October, 14, 2014, the Company replied to Plaintiffs' letter affirming the Company's intention to proceed with the Proposed Restructuring based upon its assertion that "[t]here is no viable alternative."[21]

25. Plaintiffs and the Company exchanged several more letters on October 17 and 21, 2014.[22] Unfortunately, no progress was made. Then, on October 22, 2014, Milbank Tweed

---

[18] Pls.' Ex. 1, at 28.

[19] Marblegate does not intend to exchange its Notes because, among other things, we believe that the transaction does not provide acceptable consideration for the value of the Notes and Marblegate strongly prefers to own debt, as opposed to equity.

[20] Pls.' Ex. 232.

[21] Pls.' Ex. 233. Each side's letter contained a request that the other side take measures to preserve documents given the likelihood of litigation.

[22] See Pls.' Ex. 234; Pls.' Ex. 235; Pls.' Ex. 236.

wrote to Plaintiffs' counsel stating that it is "our present intention that the asset sale pursuant to Article 9 will proceed on or after October 30, 2014, in the event that the Exchange is not consummated by the deadline . . . ."[23] But nowhere in its letter does Milbank state who they represent. And, at no time prior to the commencement of this litigation, did the Company or the Secured Lenders engage in a meaningful settlement dialogue with Plaintiffs or their representatives.

26. Plaintiffs, accordingly, on October 28, 2014, commenced this litigation under the continued belief that, absent an injunction, we will be irreparably harmed by the Proposed Restructuring because, ***as the Company concedes in the Offering Circular***, it will permanently and irreparably impair our ability to be paid principal or interest under the Notes.

* * *

27. Contrary to certain contentions made during discovery, Plaintiffs did not commence this litigation to settle a grudge between them and KKR respecting a wholly unrelated restructuring of a company called Sonifi, which was formerly known as "Lodgenet."[24] While I remain frustrated by KKR's behavior in LodgeNet, particularly because its representatives lied to me in that transaction, the notion that KKR's improper conduct in LodgeNet is the reason why we are before this Court is absurd. First, I have a fiduciary duty to my partners and my investors at Marblegate to try and maximize the value of Marblegate's investments. I would not jeopardize one of Marblegate's larger investments because of a personal vendetta. Second, Magnolia had nothing to do with LodgeNet and there is no reason to believe that it would

[23] Pls.' Ex. 237.

[24] In mid-August 2014, LodgeNet creditors were negotiating an out-of-court restructuring of the company's debt. Competing creditor groups were pursuing alternative plans which both required majority support. KKR effectively held the swing vote due to the size of its holdings of LodgeNet's debt. Marblegate offered to buy out KKR's position at an above-market price. KKR informed me that it was unwilling to sell its position; nonetheless, the following day KKR sold its position to the proponent of the opposing restructuring plan.

sacrifice its investment to help settle a score between KKR and me.  Third, KKR is a behemoth in the investment community.  Again, it has approximately *$98 billion* under management.  I would not pick a fight with KKR lightly.  Indeed, after receiving the Exchange Offer, Plaintiffs spent several weeks writing to the Company and pleading with its Secured Lenders to try and negotiate an amicable resolution.  We were anything but eager to commence litigation.

28. And, as we have stressed throughout discovery, we remain ready, willing, and able to engage in restructuring discussions with the Company and its Secured Lenders.  Unfortunately, it appears that in order for those discussions to bear fruit, the Company and its Secured Lenders must first learn from this Court that the Trust Indenture Act applies to the Notes at issue and bars them from impairing our right to receive principal and interest under the Notes without their consent.  Once this is made clear to them, we are hopeful that the Company and its other creditors will take a more reasonable approach toward a consensual restructuring.

Dated: New York, NY
November 13, 2014

Andrew Milgram