# Exhibit B

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Sean E. O'Donnell
Joseph L. Sorkin
Christopher Carty
Lucy C. Malcolm

*Counsel for Plaintiffs Marblegate Asset Management, LLC, Marblegate Special Opportunities Master Fund, L.P., Magnolia Road Capital LP, and Magnolia Road Global Credit Master Fund, L.P.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

MARBLEGATE ASSET MANAGEMENT, LLC,
MARBLEGATE SPECIAL OPPORTUNITIES MASTER
FUND, L.P., MAGNOLIA ROAD CAPITAL LP, and
MAGNOLIA ROAD GLOBAL CREDIT MASTER FUND
L.P.,

                Plaintiffs,

                v.

EDUCATION MANAGEMENT CORP., EDUCATION
MANAGEMENT LLC, and EDUCATION MANAGEMENT
FINANCE CORP.,

                Defendants.

-------------------------------------------------------------------------X

14 Civ. 8584 (KPF)

**AMENDED DECLARATION OF DIRECT TESTIMONY OF JAME DONATH**

I, Jame Donath, hereby declare pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States of America that the following is true and correct:

**Personal Background and Professional Experience**

1. I am the Managing Partner of Plaintiff Magnolia Road Capital, LP ("Magnolia Road"), which I founded in 2013. I graduated from Yale University with a bachelor's degree in economics in 1996, and received my Master of Business Administration from Harvard Business School in 2002.

2. I have been involved in the investment industry for sixteen years. After graduating from Yale, I spent two years at Goldman Sachs in the investment banking area. I then spent two years at Jupiter Partners, which is a middle-market private equity firm based in New York. In 2000, I went back to school for my M.B.A. at Harvard. In 2002, after graduating from Harvard Business School, I joined Davidson Kempner, a New York-based multi-strategy hedge fund. I worked in Davidson Kempner's distressed debt group for seven years, in both their New York and London offices. In late 2009, after leaving Davidson Kempner, I launched a credit hedge fund in partnership with an existing firm called Karsch Capital Management.

**Magnolia Road**

3. In 2012, I left Karsch and began the process of launching my own fund, Magnolia Road. As part of the process, I organized the entities and raised seed funding from Capricorn Investment Group. We officially launched Magnolia Road in May 2013.

4. Magnolia Road is an event-driven credit hedge fund. We invest in debt securities where there is an expectation of some near-term credit catalyst that will create value or crystallize value for our instruments. We generally do not invest in equity holdings, but rather have a preference for debt holdings. Our portfolio consists of less than five percent equity

holdings at any given time. We currently have approximately $133 million in assets under management.

5. As Magnolia Road's Portfolio Manager, I am responsible for sourcing investment ideas and overseeing our analysts' credit work, the risk management function, and the business and operations sides of the firm.

**Magnolia Road's Research into, and Investment in, EDMC**

6. Magnolia Road's involvement with EDMC began in early June 2013.[1]

7. EDMC is one of the largest providers of for-profit secondary education in North America that offers both campus based education through four systems and through online platforms at three of the four systems – The Arts Institute, Argosy University, Brown Mackie Colleges, and South University. The Company is significantly dependent on funding from the government through financial aid programs – almost 80% of its revenues are from Federal Title IV Aid funding.

8. The underlying investment was attractive to us because EDMC was a well-functioning company with substantial assets and good fundamentals. More importantly, the EDMC Cash Pay/PIK Notes (the "Notes") offered a short-term, high-yield opportunity. The Notes paid a 15% cash coupon. Since the Notes are expensive for the Company, we believed that the Company would buy them out in the short term. While the fairly high coupon suggested a certain degree of financial risk, the significant equity market capitalization and a reasonable valuation suggested otherwise. Specifically, our analysis indicated that the Notes would be called at or above par by the first call date in March of 2014.

---

[1] "EDMC" refers to defendant Education Management Corporation and its subsidiaries, including defendants Education Management LLC and Education Management Finance Corp. Unless otherwise defined herein, capitalized terms shall have the same meaning as used in Plaintiffs' Complaint for Declaratory and Injunctive Relief.

3

9. The Notes are situated in a unique place in EDMC's overall capital structure. The Notes were secured by a parent guarantee against the Company, which was not in place for other parts of EDMC's debt structure. Additionally, we believed and continue to believe that EDMC, as a for-profit educational company, is an unlikely to file for bankruptcy at any point. In the event that EDMC files for bankruptcy under Chapter 11, it and its constituent schools would lose their eligibility to participate in Title IV funding programs, which would be catastrophic to the Company. We believed that EDMC would be unlikely to use Chapter 11 to restructure its balance sheet, and that this unique situation, in addition to the terms of the Notes, made the Notes an attractive investment.

10. Our investment thesis in EDMC was built around the likelihood of a refinancing of the Notes, combined with a cautiously optimistic view of the Company's fiscal health. In June 2013, Kenichiro Jin, a Magnolia Road analyst, produced an internal valuation memorandum recommending a purchase of the EDMC Notes.[2]

**Magnolia Road's Investment in EDMC**

11. Ultimately, we invested in the Notes because we believed they offered a solid investment that fits with our fund's model. In June 2013, Magnolia Road purchased approximately $6 million of the Notes. We marked the price of the Notes at 108.38 in our internal daily profit-and-loss statement as of June 27, 2013. That price reflected our understanding of what the Notes should be valued at as part of determining the overall value of Magnolia Road's holdings.

12. On the second quarter earnings call on February 6, 2014, the Company indicated that there were encouraging signs on student enrollments, "positive new student enrollment

---

[2] Pls.' Ex. 20.

growth," and that EBITDA was in line with previous guidance.³ The Company indicated that while there were some limited short-term challenges, the company's long-term outlook was positive and remained on track with prior outlook forecasts.⁴ We were further encouraged by the Company's November 2013 shelf registration to issue new debt and equity securities, which we believed was a precursor to the refinancing we believed was about to take place.

13. Throughout the first half of 2014, we received the coupon payment on the Notes, and we continued to mark the Notes at above face value through April 2014.

14. Sometime around the end of the first quarter or the beginning of the second quarter, Magnolia Road also purchased a small portion of EDMC's term loan.

**EDMC Announced Financial Challenges**

15. On the May 1, 2014 third quarter earnings call, EDMC's Chief Executive Officer Ed West indicated that the Company was "in the midst of an unprecedented operating environment" which presented significant challenges.⁵ In addition, the Company announced that it had "initiated a process with [its] lenders with the ultimate goal of aligning [EDMC's] capital structure to the current environment to promote both near- and long-term operational success."⁶

16. On May 2, 2014, we received a presentation created by Houlihan Lokey outlining EDMC's current situation and alternatives for restructuring its debt.⁷ We subsequently learned that Houlihan Lokey had been hired by some or all of EDMC's secured lenders to provide financial analysis and advice in connection with this matter.

17. Later in May, we became aware of an emerging ad hoc group of EDMC creditors. This group was engaging in discussions and negotiations regarding EDMC restructuring

---

³ Pls.' Ex. 183.
⁴ *Id.*
⁵ Pls.' Ex. 203.
⁶ *Id.*
⁷ Pls.' Ex. 28.

5

alternatives. We understood that Milbank, Tweed, Hadley & McCloy ("Milbank Tweed") was acting as lead counsel for this group. To the best of my knowledge, this group was comprised of KKR, Oaktree, Eaton Vance, and, potentially, Angelo Gordon.

18. We reached out to Milbank Tweed in early May 2014 to discuss the EDMC restructuring.

19. On May 12, 2014, we received another presentation directly from Houlihan Lokey, which outlined EDMC's financial situation and provided an analysis of "preliminary transaction considerations."[8]

20. It was at this point that we began to reach out to other EDMC creditors and to investigate the nature of any possible restructuring. While we believed that some revision of EDMC's balance sheet may have been financially appropriate, we did not anticipate that a wholesale restructuring was contemplated.

21. During the summer of 2014, we had conversations with representatives of Angelo Gordon, KKR, Evercore, and Houlihan Lokey regarding the EDMC restructuring plans.

22. ████████████████████████████████████████████ Our internal valuation of the Notes reflected not only the market activity, but our own assessment of the value of the rights granted to the Notes and the practical reality that EDMC is a bankruptcy-remote entity.

**The Proposed Restructuring**

23. On August 27, 2014, we received the Term Sheet for the Restructuring Support Agreement (the "RSA"), outlining the Company's plan for restructuring its debt (the "Proposed Restructuring").

---

[8] Pls.' Ex. 32.

24. We decided to take no action in the initial exchange offer period provided in the Term Sheet. At that point, we did not believe that the exchange offer provided a financially acceptable return for our investors. Given our perspective on the rights under the Notes and EDMC's unique nature as a for-profit educational institution dependent on Title IV program funds, we felt that the Notes were more valuable than the consideration that was being offered for tendering creditors. In addition, we did not want to equitize our debt in EDMC and felt that maintaining our position in the Notes, with their valuable coupon, was a better position for our investors.

25. On September 3, 2014, we received several draft versions of the RSA and the RSA Term Sheet from Houlihan Lokey.[9] Houlihan Lokey also sent us an updated presentation that it had prepared, outlining the Proposed Restructuring.[10]

**Negotiations with EDMC and its Creditors**

26. Following the release of the RSA, we attempted to engage in discussions with EDMC and its creditors, as well as their respective advisors and counsels. In particular, we reached out about the possibility of exchanging our portion of the term loan in the Proposed Restructuring. We were willing to do so in the hopes of facilitating the restructuring and achieving a consensual agreement. However, due to a clause in the RSA, we were unable to do so without effectively exchanging all of our debt, both secured and unsecured. We requested that the Company and its advisors revise this section of the RSA to enable us to exchange our term loan holdings only. The Company never responded to our requests on this issue.

27. ███████████████████████████████████████[11]
███████████████████████████████████

---

[9] Pls.' Ex. 58.
[10] Pls.' Ex. 41.

**Retention of Attorneys and Negotiations**

28. In August 2014, we retained counsel in relation to the Proposed Restructuring. Through counsel, we engaged in negotiations with the Company and with various EDMC creditors in an effort to resolve this situation without resort to litigation. We also sent several letters to the Company, informing them that we believed the terms of the Proposed Restructuring are unlawful and urging them not to proceed with the transaction. We also conferred via telephone with counsel for the Company and the Ad Hoc Committee of Term Loan Lenders. At no point did either the Company or the Ad Hoc Committee engage in substantive negotiations with us.

**The Litigation**

29. On October 28, 2014, after exhausting our efforts to come to an amicable out-of-court resolution and because we will be irreparably harmed by the Proposed Restructuring, we commenced this litigation.

* * *

---

[11] Pls.' Ex. 48.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: New York, NY
      November 14, 2014

                                                           _____
                                                           Jame Donath