UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------X
                                                      :
MARBLEGATE ASSET MANAGEMENT, et al.,                  :
                                                      :
                              Plaintiffs,             :
                                                      :
              v.                                      :
                                                      :
EDUCATION MANAGEMENT CORP., et al.,                   :
                                                      :
                              Defendants.             :
                                                      :
------------------------------------------------------X
```

┌─────────────────────────────────────────┐
│ USDC SDNY                                 │
│ DOCUMENT                                  │
│ ELECTRONICALLY FILED                      │
│ DOC #: _____                     │
│ DATE FILED: December 30, 2014             │
└─────────────────────────────────────────┘

14 Civ. 8584 (KPF)

AMENDED OPINION
AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Marblegate Asset Management, LLC, Marblegate Special

Opportunities Master Fund, L.P. (together "Marblegate"), Magnolia Road

Capital LP, and Magnolia Road Global Credit Master Fund L.P. (together

"Magnolia," and with Marblegate "Plaintiffs") hold unsecured debt in Defendant

Education Management LLC, which along with Defendant Education

Management Finance Corporation is a subsidiary of Defendant Education

Management Corporation ("EDMC," or together "Defendants").  Plaintiffs seek a

preliminary injunction to block a proposed restructuring of Defendants' debt

that would force Plaintiffs either to convert their debt to equity or to risk the

elimination of their practical ability to recover their principal and remaining

interest payments.  The Ad Hoc Committee of Term Loan Lenders of Education

Management LLC ("Intervenors") is a group of primarily secured creditors who

support the restructuring, and who have intervened in opposition to the

motion.

Plaintiffs acknowledge that a restructuring of Defendants' debt is almost certainly necessary to avoid insolvency, and that EDMC's insolvency is an unappealing option for all parties involved.  Their complaint centers around the deal they and the other unsecured creditors have received in this version of the restructuring, and their contention that the restructuring, absent their consent, violates the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa-77bbbb. While Plaintiffs' legal arguments have merit, this Court is unwilling to introduce a highly disruptive injunction into the delicate regulatory and financial ecosystem in which the parties operate.  More to the point, the Court is unwilling to accord to holders of $20 million in unsecured notes the legal right to stop a $1.5 billion restructuring.  Because Plaintiffs have failed to demonstrate a likelihood of irreparable harm, and because the balance of the equities and the public interest weigh against granting the injunction, the motion is denied.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Parties

EDMC, founded in 1962, is one of the country's largest for-profit providers of college and graduate education, with an enrollment of roughly

---

[1]    The facts set forth herein are not in dispute, except where specifically identified, and are drawn from the parties' exhibits ("Pl. Ex." and "Def. Ex."); the exhibits to the declarations of Lucy Malcolm for Plaintiffs ("Malcolm Decl."), Lauren M. Kofke for Defendants ("Kofke Decl."), and James Burke for Intervenors ("Burke Decl."); the declarations of various witnesses ("___ Decl."); the expert reports submitted by the parties ("___ Report"); and transcripts from depositions ("___ Depo. Tr.") and testimony at the hearing ("Hrg. Tr.").

118,090 students and 20,800 employees.  (West Decl. ¶¶ 4, 11).  In 2014

EDMC derived 78.6% of its net revenues from federal student aid programs

under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070-1099.

(*Id.* at ¶ 13).  Eligibility for Title IV funds is determined on both an institutional

and a company-wide basis.  Each institution must be (i) authorized by the

relevant state agency; (ii) institutionally accredited by an accreditation agency

recognized by the Department of Education ("DoE"); and (iii) certified as an

eligible institution by the DoE.  (*Id.* at ¶ 14).  Because EDMC operates 18

institutions across the country, its institutions operate under the regulatory

purview of a number of state agencies and regional accrediting agencies.  (*Id.* at

¶ 19).  EDMC regularly negotiates the eligibility of its institutions with each of

these regulatory bodies, some of whom have expressed their concern over its

financial condition.  (*Id.* at ¶¶ 23-24).

    The DoE's oversight poses a special set of challenges for EDMC, as it

assesses the eligibility of EDMC as a whole to receive Title IV funds.  Because

EDMC has not met the financial responsibility standards established by the

Secretary of Education pursuant to 20 U.S.C. § 1099c(c), it is only provisionally

---

    For convenience, the parties' memoranda of law will be referred to as follows: Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction as "Pl. Br."; Defendants' Brief in Opposition to Plaintiffs' Motion for a Preliminary Injunction as "Def. Opp."; Intervenors' Opposition to Plaintiffs' Motion for a Preliminary Injunction of the Steering Committee for the Ad Hoc Committee of Term Loan Lenders of Education Management LLC as "Int. Opp."; Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction as "Pl. Reply"; and Intervenors' Memorandum of Law in Support of the Motion of the Steering Committee for the Ad Hoc Committee of Term Loan Lenders of Education Management LLC to Intervene as "Memo to Intervene."  Several of these documents were filed under seal and then refiled in redacted form pursuant to the Court's instructions.

certified, enabling the Secretary to require the posting of a letter of credit, *id.* § 1099c(c)(3)(A).  The DoE currently requires EDMC to post a $302.2 million letter of credit, equal to 15% of its Title IV funds received.  (West Decl. ¶¶ 16-18).  Of critical importance, an institution loses its eligibility for Title IV funds if it, or a controlling affiliate, files for bankruptcy or has an order for relief in bankruptcy filed against it.  *See* 20 U.S.C. § 1002(a)(4)(A); Conditions of Institutional Eligibility, 34 C.F.R. § 600.7(a)(2).

Marblegate is an investment management firm that focuses in part on "event-driven distressed corporate credit restructuring."  (Milgram Decl. ¶ 3).  Marblegate primarily invests in corporate debt rather than equity, and among its debt positions owns primarily first lien loans and secured bonds.  (*Id.* at ¶ 5).  Having had experience investing in the for-profit education sector, Marblegate began exploring investing in EDMC in September 2012.  (*Id.* at ¶ 6).  Despite the decline in EDMC's financial position, Marblegate determined that an investment in the unsecured notes of Education Management LLC made sense due to EDMC's then-limited debt burden and the interaction of the Title IV eligibility requirements with the notes' eligibility under the Trust Indenture Act.  (*Id.* at ¶¶ 10-11).  Marblegate believed that, with bankruptcy not a viable option due to Title IV, EDMC would have to pay the notes in full or obtain Marblegate's consent to any modification due to the Trust Indenture Act.  (*Id.* at ¶ 12).  Marblegate thus began purchasing notes in January 2013.  (*Id.*).  Marblegate then participated in a February 2013 exchange offer, exchanging the old notes for new notes (the "Notes") governed by the March 5, 2013

4

Indenture (the "Indenture"), ultimately acquiring $14.3 million of the Notes. (*Id.* at ¶¶ 13-15).

Magnolia is "an event-driven credit hedge fund" that, like Marblegate, invests primarily in corporate debt.  (Donath Decl. ¶ 4).  Magnolia took a "cautiously optimistic" view of EDMC's financial health, and, assessing EDMC's legal obligations in a similar manner as Marblegate, invested in the Notes in June 2013, expecting that the Notes would eventually have to be refinanced, and that any such refinancing would be on terms favorable to Magnolia.  (*Id.* at ¶¶ 9-10).  Magnolia presently owns approximately $6 million of the Notes.  (*Id.* at ¶ 11).

Intervening in the litigation pursuant to Federal Rule of Civil Procedure 24(b) is the Steering Committee for the Ad Hoc Committee of Term Loan Lenders (the "Steering Committee," or "Intervenors"), a group of six asset management firms that collectively hold a significant portion of EDMC's secured debt and unsecured Notes (*see infra*) and support the Proposed Restructuring.  Those firms are: HG Vora Capital Management, LLC, KKR Credit Advisors (US) LLC ("KKR"), Oak Hill Advisors, LP, Oaktree Capital Management, L.P., Regiment Capital Advisors, LP, and Centerbridge Partners, L.P.

### 2. EDMC's Debt

EDMC has outstanding debt of $1.553 billion.  (Beekhuizen Decl. ¶ 7). This consists of $1.305 billion in secured debt, divided between $220 million drawn from a revolving credit facility and $1.085 billion in term loans, and

$217 million in unsecured Notes. (*Id.*). The secured debt is secured by collateral in "virtually all of the assets of" EDMC and its subsidiaries. (*Id.* at ¶ 8). The secured term loans were, until September 2014, governed by the Second Amended and Restated Credit and Guarantee Agreement (amended and restated as of December 7, 2010) (the "2010 Credit Agreement") (Def. Ex. 6). Among other provisions, the 2010 Credit Agreement gave the secured creditors, upon an "Event of Default," the right to "sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes[.]" (2010 Credit Agreement § 6.1(h)).

The unsecured Notes are partially held by Plaintiffs (though Magnolia also owns a small amount of secured debt (Donath Decl. ¶ 14)). The Notes are due in 2018 with periodic interest payments, and are governed by the March 5, 2013 Indenture (the "Indenture") (Malcolm Decl. Ex. B), which has several relevant provisions. First, the Notes are qualified under the Trust Indenture Act (Indenture § 12.01), and under Section 6.07 the Notes receive the same protections provided for in Section 316(b) of the Act, 15 U.S.C. § 77ppp(b):

> *Rights of Holders of Notes to Receive Payment.* Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal, premium, if any, and Additional Interest, if any, and interest on the Note, on or after the respective due dates expressed in the Note … or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

(Indenture § 6.07).

One feature of the Notes that increased their value in the eyes of Marblegate and Magnolia was that, despite being issued by Education Management LLC, they were guaranteed by EDMC, the parent corporation (the "Parent Guarantee").  (*See* Donath Decl. ¶ 9; Hrg. Tr. 61-62).  Yet the Indenture contains provisions by which the Parent Guarantee can be removed.  First, Section 9.02 allows a majority of Noteholders to waive the Parent Guarantee on behalf of all Noteholders:

> *With Consent of Holders of Notes.*  Except as provided below in this Section 9.02, the Issuers and the Trustee may amend or supplement this Indenture, the Notes and the Guarantees with the consent of the Holders of at least a majority in principal amount of the Notes … then outstanding voting as a single class (including … consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes), and … the Guarantees or the Notes may be waived with the consent of the Holders of a majority in principal amount of the then outstanding Notes[.]

(Indenture § 9.02).  And second, Section 10.06(a)(ii) provides for an automatic release of a guarantee in the event that the secured creditors release the same guarantor's guarantee of their own debt:

> *Release of Guarantees.*  A Guarantee by a Guarantor shall be automatically and unconditionally released and discharged, and no further action by such Guarantor, the Issuers or the Trustee is required for the release of such Guarantor's Guarantee, upon: (a) … (ii) the release or discharge of the guarantee by such Guarantor of the Senior Credit Facilities or the guarantee which resulted in the creation of such Guarantee, except a discharge or release by or as a result of payment under such guarantee[.]

(Indenture § 10.06(a)(ii)).

7

These features were highlighted in the February 1, 2013 Offering Circular that accompanied the Notes (the "Original Offering Circular") (Def. Ex. 17).  In the summary, purchasers were informed that the Parent Guarantee was "being provided solely for the purpose of allowing the Issuers to satisfy their reporting obligations under the indenture that will govern the New Notes by furnishing financial information relating to Education Management Corporation instead of the Issuers and, accordingly, *you should not assign any value to such guarantee*." (*Id.* at 5 (emphasis added)).  And under "Risk Factors," the Original Offering Circular elaborated: "The lenders under the senior secured credit facility will have the discretion to release the guarantors under the senior secured credit agreement in a variety of circumstances, which will cause those guarantors to be released from their guarantees of the New Notes." (*Id.* at 33).  Marblegate's Chief Investment Officer Andrew Milgram testified that while he was aware of this cautionary language, he did not accord it much weight.  (Hrg. Tr. 59-64, 83-87).

At the time Plaintiffs acquired the Notes, there was no Parent Guarantee on the secured term loans.  (Int. Opp. 15).  Because the secured lenders had no Parent Guarantee of their own, there was thus no ability for them to release that guarantee and by doing so release the Parent Guarantee on the Notes through Indenture § 10.06.  Nothing in the Indenture, however, restricted Section 10.06 to providing an automatic release of a guarantee only where the corresponding guarantee on the secured debt existed at the time of the Indenture's formation.  And in September 2014, EDMC guaranteed the secured

loans when it and a majority of secured lenders agreed to a restructuring of the 2010 Credit Agreement (*see infra*).

### 3.    EDMC's Financial Distress

In a May 2014 conference call, EDMC informed its investors and creditors that it was experiencing significant financial distress.  (Milgram Decl. ¶ 16; Donath Decl. ¶ 15).  EDMC's earnings before interest, taxes, depreciation, and amortization ("EBITDA") had declined from $662 million in fiscal year 2013 to $276 million in fiscal year 2014, with a corresponding drop of 95% in its stock price.  (Beekhuizen Decl. ¶ 14).  The company expects further declines in EBITDA in fiscal year 2015.  (*Id.*).  Given its declining income and mounting interest payments, EDMC anticipated "significant negative cash flow in fiscal 2015."  (*Id.* at ¶ 17).  Furthermore, this declining financial performance risked adverse regulatory action and erosion of student confidence in EDMC's long-term viability.  (*Id.* at ¶ 18; West Decl. ¶¶ 32-33).  In addition, the DoE recently announced proposed "Gainful Employment" regulations that evaluate programs' eligibility for Title IV funding based upon graduates' earnings relative to their debt.  (West Decl. ¶ 25).  EDMC estimates that over half of its programs may currently fail to meet the Gainful Employment standards (*id.*), risking a significant loss of future earnings (Taylor Report ¶ 39).

In the same May 2014 conference call, EDMC announced that by the end of June it would no longer be in compliance with certain financial covenants under the secured credit facility.  (*Id.* at ¶ 15).  On June 23, 2014, the necessary majority of the secured lenders agreed to waive those covenants

through September 15, 2014, in order to facilitate a longer-term restructuring of EDMC's balance sheet.  (Burke Decl. Ex. F).  On September 5, 2014, EDMC and the requisite majority of the secured lenders agreed to a Third Amended and Restated Credit and Guaranty Agreement (the "2014 Credit Agreement") (Kofke Decl. Ex. 7), which eliminated, altered, or delayed many of Education Management LLC's payment obligations to the consenting lenders.  (*See id.*).  In exchange, EDMC became a guarantor of the secured loans.  (*Id.* §§ 1.1, 7.1).

The precise extent of EDMC's financial distress is the subject of some dispute among the parties.  EDMC maintains that "without a restructuring, the Company would have been unable to pay its debts through fiscal year 2015." (Beekhuizen Decl. ¶ 17).  It is generally agreed that without any renegotiation of its debts, EDMC will not be able to make the June 1, 2015 payment (subsequently postponed to July 2, 2015) on its revolving credit facility, amounting to $219.9 million.  (*Id.* at ¶¶ 7, 17).  Though Plaintiffs suggest that such a sizeable lump payment can generally be refinanced (*see* Hrg. Tr. 29-30 (Milgram cross)), they offer little evidence to support this optimism.  Plaintiffs maintain that, at a minimum, EDMC has sufficient liquidity to pay the September 30, 2014 and March 30, 2015 interest payments on the unsecured Notes, regardless of whether it consummates the Proposed Restructuring. (Kearns Decl. ¶¶ 10-11).  Defendants respond that this relies on an overstatement of Defendants' liquidity and an understatement of the risks of further adverse regulatory action; accordingly, it can only be stated with

10

certainty that Defendants can make the September 30 interest payment. (Hannan Rebuttal Report ¶ 2).[2]

Furthermore, Plaintiffs do not contest that *if* EDMC were to enter bankruptcy (an admittedly unlikely outcome), the claims of the unsecured Noteholders stand behind those of the secured creditors in order of priority. (*See* Hrg. Tr. 370). And Plaintiffs do not offer a valuation of EDMC that contradicts the report of Defendants' expert John Taylor, who values EDMC at $1.05 billion. Because Plaintiffs' claims stand behind roughly $1.305 billion in secured debt, the Court finds that Plaintiffs would likely recover nothing in bankruptcy. Accordingly, the Court finds that absent any restructuring of Defendants' debt whatsoever, Plaintiffs' ultimate recovery on the Notes would be limited to between one and two interest payments of $1.5 million each (*see* Hrg. Tr. 116-17), with no recovery of principal. As discussed below, the precise number of interest payments does not affect the Court's conclusions of law.

### 4.      The Proposed Restructuring

At the same time EDMC was negotiating the 2014 Credit Agreement to provide short-term relief from its obligations to secured creditors, it began to

---

[2]      The Court has significant qualms about relying on the expert report of Stephen Hannan. Hannan is employed by Evercore Partners ("Evercore"), an investment banking advisory firm that was retained by EDMC in March 2014 to assist with the restructuring process. (Hannan Report ¶¶ 1-2). Though Hannan is not being reimbursed specifically for his services as an expert (*id.* at ¶ 6), Evercore has a significant stake in the success of EDMC's restructuring, and accordingly in the outcome of this litigation (Pl. Ex. 262). Given Hannan's personal involvement and paucity of expert qualifications (*see* Hannan Report ¶ 5), it is far from clear that he is properly identified as an expert rather than a fact witness. Because the Court does not rely on any of his assertions as expert, however, it need not reach the question of his qualifications.

seek a longer-term balance sheet restructuring.  (Beekhuizen Decl. ¶ 25).

EDMC negotiated with the Ad Hoc Committee of Term Loan Lenders (the "Ad

Hoc Committee"), a group of 18 asset management firms that held 80.6% of

EDMC's secured debt and 80.7% of its unsecured Notes.  (Pl. Ex. 223).  As

Plaintiffs stress, while this group contained lenders who held only secured debt

as well as lenders who held both secured and unsecured debt, it contained no

lenders who held only unsecured Notes.  (*Id.*).[3]  However, Defendants point out

that they agreed to pay the fees and expenses of multiple law firms to represent

various creditor classes, including Paul, Weiss, Rifkind, Wharton & Garrison

LLP to represent the unsecured Noteholders (among whose clients were entities

holding $42 million in unsecured Notes and no secured debt whatsoever).

(Beekhuizen Decl. ¶ 31).  The negotiations were primarily conducted between

EDMC and the Steering Committee, a subset of the Ad Hoc Committee

consisting of six firms that at the time held 35.8% of EDMC's secured debt and

73.1% of the unsecured Notes.  (*See* Memo to Intervene 1 n.1; Pl. Ex. 223).[4]

---

[3]     Evidence was presented to the Court about possible missed opportunities that
Marblegate had to participate more actively in the negotiations over the Proposed
Restructuring.  (*See* Hrg. Tr. 39-42).  The Court does not find relevant for purposes of
the preliminary injunction motion whether Marblegate was actively denied the
opportunity to participate or simply declined to pursue participation as vigorously as
might have been possible.

[4]     The Court notes some discrepancy between the firms identified as part of the Steering
Committee in the Intervenors' papers and those identified in email correspondence from
May 2014.  (*See* Pl. Ex. 221).  The discrepancy is not material: both sets own more
secured debt than unsecured debt in absolute terms, own a higher proportion of the
unsecured debt than the secured debt, and do not include Plaintiffs.

The Court further notes that the Steering Committee, as of their November 5 motion to
intervene, claim to hold or control $565 million in secured debt, which would amount to
43.5% of EDMC's secured debt.  Again, the difference between these amounts is not
material to the resolution of this motion.

The parties to the negotiations arrived at the Proposed Restructuring, which would involve the conversion of EDMC's debt into a smaller amount of debt and equity, with the exact ratio varying by the type of debt held. This restructuring is governed by the Restructuring Support Agreement (Kofke Decl. Ex. 2). Three important features of the Restructuring Support Agreement are that it can only be amended by two-thirds of each relevant category of consenting creditors (*id.* § 8); absent such an amendment, any injunction of 20 days or more will automatically terminate the restructuring (*id.* § 7.01(c)(ii)); and with the support of two-thirds of each category of consenting creditors, all the signatories must proceed with the Intercompany Sale described below (*id.* § 4.05). In effect, the Restructuring Support Agreement provides two potential paths by which to accomplish the proposed restructuring.

The Proposed Restructuring will proceed along the first path if EDMC obtains the consent of 100% of creditors. Under this path, $150 million of the revolving loans would be repaid and made available for re-borrowing; certain letters of credit drawn from the revolver would be extended until March 2019; and the remainder of EDMC's secured debt (constituting $1.155 billion), including the term loans, would be exchanged for $400 million in new secured term loans and preferred stock convertible into roughly 77% of EDMC's common stock (subject to some dilution through warrants). (Beekhuizen Decl. ¶ 25; Pl. Ex. 223). Using Defendants' estimated post-restructuring equity value of $300 million (*see* Def. Ex. 125), this would leave the secured lenders with debt and equity worth $631 million, for a recovery of roughly 54.6% of the

13

$1.155 billion secured debt.  The Noteholders, meanwhile, would receive equity convertible into between 19% and 23.5% of EDMC's common stock, depending on whether holders of optionally convertible preferred stock and stock warrants convert into common stock.  (*See* Hannan Report ¶ 6 n.4).  Assuming the 23.5% figure, this equity would be worth roughly $71 million to the Noteholders as a whole and $7 million to Plaintiffs, for roughly a 32.7% recovery of value.  (*See* Def. Ex. 125).  The current shareholders would receive 4% of EDMC's common stock, with additional warrants.  (Beekhuizen Decl. ¶ 25).

In order to effectuate this voluntary restructuring, Defendants commenced an exchange offer for the Notes on October 1, 2014 (the "Exchange Offer").  (*See* Pl. Ex. 1 (the "Exchange Offering Circular")).  Holders of over 90% of the unsecured Notes have agreed to exchange their Notes, with Plaintiffs constituting all but $56,000 of the nonconsenting Noteholders.  (Beekhuizen Decl. ¶¶ 27-28).[5]  Defendants have also reached out to holders of their secured debt, acquiring 99% consent for the Proposed Restructuring.  (*Id.* at ¶ 28).

If Defendants do not obtain 100% creditor consent, the Restructuring Support Agreement obligates the signatories to the agreement to undertake the Intercompany Sale.  In the Intercompany Sale, a number of steps would occur with near simultaneity: (i) the secured lenders would release EDMC's parent

---

[5]      The holders of these $56,000 of Notes, along with the roughly 1% of the secured debt not to have consented, are represented by Defendants to be merely as-yet-unidentified rather than actively refusing to participate.  (*See* Hrg. Tr. 411-12 ("I think the Company is hopeful they'll deal with what they view [as] a mechanical problem.")).

guarantee of their loans (which the secured lenders recently obtained in the 2014 Credit Agreement), thus triggering the release of EDMC's parent guarantee of the Notes under Indenture § 10.06 (*see* Beekhuizen Decl. ¶ 34);[6] (ii) the secured lenders would exercise their rights under the 2014 Credit Agreement and Article 9 of the Uniform Commercial Code to foreclose on "substantially all the assets" of Defendants (*id.* at ¶ 33); and (iii) the secured lenders would immediately sell these assets back to a new subsidiary of EDMC (*id.*).  This new subsidiary would then distribute debt and equity to the creditors who had consented to the Restructuring Support Agreement in accordance with that document's terms.[7]

Defendants were not shy about spelling out the consequences of the Intercompany Sale for those unsecured Noteholders who declined to participate in the Exchange Offer.  The Exchange Offering Circular states:

> **Q: Why is it important that I tender my Notes in the Exchange Offer?**  A: … In the event an Intercompany Sale is consummated, Holders who do not tender their Notes in the Exchange Offer will continue to have claims against the Co-Issuers and certain of our subsidiaries that currently guarantee the Notes; however, *substantially all of our assets will have been transferred to New EM Holdings and will not be available to satisfy the claims of such Holders.  As a result, we anticipate that such Holders will not receive payment on account of their Notes,* including then accrued and unpaid interest,

---

[6]   Defendants state that as a matter of "belt and suspenders" the Parent Guarantee would also be released by a majority vote of the Noteholders pursuant to Indenture § 9.02. (Def. Opp. 17).

[7]   While the nonconsenting Noteholders would receive nothing from this distribution, any nonconsenting secured creditors would receive debt in the new EM Holdings.  However, this debt would become junior to that of the consenting secured creditors.  (*See* Malcolm Decl. Ex. C, at 4).

> from and after the date the Proposed Restructuring is
> consummated.

(Exchange Offering Circular 3 (emphasis added); *see also id.* at 8, 28).

Defendants left this Hobson's choice open until 11:59 p.m. on October 29,

2014. (*Id.* at 17). This timing was designed to take advantage of a 30-day

grace period that Defendants had before Noteholders could demand the interest

payment nominally due September 30, 2014; thus, ideally, the restructuring

could take place before any cash interest payments would be required. (*See*

Hrg. Tr. 146-47; Beekhuizen Depo. Tr. 30-31).

    One hurdle that the Proposed Restructuring has yet to clear is regulatory

approval. As noted, an unauthorized change of control could threaten EDMC's

access to Title IV funding. (*See* Exchange Offering Circular 44; Hrg. Tr. 141-

42, 148-49). In order to forestall this possibility, EDMC has been in

discussions with state regulators, regional accrediting bodies, and the DoE to

obtain preapproval for any restructuring, whether fully consensual or by

means of the Intercompany Sale. (*See* Hrg. Tr. 149-77). In order to secure

such approval for the Intercompany Sale in particular, Defendants have

assured regulators that the Intercompany Sale will not *really* effect a change of

control: "In no event does the Intercompany Sale change the ownership, debt

structure, board, management or governance of EDMC or its institutions[.]"

(Pl. Ex. 255 (e-mail from Tom Hylden of Powers Pyles Sutter & Verville PC

(EDMC's counsel dealing with regulators) to Steven Finley of the DoE)). In

effect, EDMC invites regulators to meet the new boss, same as the old boss.

An additional issue is whether a change of control would occur at the moment when the creditors exchange their debt for preferred stock (Step 1), or only at the point where the preferred stock was converted to common stock so as to leave the creditors with the vast majority of EDMC's common stock (Step 2). (*See* Hrg. Tr. 149-78). On November 25, 2014, Defendants represented to the Court that they had obtained the necessary regulatory approvals to proceed with Step 1, and remained in the process of obtaining approval of Step 2. (Dkt. #49).

## B.   The Instant Litigation

Plaintiffs declined to participate in the Exchange Offer.[8]  After discussions with Defendants failed to avert the Proposed Restructuring (*see* Milgram Decl. ¶¶ 24-26), Plaintiffs filed a motion for a temporary restraining order and preliminary injunction on October 28, 2014.  Plaintiffs had already notified Defendants of their intent to do so, and after several hours of negotiations between and among Plaintiffs, Defendants, and Intervenors, the parties agreed to postpone both the Proposed Restructuring and any demand for the September 30, 2014 interest payment.  (*See* Dkt. #44).  Setting aside the motion for a temporary restraining order, the parties agreed to an

---

[8]     In the briefing and at the hearing, there was significant discussion of whether Marblegate's stance was motivated by Milgram's ire with KKR over a previous unrelated transaction.  (*See* Hrg. Tr. 42-50; Def. Opp. 1, 10-11; Int. Opp. 2).  Milgram testified that some of his more colorful comments were born of a combination of frustration and posturing, and that he would not risk a major investment for Marblegate over a vendetta.  (Hrg. Tr. 43-45, 82-83).  The Court is inclined to believe Milgram (*see id.* at 359-60), but does not find his motives legally relevant, particularly as Magnolia adopts precisely the same position as Marblegate absent any allegation of impure motive.

accelerated discovery and briefing schedule, with Defendants' (and

subsequently Intervenors') response to Plaintiffs' motion due on November 13,

2014, at 11:59 p.m., and Plaintiffs' reply due on November 16, 2014, at 11:59

p.m.  (*See id.*).

      With the parties' briefs and exhibits submitted according to this

schedule, the Court held a hearing on the motion for a preliminary injunction

on November 18 and 19, 2014.  Exactly what Plaintiffs seek to enjoin became

clearer at the hearing.  In their reply brief, Plaintiffs stressed that they

> seek relief in this action only against [Defendants].
> Plaintiffs are not seeking to enjoin the Secured Lenders
> from exercising their remedies under the Senior Credit
> Facility.   Plaintiffs seek only to enjoin the Company,
> specifically the Issuers and Guarantors of the Notes,
> from violating their duties under the Trust Indenture
> Act and the Indenture.

(Pl. Reply 13).  Pressed at oral argument, Plaintiffs identified Defendants' active

participation in the Intercompany Sale — nominally a process of the secured

creditors exercising their rights to foreclose against Defendants — as the

element of the Intercompany Sale that would offend the Trust Indenture Act.

(Hrg. Tr. 343-46).  Plaintiffs further suggested the possibility that an injunction

be granted and a trial date set within 20 days, which would force Defendants

back to the negotiating table without triggering the automatic dissolution of the

Restructuring Support Agreement pursuant to § 7.01(c)(ii).  (*See* Hrg. Tr. 349-

50).

      On December 15, 2014, the Court filed an unredacted version of this

Opinion under seal.  On that same day, the Court provided the parties with a

copy of the unredacted Opinion and allowed the parties to propose redactions.

Pursuant to the Court's directions, the parties filed their materials publicly on

December 29, 2014, with certain limited categories of information redacted in

accordance with *Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir.

2006).  On that date, the parties also filed a joint letter suggesting requesting

permission to file certain other materials in redacted form, but declining to

request redactions to the Opinion.  In the intervening two weeks, Plaintiffs

Magnolia Road Capital LP and Magnolia Global Credit Master Fund L.P.

voluntarily dismissed their claims pursuant to Federal Rule of Civil Procedure

41(a)(1)(A)(i).  (Dkt. #53).[9]  Accordingly, the Court now files this amended but

unredacted Opinion publicly.

## DISCUSSION

### A.  Applicable Law

The Supreme Court has made clear that "[a] preliminary injunction is an

extraordinary remedy never awarded as of right," and, further, that "[a]n

injunction is a matter of equitable discretion; it does not follow from success on

the merits as a matter of course."  *Winter* v. *Natural Res. Def. Council, Inc.*, 555

U.S. 7, 24, 32 (2008).

Under the Second Circuit's traditional standard, a district court was

entitled to grant a preliminary injunction where a plaintiff demonstrated

(i) "irreparable harm," and (ii) either (a) "a likelihood of success on the merits"

---

[9]     Although Magnolia is no longer party to the case, the Court took its position into
consideration in deciding the motion.  Accordingly, the Opinion has not been otherwise
altered to reflect Magnolia's dismissal.

or (b) "sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Otoe-Missouria Tribe of Indians* v. *N.Y. Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Lynch* v. *City of N.Y.*, 589 F.3d 94, 98 (2d Cir. 2009)). The Supreme Court, in *Winter*, rejected an analogous flexible standard adopted by the Ninth Circuit, which allowed for a preliminary injunction where the plaintiff showed a "strong likelihood of prevailing on the merits" and a "possibility" of irreparable harm. 555 U.S. at 21 (internal quotation marks and citation omitted). The Court stated the standard for a preliminary injunction as requiring that a plaintiff "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.[10] The Court additionally made clear that even if a plaintiff could establish both irreparable injury and a likelihood of success on the merits, such a showing could be (and in that case would be) outweighed by "the balance of equities and consideration of the overall public interest." *Id.* at 26.

Despite the seeming inconsistency of the standards for a preliminary injunction set forth by the Supreme Court and the Second Circuit, the Second Circuit has subsequently reaffirmed that its standard remains good law. *See*

---

[10]     The Court elaborated in *Nken* v. *Holder*, 556 U.S. 418 (2009), that the "possibility" standard was too lenient for the likelihood of success prong, in addition to the irreparable harm prong, and that "[i]t is not enough that the chance of success on the merits be 'better than negligible.'" *Id.* at 434 (quoting *Sofinet* v. *INS,* 188 F.3d 703, 707 (7th Cir. 1999)).

*Citigroup Global Mkts., Inc.* v. *VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010).  The appropriate way to reconcile these decisions was identified by the Second Circuit's most recent guidance in *Otoe-Missouria Tribe*; while the traditional two-pronged test controls in most cases as to the necessity of irreparable harm and the requisite degree of likelihood of success, *see* 769 F.3d at 110, a plaintiff must demonstrate as well that "the balance of equities tips in his favor[ ] and ... an injunction is in the public interest," *id.* at 112 n.4 (alterations in original) (quoting *Winter*, 555 U.S. at 20) (internal quotation marks omitted).  Thus Plaintiffs must establish four elements to prevail on their motion for a preliminary injunction: (i) a likelihood of irreparable harm; (ii) either a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips *decidedly* in their favor; (iii) that the balance of hardships tips in their favor regardless of the likelihood of success; and (iv) that an injunction is in the public interest.  *See Salinger* v. *Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010); *id.* at 78 (noting that this standard defines "the traditional principles of equity" and should apply broadly across different contexts).[11]

---

[11]  None of the circumstances that might justify heightening this standard — (i) if the moving party seeks to enjoin a regulation in the public interest; (ii) if an injunction would provide all the relief sought and could not be undone; or (iii) if the injunction sought is mandatory rather than designed to preserve the status quo — is present here. *See Citigroup Global Mkts.*, 598 F.3d at 35 n.4.

**B.    Analysis**

**1.    Plaintiffs Have Not Established a Likelihood of Irreparable Harm**

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," and "[i]n the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied." *Rodriguez ex rel. Rodriguez* v. *DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999) (internal quotation marks and citation omitted).  "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation.'"  *Tom Doherty Assocs., Inc.* v. *Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (quoting *Jackson Dairy, Inc.* v. *H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).  The instant case presents two issues on the question of irreparable harm: whether the Proposed Restructuring works an actual and imminent harm upon Plaintiffs, and if so whether such harm can be remedied by a monetary award.

**a.    Plaintiffs' Harm Is Not Actual and Imminent**

At first blush, Plaintiffs identify a straightforward harm: "they will be left with outstanding interest and principal payments on their Notes, and effectively no recourse for payment."  (Pl. Br. 10).  Yet EDMC's financial distress makes the situation more complicated.  The evidence before the Court indicates that Plaintiffs are exceedingly unlikely to recover the principal on their Notes currently due in 2018, and that, absent any restructuring, Plaintiffs will only recover between one and two interest payments of $1.5 million. Defendants point out that Plaintiffs stand to gain more by participating in the

restructuring — equity worth roughly $7 million — than by blocking it even under their most optimistic assumption of $3 million in interest payments. Plaintiffs offer two responses.

The first is that the involuntary exchange of the certainty of debt for the uncertainty of equity works a harm regardless of the theoretical valuation of the equity. (*See* Hrg. Tr. 369-71). And indeed Plaintiffs are correct that Defendants' valuation of the equity offered in the Exchange Offer is highly uncertain, particularly given EDMC's ongoing financial distress and the regulatory delay before Step 2 of the restructuring — when participants in the Exchange Offer would actually acquire common stock — could be consummated. Yet if the Proposed Restructuring were enjoined, Plaintiffs have only succeeded in demonstrating the certainty of a single forthcoming cash interest payment of $1.5 million. Under these unusual circumstances, the Court is not prepared to say with certainty that the interest payments that might come due on the Notes over the next several months outweigh the value of the common stock that Plaintiffs might acquire upon the completion of the restructuring. Faced with comparing the potential future income stream from the Notes absent a restructuring with the value of equity following such a restructuring, the Court cannot help but find any possible harm "remote or speculative" rather than "actual or imminent."

Plaintiffs' second response is that enjoining the Proposed Restructuring would not spell EDMC's demise, and thus would not actually constrain Plaintiffs' potential recovery to $3 million; given the overwhelming incentives

that Defendants and their creditors share in avoiding bankruptcy and jeopardizing EDMC's Title IV funding, an alternative arrangement will be worked out. In particular, Plaintiffs have suggested an injunction long enough to "let people understand … that the Trust Indenture Act, at least in the Court's mind, might mean something here," but short enough to avoid triggering the dissolution of the Restructuring Support Agreement. (Hrg. Tr. 349-50). Viewed cynically, Plaintiffs are petitioning the Court for leverage with which to extract a more generous deal from Defendants. Viewed more generously, Plaintiffs are seeking to allocate the legal entitlement to block a restructuring in accordance with what they view as the Trust Indenture Act's intent. If EDMC and its creditors can renegotiate in a frictionless market, the efficient solution — a restructuring — will still prevail, and the allocation of the property entitlement will serve only to redistribute resources from one set of parties to another. *See* Guido Calabresi & A. Douglas Melamud, *Property Rules, Liability Rules, and Inalienability: One View of the Cathedral*, 85 Harv. L. Rev. 1089, 1094-95 (1972).

Yet as Calabresi and Melamud remind us, "no one makes an assumption of no transaction costs in practice"; the assumption is merely a theoretical device. Calabresi & Melamud, *supra*, at 1096. And indeed, the record before the Court amply demonstrates the transaction costs that would abound in renegotiating the Restructuring Support Agreement. (*See* Winthrop Decl. ¶ 3 ("The negotiation of the proposed restructuring involved an enormous amount of effort on the part of the Company, its creditors, and their financial and legal

24

advisors."); Srivastava Decl. ¶ 6 ("The negotiation of the proposed restructuring involved an enormous amount of effort on the part of the Company, its creditors, and their respective financial and legal advisors."); Beekhuizen Decl. ¶ 37 ("The restructuring negotiations were extremely difficult and hard-fought, and the creditors that agreed to compromise their claims insisted that other creditors not 'free-ride' on the deal."); Beekhuizen Depo. Tr. 88-90).

The Restructuring Support Agreement, then, was designed precisely to avoid the holdout problem that results when multiple parties possess an entitlement to block a welfare-enhancing transaction. EDMC's own internal financial projections suggest that if the restructuring were to go forward, they could afford — at least temporarily — a limited number of holdouts who must be paid out the entire interest due under their respective indentures. (*See* Def. Ex. 223, at 6). Yet Plaintiffs have brought forward little evidence to suggest that the collective action problem inhibiting a new restructuring deal could easily be overcome, and Defendants have provided ample reason for doubt. The Court thus finds that, while the Proposed Restructuring may work a harm upon Plaintiffs as compared to a hypothesized ideal, granting the injunction will not lead to a smooth rearrangement to Plaintiffs' benefit.[12]   Rather,

---

[12]   The Court notes three distinctions between the instant case and one relied upon heavily by the Plaintiffs to establish irreparable harm, *Federated Strategic Income Fund* v. *Mechala Grp. Jam. Ltd.*, No. 99 Civ. 10517 (HB), 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999). First, the evidence of Defendants' financial distress is much more compelling here than in *Mechala*. *See id.* at *8. Second, the court in *Mechala* had reason to be confident that a superior arrangement could be reached quickly. *See id.* at *9-10. And third, if there were not irreparable harm here, this Court would still have to follow *Winter* and consider the balance of the equities and the public interest, unlike the court in *Mechala*.

enabling each bondholder to enjoin the restructuring may prove value-destructive for all bondholders, Plaintiffs included.  When considering irreparable harm, "the injunction must address the injury alleged to be irreparable — the Court should not grant the injunction if it would not so prevent that injury."  *Toney-Dick* v. *Doar*, No. 12 Civ. 9162 (KBF), 2013 WL 1314954, at *9 (S.D.N.Y. Mar. 18, 2013).  Some loss of value in the Notes appears inevitable, and Plaintiffs have not carried their burden to convince the Court that the cure they seek would not be worse than the disease of which they complain.

### b.    Any Harm to Plaintiffs Is Not Irreparable

"[I]t is settled law that when an injury is compensable through money damages there is no irreparable harm."  *Beautiful Home Textiles (USA), Inc.* v. *Burlington Coat Factory Warehouse Corp.*, No. 13 Civ. 1725 (LGS), 2014 WL 4054240, at *7 (S.D.N.Y. Aug. 15, 2014) (quoting *JSG Trading Corp.* v. *Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir. 1990)) (internal quotation marks omitted). Yet while Plaintiffs' injury is unquestionably monetary in nature and easily calculable, "courts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents."  *Brenntag Int'l Chemicals, Inc.* v. *Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999).  It is thus not sufficient that a monetary remedy be theoretically calculable; there must actually be a solvent defendant at the close of litigation from whom to recover such damages.

26

Given that the Intercompany Sale is explicitly designed to deprive unsecured Noteholders of assets and guarantors to claim against, Plaintiffs would appear to have a strong case for the insolvency exception to the monetary injury rule.  Defendants respond by noting the availability of a fraudulent conveyance action against solvent parties — either EDMC or the new EM Holdings — under state law.  (Def. Opp. 22).  Yet the Court is not convinced that the existence of a fraudulent conveyance action against other entities suffices to render the harm reparable.  The Second Circuit has recognized that, despite "the danger in finding irreparable harm where alternative, solvent defendants are available," a party should not be denied a preliminary injunction solely on those grounds where the primary claims "are far simpler and much stronger."  *Brenntag*, 175 F.3d at 250.  And indeed, Plaintiffs are right to note with dismay the difficulty of establishing a fraudulent conveyance relative to their straightforward ability to demand payment under the Indenture.[13]  While Plaintiffs do not suffer irreparable

---

[13]    Though the Court declines to speculate on Plaintiffs' chances of prevailing on such a claim, it does note that at a minimum under New York law Plaintiffs must prove that any transfer was made without "fair consideration."  *See, e.g.*, *Palermo Mason Constr., Inc.* v. *Aark Holding Corp.*, 300 A.D.2d 458, 460 (2d Dep't 2002).

The Court also notes that *Brenntag*'s guidance is in some tension with the Supreme Court's admonition in *Grupo Mexicano de Desarrollo, S.A.* v. *Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), that injunctive relief should not issue against a debtor's disposition of property when the creditor has not established a legal interest in such property.  *See id.* at 322 ("The law of fraudulent conveyances and bankruptcy was developed to prevent such conduct; an equitable power to restrict a debtor's use of his unencumbered property before judgment was not.").  The Court is additionally concerned that it "ha[s] no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages," *id.* at 333; however, as the Court declines to grant the injunction, it need not interrogate its jurisdiction to do so.

27

injury simply because they may not be able to prevail in a subsequent claim, *see Sturm, Ruger & Co.* v. *Chase Manhattan Bank, N.A.*, No. 93 Civ. 7519 (SS), 1994 WL 191512, at *3 (S.D.N.Y. May 17, 1994), they are not required to place their faith in an action of an entirely different nature.

However, the nature of Plaintiffs' arguments on the merits belies the notion that a fraudulent conveyance claim would be their only recourse.  Under the status quo, Plaintiffs have a claim to payment on their Notes against EDMC as a guarantor.  If Plaintiffs are correct that the Intercompany Sale as conceived offends their rights under the Trust Indenture Act, a key element of that offense would be the removal of the Parent Guarantee (*see infra*).  And if, as Plaintiffs contend, this Court has the ability to substantively review the Proposed Restructuring for its impairment of Plaintiffs' ability to recover on their Notes, then it must follow that the Court has the ability to deem the removal of the Parent Guarantee to be in violation of the Trust Indenture Act and Indenture § 6.07.  A straightforward demand that EDMC pay the amounts due under the Indenture would then follow.

While courts have looked more favorably upon an injunction where there appears to be an active attempt to render a defendant judgment-proof — and such an inference is not difficult here, given the nature of the Intercompany Sale and the stark warnings to Noteholders contained within the Exchange Offering Circular — "this exception has not been applied where efforts to render a defendant judgment-proof may be remedied by enforcing the judgment against other companies and officers through corporate veil-piercing and other

mechanisms." *Sea Carriers Corp.* v. *Empire Programs, Inc.*, No. 04 Civ. 7395 (RWS), 2006 WL 3354139, at *5 (S.D.N.Y. Nov. 20, 2006).

And indeed, if the Court were to agree with Plaintiffs that the Trust Indenture Act has been violated, broad principles of veil-piercing would enable the Court to facilitate a demand for payment from EDMC wherever within its corporate structure assets happen to be located.  A court in this District has denied injunctive relief in a similar case because the counterclaim defendant "corporations are closely related and operate as a single overall commercial unit." *Great Earth Int'l Franchising Corp.* v. *Milks Devs., Inc.*, 302 F. Supp. 2d 248, 254 (S.D.N.Y. 2004).  The court found "no basis in the record to suggest that a judgment recovered by [plaintiffs] against [counterclaim defendant], if unsatisfied by that company, could not be enforced against other [subsidiaries] or officers, through corporate veil-piercing or other procedures." *Id.*  And in a case even more strikingly apposite to the instant litigation, a court in this District denied a preliminary injunction because

> APWC is just one member of a large family of corporations of which PEWC is the head.  Were APWC Gen'l to strip the assets of APWC, Set Top could still be returned to the position it previously occupied by an award of monetary damages against the persons or corporations responsible for the stripping.

*Pac. Elec. Wire & Cable Co.* v. *Set Top Int'l Inc.*, No. 03 Civ. 9623 (JFK), 2003 WL 23095564, at *5 (S.D.N.Y. Dec. 30, 2003).  Should Plaintiffs prevail at trial and convince the Court to find EDMC liable for payment on their Notes, they have offered no reason to believe that they cannot obtain relief from EDMC, EM Holdings, or whatever other subsidiary takes hold of the assets disposed of

through the Intercompany Sale.  Accordingly, any harm Plaintiffs might suffer should the Proposed Restructuring proceed is not irreparable.

### 2.    The Balance of the Equities Does Not Tip in Plaintiffs' Favor

Even where a plaintiff can show a likelihood of irreparable injury, "[i]n each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co.* v. *Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987)).  "A preliminary injunction may not issue unless the movant clearly shows that the balance of equities favors the movant."  *Litwin* v. *OceanFreight, Inc.*, 865 F. Supp. 2d 385, 401 (S.D.N.Y. 2011).

Here, for many of the same reasons as set forth above, there is little question that the harms on Defendants' side of the ledger vastly outweigh those on Plaintiffs'.  Plaintiffs face the potential loss of ability to recover interest and principle on Notes worth, nominally, just over $20 million (and in reality far less than that absent a restructuring), constituting 3.5% and 4.5% of Marblegate's and Magnolia's respective assets under management.  (*See* Milgram Decl. ¶ 15; Donath Decl. ¶¶ 4, 11).  Defendants and their creditors at a minimum risk the imperilment of a painstakingly negotiated $1.5 billion debt restructuring, one which the overwhelming majority of creditors support.  More broadly, given EDMC's perilous financial condition and the regulatory constraints, there is a serious risk of insolvency that would spell the end of a company valued, according to the evidence before the Court, at $1.05 billion.

While the disparity in dollar amounts at risk is not quite so large as that in *Litwin*, *see* 865 F. Supp. 2d at 401 ("Plaintiff in this case owns eight shares of OceanFreight stock worth approximately $75.  If granted, her motion would delay and quite possibly imperil a $239 million transaction which was negotiated over a period of months[.]"), it is nevertheless compelling reason to find that the equities do not favor an injunction.

None of the cases cited by Plaintiffs offers remotely comparable risks. (*See* Pl. Br. 15-16 (citing *Int'l Controls Corp.* v. *Vesco*, 490 F.2d 1334, 1338 (2d Cir. 1974) (granting a preliminary injunction where a defendant fled to "Nassau, the Bahamian capital, beyond the reach of the United States," and sought to dispose of the only fixed assets that potential victims of securities fraud might recover); *In re Netia Holdings S.A.*, 278 B.R. 344, 357 (Bankr. S.D.N.Y. 2002) (granting a preliminary injunction against the disbursement of funds from a bankrupt estate where there was no evidence that keeping the funds in place "would cause anyone any injury whatever"); *Quantum Corporate Funding, Ltd.* v. *Assist You Home Health Care Servs. of Va.*, 144 F. Supp. 2d 241, 248-49 (S.D.N.Y. 2001) (finding a balance of hardships tipping in plaintiff's favor where there was "a continuing pattern of bad-faith by [defendant] in evading creditor claims" and no serious risk to defendant's business))).  The ramifications of an injunction are, as this Court has acknowledged, highly uncertain (*see* Hrg. Tr. 338-39), but the potential costs of erring in favor of an injunction plainly dwarf the costs of erring against an injunction.

### 3.   The Public Interest Does Not Favor an Injunction

The Court must also "ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction."  *Salinger*, 607 F.3d at 80 (quoting *eBay Inc.* v. *MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Defendants point out that any injunction, by jeopardizing the future of EDMC, creates a significant risk of harm to its 118,090 current students, more than 400,000 alumni, and 20,800 employees.  (*See* West Decl. ¶¶ 4, 11, 35). Plaintiffs offer two responses.

First, Plaintiffs point to the example of Corinthian Colleges, Inc. ("Corinthian") to demonstrate that failure to meet the DoE's Title IV requirements will not result in an immediate dissolution and leave current students in the lurch.  (Hrg. Tr. 308-13).  Yet Defendants persuasively counter that following Corinthian — which is undergoing a "teachout" or "runoff" in which it can matriculate current students but accept no more as it winds down — would be a terrible outcome for EDMC and its students.  (*See* Hrg. Tr. 393).  The Court is inclined to agree that EDMC's current students and alumni would be less than thrilled to see their diplomas bear the name of a defunct institution.

Second, Plaintiffs simply argue that enforcement of the laws is in the public interest.  (*See* Pl. Br. 17-18).  Yet this argument, logically extended, would imply that any time a plaintiff demonstrated a likelihood of success on the merits, the public interest in enforcement of the laws would necessarily be served by an injunction.  Such an interpretation would effectively read the

32

public interest prong out of the test for a preliminary injunction, and run
counter to the Supreme Court's admonition that "courts of equity should pay
particular regard for the public consequences in employing the extraordinary
remedy of injunction," and that "[a]n injunction … does not follow from success
on the merits as a matter of course."  *Winter*, 555 U.S. at 24, 32 (internal
citation and quotation marks omitted).  While the public undoubtedly has an
interest in seeing the rights of bondholders protected, Plaintiffs offer no reason
why the public's interest — as opposed to their own — is best served by an
injunction rather than post hoc liability.

### 4.    Plaintiffs Have Demonstrated a Likelihood of Success on the Merits

As noted above, Plaintiffs cannot obtain a preliminary injunction due to
their inability to demonstrate irreparable harm, and additionally fail to
demonstrate that the balance of the equities weighs in their favor and that an
injunction would be in the public interest, as required by *Winter*.  Nevertheless,
this Court will consider the merits of Plaintiffs' claims in the hopes of providing
clarity for subsequent litigation in this and other cases.

As relevant to the instant litigation, the Intercompany Sale involves two
major elements: the foreclosure on Education Management LLC's assets by the
secured creditors, and the removal of EDMC's Parent Guarantee on the
unsecured Notes of Education Management LLC held by Plaintiffs.  Plaintiffs do
not contest that both elements have valid contractual bases; the foreclosure is
provided for by the 2014 Credit Agreement and earlier iterations, and is a valid
exercise of the secured creditors' rights under UCC Article 9, while the removal

33

of the Parent Guarantee is contemplated by Sections 9.02 and 10.06 of the Notes' Indenture.  However, Plaintiffs argue that the Intercompany Sale broadly conceived, and the removal of the Parent Guarantee in particular, impermissibly impairs or affects their right to receive payment on their Notes, which is enshrined in both Section 6.07 of the Indenture and Section 316(b) of the Trust Indenture Act.  Because the claims over the Parent Guarantee and the Intercompany Sale are inextricably intertwined, and because Section 6.07 of the Indenture precisely replicates the protections of Section 316(b) of the Trust Indenture Act, the questions presented on the merits essentially boil down to a dispute over the scope of the protections afforded by the Trust Indenture Act:  Is it a broad protection against nonconsensual debt restructurings, or a narrow protection against majority amendment of certain "core terms"?  For the reasons set forth below, the Court finds the former interpretation more persuasive, and thus finds that Plaintiffs have demonstrated a likelihood of success on the merits.

> ### a.    The Trust Indenture Act Affords a Broad Protection Against Nonconsensual Debt Reorganizations

It is a "familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself."  *Consumer Prod. Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980).  Where these "[o]rdinary principles of statutory construction apply," courts should first "examine the statute's text in light of context, structure, and related statutory provisions."  *Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005).  Where a statute's meaning cannot be divined from text alone, courts

may turn to a statute's "basic purpose" and "legislative history," *Muscarello* v. *United States*, 524 U.S. 125, 132 (1998), while remaining mindful of the Supreme Court's warning that "legislative history is itself often murky, ambiguous, and contradictory," and vulnerable to being used to confirm a preexisting inclination rather than provide an independent authority, *Allapattah*, 545 U.S. at 568. Because the text of Section 316(b) lends itself to multiple interpretations, this Court must turn to the legislative history, which confirms a broad reading of this provision, but also provides a standard by which to prevent courts from running amok.

Section 316(b) of the Trust Indenture Act reads in relevant part:

> Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder[.]

15 U.S.C. § 77ppp(b). At issue here is whether the "right ... to receive payment" is to be read narrowly, as a legal entitlement to demand payment, or broadly, as a substantive right to actually obtain such payment.

Plaintiffs argue initially that the "right" created by Section 316(b) is "absolute and unconditional," citing for this proposition *UPIC & Co.* v. *Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 455 (S.D.N.Y. 1992). Yet the right that *UPIC* declares "absolute and unconditional" is defined elsewhere as "a noteholder's absolute and unconditional statutory right to bring an action for

principal and interest due and owing under a debenture," as "the right of a
debentureholder to sue on his debenture for payment when due," and as the
"right to bring an action to recover principal and interest."  *Id.* at 454, 455,
457.  Ultimately, the *UPIC* court agreed with the defendant's contention that
"although Section 316(b) may guarantee a Securityholder's 'procedural' right to
commence an action for nonpayment, Section 316(b) does not [affect] or alter
the substance of a noteholder's right to payment of principal and interest
under the Indenture and, in particular, cannot 'override' the Indenture's
subordination provisions."  *Id.* at 456-57.  There is little question that
"[n]othing in Section 316(b), or the [Trust Indenture Act] in general, requires
that bondholders be afforded 'absolute and unconditional' rights to payment."
*Bank of N.Y.* v. *First Millennium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010).

   At least two courts have taken this logic a step further, and explicitly
declared that Section 316(b) "applies to the holder's *legal* rights and not the
holder's *practical* rights to the principal and interest itself … there is no
guarantee against default."  *In re Nw. Corp.*, 313 B.R. 595, 600 (Bankr. D. Del.
2004) (emphasis in original); *accord YRC Worldwide Inc.* v. *Deutsche Bank Trust
Co. Am.*, No. 10 Civ. 2106 (JWL), 2010 WL 2680336, at *7 (D. Kan. July 1,
2010) ("TIA § 316(b) does not provide a guarantee against the issuing
company's default or its ability to meet its obligations.  Accordingly, the fact
that the deletion of section 5.01 might make it more difficult for holders to
receive payment directly from plaintiff does not mean that the deletion without
unanimous consent violates TIA § 316(b)[.]").  The language and logic of the

36

*Northwestern Corp.* and *YRC Worldwide* decisions would suggest that Plaintiffs

have no claim, as nothing about the Intercompany Sale or the removal of the

Parent Guarantee prevents them from asserting a legal claim to payment

against the soon-to-be judgment-proof Education Management LLC.

A court in this District, however, has taken the opposite tack, finding

that the Trust Indenture Act protects the *ability*, and not merely the formal

right, to receive payment in some circumstances:

> By defendant's elimination of the guarantors and the
> simultaneous disposition of all meaningful assets,
> defendant will effectively eliminate plaintiffs' ability to
> recover and will remove a holder's "safety net" of a
> guarantor, which was obviously an investment
> consideration from the outset.  Taken together, these
> proposed amendments could materially impair or affect
> a holder's right to sue.  A holder who chooses to sue for
> payment at the date of maturity will no longer, as a
> practical matter, be able to seek recourse from either
> the assetless defendant or from the discharged
> guarantors.  It is beyond peradventure that when a
> company takes steps to preclude any recovery by
> noteholders for payment of principal coupled with the
> elimination of the guarantors for its debt, that such
> action does not constitute an "impairment" or "affect"
> the right to sue for payment.

*Federated Strategic Income Fund* v. *Mechala Grp. Jam. Ltd.*, No. 99 Civ. 10517

(HB), 1999 WL 993648, at *7 (S.D.N.Y. Nov. 2, 1999).  Unsurprisingly, Plaintiffs

urge the Court to follow *Mechala* and discount the later errant cases from other

districts.

Defendants offer three primary arguments as to why this Court should

side with *Northwestern Corp.* and *YRC Worldwide* rather than *Mechala*.  First,

they argue that courts have followed *UPIC*'s lead in restricting the protections

of Section 316(b) to "core term[s]," which are defined as "one[s] affecting a securityholder's right to receive payment of the principal of or interest on the indenture security on the due dates for such payments." *UPIC*, 793 F. Supp. at 452. This is correct, but does little to answer the underlying question of what the "right" consists of, or when an action "affect[s]" such a right. If Plaintiffs are correct that the right is substantive rather than formalist, then they are right to say that "[y]ou have to look at the overall structure" to determine whether a given term affects that right in the context of a particular transaction, and thus whether or not it is a "core term." (*See* Hrg. Tr. 381).[14]

Second, Defendants argue that a bondholder's "right to payment may be conditioned or limited by the Indenture itself, as it was here." (Def. Opp. 18).[15] This is correct as well, but this time Defendants prove too much. As the Intervenors acknowledge, Section 316(b) "prohibit[s] non-consensual amendments to contractual payment rights." (Int. Opp. 16 (citing *First Millennium*, 607 F.3d at 917)). Yet if the Trust Indenture Act protects only those rights that are enshrined in an indenture, subject to whatever limitation

---

[14] This contextual understanding of the core/non-core distinction would also diminish the implications of the Gadsden expert report. Because releases of guarantees through automatic or majority-vote provisions are commonplace in the bond market (*see* Gadsden Report), Defendants argue that such provisions are not understood to run afoul of the Trust Indenture Act. Yet this Court would not have to condemn widespread market practice in order to find that the release of the Parent Guarantee violates the Trust Indenture Act in this context.

[15] Defendants are not the first party to advance this theory. *See* Harold S. Bloomenthal & Samuel Wolff, 3B *Sec. & Fed. Corp. Law* § 11:8 (2d ed. rev. 2014) ("An interesting issue arises when the obligor purports to limit the debtholders' rights as specified in Section 316(b) before the securities are sold, on the theory that by purchasing the securities, the investor is 'consenting' to the variant term. The staff [of the SEC] has objected to this theory in the past.").

contained therein, and nothing prevents an ex ante limitation on the right to receive payment (including through majority vote), then the Trust Indenture Act would fail to prohibit indentures allowing for majority modification of payment terms.  In effect, the statute would prohibit nothing more than violations of the indenture contract, rendering it superfluous.[16]  The Trust Indenture Act, then, must protect *some* rights against at least *some* ex ante constraints.

Finally, Defendants offer a parade of horribles if this Court were to adopt the *Mechala* approach: "If plaintiffs' position were correct … [the Trust Indenture Act would] permit any noteholder to attack any transaction based on a standardless 'ability to receive payment test[.]'"  (Def. Opp. 15-16; *accord* Int. Opp. 17).  Certainly this Court does not wish to find itself in the position of evaluating whether a proposed investment in a new widget factory is likely to erode an issuer's financial stability and thus negatively affect a bondholder's ability to receive payment.  Yet the Court finds equally unsatisfying the notion that Section 316(b) protects only against formal, explicit modification of the legal right to receive payment, and allows a sufficiently clever issuer to gut the Act's protections through a transaction such as the one at issue here.

---

[16]    Defendants and Intervenors argue that Section 316(b) is designed to "ensure[] … that noteholders … retain the power to exercise creditor remedies under state law" (Def. Opp. 15), or to add "a further gloss on such rights" (Int. Opp. 17 (quoting *In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384, 389 (Bankr. S.D.N.Y. 2004))).  One possibility thus hinted at is that Section 316(b) is merely designed to provide a federal forum for breach of contract and other state law claims.  However, no evidence of so limited an intent appears in the legislative history.  *See* H.R. Rep. 76-1016 (1939); S. Rep. No. 76-248 (1939).

Fortunately, a way out of this dichotomy is provided by the legislative history.  The reports of the House and Senate subcommittees responsible for drafting the Trust Indenture Act offer precisely the same understanding of the purpose of Section 316(b): "Evasion of judicial scrutiny of the fairness of debt-readjustment plans is prevented by this prohibition. ...  This prohibition does not prevent the majority from binding dissenters by other changes in the indenture or by a waiver of other defaults, and the majority may of course consent to alterations of its own rights."  H.R. Rep. 76-1016, at 56 (1939); S. Rep. No. 76-248, at 26-27 (1939).  This Court is wary of the murkiness of legislative history, and the risk that "judicial reliance on legislative materials like committee reports ... may give unrepresentative committee members — or, worse yet, unelected staffers and lobbyists — both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text."  *Allapattah*, 545 U.S. at 568.  Yet courts and commentators to consider the legislative purpose and history of the Trust Indenture Act have come to the same conclusion, even while often disparaging the result: that Section 316(b) was intended to force bond restructurings into bankruptcy where unanimous consent could not be obtained.  *See Brady* v. *UBS Fin. Servs., Inc.*, 538 F.3d 1319, 1325 (10th Cir. 2008) ("Section 316(b) was adopted with a specific purpose in mind — to prevent out-of-court debt restructurings from being forced upon minority bondholders. ...  Specifically, § 316(b) was designed to provide judicial scrutiny of debt readjustment plans to ensure their equity." (internal alterations,

40

citations, and quotation marks omitted)); *UPIC*, 793 F. Supp. at 453 ("The
Securities Exchange Commission was undoubtedly aware that requiring
unanimity in bondholder voting — rather than mere majority action — would
frustrate consensual workouts and help induce bankruptcy.  And convinced
that insiders or quasi-insiders would damage bondholders, the Commission
welcomed the prospect."); Jonathan C. Lipson, *Governance in the Breach:
Controlling Creditor Opportunism*, 84 S. Cal. L. Rev. 1035, 1054 (2011) ("Those
who hold bonds subject to the Trust Indenture Act can always effectively
thwart a negotiated modification to the core provisions of the bond — maturity
date, interest, principal amount — which would, in turn, impair a
reorganization outside bankruptcy."); Mark J. Roe, *The Voting Prohibition in
Bond Workouts*, 97 Yale L.J. 232, 234 (1987) (criticizing Section 316(b) as
anachronistic, but noting that "William O. Douglas, the principal architect of
the prohibition … offered bondholder protection as the rationale for prohibiting
votes.  Douglas and his colleagues at the SEC were not only aware that
requiring near unanimity would help induce bankruptcy, they welcomed the
prospect.").  If Defendants and Intervenors were correct that Section 316(b) is
limited to preventing formal majority modification of an indenture's payment
term, then the case at hand amply demonstrates that the provision would *not*
prevent "[e]vasion of judicial scrutiny of the fairness of debt-readjustment
plans." H.R. Rep. 76-1016, at 56; S. Rep. No. 76-248, at 26-27.  The Court
cannot accept an interpretation that is neither mandated by the statute's text
nor remotely in conformity with the statutory purpose and legislative history.

41

Not only do the legislative history and statutory purpose refute the interpretation advanced by Defendants and Intervenors, but they also provide a limiting principle that averts the proffered specter of untrammeled judicial intrusion into ordinary business practice.  (*See* Def. Opp. 15-16; Int. Opp. 17). Practical and formal modifications of indentures that do not explicitly alter a core term "impair[] or affect[]" a bondholder's right to receive payment in violation of the Trust Indenture Act only when such modifications effect an involuntary debt restructuring.  Such a standard does not contravene the decisions that have allowed preexisting subordination terms to survive a challenge under Section 316(b).  *See UPIC*, 793 F. Supp. at 457.  Nor does it prevent majority amendment of a significant range of indenture terms, including many that can be used to pressure bondholders into accepting exchange offers.  *See* John C. Coffee, Jr. & William A. Klein, *Bondholder Coercion: The Problem of Constrained Choice in Debt Tender Offers and Recapitalizations*, 58 U. Chi. L. Rev. 1207, 1224-25 (1991) ("Although the Trust Indenture Act of 1939 provides that bondholders may not alter certain 'core' provisions of publicly issued debt obligations, bondholders can agree to eliminate other important protective covenants — for example, covenants prohibiting the firm from paying dividends, covenants requiring the firm to maintain a specified net worth, or covenants prohibiting the firm from incurring debt senior in any respect in right of payment to the debt for which the exchange offer is made.").  But where a debt reorganization that seeks to

42

involuntarily disinherit the dissenting minority is brought about by a majority vote, that violates the fundamental purpose of the Trust Indenture Act.

### b.    The Proposed Restructuring Likely Violates the Trust Indenture Act

The Court does not deny that the standard identified in the preceding section might produce close, difficult cases.  The record before this Court, however, leaves little question that the Intercompany Sale is precisely the type of debt reorganization that the Trust Indenture Act is designed to preclude. The Restructuring Support Agreement makes its intent plainly known in its recital clauses, where it announces that "the Companies and the Restructuring Support Parties have agreed to a restructuring of the Companies' Obligations under the Credit Agreement and its indebtedness under the Indentures" (Malcolm Decl. Ex. C), and that the Intercompany Sale is designed as "an out-of-court restructuring" (*id.* § 4.01(c)).  The Exchange Offering Circular defines the Proposed Restructuring as "intend[ed] to restructure [EDMC's] existing indebtedness," and that in the case of dissenters the Restructuring Support Agreement requires the parties to it "to implement the Proposed Restructuring over any such objection" via the Intercompany Sale, ensuring that such dissenters "will not receive payment on account of their Notes."  (Exchange Offering Circular 7-8).

Furthermore, the mechanism by which the Intercompany Sale is to be carried out operates, in context, to effect a complete impairment of dissenters' right to receive payment.  It is true that the Indenture by which the Notes are governed contains two clauses, common to many indentures (*see* Gadsden

Report), that provide for the release of the Parent Guarantee: Section 9.02 by majority vote of the Noteholders, and Section 10.06 by action of the secured creditors.[17]   One can imagine contexts where those clauses would be invoked without implicating Section 316(b).   Section 9.02 might be invoked to release the Parent Guarantee where the Noteholders determined that it impaired flexibility and bargained it away, much like the covenants identified by Professors Coffee and Klein.   Section 10.06 might be invoked, much like the senior creditors' Article 9 rights to foreclose on their collateral, in a genuinely adversarial attempt to safeguard some recovery against a company they have come to regard as unable to pay its debts.

But this is not such a case.   The Parent Guarantee that the senior creditors intend to release (and by so doing, release the Parent Guarantee on the Notes) was conferred less than a month ago by EDMC, albeit for significant concessions.   More importantly, EDMC has assured regulators that the foreclosure is purely a formality, and that "[i]n no event does the Intercompany Sale change the ownership, debt structure, board, management or governance of EDMC or its institutions[.]"   (Pl. Ex. 255).[18]   Although Plaintiffs were

---

[17]   Intervenors urge the Court to distinguish, if necessary, between the releases contained within Sections 9.02 and 10.06 on the basis that the former operates by majority vote and the latter automatically.   (*See* Hrg. Tr. 449-51).   While Section 9.02 may run more squarely afoul of Trust Indenture Act § 316(b)'s minority-protective intent, Section 10.06 as deployed here allows one class of creditors, with company assistance, to force a debt reorganization onto another class of creditors.   Given the overall design of the Intercompany Sale, the Court does not find it material which of the two clauses is utilized to impair the rights of nonconsenting Noteholders.

[18]   Intervenors argue that even EDMC's enthusiastic assurances to regulators are merely part of the secured creditors' contractual rights.   And indeed, the 2014 Credit Agreement offers some support for this position:

cautioned in the Original Offering Circular that they "should not assign any value to such guarantee" (Original Offering Circular 5), the Court does not believe that such cautionary language can undo the protections of the Trust Indenture Act.  Plaintiffs may have been warned that modifications were possible, but they were not told that they could be forced to accept a wholesale abandonment of their right to receive payment.  Accordingly, the Court must find that Plaintiffs have a likelihood of succeeding on an eventual claim for payment against EDMC and its subsidiaries.

If this Court were inclined to grant an injunction, it would face the task of disentangling precisely what elements of the Intercompany Sale improperly impaired Plaintiffs' rights.  Yet as noted above, "[a]n injunction … does not follow from success on the merits as a matter of course."  *Winter*, 555 U.S. at 32.  Accordingly this Court declines to grant Plaintiffs the injunctive relief sought, even while observing that, absent EDMC's insolvency, Plaintiffs may ultimately be able obtain payment on their debts as they come due.  Doing so gives effect to the understanding embedded in the Trust Indenture Act that minority bondholders are to be protected from involuntary restructuring, but

---

> The Credit Parties shall, and shall cause their affiliates, and each of their respective representatives, agents and employees to, take such steps as are reasonably necessary or desirable to consummate the Exchange … in the reasonable good faith determination of the Company in consultation with the Lenders.

(2014 Credit Agreement § 5.16).  The Court is skeptical that this language could be used to force quite the current level of participation from EDMC, in particular its assurances that its entire management team will remain at the helm of the reconstituted enterprise following the Intercompany Sale.  Yet even if Credit Agreement § 5.16 did go that far, the Court does not think that an issuer could excuse its own violation of the Trust Indenture Act by constraining itself in another contract.

are not granted the right to hold hostage a majority willing to make sacrifices. *See* H.R. Rep. 76-1016, at 56 ("[T]he majority may of course consent to alterations of its own rights."); S. Rep. No. 76-248, at 27 (same).  And the creation of a liability rule rather than a property rule avoids the worst of the collective action problems associated with granting diffuse parties the ability to block a value-enhancing transaction.

This Court is not so naïve as to think that establishing Plaintiffs' ultimate right to full payment will not pose problems for the Proposed Restructuring. Where individual bondholders can free-ride off an exchange offer, as they retain claims for the full value of their debt against a newly solvent issuer, they are better off refusing the offer; "[i]f enough bondholders refuse, they will frustrate the workout," leaving the bondholders "locked in game theory's prisoners' dilemma."  Roe, *supra*, at 236-37.  The problem is even more acute here due to the unusual role played by Title IV's funding requirements for for-profit education institutions, which removes bankruptcy as a viable option or a credible threat for EDMC.  While the difficulty of negotiating a deal with multiple creditors who have incentives to hold out can be fatal, *see id.* at 239, this Court notes optimistically that many restructurings overcome the problem by requiring 80-85% bondholder approval as a prerequisite to a restructuring, *id.* at 236-37 & n.11, forcing large bondholders in particular to weigh the benefits of holding out against the risk to the restructuring at large.  Yet whatever the ultimate cost to EDMC, its creditors, its employees, and its students, the Trust Indenture Act simply does not allow the company to

46

precipitate a debt reorganization outside the bankruptcy process to effectively eliminate the rights of nonconsenting bondholders.

### CONCLUSION

Because Plaintiffs have failed to demonstrate a likelihood of irreparable harm, that the balance of equities tips in their favor, or that an injunction is in the public interest, the motion for a preliminary injunction is DENIED.  The requests of the parties to file certain documents in redacted form is GRANTED.

SO ORDERED.

Dated:      December 30, 2014
            New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge