# EXHIBIT B

8 2 3 - 3

# TRUST INDENTURES

## HEARINGS

### BEFORE A

### SUBCOMMITTEE OF THE

### COMMITTEE ON

# INTERSTATE AND FOREIGN COMMERCE

## HOUSE OF REPRESENTATIVES

### SEVENTY-FIFTH CONGRESS

#### THIRD SESSION

#### ON

# H. R. 10292

TO PROVIDE FOR THE REGULATION OF THE SALE OF CER-
TAIN SECURITIES IN INTERSTATE AND FOREIGN COM-
MERCE AND THROUGH THE MAILS, AND THE
REGULATION OF THE TRUST INDENTURES
UNDER WHICH THE SAME ARE ISSUED
AND FOR OTHER PURPOSES

APRIL 25, 1938

Printed for the use of the
Committee on Interstate and Foreign Commerce



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1938

63402

# COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE

CLARENCE F. LEA, California, *Chairman*

ROBERT CROSSER, Ohio
ALFRED L. BULWINKLE, North Carolina
VIRGIL CHAPMAN, Kentucky
PAUL H. MALONEY, Louisiana
WILLIAM P. COLE, Jr., Maryland
SAMUEL B. PETTENGILL, Indiana
EDWARD A. KELLY, Illinois
GEORGE G. SADOWSKI, Michigan
JOHN A. MARTIN, Colorado
EDWARD C. EICHER, Iowa
THOMAS J. O'BRIEN, Illinois
HERRON PEARSON, Tennessee
JERRY J. O'CONNELL, Montana
GEORGE B. KELLY, New York
LYLE H. BOREN, Oklahoma
MARTIN J. KENNEDY, New York
JAMES L. QUINN, Pennsylvania
EDWARD L. O'NEILL, New Jersey

CARL E. MAPES, Michigan
CHARLES A. WOLVERTON, New Jersey
JAMES WOLFENDEN, Pennsylvania
PEHR G. HOLMES, Massachusetts
B. CARROLL REECE, Tennessee
JAMES W. WADSWORTH, New York
CHARLES A. HALLECK, Indiana

GARDNER R. WITHROW, Wisconsin

ELTON J. LAYTON, *Clerk*

## SUBCOMMITTEE

EDWARD C. EICHER, Iowa, *Chairman*

LYLE H. BOREN, Oklahoma          B. CARROLL REECE, Tennessee

II

# CONTENTS

Statement of—                                                    **Page**
    Hon. William O. Douglas_____ **16**
    Carroll Shanks_____ **43**
    Robert M. Hanes_____ **45**
    R. G. Page_____ **46**
    Harold V. Amberg_____ **47**
    Fred N. Oliver_____ **58**
    G. S. Canright_____ **61**
    Harry C. Eckhart_____ **68**
    G. R. Helffrick_____ **69**
    F. E. Frothingham_____ **72**
    Oscar W. Haussermann_____ **76**
    Benjamin J. Buttenwieser_____ **80**
    Allen Northey Jones_____ **87**
    Ralph Crane_____ **91**

# TRUST INDENTURES

## MONDAY, APRIL 25, 1938

House of Representatives,
Subcommittee of the Committee on
Interstate and Foreign Commerce,
*Washington, D. C.*

The subcommittee met, pursuant to call, at 10 a. m., in the committee room, New House Office Building, Hon. Edward C. Eicher (chairman) presiding.

Mr. Eicher. The committee will please be in order. This is a subcommittee composed of Mr. Boren of Oklahoma, Mr. Reece of Tennessee, and myself, and we are met to conduct hearings on H. R. 10292, introduced in the House by Chairman Lea of this committee, to provide for the regulation of the sale of certain securities in interstate and foreign commerce, and through the mails, and the regulation of the trust indentures under which the same are issued, and for other purposes.

This is a companion bill to the so-called Barkley bill in the Senate, S. 2344, which has recently been reported to the Senate from its Committee on Banking and Currency.

(The bill, H. R. 10292, is as follows:)

[H. R. 10292, 75th Cong., 3d sess.]

A BILL To provide for the regulation of the sale of certain securities in interstate and foreign commerce and through the mails, and the regulation of the trust indentures under which the same are issued, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Trust Indenture Act of 1938".

### NECESSITY FOR REGULATION

Sec. 1. (a) Upon the basis of facts dislosed by the reports of the Securities and Exchange Commission made to the Congress pursuant to section 211 of the Securities Exchange Act of 1934 and otherwise disclosed and ascertained, it is hereby declared that the national public interest and the interest of investors in notes, bonds, debentures, evidences of indebtedness, and certificates of interest or participation therein, which are offered to the public, are adversely affected—

(1) When the obligor fails to provide a trustee to protect and enforce the rights and to represent the interests of such investors, notwithstanding the fact that (A) individual action by such investors for the purpose of protecting and enforcing their rights is rendered impracticable by reason of the disproportionate expense of taking such action, and (B) concerted action by such investors in their common interest through representatives of their own selection is impeded by reason of the wide dispersion of such investors through many States, and by reason of the fact that information as to the names and addresses of such investors is either controlled by the obligor and underwriters or otherwise not available to such investors;

(2) When the trustee does not have adequate rights and powers, or adequate duties and responsibilities, in connection with matters relating to the protection and enforcement of the rights of such investors; when, notwithstanding the obstacles to concerted action by such investors, and the general

1

and reasonable assumption by such investors that the trustee is under an affirmative duty to take action for the protection and enforcement of their rights, trust indentures (A) generally provide that the trustee shall be under no duty to take any such action, even in the event of default, unless it receives notice of default, demand for action, and indemnity, from the holders of substantial percentages of the securities outstanding thereunder, and (B) generally relieve the trustee from liability even for its own negligent action or failure to act;

(3) When the trustee does not have resources commensurate with its responsibilities, or has any relationship to or connection with the obligor or any underwriter of any securities of the obligor, or holds, beneficially or otherwise, any interest in the obligor or any such underwriter, which relationship, connection, or interest involves a material conflict, actual or potential, with the interests of such investors;

(4) When the obligor is not obligated to furnish to the trustee under the indenture and to such investors adequate current information as to its financial condition, and as to the performance of its obligations with respect to the securities outstanding under such indenture; or when the communication of such information to such investors is impeded by the fact that information as to the names and addresses of such investors is either controlled by the obligor and underwriters or otherwise not available to such investors;

(5) When, in the light of the bargain of the parties, the indenture does not contain adequate restrictions and conditions upon the release and substitution of property subject to the lien of the indenture, the issuance of additional securities thereunder, or the satisfaction and discharge of the indenture; or

(6) When, by reason of the fact that trust indentures are commonly prepared by the obligor or underwriter in advance of the public offering of the securities to be issued thereunder, such investors are unable to participate in the preparation thereof, and, by reason of their lack of understanding of the situation, such investors would in any event be unable to procure the correction of the defects enumerated in this subsection.

(b) Abuses of the character above enumerated have been so widespread that, unless regulated, the public offering of notes, bonds, debentures, evidences of indebtedness, and certificates of interest or participation therein, by the use of means and instruments of transportation and communication in interstate commerce and of the mails, is injurious to the capital markets, to investors, and to the general public; and it is hereby declared to be the policy of this Act, in accordance with which policy all the provisions of this Act shall be interpreted, to meet the problems and eliminate the abuses, enumerated in this section, connected with such public offerings.

DEFINITIONS

SEC. 2. When used in this Act, unless the context otherwise requires—

(1) Any term defined in section 2 of the Securities Act of 1933, as heretofore amended, and not otherwise defined in this section, shall have the meaning assigned to such term in such section 2.

(2) The term "sale" or "sell" shall include all transactions included in such term as provided in paragraph (3) of section 2 of the Securities Act of 1933, as heretofore amended, except that a sale of a certificate of interest or participation shall be deemed a sale of the security or securities in which such certificate evidences an interest or participation if and only if such certificate gives the holder thereof the right to convert the same into such security or securities.

(3) The term "underwriter" means any person who has purchased from an issuer with a view to, or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission.

(4) The term "director" means any director of a corporation, or any individual performing similar functions with respect to any person whether incorporated or unincorporated.

(5) The term "executive officer" means the president, every vice president, the cashier, the secretary, the treasurer, and the trust officer of a corporation and, any individual customarily performing similar functions with respect to any person whether incorporated or unincorporated.

(6) The term "indenture" means any mortgage, deed of trust, trust or other indenture, or similar instrument or agreement (including any supplement or

amendment to any of the foregoing), under which securities are outstanding or are to be issued, whether or not any property, real or personal, is, or is to be, pledged, mortgaged, assigned, or conveyed thereunder.

(7) The term "application" or "application for qualification" means the application provided for in section 5, and includes any amendment thereto and any report, document, or memorandum accompanying such application or incorporated therein by reference.

(8) The term "indenture to be qualified" means the indenture in respect of which a particular application is filed.

(9) The term "indenture trustee" means each trustee under the indenture to be qualified, and each successor trustee.

(10) The term "indenture security" means any security issued or issuable under the indenture to be qualified.

(11) The term "obligor" means every person who is liable upon any such indenture security, and, if such security is a certificate of interest or participation, such term means also every person who is liable upon the security or securities in which such certificate evidences an interest or participation; but such term shall not include the trustee under an indenture under which certificates of interest or participation, equipment trust certificates, or like securities are outstanding.

(12) The term "paying agent," when used with respect to any such indenture security, means any person authorized by an obligor thereon (A) to pay the principal of or interest on such security on behalf of such obligor, or (B) if such security is a certificate of interest or participation, equipment trust certificate, or like security, to make such payment on behalf of the trustee.

(13) The term "State" means any State of the United States.

(14) The term "Commission" means the Securities and Exchange Commission.

(15) The term "voting security" means any security presently entitling the owner or holder thereof to vote in the direction or management of the affairs of a person, or any security issued under or pursuant to any trust, agreement, or arrangement whereby a trustee or trustees or agent or agents for the owner or holder of such security are presently entitled to vote in the direction or management of the affairs of a person; and a specified "per centum of the outstanding voting securities of a person" means such amount of the outstanding voting securities of such person as entitles the holder or holders to cast such specified per centum of the aggregate votes which the holders of all the outstanding voting securities of such person are entitled to cast in the direction or management of the affairs of such person.

(16) The terms "Securities Act of 1933", "Securities Exchange Act of 1934", and "Public Utility Holding Company Act of 1935" shall be deemed to refer, respectively, to such Acts, as heretofore or hereafter amended.

### EXEMPTED SECURITIES AND TRANSACTIONS

SEC. 3. (a) The provisions of sections 4, 5, 12, 13, and 14 of this Act shall not apply to any of the following securities:

(1) Any security other than (A) a note, bond, debenture, or evidence of indebtedness, whether or not secured, or (B) a certificate of interest or participation in any such note, bond, debenture, or evidence of indebtedness, or (C) a temporary certificate for, or guarantee of, any such note, bond, debenture, evidence of indebtedness or certificate;

(2) Any certificate of interest or participation in two or more securities having substantially different rights and privileges, or a temporary certificate for any such certificate;

(3) Any security which, prior to or within six months after the enactment of this Act, has been sold or disposed of by the issuer or bona fide offered to the public, but this exemption shall not apply to any new offering of any such security by an issuer subsequent to such six months;

(4) Any security exempted from the provisions of the Securities Act of 1933, as heretofore amended, by paragraph (2), (3), (4), (5), (6), (7), (8), or (11) of subsection 3 (a) thereof;

(5) Any security issued under a mortgage indenture as to which a contract of insurance under the National Housing Act is in effect; and any such security shall be deemed to be exempt from the provisions of the Securities Act of 1933 to the same extent as though such security were specifically enumerated in section 3 (a) (2) of such Act;

(6) Any note, bond, debenture, or evidence of indebtedness issued or guaranteed by a foreign government or by a subdivision, department, municipality, agency, or instrumentality thereof; or

(7) Any guaranty of any security exempted from the provisions of this Act by this subsection.

(b) The provisions of section 4 shall not apply (A) to any of the transactions exempted, by section 4 of the Securities Act of 1933, as heretofore amended, from the provisions of section 5 thereof, or (B) to any transaction which would be so exempted but for the last sentence of paragraph (11) of section 2 of such Act.

(c) The Commission may from time to time by rules and regulations, and subject to such terms and conditions as may be prescribed therein, add any class of securities to the securities exempted in subsection (a) of this section, if it deems that the application of this Act with respect to such securities is not necessary in the public interest and for the protection of investors by reason of the small amount involved and the small amount of securities outstanding and thereafter issuable under the same indenture, or by reason of the limited character of the public offering; but no issue of securities shall be exempted under this subsection where the aggregate amount at which such issue is offered to the public exceeds $250,000.

(d) The Commission may, on application by the issuer and after opportunity for hearing thereon, by order exempt from any one or more provisions of this Act any security issued or proposed to be issued under an indenture under which, at the time such application is filed, securities referred to in paragraph (3) of subsection (a) of this section are outstanding, if and to the extent that the Commission finds that compliance with such provision or provisions, through the execution of a supplemental indenture or otherwise—

(1) would require, by reason of the provisions of such indenture, or the provisions of any other indenture or agreement made prior to the enactment of this Act, or the provisions of any applicable law, the consent of the holders of securities outstanding under any such indenture or agreement, or

(2) would impose an undue burden on the issuer, having due regard to the public interest and the interests of investors.

(e) The Commission may, on application by the issuer and after opportunity for hearing thereon, by order exempt from any one or more of the provisions of this Act any security issued or proposed to be issued by a person organized and existing under the laws of a foreign government or a political subdivision thereof, if and to the extent that the Commission finds that compliance with such provision or provisions is not necessary in the public interest and for the protection of investors.

#### PROHIBITIONS RELATING TO INTERSTATE COMMERCE AND THE MAILS

SEC. 4 (a) Subject to the provisions of section 3, unless a security has been or is to be issued under an indenture as to which an application for qualification is effective, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

(b) Notwithstanding the provisions of the Securities Act of 1933, after the expiration of six months after the enactment of this Act, no registration statement relating to a security which is subject to the provisions of subsection (a) of this section shall become effective unless such security has been or is to be issued under an indenture as to which an application for qualification is effective.

#### APPLICATIONS FOR QUALIFICATION AND THE TAKING EFFECT THEREOF

SEC. 5. (a) An application for qualification of the indenture under which a security has been or is to be issued shall be filed with the Commission by the issuer of such security. Each such application shall be in such form, and shall be signed in such manner, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. Each such application shall include such of the information and documents as would be required to be filed in order to register such indenture security under the Securities Act of 1933, and such additional information, in such form

and detail, and such documents, regarding the issuer of such security, the obligors thereon, the indenture trustees, the paying agents with respect to such security, the underwriters (as such term is defined in the last paragraph of subsection (b) of section 7), and the prospective obligors, indenture trustees, and underwriters, and the direct or indirect relationships between any of the foregoing, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. Subject to the provisions of section 10, the information and documents contained in or filed with any application shall be made available to the public under such regulations as the Commission may prescribe, and copies thereof, photostatic or otherwise, shall be furnished to every applicant therefor at such reasonable charge as the Commission may prescribe.

(b) The filing with the Commission of an application, or of an amendment to an application, shall be deemed to have taken place upon the receipt thereof by the Commission, but unless a registration statement, under the Securities Act of 1933, covering securities issued or to be issued under the indenture to be qualified has been filed prior to or simultaneously with the application, the filing of such application shall not be deemed to have taken place unless it is accompanied or preceded by payment to the Commission of a filing fee in the amount of $100, such payment to be made in cash or by United States postal money order or certified or bank check, or in such other medium of payment as the Commission may authorize by rule and regulation. If a registration statement covering securities issued or to be issued under such indenture is subsequently filed, the amount of the fee so paid shall be credited against the fee required to be paid at the time of filing such registration statement, and any excess shall be refunded to the applicant. If an amendment to an application is filed prior to the effective date of such application, the application shall be deemed to have been filed when such amendment was filed; except that an amendment filed with the consent of Commission, prior to the effective date of the application, or filed pursuant to an order of the Commission, shall be treated as a part of the application. Amendments after the effective date of an application may be made upon such terms and conditions as the Commission may prescribe.

(c) The effective date of an application shall be the twentieth day after the filing thereof, unless the Commission prior to such time shall have issued an order to the issuer to show cause why such application should become effective. If any such order to show cause has been issued with respect to any such application, such application shall become effective within such reasonable period of time after an opportunity for hearing upon such order as the Commission shall fix by rules and regulations, unless the Commission prior to the expiration of suchperiod shall have issued an order pursuant to section 6 refusing to permit such application to become effective. Whenever the Commission shall issue an order to the issuer to show cause, it shall be served upon the issuer in such manner as the Commission may by rules and regulations prescribe, and the Commission shall accord an opportunity for hearing thereon at a time fixed by the Commission, but within ten days after such service. An application may be withdrawn by the applicant at any time prior to the effective date thereof.

(d) Except as otherwise expressly provided in this Act, the making, amendment or rescission of a rule, regulation or order under the provisions of this Act shall not affect the qualification, form or interpretation of any indenture as to which qualification became effective prior to the making, amendment or rescission of such rule, regulation, or order.

(e) The Commission is hereby empowered to make an investigation in any case in order to determine whether a refusal order should issue under section 6. If the issuer, or any obligor, or any underwriter, or prospective underwriter, of the securities in respect of which the application is filed, or any trustee or prospective trustee under the indenture to be qualified, shall fail to cooperate, or shall obstruct or refuse to permit the making of such investigation, such conduct shall be proper ground for the issuance of a refusal order under section 6.

## REFUSAL ORDERS

Sec. 6. The Commission shall issue an order refusing to permit an application filed pursuant to section 5 to become effective if it finds that—

(1) such application does not conform to the requirements of this Act and the rules and regulations thereunder;

(2) the application includes any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading;

(3) any person designated as trustee under the indenture to be qualified is not eligible to act as such under subsection (a) of section 7 or has any conflicting interest as defined in subsection (b) of section 7;

(4) such indenture does not conform to the requirements of section 7, and the rules, regulations, and orders thereunder; or

(5) such indenture or any security to be issued thereunder contains any provision which limits, qualifies, or conflicts with a provision required to be contained in such indenture by this Act, or the rules, regulations, or orders thereunder; or contains any provision which is misleading or deceptive, or the elimination of which is necessary or appropriate in the public interest or for the protection of investors to prevent the circumvention or evasion of this Act.

If and when the Commission deems that the objections on which such order was based have been met, the Commission shall enter an order rescinding such refusal order, and the application shall become effective upon the date fixed pursuant to subsection (c) of section 5, or upon the date of such rescission, whichever shall be the later.

## CONTENTS OF INDENTURE

### Persons Eligible for Appointment as Trustee

Sec. 7. (a) (1) The indenture to be qualified shall require that there shall at all times be one or more trustees thereunder, at least one of whom shall at all times be an institution incorporated and doing business under the laws of the United States or of any State or Territory or of the District of Columbia, which (A) is authorized under such laws to exercise corporate trust powers, and (B) is subject to supervision or examination by Federal, State, Territorial, or District authority.

(2) If the Commission deems it necessary or appropriate in the public interest or for the protection of investors, in view of the type of indenture, the amount of securities outstanding and thereafter issuable thereunder, and the duties and responsibilities imposed thereby on the trustee or trustees, the indenture to be qualified shall require that such institutional trustee have at all times a combined capital and surplus of such specified minimum amount as the Commission deems adequate, having due regard to the public interest and the interests of investors. If such institutional trustee publishes reports of condition at least annually, pursuant to law or to the requirements of such supervising or examining authority, the indenture may provide that, for the purposes of this paragraph, the combined capital and surplus of such trustee shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.

(3) If the indenture to be qualified requires or permits the appointment of one or more co-trustees in addition to such institutional trustee, such indenture shall provide that the rights, powers, duties, and obligations conferred or imposed upon the trustees or any of them shall be conferred or imposed upon and exercised or performed by such institutional trustee, or such institutional trustee and such co-trustees jointly, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed, such institutional trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties, and obligations shall be exercised and performed by such co-trustees.

(4) In the case of certificates of interest or participation, the indentu    to be qualified shall require that the indenture trustee or trustees have the lega. power to exercise all of the rights, powers, and privileges of a holder of the security or securities in which such certificates evidence an interest or participation.

### Disqualification of Trustee

(b) The indenture to be qualified shall provide that if the indenture trustee has or shall acquire any conflicting interest as hereinafter defined, (1) such trustee shall, within ninety days after ascertainment of such conflicting interest, either eliminate such conflicting interest or resign, such resignation to become effective upon the appointment of a successor trustee and such successor's acceptance of such appointment, and the obligor shall take prompt steps to have a successor appointed in the manner provided in the indenture, and (ii) subject to the provisions of subsection (k) of this section, any security holder who has been a bona fide holder of indenture securities for at least six months (on failure of such trustee on the written request of such holder either to resign or to eliminate such conflicting interest, as required by clause (i) of this subsection) may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for

the removal of such trustee and the appointment of a successor trustee. For the purposes of this subsection, an indenture trustee shall be deemed to have a conflicting interest if —

(1) such trustee is trustee under another indenture under which any other securities, or certificates of interest or participation in any other securities, of an obligor are outstanding unless (A) the indenture securities are collateral trust notes secured exclusively by securities issued under such other indenture, or (B) such other indenture is a collateral trust indenture secured exclusively by indenture securities, or (C) such obligor has no substantial unmortgaged assets and is engaged primarily in the business of owning, or of owning and developing and/or operating, real estate, and the indenture to be qualified and such other indenture are secured by wholly separate and distinct parcels of real estate, or (D) such trustee shall sustain the burden of proving, on application to the Commission and after opportunity for hearing thereon, that trusteeship under the indenture to be qualified and such other indenture is not so likely to involve a material conflict of interest as to make it necessary in the public interest or for the protection of investors to disqualify such trustee from acting as such under one of such indentures;

(2) such trustee or any of its directors or executive officers is an obligor or underwriter;

(3) such trustee directly or indirectly controls or is directly or indirectly controlled by or is under direct or indirect common control with an obligor or underwriter, whether by agency, stock ownership or otherwise;

(4) such trustee or any of its directors or executive officers is a director, officer, partner, employee, appointee or representative of an obligor, or of an underwriter (other than the trustee itself) who is currently engaged in the business of underwriting, except that (A) one individual may be a director and/or executive officer of the trustee and of an obligor, but may not be at the same time an executive officer of both the trustee and of such obligor, and (B) if and so long as the number of directors of the trustee in office is more than nine, one additional individual may be a director and/or executive officer of the trustee and a director of such obligor, if his pecuniary interest in such obligor does not exceed such percentage of the voting securities or such percentage of all other securities, other than indenture securities, of such obligor as the Commission may deem not detrimental to the public interest and the interests of investors, such percentages and the method of calculating the same to be fixed in the indenture, but such percentages in no event to exceed 1 per centum, and (C) such trustee may be designated, by any obligor or underwriter, to act in the capacity of transfer agent, registrar, custodian, paying agent, fiscal agent, escrow agent, or depositary, or in any other similar capacity, or, subject to the provisions of paragraph (1) of this subsection, to act as trustee under an indenture or otherwise;

(5) 5 per centum or more of the voting securities of such trustee is beneficially owned, individually or collectively, by an obligor or by any director, partner, or executive officer thereof, exclusive of any such securities owned by an individual described in clause (A) of paragraph (4) of this subsection in an amount not exceeding 2½ per centum of such securities or owned by an individual described in clause (B) of such paragraph (4); or 5 per centum or more of the voting securities of such trustee is beneficially owned, individually or collectively, by an underwriter, or by any director, partner, or executive officer thereof;

(6) such trustee is the beneficial owner of, or holds, as collateral security for an obligation which is in default as hereinafter defined, (A) 5 per centum or more of the voting securities of 10 per centum or more of any other class of security of an obligor (other than indenture securities and securities issued under any other indenture under which such trustee is also trustee) or (B) 10 per centum or more of any class of security of an underwriter;

(7) such trustee is the beneficial owner of, or holds, as collateral security for an obligation which is in default as hereinafter defined 5 per centum or more of the voting securities of any person who to the knowledge of the trustee owns 10 per centum or more of the voting securities of, or controls directly or indirectly or is under direct or indirect common control with, an obligor, whether by agency, stock ownership, or otherwise.

(8) such trustee is the beneficial owner of, or holds, as collateral security for an obligation which is in default as hereinafter defined, 10 per centum or more of any class of security of any person who to the knowledge of the trustee owns 50 per centum or more of the voting securities of an obligor; or

(9) such trustee owns, on May 15 in any calendar year, in the capacity of executor, administrator, testamentary or inter vivos trustee, guardian, committee or conservator or in any other similar capacity, an aggregate of 25 per centum or more of the voting securities of any person the beneficial ownership of 5 per centum of which would have constituted a conflicting interest under paragraph (6) or (7) of this subsection, or an aggregate of 25 per centum or more of any class of security the beneficial ownership of 10 per centum of which would have constituted a conflicting interest under paragraph (6) or (8) of this subsection. The indenture to be qualified shall provide that promptly after May 15 in each calendar year, the trustee shall make a check of its holdings of such securities as of such May 15. Such indenture shall also provide that if the obligor fails to make payment in full of principal or interest under such indenture when and as the same becomes due and payable, the trustee shall make a prompt check of its holdings of such securities as of the date of such default, and that all such securities held by the trustee in any of the above-mentioned capacities, with sole or joint control over such securities vested in it, shall thereafter be considered as though beneficially owned by such trustee, for the purposes of paragraphs (6), (7), and (8) of this subsection. The indenture to be qualified may contain provisions excluding from the operation of this paragraph the ownership by the indenture trustee of not more than 25 per centum of any such voting securities, or of not more than 25 per centum of any class of such other securities, until the expiration of a period of not more than eighteen months from the date of acquisition thereof, or until the obligor fails to make payment in full of principal or interest under the indenture to be qualified when and as the same becomes due and payable, whichever event shall first occur, if the trustee became the owner of such securities through becoming executor, administrator, or testamentary trustee of an estate which included such securities.

For the purposes of paragraphs (6), (7), (8) and (9) of this subsection, (A) the term "security" shall include only such securities as are generally known as corporate securities; (B) an obligation shall be deemed to be in default when a default in payment of principal shall have continued for thirty days or more, and shall not have been cured; and (C) the indenture trustee shall not be deemed the owner of (i) any security which it holds as collateral security (as trustee or otherwise) for an obligation which is not in default as above defined, or (ii) any security which it holds as collateral security under the indenture to be qualified, irrespective of any default thereunder, or (iii) any security which it holds as agent for collection, or as custodian, escrow agent, or depositary, or in any similar representative capacity.

For the purposes of this subsection, the term "underwriter" means every person who, within six years prior to the time as of which the determination is made, was an underwriter of any security of an obligor outstanding at such time, except that for the purposes of paragraph (2) of this subsection, underwritings on or before June 16, 1934, shall be disregarded.

### Preferential Collection of Claims Against Obligor

(c) Subject to the provisions of subsection (d) of this section, the indenture to be qualified shall provide that if the indenture trustee shall be, or shall become, a creditor, directly or indirectly, secured or unsecured, of an obligor, within four months prior to a default as defined in the last paragraph of this subsection, or subsequent to such a default, then, unless and until such default shall be cured, such trustee shall set apart and hold in a special account for the benefit of the trustee individually and the indenture security holders—

(1) an amount equal to any and all reductions in the amount due and owing upon any claim as such creditor in respect of principal or interest, effected after the beginning of such four months' period and valid as against the obligor and its other creditors, except any such reduction resulting from the receipt or disposition of any property described in paragraph (2) of this subsection, or from the exercise of any right of set-off which the trustee could have exercised if a petition in bankruptcy had been filed by or against such obligor upon the date of such default; and

(2) all property received in respect of any claim as such creditor, either as security therefor, or in satisfaction or composition thereof, or otherwise, after the beginning of such four months' period, or an amount equal to the proceeds of any such property, if disposed of, subject, however, to the rights, if any, of the obligor and its other creditors in such property or such proceeds.

Nothing herein contained shall affect the right of the indenture trustee—

(A) to retain for its own account (i) payments made on account of any such claim by any person (other than the obligor) who is liable thereon, and

(ii) the proceeds of the bona fide sale of any such claim by the trustee to a third person, and (iii) dividends paid on claims filed against the obligor in bankruptcy or receivership or in proceedings for reorganization pursuant to the Bankruptcy Act or applicable State law; or

(B) to realize, for its own account, upon any property held by it as security for any such claim, if such property was so held prior to the beginning of such four months' period; or

(C) to realize, for its own account, but only to the extent of the claim hereinafter mentioned, upon any property held by it as security for any such claim, if such claim was created after the beginning of such four months' period and such property was received as security therefor simultaneously with the creation thereof, and if the trustee shall sustain the burden of proving that at the time such property was so received the trustee had no reasonable cause to believe that a default as defined in the last paragraph of this subsection would occur within four months; or

(D) to receive payment on any claim referred to in paragraph (B) or (C), against the release of any property held as security for such claim as provided in paragraph (B) or (C), as the case may be, to the extent of the fair value of such property.

For the purposes of paragraphs (B), (C), and (D), property substituted after the beginning of such four months' period for property held as security at the time of such substitution shall, to the extent of the fair value of the property released, have the same status as the property released, and, to the extent that any claim referred to in any of such paragraphs is created in renewal of or in substitution for or for the purpose of repaying or refunding any preexisting claim of the indenture trustee as such creditor, such claim shall have the same status as such pre-existing claim.

The indenture to be qualified shall provide that, if the trustee shall be required to account, the funds and property held in such special account and the proceeds thereof shall be apportioned between the trustee and the indenture security holders in such manner that the trustee and the indenture security holders realize, as a result of payments from such special account and payments of dividends on claims filed against the obligor in bankruptcy or receivership or in proceedings for reorganization pursuant to the Bankruptcy Act or applicable State law, the same percentage of their respective claims, figured before crediting to the claim of the trustee anything on account of the receipt by it from the obligor of the funds and property in such special account and before crediting to the respective claims of the trustee and the indenture security holders dividends on claims filed against the obligor in bankruptcy or receivership or in proceedings for reorganization pursuant to the Bankruptcy Act or applicable State law, but after crediting thereon receipts on account of the indebtedness represented by their respective claims from all sources other than from such dividends and from the funds and property so held in such special account.

Any indenture trustee who has resigned or been removed after the beginning of such four months' period shall be subject to the provisions of this subsection as though such resignation or removal had not occurred. Any indenture trustee who has resigned or been removed prior to the beginning of such four months' period shall be subject to the provisions of this subsection if and only if the following conditions exist:

(i) the receipt of property or reduction of claim which would have given rise to the obligation to account, if such indenture trustee had continued as trustee, occurred after the beginning of such four months' period; and

(ii) such receipt of property or reduction of claim occurred within four months after such resignation or removal.

As used in this subsection, the term "default" means any failure to make payment in full of principal or interest, when and as the same becomes due and payable, under any indenture as to which an application for qualification is effective, and under which the indenture trustee is trustee and the person of whom the indenture trustee is directly or indirectly a creditor is an obligor; and the term "indenture security holder" means all holders of securities outstanding under any such indenture under which any such default exists.

## Exclusions From Section 7 (c)

(d) The indenture to be qualified may contain provisions excluding from the operation of subsection (c) of this section a creditor relationship arising from—

(1) the ownership or acquisition of securities issued under any indenture, or any security or securities having a maturity of one year or more at the time of acquisition by the indenture trustee;

(2) advances authorized by a receivership or bankruptcy court of competent jurisdiction, or by the indenture, for the purpose of preserving the property subject to the lien of the indenture, if notice of such advance and of the circumstances surrounding the making thereof is given to the indenture security holders, at the time and in the manner provided in the indenture;

(3) disbursements made in the ordinary course of business in the capacity of trustee under an indenture, transfer agent, registrar, custodian, paying agent, fiscal agent or depositary, or other similar capacity;

(4) an indebtedness created as a result of services rendered or premises rented; or an indebtedness created as a result of goods or securities sold in a cash transaction as defined in the indenture;

(5) the ownership of stock or of other securities of a corporation organized under the provisions of section 25 (a) of the Federal Reserve Act, as amended, which is directly or indirectly a creditor of an obligor; or

(6) the acquisition, ownership, acceptance, or negotiation of any drafts, bills of exchange, acceptances, or obligations which fall within the classification of self-liquidating paper as defined in the indenture.

The Commission shall by rules and regulations prescribe the definitions of the terms "cash transaction" and "self-liquidating paper" which shall be included in any such indenture, and shall in such definitions include such of the creditor relationships referred to in paragraphs (4) and (6) of this subsection to which the Commission determines that the application of subsection (c) of this section is not necessary in the public interest and for the protection of investors, having due regard to the purposes of such subsection.

## Reports by Obligor and Indenture Trustee

(e) The indenture to be qualified shall contain provisions—

(1) requiring each obligaor to file with the trustee and the Commission such annual and other reports, including such information with respect to the performance by such obligor of its obligations under the indenture, as the Commission may from time to time prescribe by rule or regulation as necessary or appropriate in the public interest or for the protection of investors, and

(2) requiring the indenture trustee to file with the Commission such annual and other reports with respect to its eligibility and its qualifications under subsections (a) and (b), respectively, of this section, the properties and funds held by it under the indenture, and its administration of the trust, and such notices of the issuance of additional indenture securities, of the release and substitution of property subject to the lien of the indenture, and of the making of advances by it to any obligor thereunder, as the Commission may from time to time prescribe by rule or regulation as necessary or appropriate in the public interest or for the protection of investors.

The indenture to be qualified shall also provide that such reports, information, and notices shall be in such form and detail, and shall be transmitted or otherwise made available to the indenture security holders in such manner as may from time to time be prescribed in such rules and regulations. Such rules and regulations may be adopted either before or after qualification becomes effective as to such indenture.

## Bondholders' Lists

(f) The indenture to be qualified shall contain provisions which the Commission deems adequate, having due regard to the public interest and the interests of investors, requiring each obligor to furnish or cause to be furnished to the institutional trustee thereunder, at stated intervals, all information in the possession or control of such obligor or of any of its paying agents as to the names and addresses of the indenture security holders, and requiring such trustee to preserve all such information so furnished to it or received by it in the capacity of paying agent, and to make such information or the use thereof available to indenture security holders, subject only to such terms and conditions as the Commission deems not detrimental to the public interest or the interests of investors. The disclosure of any such information in accordance with such provisions, regardless of the source from which such information was derived, shall not be deemed a violation of any existing law or of any law hereafter enacted which does not specifically refer to this subsection.

## Duties of the Trustee Prior to Default

(g) The indenture to be qualified shall contain provisions imposing upon the indenture trustee such specific duties and obligations prior to default (as such term is defined in such indenture) as the Commission deems consistent with the duties and obligations which a prudent man would assume and perform prior to such a default if he were trustee under such an indenture, including, without limitation, action in respect of the following matters:

(1) the recording, re-recording, filing, and refiling of the indenture;

(2) the application of the indenture securities and the proceeds thereof to the purposes specified in the indenture;

(3) the existence of or compliance with all conditions precedent to the authentication and delivery of the indenture securities, to the release or substitution of any property subject to the lien of the indenture, to the satisfaction and discharge of the indenture, and to any other action by the trustee under the indenture; and

(4) the performance by the obligor of such of its other obligations under the indenture as the Commission deems necessary or appropriate in the public interest or for the protection of investors.

The indenture to be qualified shall also contain provisions requiring the obligor to provide the indenture trustee with such information, such opinions and certificates of attorneys, accountants, and other experts, and such other documents, as the Commission may deem necessary or appropriate to enable the trustee to perform, or to facilitate its performance of, the duties and obligations imposed upon it pursuant to this subsection.

## Notice of Defaults

(h) The indenture to be qualified shall contain provisions requiring the trustee to give to the indenture security holders, at such time and in such manner as the Commission may deem adequate, having due regard to the public interest and the protection of investors, notice of all default known to the trustee: *Provided, however,* That the indenture may provide, except in the case of defaults (to be specified in the indenture) of which the Commission deems it necessary or appropriate in the public interest or for the protection of investors that prompt notice be given, that the trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors and/or responsible officers, of the trustee in good faith determine that the withholding of such notice is in the interests of the indenture security holders.

## Duties of the Trustee in Case of Default

(i) The indenture to be qualified shall contain provisions requiring the indenture trustee to exercise in case of default (as such term is defined in the indenture) such of the rights and powers vested in it by the indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise under the circumstances if he were a fiduciary and had the degree of skill which the indenture trustee has, or which, at the time of the offering of the indenture securities, the indenture trustee represents itself as having, as indenture trustee, whichever is the higher.

## Responsibility of the Trustee

(j) The indenture to be qualified shall not contain any provisions relieving the trustee from liability for its own negligent action or failure to act, or for its own willful misconduct, except that—

(1) The Commission shall permit the inclusion in the indenture to be qualified of one or more provisions authorizing the indenture trustee conclusively to rely, as to the truth of the statements and the correctness of the opinions contained therein, in the absence of bad faith on the part of such trustee, upon opinions or certificates of attorneys, accountants, or other experts (subject to such requirements as to independence and qualifications and the exercise by the trustee of reasonable care in their selection or approval, and subject to such other terms and conditions, as the Commission may deem necessary or appropriate in the public interest or for the protection of investors), and, when authorized by the indenture, upon opinions or certificates of specified officers of the obligor, if, in any of the above cases, the Commission deems that such provisions do not materially conflict with the required standard of conduct and are not detrimental to the public interest and the interest of investors;

(2) The indenture to be qualified may contain provisions protecting the trustee from liability for any error of judgment made in good faith by a responsible officer or officers of the trustee, unless it shall be proved that the trustee was negligent in ascertaining the pertinent facts;

(3) The indenture to be qualified may contain provisions (A) authorizing the holders of not less than a majority in principal amount of the indenture securities at the time outstanding to direct the method and place of conducting all proceedings at law or in equity for any remedy under such indenture, and (B) protecting the indenture trustee in respect of any action taken in good faith in accordance with any such direction. In determining whether the required proportion in principal amount of the indenture securities outstanding has concurred in any such direction, indenture securities owned by any obligor or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with any obligor shall be disregarded, except that, for the purposes of clause (B) of this paragraph, only indenture securities which the trustee knows are so owned shall be so disregarded.

### Undertaking for Costs

(k) The indenture to be qualified may contain provisions to the effect that all parties thereto, including the indenture security holders, agree that the court may in its discretion require, in any suit for the enforcement of any right or remedy under such indenture or against the trustee, as trustee, the filing by any party litigant of an undertaking to pay the costs of such suit, and may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant, having due regard to the merits and good faith of the suit or defense: *Provided, however,* That the provisions of this subsection shall not apply to suits instituted by the trustee or to suits instituted by indenture security holders for the enforcement of the payment of the principal of or interest on any indenture security, upon or after the respective due dates expressed therein, or to suits instituted by any indenture security holder or group of indenture security holders holding in the aggregate more than 10 per centum in principal amount of the indenture securities outstanding.

### Release and Substitution; Issuance of Additional Securities; Satisfaction and Discharge

(l) Any provisions in the indenture to be qualified with respect to (1) the release and substitution of any property subject to the lien of the indenture, or (2) the issuance of additional indenture securities, or (3) the satisfaction and discharge of the indenture shall be subject to restrictions and conditions which, in the light of the bargain of the parties, the Commission deems adequate, having due regard to the public interest and the interest of investors.

### Rights, Powers, and Remedies of Indenture Trustees and Indenture Security Holders

(m) The indenture to be qualified shall contain provisions which the Commission deems adequate, having due regard to the public interest and the interest of investors, with respect to the following matters—

    (1) The definition of what shall constitute a default thereunder;

    (2) The rights and powers of the indenture trustee with respect to (A) entry into possession of the trust estate; (B) obtaining, in its name as such trustee, a judgment for the entire amount due and owing under the indenture; (C) the institution of foreclosure proceedings and proceedings for the judicial or other sale of the property subject to the lien of the indenture; and (D) appearance and intervention in any judicial proceedings, and filing proofs of claim therein on behalf of the indenture security holders; and the duties of the indenture trustee with respect to calling meetings of the indenture security holders;

    (3) The rights, powers, and remedies of the indenture security holders and the manner in which and the conditions upon which such rights, powers, and remedies may be exercised, including the rights, powers, and remedies of the indenture security holders with respect to (A) accountings by the indenture trustee, (B) bringing action to collect the principal of and interest upon the indenture securities upon their respective due dates, and (C) calling and holding meetings of the indenture security holders and taking action at such meetings. The indenture to be qualified may contain provisions authorizing

the holders of not less than a majority in principal amount of the indenture securities at the time outstanding to consent to the postponement of any interest payment for a period not exceeding one year from its due date, or to the waiver of any default and its consequences, except a default in the payment of the principal of any indenture security upon the date of maturity specified therein, and except that a default in the payment of interest shall not be waived unless payment of all arrears of interest not so postponed shall have been made or provided for. The provisions of paragraph (3) of subsection (j) of this section shall govern the determination of whether the required proportion in principal amount of the indenture securities has concurred in such consent, and the extent to which the trustee shall be protected in relying thereon.

## Other Indenture Provisions

(n) The indenture to be qualified shall contain provisions which the Commission deems adequate, having due regard to the public interest and the interest of investors, with respect to the following matters—

(1) The qualifications, rights, powers, and duties of paying agents, including the duty of each paying agent to hold for the benefit of the indenture security holders or the trustee all sums held by such paying agent for the payment of the interest on and principal of the indenture securities, and to give to the indenture trustee notice of any default by the obligors in the making of such payments;

(2) Restrictions upon the employment by the indenture trustee of attorneys or other experts who have any interests which are likely to involve a material conflict with the interests of the indenture security holders; and

(3) The obligations of the obligors with respect to the recording or filing of the indenture.

### RULES, REGULATIONS, AND ORDERS

SEC. 8. (a) The Commission shall have authority from time to time to make, issue, amend, and rescind such rules and regulations and such orders as it may deem necessary or appropriate in the public interest or for the protection of investors to carry out the provisions of this Act, including rules and regulations defining accounting, technical, and trade terms used in this Act. Among other things, the Commission shall have authority, for the purposes of this Act, to prescribe the form or forms in which information required in any statement, application, report, or other document filed with the Commission shall be set forth, and to prescribe or recommend the form or forms of any provisions which, pursuant to section 7, are required or permitted to be included in an indenture. For the purpose of its rules or regulations the Commission may classify persons, securities, and other matters within its jurisdiction and prescribe different requirements for different classes of persons, securities, or matters.

(b) Subject to the provisions of the Federal Register Act and regulations prescribed under the authority thereof, the rules and regulations of the Commission under this Act shall be effective upon publication in the manner which the Commission shall prescribe, or upon such later date as may be provided in such rules and regulations.

(c) The Commission, by such rules and regulations or order as it deems necessary or appropriate in the public interest or for the protecton of investors, may authorize the filing of any information or documents required to be filed with the Commission under this Act, or under the Securities Act of 1933, or under the Securities Exchange Act of 1934, or under the Public Utility Holding Company Act of 1935, by incorporating by reference any information or documents on file with the Commission under this Act or any such Act. No provision of this Act imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule, regulation, or order of the Commission, notwithstanding that such rule, regulation, or order may, after such act or omission, be amended or rescinded or be determined by judicial or other authority to be invalid for any reason.

### HEARINGS BY COMMISSION

SEC. 9. Hearings may be public and may be held before the Commission, any member or members thereof, or any officer or officers of the Commission designated by it, and appropriate records thereof shall be kept. The Commission may, by such rules and regulations or orders as it deems necessary or appropriate in the

63402—38——2

public interest or for the protection of investors, provide for the consolidation of proceedings under this Act with proceedings under the Securities Act of 1933, Securities Exchange Act of 1934, and/or under the Public Utility Holding Company Act of 1935.

SPECIAL POWERS OF THE COMMISSION

SEC. 10. (a) For the purpose of any investigation or any other proceeding which, in the opinion of the Commission, is necessary and proper for the enforcement of this Act, any member of the Commission, or any officer thereof designated by it, is empowered to administer oaths and affirmations, subpena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, contracts, agreements, or other records which the Commission deems relevant or material to the injury. Such attendance of witnesses and the production of any such books, papers, correspondence, memoranda, contracts, agreements, or other records may be required from any place in the United States or in any Territory at any designated place of investigation or hearing. In addition, the Commission shall have the powers with respect to investigations and hearings, and with respect to the enforcement of, and offenses and violations under, this Act and rules and regulations and orders prescribed under the authority thereof, provided in sections 20, 22 (b), and 22 (c) of the Securities Act of 1933.

(b) The Treasury Department, the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Reserve Banks, and the Federal Deposit Insurance Corporation are hereby authorized, under such conditions as they may prescribe, to make available to the Commission, such reports, records, or other information as they may have available with respect to trustees or prospective trustees under indentures for which applications for qualification have been filed with the Commission, and to make through their examiners or other employees for the use of the Commission, examinations of such trustees or prospective trustees. Every such trustee or prospective trustee shall, as a condition precedent to qualification of such indenture, consent that reports of examinations by Federal, State, Territorial, or District authorities may be furnished by such authorities to the Commission upon request therefor.

Notwithstanding any provision of this Act, no report, record, or other information made available to the Commission under this subsection, no report of an examination made under this subsection for the use of the Commission, no report of an examination made of any trustee or prospective trustee by any Federal, State, Territorial, or District authority having jurisdiction to examine or supervise such trustee, no report made by any such trustee or prospective trustee to any such authority, and no correspondence between any such trustee or prospective trustee and any such authority, shall be divulged or made known or available by the Commission or any member, officer, agent, or employee thereof, to any person other than a member, officer, agent, or employee of the Commission: *Provided,* That the Commission may make available to the Attorney General of the United States, in confidence, any information obtained from such records, reports of examination, other reports, or correspondence, and deemed necessary by the Commission, or requested by him, for the purpose of enabling him to perform his duties under this Act.

(c) Nothing in this Act shall be construed as empowering the Commission to conduct an investigation or other proceeding for the purpose of determining whether the provisions of an indenture as to which an application for qualification is effective are being complied with, or to enforce such provisions.

Any investigation of a prospective trustee, or any proceeding or requirement for the purpose of obtaining information regarding a prospective trustee, under any provision of this Act, shall be limited—

    (1) to determining whether such prospective trustee is qualified to act as trustee under the provisions of subsection (b) of section 7;

    (2) to requiring the inclusion in the application of information with respect to the eligibility of such prospective trustee under paragraph (1) of subsection (a) of such section 7; and

    (3) to requiring the inclusion in the application of the most recent published report of condition of such prospective trustee, as described in paragraph (2) of such subsection (a), or, if the indenture does not contain the provision with respect to combined capital and surplus authorized by the last sentence of paragraph (2) of subsection (a) of such section 7, to determining whether such prospective trustee is eligible to act as such under such paragraph (2).

## COURT REVIEW OF ORDERS; JURISDICTION OF OFFENSES AND SUITS

SEC. 11. (a) Orders of the Commission under this Act shall be subject to review in the same manner, upon the same conditions, and to the same extent, as provided in section 9 of the Securities Act of 1933.

(b) Jurisdiction of offenses and violations under, and jurisdiction and venue of suits and actions brought to enforce any liability created by, this Act, or any rules or regulations or orders prescribed under the authority thereof, shall be as provided in section 22 (a) of the Securities Act of 1933.

### LIABILITY FOR MISLEADING STATEMENTS

SEC. 12. (a) Any person who shall make or cause to be made any statement in any application, report, or document filed with the Commission pursuant to any provisions of this Act, or any rule, regulation, or order thereunder, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, or who shall omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, shall be liable to any person (not knowing that such statement was false or misleading or of such omission) who, in reliance upon such statement or omission, shall have purchased or sold a security issued under the indenture to which such application, report, or document relates, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading or of such omission. A person seeking to enforce such liability may sue at law or in equity in any court of competent jurisdiction. In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit and assess reasonable costs, including reasonable attorneys' fees, against either party litigant, having due regard to the merits and good faith of the suit or defense. No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued.

(b) The rights and remedies provided by this Act shall be in addition to any and all other rights and remedies that may exist under the Securities Act of 1933, or the Securities Exchange Act of 1934, or the Public Utility Holding Company Act of 1935, or otherwise at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this Act shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.

### UNLAWFUL REPRESENTATIONS

SEC. 13. It shall be unlawful for any person in issuing or selling any security to represent or imply in any manner whatsoever that any action or failure to act by the Commission in the administration of this Act means that the Commission has in any way passed upon the merits of, or given approval to, any trustee, indenture or security, or any transaction or transactions therein, or that any such action or failure to act with regard to any statement or report filed with or examined by the Commission pursuant to this Act or any rule, regulation, or order thereunder, has the effect of a finding by the Commission that such statement or report is true and accurate on its face or that it is not false or misleading.

### PENALTIES

SEC. 14. Any person who willfully violates any provision of this Act or any rule, regulation, or order thereunder, or any person who willfully, in any application, report or document filed or required to be filed under the provisions of this Act or any rule, regulation, or order thereunder, makes any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined not more than $5,000 or imprisoned not more than five years, or both.

### EFFECT OF EXISTING LAW

SEC. 15. Nothing in this Act shall affect (1) the jurisdiction of the Commission under the Securities Act of 1933, or the Securities Exchange Act of 1934, or the Public Utility Holding Company Act of 1935, over any person, security, or contract, or (2) the rights, obligations, duties, or liabilities of any person under such Acts; nor shall anything in this Act affect the jurisdiction of any other commission,

board, agency, or officer of the United States or of any State or political subdivision of any State, over any person or security, insofar as such jurisdiction does not conflict with any provision of this Act or any rule, regulation, or order thereunder.

SEC. 16. Any condition, stipulation, or provision binding any person to waive compliance with any provision of this Act or with any rule, regulation, or order thereunder shall be void.

SEPARABILITY OF PROVISIONS

SEC. 17. If any provision of this Act or the application of such provision to any person or circumstance shall be held invalid, the remainder of the Act and the application of such provision to persons or circumstances other than those as to which it is held invalid shall not be affected thereby.

## STATEMENT OF WILLIAM O. DOUGLAS, CHAIRMAN, SECURITIES AND EXCHANGE COMMISSION, AND EDMUND BURKE, JR., ATTORNEY

Mr. EICHER. Commissioner Douglas is here. If you are ready to start, Mr. Commissioner, we will let you open the hearings. I may say for the record that Mr. Reece of Tennessee, a member of the subcommittee, indicated Friday that he would not be able to be with us this morning, but asked us to proceed with the hearings notwithstanding his absence.

You may proceed, Mr. Douglas.

### HISTORY OF THE BILL

Commissioner DOUGLAS. Mr. Chairman and members of the committee: This bill is the outgrowth of studies that the Securities and Exchange Commission and others have made in the field of corporate trusteeships.

The Commission made a study and investigation pursuant to section 211 of the Securities Exchange Act of 1934, and the enumeration of the defects contained in section 1 of the bill is based upon the records of the public hearings conducted by the Commission in that investigation and upon an examination by the Commission of more than 400 trust indentures of issuers of all types, most of them made after 1920.

The Commission submitted to the Congress a report on Trustees Under Indentures in June of 1936. Following that time, the Commission assisted in the preparation of legislation to recommend to the Congress, and the bill which was worked out was, as you know, introduced by Senator Barkley in the Senate.

In the preparation of that measure for Senator Barkley, the Commission had the assistance and cooperation of various groups. I am very glad to be able to report that this measure was, from its inceptiton, worked out in close cooperation with those who would be most affected by it.

I think the history of that might be of interest to the committee. In January, I believe it was, 1937, Tom K. Smith, then president of the American Bankers' Association, came into my office and said that he had heard that some legislation was being worked upon and asked whether it would be possible to collaborate in that endeavor. I assured him, on behalf of the Commission, that the Commission would

welcome such collaboration, and a very close cooperative set-up was the result.

Some members of the committee which Tom K. Smith appointed are here, I believe, this morning. There is one who is not here, Mr. Blaine B. Coles, vice president, First National Bank of Portland, Oreg. Mr. Coles, under date of April 16, 1938, gave me a letter on this matter which I would like to offer for the record, Mr. Chairman.

Mr. EICHER. Without objection, it may be put in the record.

Mr. DOUGLAS. I will not read the entire letter. There are one or two sentences which I would like merely to mention in passing. Mr. Coles says:

> I should like to say to you that while I do not now speak as an official of the American Bankers' Association, yet I know that for the most part the bill has the approval of the great majority of trust institutions in the country, especially those located in cities west of the Mississippi River. Most trust men who have given serious consideration to the bill are in accord with the aims and objectives of the bill. Most of us also feel that the bill as now drafted is entirely workable and that regulations can easily be prepared that will provide for a simple, speedy, and direct administration.

(The letter above referred to is as follows:)

PORTLAND, OREG., <em>April 16, 1938.</em>

Hon. WILLIAM O. DOUGLAS,
    <em>Chairman, Securities and Exchange Commission,</em>
                    <em>Washington, D. C.</em>

MY DEAR MR. CHAIRMAN: As you know, while I was president of the trust division of the American Bankers' Association during the last year, I have spent a good deal of time and have given much thought to Senate bill No. 2344 which, if passed, will be known as the Trust Indenture Act of 1938, and which is now before a committee of the House of Representatives for consideration. I have not seen the draft of the House bill but assume that it is in the same form as the Senate bill now stands.

I should like to say to you that while I do not now speak as an official of the American Bankers' Association, yet I know that for the most part the bill has the approval of the great majority of trust institutions in the country, especially those located in cities west of the Mississippi River. Most trust men who have given serious consideration to the bill are in accord with the aims and objectives of the bill. Most of us also feel that the bill as now drafted is entirely workable and that regulations can easily be prepared that will provide for a simple, speedy, and direct administration.

If it should prove in practice that amendments are necessary, you may count upon my assistance in helping to work out such changes as experience indicates will be desirable. Speaking personally and at the same time reflecting what I believe is the attitude of trust men in the West and Middle West, may I say that I hope the bill will pass in nearly as possible its present form.

With every good wish, I am,
    Sincerely and respectfully,

BLAINE B. COLES,<br><em>Vice President, First National Bank of Portland, Oreg.</em>

Commissioner DOUGLAS. I think, Mr. Chairman, that the excellency of the measure is due in no small part to the close cooperation and collaboration which has been received from those who are vitally interested in this problem.

In addition to the committee of the American Bankers' Association, the Securities and Exchange Commission consulted throughout the spring of 1937, on numerous occasions, with informal committees representing various life-insurance companies and mutual savings banks.

The bill, as it was originally introduced in the Senate, had, I believe, certain features which the committee of the American Bankers' Association found objectionable. I believe that those provisions which

were at the early stages of this measure found objectionable by them
have been eliminated. Every draft of the bill was scrutinized, not
only by the special committee on mortgage trusteeships of the Ameri-
can Bankers' Association, but also by an informal committee of the
executives of 17 New York City banks. I understand that those
committees do not oppose adoption of the bill in its present form.
So far as the measure now stands, Mr. Chairman, it does have the full
endorsement of the Securities and Exchange Commission.

Mr. EICHER. For the record, Mr. Douglas, right there: Is H. R.
10292 identical with amended S. 2344 as reported by the Senate
Committee on Banking and Currency?

Commissioner DOUGLAS. I have had it checked very carefully, Mr.
Chairman, and it is identical except for a comma here and there.
The substantive provisions of the bill are precisely identical.

### OBJECTIVES OF THE BILL

Now, the general scope of the bill and the reasons which support it,
and a section by section analysis of it are set forth in the report of the
Senate Banking and Currency Committee, accompanying the Senate
bill, copies of which are available to this committee. In view of that
fact, I do not know that it would be desirable or necessary to go into
all of the minutiae of this bill. I shall be glad to do so to the extent
that the committee desires.

For the purposes of the record, however, I think it might be well
for me to make a brief statement as to the nature of the trust indenture
and the reasons for its widespread use.

Where bonds are to be nationally distributed, particularly if they
are to be secured by the mortgage or pledge of property, the use of the
trust indenture device has been found to be a practical necessity. The
bondholders are generally widely scattered through many States.
Their individual holdings are likely to be small. Even if the average
bondholder had the necessary initiative and knowledge, an attempt
by him to enforce his rights by individual action, or to keep reasonably
well informed as to the performance of the obligations assumed by the
obligor, would require a disproportionate expenditure of time and
money. By the adoption of the trust indenture device, and by vesting
in the indenture trustee powers with respect to the enforcement of the
rights of the bondholders, including their rights in any property mort-
gaged or pledged under the indenture, much duplication of effort and
expense can be avoided. These facts, coupled with the increasing
complexity of corporate financial transactions, have led to the exten-
sion of the trust indenture device to unsecured bonds as well as mort-
gage bonds. The desire of borrowers to place limitations and restric-
tions upon the bondholders' right of individual action has also played
a part in this development.

The bond itself is merely one sheet of paper. The indenture is an
elaborate legal document from 50 to 200 pages long. Although the
bondholder rarely sees it, and could not understand it if he did see
it, the indenture legally constitutes part of his contract to the borrower,
that is, the obligor. The increasing complexity of corporate financial
transactions has made it inevitable that important provisions with
respect to the rights of the bondholders will be found only in the inden-
ture, and will be incorporated in the bonds themselves only by reference
to the indenture.

To the extent that the types of trust indenture now in common use are inadequate, it is clear that such inadequacy presents a national problem which cannot be dealt with effectively by the States, for it is conservatively estimated that more than $40,000,000,000 of securities which have been nationally distributed are now outstanding under trust indentures, and in the 12 months ended April 30, 1937, nearly 2½ billions of additional securities which would have been affected by this bill were registered under the Securities Act, for sale by use of the mails or in interstate commerce.

At a later point in my statement, I shall be glad to discuss in some detail the deficiencies which, in the course of its study of the subject, the Commission found to exist in the forms of trust indenture in common use. I shall also discuss the manner in which the trust indenture is customarily prepared.

At this time I will, if the committee desires, touch merely upon what I think are the more salient points of the bill and its most important objectives. The primary purpose of the bill is twofold:

First, to bring all indenture trustees, which are usually national banks or State banks or trust companies, up to the high level of diligence and loyalty now maintained by the more conscientious trust institutions.

Second, to remedy the defects in indentures which now handicap those institutions in their efforts to render the vigilant and effective service which the protection and enforcement of the rights of investors require.

These objectives are to be accomplished by the establishment of statutory standards to which these trusts indenture must conform.

In our opinion, the bill has the same constitutional basis as the Securities Act of 1933, namely, the public offering of securities by the use of the mails or agencies of interstate commerce. In general, the bill applies only to indentures which must now, under the Securities Act, be submitted to the Securities and Exchange Commission as part of a Securities Act registration statement covering the bonds to be issued thereunder. All indentures so filed at the present time under the Securities Act are examined by our staff in order to determine whether their terms have been fairly and adequately disclosed in the registration statement and the prospectus.

The bill would merely require the Commission to determine also whether the terms of the indentures conform to the standards prescribed by the bill. I mention that, Mr. Chairman, because I do not think that, so far as the administrative load is concerned, the increase in work by the Securities and Exchange Commission, in the period after this bill gets in full operation, will be materially greater than the work which the Commission at the present time does under the Securities Act on trust indentures.

I would like to say at this point, Mr. Chairman, that the bill does not give the Commission any jurisdiction whatsoever over such matters as the wisdom of the issue, or the amount of security to be given for the issue, or the offering price, the maturity date——

Mr. BOREN. May I interrupt there, Mr. Douglas.

Commissioner DOUGLAS. Yes; Mr. Boren.

Mr. BOREN. I think I understand this, but I want to be sure. The difference between an underwriter and an ordinary broker is that the underwriter simply is an agent of the originating company? I mean

that he does not have any investment in the securities whatever. Is that right?

Commissioner Douglas. He usually does not. He may, but that would be wholly incidental. He usually makes a commitment with the issuer to sell or to dispose of the particular security in question.

Mr. Boren. Then he is in a sense a commission merchant?

Commissioner Douglas. He is a merchant; yes.

Mr. Boren. Well, do you not think that the term "commission merchant" fits him in that he draws a commission on the sale of securities which he takes?

Commissioner Douglas. He gets his commission or his "spread." He commonly purchases the issue from the issuer or agrees to find purchasers for that issue; or he may merely agree to take all of the issue that remains unsold after the issuer has completed its offer.

Mr. Boren. I think that answers my question, Mr. Chairman.

(The following summary of the deficiencies found by the Securities and Exchange Commission to exist in the present-day trust indenture was submitted by Commissioner Douglas, at the request of the subcommittee, for inclusion at this point in the record.)

\*       \*       \*       \*       \*       \*       \*

### SUMMARY OF DEFECTS IN TRUST INDENTURES

In the course of its studies made pursuant to section 211 of the Securities Exchange Act of 1934, the Commission examined more than 400 indentures of issuers of all types. There follows a brief summary of the deficiencies found by the Commission to exist in the forms of trust indenture now in common use. Page references are to the various parts of the Commission's report of this study.

1. Trust indentures frequently fail to provide the trustee with the necessary tools for making an effective check on the performance of even the more important obligations assumed by the obligor in the indenture.

Where property is mortgaged or pledged under the indenture, the first essential is to see that the indenture is properly recorded. Failure to do so may mean disaster for the bondholders. Nevertheless, in 86 percent of the indentures examined, there was an express provision to the effect that the trustee was to be under no obligation to see that such recording was effected. (See pt. VI, Trustees Under Indentures, p. 24.)

In many cases it is not only proper, but essential, that the trustee make some check upon the disposition of the proceeds of the bonds issued under the indenture. The trustee received and disbursed the proceeds in the case of one-fourth of the indentures examined by the Commission. In practically none of the remaining indentures was any machinery established for a check by the trustee upon the disposition of the proceeds. (See pt. VI, p. 127.)

It is also essential, in many cases, that proper machinery be established whereby the trustee may make an effective check upon the performance of the conditions precedent to the issuance of additional securities. The failure to make such a check may be definitely prejudicial to the bondholders. (See pt. VI, pp. 26–29.)

If the indenture fails to establish adequate restrictions and conditions upon the release and substitution of property mortgaged or pledged under the indenture, the bondholders may find, when trouble arises, that the assets upon which they have relied for security have been whisked away out of their reach. (See pt. VI, pp. 16–23.)

2. Indentures commonly failed to require the obligor to make reasonably informative periodic reports to the trustee. More than one-third of the indentures examined made no provision whatsoever even for annual reports by the obligor. (See pt. VI, p. 125.)

3. None of the indentures examined contained provisions requiring the obligor to file with the trustee information as to the names and addresses of the bondholders, or provisions requiring the trustee to make such information or the use thereof available to the bondholders themselves. Such provisions are an essential part of the necessary machinery for the transmission of information to the bondholders, and for the organization of the bondholders for the protection of their own interests.

I have already mentioned the impracticability of any attempt by the average bondholder to enforce his rights by individual action. Some form of concerted action, ordinarily through the formation of a protective committee, is not only advisable—it is essential, under the terms of the typical indenture provisions referred to in paragraph 5 below. And access to a list of bondholders is a practical prerequisite to concerted action. (See pt. 1, Strategies and Techniques of Protective and Reorganization Committees, pp. 408–457.)

The obligor itself and its investment bankers now have practically complete control over bondholders' lists. (See pt. I, pp. 436–446.) The indenture trustee frequently has no list at all, or only an incomplete one, and even if it has a list, it is very likely to refuse to make it available to the bondholders except upon court order. (See pt. VI, pp. 130, 131.) Out of a total of 943 protective committees which reported to the Commission, nearly 88 percent obtained their lists of security holders from the underwriters or from the company itself. (See pt. I, p. 439.) Under the circumstances it is not at all surprising to find that protective committees are so largely composed of persons connected with either the issuer or its underwriters. (See pt. II, Committees and Conflicts of Interest, pp. 536, 537.)

Control of bondholders' lists has been a major basis for banker-management domination of the reorganization process. Section 7 (f) of the bill, even standing alone, would do much to restore to the bondholders control of their own destinies.

4. Not a single one of the indentures examined imposed upon the trustee any obligation to notify the bondholders of the occurrence of even the most serious defaults. (See pt. VI, p. 125.) In fact, although the trustee usually learns of a default before the bondholders do, nearly two-thirds of the indentures examined contained the so-called ostrich clause, which permits the trustee to shut its eyes to the existence of a default unless formally notified of it by the holders of a specified percentage of the bonds. (See pt. VI, p. 38.) The practical consequences are illustrated by the case histories which appear at pages 31 to 42 of part VI.

5. Indentures commonly make inaction the path of least resistance for the trustee, even where action is imperative, first, by absolving the trustee from any duty to act unless it receives notice of default, demand for action, and indemnity, from substantial percentages of the bondholders, and second, by protecting the trustee from liability even for its own negligence.

The trustee was generally given ample power to bring suit to collect the principal of the bonds, and almost invariably it was vested with the exclusive power to enforce the rights under the indenture against the property mortgaged or pledged thereunder. (See pt. VI, pp. 42, 43.) But practically all of the indentures examined absolved the trustee from any duty to act unless the trustee received a demand for action from upwards of 25 percent of the bonds, and indemnity against possible expense or liability, notwithstanding the fact that indentures commonly give the trustee a prior lien for such expenses and liability, upon the property mortgaged or pledged under the indenture or upon the proceeds of suit. (See pt. VI, p. 43.) I understand that the committees of trust institutions regard this lien as affording adequate protection. Further, under most of the indentures examined, even after the necessary demand and indemnity had been received, the trustee retained the power to elect the remedy to be pursued, unless the holders of a majority of the bonds directed it to take a particular type of action. (See pt. VI, pp. 43, 44.) In addition, practically all of the indentures expressly exempted the trustee from liability except for gross negligence or willful misconduct. (See pt. VI, p. 125.)

6. Finally, trust indentures rarely contained provisions prohibiting the possession by the trustee of interests which materially conflicted with those of the bondholders and not infrequently specifically authorized the trustee to possess such materially conflicting interests.

The foregoing summary is based upon our examination of more than 400 trust indentures in the course of our studies pursuant to section 211 of the Securities Exchange Act. In addition, the Commission has had occasion to examine a large number of indentures filed with it under the Securities Act, many of them filed after the publication of the part of its report in which those deficiencies were pointed out (June 18, 1936). The results of that examination clearly show that no substantial progress has been made in the correction of those deficiencies in the 2 years since that part of our report was published.

The more conscientious trust institutions will use their best efforts to protect and enforce the rights of the bondholders, within the limitations imposed by the deficiencies in the indenture itself, notwithstanding the fact that they could safely refrain from acting. But the traditional view is that the indenture trustee is merely a mechanical, clerical agency. (See pt. VI, pp. 4, 23.) The practical consequences, to the bondholders, of the adoption of such a view are illustrated

by the case histories cited in part VI, pages 20–23, 48–61, 68, 69, and 129, and in part I, pages 329–341.

The obligor and its underwriters ordinarily control the lists of bondholders. They therefore are in the best position to galvanize a reluctant trustee into action, and to direct the action to be taken by the trustee. The net effect of the deficiencies referred to is to deprive the bondholders of control of their own destinies, and to vest such control in the underwriters and in the obligor itself. The correction of those deficiencies in the manner provided in the bill would make it possible for the indenture trustee and the bondholders themselves to take whatever action their interests might require, independently of the obligor and the underwriters.

The committees of the trust institutions themselves do not oppose the correction of those deficiencies. Any unselfish opposition, on the part of the underwriting houses, must in large part be based upon the theory that the bondholder should continue to rely, and to have to rely, almost exclusively on the underwriting house for protection. But if, when trouble arises, the underwriting house has ceased to exist, or if it fails to discharge its moral obligation, or if its judgment is in error, these deficiencies in the indenture itself constitute a serious handicap to any effort by the bondholders to work out their own salvation.

\*          \*          \*          \*          \*          \*          \*

Commissioner DOUGLAS. Now, this bill does not give the Commission any jurisdiction whatsoever over such matters as the wisdom of the issue or the amount of security to be mortgaged or pledged under the bonds, or the offering price, or the maturity date, or the interest rate, or the sinking-fund provisions. In other words, the Commission is not, under this bill, given power to pass upon the investment merits of particular securities. That is not the theory of it.

Nor does this bill give the Commission any power with respect to the enforcement of the provisions in these indentures. Under this bill, if it were the law, the Commission would be concerned only with those provisions which relate to the protection and enforcement of the rights of bondholders. Once an indenture has been determined by the Commission to conform to the standards of the statute, the work of the Commission will have been completed. After that date the Commission has no continuing jurisdiction over the corporate trustee; no continuing jurisdiction to take steps in connection with the enforcement of the various covenants in the indenture. The indenture, after it has been "qualified" under this statute, will be enforceable in the same manner as any other contract is enforceable, in the same manner that indentures presently executed are enforceable.

(Discussion of necessity for regulation resumed at p. ——, infra.)

### TIE-IN WITH THE SECURITIES ACT

Mr. EICHER. Mr. Douglas, will you point out right there a little more precisely just how this proposed measure will dovetail in with the jurisdiction that the Securities and Exchange Commission possesses now under the Securities Act and to what extent it adds to its jurisdiction.

Commissioner DOUGLAS. By and large, Mr. Chairman, with very few exceptions, this bill is applicable only to those bonds and similar securities which now have to be registered under the Securities Act of 1933. There are a few exceptions that are not particularly important at this point.

Under the Securities Act, the indenture has to be filed and we have to examine it to determine whether or not there are provisions in it which ought to be disclosed in the prospectus or in the registration statement.

We commonly require certain key provisions in the indenture to be so disclosed.

Under this bill there has to be more than the mere disclosure now required in the registration statement under the Securities Act. An application would be filed under this bill for the qualification of the indenture under which it is proposed to issue the bonds.

Mechanically, we have under this statute the same 20-day period that we have under the Securities Act. This is designed to provide the staff of the Commission with ample time to make an examination of the indenture, and to check its proposed provisions against the standards of this statute.

The indenture to be qualified under this statute, comes into a position for clearance by the Commission at the end of the 20-day period.

There is this important distinction: Under the Securities Act our Commission can, and frequently does, issue stop orders against the further sale of securities after the registration statement has become effective and after some of the securities may have been sold. That is done pursuant to the powers which we have, under section 8 (d) of the Securities Act, to stop the sale of securities where there have been material misrepresentations of fact.

Under the proposed bill the Commission will have no power, after the indenture has been qualified, to issue a stop order against the further sale of bonds to be issued thereunder. The reason for that is this. Under the Securities Act, disclosure, and disclosure alone, is the standard for clearance. Under this bill the standard is not merely disclosure. The test is whether or not certain of the provisions in the indenture meet the requirements of the statute.

Now, that indenture is a contract. After the contract has been made and some of the bonds are outstanding thereunder, it would be difficult, as a matter of law, to recall that contract and to remake it. So, after the indenture has once been qualified, the Commission, under this bill, cannot step in and issue a stop order against the further sale of securities issued thereunder. After it has been qualified, the indenture becomes a contract. Thereafter it is enforceable only by the bondholders, the trustee, and the obligor. The Commission cannot intrude, at any point of time thereafter, upon the enforcement of its covenants or the assertions of rights thereunder in any respect whatsoever.

Now, since the Commission will not have the second line of defense, so to speak, provided by the stop-order machinery, it is considered unwise to impose a mandatory requirement that refusal order proceedings (the method by which the Commission may prevent an indenture from being qualified) be instituted within a shorter period of time than the 20 days provided in section 6 (c) of the bill, although in many cases—probably in most cases—the Commission will be able to complete its examination and give the issuer an opportunity to correct any defects in the indenture within a considerably shorter time. In any event, the obligor, under this bill, can insure that the indenture will become qualified at or before the time that registration of the bonds themselves become effective, by the simple expedient of filing the indenture, together with the information and documents required in the application, before it files its registration statement under the Securities Act. Most, if not all of such information and documents are of such a nature that they could easily be supplied in

advance ·of the filing of the registration statement. To the extent that they are not available at the time, the Commission will have the power to consent to the filing thereof by amendment as under the Securities Act and thus prevent delaying the qualification of the indenture. The registration statement now required to be filed under the Securities Act includes not only the form of indenture, but also most of the information and documents which would be necessary under the bill in connection with the examination of the indenture. Unnecessary duplication of such information and documents can be avoided by incorporating them in the application by reference to the registration statement, or vice versa, pursuant to rules which the Commission is authorized to make under section 8 (c) of the bill.

With the few exceptions that I have mentioned, the statute is set up mechanically in much the same way as the Securities Act, so that the proceedings under both statutes will in effect be a consolidated proceeding not involving additional time or confusion, or red tape. I think, from the point of view of the administrative agency, that this bill and the Securities Act are geared very closely together mechanically, so as to produce full efficiency in the operation of both.

## LIMITED SCOPE OF INTERFERENCE WITH CONTRACT BETWEEN LENDER AND BORROWER

Mr. EICHER. Mr. Douglas, this bill then does enter to a degree, at least, into the field of regulation of private contracts?

Commissioner DOUGLAS. That is correct, Mr. Chairman.

Mr. EICHER. Is the constitutional authority for that power found in the precedents permitting regulations defining fair business practices, or is there a possibility that some of the power that you might exercise under the sanction of this bill would impinge the constitutional inhibition against the impairment of the obligation of contracts?

Commissioner DOUGLAS. Well, it comes rather basically down to the question as to the power of the Congress to deal adequately with securities flowing in interstate commerce.

Under the Public Utility Holding Company Act of 1935, the Congress gave the Commission the power to pass upon securities being issued by registered holding companies and their subsidiaries. It gave the Commission standards such as whether the security was reasonably adapted to the earning power of the issuer, and it required the Commission to make findings as to the type of capital structure, the interest rate, underwriters' commissions, and so on. The theory of such provisions of that act was and is that some supervision or control is necessary to see to it that conservative investments are put out by these holding-company systems rather than securities that have little or nothing back of them. That is to say, the theory was and is that our economic welfare is dependent upon the pumping of private capital into enterprises. We cannot allow the reservoirs of private capital to be tapped recklessly. The Congress has the power to require that certain minimum safeguards be set up so that the interstate streams from those reservoirs of capital will not become polluted, or contaminated.

Certainly, if the Congress had the power to take that major step under, say, section 7 of the Public Utility Holding Company Act, it would, in our judgment, have the power to take the much lesser step,

not of having the Commission pass upon the securities, but merely having it look at the terms of the trust indenture itself to see to it that the members of the general public who buy the securities either will be in a position to protect themselves or will have someone there who can protect them. To condition the use of the mails or agencies of interstate commerce in the sale of bonds secured by such indentures seems clearly constitutional.

On the question of interference with private contracts, there is no no question in my mind but that it does interfere, to that extent, and there is no question in my mind but that it is constitutional so to interfere, and necessary in the public interest so to interfere.

### MEMBERS OF INVESTING PUBLIC ARE THE REAL LENDERS

Who are the parties to this contract? Not speaking as a lawyer, but speaking as a layman, the parties to the contract are the security holders on the one hand and the obligor on the other, the lender and the borrower.

### INVESTING PUBLIC CANNOT PARTICIPATE IN DRAFTING INDENTURE

The investment bankers who underwrite an issue of bonds ordinarily have no intention whatsoever of making a permanent investment in those bonds. That is not their business. Their capital would ordinarily not be adequate for that purpose without the assistance of substantial bank loans. If the underwriter ever becomes the owner of the bonds, it is only with the intention of distributing those bonds to the public. Occasionally, of course, where the underwriters are unable to dispose of the issue, they find themselves in the position of involuntary investors, but realistically, where there is to be a public offering, the real "lenders" are the ultimate purchasers of the securities—the members of the general public who buy them. Therefore, when we speak of the interference with the right of private contract between borrower and lender in this situation, we are speaking of the contract between the obligor and the ultimate purchasers of the securities. I think it is very important to bear that point in mind.

Who are the security holders? At the time of the issuance of the securities, they are unknown. The obligor may be in Delaware and the security holders may be in the other 47 States.

We all know, from our common knowledge, about the interstate mechanism which has been developed for the interstate distribution of securities. We all know that they flow in interstate commerce. We all know that they are sold nationally. We also know that the wide sale and distribution of the securities raises a very acute problem as to what those disorganized, scattered, security holders are going to be able to do to protect themselves, in case the particular issue gets into difficulty.

Mr. Boren. The indenture is not a contract of sale?

Commissioner Douglas. I beg your pardon.

Mr. Boren. The indenture is not a contract of sale, but rather a contract to offer for sale. Is that not a layman's interpretation of it?

Commissioner Douglas. I think so.

Now, as I have said, the bond itself is merely one sheet of paper. The indenture is an elaborate legal document which, although the bondholder rarely sees it, legally constitutes part of his contract.

It is perfectly obvious that with certain exceptions this contract that is made is not made by the security holders on one side of the table and the obligor on the other side of the table. It is a contract that is made for them, not by them. Who makes it? We know that the security holders do not make it, with certain exceptions.

Mr. EICHER. It is a contract that the lender has the option to accept or reject later on?

Commissioner DOUGLAS. That is correct.

Mr. EICHER. It is only then that it becomes a contract.

Commissioner DOUGLAS. Legally, I suppose it is a contract between the trustee and the obligor. Actually, our statistics show that in the case of more than half of the indentures examined by the Commission in the course of its study of protective committees, the trustee had no participation whatsoever in the drafting of that contract. (See pt. VI of the report above referred to, entitled "Trustees Under Indentures," pp. 7–10.) That contract has, by and large, been drawn by the obligor on the one hand and the underwriter on the other. The traditional view is that, generally speaking, it is not the place of the trustee to make any suggestions except on two points: First, whether the provisions of the indenture will "work," as a purely mechanical matter, and, second, whether the trustee is given adequate powers and immunities. A prospective trustee which made suggestions as to other points would be likely to find that its choice lay between accepting the indenture "as is," or declining to act as trustee. In the latter case, the borrower could shop around until it found a trust institution which would accept the indenture, notwithstanding the objectionable provisions.

It would be clear to me that the drawing of the contract should not be left to the borrower—the obligor. Perhaps if we were dealing with an old-fashioned situation in which we had one prudent man dealing with another prudent man in a simple borrowing and lending situation, we could fully expect that the one prudent man could take care of himself, or we would not feel so badly if he did not take care of himself; but where we are reaching the masses of the people, different considerations apply.

They are not in a position, realistically, to look after their own interests.

Mr. EICHER. But it is known right from the beginning, is it not, Mr. Douglas, that the trustee is merely a straw man and he is set up there for the purpose of representing the ultimate hundreds, possibly thousands, of private investors whose money it is expected will be invested in that particular issue?

Commissioner DOUGLAS. Yes, sir.

Mr. EICHER. So it is the general public interest represented by these millions of investors that are expected to supply the funds that this bill seeks to serve?

Commissioner DOUGLAS. The trustee does not supply the funds.

Mr. EICHER. No. It is these individuals who represent the public interest and it is their interest that this bill seeks to protect.

Commissioner DOUGLAS. That is right.

Mr. EICHER. And seeks to see to it that the kind of a contract that they think they are buying is the kind of a contract they are getting.

Commissioner DOUGLAS. That is correct.

Mr. BOREN. As a practical matter, in the ordinary and average sense, in the trust indenture, who is the underwriter and who is the trustee?

Commissioner DOUGLAS. Well, that varies so much, Mr. Boren.

Mr. BOREN. I mean, to indicate, Mr. Commissioner, that we will say possibly the First National Bank & Trust Co. in Oklahoma City will be the trustee and may be the underwriter. Is that a practical application of the thing?

Commissioner DOUGLAS. No; not since the passage of the banking act, when the underwriting of securities was divorced from commercial banking. Your underwriter at the present time is a partnership or a corporation, or an individual, who is engaged either in the wholesaling or retailing of securities. The trustee, by and large, is a bank, a commercial bank, or a trust institution.

Mr. BOREN. That is the distinction I wanted to make, as to whether under the banking act the bank could act as an underwriter or a trustee.

Commissioner DOUGLAS. The banks in these situations are acting as trustees in most of the cases.

Now, we will find smaller issues where the bank does not act as trustee, but where an individual has been acting as trustee.

You take, Mr. Chairman, our report on real-estate bonds. That report shows that, in many real-estate situations, an individual, an officer of the underwriter, was the trustee—a so-called vest-pocket trustee. (See pt. III of the report above referred to, entitled "Committees for the Holders of Real Estate Bonds," pp. 12–17.) This bill is, among other things, designed to see to it that in those issues of national importance the trustee is a responsible institution.

Mr. EICHER. In other words, that there be arm's-length representation.

Commissioner DOUGLAS. That there is arm's-length representation by a responsible institution.

Mr. BOREN. In the eventuality of an issue not being marketable as expected at the time of issue, does the underwriter then stand in the position of holding an obligation to assure to the obligor that its issue shall be taken up and funds will be furnished it?

Commissioner DOUGLAS. That depends entirely upon the contract the underwriter makes with the issuers. Normally it will be an agreement to take all that is not sold by the issuer, or an agreement to find purchasers for the issuer, which means a firm commitment that, if they do not find purchasers, the underwriter will take them. Sometimes you will find underwriters as defined in the Securities Act not taking a commitment, but merely selling as an agent without any firm commitment. That is not the usual case.

Mr. BOREN. If I might go a little afield from the point here under discussion, I was particularly interested in the exemption you mentioned under section 3 in reading the first provision under section 3.

Am I right in the assumption that you rather intended to define what securities were under the act rather than what securities were to be exempted?

Commissioner DOUGLAS. Well, under section 3 an attempt was made to eliminate from the bill certain types of securities which it did not seem necessary to subject to the bill. In other words, where the public interest was not so apparent or where the kind or type of security itself did not lend itself to the type of abuses that had arisen.

Mr. BOREN. It strikes me that in this section you have proceeded in the reverse of the ordinary approach by saying that all securities are exempted, except.

Commissioner DOUGLAS. That is the Securities Act approach, Mr. Boren, and this is drafted along the lines of the Securities Act in that respect. That is, the Securities Act sets out categories of securities exempt from the Securities Act. There are exceptions, but by and large this bill follows the Securities Act type of exemption. For example, as respects Government securities, municipal securities, and so on.

Mr. BOREN. Well, I do not think it is fundamentally important, but I do want to be sure that I understand clearly your proposition here.

If I understand the Security Act properly, it sets out definite exemptions, say, for example, municipal securities are exempt.

Commissioner DOUGLAS. That is right.

Mr. BOREN. And rather defines the exemptions, while apparently in section 3 here you said that all securities are exempted, "except," and then define those that are not exempt.

Commissioner DOUGLAS. That was not the intention, Mr. Boren.

Mr. BOREN. I wanted to make it clear.

Commissioner DOUGLAS. Section 3 (a) reads:

The provisions of sections 4, 5, 12, 13, and 14 of this Act shall not apply to any of the following securities.

Mr. BOREN. Will not apply to any securities other than?

Commissioner DOUGLAS. No; shall not apply to any of the following securities. In other words, it is following the pattern of the Securities Act.

Mr. BOREN. I do not know whether I have the proper bill or not, but it reads:

(1) Any security other than (a) a note bond, debenture, or evidence of indebtedness, whether or not secured, or (b) a certificate of interest or participation in any such note, bond, debenture, or evidence of indebtedness, or (c) a temporary certificate for, or guarantee of, any such note, bond, debenture, evidence of indebtedness or certificate.

Mr. BURKE. That is right.

Commissioner DOUGLAS . You are thinking of 3 (a) (1).

Mr. BOREN. That is right.

Commissioner DOUGLAS (reading):

Any security other than a note, bond, debenture, or evidence of indebtedness, whether or not secured.

That is correct.

In other words, we are not dealing with all types of securities here. We are dealing with those securities which are customarily issued under an indenture.

Mr. BOREN. You have listed here specific securities which you are dealing in in this section 3 (a) (1), rather than in the specific securities which are exempt?

Commissioner DOUGLAS. That is true with respect to section 3 (a) (1), sir, but the remaining paragraphs of subsection 3 (a) specifically exempt certain additional classes of security. For example, 3 (a) (4) carries over all of the Securities Act exemptions.

Mr. BOREN. Yes.

Commissioner DOUGLAS. Other than those provided by paragraphs (9) and (10) of subsection 3 (a) of the Securities Act.

Mr. BOREN. I just wanted to be certain that I understood this differentiation.

Mr. BURKE. In section 3 (a) (1) you limit the application of the bill to notes, bonds, debentures, or evidence of indebtedness, and so forth, as specified in that paragraph.

Mr. BOREN. When you refer to a temporary certificate or guarantee, you mean a callable issue, for a temporary purpose?

Mr. BURKE. No, sir; not quite that. Where securities or bonds are to be issued, ordinarily, in the case of the larger issues at least, it is necessary to engrave those bonds. That takes some little time. It may not be possible to do that by the time that the underwriter wants to make an offering of the bonds, and actually to deliver them. In those situations the underwriter frequently gets up what is called a temporary bond, which is merely a printed bond and can be gotten up over night.

Now, the bill applies to those temporary bonds as well as to what are called the definitive, engraved bonds.

Mr. BOREN. I have finished, Mr. Chairman.

Commissioner DOUGLAS. Mr. Chairman, the philosophy of this bill is that in the drafting of these indentures the interests of the security holders have not been adequately represented.

Some critics of the bill make the argument that the interests of the investors do receive at the present time adequate protection through the participation of underwriters in the preparation of the indenture, and through the disclosure requirements of the Securities Act.

Mr. BOREN. Mr. Commissioner, I have five volumes that I have been looking over during the week end of reports that the Commission has made as a result of its studies on this subject; but I think it would be well for our record here to show a specific example, one or two, and give some illustrations of the extent of the studies that you have made to show the need for this sort of protection to the public.

Commissioner DOUGLAS. What would be the best way of treating the factual material, Mr. Chairman? We submitted to the Congress in June 1936, a report entitled "Trustees Under Indentures" covering this subject.

Should I offer for this record a copy of that?

Mr. BOREN. It is too long, I suspect, for printing in this record.

Commissioner DOUGLAS. It is rather voluminous.

Mr. BOREN. Perhaps I have made here an unnecessary request.

Mr. EICHER. I believe it would be of value, for the purpose of these hearings, and would promote their educational features, if Mr. Douglas would incorporate with his statement a ready reference to those more formal hearings of such specific examples as Mr. Boren refers to.

Commissioner DOUGLAS. I should be very happy to do that. I can do that.

Mr. EICHER. It would help the committee very substantially if we had that ready reference available.

Commissioner DOUGLAS. And I can, as I go along, perhaps give in hypothetical terms the types of problem that the bill deals with.

Mr. BOREN. I think that would be well.

Commissioner Douglas. I will see that that is done, Mr. Chairman, and I will endeavor in doing so not only to make reference to the parts of the Commission's public records, but indicate some of the experiences of the Commission since its investigations and studies of this subject ended, because we have these cases of trust indentures and corporate trustees before us every day, either under the Securities Act or under the Public Utility Holding Company Act.

Mr. Boren. It is important in presenting the case in precise form to this full committee, and to the Congress, assuming we get that far with it.

Mr. Eicher. I think it would be very fine to have that.

## ADEQUATE PROTECTION IS NOT PROVIDED BY UNDERWRITERS PARTICIPATION IN DRAFTING INDENTURE, OR BY DISCLOSURE OF ITS TERMS

Commissioner Douglas. Mr. Chairman, some critics of the bill have made the argument that the interests of the investors now receive adequate protection through participation of the underwriters in the preparation of the indenture, and through the disclosure requirements of the Securities Act.

Now, there is no doubt but what the underwriters have, in the drafting of these indentures, performed in the past a very important function. It is certainly true that the underwriters, and very largely the underwriters alone, have been in a position to correct deficiencies in the indenture, for, as I have said, it is obvious that the investing public can have no share in its preparation; but the fact remains that the deficiencies at which the bill is directed persist in the indentures currently filed with the Commission under the Securities Act, and the fundamental fact remains that if the underwriters had discharged their obligation we would have no need to be here today.

What we are dealing with is a competitive situation where if one underwriter does not touch it another will, or may; or if one corporate trustee does not take an issue on another will or may. And it is not without significance that, as I have said, the correction of the deficiencies in indentures, at which this bill is directed, will largely impair management-underwriter control of the destinies of the bondholders, and restore such control to the bondholders themselves.

Mr. Eicher. In other words, the borrower can shop around and find the fellow who will take it on his terms.

Commissioner Douglas. The borrower can shop around. The borrower can shop around and the borrower does. We know from our experience at the Commission that they do. We have seen the borrower shopping around for a trustee.

Now, if it were merely a question of dealing with the top, the cream of the profession, again we would not be here today; but as I say, we have in the trust indenture field as in almost any other field, variations in efficiency and integrity.

The types of corporate trust institutions vary very much.

All that this bill is designed to do is to make more standardized and uniform the best practices in the field.

Mr. Boren, in connection with your recent question, perhaps this would be of interest: On Saturday morning last we had informally before the Commission a situation where a trustee was about to accept a trusteeship under a first-mortgage bond issue. At the same

time the trustee was heavily interested in the stock of the issuer of those bonds. That was last Saturday. Now, that happens to be a case under the Public Utility Holding Co. Act and I think that if the issuer persists in retaining that particular corporate trustee, that the Commission might well refuse to issue the order permitting the sale of those securities.

That does not happen to be one of the top-flight trustees in the country and the underwriter in that particular situation did not happen to be a top-flight underwriter.

Mr. EICHER. Under the illustration you have just given then as I understand it, the trustee himself would be a borrower, at least to the extent of his common-stock holdings.

Commissioner DOUGLAS. He would. That is correct.

We have seen that situation develop in practice. It is not a healthy situation from the point of view of the bondholders. Top-flight trustees will not get into that situation. But as I say, we are not dealing with top-flight trustees throughout this whole field. There are varying degrees of competency and varying degrees of integrity, as there are in any field. In view of such current situations that we run across in our work at the Commission, it is our conviction that there is only one way to deal with the problem, and that is in a uniform way; not by trying to throw the whole thing into a legislative straitjacket, but by setting up minimum standards so that security holders will know that they are dealing with a real trustee; so that the security holders will be protected against the dilution of the loyalty of the trustee to them by reason of pecuniary self-interest with the obligor.

The theory of the bill is that the trustee should be in a better and in a more strategic position to protect the security holders than it is at the present time.

Its broad aim is a revitalization of the trusteeship, a step which the underwriter and the obligors have long delayed.

(Discussion of the inadequacy of disclosure as a corrective is resumed at p. ——.)

### BILL WILL NOT HINDER OR DELAY FINANCING

Mr. EICHER. Mr. Douglas, I do not want to interfere with your own order of presentation, but before you conclude your statement, it would be helpful to me personally, at least, if you would discuss some of the objections that have been coming to me in the last 2 or 3 days, the burden of which have been that the enactment of this bill at the present time would restrict the free flow of funds from the capital markets into industry. I believe that one of the telegrams stated, and most of the others, that it would tend to be another handicap to the revival of business that we are all hoping for.

Will you speak of that now or later on in your statement, as you please.

Commissioner DOUGLAS. Mr. Chairman, I can assure you that if the Commission felt that that was true—and that objection has been urged on us—we would be here today opposing this bill rather than favoring this bill.

The argument has been made that the necessity of qualification of indentures under the bill will cause additional expense and delay in the flotation of bond issues.

Now, as I have said, the bill applies generally only to those indentures submitted to the Securities and Exchange Commission as part of the securities' registration statement covering a proposed bond issue. As I think I have already said, at the present time the Commission must examine such trust indentures in order to determine whether there has been a full disclosure of their terms in the registration and prospectus.

We have that chore to do at the present time and we do it. We read the trust indentures from cover to cover.

Under the bill the Commission would have to determine whether the terms of such indentures conform to the standards established by the bill.

The machinery for qualification of the indenture is carefully geared into the registration machinery of the act in order to avoid expense and delay.

I assure you, Mr. Chairman, that our Commission is very much alive to the importance of not interfering with the flotation of legitimate securities. We are very much alive to the great importance of getting private capital moving into industry and we would not, for a minute, approve this bill if we believed that its passage would interfere with a proper functioning of the capital markets or would not aid in the restoration of investors' confidence.

Now, our Commission is vitally interested in the restoration of the capital markets. We are anxious to do everything that we can. Only the other day, we took steps toward simplifying some of our rules and regulations respecting small established business.

I think this matter should not be overlooked, that the keystone of all of the capital markets is the confidence of investors. Now, that confidence, in my opinion, has never recovered from the blow it received in 1929. Of all of the financial abuses against which the country became aroused in recent years, perhaps none has shocked the morals or destroyed confidence as greatly as the absence of adequate fiduciary responsibilities in large areas of the field of finance.

The trustee in our legal and financial system must be a symbol of confidence and protection, and I think the higher standards set by the bill will tend to restore confidence, on the part of investors, in the integrity of the financial processes.

I have every reason to believe, as a result of our administrative experience today, that there will not be the expense and delay of which the opponents of this measure have voiced fear. In that connection, let me point out that the bill becomes operative 6 months after it is passed. That provision is in there because it was realized that it would take some time to work out rules and regulations trying to standardize, to the greatest extent possible, the various types of covenants that would be required in an indenture. That provision will eliminate any delay which might otherwise result, on the passage of the bill, merely from the difficulty of getting out the necessary rules and regulations.

So, the bill as presently drafted provides a 6 months' period within which the Commission, working with the committees of the American Bankers' Association and working with such other committees as elements in the industry may provide, can proceed forthwith to set up practical, workable rules and regulations, so that, when the bill does go into effect, it will operate smoothly and without interruption to the normal processes of finance.

ADEQUATE PROTECTION IS NOT PROVIDED BY DISCLOSURE

(Discussion continued from p. —.)

In summary of all of this, Mr. Chairman, I might merely indicate this: It is our confident belief, and we believe the informed judgment, that requirements which look only to the disclosure of what is in the indenture are not an adequate solution of the problem.

Mr. EICHER. That is all of the authority you have under the existing law?

Commissioner DOUGLAS. That is all the authority we have under the existing law—that is, under the Securities Act. We do have peculiar problems under the Public Utility Holding Co. Act; but in finance generally that is all the authority we have, and we see its inadequacy. We saw it last Saturday in the case I mentioned in which the trustee was in effect the obligor.

The average investor rarely sees the indenture which constitutes part of his contract. He could not understand it if he did see it. A great deal of explaining would be necessary in order to make him realize why the deficiencies to which I have referred operate to his great disadvantage. And when trouble comes, he is unlikely to attribute his difficulties in the enforcement of his rights to deficiencies in the indenture itself. Any investment banker will agree that when you are trying to sell a security, you do not say much about the possibility of default. That is perfectly natural. It is also perfectly natural that the average investor, when he purchases a bond, thinks more about the price, the interest rate, the maturity date, and the security therefor than he does about the adequacy of the provisions relating to the protection and enforcement of his rights. In any event, it is clear from 2 years of experience under the Securities Act since the publication of our report on "Trustees under indentures" that even the fullest disclosure of the terms of an indenture is not sufficient to bring about the necessary improvements, and that the desired objectives will not be attained so long as the form of the indenture is determined exclusively by the conventions of the obligor and its underwriters.

We come down to the situation, Mr. Chairman, closely analogous to the insurance situation some 30 years ago, when for the benefit of insurance buyers the States found it necessary to take steps to protect them.

Mr. EICHER. You are referring to the Hughes investigation?

Commissioner DOUGLAS. Well, I am referring to the efforts made by the States to standardize certain types of clauses in insurance policies; to eliminate some clauses that history had shown were very bad, from the point of view of the insurance buyers. The States at that time, as you know better than I, found it necessary to take steps to see to it that insurance policies were more fairly drawn, against certain uniform standards. Such regulation is now accepted as a matter of course, and I think insurance company officials would practically all agree that the resulting improvement in the forms of insurance policies has been an excellent thing, not only for the purchasers of such policies, but for the insurance companies themselves.

This situation provides a close analogy. Here we are concerned not with the protection of insurance buyers, but with the protection of security buyers. The bill does not involve an attempt to say this

issue is sound and that issue is unsound; that this issue is of invest-
ment grade and that that issue is speculative. But in the light of
the bargain which the parties have made, the bill says to the trustee
or to the obligor, "If you want to do this, you have to do it in a certain
way." For example, suppose there is a provision in an indenture
which comes up for consideration under this bill, allowing a substitu-
tion of collateral held as security for the bonds. The bonds, at the
time of the issuance, are secured by other bonds, and those other
bonds, we will say, are first-mortgage bonds.

Is it not important that the buyer of the security is protected
against negligent or wilful dissipation of the security underlying his
security? If common stock is to be substituted for those first-
mortgage bonds underlying the bonds that are sold, should not some
protection be provided to see to it that adequate standards are applied
and adequate diligence employed in the substitution?

There is no attempt in this bill to say you cannot substitute X for Y;
but machinery is provided in this bill so that there will be a check on
the substitution of X for Y, so that an independent auditor or inde-
pendent engineer, say, will pass on the substitution, so that the
obligor will not be able to play with the portfolio, to the great dis-
advantage of the security holders.

That is the type of technique employed, not the technique of saying
you cannot make the type of bargain which will permit substitution;
but the technique which says when you make a bargain which permits
substitution, then certain safeguards must be set up around its
exercise.

I think I have covered in general, Mr. Chairman, the mechanics.

### NECESSITY FOR FLEXIBILITY

There is one other point that has been raised by some of the critics.
I believe some have objected that each indenture under this bill was
to be the subject of separate and independent substantive rulings by
the Commission, and that that was bad.

Now, the bill does permit the Commission to act by order as well as
by rule and regulation.

Mr. EICHER. With an appeal from the order?

Commissioner DOUGLAS. Yes, sir; with an appeal from the order,
as under the Securities Act.

There are several ways in which one could go about accomplishing
the objectives of this proposed legislation. There are several methods
he could employ. First, he could attempt to standardize everything—
"Thou shalt not," or "Thou shalt," so to speak—and put it right in
the statute. We think that would be a bad way of doing it.

The problems exist with respect to all types of securities issued
under indentures—real estate bonds on the one hand, and industrials
on the other, and so on.

We are careful of trying to put rigid rules right in the statute. That
would be a legislative strait jacket, injurious, I think, really injurious
to finance. What this bill seeks to provide is flexibility, and the
maximum protection to finance. That protection is afforded by this
flexibility, in my opinion. We can act by rule or regulation, or by
order. The bill does permit a case by case treatment of each indenture
and that, I think, is one of its strongest points.

I think as a matter of practice at the end of the 6 months' interlude between the enactment of the bill and the time it becomes effective, the Commission, with the cooperation of the industry, can cover large areas of this subject by rules and regulations. I doubt very much, against the background of our experience under the Securities Act and under the Securities Exchange Act, that it would be possible to cover 100 percent of the situations in that way. We think that it would be very undesirable if we did attempt by rule and regulation to cover 100 percent of the situations. We think it might actually result in stepping in front of some of these movements and slowing them up if we were to throw them into a legislative or administrative strait jacket. I think that the representatives of trust institutions and institutional investors by and large agree that such flexibility is a necessary, desirable, feature of the bill and that we should have power to act by order.

### INDENTURES CAN BE AMENDED IF BILL IS AMENDED

There is one other criticism, Mr. Chairman, that raises somewhat of a bogey, I think. It has been said that the bill, by its terms, would impose an impossible requirement of the consent of 100 percent of the bondholders in order to amend it.

It has been urged that this deplorable situation would obtain if any particular provision of the bill should be found unworkable and should itself be amended.

There is absolutely no basis for that contention. There is absolutely nothing in the bill to prevent the inclusion in the indenture of a provision permitting an amendment of the indenture in this situation by the vote, say, of 50 percent, or 75 percent, of the security holders.

Under section 7 (m) (3), there may be included in the indenture provisions authorizing the holders of a majority of the outstanding bonds to consent to the postponement of any interest payments for a period not exceeding 1 year or to the waiver of defaults and their consequences.

The permission thus granted is subject to an exception, however, and the criticism I have been discussing may be the result of confusion as to the effect of this exception. The effect of this exception is merely to prohibit provisions authorizing such a majority to force a non-assenting security holder to accept a reduction or postponement of his claim for principal, or a reduction of his claim for interest or a postponement thereof for more than 1 year. In other words, this provision merely restricts the power of the majority to change those particular phases of the contract.

Evasion of judicial scrutiny of the fairness of debt-readjustment plans is prevented by this exception. Until comparatively recently, a prohibition of this sort was perfectly standard in note and bond indentures. In many States it is necessary in order to preserve the negotiability of the notes or bonds; in others it is necessary if the notes or bonds are to be legal investments for insurance companies, savings banks, and the like.

As we said in part VI, Trustees Under Identures, at page 150:

Hence, although these indentures which provide for reorganization by contract may solve some of the reorganization difficulties inherent in equity receivership or bankruptcy, it must be admitted that they give rise to abuses and problems which

must be faced if the interests of security holders are not to be made subordinate to the desires and conveniences of the dominant group. The risk is that if these provisions come into vogue and no controls are set up over them, the next cycle of reorganizations will take place on a voluntary basis without supervision of any court or administrative agency.   *   *   *

If less than all the bondholders are to be given the power to effect reorganizations by virtue of the contract contained in the indenture, the use of proxies will doubtless be common. In case of indentures which provide for bondholders' meetings, it will not be practical to expect large numbers to attend in person. Rather, if the history of stockholders' meetings teaches us anything, we may expect that the bulk of bondholders, if they are represented, will be represented by proxy holders. If those proxies come into hands with interests adverse to those of the bondholders the latter will not only be inadequately represented; they may be exploited in the fashion in which protective committees in other situations have exploited security holders.

If the management or the junior security holders of a corporation can obtain proxies from bondholders to vote in their place and stead for changes in the bonds and in the indenture, grave injustices may result. The interests of such parties normally will not lie with the bondholders. Similar conflicts of interest may exist as respects other proxy holders.

In other words, the bill does place a check or control over the majority forcing on the minorities a debt-readjustment plan. It does go that far; but it does not prohibit any other restriction or appropriate amendments of the indenture by the consent of the parties.

This prohibition does not prevent the majority from binding the dissenters by other changes in the indenture or by waiving defaults and the majority may, of course, consent to the alteration of its own rights.

That covers, I think, for the most part, Mr. Chairman, the various points of criticism that have come to me.

### BRIEF OUTLINE OF THE BILL

Now, for a few of the high spots in the bill, if the committee desires. They center, for the most part, around section 7, which is the keystone of this bill.

#### PERSONS ELIGIBLE FOR APPOINTMENT AS TRUSTEE

Section 7 (a) on page 18 requires the indenture trustee be an institution which is subject to governmental supervision or examination; an institution with resources commensurate with its responsibilities. That is the normal practice to have an institution today—there have been exceptions. Those exceptions largely have been in the real-estate field where you have had an individual trustee and the very damaging consequences as the result of that are shown very vividly, I think, in our reports on real estate bonds. (See Pt. III, Committees for the Holders of Real Estate Bonds, pp. 12 to 22.)

#### CONFLICTING INTERESTS

In section 7 (b), on page 20, we have a prohibition, to which I referred earlier, dealing with the problem of conflicts of interest possessed by the indenture trustee; conflicts between the trustee and the persons being represented by the trustee. There is little dissent and can be little dissent from the proposition that the trustee should not have interest materially conflicting with those of the security holders. The only questions are, first, what is a conflict; second, what should be the method of treatment. There are several possible methods of treat-

ment. In the interest of uniformity and ease of administration, our Commission is strongly of the opinion that rules of thumb should be applied; that the Congress should not give the Commission continuing jurisdiction over the problem as some critics have suggested.

The interests which the trustee has may change from week to week or month to month, or day to day, over the life of a 20-year bond issue. It seems to us to be better to set-up rules of thumb fully covering such interests. They have the advantage of uniformity. They have the advantage of certainty. The trustee can know at all times precisely where he stands.

Mr. Eicher. The bill would include all issues regardless of size?

Commissioner Douglas. The bill has a provision on pages 10 and 11, section 3 (c), which eliminates from the bill certain small issues where the aggregate amount of the issue is under $250,000, where you are not so apt to get your widespread holdings; where your holdings are more apt to be locally held, and so on. The Commission has that exemptive power.

Mr. Eicher. Do you consider that is a sufficient safety valve to prevent any hardships under the provisions of section 7 (a) requiring a recognized institution always to be one of the trustees? In other words, might there be individual cases of hardship arising out of the fact that individuals are not permitted under any circumstances to be the trustee?

Commissioner Douglas. There might possibly be in connection with some of the small issues. That was one of the reasons, I believe, that the $250,000 limit was put in rather than the $100,000 limit that is in the Securities Act. It was the feeling that the $250,000 top limit would take care of those situations.

Now, section 7 (b) treats with conflicts of interest. It imposes disqualifications upon trustees who are trustees under more than one indenture of the same obligor. That is, where the X company has a first-mortgage bond issue outstanding and a second-mortgage bond issue outstanding, the trustee cannot serve as trustee under both of those issues. The section places limitations upon too close affiliations with the obligor or with underwriters of its outstanding securities, and upon the ownership by the trustee of substantial amounts of other securities of the obligor.

In the case I mentioned, Mr. Chairman, which was before our Commission informally last Saturday morning, the trustee had a substantial block of stock of the issuer and at the same time proposed to act as trustee under a first-mortgage bond issue. He would be disqualified under section 7 (b) of this bill.

I should point out in this connection that the fundamentals of this conflict of interest sections are not too strange. The New York Stock Exchange will not accept as a trustee, for a listed bond issue, an institution which is trustee under other indentures of the same obligor, or in which an officer of the obligor is an executive officer, or which controls, or is controlled by the issuer. Affiliations with underwriters are now largely proscribed by the Banking Act of 1933.

The bill embodies a logical extension of those principles into other fields. It is designed to lay down definite, concrete, specific rules covering the relationship of the trustee to the issuer and to the underwriter.

As we said in Part VI, Trustees Under Indentures, at page 106:

To recapitulate, if the trustee is affiliated with the issuer or with the under-
writing bankers, it is all too likely to be sympathetic with their concerns. It is
under constant pressure to protect them and their interests, instead of conduct-
ing itself with an eye single to the interests of its cestuis. And if it is a creditor
of the issuer, the temptation to sacrifice their interests is redoubled. It is in a
position to salvage its own interests at their expense; whether or not it is affili-
ated with management or bankers, it is able to move rapidly and effectively to
protect its claims, before the interests of security holders are safeguarded. And
in the reorganization process, if it is affiliated with management or bankers it is
all too likely to accept, without careful scrutiny, plans which they propose, and
to aid and abet majorities which they have marshalled while the interests of
minorities go unrepresented. Certainly if trustees are to be expected to live up
to the standard of conduct before and during reorganization which we have out-
lined, they cannot be allowed to incur antagonistic duties and loyalties to them-
selves as creditors or holders or representatives of conflicting securities, or to the
management or its bankers.

### PREFERENTIAL COLLECTION OF CLAIMS AGAINST OBLIGOR

There is nothing in the bill to prevent a trustee from becoming a
creditor, a short term creditor, of the obligor. This is a matter
dealt with in subsections (c) and (d) of section 7 on page 27. Under
those sections, however, if within 4 months prior to a principal or
interest default under the indenture the trustee effects a preferential
collection upon its own claim, to the disadvantage of the bondholders
which it represents, it must share the proceeds of such collection with
the bondholders.

I do not understand that there is any real objection to that prin-
ciple. That is to say, if X company is trustee for bondholders under
an indenture and is likewise a short-term creditor of the obligor,
within the period of 4 months prior to a default, if he collects money
from the obligor during that 4 months' period, he collects it not only
for himself but also for the bondholders.

Some have pointed out that these requirements might have the
collateral effect of discouraging so-called rescue loans by the inden-
ture trustee within 4 months of the default. It has been said, I
believe, that in such cases the trustee should be permitted to retain
the security even where it had knowledge of impending default at
the time the loan was made.

The Commission has given careful consideration to those arguments
and has concluded that since the trustee moves into a directly com-
petitive position as soon as it makes such a loan, the apportionment
provision should be applied, unless the trustee establishes it had no
reasonable cause to believe that the rescue would be unsuccessful,
that is, no reasonable cause to believe that the rescue would be un-
successful.

Mr. EICHER. Is there possibly another answer to that objection,
that the mechanics of this bill if and when it becomes law would permit
flexibility of action among the bondholders for their own protection
which under the existing law the bondholders do not have as a prac-
tical matter, so that for the purpose of rescue loans, if that should be
indicated as desirable, the bondholders can jointly take any necessary
action?