Commissioner DOUGLAS. They can much more easily mobilize for action. That is indicated in section 7 (f) on page 34, requiring the obligor to supply the trustee with information as to names and addresses of bondholders.

In the past obligors have had a practical monopoly on such information derived from their records of persons to whom interest was paid. The monopoly has been shared partially by the underwriters. (See pt. I, Strategy and Techniques of Protective and Reorganization Committees, pp. 436–446.)

Mr. EICHER. That is, the bondholder lists would be available as public records?

Commissioner DOUGLAS. They would be available in the hands of the trustees for legitimate use by the security holders in getting together to protect their own interests.

Mr. EICHER. Well, they are on file, under the requirements of the bill, with the Securities and Exchange Commission, are they not?

Commissioner DOUGLAS. Under this proposed bill they are not filed with the Commission. They are filed with the trustee.

Under section 7 (e)——

Mr. EICHER. Well, would the Commission have the power under the bill to require the trustee to disclose the bondholders?

Commissioner DOUGLAS. Under the bill the Commission has control only over the indenture provisions. Once an indenture becomes qualified under the bill the Commission thereafter has no power to intercede, to step in, to force the trustee to do anything. The role of the Commission would be to see to it that the particular provisions of the indenture meet the standards of this statute.

### REPORTS BY OBLIGOR AND INDENTURE TRUSTEE

Under the bill, section 7 (e) on page 33, the obligors will be required by the indenture to make reasonably informative periodic reports to the trustee. The better companies make such reports to their stockholders. The bill takes what seems to us to be the logical step of requiring such reports, and similar reports by the trustee concerning the trustee, to be made available to the bondholders.

The other phases of the bill relate largely to the duties of the trustee and the powers of the bondholders prior to default and after default.

### DUTIES OF TRUSTEE PRIOR TO DEFAULT

Few will deny that in the case of national distribution of securities the obligor should be required to provide the trustee with the necessary tools for making an effective check on the performance of the undertakings of the obligor.

With respect to the more important undertakings, the obligor should provide, and its trustee should be required to obtain, certificates or opinions of independent attorneys, accountants, or other experts to see to it that the obligor is performing its obligations. If such opinions are not required, I think that trust officers will agree that the best trust institutions in the country cannot do a real job. The imposition of such requirement in no sense involves an interference with the management of the business. With respect to the less important

undertakings, certificates of the obligor and its officers will suffice;
but on some of these major things, such as substitution of securities,
by and large, that safely could be handled only by requirements that
independent auditors or independent engineers make their appraisal
or their audit, and submit a certificate to the trustee.

### NOTICE OF DEFAULT

Under section 7 (h) on page 36 the bill deals with notice of default.
Ordinary fairness would seem to demand that knowledge of the occur-
rence of the more serious defaults under the indentures should not be
the exclusive property of a few. The bondholders certainly should
be advised of such defaults, for failure to give such notice presents a
serious obstacle to the organization of bondholders in their own
interests. (See pt. VI, Trustees Under Indentures, pp. 31 to 42a.)

Now, in the case of lesser defaults, less serious defaults, less discretion
may properly be vested in the trustee to determine whether the giving
of notice is to the best interest of the bondholders. It is a good
illustration of what I mentioned about flexibility. There is not, by
law, any mandatory requirement that in the case of all defaults the
trustee shall immediately give notice. That probably would be very
bad practice; but there is permitted——

Mr. EICHER. You mean because of the effect on its credit?

Commissioner DOUGLAS. Precisely. Because there might be for a
few hours a technical default, purely technical. To publicise such a
default very likely would do irreparable damage to the credit of the
company. Instead, the bill provides flexibility to select and sort out
defaults, for purposes of classification under an indenture, in view of
the specific type of situation being dealt with; types of default as to
which notice must be given; types of default as to which the trustee
can properly keep silent.

### DUTIES OF TRUSTEE AFTER DEFAULT

Now, section 7 (i) on page 37 merely requires all indenture trustees
to live up to the standards of conduct to which the more conscientious
trust institutions now endeavor to adhere. It is substantially the
same standard as that required of trustees under the so-called personal
trusts.

### RESPONSIBILITY OF TRUSTEE

Section 7 (j) on page 37 prohibits the inclusion of so-called excul-
patory clauses relieving the trustee from liability for its own negligence
or its own willful misconduct.

This section and the sections relating to the duties of the trustee
before and after default, primarily concern the trust institutions them-
selves and, of course, the bondholders.

I understand that the committees representing trust institutions do
not oppose the provisions of these sections, in view of the safeguards
provided in this section and in section (k) on page 39.

Now, 7 (j) generally permits the inclusion in the indenture of pro-
visions protecting the trustee with respect to action taken in reliance
upon proper certificates or opinions of attorneys, accountants, or other
experts, and provisions protecting the trustee for action taken in reli-
ance upon the instruction of the holders of a disinterested majority of
the outstanding bonds.

It also permits the inclusion of provisions protecting the trustee with respect to losses arising from errors of judgment, if the trustee was not negligent in ascertaining the pertinent facts. In other words, we have endeavored to work out, with the cooperation of the best minds in the corporate trust business, what would be a practicable, workable, and safe standard of care for the trust institutions.

Sections 7 (j), 7 (i), and 7 (k) seem to us to meet that situation, from the point of view of the trustee, and from the point of view of the bondholders, to provide a standard adequate for these trusts.

### UNDERTAKINGS FOR COSTS

Section 7 (k) protects the trustee against the risk of so-called strike suits by authorizing the inclusion of a provision in the indenture permitting the court in its discretion to require the filing of an undertaking for costs, including attorneys' fees. A comparable provision is found in section 23 (b) of our Securities and Exchange Act of 1934.

### RELEASE AND SUBSTITUTION, ETC.

On page 40, section 7 (1), we come to questions such as releases and substitutions of security, which I have commented briefly on already; the issuance of additional securities; and the satisfaction and discharge of these indentures. There will be little dissent from the proposition that any provision for the release or substitution of any property subject to the lien of the indenture or the issuance of additional indenture securities, or the satisfaction and discharge of the indenture should be subject to restrictions or conditions designed to prevent such provision from rendering nugatory the protection the indenture purports to provide.

Under section 7 (1) the adequacy of such restriction and additions is to be determined in the light of the bargain of the parties.

To revert to the one illustration that I gave earlier, if substitution of securities is permissible under the bargain that the parties have made, then the question is, Is this particular covenant safe in the light of what the parties want to do?

We cannot interfere with the basic business features of these deals in any way whatsoever, but knowing the business features of the deal, can say, "You cannot let this real property come out from under this mortgage and common stock be substituted unless it is on the certificate of an independent accountant or independent engineer."

### RIGHTS, POWERS, AND REMEDIES OF TRUSTEE AND BONDHOLDERS

Under section 7 (m) on page 40 we have a provision dealing with the rights, powers, and remedies of the trust and security holders. There is, I think, general agreement that trust indentures should contain an adequate definition of what shall constitute a default thereunder and should confer upon the trustee adequate rights and powers with respect to the enforcement of the indenture.

The requirements of this section will prevent, I believe, a nullification of the provisions with respect to the duties of the trustee through the device of inserting in the indenture a more restricted definition of the term "default" than is now properly contained in the better trust indentures, or through the device of denying to the

trustee rights and powers which the better grade indentures now confer and should confer.

Section 7 is the keystone of the substantive provisions of the act. To recapitulate, it covers conflicts of interests, by definite, certain, rules so that the trustee will know at all times, or be in a position to find out, exactly where he stands.

The other provisions relate primarily to the duties of the trustee prior to default and after default. It is a step in the direction of making the corporate trustee live up to the highest standards in the profession and to see to it that by contract the responsibilities of the trustee are not whittled away to mere nothings. At the same time it is recognized that, for practical reasons, the trustee must receive some protection when he is honest and diligent and earnestly trying to do his job. There is permitted no freedom from liability for foolish conduct or gross negligence, so to speak, on his part; but machinery is provided whereby the trustee can rely upon the certificates of independent persons, and in reliance upon those certificates to allow releases and substitutions, and so forth.

A third phase covered by section 7 includes reports by the obligors to the security holders and to the trustee; reports by the trustee to the security holders; and bondholders' lists the use of which this bill for the first time would make generally available to the bondholders themselves.

Those three phases constitute the major substantive provisions of the measure and set flexible safeguards, duties, and responsibilities; definite and specific standards, so far as conflicts of interest go; standards which the Commission would look at in determining whether or not the particular indentures coming through for qualifications were satisfactory. Once the Commission has determined that those provisions were adequate, in the light of this statute, the Commission then would be through with it once and for all and could not come back and do anything to the corporate trustee. It would have no semblance of continuing jurisdiction over the indenture, over the corporate trustee, over the security holders, or over the obligors or the underwriters.

It is an attempt, Mr. Chairman, in the final analysis, merely to establish higher uniform standardized practices in this broad field. The public importance is demonstrated by the fact that there are about $40,000,000,000 of these securities outstanding today in the hands of the public under such trust indentures. We cannot confidently expect to elevate the practices of the many to the standards of the top few unless we apply a uniform treatment. This bill in our opinion does precisely that.

Mr. EICHER. You estimate that there are $40,000,000,000 of domestic issues?

Commissioner DOUGLAS. Bonds, notes, and debentures issued under trust indentures; $40,000,000,000 outstanding at the present time.

Mr. EICHER. This bill does not assume to interfere in any manner with the foreign field?

Commissioner DOUGLAS. No; it does not.

Mr. EICHER. Is that much of a factor at the present time?

Commissioner DOUGLAS. Well, it was for a period in the 1920's, but does not appear to be much of a factor at the present time.

If there are no questions, Mr. Chairman, that completes my statement.

Mr. EICHER. Do you have any questions, Mr. Boren?

Mr. BOREN. No.

Mr. EICHER. I have before me a list of witnesses who desire to appear in favor of the bill and also a list of witnesses who desire to appear as opponents to the bill.

I have four names of gentlemen who wish to appear in favor of the bill and five who wish to appear in opposition to the bill.

The CLERK. Here are six more.

Mr. EICHER. Making 11 altogether of those who wish to appear in opposition to the bill.

Now, I presume that we can get consent from the House to sit this afternoon.

Mr. BOREN. I will be willing to sit this afternoon, Mr. Chairman. Can any of these groups consolidate their testimony, or can we set a reasonable maximum time for these witnesses without jeopardizing their case? Can we have some sort of an agreement as to time from the witnesses?

Mr. EICHER. The clerk can probably work that out during the recess, so that we can reasonably expect to conclude by 5 or 6 o'clock.

Mr. BOREN. I think I would prefer to have it point toward 5 o clock.

Mr. EICHER. Yes.

Will you endeavor to work that out during the recess, Mr. Layton?

The CLERK. Yes; Mr. Chairman.

Mr. EICHER. I presume the logical order should be that we should proceed after the recess with the proponents of the bill and then later hear the opposing witnesses. If that is satisfactory we will proceed in that order.

The committee will now recess to meet at half past 1.

(Thereupon, at 11:55 a. m., the committee took a recess until 1:30 p. m., of the same day.)

### AFTER RECESS

(The committee reassembled, pursuant to the taking of the recess, at 1:45 p. m.)

Mr. EICHER. The committee will please be in order.

Mr. BOREN and I have been delayed by having to answer two roll calls. We will proceed with the proponents. Mr. Shanks.

## STATEMENT OF CARROLL SHANKS, ASSOCIATE GENERAL SOLICITOR, PRUDENTIAL INSURANCE CO. OF AMERICA, NEWARK, N. J.

Mr. EICHER. Please give your full name and address to the reporter.

Mr. SHANKS. My name is Carroll Shanks. I am associate general solicitor of the Prudential Insurance Co. of America, Newark, N. J.

Mr. Chairman, I am speaking on behalf only of the Prudential Insurance Co.

Last spring, at the time this bill was in the process of formulation we informally talked with a number of other insurance companies, but those talks have been so informal that although they have been carried on in a desultory way up to date, I cannot say I am speaking for any of the other companies.

We favor this bill in a general way, although we have some doubts as to the way some of the provisions may work out. We favor it, because we think that the bill as drawn would tend to elevate to a great extent the nonbusiness provisions of the indentures. We think that is certainly a worthy objective.

As to the provisions of the bill which have to do with the qualifications of trustees, I do not wish to make any comments. Our sole interest in that part of the bill is merely that there shall be responsible and skillful trustees.

I am under the impression that we will be able to get those kinds of trustees even under the restrictions which are imposed upon their qualifications under this bill.

Now, our doubts as to the bill, strangely enough, are as to those provisions which we are most in favor of. That is, those provisions of the bill which give the Commission broad discretionary powers to make, by rule, regulation or order, to affect those provisions of the indentures which do not have to do with the business aspects.

If it were not for that broad discretionary power, it would be necessary to write into this bill so-called standard form provisions which would outline what could go in and what could not. We think that would be a strait jacket, indeed, and we would be opposed to it.

However, we think these discretions should be workable. We think they may have within them seeds of danger, because you may have too zealous administration in the future, or you may have a commission which may be more or less a deadhead on these features.

Mr. BOREN. What provisions do you specially refer to?

Mr. SHANKS. I am referring to those provisions, beginning about page 33 and from there on which give the Commission the discretion to indicate as to all of the various points, what provisions will be acceptable and will be allowed to go in. Those have to do, as you will see, mainly with the more or less mechanical provisions of the indenture and do not have to do with the business provisions.

Now, we think it is possible that in the future, by too stringent legislation, regulation or order, the trust companies and the obligors may be tied up more tightly than they should be. However, we think that this solution ought to be tried and are willing to see it tried, because we have faith in the wise exercise of discretion over a period of years of the Commission and we do not see any other way in which it could be done, except by naming right in the bill the various covenants which should be allowed. We think that would indeed be unfortunate at this time.

That, really, is all I have to say, Mr. Chairman.

Mr. BOREN. You do not find any particular objection to any of these provisions, such as those requiring notice of default?

Mr. SHANKS. Oh, no. Most of those provisions we think are entirely salutary and of course, as you know, we do not know what those provisions will be. It is entirely within the discretion of the Commission as to what regulations they will lay down. A wise exercise of that discretion I think should be helpful. On the other hand, an unwise exercise might be dangerous and that, of course, is the danger of the bill in our estimation.

Mr. EICHER. Thank you, Mr. Shanks.

Mr. SHANKS. Thank you.

## STATEMENT OF ROBERT M. HANES, CHAIRMAN OF THE COMMITTEE ON FEDERAL LEGISLATION OF THE AMERICAN BANKERS' ASSOCIATION AND PRESIDENT OF THE WACHOVIA BANK & TRUST CO. OF WINSTON-SALEM, N. C.

Mr. EICHER. We will hear Mr. Robert M. Hanes. Will you give your full name, representation, and address to the reporter?

Mr. HANES. Mr. Chairman and Mr. Boren: My name is Robert M. Hanes. I am chairman of the Committee on Federal Legislation of the American Bankers' Association and president of the Wachovia Bank & Trust Co., of Winston-Salem, N. C.

I would like to make clear that we are not appearing here as proponents of the bill or as opponents to it. We had previously worked with the Securities and Exchange Commission on the bill, and we simply want to state our experience and our belief as to the bill.

This proposed legislation affects directly every bank and trust company which has a corporate trust department. When the legislation was first suggested in the report of the Securities and Exchange Commission, although we did not accept as well founded many of the statements and conclusions in that report, we were confronted with the choice of opposing all regulatory legislation in this field and attempting to work out some system of self-regulation or of offering to cooperate in the preparation of regulatory legislation, so that the ultimate bill would be a livable and workable bill. We recognized that the purpose of the Securities and Exchange Commission in suggesting legislation, as stated by Mr. Douglas, was to bring the procedure of corporate trustees to the high standards set by the best and most responsible persons in the profession. With this objective, of course, we were in full agreement.

The only question was as to the methods to be used to accomplish that end. We strongly preferred a system of self-regulation, subject to the supervision of the Federal Reserve Board. We did considerable work on a proposed "Statement of principles for the conduct of trust institutions," and we discussed with Mr. Landis and Mr. Douglas the feasibility of accomplishing the desired results by the adoption of such a voluntary code, which would make legislation unnecessary. Mr. Landis and Mr. Douglas, however, disagreed with us and stated strongly that they believed that legislation was necessary and informed us that the Securities and Exchange Commission intended to press for such legislation.

We then asked them if they were willing to submit drafts of the proposed legislation to us, so that we could give them the benefit of our experience and suggest changes that we might regard as necessary and desirable. This has been done, and I wish here to express my appreciation of the attitude of Mr. Landis, Mr. Douglas, and Mr. Burke, and the other gentlemen in the Commission who have been so frank in consulting with us and discussing with us the various suggestions which we have made. Of course, there are suggestions which we made which the Commission has not accepted, on the other hand, many important changes were made at our suggestion and we believe,

in the words of Mr. Douglas, that the present bill is "workable, practicable, and livable."

The bill gives great discretionary power to the Commission to approve or disapprove the form of particular indentures in connection with matters specified in the bill. The administration of the bill, therefore, will require a high degree of common sense, reasonableness, and cooperation, both by the Commission and the trustee institutions. To this end, we pledge our support. If the bill passes, we will try in good faith to make it work. If, after a fair trial, we find it necessary to suggest amendments, we hope and expect we will receive sympathetic consideration both from the Securities and Exchange Commission and from Congress.

Mr. EICHER. Mr. Hanes, does that present the well-considered views of the responsible executive officials of the American Bankers Association?

Mr. HANES. It presents the views of the Federal legislation committee, which we have reported to the Executive Council of the American Bankers Association, and our report has been accepted.

Mr. EICHER. Any questions, Mr. Boren?

Mr. BOREN. I have no questions.

Mr. EICHER. Thank you, Mr. Hanes.

Mr. HANES. Thank you.

Mr. EICHER. Mr. Oliver.

Mr. Oliver will be in later.

## STATEMENT OF R. G. PAGE, CHAIRMAN, COMMITTEE ON MORT-GAGE TRUSTEESHIPS OF THE TRUST DIVISION OF THE AMERICAN BANKERS ASSOCIATION, NEW YORK, N. Y.

Mr. EICHER. Will you give your full name to the reporter?

Mr. PAGE. My name is R. G. Page, of New York City, address, Bankers Trust Co., New York, N. Y.

I am chairman of the committee on mortgage trusteeships of the trust division of the American Bankers Association.

The trust division early in 1936 appointed the special committee of which I am chairman to cooperate with the Securities and Exchange Commission in connection with the investigation which Mr. Douglas at that time was making of mortgage trusteeships in connection with his proposed report and any legislation which might flow from it.

The committee has representatives from 12 cities across the country, from Boston and Atlanta on the East to St. Louis and Los Angeles on the West. Each member of the committee in turn has organized an informal committee in his own district, so that it may fairly be said that this group represents the thought of trust officials generally throughout the country.

It perhaps goes without saying that the trust institutions did not welcome Federal regulatory legislation of this type. The American Bankers Association does not believe that the bill is necessary. It would have preferred to continue its efforts to bring about a satisfactory system of voluntary control, similar to that now in use in connection with personal trusts, and throughout the committee's discussions of the subject I have so indicated to the Securities and Exchange Commission.

However, the committee for nearly 2 years has worked closely with the Securities and Exchange Commission in a cooperative effort to make the bill, as recommended by the Securities and Exchange Commission, workable. The committee, on behalf of the American Bankers Association, agreed that, if as a result of the cooperative effort the bill as presented to Congress should, in the judgment of the committee be workable, the American Bankers Association would not oppose its passage. In the opinion of the American Bankers Association and the committee, the bill as introduced is workable, and I am authorized on behalf of the American Bankers Association and the committee to advise you gentlemen that the American Bankers Association will not oppose the passage of the bill.

In this connection I should make clear that the American Bankers Association has not the right and does not purport to bind individual member banks.

I feel sure that, if the bill is enacted, the financial institutions as a whole will whole-heartedly cooperate with the Securities and Exchange Commission in the Commission's administration of the act. However, it is but fair to add that on entirely new legislation of as technical and complex a nature as this bill it is quite possible, despite the careful study which has been given to its drafting, that defects will be developed after administration commences. If this should prove true the American Bankers Association would expect to recommend and believes that the Securities and Exchange Commission will urge that Congress enact appropriate amendments.

In conclusion, may I say to this committee, as I have to the banking and Currency Committee of the Senate, that the American Bankers Association sincerely appreciates the fine spirit with which Mr. Douglas and his associates on the Securities and Exchange Commission have received the committee's efforts to cooperate with it in the consideration of the provisions of the bill.

Mr. EICHER. Any questions, Mr. Boren?

Mr. BOREN. I have no questions.

Mr. EICHER. We thank you, Mr. Page.

Mr. PAGE. Thank you.

## STATEMENT OF HAROLD V. AMBERG, VICE PRESIDENT AND GENERAL COUNSEL OF THE FIRST NATIONAL BANK OF CHICAGO, CHICAGO, ILL.

Mr. EICHER. Mr. Amberg, general counsel, First National Bank of Chicago. Will you give your full name to the reporter?

Mr. AMBERG. My name is Harold V. Amberg. I am vice president and general counsel of the First National Bank of Chicago.

Mr. Chairman and Mr. Boren, I have a serious message in opposition, and I should like to go through with a somewhat carefully prepared statement without interruption if I may, because my time is limited. I will be glad to stop and answer questions to the best of my ability, if it is not taken out of my time.

Mr. EICHER. If it is satisfactory with Mr. Boren, we will postpone our questions until you have finished your prepared statement.

Mr. AMBERG. To avoid possible misunderstanding, may I briefly qualify myself and my status. I am vice president and general counsel of the First National Bank of Chicago, associated with the

bank since 1922 and actively engaged in matters involving the bank's functions as trustee under corporate mortgage indentures and the bank's position as a creditor of corporate debtors requiring assistance or reorganization. Until recently, when it was discontinued, I was a member of the commission on banking law and practice of the Association of Reserve City Bankers. Neither a new committee to be formed, nor the association, has had an opportunity to go on record on this bill. I am presently a member of the committee on Federal legislation of the American Bankers Association, more directly in relation to bankruptcy matters.

You have heard Mr. Page and Mr. Hanes state the attitude of the American Bankers Association.

Mr. EICHER. You are making, then, what might be called a minority report?

Mr. AMBERG. It may or may not be a little more than that. The respective attitudes of the trust-functioning banks of the country would determine that.

I do not appear as spokesman of either of these associations. My remarks express the viewpoint of the First National Bank of Chicago. Some 2 years ago, when the so-called Barkley bill in the Senate was in its original draft, we strongly supported the policy of full and cooperative discussion between the subcommittee of the trust division of the American Bankers Association—of which one of our officers was a member—and the Securities and Exchange Commission, reserving, with the knowledge of the Commission, freedom to express our opinions. We had no direct participation in the extensive discussions which ensured. We had hoped that these discussions might lead to one of three results:

First, that the proposed legislation might be recast on the traditional theory of freedom of contract between the borrower, the lender, and the trustee, with full disclosure of the contract to the Securities and Exchange Commission, as against the proposed theory of dominion of the Securities and Exchange Commission over any proposed contract between the parties. The full disclosure theory, as distinguished from the dominion theory, permits a flexibility necessary to accommodate the substantive, legal, and timing requirements of each particular lending transaction. Hardly any two are alike and no one, I take it, urges that any standard form of trust indenture will meet regional needs. The full disclosure theory, retaining freedom and flexibility of contract, has proved unacceptable.

Our second hope was that, if dominion over the corporate trusteeship functions of banks was to be extended, such dominion would be lodged in one of the numerous Federal agencies now supervising banks, more particularly in the Board of Governors of the Federal Reserve System which, under the existing law, supervises bank trust operations and, if the Securities and Exchange Commission was to participate, such dominion might be exercised at least jointly with the Board of Governors of the Federal Reserve System under a flexible machinery. It should be remembered that, once the terms of a long-term mortgage indenture are set, future changes in the law or in economic conditions cannot unwrite the indenture. This approach has failed of acceptance.

Our third hope was that, if the dominion theory of supervision by the Securities and Exchange Commission was to prevail, full discussion would iron out many debatable items through a process of

mutual education. To a considerable extent, particularly in regard to conflicts of interest in the trustees, referred to by Mr. Douglas, this has occurred, and did occur, before the bill came on for hearing before the subcommittee of the Senate Committee on Banking and Currency in June 1937.

At that hearing, Edward E. Brown, president of the First National Bank of Chicago, for years previously general counsel of the bank, testified and subsequently, at the request of Senator Wagner, set forth his suggestions in a letter, dated June 25, 1937, concluding his letter as follows:

In conclusion, I repeat, as I testified on Tuesday, that the subject matter of this bill merits much more complete exploration before it is fixed in our statutory law, and that the suggestions in this letter represent a minimum of amendments to make the bill useful and desirable in a workaday world, if we are to have legislation at this time. Anything less would be risking too great a tearing of our economic, industrial, and financial fabric, and therefore clearly is not in the public interest.

Mr. Brown, having been invited by this committee to testify before it and being unable to attend, has requested me to express our bank's views on this bill (H. R. 10292) introduced in the House of Representatives last week.

The bill, as now rewritten, has been amended to meet Mr. Brown's first objection, contained in his letter to Senator Wagner, that is, a corporate indenture trustee does not disqualify itself as trustee by virtue of making a loan to an indenture obligor in cases where the indenture involves unsecured obligations or secured obligations of a maturity of less than 5 years.

As to Mr. Brown's second objection, the bill, as now rewritten, makes a gesture toward preservation of the so-called rescue loan by a trustee bank to a corporate borrower to pay rents, payrolls, taxes, and so forth, to carry it over an emergency and avoid bankruptcy. Let us make no mistake as to the merits of the time-honored rescue loan and the grief it has saved, in spite of the very occasional abuse of it.

The provisions beginning at the top of page 27, H. R. 10292, as I read them, permit a trustee bank loaning to a corporate obligor within 4 months of a default on interest or principal under its mortgage indenture to retain the collateral received for such loan on condition that the trustee bank "shall sustain the burden of proof that at the time such property was so received the trustee had no reasonable cause to believe that such default would occur within 4 months," and, failing such burden of proof, the trustee bank must hold any such collateral for the pro rata benefit of itself and all the trust indenture bondholders.

By the very nature of a rescue loan the loaning trustee bank would have great difficulty in sustaining such burden of proof if in fact such a default did occur within 4 months. So, obviously, the trustee bank will not make any loan to a faltering corporation under such conditions. Incidentally, in practice, it is the trustee bank generally which is the only one that has been willing to make such a loan.

Mr. Brown's third objection, to wit, the required provision in an indenture that the bondholders cannot waive a default in principal payment to give the corporate debtor a breathing spell, has not been accommodated in the present bill. In fact, the bondholders are not to be permitted to waive a default of interest in excess of 1 year's

interest. The investor's control of his own destiny would thus be seriously curtailed. Such provisions seem to proceed on the theory that bankruptcy of his corporate debtor is the best way to serve the investor's welfare.

In the indenture commonly in use, the bondholders control their destiny in practically all respects after default. Section 7 (m) of the bill apparently will preserve only a very limited modicum of such control.

Mr. Brown's fourth and insistent objection before the Senate committee had to do with the degree of responsibility put on the corporate trustee after default under the corporate indenture. He expressed it in this language in his testimony—I am going to add a little bit in this respect. I am well within my time allotment, I think.

This is found on page 123 of the hearings before a subcommittee of the Committee on Banking and Currency, United States Senate, Seventy-fifth Congress, first session, S. 2344.

As to the first—that a responsible corporate trustee shall be named in every indenture—I assume from the bill and the Commission's report, and the tenor of the testimony before the committee, that the Commission feels that the only institution' generally speaking with sufficient capital resources and experience properly undertake the responsibilities of being corporate trustee are banks of deposit, whether called banks or trust companies, and that it is the expectation that most corporate trustees under indenture conforming to the bill will be banks of deposit. With this I have no quarrel except to point out that the primary duty of a bank of deposit is to its depositors and that it is not good public policy to allow or encourage a bank of deposit to accept contingent liabilities which might possibly exhaust its entire capital resources and put its depositors in jeopardy. The failure of one or two large banks or a number of smaller banks, through liabilities imposed upon them as the result of trust operations, might easily produce another national banking crisis. It seems to me obvious that the entire capital of a bank should not be put at the risk of its trust operations as against its liability to depositors, both commercial and saving.

It is for these two reasons—first, the danger to the banks and banking structure of the country of the imposition of liabilities contemplated by this bill, and, secondly, the danger that trustees, under fear of liability, will force concerns that could otherwise be saved, into bankruptcy or 77B—that I think the provisions of this bill in respect to the liabilities assumed by the trustee should be qualified, and exoneration of the trustee should be greatly liberalized and definitely stated in the bill.

In his letter to Senator Wagner he suggested an amendment in the following language:

As to the trustee:
Reiterating my testimony of last Tuesday, I fear the potential danger to the banking structure contained in the proposal to impose affirmative active duties on the trustee and denying protection to the trustee except on the narrow test of simple negligence. The existing test commonly used of gross negligence may be too broad but by the same token the proposed test of negligence is clearly too narrow; I suggest, therefore, there be added at the end of subsection (j) on page 38 (of the bill then before the Senate) the following language:

"But may contain provisions protecting the trustee from liability for any error of judgment; for any action taken or inaction deliberately suffered (a) at the request of the holders of not less than a majority in principal amount of the indenture securities at the time outstanding or (b) independently of the security holders, in good faith and without negligence; and for any omission in the execution of the trust not the result of bad faith or negligence. Such indenture may also provide that as to claims against the indenture trustee predicated on negligence reasonable doubt in respect thereof shall be resolved in favor of the indenture trustee."

Now, in this respect there has been no change in the proposed bill as I read it since it was before the Senate committee, in the form that

it then was. The suggested amendment or some other of equivalent import is missing.

We submit that the provisions relating to the responsibility of trustees, section 7 (j), page 37, far from liberalizing exoneration of the indenture trustee, inferentially increase it by qualifying the exoneration from liability "for any error of judgment made in good faith by a responsible officer or officers of the trustee" with the condition "unless it shall be proved that the trustee was negligent in ascertaining the pertinent facts." There is a clear invitation to charge disastrous consequences of the trustee's action after default to negligence in gathering his facts as the cause of his error in judgment. Incidentally there has never been a liability on a trustee or any one else for a nonnegligent error in judgment, in good faith.

The prospect of an indenture trustee being held liable for any act on his part, if the results are disastrous, is increased to the danger point, if not almost to the point of certainty, by the provisions of section 7 (i) relating to duties of the trustee in case of default.

I would like to call, Mr. Chairman, your attention to section 7 (i). This subsection reads as follows:

(i) The indenture to be qualified shall contain provisions requiring the indenture trustee to exercise in case of default (as such term is defined in the indenture) such of the rights and powers vested in it by the indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise under the circumstances if he were a fiduciary and had the degree of skill which the indenture trustee has, or which, at the time of the offering of the indenture securities, the indenture trustee represents itself as having, as indenture trustee, whichever is higher.

It is axiomatic in law that the higher the degree of duty the narrower the margin of nonnegligent conduct. The test of care and skill set forth in section 7 (i) is such that a prudent man might automatically stand convicted of negligence by accepting it. It carries a test far beyond anything that common law ever contemplated and the common law generally reflects fair standards of conduct. In fact its alternative aspects are almost metaphysical in their indefiniteness. Apparently, the nature of a corporate trustee's advertising in respect of his trust functions is to be interpreted by a jury of laymen and, under the instructions of a court, the degree of represented care and skill, on which the negligence or nonnegligence of the trustee is to be determined, is to be fixed by the jury.

Now let us look at the practical side of it. Looking at the proposed duties and responsibilities of the corporate trustee from the viewpoint of practical considerations, the prospect of the corporate trustee being liable for disastrous consequences of any action it may take after default becomes shockingly real. By what token may it be assumed that any corporate trustee has within its four walls the skill and capacity to function without subjecting itself to a charge of negligence under the proposed set-up. The decisions that face an indenture trustee when a corporate debtor is in failing circumstances are extremely delicate and difficult. One of the most difficult functions a trustee under personal trusts faces is the direction of smaller flourishing corporations inherited through stock ownership on the death of the owner, who in his lifetime had supplied the effective management. How much greater the problem of a corporate indenture trustee to have a large corporation in faltering circumstances dropped suddenly into its lap.

Shall the trustee base his conduct on the advice of the existing management or seek advice from other sources, generally competitive with the corporate debtor? Shall outside financial advice be sought and, if so, shall it be from the original house of issue or some competitive house? Shall the company be allowed to continue under the existing management or shall the trustee, being unqualified to do the managing itself, put in new management? Shall a petition in bankruptcy be filed or avoided? If a petition in bankruptcy be filed, what recommendation shall the trustee make to the court, or if it fails to make any recommendation, being uncertain, has it thereby stamped itself as an unskillful trustee? If whatever it does turns out disastrously, can it reasonably expect to escape at least a suit to test its negligence? It should be borne in mind that any bondholder can start a class suit for all the bondholders and that the defense of the suit itself is a costly matter. Incidentally, such expenses and the expense of additional duties placed on the trustee in the proposed bill bids fair to far out-balance any fees for the trustee that private corporate financing has, heretofore at least, commanded. If by chance the trustee is held to have been negligent, and in depression times the chances are that before a jury it will, the bondholder can look to it to pay damages. What those damages are, no one can prophesy.

It will be noted that section 7 (a) requires that at least one of the trustees shall be an institution incorporated under the laws of the United States or of any State or Territory or the District of Columbia authorized to execute trust powers, and that:

(2) If the Commission deems it necessary or appropriate in the public interest or for the protection of investors, in view of the type of indenture, the amount of securities outstanding and thereafter issuable thereunder, the duties and responsibilities imposed thereby on the trustee or trustees, the indenture to be qualified shall require that such institutional trustee have at all times a combined capital and surplus of such specified minimum amount as the Commission deems adequate, having due regard to the public interest and the interests of investors.

And I call your attention to the preamble of this bill on which its interpretation in the courts is predicated. On page 3, I think, reading over from page 1:

SEC. 1 (a). Upon the basis of facts disclosed by the reports of the Securities and Exchange Commission made to the Congress pursuant to section 211 of the Securities Exchange Act of 1934 and otherwise disclosed and ascertained, it is hereby declared that the national public interest and the interest of investors in notes, bonds, debentures, evidences of indebtedness, and certificates of interest or participation therein, which are offered to the public, are adversely affected—

And jumping (1), (2), and over to page 3—

(3) When the trustee does not have resources commensurate with its responsibilities.

It was considerations such as set forth above in regard to the responsibility of the indenture trustee that led Mr. Brown to testify before the Senate committee as follows:

My purpose today is to address my remarks primarily to the fourth means proposed for protecting the investor, namely, the mandatory imposition of active duties on the trustee, both before and after default, with the prohibition of exoneration clauses such as are now universally found in corporate trust deeds. I assume that the committee clearly realizes that the bill prohibits the freedom of a borrower to contract with prospective investors regarding the duties and obligations which the trustee is to assume, and gives overriding rights to the Commission to write the provisions of the contract if one is to be made. I am not here today to discuss the question as to whether such a policy is in the interest of

the investor or of the public. But I do want to point out that in the bill as drafted the imposition of such active duties on the trustee, both before and after default, imposes very grave liabilities on the trustee, and such liabilities, coupled with the prohibition of adequate exoneration clauses, may cause corporate trustees to suffer losses which, if they are banks of deposit, may threaten their solvency, and with them the integrity of our banking structure and also cause many bankruptcies that would otherwise be avoided.

I shall make no further comments as to the details of the bill although, in passing, I submit that there are many requirements which may be included in indentures in the discretion of the Securities and Exchange Commission, to the extent that the Commission deems them adequate or advisable to protect "the public interest and the interests of investors." Some of them which are specified in general terms, such as the one in section 7 (m) (2) (A) in regard to entry into possession of the trust estate after default, should be analyzed in the light of respective States laws and the propriety of allowing indenture trustees to accept such a responsibility in view of the liabilities entailed under existing State law. It is one thing to enter into possession of an apartment building and quite another to take dominion over a large manufacturing concern. It must be remembered that the laws of the respective States control to a considerable degree the consequences of the trustee's action and if the debtor has plants in different States, what to do about it.

Finally, all human endeavor, be it in industry, politics, or anything else, has its practical aspects and cannot be carried on in a theoretical vacuum.

So much for this bill from its trustee point of view.

Briefly, in regard to two general aspects of the proposed bill from the point of view of the investor in corporate bonds and the point of view of unsecured bank and trade creditors of the corporate debtor: Practically all of the banks in the country, big and little and regardless of any trust indenture operations, invest considerable portions of their funds in corporate bonds and debentures and, to the extent that under the terms of the indenture any such investor loses control of his own destiny, such as being denied the right to waive a default in principle to help his failing debtor, his interests may suffer. Possibly the alternative prospect of an all-wise trustee or of recovery from the trustee for negligent conduct is proposed as a compensation for the control of the investors surrenders to the trustee.

Speaking for our bank, we would much rather retain control of our own destinies as a bondholder and be in a position to participate with the other bondholders in the control of the conduct of the trustee, who might be located in New York and be directing the destiny of an industry physically located in Chicago, or be located in Chicago and be directing a concern operating in Iowa, the securities of which are held primarily by citizens of Iowa.

The second general aspect of the proposed legislation, aside from the trusteeship features, bears on the consequences to unsecured bank and trade creditors of the defaulting corporation. It may be said with confidence that the last thing an unsecured creditor deems to be to his interest, other things being equal, is to have his debtor propelled into bankruptcy. He will fight and make concessions, if he has the opportunity, to avoid such a result. Such creditors can create mechanics of common action with astonishing speed. The tendency of the proposed bill, plus some proposed amendments in the so-called Chandler

bill, dealing with bankruptcy (H. R. 8046) and the so-called Lea bill, dealing with rights of stockholders and creditors to form protective committees (H. R. 6968), all carry the inevitable tendency of prematurely precipitating the faltering debtor corporation into prolonged bankruptcy, even though practical considerations, if freedom of action were preserved, might dictate and result in a different course. The difference between railroads and utilities, on the one hand, and industrial corporations, on the other, must be clearly recognized. A railroad or utility can jog along indefinitely in bankruptcy proceedings. They are protected in their operations by the very nature of a geographical monopoly which they enjoy. Their customers, to a great extent, have no choice but to continue to do business with them. An industrial corporation is entirely different. It can lose its goodwill, its distribution facilities, and its customers with lamentable rapidity.

In seeking a means to protect investors in a faltering corporation, we should be careful lest predetermined immutable regulations, as to what instruments may be used and how extensively they must be sterilized, doom the patient regardless of the skill and alertness of the surgeons. In the case of an industrial corporation, the corpse will consist of brick, mortar, and machinery, around which the chief mourners will be all classes of investors, bondholders, unsecured creditors, and stockholders alike.

I had, Mr. Chairman and Mr. Boren, something to do with the amendment of the bankruptcy law, 77B. The bankruptcy law was changed with a view to aiding harassed debtors, particularly corporate debtors. It was conceived as an aid to them and consequently an aid and protection to investors in their securities. I submit that those proposed bills involve a reversal of that policy.

In conclusion, speaking for a bank which was organized in 1863, under charter No. 8 of the National Bank System, and which through the 75 years of its existence has been an integral part of the industrial growth of the Middle West, we renew our alternative plea: First, that the subject of the reform of indenture trustee practice and procedure receive extensive exploration by your Committee before any particular theories are crystallized into law, and secondly, if the proposed legislation, or the bill as it is, is to be passed, that the three suggested amendments referred to in our letter to the Senate committee, more particularly the one with regard to responsibility and exoneration of trustees, be adopted. I say untimely, because, regardless of the skill and diligence of the Commission, the mechanics of passing on individual indentures will in my opinion, entail delay and discouragement in private industrial financing.

I have just two final comments. Under this bill, so far as our bank is concerned, our concern would be that, if we should accept trusteeships under it, we would not be able to protect the interests of the investors as well as we have in the past, a record of which we are proud.

As to what banks in this country have positively approved this bill, as distinguished from not opposing it, I do not know. Mr. Douglas has introduced a letter, which he was kind enough to show me after the hearings this morning, from Mr. Blaine B. Coles, who was president of the Trust Division of the American Bankers Association during the time this bill was under consideration, who stated

that in his opinion the majority of the banks in this country, and particularly those west of the Mississippi, were in favor of the bill. Any opinion of mine in this respect would be presumptuous. I submit, however, that this committee might advantageously seek the opinion of many banks which I know think this legislation to be untimely and undesirable.

Mr. BOREN. I would like to ask one question, Mr. Chairman.

Mr. EICHER. Mr. Boren.

Mr. BOREN. In relation to the two fundamental policies which you named in the early part of your testimony—I do not remember the terms exactly you used in naming them——

Mr. AMBERG. "Full disclosure" and "dominion."

Mr. BOREN. Yes. Now, this bill follows the dominion approach, I take it, from your statement.

Mr. AMBERG. The bill says indentures shall contain and shall not contain certain things, and may contain, under certain conditions, other things.

Mr. BOREN. Do you mean by a full disclosure approach that if debentures contain the information that that is sufficient regulation within itself?

Mr. AMBERG. No.

Mr. BOREN. I know that a while back insurance policies, in some instances, I believe, contained clauses that were not readily recognized by the purchasers of the policies, and it became necessary, in some instances, to have regulation on that score.

Mr. AMBERG. Well, I would question the analogy. I would question the application of the illustration.

Mr. BOREN. I do not know that it should be made. We will strike that out.

Mr. AMBERG. I would not say that we should not go beyond the full disclosure theory. It is possible, although I dislike the rigidity of it, that the question of conflicts in the trustee should be legislated upon. Preferably they could be handled on a flexible basis under the supervision of the Reserve Board. The arbitrary rules contained in this bill do not necessarily solve the problem or serve the interest of investors—particular cases. They are bad. I think that most trustees seek to avoid them, whenever they are read under the circumstances. They have led to some abuse and embarrassment.

Mr. BOREN. I think that is all I have, Mr. Chairman.

Mr. AMBERG. Mr. Chairman, may I add this: I have a letter here from Mr. William S. Miller, vice president and general counsel of the Northern Trust Company, of Chicago. His position is comparable to ours, somewhat, and I would like to offer that for the record.

Mr. EICHER. Without objection it may go into the record.

(The letter referred to is as follows:)

THE NORTHERN TRUST CO.,
*Chicago, April 22, 1938.*

Mr. HAROLD V. AMBERG,
*Vice President, The First National Bank of Chicago,*
*Chicago, Ill.*

DEAR MR. AMBERG: I am very sorry that it will be impossible for me to attend the hearing before the House committee which is considering the bill which has been introduced in the House as a companion bill to the Barkley bill now pending in the Senate.

We wish you would state to the committee that the position of the Northern Trust Co. in reference to this proposed legislation is the same as your own and that of your president, Edward E. Brown.

The more we consider the proposed legislation, the more convinced we are that it will prove to be a deterrent to public financing of securities and for that reason we feel that it would be most unfortunate to have it passed at the present time when such strong efforts are being made to bring about a business recovery.

In the past it has been necessary to work out an agreement between the company borrowing the money, the underwriters, and the trustee as to the terms of a bond issue and particularly as to the form of the trust indenture. Under the terms of the bill so many things are subject to the approval of the Securities and Exchange Commission that there is sure to be a real delay as well as an added difficulty in carrying through any corporate financing.

Another thing that impresses me strongly is that in view of the very large amounts which are involved, any bank or trust company acting as trustee will have to lean backward in considering possible liability and for that reason might feel obliged to take action in case of default which might not be for the best interest of the corporation or its security holders and which it would not have taken were it not for the fear of liability.

There does not seem to me to be any strong demand for this legislation at the present time and for that reason I would like to emphasize the suggestion which Mr. Edward E. Brown made in his testimony before the Senate committee to the effect that this proposed legislation is of such public interest that it deserves more complete exploration before it is incorporated into statutory law and to his further suggestion that if we are to have legislation at this time it might well be confined to the conflict features of the bill.

You, of course, have our permission to make this letter a matter of record with the committee.

Very truly yours,

WILLIAM S. MILLER,
*Vice President and General Counsel.*

Mr. AMBERG. Then, if it is not too great an imposition, there has been a very excellent impartial legal and factual study made of this Barkley bill, the present bill, by Mr. Oscar W. Haussermann, of the Boston bar. It is a lecture he made in Boston. It is, I can assure you, an impartial, fair presentation of the issues, and I would like, with your permission—and I have his permission—he is too modest to ask for it himself—to insert it in the record.

Mr. EICHER. How many pages are there?

Mr. AMBERG. About 32 pages.

Mr. BOREN. Do you have other copies of that?

Mr. AMBERG. I have not.

Mr. EICHER. Doubtless Mr. Haussermann could furnish us with more copies, so that each member of our committee could have one. Could you supply us with 27 copies?

Mr. HAUSSERMANN. I will be glad to do that.

Mr. EICHER. If you can do that, I will see personally that each member of our committee gets it.

Mr. AMBERG. Then that will avoid the necessity of putting it into the record.

Mr. EICHER. Just one more question, Mr. Amberg; Do I understand the purport of your three amendments, or Mr. Brown's three amendments, to be that if they were embodied within this bill, it would change its philosophy from the dominion to the full disclosure aspect?

Mr. AMBERG. No; not at all.

Mr. EICHER. Just one more question: Do you entertain any confidence at all, Mr. Amberg, that private corporate financing can by any possibility ever succeed in cleaning its own house without governmental assistance?

Mr. AMBERG. I certainly do. I have enough confidence in the integrity of the American people and their providence to believe that they can. That is not to say that some forms of supervision do not greatly help in preventing deliberate overreaching and fraud. Incidentally, in future days, if we all go speculatively haywire like we did in 1929, the investors are gone, regardless of laws.

Mr. EICHER. Mr. Amberg, I rather gather from your statement that you feel considerable alarm over the implications of the word "negligent" in line 17, page 38.

I assume you feel that it might in practically all circumstances be a jury question as to the damage liability on the part of trustees.

Would you feel that should the word "negligent" be changed possibly to "willful closing of the eyes and ears of the trustee"——

Mr. AMBERG (interposing). Yes; if this clause remains, but that is purely secondary, Mr. Chairman. In the present indenture the trustee naturally has sought the high degree of protection against charges of negligence. He has not done it because he has been unwilling to act, but he does not like to be chiseled at by a minority of security holders when most of them are satisfied.

Mr. Brown merely asked that inasmuch as the conduct of the trustee in the very technical matters was to be tested before a jury and not before a group of men familiar with these matters, it was just altogether too much and unfair to submit the trustee to the risks of going before a jury of laymen to have determined whether or not his conduct was negligent.

Mr. BOREN. You would add in there, on line 17, further language?

Mr. AMBERG. I would strike No. 2. I do not care about it at all. A trustee has never been liable for an error of judgment. I would like to have it broadened and go back to principles such as Mr. Brown suggested in his testimony, that reasonable doubt as to negligence should be resolved in favor of the trustee, as proposed—the amendment submitted to the Senate.

Mr. BOREN. Would not your suggestion be answered here by adding in line 17, "it shall be proved beyond a reasonable doubt," or something like that, that he was negligent?

Mr. AMBERG. That would be helpful.

Mr. EICHER. Is it your idea that the whole paragraph (2) on page 38 reverses the common law burden of proof?

Mr. AMBERG. Possibly. The inferences are uncertain.

Mr. BOREN. If we strike that paragraph entirely out, without adding any new language, you think that would materially improve the bill?

Mr. AMBERG. No; it would not improve the bill from the point of view of the inordinate risks which it places on the trustee, which, incidentally, will as a practical matter make trustees reluctant to accept trusteeships except in cases where the prospect of future trouble is very slight and the fees relatively commensurate.

Mr. EICHER. Thank you, Mr. Amberg.

Mr. AMBERG. Thank you.

## STATEMENT OF FRED N. OLIVER, GENERAL COUNSEL FOR THE NATIONAL ASSOCIATION OF MUTUAL SAVINGS BANKS, NEW YORK, N. Y.

Mr. EICHER. Mr. Oliver, will you give your name and address, and your occupation to the reporter?

Mr. OLIVER. Mr. Chairman, my name is Fred N. Oliver. I am general counsel for the National Association of Mutual Savings Banks, 60 East Forty-second Street, New York, N. Y.

There are 550 mutual savings banks in the country having assets of $11,000,000,000. Their investments are generally restricted by law to mortgages, Government and municipal bonds, public-utility bonds, and railroad bonds which meet certain investment tests. In some States investments in the better grade industrials are permitted. This bill would affect only the investments made in public-utility bonds and, in those States where such investments are permitted, in industrial bonds. Obviously, mutual savings bank officials are interested in any legislation which is designed to afford more adequate protection to investments of their depositors.

At the time the proposed legislation was being drafted by the Securities and Exchange Commission, an informal committee of savings bankers was appointed to study the measure and to confer with the Commission about it. Mr. Charles A. Miller, then president of the Savings Bank Trust Co., of New York, and now chairman of the board of that institution, is the chairman of the committee. The committee had several conferences with Chairman Douglas and his associates on various aspects of the bill as it was being developed.

The members of the committee are widely scattered. Due to the limited time available, I have been unable to get in touch with all members of the committee to obtain their views as to the measure in its present form. Consequently my appearance here is in my personal capacity.

I have gone over the measure with the chairman of the committee and he has approved the remarks which I shall make as well as two or three other members of the committee.

However, an appearance was made before the Senate committee and there is no apparent reason for any change in attitude with respect to the measure, nor is there any reason for me to restate in detail the testimony given at that time.

Generally speaking it seems to be the feeling of those savings bankers who have gone into the matter that some improvement of corporate indentures is desirable. There has been no complaint generally from our banks and we find that corporate trustees generally have acted with a high sense of their fiduciary responsibilities. Occasionally a situation has arisen, however, which indicates the desirability of some improvement in corporate trust indentures. In these situations the difficulty has arisen not because of the failure of a corporate trustee to act properly but because of the limitations as to his duties contained in the indenture itself.

I know of no other practical way to improve corporate indentures in these respects except through the method of statutory prescription of minimum requirements. The purchasers of securities ordinarily have no opportunity to participate in the drafting of the indenture itself. It is not a satisfactory answer to say in my judgment that

they can examine the indenture and exercise their judgment with respect to purchasing the bonds after the event.

A complete disclosure through the registration method would not in my judgment seem to be sufficient. Such a method does not attack the real problem of finding an effective method to bring about changes in the indenture where such changes seem desirable.

Some of our savings bankers have been giving thought to this subject for some years and have felt that investors should unite and use their collective purchasing power as a bargaining weapon to bring about changes in those instances where necessary in corporate indentures. This has been done through united effort by some of the larger institutional investors in certain isolated cases. As a general rule, however, it does not seem to be practicable for the smaller institutions to do this. To accomplish this result suggestions have even gone so far as to discuss the creation of a central agency to act for the smaller institutional investors in an anlaysis of corporate trust indentures and in an effort to perfect them in the interest of purchasers.

I might say that such a movement has been on foot by cooperative action of the life-insurance conference, a group of smaller life companies in the West, in discussions with the savings banks.

I think our institutions are primarily interested in those provisions of the bill which have to do with the activities of the corporate trustee prior to default, particularly subsection (e), which relates to the furnishing of information, and subsection (g) of section 7. From our standpoint it is more essential that the corporate trustee assume such affirmative duties prior to default as seem necessary or desirable. It is at this stage that the bondholders are usually not on the alert and should be in a position to depend with some assurance upon the action of the corporate trustee to follow matters for them.

I have two suggestions to make on behalf of the savings banks. The first is that these affirmative duties should not be so burdensome as to discourage or prevent responsible institutions from acting as corporate trustees. I assume that the trust company committee of the American Bankers Association have satisfied themselves as to the workability of the provisions.

The second qualification was also mentioned in my statement before the Senate committee but perhaps was not emphasized sufficiently. We do not think that the bill should delegate the right to remake or alter the contract entered into between the parties. According to my understanding it is not the intention to do so, and I think that the language of the bill should be made perfectly plain in that respect.

As I understand it, the theory of the bill is to set up in the indentures insofar as it is practicable minimum standards for corporate trustee action. Quite apparently, it is not practicable in a statute to write in the actual language to be incorporated to accomplish these results and necessarily some discretion must vest in the Commission with respect to the propriety and adequacy of these specific provisions. But the Commission's jurisdiction should end at that point. It should not have power to deal with the substantive features of the contract.

I have particular reference to the language of subsection (m), of section 7. The language in that section has been vastly improved in this draft but it seems to me that some further clarification is

required, particularly insofar as it relates to paragraph 3. Subsection (m), as you will observe, provides that—

the indenture to be qualified shall contain provisions which the Commission deems adequate, having due regard to the public interest and the interest of investors, with respect to the following matters. Paragraph 3 contains the rights, powers, and remedies of the indenture security holders and the language in which and the conditions upon which such rights, powers, and remedies may be exercised, including—

And so forth.

Now, it seems to me that the term "rights, powers, and remedies" is a very broad term and might be interpreted to relate to any feature of the agreement rather than purely to procedural steps to be followed by the trustee. I should think that the language of subsection (m) should be restricted so as to make it perfectly plain what the Commission intends to do, and I understand that is in conformity with the Commission's thoughts in this matter and my own request is that the language be clarified so that there will be no misunderstanding about it in the future. It might be clarified in a variety of ways. One suggestion is that the language in subsection (m) in lines 16 and 17 on page 40 be amended to read as follows:

For the purpose of effectuating the purposes of this act relating to the qualifications, conduct, and duties of the indenture trustee, the indenture to be qualified shall contain provisions which the Commission deems adequate.

And then go ahead as the act now reads. In other words, for the purpose of effectuating the purposes of this act relating to the qualifications, conduct, and duties of the indenture trustee, the indenture to be qualified should contain provisions.

Mr. BOREN. Mr. Chairman.

Mr. EICHER. Mr. Boren.

Mr. BOREN. Would it be pertinent to call the attention of the representatives of the Commission here to that suggestion and ask specifically that they reply on that suggestion?

Mr. BURKE. I have it, sir.

Mr. OLIVER. I might say, to be frank about it, that the Commission asked me to make suggestions and I did not know that anything was being done until I got a copy of this draft last week.

It might be done also by another method. You might have inserted at the end of line 18 a somewhat similar provision to that which has been inserted in subsection (1) as follows:

having due regard to the public interest and the interest of the investors and not inconsistent with the bargain of the parties.

Mr. EICHER. Bargain of the parties?

Mr. OLIVER. And not inconsistent with the bargain of the parties.

The first suggestion I make conforms to the general provisions of that similar character which we have in most of our State banking laws dealing with the general duties of banking boards. There are any variety of ways in which I think the language could be restricted in such a fashion as to make it plain that the Commission is not delegated power to change the contract between the parties

We are not interested in the precise language that is employed. We are only interested in seeing that it is clear.

Mr. BOREN. You do not anticipate any foundation for fear that the Commission would issue such rules and regulations as might interfere with you?

Mr. OLIVER. Not at all; but it seems to be a safe and wise thing to do in regulation statutes of this character to have plain this phase so that there may be no misunderstanding in the future about it.

I thank you, Mr. Chairman.

Mr. EICHER. Thank you, Mr. Oliver.

## STATEMENT OF G. S. CANRIGHT, REPRESENTING THE CONTINENTAL ILLINOIS NATIONAL BANK & TRUST CO., CHICAGO, ILL.

Mr. EICHER. Mr. Canright, we will hear you. Will you give your full name, your address, and those for whom you speak?

Mr. CANRIGHT. Mr. Chairman: My name is G. S. Canright, counsel for the corporate trust division of the Continental Illinois National Bank & Trust Co. of Chicago.

At the outset, I should like to make clear that our position with reference to this bill, and our approach to the question before us is:

First, we have no quarrel with those who say that the trustee under the corporate trust indenture has a fiduciary relationship to bondholders. We believe, and I think most trust companies will agree with me on this, that it should be the function of the trustee to see, in general, that the contract that is made for the benefit of the bondholders is carried out in much the same way that the individual holder of a mortgage may see that his contract is carried out for his own benefit.

The other observation I wish to make is this:

If the committee should believe, from the testimony, that the failure of corporate trustees to perform their functions as trustees, or that the misconduct of trustees is so widespread as to require legislation, we have no criticism of the objectives of this bill. However, I think we can all agree that in the adoption of remedial legislation that legislation is to be preferred which will interfere least with the rights and normal activities of our citizens or, as Commissioner Douglas himself has put it very aptly in speaking in Chicago, "The best government is that which reaches the stated objectives with the least possible interference with business and finance." It is from that standpoint that I wish to approach the bill. We have carefully considered the Senate bill which is a companion measure to this and insofar as we have had an opportunity to, the amendments which have been made since the hearings before the Senate committee, and that we have reluctantly, but unavoidably come to the conclusion that the bill is fundamentally unsound and that this committee should recommend that it be not passed.

Our reasons for this may be grouped into four:

First, it will inject uncertainty into financial transactions and constitute a hindrance to business development which not only is not necessary to accomplish the purposes of the bill, but which is out of all proportion to the good to be accomplished.

Second, it places restrictions and burdens on trustees which may make the business of trusteeship prohibitive, and in times of financial stress may be destructive of the banking system of the country.

Third, in some respects it is almost certain to be harmful to the bondholders whom it is designed to protect.

Fourth, its objectives can be accomplished much more effectively by a different and simpler type of legislation, which will avoid the unnecessary burdens and dangers inherent in this bill.

Inasmuch as I am opposing the whole theory of the bill and deem the entire bill unsound, I am not going to deal with particular provisions, as I would if I were asking for amendments of the bill.

I shall, however, refer to some of the salient features which are illustrative of the provisions which form the basis of our criticism.

Section 7 (b) sets up certain standards by which to determine whether a trust company is disqualified by reason of conflicting interests to act as trustee. Some of these standards are harmless and some of them, I venture to predict, will turn out to be very harmful; but the more serious objection is that, notwithstanding the vexatious and the troublesome features of these provisions they are of little value in accomplishing the purpose of this legislation.

There is no attempt to eliminate the incompetent trustee. There is no attempt to eliminate the unscrupulous trustee; but only to eliminate certain situations which at some time and under certain circumstances might tend to dissuade a trustee from performing its functions properly.

The trustee could be free from all of the conflicting interests that are mentioned here and still be a very unsatisfactory trustee and it could have practically all of the conflicting interests that are stated here and still be a very excellent trustee.

I want to look at just one or two of these situations which disqualify it to act as trustee.

Paragraphs (6) to (8) set out with great particularity the disqualifications of a trustee, because it owns or holds as collateral security for obligations in default a specified percentage of the stock of the obligor or some associated company. The percentages, of course, are purely arbitrary. By that I mean the action of the trustee, manifestly, would be no different whether it owned 3 percent, 5 percent, or 7 percent of the stock: but, not only are the percentages arbitrary, but they are more or less artificial. They bear little relation to the situation which is supposed to be corrected.

Under section 7 (b) of the bill, paragraph (8), an indenture trustee shall be deemed to have a conflicting interest:

If such trustee is the beneficial owner of, or holds as collateral security for an obligation which is in default as hereinafter defined (A) 5 percent or more of the voting securities or 10 percent or more of any other class of securities of an obligor.

Why the difference between voting securities and other securities? Is it thought, although a majority of the other stockholders believe it is to their interest that the obligor do not default under the indenture, that the trustee of the indenture will, nevertheless, cast his vote to breach the indenture agreement merely because it owns 5 percent of the stock. Is it thought that although the majority of the stockholders do not want the company to go into default, the trustee as owner of 5 percent of the stock would exercise its power to do what it could to get the company to go into default? Or, if a majority of the stockholders want the company to pay its debentures, is it thought that the vote of a holder of 5 percent of the stock can induce it to do otherwise?

As a matter of fact, the percentage of the stock held by the trustee, unless it held 50 percent, so that it had a controlling interest of the

obligor, the percentage of the stock held is of little importance. The thing that is really important is what it amounts to in dollars. An unscrupulous trustee might be influenced to risk its own reputation and act against the interest of the bondholders if the amount involved were $500,000, when it would not act if the amount involved was only $10,000.

After all, all that a trustee has to sell is service and its reputation as a good trustee is of vital importance to it, and the percentage of interest that it has in the stock, even of the obligor, is of little importance in determining whether it is going to perform its function.

Mr. EICHER. Mr. Canright, are you not rather getting away from the fundamental philosophy of the bill and discussing the details now?

Mr. CANRIGHT. I must discuss the details of the bill to explain why I object to the philosophy of the bill. I hope to tie it up in such a way that you will see why I have dealt at length on this provision.

The point I am trying to make is this: It is wholly impossible to define what will constitute a conflicting interest; but in this kind of a bill, if you want to eliminate conflicting interests, you must define it, and that is what the commission tried to do and they let it go at that.

Now, there will be conflicting interests that a trustee can have and there is nothing in the bill to prevent it, and there are many of these provisions that will scarcely if ever be conflicting interests, depending upon the situation.

Let us take another one of these conflicting interests:

Paragraph (7) of the same section provides that it will be a conflicting interest if the—

trustee is the beneficial owner of or holds as collateral security for an obligation which is in default as hereinafter defined, 5 percent or more of the voting securities of any person who to the knowledge of the trustee owns 10 percent or more of the voting securities of, or controls directly or indirectly, or is under the direct or indirect common control with an obligor, whether by agency, stock ownership, or otherwise.

I want to analyze this provision for just a minute.

Let us suppose we have a company, the A company—and it has a subsidiary whom we will call the B company, and another subsidiary whom we will call the C company. All of these companies are in sound financial condition and very prosperous. A bank is the trustee of a debenture issue of the C company. John Smith comes to the bank and borrows money and puts up as collateral voting stock, 5 percent of the voting stock of the B company. Under the provisions of the indenture, the trustee is immediately disqualified to act as trustee.

Now, why do we object to that? First: Not by the widest stretch of the imagination is there any actual conflict of interest between the rights of the bank as the holder of the stock of the B company and the right or duty as trustee the debentures of the C company. There is nothing that the bank can do either as an owner of the stock or as a holder of the collateral which can benefit itself. Nothing that it itself as trustee can do which will benefit itself as holder of the stock of the B company.

Also there is nothing the trustee can do in the capacity as trustee or refrain from doing that will be beneficial to the company, or to the bank in its individual capacity, and if so, there can be no conflicting interest.

Now, notwithstanding that fact, what does it do? Suppose, first, that John Smith is indebted to the bank and has stock up as collateral and he is in default in his loan, and the C company with whom the bank has had pleasant relations for many years, comes to the bank and wants the bank to be trustee under its indenture issue. The bank must refuse to act as trustee, not because of any fault of the B company or the C company, but because John Smith happens to have the B company stock up as collateral and is in default under his loan.

That breaks our association of many years. It causes loss of business for after all, the bank, if it is going to succeed, must keep its old associations; must keep its connections, and must take all of the legitimate business that is brought to it.

Suppose John Smith defaults after we are trustee? We must do one of either three things. We must resign as trustee and thus give up our connections, and business, or we must sell the collateral, even though the market may not be right and it may result in a loss to us; or we must do the thing that no bank would want to do—evade the law, by renewing John Smith's note.

If there were going to be any substantial benefits to the bondholders, perhaps it is a burden that the trustee should take; but the point that I am making is that it will not either help or harm the bondholders, which after all is the person supposed to be helped; but it will be of tremendous harm to the bank which is acting as trustee.

There is another point that I would like to make: If, as the Commission has repeatedly asserted, bondholders buy bonds relying upon the reputation of a particular trustee and expecting it to protect their interest, requiring the trustee to resign under those circumstances is unfair to the bondholders, because the trustee upon whom the purchaser relied will have a substitution made for it and there is not one case in a thousand where, as a practical proposition, the bondholder can have a voice in the selection of the new trustee.

Now, there is another provision I want to refer to, and on the face of it, it seems harmless, but it actually has some purpose back of it.

In paragraph (7) (e), it provides that the indenture to be qualified shall contain provision—I am not reading—"requiring the obligor to make certain reports and requiring the trustee to make certain reports."

My first objection to that is this: There is no effective restriction or limitation on what the Commission may require. Once the company and the trustee have become parties to the indenture which the Commission has approved, they have their head in the noose and the Commission is holding the rope. We are then entirely dependent upon the reasonableness of the Commission as to whether they shall act wisely or unwisely; justly or unjustly.

Now, in order that you may understand I am not just fighting windmills, let me call your attention at this time to section 12 (a). That section, 12 (a) makes the company and the trustee liable in damages to any person who purchases or sells bonds in reliance on one of these statements mentioned, and which turns out to be false or misleading or which has omitted to state a material fact.

There are some reports that can be required of the trustee by the Commission under the provisions of this section which no trustee could make for fear it would make a misleading statement or for fear it would not have made a complete statement.

For example, the provision that I referred to and illustrated by the A, B, and C companies. That section says that if the two companies are under one control (the control being the A company in that particular case) or under control by reason of stock ownership or contract, or otherwise—Now, how are we going to know whether it is? What report is the Commission going to require of us?

That is one of the things we are required to report to the Commission annually or more frequently if they ask for it.

What investigation is the Commission going to require the trustee to make, and what reports is the Commission going to require the trustee to give; what facts is it going to require it to set out? Certainly the Commission is not going to let the trustee say, "So far as we know there is no conflict," because that report would be valueless. But some place between that, and a definite statement that we do not hold stock of any company who is under control with a company on whose stock we are loaning money; some place between those two, the Commission is going to land, and nobody can tell where it will be.

Mr. EICHER. Would not that same criticism be applicable to a good many reports required under existing law today?

Mr. CANRIGHT. Let us say on an issue of securities you are required to make an application to the Commission and if there is something you cannot report about, it may be fatal to your business; you may not be able to go ahead; but you have not made a contract whereby you are obligated to make a report whether you want to or not; but this will be something that you are obliged to do and therefore once you have made your contract, whether you like to make it or not, you must make some kind of a report.

Now, with reference to the duties prior to default, some of the speakers who have spoken in favor of this bill, or more or less in favor of it, have been rather favorably disposed toward this provision relating to the duties of the trustee prior to default.

I think it arises to a considerable extent out of a misconception of the functions of a trustee.

I said that the trustee should perform duties similar to what he would perform if he were loaning money directly on a piece of property and held the mortgage himself. Now, suppose, I am a mortgagor. I have a loan on my place. The owner of that mortgage does not come around every so often and ask me whether I have made repairs on my property or ask me whether I have paid all of the bills; did I make repairs, or a number of things of that kind. He does not even come and ask me whether I have paid my taxes. He goes on the assumption that as long as I keep up my interest and my principal, that my own self-interest will require me to keep my property in repair and to pay the taxes on the property.

There is no object in paying principal and interest if one is going to lose the property.

Now, the reason why you have some of these exculpatory clauses put in a trust indenture is this: As a practical proposition a trustee cannot be following up every corporation to find out whether they are making proper repairs on their plants; whether they have any mechanics' liens on them, and so forth. If we obtained that information today it might all be changed tomorrow. What a trustee should have to do is only to follow the obligor sufficiently to see that he meets the requirements of the indenture as an honest obligor would. When

the trustee gets the obligor's financial statement, from that it can tell whether the taxes have been paid or not; whether there are any mechanics' liens or not on the property; but it cannot follow them up from day to day.

Now, there is another thing I want to refer to. Although it is not mentioned, the Commission, by its control over the provisions that can or cannot go into the trust indenture, can eliminate most of these exculpatory clauses, and, among others, that relating to indemnity to the trustee.

Inasmuch as the trustee has to defend a suit or in case a trustee has to bring an action, there seems to be an impression on the part of the Commission that there is something unreasonable in the trustee when it acts for the bondholders and spends money for the bondholders, to ask to be indemnified or to be furnished with funds with which to do the work; and yet there never was in the law any time a requirement that a trustee spend its own money to protect the trust estate and if the trustee is required to, if the situation is such that the trustee ought to spend money to protect the trust estate, the least the bondholders can expect is either to provide the funds, or to give indemnity to the trustee.

A word with reference to the duties in the case of default: Under the existing form of trust indenture, although the indenture provides that the trustee shall not be required to take action unless there are, say, 25 percent of the bondholders requesting it to, and although the trustee frequently does not take action, it always has the power of taking action. We have on some occasions had situations where an emergency has arisen and the bondholders were not organized, where we have gone ahead and taken action without the request, but many times the bondholders do not want us to do that. Many times it is of advantage to them that the trustee do not; but you are going to have a changed situation under this bill. The trustee is required to exercise its power and duties in case of default as a reasonably prudent man would do, and it is liable for negligence to anyone who suffers any damage on account of that, particularly if the trustee has acted with a mistaken idea as to what the pertinent facts are.

Now, what is a trustee going to do in circumstances of that kind? Here you have a possible liability for $50,000,000. You can protect yourself from liability by starting action on account of default, or you can act in good faith and take your chances that a jury will decide at some time in the future you were right. When you have everything to gain by enforcing the default and nothing to gain by doing the thing that your good judgment tells you should be done to protect the bondholders, what can any trustee do? He has got to protect his own interest and enforce the default whether he believes it desirable from the standpoint of the bondholders or not.

There is one thing that I wanted to mention which does not really concern the trustee, but I feel that I owe it to the committee to call it to their attention: One is the provision affecting the turning over of the bondholder list to other security holders, and the other is giving notice of default to security holders.

I want to say to you that it is one of the most dangerous provisions in the bill from the standpoint of the bondholders. It is one of the most difficult situations that a trustee has to confront. You know, as

soon as it becomes known that there is a default under the bill and it might be the basis for foreclosure, there are attorneys just lying in wait to grab such things. If they can get hold of one bondholder and that bondholder insists on getting hold of other bondholders, the trustee will have to supply the list of bondholders, and then you will have a half a dozen attorneys starting action and asking for bondholders' lists, having no purpose in view except the money that the lawyer is going to make out of it. There may be some committees that will do the same thing.

We have been confronted with that time and time again. We have never refused a bondholders' list where we thought the persons were acting in good faith, but we have had to refuse them when we were satisfied that the person asking for them had an ulterior motive.

Now, the trouble with this provision of the bill is that the Commission must determine when the indenture is written whether this man or that man shall be entitled to a list, and I tell you gentlemen out of my experience it cannot be done. You can only tell on the circumstances that exist at the time the list is requested; but the rest will be specified in the indenture and it will be there as long as the bonds are outstanding.

Now, I would just like to say one word more, with reference to the general effect of this bill and which will perhaps be a summary of what I have said.

Mr. CANRIGHT. The Commission has criticized trustees for both being mechanical agencies and for not being active trustees, and that is the principal reason, principal justification for this bill.

Now, perhaps that is true of some trustees. The gentleman who testified for the savings banks said that they had found it generally was not true; that it was an exceptional case and my experience would be that he is correct; but let us assume that the criticism is justified. The point I wish to make is that the bill does not correct it. If a trustee was inactive before, he may be somewhat more active if the bill is passed, but mere activity is not important. The question is, What kind of action is he taking?

The Commission complains that they were mechanical, and I say to you that the trustee who was mechanical before, who was indifferent to the interest of the bondholders, will be just as mechanical under this bill as he was before, only he will be following the rule of thumb laid down by the Commission instead of exercising intelligence.

As to the trustees—whom I assert represent the great majority of trustees—who do take an active interest in the bondholders, and who heretofore have attempted to protect them, and to use their best judgment for their protection as they would do if they had their own money at stake, such trustees will have to be more mechanical in the future because the liability that is placed upon them will make it impossible for them to do otherwise.

I think the subject matter of this legislation requires a much greater study than has been given to it at the present time, and I think this bill should not be passed.

I thank you.

Mr. EICHER. Thank you.

## STATEMENT OF HARRY C. ECKHART, VICE PRESIDENT OF THE HARRIS TRUST & SAVINGS BANK, CHICAGO, ILL.

Mr. Eicher. Mr. Eckhart, we will hear you. Will you give your full name, representation, and address to the reporter?

Mr. Eckhart. My name is Harry C. Eckhart. I am vice president of the Harris Trust & Savings Bank, Chicago, Ill.

Because of the time which is so short, I shall confine my remarks to a more or less general nature.

I should like to begin by saying that I heartily approve of what Mr. Amberg and what Mr. Canright have said, and I subscribe to that wholeheartedly.

In addition to the question of the desirability and workability of certain provisions of the bill, in fact, numerous provisions of the bill, there are many very important aspects of this situation to which should be given consideration at this time.

The bill requires the insertion into the corporate trust agreement of many provisions which have not heretofore been found in such agreements. Many of these provisions in turn call for regulations to be promulgated by the Securities and Exchange Commission. These provisions undertake to increase very materially the duties and responsibilities of the trustees under the indenture. The net result of these provisions is that in effect the form of the trust indenture will be very very largely written by the Securities and Exchange Commission. Because the drafting of these additional provisions of the indenture will require considerable study and effort and obviously will have to be revised from time to time in accordance with experience, a great deal of time will be consumed in completing the drafting of corporate indentures.

This naturally means additional expense to the borrowing corporation. The expense will be greatly increased not only at the time of the drawing of the indenture, but for the life of the indenture. This increase in expense is attributable in part to larger fees of attorneys for the borrower, for the trustee, and for the investment banker.

Also because of the increase in the duties and responsibilities of the trustee his fees naturally will have to be substantially increased, and speaking out of my experience of a great many years in this kind of business, I should say that the trustee's fees would perhaps have to be increased several times over what they are now.

At the present time, borrowing by industrial and utility corporations is virtually at a standstill, with the result that business is not going forward. This situation seems to be recognized by all informed persons, and the Federal administration is now engaged in the formulation of various plans by which such borrowing may be stimulated. Only recently the President of the United States announced that a study is being made of means by which loans could be made to utility corporations, so that they in turn might proceed with much needed additional expansion and extensions to their property. Because of the delay and uncertainty which the enactment of this bill would entail, borrowing would be greatly hindered and therefore the effort now being made to stimulate borrowing would be largely, if not entirely, nullified.

Anyone familiar with the scope and purpose of this bill must realize, I am sure, that it is extremely far-reaching in its effect. Therefore it would seem clear that before an attempt is made to enact

it into law, a much more complete study should be made of the problems involved.

In this connection, attention may be well directed to the circumstances surrounding the enactment and the administration of the securities-exchange law. It will be recalled that after the enactment of that law borrowing by means of bonds and debentures was at a standstill for some months. Before borrowers and lenders could be induced to proceed, it was necessary to lessen quite materially the restrictions surrounding the issuance of bonds and it was not until then that borrowing began. Moreover, it has been found necessary from time to time to further lessen the restrictions and only this morning Mr. Douglas told you or has referred to making additional further changes in the registrations which would stimulate borrowing on the part of corporations.

Although everyone recognizes that certain abuses, and undesirable practices have existed in connection with the administration of some corporate indentures, they have been confined to a very large extent to inexperience and lack of training of the trustees.

The bill as it now stands proposes to exempt from the operation of the act those issues of securities aggregating less than $250,000. Most of the difficulties experienced during the past several years have been with respect to these smaller issues and therefore the bill largely fails of the purpose by exempting such situations.

The more experienced trust companies have for the most part for years recognized and put into effect some of the procedure specified in this bill.

For these reasons, there does not seem to be an emergency such as would require the enactment of this piece of legislation at this time.

The enactment of this bill would in the opinion of many experienced trust men tend to concentrate the business of acting as corporate trustees under indentures very largely in the larger cities and deprive many localities of the advantage of having such matters administered in those localities where there is great familiarity of the problems of the particular corporation or industry.

Mr. EICHER. Thank you, Mr. Eckhart.

Mr. ECKHART. Thank you.

## STATEMENT OF G. R. HELFFRICH, TRUST OFFICER, CITY NATIONAL BANK & TRUST CO., CHICAGO, ILL.

Mr. EICHER. Mr. Helffrich. Will you give your full name and your address to the reporter.

Mr. HELFFRICH. Mr. Chairman: My name is G. R. Helffrich, trust officer, City National Bank & Trust Co., Chicago.

I have read and briefly studied this bill and while I do not pretend to be familiar with all of its technical aspects, I do feel that I know enough about it to make these general observations.

It is difficult to understand the necessity for legislation of so drastic and such far-reaching effect as that contemplated by this bill, especially so at a time like the present when everything possible should be done to avoid what might further tend to complicate the orderly functioning of the capital markets.

The bill is based largely on reports made to Congress by the Securities and Exchange Commission, which Commission is charged with the duty of protecting the interests of the security holders.

I entertain no doubt but that the Commission was motivated by the best of intentions, but am somewhat fearful that some of the provisions of the bill which theoretically may benefit the security holders might in reality have very little effect upon them.

For example, premature or untimely default action on the part of the trustee prompted solely by the desire to free itself of possible liability under the rigid requirements of the bill, might well be detrimental to the interests of the security holders.

Likewise, it seems unreasonable to expect that credit will be extended by indenture trustees to an obligor if there is imposed on the bank the burden of proving that it had no reasonable cause to believe that the obligor would default on the indenture security within 4 months, and this might adversely affect the interests of the security holders, particularly if the obligor is unable to obtain credit elsewhere, which well might be the case.

Another matter which merits careful thought and consideration of this bill is the result which might be produced from the unwillingness of financially responsible and ably staffed trust companies to assume the burdens and liabilities imposed upon the trustee in the probable diversion of indenture trusteeships to weaker and less competent institutions. And in this connection, also, the matter of how much the bill might conflict or interfere with the control and supervision of the Federal Reserve Board which should be vitally interested in any liabilities assumed by member banks of the Federal Reserve System.

Indenture securities issued under corporate trust indentures in most cases have maturities extending over many years, during which time economic conditions will be constantly changing. Unless some flexibility is permissible under the terms of the indentures by which such securities are secured to meet these changing conditions, the security holders may in many cases be harmed by the rigid restrictions which were designed to protect them. Such flexibility should be provided by vesting discretionary powers in the trustee without exacting further responsibility than the exercise of good faith in the light of circumstances existing at the time the power was exercised.

Our counsel in matters of corporate trust administration has repeatedly stated to us that the elaborate exculpatory provisions which commonly appear in trust indentures are not as effective as they might seem and has advised that the indenture trustee is bound to act in good faith and exercise reasonable care. The provisions of the bill in this regard should not go further than to require from the trustee good faith and reasonable diligence.

The conflicting interest provisions are entirely too complicated to be strictly complied with by a trust company of any size. It would perhaps be preferable from the standpoint of all concerned simply to provide that the indenture trustee shall be liable for losses suffered by the security holders to the extent that advantage was gained by it at the expense of the security holders.

In its present form the bill vests in the Securities and Exchange Commission powers which are so broad, if legal, as to practically permit the Commission to write the indenture, thus taking out of the hands of the real parties to the transaction the privilege of making their own contract, a condition which seems to be entirely unjustified

under the circumstances, and in all probability a dangerous undertaking insofar as the Government itself is concerned.

I have two general recommendations to make.

1. No legislation on the subject matter of this bill at a time like the present when numerous other obstacles stand in the way of orderly functioning of the capital markets.

2. Constructive efforts to approach the matter of framing a bill of this nature, for presentation at an opportune time, from the standpoint, essentially, of simplicity, flexibility, and not imposing too drastic liability on the trustee in respect of the trust estate which is not under its direct control and supervision.

(a) Providing that indentures covering securities required to be registered with the Securities Exchange Commission must have as one of the trustees thereunder an institution, authorized to exercise corporate trust powers, which is subject to Federal or State supervision or examination.

(b) Providing that the same institution shall not be eligible to act as trustee under more than one indenture of the same obligor.

(c) Providing some reasonable penalty for advantage gained by the indenture trustee, individually, at the expense of security holders.

(d) Restricting exculpatory provisions in indentures to the extent of exacting from the trustee good faith and reasonable diligence in the administration of its trust functions.

3. Further impartial investigation by the Government, either through the Securities Exchange Commission or available banking channels of the general practice and policies of trust companies in matters of indenture trustee administration by member banks of the Federal Reserve System. It is suggested pertinent data along these lines might be obtained at very little expense to the Government by utilitizing the facilities of bank examination.

Mr. EICHER. Don't you feel, Mr. Helffrich, that there is a probability of increased investor confidence which would result in greater mobility in distribution of securities if there can be accomplished the standardization that this bill contemplates?

Mr. HELFFRICH. I do not so understand. I have not heard any investors complain outside perhaps of this real estate situation—there were a few no doubt in the Commission's report which I understand was made on the basis of an examination not only of banks and trust companies which may be members of it and you understand subject to national supervision, but was made of this whole situation generally which included individual trustees and special banking houses in some cases which had the whole thing in their own shop. They acted as trustees; they sold the bonds and were perhaps affiliated with the obligor.

Mr. EICHER. On all four sides of the same table?

Mr. HELFFRICH. There is no question about it; but those situations I think existed largely in the real estate field, so-called real estate mortgages, and goodness knows when the time will come again that will be possible to float these so-called real estate issues.

Mr. EICHER. Thank you.

Mr. HELFFRICH. Thank you.

## STATEMENT OF F. E. FROTHINGHAM, PRESIDENT, INVESTMENT BANKERS' ASSOCIATION, BOSTON, MASS.

Mr. EICHER. Mr. Frothingham.

Mr. FROTHINGHAM. Mr. Chairman and gentlemen of the committee, my name is F. E. Frothingham. I am president of the Investment Bankers' Association.

Mr. Chairman, the time is running very short and so I will say but a few words, because I desire that some of my associates may say what they more particularly like to.

Mr. EICHER. The clerk has an allocation of an hour and a quarter for the remaining witnesses. That would be 15 minutes for each.

Mr. FROTHINGHAM. I will be short, nevertheless.

So much has been said here that is in support of our general views to which I want to refer particularly, but I think they corroborate the feeling of the governing board of the Investment Bankers' Association, which is unanimous that fundamentally the approach to this bill is not along lines that will be productive of the best results and that especially this is not a time to engage in further legislation of this sort.

I know of the careful study that Mr. Douglas has made of this subject since before he was Commissioner. I have read his reports and no sensible man can other than be condemnatory of the practices that were there outlined.

All of my business experience has been more or less in contact with mortgages, in contact with these affairs, and I am appreciative of the faults that need correction, but I cannot yield even to Mr. Douglas in my desire to see those faults corrected and the conduct of business brought to a high plane.

Nevertheless, the fundamental approach to this subject in this bill seems to us a mistaken one. It is on the theory primarily of approval by the Commission. The full disclosure theory has been widely departed from in this suggestion.

If I understand the approval theory it is that over and above all other rules which the Commission might make, they are largely, if not entirely, controlled by their independent and unregulated judgment of what they believe to be for the public interest and for the protection of investors. That clause appears I think some 22 times in the bill.

Mr. EICHER. You understand, of course, that is to meet the requirements of the Supreme Court.

Mr. FROTHINGHAM. Well, under that clause, rules and regulations can be made, among other things, as to title for the issue, method of handling debentures, maintenance of certain ratios of assets; terms for issues of additional bonds, or for the release of property; substitution of property or collateral; use of proceeds of released property; in the event of default, methods of foreclosure duties of trustees and in connection with other provisions of the indenture.

Now, the objection to that theory, gentlemen, is this: That it substitutes the judgment of a commission, which unfortunately must be made up of changing personnel as time goes on, for the judgment of both the borrower and the lender. It sets the Commission at the counsel table and gives the Commission final decision with regard to these various items.

That has the effect of dulling independence and the eagerness of both the borrower and lender to do their best with the situation. Their responsibilities automatically take an instinctive shift to the Commission. The Commission, as we see it, does, in fact, define in a very large measure the provisions of the mortgage. True, it cannot touch such matters as the amount of the issue. It can touch the maturity items and things of that sort, but those are not major considerations.

As time goes on conditions change. Nobody can tell what will be the judgment of the Commission. The whole subject remains indeterminate and unfinished and leads to a quality of confusion that we do not believe can be productive of the most desirable results. Further than that, we cannot see from a reading of the bill carefully, or as carefully as we can, from the point of view and objective study which we always want to make, that the objective sought by the bill will, in fact, be reached.

My associates will speak more particularly on the details of that, but, in general, that would be my judgment and it is the judgment of the Investment Bankers' Association.

The application of the rules under this bill will surely result in developing almost immediately another series of corrections that will be required.

I realize that the corrective processes must be more or less a cut and dried one. Mistakes will be made and corrections will be made, but in our judgment this bill approaches the subject from so fundamentally an unfortunate angle in itself and one we feel so confidently will not cure the evils involved, that for those reasons we think the bill should have further study. We would like to give it further study. We would like to see, and I personally would like to see, a group of men get together with the Commission, a lender, a borrower, and someone representing industry—a banker—to study this situation.

I know that it may be felt by you and by others that the interest of the investment banker is a purely selfish one. That perhaps is not an unnatural feeling. But I would like to call your attention to the fact that the success of the investment banker, the profitableness of his business, depends primarily upon the free flow of the capital markets, the constant borrowing and lending, and the constant investments by security holders. There is where our selfish interest lies. So that we want to see all these various interests, so far as we can and in accordance with our good judgment, protected, as they can be.

It has been pointed out how the bankers might be injured. We are interested in the banking situation, that it may remain solvent; that it shall perform its duties; that it will always be healthy. We are also interested in the borrower's situation, that he will gradually come forward and try to get money, and that undue restraint be not placed upon the machinery for getting it.

We are interested in the purchaser. The purchaser is usually a group of investment banking houses who buy with their own money and hold in their own accounts.

My experience has been, and I have had a good deal of it, that in the overwhelming majority of cases their effort is to protect the people to whom they are going to sell securities. If they cannot succeed in

protecting those people and so devise as good an instrument as may be possible, they injure themselves in the long run.

Now, I understand that the remote customer is not a party to the decision. He cannot be. I understand that the borrower may lay down certain terms and say to the purchaser, if you do not want this "piece of goods" we will sell it to somebody else. Some conditions are more or less inevitable at all times in whatever occupation we are engaged.

I will not pursue that further, but I would like to emphasize those two points, that the fundamental approach to this bill, we think, is not a wholesome one, that there is danger in legislative procedure, and that this is not the time to put through legislation of this sort.

May I refer for instance to the right of appeal which Mr. Douglas said that, of course, was available; but consider how attenuated is the right of that appeal? What are you going to appeal from, and if you are successful in making an appeal, how long is it going to be before the appeal is settled and you know where you stand? In the meantime a market has gone by; the need of a situation has gone by. You are thrown into a confusion as a result of unnecessary delay.

With regard to the provisions that require that the nonassenting bondholder shall be able to maintain his rights, let me say there again over the long experience that there has been a constant evolution in the method of writing mortgages. In the old days the terms were explicit. There were a lot of protective features injected for the benefit of the ultimate purchaser and there was no provision provided, no modification clauses, as they are called in mortgages.

As time went on occasions came up which developed the mistakes, made clear many of the mistakes of the restrictive provisions in mortgages, and the inclusion of clauses allowing for the modification of the mortgage were inserted.

As a rule that provision presented modification either of the due date, the interest rate, or the nature of the lien, but as time has gone on, as we have seen the experience in other countries, it is beginning to look very much as though the greatest interest of the bondholders would lie in a more expanded clause which prior to the default or prior to receivership or bankruptcy proceedings would enable such a majority of the bondholders as would unquestionably represent the best interests of the whole group of bondholders to override the desires of a small minority.

We would all at once say that if 99 percent of the bondholders agreed to something, 1 percent ought not to be able to hold them up. Between that and some lower figure, there is an opportunity for judgment, but the direction of the tendency of writing these mortgages is to enlarge those provisions so that the incidents coming up, innumerable as time goes on and innumerable unforeseen circumstances make it possible to create conditions not rigid, but on a more flexible basis.

Now, with regard to the limitations that are put on the action of the trustees: It seems to me that has been very well explained here. Many of them result in unhappy results. The definitions of what constitutes conflicting interests are so meticulous and to such refined limits that they do not, it seems to me, accomplish the objects in mind. They simply cannot. One has got to depend on a certain amount of discretion, on a certain amount of ability and good will.

The method of approaching that subject is, I believe, by an entirely different route.

Now, since time is short, I will wind up, if I may, by reading, Mr. Chairman, a statement that was made in the statement to the Senate committee with regard to this being an undesirable time for putting through this type of legislation.

Mr. EICHER. Did the investment bankers participate in the Senate hearings last summer?

Mr. FROTHINGHAM. Last summer, Mr. Buttenwieser, who will speak in a few moments, participated, made a statement, which while it was not on the bill as it stands today, still, reaches the fundmanetal structure of today's bill.

Our broad objection to the bill is on the grounds of present expediency. The timing seems unfortunate. Since the bill was first introduced, circumstances in the business world have altered fundamentally and unfortunately very much for the worst. An emergency in the national economy has arisen. The paramount issue therefore is now to avoid every move which will retard the functioning of the capital markets. There is in this suggestion, of course, no intention to deny the advantages that under more normal conditions would flow from a modification of some trust-indenture practices. But we cannot escape the conclusion that the serious deterrent effect at present on the flexibility of capital markets in the passage of this minutely regulative, time-consuming and cost-increasing legislation should and can now be avoided.

It would, of course, be unfair to magnify the importance of this proposed legislation. Its nonpassage will not of itself free capital markets. There are too many other factors also involved. Neither would its passage kill the investment-banking business, but it would unquestionably be a definitely retarding influence in the recovery of the capital markets.

This is not a plea of evasion, but is rather a plea that realism prevail at this critical juncture. Business now needs a relief from unnecessary repressions that it may employ labor and pay the costs of government. These considerations, we submit, are in themselves controlling on the score of present expediency.

A very great light of hope would be given to the capital markets if some way can be found, as I know Mr. Douglas and the Commission want to find it and are working toward it, to simplify the present processes that have come into existence so that without departing from the correction of abuses sought the process of arriving there may be simpler to understand and facilitate in that way the entire process of the capital markets.

There are being created, sir, too many distinct bottlenecks which are preventing the free flowing of the capital markets, with the net result that temptation is always put on Government to find some way by creating additional agencies to take up what is called the slack. That is one of the thing which led to the passage of the Glass bill enlarging the lending facilities of the Reconstruction Finance Corporation. That has in fact put the Reconstruction Finance Corporation into the investment banking business.

I am not going, for the moment, to say whether in the end that will prove desirable or otherwise, but what I do say is that it has in the immediate present added another doubtful factor, another hazard,

another difficulty, in the way of the investment banking fraternity helping in this situation.

Mr. EICHER. Thank you.

Mr. FROTHINGHAM. Thank you.

## STATEMENT OF OSCAR W. HAUSSERMANN, BOSTON, MASS.

Mr. EICHER. Mr. Haussermann, we will hear you.

Will you give your full name and address to the reporter?

Mr. HAUSSERMANN. Mr. Chairman, my name is Oscar W. Haussermann; my address is 50 Federal Street, Boston, Mass. I am a partner in the Boston law firm of Ropes, Gray, Boyden & Perkins.

Mr. Chairman, I have been asked a number of times to come to Washington and speak before committees. This is the first time I have ever come to speak.

I am here in opposition to this particular bill, and I hope you will believe me when I say that my opposition does not issue from any reactionary spirit or any instinctive hostility toward Federal regulation in itself.

I appreciate the fact that this Barkley bill is born of a fin  spirit of desire to protect indenture security holders, and a sincere  nviction that indenture trustees should be forced to transform thems ves from passive to active trustees and to free themselves from confl cting interests, and I recognize that this particular bill involves at one phase with the general but very difficult problem of how much and what kind of Federal regulation and of industry and finance is reasonably necessary or advisable in the public interest.

I oppose this bill not because I am against Federal regulation, but because I think this particular measure entails excessive and the wrong kind of governmental regulation.

The bill, read against the background of the Securities and Exchange Commission report of June 1936, appears to stand for three general propositions:

First: The proposition, about which there is no dispute, that trust indentures now in common use are complacent toward the idea of passive trustees as distinct from active trustees, and do not say the right things or discourage or prevent trustees from acquiring conflicting interests;

Second: The proposition, which I think is highly debatable, that, taking the Nation as a whole, the functioning, or rather the lack of functioning, of trustees generally under these trust indentures has created a national evil; and

Third: The proposition, in which I do not concur at all, that the protection of investors and the general welfare require governmental regulation of the specific nature and scope contemplated by this Barkley bill.

I do not quarrel with the professed general purpose of the bill, but I do have misgivings as to the necessity or wisdom of the specific means it embraces to achieve its purpose.

I have time only to announce or advance three general objections to the bill, which I think are the principal objections.

My first objection is this: The bill says in effect that the statutory provisions of the moment and the regulations of the moment shall be picked up and set down into each long-term contract under which

corporate obligations are to be issued, forced into trust indentures, whether they have a life of 20 or 30 or 50, or more years.

Now, I know that neither the Congress nor the Commission assumes omnipotence or infallibility. Therefore, I think it is accurate to say that this feature is on the face of it practically certainty that after experience, trial, and error the Congress on the one hand will find some of the statutory provisions that it forced into indentures were either unnecessary or unwise or unworkable, and that the Commission on the other hand will find that some of the regulations which it had forced into indentures as contractual parts of those indentures are unwise or unworkable.

In other words, this particular bill if enacted will produce each year a crop of long-term indentures which would embrace the statutory provisions and the regulations of that year and would continue to embrace those regulations and statutory provisions even though long ago the Congress or the Commission had abandoned some of them.

Mr. Douglas has suggested that an answer to this objection is an easy amendment clause in the indenture. Well, as you know amendment of a statute and regulation is one thing. Amendment of a formal and formidable long-term trust indenture is another and different thing.

It makes good sense to avoid inflexible statutes and regulation and therefore it makes good sense to leave the Congress and the Commission comparatively free to amend statutes and regulations.

On the other hand, a corresponding flexibility and facility in amending trust indentures would, in my opinion, work a serious handicap on the sale of these indentures. First it would leave the original buyers of securities with less assurance that their original bargain will remain substantially intact.

I do not think that these suggestions that an easy amendment clause in the indenture is a sound answer. I think the easier it is to amend the indenture, the more difficult it is to effect sale of the indenture securities.

A second objection centers around those provisions which have the effect of subjecting bank deposits to increased risk by virtue of the extra chances or large liabilities which the trustees, by virtue of this bill, are obliged to run.

I think it is sound and logical and one of the purposes of this bill, is to impose upon trustees higher standards of conduct with attendant risks of large liability. As to whether this is merely regulatory, I just suggest consideration of a case that might easily arise of some bank being obliged to pay under this act a very large liability that forced it to close its doors, and then the balance between the protection of depositors and protection of the indenture security holders will be obvious.

The third objection centers around those provisions of the bill which put the Federal Government in the business of writing a goodly portion of each trust indenture on the Commission's own terms.

Except for certain matters, such as the interest rate, the amount of the issue and the nature of the original security, the matter of sinking fund and the terms governing the sinking fund; the matter of whether the bonds are to be convertible and the terms and conditions of the

conversion, the call price, and so forth; except for these matters, the parties closest to the situation, closest to the issuing company, and its business, and its financial needs, and closest to the market of the buyers would be denied the right to determine the terms of the indenture.   Each indenture would have to be taken to Washington, to the Commission, which would have practically unlimited power to prescribe the provisions which the bill says the indenture shall contain.

Now, it is true that the bill purports to qualify or limit the powers of the Commission when it prescribes these provisions of the indenture which, however, I submit that these qualifications or limitations are merely rhetoric rather than real.

To illustrate: In one part of the bill the Securities and Exchange Commission in defining the trustee's duties before default is to be guided by what it terms to be consistent, by the duties which a prudent man if he were a trustee would assume and perform.   In another part of the bill the Securities and Exchange Commission in writing out the provisions as to the trustee's duties in case of default, is to be guided by what it, the Commission, deems would be the duties which a prudent man would be expected to observe if he were a fiduciary and had the degree of skill which the indenture trustee has or says it has, whichever is higher.

In another part of the bill where the Securities and Exchange Commission is empowered with determining the provisions with respect to release and substitution of property and with respect to additional issuance of indenture securities and with respect to satisfaction and discharge of the indenture, the Commission may insist upon such provisions which the Commission deems adequate in the light of the bargain of the parties, having due regard to the public interest and the interest of the investors.

And in the final part of the bill, when the Commission determines the provisions defining default and governing the trustee's rights and powers with respect to entry into possession of the trust estate, and so forth, the Commission is guided merely by what it shall deem adequate, having due regard to the public interest and the interest of investors.

I think this language justifies these two concluding remarks:

First: The question of whether the Securities and Exchange Commission is observing the proper standard is virtually left to the determination of the Securities and Exchange Commission itself.   If the Securities and Exchange Commission is wrong, or an aggrieved party thinks it is wrong, the only redress is an appeal to the courts, and until the courts finally decide whether the Securities and Exchange Commission was right or wrong in a given case, any refusal by the Securities and Exchange Commission to qualify an indenture and to permit the public sale of the indenture securities continues in full force and effect.

Second: If an indenture must contain a certain provision, then as a practical matter, the language or scope of that provision must be whatever the Securities and Exchange Commission deems it ought to be.

Now, I realize that my objections have less force, if there is no other means by which the worthy aims of this bill could be achieved. I see no way of avoiding giving the Commission the unlimited powers I have just mentioned, if you are going to pass a bill like the Barkley

bill, which requires the Commission's prior approval as to form and substance of the indentures before indenture securities may be sold. The probable necessity of clothing the Commission with such power if such a bill is to be passed is, in my opinion, the reason why a bill of the Barkley type should not be passed.

I believe it is possible to frame a bill that would meet each of the three objections I have just named and at the same time achieve substantially the general aims of the Barkley bill.

The type of bill that I have in mind would embrace these salient features—and I hope to close this very shortly. I do not want to develop a blind spot as to the possible test of this type of measure.

First. Such a bill would make it unlawful to use the mails or instrumentalities of interstate commerce to offer or sell or send indenture securities unless the same are issued under an indenture having as a party thereto a qualified indenture trustee.

Second. No banking institution—now, we are invoking our laws—no banking institution, Federal or State, would be a qualified indenture trustee unless, except by virtue either of (1) membership in the Federal Reserve System or (2) an agreement with the Board of Governors of the Federal Reserve System, it was subject to the rules and regulations of the Federal Reserve System as to the duties which corporate trustees were to have and the System's rules and regulations as to the standards to be observed in the performance of such duties.

Third. The statute and these rules and regulations would say—this is flexible—that the contracting parties who frame the trust indenture, namely, the underwriters, the issuer, and the corporate trustee, are free to trade out the terms of the indenture but that, notwithstanding any provisions of the indenture to the contrary the trustee shall have certain statutory duties and be subject to certain statutory standards of performance.

Fourth. Any breach by the trustee of these duties or any deviation from these standards would entitle the Federal Reserve System to suspend or revoke the trustee's right thereafter to serve as a trustee or to engage in the trust business.

Fifth. This penalty would be the only penalty so far as the statute went. In other words, a breach by the trustee of his statutory duties or of the rules and regulations of the Federal Reserve System would not affect the validity of the indenture or the validity of the securities and would not entitle security holders, by virtue of the statute, to any civil rights in the nature of damages or rescission as against the trustee. Whatever civil rights in the nature of damages or otherwise which the security holders would have would be dependent solely upon the terms of the indenture itself.

Sixth. The filing or registration or governmental approval of trust indentures would not be conditions precedent to the right to use the mails or interstate facilities to offer, or sell, or send the indenture securities.

A bill following the foregoing general outline would not, of course, have as many teeth in it as the Barkley bill. However, I believe it would have sufficient teeth to bring about the principal aim of the Barkley bill—namely, the aim of transforming corporate trustees from passive to active trustees. And in so doing, such a bill would not place permanently into trust indentures as integral, contractual parts

thereof the statutory provisions and commission regulations of the moment; would not subject bank depositors and the banking structure of the country to the jeopardy which the Barkley bill would create; would not place the Federal Government in the business of writing a goodly portion of future trust indentures; and would not involve the impedimenta on the flow of private capital into private industry which the registration requirements and approval theory of the Barkley bill entail.

Mr. EICHER. In connection with your suggested amendment, Mr. Haussermann, do you honestly believe that public opinion would stand for such an enlargement of the money monopoly that the Federal Reserve System already has so as to include within its control practically the entire investment field?

Mr. HAUSSERMANN. The suggested bill by virtue of using the power of commerce under interstate commerce would draw in all commercial banks which would like to engage in the corporate trustee business.

Mr. EICHER. I understand that.

Mr. HAUSSERMANN. They would have to file an agreement in keeping with the provisions.

Mr. EICHER. As I understand you, the trustees in all cases would have to be members of the Federal Reserve System.

Mr. HAUSSERMANN. No. No one could be a trustee, indenture trustee, unless (1) he were a member of the Federal Reserve System, or (2) he filed with the Federal Reserve System an appropriate agreement which would subject itself to the rules and regulations of the Federal Reserve System.

Mr. EICHER. That would certainly be substituting Federal Reserve regulation in place of regulation by the Securities and Exchange Commission.

Mr. HAUSSERMANN. But, the point there is that the rules and regulations would impose statutory, or the statute would impose statutory duties. The parties drafting the indenture would be free to draft as they are now, but I seriously think that if the statute and the regulations forced upon trustees the rule of active trustees, as distinguished from passive trustees, the substantial aims, the salient aims of this particular bill would be achieved. The penalty, I think, is a real penalty—suspending or revoking the power to the commercial banks to engage in that business hereafter. If a bank outside of the Federal Reserve System did not file this agreement then the indenture would not have as a party thereto a qualified indenture trustee and thereefore those bonds issued under that indenture could not be sent through the mails or interstate facilities.

Mr. EICHER. Any questions?

Mr. BOREN. I have no questions.

Mr. EICHER. Thank you.

Mr. HAUSSERMANN. Thank you.

## STATEMENT OF BENJAMIN J. BUTTENWIESER, NEW YORK, N. Y.

Mr. EICHER. Mr. Buttenwieser, will you give your full name and address to the reporter?

Mr. BUTTENWIESER. My name is Benjamin J. Buttenwieser, 52 William Street, New York City. Mr. Chairman——.

Mr. EICHER. Representing whom?

Mr. BUTTENWIESER. The firm of Kuhn, Loeb & Co., investment bankers, New York.

I am chairman of and here represent the Investment Bankers Association of America's special committee on trust indentures.

At the very outset, Mr. Chairman and Congressman Boren, I would like to point out that with a view to being helpful in this entire situation, the Investment Bankers Association in the spring of 1936, when this subject was first broached by Commissioner Douglas' report on trustees and trust indentures, appointed a special committee on trust indentures, of which committee I have the honor to be chairman.

The first memorandum submitted by this committee contained a statement which I should like to read to you this afternoon, because it embodies the principles of conduct which the Investment Bankers Association has sought to follow in its consideration of this legislation.

It stated that:

The Investment Bankers Association wishes to emphasize that, for the continued improvement of financing methods and standards and for the protection of investors, it heartily favors any legislation which will better serve and safeguard the important interests of investors and borrowers, which the investment banking business serves

and result in what Commissioner Douglas rightly desires, as do we all, namely, the restoration of investors' confidence with a further resultant easing of the capital market.

In the interest of saving your time I have not sought to read to you gentlemen the memoranda that we have already submitted in opposition to this bill.

They have already been incorporated in the Senate record of the hearings and they are available to you, or we can submit copies to you.

Mr. EICHER. We have the Senate hearings available.

Mr. BUTTENWIESER. I would like to point out, however, that broadly speaking we feel that the basic defects enumerated therein are still generally valid. Furthermore, due to the lateness of the hour and due to the fact that Commissioner Douglas and others have so lucidly explained the bill, there is no need of my consuming your time by a repeated analysis of it and I will confine myself merely to considering four questions raised by the bill which I, as chairman of the committee, consider basic.

They are the result of sincere study and reflection and I hope you will realize that they are neither selfish nor captious.

The first question is whether the entire field of the terms of securities issued under trust indentures as differentiated from the duties of trustees is susceptible of legislative regulation. In that regard, I might pause for a moment to say that the Investment Bankers Association's special committee studied the practice with regard to trust indentures and with regard to the issuance of securities under such indentures in England, France, Germany, Switzerland, and Holland, and we failed to find any regulation such as is sought to be embodied in this bill as to the terms of securities.

I would suggest that the reasonable inference from that study is that possibly trustees' duties might be standardized and regulated, but the terms of the securities themselves cannot be so regulated.

I would not for a minute mean to suggest that we have exhausted this study in all of the countries of the globe, because it was impossible for us to study all of them. Our unfamiliarity with the very languages

would prevent our studying it in some of the oriental countries; but
our most sincere effort to make a careful survey of leading financial
centers of the world, those I enumerated, resulted in our being unable
to find that the terms of securities were susceptible of that type of
regulation.

Possibly that may account for why a part of the American Bankers
Association appears to approve the bill, whereas the Investment
Bankers Association, the part I represent, must necessarily disapprove
the bill.

Now, I concede that the duties of trustees flow from the indenture
provisions that are set up in any indenture, but this bill goes much
further.

It will perhaps not be unfamiliar to you gentlemen if I repeat that
this is an approval rather than a disclosure form of statute.

The Securities Act is a disclosure form of statute and I doubt that
anybody can validly dissent from that principle.

We, however, say that disclosure is adequate.

Approval is something quite apart from that and the reason I say
that disclosure is adequate is that, with all due respect to Commis-
sioner Douglas, who made a very careful study of the subject, in most
cases the underwriter is not, as was suggested this morning, a commis-
sion merchant.   He is the primary purchaser and he wants to buy a
saleable security.   Under the Securities Act, the terms of the security
must be fully disclosed.

Now, I say in most cases the investment banker is not a commission
merchant.   Of course there are certain cases, and perhaps that is what
Commissioner Douglas had in mind this morning, where the under-
writer sells securities on an agency basis, that is, does not assume an
unqualified obligation to buy an entire issue.   He sometimes takes
them on what the term would imply, that is, he takes on consignment.

I submit, however, gentlemen, that is the exception rather than the
rule.   Usually the underwriter either buys an issue outright with no
reservations and no safeguard toward assuming anything but an
unqualified obligation to pay for those securities at a certain time, or
in the case of the underwriting of securities which are being offered to
shareholders, because of the mandatory provisions of the stock of the
corporation in question, he stands ready to take the unsubscribed
portion.

So from those two aspects the investment banker, as he is termed,
is a merchandiser of securities.   He buys securities in order to sell
them.

The original parties, therefore, to a contract are the investment
banker, the underwriter, on the one hand, and the obligor on the
other.

The trustee really acts in a representative fiduciary capacity and
the reason I described the underwriter's role at some length, gentle-
men, is because this bill in its preamble recites—and I am quoting
now:

That the national public interest and the interest of investors in notes, bonds,
debentures, evidences of indebtedness, and certificates of interest or participa-
tion therein which are offered to the public, are adversely affected—

(6) When, by reason of the fact that trust indentures are commonly prepared
by the obligor or underwriter in advance of the public offering of the securities
to be issued thereunder, such investors are unable to participate in the preparation
thereof, and, by reason of their lack of understanding of the situation, such inves-

tors would in any event be unable to procure the correction of the defects enumerated in this subsection.

Now, I submit, gentlemen, that this is not a precise or realistic representation of what takes place. The investment banker is the primary purchaser of security issues. So in the first instance he becomes the investor, but as I pointed out a moment ago, no investment banker buys those securities for permanent investment. If for no other reason he would not have the capital to pay for and continue to hold, all securities he buys. Second, he is, as he is called in England, a merchant banker, merchandizing securities, just the same as a department store buys shoes; buys them and resells them to the public. Therefore, if for nothing other than a selfish reason, the investment banker is at pains to see to it that the terms of the security are as attractive and the safeguards as numerous as it is reasonable to include in the securities which he seeks to sell to the public.

Mr. EICHER. Yet, he does not become an endorser when he sells them.

Mr. BUTTENWIESER. No; neither does a seller of shoes become a guarantor that those shoes will last for a certain length of time; but I submit, Mr. Chairman, there is no one more ruthless in his appraisal of the merits of a security or of shoes, if you will, than the public, and if I buy shoes from Macy's in New York, or some store in Iowa, and they do not last very long, I will be quite certain not to buy shoes at that store again. So likewise if I buy and sell securities which the public has a bitter experience with because I have been short-sighted or have been negligent or inefficient in formulating their terms, the public soon puts me as an investment banker out of business, because it ceases to buy my securities.

Now, it was for that reason that in a memorandum which we submitted to the Senate Committee which I mentioned a moment ago we stated the very practical test of the situation, demonstrating that this is not the fact.

I am referring now to the citation I just made from the preamble that the investors are not represented, when the terms of a security to be issued are determined upon. The banker who purchases the bonds or securities represents the investors in such an issue. If for no other than a selfish reason, the bankers are naturally zealous in their endeavors to have each indenture under which securities are issued render the greatest possible protection to such securities, so that their resale to the investing public will be more readily facilitated.

A statement such as that cited above—I am referring again now to the statement from the preamble—can only be based on a mistaken view of the realities of the investment situation, or I might add the fallacious principle of reasoning from the specific to the generic, which is an elementary error of logic.

In this regard we believe that the substitution of a governmental agency for an original purchaser, such as the investment banker, in the regulation of the substantive terms and provisions of a security is unsound.

It is our sincere belief that the interests of investors are better served when a governmental agency, such as the Securities and Exchange Commission, sees to it, as it now has within its power to require, that all of the provisions and terms of the security are clearly disclosed.

In that line, I might cite what I think is an analogy. We have had for some years on the national statute books the Pure Food and Drugs Act. Now, the Pure Food Act, as I understand it, requires a clear and lucid description of the contents of any food or drug container. If one sells Sloan's Liniment one must reveal what the contents are. However, as I understand it, the act does not guarantee that Sloan's Liniment will cure some particular ache or pain nor does it contemplate there shall be no doctor in this country, and one should merely buy certain medicines which will have stated on them what their contents are. Thus, some governmental agency by adding the stamp of its approval, suggests that one need no longer consult a doctor as to the use of a certain remedy.

The reason I cite that analogy is that in addition to being the original purchaser of security issues, a banker performs another very important role. I refer now, of course, to the investment banker. He acts as financial adviser, so to speak. He is in the same position relatively toward his clients as the doctor is toward his patients.

The terms of buying are usually set by seasoned buyers who rely on the advice of the investment banker in whom they have confidence, just the same as I consult a doctor or you gentlemen consult a doctor in whom you have confidence, and those clients are very keen and very alert to sense, as would a patient, any unsound advice given by their financial doctor or any unsound provision in securities designed by the investment banker.

Therefore, if a full disclosure is made, as is already provided for in the Securities Act, similar to the disclosure under the Pure Food Act, we maintain that there is not the further danger that people will feel that any type of governmental approval is included in this supervision, but which might be interpreted as such if this bill became a law.

It has been said at times, and I think repeated here today, that the investment bankers very often would favor the corporate buyer because the corporate buyer if he could not meet the terms suggested by one banker might shop elsewhere.

In that line I would like to submit to you gentlemen a statement which was recently made. It said:

The banker whose business it is to make loans to sell is apt to favor the investor at the expense of the borrower.

Gentlemen, that might sound to you like an investment banker pleading his own cause. It might sound to you like some one who engaged counsel to formulate some catchy phrase which might appeal to the imagination of legislators. However, that statement was made by neither of those types. It was made by one of the most respected governmental officials, and I submit by one of the largest lenders in the country. That statement was made by Mr. Jesse Jones in a magazine article which appeared on June 26, 1937, and I cite it because I feel Mr. Jones' experience will appeal to you gentlemen as adequate refutation of the statement that has been made here previously.

Now, as a result of the provisions which would be included in this bill, instead of defining broad lines on which indentures would be qualified, as we see it, the Securities and Exchange Commission would specifically be approving countless individual issues. This would result in countless substantive rulings approving indentures, rather than

having them approved if they met broad objective principles and general rules.

Commissioner Douglas this morning said—if I misquote him it is only because I did not catch his exact words, but I tried my best and I am trying my best to repeat their general import.

This bill is an attempt to bring uniformly higher standardized practices into the trust field.

We feel every one must concur in that, but much of a substantive nature, perhaps unwittingly, has been included in the bill.

In substantiation of that I would like to point out that on page 13 of the Senate report on the Barkley bill one section states what must be omitted and another section states what must be included. Therefore, I suggest that if on the one hand it is provided what shall be included and on the other hand what shall be omitted, the law intends that the Securities and Exchange Commission shall prescribe the provisions of the indenture.

Now, I should doubt that that is the type of legislation that one wants to pass.

Commissioner Douglas also said that the bill would not go into effect for 6 months, so that the Securities and Exchange Commission would have ample time to draft rules and regulations.

Now, with all due deference, I think that is rather optimistic. I doubt if any specific rules and regulations can cover this broad subject at all. They have not in any of the other countries we have studied; and they have not as to the other broad subjects with which the Securities and Exchange Commission has been confronted over the past 2 years and where it has been found, I believe, that disclosure is still the most adequate safeguard against the ills with which these particular laws seek to cope.

Thus, indentures will have to be separately passed upon by a vast number of administrative assistants and not by the Commissioners themselves. If we could be assured each of them would be passed upon by the present caliber of the Commissioners, then I feel that some of our doubts might be resolved and some of our fears might be allayed. However, the very bill itself contemplates that the indentures themselves will have to be passed on individually, because more often than not the term is used in the bill

that the indenture, to be qualified, shall contain provisions which the Commission deems adequate, having due regard to the public interest and the interest of the investors.

That provides for a specific type of approval.

If rules and regulations were to be a governing principle, then more frequently, I should think, the term would be used which appears occasionally in the bill, namely, that the indentures have to meet certain rules and regulations.

In other words, to sum it all up, the field of the terms of indentures issued under indentures is so broad that I doubt that it can be covered at all by any rules or regulations and will have to be the occasion for individual, thousands of individual, substantive rules.

Now, there is a third——

Mr. Eicher. Will you take much longer? You are over your time now. You will have the privilege of extending and revising your remarks.

Mr. Buttenwieser. I will hurry. There is a third responsibility upon the Securities and Exchange Commission, because I think the investor would have reason to be lulled into a fase sense of security when he purchased securities which, however much you seek to disclaim it, it is known to have been passed upon, that is, the terms have been passed upon by the Securities and Exchange Commission.

Up till now, the only provision has been that there be complete disclosure, and with that, I repeat, no one quarrels, but when the terms are passed upon by the Securities and Exchange Commission, however much one seeks to disclaim it, and such disclaimer is provided in the bill, the investor would be led to believe by illicit salesmen, if you will, but in general there is some substance for their believing that the Securities and Exchange Commission has passed upon the terms of the security and therefore they have passed upon the merits of the security, and that therefore there was not investment risk, and we all know that there are investment risks.

Now, my last point is that as a result of the many and varied rulings which would, I fear, result from this bill, as to the terms of the indenture, no borrower, no corporate borrower, would know in advance to what pattern its indenture would have to conform in order to be qualified. This would cause more delay, more confusion, more expense and more delay in capital financing at a time when capital markets should be expanding, and when, as Commissioner Douglas himself quite rightly pointed out this morning, our economic welfare depends on pumping private capital into channels where it is needed.

So, in conclusion, Mr. Chairman, I should like to say that, however deeply the Investment Bankers Association's special committee considered the subject, and however liberal and progressive it tried to be in its thinking, it is inevitably led back to the belief that full disclosure is the only cure for such ills as may have existed or exist in the field under discussion. We feel that it is sound public policy to entrust to the Commission authority to make certain that the protection which the prospectus represents as being insured to the indenture security by the indenture under which it is issued is actually so afforded. We do not, however, feel that Congress should delegate, or that any governmental commission should assume, the responsibility of passing on the substantive provisions of any indenture.

Though this responsibility may not be apparent from a cursory reading of the bill, a careful analysis of it clearly demonstrates that this is the power with which it vests the Securities and Exchange Commission. It appears to us that through this process the Securities Act of 1933, as amended, is being transformed from an administrative law whose fundamental concept is provision for adequate disclosure, to an approval law whose underlying principle involves specific approval of individual indentures of all types of corporations, large and small, and, through that approval, of securities issued by such corporation under such indentures. Such a transition we firmly believe must inevitably lead to lulling the investing public into a false sense of security and this, of course, is something which we know Congress and the Commission would sedulously seek to avoid.

Mr. Eicher. Mr. Buttenwieser, we all have faith in the ability of the Government to find some persons equally as capable after Mr. Douglas and his colleagues have given up their posts to carry on.

Mr. Buttenwieser. I fervently share your hope.

## STATEMENT OF ALLEN NORTHEY JONES, NEW YORK, N. Y.

Mr. EICHER. Mr. Jones.

Mr. JONES. Mr. Chairman, my name is Allen Northey Jones, 2 Wall Street, New York. I am a member of the Investment Bankers Association's Committee on Trust Indentures and I am an officer and a director of Morgan, Stanley & Co., New York.

In the 2½ years that our firm has been in business we have been the underwriters or managing underwriter for groups of underwriters that have purchased from obligors for resale something over $2,000,000,000 face amount of securities, and of these something over $1,800,000,000, have been issued under 46 different trust indentures.

I have been working on trust indentures for about 18 years, ever since I have been in business.

I want to say that we are against this bill because we think it is wrong in theory. We think that the bill is not the proper method for attaining the ends in view, nor is it the time to pass such a bill.

I want to remark particularly on the effect this bill would have on the preparation of trust indentures. I think we all agree that the aims of Congress, of the Commission, and of investment bankers are the same, namely, that this indenture, this contract between the obligor and the security holder which runs from 1 to 50 or more years should be a fair contract. Certainly the investment banker, as Mr. Buttenwieser said, is interested in attaining this end because in the original instance he usually purchases the securities as a merchant, and he wants to see that he has a merchantable product. If he does not have a merchantable security issued under a fair indenture he cannot continue long in business, as his continuance in business is dependent upon his reputation for selling good wares. Therefore we have been continually striving to get this contract as fair as we can possibly get it between the obligor and the investor.

It is true that there have been faulty indentures, but as a rule it has not been the faulty indenture which has caused the losses which have been suffered by investors. Generally the indentures have worked successfully. With few exceptions the losses to investors have been caused by the business losses of the corporations, not by the faulty indentures.

What does this bill do; how does it affect the preparation of indentures? We have a provision here in section 6 which deals with refusal orders. It says that the Commission shall issue a refusal order which would stop the public offering of the security if it finds that the indenture "contains any provision which is misleading or deceptive, or the elimination of which is necessary or appropriate in the public interest or for the protection of investors to prevent the circumvention or evasion of this act." I know that that sounds all right on its face; and that without analysis everybody would agree with it; but when we look at the Senate committee report on this provision we see that it says:

The provision with respect to misleading or deceptive provisions will permit the Commission to prevent the inclusion in an indenture of a so-called "negative pledge clause" which, though purporting to provide protection to the bondholders, can be so readily circumvented that the protection afforded thereby is illusory.

Now, what is a negative pledge clause? The most generally used negative pledge clause appears in an indenture covering unsecured debentures and says that the corporation will not pledge any of its

assets unless at the same time it ratably secures the debentures issued under the indenture.

Now, it is true that a relatively small number of these negative pledge clauses have been circumvented; but I ask whether it is right to make a rule to do away with all padlocks because some padlocks have been picked.

After the report of Mr. Douglas came out—and it attacked these negative pledge clauses—we talked to a number of institutional purchasers of securities, particularly insurance companies. It does not apply to savings banks, because they cannot buy unsecured debentures. We said to the insurance companies, "Would you rather have the negative pledge provision or not?" And they said, "We want it for the protection that it affords. It is not a perfect protection, but we wish it for what it does afford."

And now it is proposed to leave the insertion or deletion of this kind of protection, that investors want and should have, to the uncontrolled discretion of the Commission which on a theoretical basis may say, "No; we do not think that this is good protection. It is an illustory protection, therefore, cut it out."

Now, I am afraid that the time is getting late and I do not have time to talk about a number of other types of provisions, like the after-acquired-property clause which the Commission may or may not think is illusory or not perfect protection. The negative pledge clause is the only one that is methioned here in the Senate report. I do not know what Mr. Douglas things about the after-acquired property clause.

That is the type of clause where the existing property of a company is mortgaged and then this clause says that there shall be included under the lien any property which may be acquired in the future.

Now, that would seem to afford protection to investors. If we merge two corporations, and they each have the after-acquired property clause in their indentures, there is a conflict between the after-acquired clauses, and the Commission may say that the protection is illusory. I may say that I do not know the answer to that. I do not know what the Commission would think about it. Now, these examples could be added to time after time, and it is proposed to give to the Commission the right to insist on the deletion of any clause which in its discretion it may think is illusory. What the Commission deems to be illusory may be based either on the clause not having worked in some instance in the past or on its not working if some future event should change conditions. People began working on indentures in the eighteen forties. The early mortgage indentures were only 4 or 5 pages long. Now, they are great long documents, and I do not know how within the short space of 6 months or a year we are going to be able to get anything which will be near the perfect indenture. We have been moving forward all of the time and we are trying to improve these indentures all of the time, and I just do not see how anyone can sit down and write a concrete set of rules as to just exactly what these provisions shall be and shall not be.

So much for the veto power of the Commission on the provisions which it in its sole discretion although acting in good faith may disapprove, but still the Commission might be wrong.

On the other hand, we have in section 8 on page 43, line 17 a provision that the Commission has the right to prescribe the form

or forms of any provisions which, pursuant to section 7, are required or permitted to be included in an indenture.

In addition to the indenture provisions about the qualifications of the trustee and the conflicts that might arise in respect to the trustee, starting in with section (e), I find 29 different provisions of the indenture which the Commission may prescribe. In other words, in this——

Mr. EICHER. Section 7 (e) you are referring to?

Mr. JONES. Yes. I do not know whether you want me to, Mr. Chairman, read you off this list of these 29 provisions which the Commission can prescribe in indentures.

Mr. BOREN. You might put it in the record. I would like to have it.

Mr. JONES. I will.

(The list referred to is as follows:)

The 29 provisions of the indenture set forth in sections 7 (e) to 7 (n) inclusive, which the Commission is given the right to prescribe in section 8 of the bill, are as follows:

1. As to reports by obligors.
2. As to reports by the trustee.
3. As to bondholders' lists.
4. As to trustees' duties re recording and filing indentures.
5. As to trustees' duties re applications of proceeds.
6. As to trustees' duties re authentication and delivery of securities.
7. As to trustees' duties re release or substitution of property.
8. As to trustees' duties re satisfaction and discharge of indenture.
9. As to trustees' duties re performance of other obligations under the indenture.
10. As to notice of defaults.
11. As to trustees' standard of action in case of default.
12. As to trustees' reliance on certificates.
13. As to protection of trustee from liability for errors of judgment made in good faith.
14. As to authorization of bondholders to direct action of trustee.
15. As to undertaking for costs of suits.
16. As to obligor's obligation re release and substitution of property.
17. As to obligor's obligation re issuance of additional securities.
18. As to obligor's obligation re satisfaction and discharge of the indenture.
19. As to definitions of defaults.
20. As to right of entry.
21. As to obtaining judgment.
22. As to institution of foreclosure proceedings.
23. As to intervention in judicial proceedings and filing proofs of claim.
24. As to the rights of security holders re accountings by trustees.
25. As to rights of security holders re bringing action to collect.
26. As to rights of security holders re meetings of bondholders.
27. As to qualifications, rights, powers and duties of paying agents.
28. As to restrictions upon employment of attorneys or experts with possible conflicting interests.
29. As to obligor's obligation to record and file the indenture.

Mr. JONES. I submit that, with power to write these specific provisions, and write the indenture to this extent, and to veto other provisions of the indenture if the Commission does not agree with them, you are practically granting to the Commission the right to write the private contract.

There are so many of the provisions which may be prescribed, and this veto power on the provisions which the Commission does not like is so broad that you are giving to the Commission, granting to the Commission, the power to write this contract as between the obligor and the investor.

I submit that that is a granting of power which I hope that you will consider Congress does not want to grant. If Congress wants to make a law to say that only certain institutions shall be qualified to be trustees and a law to say that certain specific minimum requirements, including minimum trustee requirements, shall be contained in these indentures, I suppose that would be good law. I am not a lawyer and so do not know exactly how this should be effected, but I believe that it would be possible to put certain specific things about an indenture in the Securities Act. We can attain many of the ends in view without this broad grant of power to the Commission to enter between businessmen in their orderly borrowing and lending relationships.

There is another thing I want to say one word about in addition to the method of regulation being wrong because of the broad grants of power to the Commission to write the contract. I think the time is also wrong to pass such a bill. Although 6 months is given in which to write the rules and regulations under this bill, I do not believe that rules and regulations which the Commission would think were right could be written in such a short period. Lawyers for as long as I can remember have been working on these provisions, trying to ascertain what they should do, and they cannot decide. We cannot decide. We are always making some progress on them, but we just cannot get them standardized.

Now, we have various forms to file and approvals that we have to obtain in many issues of securities in our capital markets today. Take for instance a public utility. It has to get authority from the State regulatory commissions. If a registered public-utility holding company is involved, it has to get approval under the Public Utility Holding Company Act. It may be that it has to go to the Federal Power Commission also. It has to register under the Securities Act. If the security is going to be listed the company has to file another registration under the Securities and Exchange Act. If the security is going to be listed, the company also has to file an application with the stock exchange on which the security is going to be listed. If convertible securities are to be issued it is necessary to file an application for listing the warrants and another application for when issued trading.

Now, if we put new regulation on top of all that, if this bill is passed and made a law, we will just have one more hurdle, and a great big high hurdle in this case, because the indenture runs from 100 to 200 pages in length and we will have to come down here with lawyers and talk with the Commission and its lawyers, and try to get this indenture passed upon.

Mr. EICHER. You are under those requirements because you want to do business with the general public.

Mr. JONES. Yes, sir.

Mr. EICHER. And a little peddler in a small country town has his license.

Mr. JONES. That is right, but it is a question, Mr. Chairman, of excessive regulation, I would say. There are these regulations now under the Securities Act, and I would say that it is working well and the information which goes to the public has been much better than it used to be in the old days.

Mr. EICHER. If it has worked so well, how do you account for the fact that these fellows did what they did the other day? Those things keep happening.

Mr. JONES. I do not think that that has anything to do with the sale of securities, Mr. Chairman.

Mr. EICHER. Does it not have a lot to do with the losses to the ultimate investor who is going to have to sustain the losses as a result of their defalcations?

Mr. JONES. I mean, this law would not change that. I think we have got a lot of other laws to cover that. If people are going to take money, we have laws on the books now to put them in jail.

Mr. EICHER. I know, but that simply occurred to me while you were uttering that diatribe against Government regulation in general.

Mr. JONES. I would say again against excessive regulation. I think there is a good deal of difference between regulation and such a piling up of laws, because I think that the Commission itself agrees that it would like to put some of these laws together so that there can be more simplified administration. In fact, it is working on it now.

We have in the Securities Act the requirement to file a registration statement, we have in general use a form known as Form A-2. The Commission has been working for months, have they not, Mr. Douglas, trying to get a simplified form for registration?

Commissioner DOUGLAS. We are constantly trying to improve the procedure down at our place.

Mr. JONES. I mention that as an answer to your question. And here, instead of amending and putting what is necessary in existing acts, here we are superimposing on this structure another one, which at this time would just inhibit that much more the capital markets, and it does not appear to me and to the people that I am with that this is the time to do that.

I might say in summarizing that these are the two main points: First, that I think this method of broad grants of power to the Commission is not the way to accomplish the purposes outlined in the bill and second, that I believe that the present is not the time to put through this legislation with its inhibiting effect on the capital markets.

I thank you very much.

Mr. EICHER. Thank you, Mr. Jones, for your contribution.

## STATEMENT OF RALPH CRANE, MONTCLAIR, N. J.

Mr. EICHER. We will hear Mr. Crane.

Mr. CRANE. Mr. Chairman, my name is Ralph Crane, Montclair, N. J. I am vice president of Brown, Harriman & Co., New York.

I only have one thing to say. Our worry about this legislation has been that as we are just as anxious as any one to get this capital market reopened, anything that is done in the way of legislation that delays or extends the time will undoubtedly interfere with the progress we are making.

I do not want to say that this legislation is not sound. I am sure parts of it are very sound, but I am quite sure also that in requiring the approval of the indenture, we are going to add again to the delays of the securities market, things over which we have no control, particularly the corporations, which wish to borrow.

It took some time to meet the requirements and work out the provisions of registration under the Securities Act. It ultimately was worked out. Now, if this is to be added at this time, it seems to me that we are going to have other delays, and my own hope is that Congress will not pass this bill at this time, but will postpone it until some more opportune time and that in the meantime there will be opportunity for further studies that it may be done the best way possible to accomplish the purposes.

I thank you.

Mr. EICHER. Thank you, Mr. Crane.

This closes the hearings, unless Mr. Douglas or Mr. Burke wish to put in a little rebuttal.

Commissioner DOUGLAS. Mr. Chairman, I do not want at this time to submit any additional comments or observations. I would like, if the committee please, the privilege of extending my remarks covering some of the points that have been raised by the witnesses. There have been quite a number of misinterpretations of the bill, as I read it, touched upon by the witnesses and I would like to have the privilege of submitting at the end of this testimony, at this point in the record, a summary of some of those major points which I think deserve further comment.

Mr. EICHER. That will be confined to a factual summary?

Commissioner DOUGLAS. Yes.

Mr. EICHER. Without objection, that may be done.

Mr. AMBERG. Mr. Chairman, if I may say something off of the record.

Mr. EICHER. Yes.

(After informal discussion off the record, the following proceedings were had:)

Mr. EICHER. Mr. Amberg, the clerk makes this suggestion: If you care to submit a list of names of individual banks opposed to this bill in its present form, we will be very glad to include that in the record.

Mr. AMBERG. I do not want to be put in the position of building up opposition. I do not want to be in that position, Mr. Chairman.

Mr. EICHER. Very well, if there is nothing else, the hearings will be closed and the subcommittee will stand adjourned.

(Thereupon, at 5:20 p. m., the subcommittee adjourned as above indicated.)

. ✕