# EXHIBIT F

# REGULATION OF SALE OF SECURITIES

# HEARING

BEFORE A

## SUBCOMMITTEE OF THE

# COMMITTEE ON BANKING AND CURRENCY

## UNITED STATES SENATE

### SEVENTY-FIFTH CONGRESS

FIRST SESSION

ON

# S. 2344

A BILL TO PROVIDE FOR THE REGULATION OF THE SALE
OF CERTAIN SECURITIES IN INTERSTATE AND FOR-
EIGN COMMERCE, AND THE TRUST INDEN-
TURES UNDER WHICH THE SAME
ARE ISSUED, AND FOR
OTHER PURPOSES

JUNE 9, 15, 22, and 29, 1937

Printed for the use of the Committee on Banking and Currency



UNITED STATES
GOVERNMENT PRINTING OFFICE
151514          WASHINGTON: 1937

## COMMITTEE ON BANKING AND CURRENCY

ROBERT F. WAGNER, New York, *Chairman*

CARTER GLASS, Virginia
ALBEN W. BARKLEY, Kentucky
ROBERT J. BULKLEY, Ohio
ROBERT R. REYNOLDS, North Carolina
JAMES F. BYRNES, South Carolina
JOHN H. BANKHEAD, Alabama
WILLIAM GIBBS McADOO, California
ALVA B. ADAMS, Colorado
FRANCIS T. MALONEY, Connecticut
GEORGE L. RADCLIFFE, Maryland
PRENTISS M. BROWN, Michigan
HERBERT E. HITCHCOCK, South Dakota
JAMES H. HUGHES, Delaware
CLYDE L. HERRING, Iowa
WILLIAM H. SMATHERS, New Jersey

JOHN G. TOWNSEND, JR., Delaware
FREDERICK STEIWER, Oregon
LYNN J. FRAZIER, North Dakota
HENRY CABOT LODGE, JR., Massachusetts

LEON H. KEYSERLING, *Clerk*

### SUBCOMMITTEE ON SECURITIES AND EXCHANGE

ROBERT F. WAGNER, New York, *Chairman*

CARTER GLASS, Virginia
ROBERT J. BULKLEY, Ohio
JAMES F. BYRNES, South Carolina
WILLIAM GIBBS McADOO, California
FRANCIS T. MALONEY, Connecticut
JAMES H. HUGHES, Delaware
CLYDE L. HERRING, Iowa

JOHN G. TOWNSEND, JR., Delaware
LYNN J. FRAZIER, North Dakota

II

# CONTENTS

Statement of—                                                                          Page
  Barkley, Hon. Alben W., senior Senator from Kentucky_____      16
  Bradley, Charles B., general solicitor, Prudential Insurance Co. of
    America, Newark, N. J_____ 91, 93
  Brown, Edward E., president, First National Bank, Chicago, Ill_____    122
  Burke, Edmund, Jr., member of the staff of the Securities and Exchange
    Commission, Washington, D. C_____      41
  Buttenwieser, Benjamin J., chairman, Investment Bankers Associa-
    tion of America Special Committee on Trust Indentures, New York
    City_____     185
  Canright, G. S., counsel for the corporate trust division, Continental
    Illinois National Bank & Trust Co. of Chicago, Ill_____   131
  Douglas, William O., commissioner, Securities and Exchange Com-
    mission, Washington, D. C_____      17
  Hanes, Robert M., chairman, committee on federal legislation of
    the American Bankers Association, and president of the Wachovia
    Bank & Trust Co., Winston-Salem, N. C_____      87
  Loeb, Howard A., chairman, Tradesmen's National Bank & Trust Co.,
    Philadelphia, Pa_____     146
  McCollom, H. C., New York City_____     156
  Oliver, Fred N., general counsel, National Association of Mutual
    Savings Banks, 60 East Forty-second Street, New York City_____     148
  Page, R. G., vice president, Bankers Trust Co., New York City____ 88, 154
  Posner, Louis S., member of the Mortgage Commission of the State
    of New York, New York City_____     108
  Ransom, Ronald, vice chairman, Board of Governors of the Federal
    Reserve System, Washington, D. C_____     107
  Tilney, A. A., chairman of the board of directors, Bankers Trust Co.,
    New York City_____ 89, 92
  Untermyer, Samuel, New York City_____      94
Exhibits:
  Committee Print No. 2_____       1
    Analysis thereof_____      77
  Committee Print No. 3_____     196
    Analysis thereof_____     211
  Letter from the President of the United States_____      15
  Table submitted by the Securities and Exchange Commission_____      42

# REGULATION OF SALE OF SECURITIES

## WEDNESDAY, JUNE 9, 1937

UNITED STATES SENATE,
COMMITTEE ON BANKING AND CURRENCY,
SECURITIES AND EXCHANGE SUBCOMMITTEE,
*Washington, D. C.*

The subcommittee met, pursuant to call, at 10:30 a. m., in the room of the Senate Committee on Banking and Currency, Senate Office Building, Senator Robert F. Wagner (chairman) presiding.

Present: Senators Wagner (chairman), Bulkley, McAdoo, Maloney, Hughes, Herring, and Frazier.

Present also: Senators Alben W. Barkley and William H. Smathers.

The CHAIRMAN. We will come to order. This is the subcommittee which meets to hear witnesses in reference to Senate bill 2344, introduced by Senator Barkley.

I wish to have printed here as a part of the record, a copy of Committee Print No. 2 of the bill, and a letter I have received from the President in regard to the proposed legislation, as follows:

[S. 2344, 75th Cong., 1st sess., Committee Print No. 2, June 10, 1937.]

[Omit the part enclosed in black brackets and insert the part printed in italic]

A BILL To provide for the regulation of the sale of certain securities in interstate and foreign commerce, and the trust indentures under which the same are issued, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Trust Indenture Act of 1937".

### NECESSITY FOR REGULATION

SECTION 1. (a) Upon the basis of facts disclosed by the reports of the Securities and Exchange Commission made to the Congress pursuant to section 211 of the Securities Exchange Act of 1934 and otherwise disclosed and ascertained, it is hereby declared that the national public interest and the interest of investors in notes, bonds, debentures and evidences of indebtedness publicly offered by the use of means and instruments of transportation and communication in interstate commerce and of the mails are adversely affected—

[(1) when the obtaining of adequate current information with respect to the financial condition of the obligor and its performance of its obligations with respect to such securities, and the enforcement of such obligations, is impeded through the failure to provide a trustee to protect and enforce the rights and to represent the interests of such investors; when the trustee designated does not have resources commensurate with its responsibilities, or has any relationship to or connection with the obligor or any underwriter of any securities of the obligor, or holds, beneficially or otherwise, any interest in the obligor or any such underwriter, which relationship, connection or interest involves a material conflict, actual or potential, with the interests of such investors;

[(2) when the trustee does not have adequate rights and powers, or adequate duties and responsibilities, in connection with matters relating to the protection and enforcement of the rights of such investors; when, by reason of provisions exculpating the trustee from liability for its failure to exercise its rights and powers or to discharge its duties and obligations, the protection afforded to such investors is rendered illusory; or

1

〔(3) when the obligor is not obligated to furnish to the trustee and to such investors adequate current information as to its financial condition and the performance of its obligations with respect to such securities; or when the communication of such information to such investors, and concerted action by such investors in connection with the enforcement of the obligations of the obligor and the trustee, is impeded by the suppression and monopolization by the obligor, underwriters or others of information as to the names and addresses of the holders of such securities.

〔(b) When abuses of the character above enumerated become persistent and widespread, the public offering of such securities, unless regulated, is injurious to the capital markets, to investors, and to the general public, and is tantamount to a fraud on such investors and the general public; and it is hereby declared to be the policy of this Act, in accordance with which policy all the provisions of this Act shall be interpreted, to meet the problems and eliminate the evils, as enumerated in this section, connected with the public offering of such securities by the use of means and instruments of transportation and communication in interstate commerce and of the mails.〕

*(1) When the obligor fails to provide a trustee to protect and enforce the rights and to represent the interests of such investors, notwithstanding the fact that (A) individual action by such investors for the purpose of protecting and enforcing their rights is rendered impracticable by reason of the disproportionate expense of taking such action, and (B) concerted action by such investors in their common interest through representatives of their own selection is impeded by reason of the wide dispersion of such investors through many States and the fact that information as to the names and addresses of such investors is controlled by the obligor and underwriters;*

*(2) When the trustee designated does not have adequate rights and powers, or adequate duties and responsibilities, in connection with matters relating to the protection and enforcement of the rights of such investors; when, notwithstanding the obstacles to concerted action by such investors, and the general and reasonable assumption by such investors that the trustee is under an affirmative duty to take action for the protection and enforcement of their rights, trust indentures generally provide that the trustee shall be under no duty to take any such action, even in the event of default, unless notice of default, demand for action, and indemnity, from the holders of substantial percentages of the outstanding securities, and generally relieve the trustee from liability even for its own negligent action or failure to act;*

*(3) When the trustee designated does not have resources commensurate with its responsibilities, or has any relationship to or connection with the obligor or any underwriter of any securities of the obligor, or holds, beneficially or otherwise, any interest in the obligor or any such underwriter, which relationship, connection or interest involves a material conflict, actual or potential, with the interests of such investors;*

*(4) When the obligor is not obligated to furnish to the trustee and to such investors adequate current information as to its financial condition and the performance of its obligations with respect to such securities; or when the communication of such information to such investors is impeded by the fact that information as to the names and addresses of the holders of such securities is controlled by the obligor and underwriters; or*

*(5) When, by reason of their lack of understanding of the situation and the fact that such securities are publicly offered, such investors are unable to procure the insertion of adequate protective provisions in trust indentures, which are commonly prepared by the obligor or underwriters.*

*(b) Abuses of the character above enumerated have been so widespread and have occurred in such number of instances that the public offering of such securities, unless regulated, is injurious to the capital markets, to investors, and to the general public; and it is hereby declared to be the policy of this Act, in accordance with which policy all the provisions of this Act shall be interpreted, to meet the problems and eliminate the evils, as enumerated in this section, connected with the public offering of such securities by the use of means and instruments of transportation and communication in interstate commerce and of the mails.*

### DEFINITIONS

SEC. 2. When used in this Act, unless the context otherwise requires—

(1) Any term defined in section 2 of the Securities Act of 1933, as heretofore amended, and not otherwise defined in this section, shall have the meaning provided in such section 2.

(2) The term "sale" shall include all transactions included in such term as provided in paragraph (3) of section 2 of the Securities Act of 1933, as heretofore amended, except that a sale of a certificate of interest or participation shall be deemed a sale of the security or securities in which such certificate evidences an interest or participation if and only if such certificate gives the holder thereof the right to convert the same, either immediately or on or after some future date, into such security or securities.

(3) The term "underwriter" means any person who has purchased from an issuer with a view to, or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission.

(4) The term "director" means any director of a corporation or any individual performing similar functions with respect to any person whether incorporated or unincorporated.

(5) The term "executive officer" means the president, every vice president, the cashier, secretary, treasurer, and trust officer and any person customarily performing [the] similar functions [of any such office].

(6) The term "indenture" means any mortgage, deed of trust, trust or other indenture, or similar instrument or agreement (including any supplement or amendment to any of the foregoing), under which securities are outstanding or are to be issued, whether or not any property, real or personal, is or is to be pledged, mortgaged, assigned or conveyed thereunder.

(7) The term "application" or "application for qualification" means the application provided for in section 5, and includes any amendment thereto and any report, document or memorandum accompanying such application or incorporated therein by reference.

(8) The term "indenture to be qualified" means the indenture in respect of which a particular application is filed.

(9) The term "indenture trustee" means each trustee under the indenture to be qualified, and each successor trustee.

(10) The term "indenture security" means any security issued or to be issued under the indenture to be qualified.

[(11) The term "security holder" means each holder or owner, for the time being, of any such security.]

[(12)](11) The term "obligor" means every person who is liable upon any such security, and, if such security is a certificate of interest or participation, includes every person who is liable upon the security or securities in which such certificate evidences an interest or participation; but such term shall not include the trustee under an indenture under which equipment trust certificates or like securities are outstanding.

[(13)](12) The term "paying agent", when used with respect to any such security, means any person authorized by an obligor thereon to pay the principal of or interest on such security on behalf of such obligor.

[(14)](13) The term "State" means any State of the United States.

[(15)](14) The term "Commission" means the Securities and Exchange Commission.

[(16)](15) The term "voting security" means a security presently entitling the holder or owner thereof to vote for the election of directors.

[(17)](16) The terms "Securities Act of 1933", "Securities Exchange Act of 1934" and "Public Utility Holding Company Act of 1935" shall be deemed to refer, respectively, to such Acts, as heretofore or hereafter amended.

### EXEMPTED SECURITIES AND TRANSACTIONS

SEC. 3. (a) The provisions of [section 4] this Act shall not apply to any of the following [classes of] securities:

(1) Any security other than a note, bond, debenture or evidence of indebtedness, whether or not secured, [or] and other than a certificate of interest or participation in, or temporary certificate for, or guarantee of, any of the foregoing.

(2) Any certificate of interest or participation in two or more securities having substantially different rights and privileges, or a temporary certificate for, or guarantee of, any such certificate.

(3) Any security which, prior to January 3, 1938, has been sold or disposed of by the issuer or bona fide offered to the public, but this exemption shall not apply to any new offering of any such security by an issuer or underwriter on or after such date.

(4) Any security exempted from the provisions of the Securities Act of 1933, by paragraph 2, 3, 4, 5, 6, 7, 8, or 11 of subsection 3 (a) of such Act, as heretofore amended.

(5) Any security issued under a mortgage indenture as to which a contract of insurance under the National Housing Act is in effect.

(6) Any guarantee of any security exempted from the provisions of [section 4] *this Act* by this subsection.

(b) The provisions of section 4 shall not apply to any of the transactions exempted, by section 4 of the Securities Act of 1933, as heretofore amended, from the provisions of section 5 of such Act. For the purposes of this subsection the term "underwriter", as used in section 4 of such Act, shall have the meaning provided in paragraph (3) of section 2 of this Act.

(c) The Commission may from time to time by rules and regulations, and subject to such terms and conditions as may be prescribed therein, add any class of securities to the securities exempted in subsection (a) of this section, if it deems that the application of this Act with respect to such securities is not necessary in the public interest and for the protection of investors by reason of the small amount involved and the small amount of securities outstanding and thereafter issuable under the same indenture, or the limited character of the public offering; but no issue of securities shall be exempted under this subsection where the aggregate amount of which such issue is offered to the public exceeds $250,000.

(d) The Commission may, on application by the issuer and after opportunity for hearing thereon, by order exempt from any one or more provisions of this Act any security issued or proposed to be issued under an indenture under which, at the time of such issuance, securities referred to in paragraph (3) of subsection (a) of this section are outstanding, if and to the extent that it finds that compliance with such provision or provisions, through the execution of a supplemental indenture or otherwise—

(1) would require by reason of the provisions of the indenture, or of any other indenture or agreement made prior to the effective date of this Act, or by reason of the provisions of any applicable law, the consent of the holders of securities outstanding thereunder, or

(2) would impose an undue burden on the issuer, having due regard to the public interest and the interests of investors.

## PROHIBITIONS RELATING TO INTERSTATE COMMERCE AND THE MAILS

SEC. 4. (a) Subject to the provisions of section 3, unless a security has been or is to be issued under an indenture as to which an application for qualification is effective, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

(b) Notwithstanding the provisions of the Securities Act of 1933, on and after January 1, 1938, no registration statement relating to a security which is subject to the provisions of subsection (a) of this section shall become effective unless such security has been or is to be issued under an indenture as to which an application for qualification is effective.

## APPLICATIONS FOR QUALIFICATION AND THE TAKING EFFECT THEREOF

SEC. 5. (a) An application for qualification of the indenture under which a security has been or is to be issued shall be filed with the Commission by the issuer of such security. Such application shall be in such form, and shall be signed in such manner, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. Such application shall include such of the information and documents as would be required to be filed in order to register such security under the Securities Act of 1933, and such additional information, in such form and detail, and such documents, regarding the applicant, the obligors, the trustees, the paying agents and the underwriters (as such term is defined in subsection (b) of section 7), including prospective obligors, trustees and underwriters, and the direct or indirect relationships between any of the foregoing, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. The information and documents contained in or filed with any

application shall be made available to the public under such regulations as the Commission may prescribe, and copies thereof, photostatic or otherwise, shall be furnished to every applicant therefor at such reasonable charge as the Commission may prescribe.

(b) The filing with the Commission of an application, or of an amendment to an application, shall be deemed to have taken place upon the receipt thereof by the Commission, but unless a registration statement, under the Securities Act of 1933, covering securities issued or to be issued under the indenture to be qualified has been filed prior to or simultaneously with the application, the filing of such application shall not be deemed to have taken place unless it is accompanied or preceded by payment to the Commission of a filing fee in the amount of $100, such payment to be made in cash or by United States postal money order or certified or bank check, or in such other medium of payment as the Commission may authorize by rule and regulation. If a registration statement covering securities issued or to be issued under such indenture is subsequently filed, the amount of the fee so paid shall be credited against the fee required to be paid at the time of filing such registration statement, and any excess shall be refunded to the applicant. If an amendment to an application is filed prior to the effective date of such application, the application shall be deemed to have been filed when such amendment was filed; except that an amendment filed with the consent of the Commission, prior to the effective date of the application, or filed pursuant to an order of the Commission, shall be treated as a part of the application. Amendments after the effective date of an application may be made upon such terms and conditions as the Commission may prescribe.

(c) The effective date of an application shall be the twentieth day after the filing thereof, unless the Commission prior to such time shall have issued an order to the issuer to show cause why such application should become effective. If an order to show cause under this subsection has been issued, such application shall become effective within such reasonable period of time after an opportunity for hearing upon such order as the Commission shall fix by rules and regulations unless the Commission prior to the expiration of such period shall have issued an order pursuant to section 6 refusing to permit such application to become effective. Whenever the Commission shall issue an order to show cause, it shall cause the same to be served upon the issuer in such manner as the Commission may by rules and regulations prescribe, and accord an opportunity for hearing thereon (at a time fixed by the Commission) within 10 days after such service.

(d) Except as otherwise expressly provided in this Act the making, amendment or reascission of a rule, regulation or order [relating to the contents of any indenture or indentures or the form or interpretation of any provision or provisions thereof] *under the provisions of this Act* shall not affect *the form or interpretation of any* indenture as to which qualification became effective prior to the making, amendment or rescission of such rule, regulation or order, *or of any provision of any such indenture.*

(e) The Commission is hereby empowered to make an investigation in any case in order to determine whether a refusal order should issue under section 6. If the issuer, or any obligor, underwriter or trustee, including prospective obligors, underwriters and trustees, shall fail to cooperate, or shall obstruct or refuse to permit the making of such investigation, such conduct shall be proper ground for the issuance of a refusal order.

REFUSAL ORDERS

SEC. 6. The Commission shall issue an order refusing to permit an application filed pursuant to section 5 to become effective if it finds that—

(1) such application does not conform to the requirements of this Act and the rules and regulations thereunder;

(2) the application includes any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading;

(3) any person designated as trustee [or trustees] under the indenture is not [qualified] *eligible* to act as such under [subsections (a) and (b)] *subsection (a)* of section 7 *or has any conflicting interest as defined in subsection (b) of section 7;*

(4) the indenture does not conform to the requirements of section 7 and the rules and regulations thereunder; or

(5) the indenture or any security to be issued thereunder contains any provision which limits, qualifies or conflicts with a provision required to be contained in the indenture by this Act or the rules and regulations thereunder; or any provision the inclusion of which is prohibited by this Act or

the rules and regulations thereunder; or any provision which is misleading or deceptive; or the elimination of which is necessary or appropriate in the public interest or for the protection of investors or to prevent the circumvention or evasion of this Act.

If and when the Commission deems that the objections on which such order was based have been met, the Commission shall enter an order rescinding such refusal order, and the application shall become effective at the date fixed pursuant to subsection (c) of section 5 or upon the date of such rescission, whichever shall be the later.

### CONTENTS OF INDENTURE

#### Persons Eligible for Appointment as Trustee

SEC. 7. (a) (1) The indenture to be qualified shall require that there shall at all times be one or more trustees thereunder, at least one of whom shall at all times be an institution incorporated and doing business under the laws of the United States or of any State or Territory or of the District of Columbia, which (A) is authorized under such laws to exercise corporate trust powers, and (B) is subject to supervision or examination by Federal, State, Territorial, or District authority.

(2) If the Commission deems it necessary or appropriate in the public interest or for the protection of investors, in view of the type of indenture, the amount of securities outstanding and thereafter issuable thereunder, and the duties and responsibilities imposed thereby on the trustee or trustees, the indenture to be qualified shall require that such institutional trustee have at all times a combined capital and surplus of such specified minimum amount as the Commission deems adequate, having due regard to the public interest and the interests of investors. If such institutional trustee publishes reports of condition at least annually, pursuant to law or to the requirements of such supervising or examining authority, the indenture may provide that for the purposes of this paragraph, the combined capital and surplus of such trustee shall be deemed to be its combined capital and surplus as set forth in its most recent published report of condition.

(3) If the indenture to be qualified requires or permits the appointment of one or more co-trustees in addition to such institutional trustee, such indenture shall provide that the rights, powers, duties and obligations conferred or imposed upon the trustees or any of them shall be conferred or imposed upon and exercised or performed by such institutional trustee, or such institutional trustee and such co-trustees jointly, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed, such institutional trustee shall be incompetent or unqualified to perform such act or acts.

(4) In the case of certificates of interest or participation, the indenture to be qualified shall require that the indenture trustee or trustees have the legal power to exercise all of the rights, powers, and privileges of a holder of the security or securities in which such certificates evidence an interest or participation.

#### Disqualification of Trustee

(b) The indenture to be qualified shall provide that [no person shall accept or hold the position of trustee thereunder if such person has] *if the indenture trustee has or shall acquire* any conflicting interest as hereinafter defined, [and that, if at any time any indenture trustee has or shall acquire any such conflicting interest,] (i) such trustee shall, within 90 days after [the acquisition] *ascertainment* of such conflicting interest, either eliminate such conflicting [interest, or resign and take prompt steps to have a successor appointed in the manner provided in the indenture] *interest or resign,* such resignation to become effective upon the appointment of a successor trustee and such successor's acceptance of such appointment, *and the obligor shall take prompt steps to have a successor appointed in the manner provided in the indenture,* and (ii) subject to the provisions of subsection [(1)] (*l*) of this section, any security holder *who has been a bona-fide holder of indenture securities for at least six months* (on failure of such trustee on the written request of such holder either to resign or to eliminate such conflicting interest, as required by clause (i) of this subsection) may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of such trustee and the appointment of a successor trustee. For the purposes of this subsection, an indenture trustee shall be deemed to have a conflicting interest if—

    (1) such trustee is trustee under an indenture under which any other securities, or certificates of interest or participation in any other securities, of an obligor are outstanding, other than [(A)] the indenture to be qualified,

[and (B) an indenture under which collateral trust notes of such obligor are outstanding which are secured exclusively by indenture securities, and (C) any other indenture entered into by such obligor, if] *or any other indenture entered into by such obligor, unless (A) the indenture securities are collateral trust notes secured exclusively by securities issued under such other indenture, or (B) such other indenture is a collateral trust indenture secured exclusively by indenture securities, or (C) such obligor has no substantial unmortgaged assets and is engaged primarily in the business of owning, or of owning and developing and/or operating, real estate, and* [if] *the indenture to be qualified and such other indenture are secured by wholly separate and distinct parcels of real estate, or (D) such trustee shall sustain the burden of proving, on application to the Commission and after opportunity for hearing thereon, that trusteeship under the indenture to be qualified and such other indenture is not so likely to involve a material conflict of interest as to make it necessary in the public interest or for the protection of investors to disqualify such trustee from acting as such under one of such indentures;*

(2) such trustee or any of its directors or executive officers is an obligor or *was, subsequent to June 10, 1934, an* underwriter;

(3) such trustee directly or indirectly controls or is directly or indirectly controlled by or is under direct or indirect common control with an obligor or underwriter, whether by agency, stock ownership, or otherwise;

(4) such trustee or any of its directors or executive officers is a director, officer, partner, employee, appointee, or representative of an obligor or underwriter, except that [(A) one director of the trustee may be a director or executive officer of an obligor, and (B) one additional director (who may also be an executive officer) of the trustee may, if expressly authorized by the trustee, be a director of such obligor, if he has no pecuniary interest in such obligor other than his qualifying shares as such director] *(A) one person may be a director and/or executive officer of the trustee and of an obligor, but may not be at the same time an executive officer of both the trustee and of such obligor, and (B) one additional person may be a director and/or executive officer of the trustee and a director of such obligor, if his pecuniary interest in such obligor does not exceed such percentage of the voting securities or such percentage of all other securities, other than indenture securities, of such obligor as the Commission may deem not detrimental to the public interest and the interests of investors, such percentages and the method of calculating the same to be fixed in the indenture, but such percentages in no event to exceed 1 per centum: Provided, however, That such additional person may be a director of the trustee and such obligor only so long as the number of directors of the trustee in office is more than nine,* and (C) such trustee may be designated to act as trustee under the indenture to be qualified, [or] *and* in the [capacity] *capacities* of transfer agent, registrar, custodian, paying agent, fiscal agent, escrow agent or depositary, or in other similar capacity, by any obligor or underwriter;

(5) 5 per centum or more of [any class of] *the* voting securities of such trustee is *beneficially* owned, [beneficially or otherwise,] individually *or* collectively, by an obligor [or underwriter,] *or* by any director, partner, *or* executive [officer, appointee or nominee of an obligor or underwriter, other than a director or executive officer of an obligor who is a director of such trustee] *officer thereof, exclusive of any such securities owned by a person described in clause (A) of paragraph (4) of this subsection in an amount not exceeding 2½ per centum of such securities or owned by a person described in clause (B) of such paragraph (4); or 5 per centum or more of the voting securities of such trustee is beneficially owned, individually or collectively, by an underwriter, or by any director, partner, or executive officer thereof;*

(6) such trustee shall be or become a creditor, directly or indirectly, secured or unsecured, of an obligor, except as authorized pursuant to subsection (d) of this section, if the indenture to be qualified is not secured by the pledge or mortgage of property or if any indenture securities outstanding had a maturity at the time of issuance of less than five years;

(7) such trustee is the [owner, beneficially or otherwise,] *beneficial owner* of 5 per centum or more of [any class of] *the* voting [security] *securities* or 10 per centum or more of any *other* class of security of an obligor (other than indenture securities) or of 10 per centum or more of any class of security of an underwriter;

(8) such trustee is the [owner, beneficially or otherwise,] *beneficial owner* of 5 per centum or more of [any class of] *the* voting [security] *securities* of any person [who,] *who,* to the knowledge of the [trustee,] *trustee* owns 10 per centum or more of [any class of] *the* voting [security] *securities* of, or

controls directly or indirectly or is under direct or indirect common control with, an obligor;

(9) such trustee is the [owner, beneficially or otherwise,] *beneficial owner* of 10 per centum or more of any class of security of any person [who,] *who* to the knowledge of the [trustee,] *trustee* owns 50 per centum or more of [any class of] *the* voting [security] *securities* of an obligor;

(10) *such trustee owns, on May 15 in any calendar year, in the capacity of executor, administrator, testamentary or inter vivos trustee, guardian, committee or conservator or in any other similar capacity, an aggregate of 25 per centum or more of the voting securities of any person the beneficial ownership of 5 per centum of which would have constituted a conflicting interest under paragraph (7) or (8) of this subsection, or an aggregate of 25 per centum or more of any class of security the beneficial ownership of 10 per centum of which would have constituted a conflicting interest under paragraph (7) or (9) of this subsection. Promptly after each such May 15, the trustee shall make a check of its holdings of securities of the obligor as of such May 15. If the obligor fails to make payment in full of principal or interest under the indenture to be qualified when and as the same becomes due and payable, the trustee shall make a prompt check of its holdings of securities of the obligor as of the date of such default, and all such securities held by the trustee in any of the above mentioned capacities, with sole or joint control over such securities vested in it, shall thereafter be considered as though beneficially owned by such trustee, for the purposes of paragraphs (7), (8), and (9) of this subsection:*

*Provided, however,* That for the purposes of paragraphs (7), [(8) and (9)] *(8), (9), and (10)* of this subsection, *the term "security" shall include only such securities as are generally known as corporate securities, and the indenture trustee shall not be* deemed the owner of any security which it holds as collateral [for a loan] *security (as trustee or otherwise), so long as there is no default in the principal obligation for which such security is collateral,* or which it holds [in a custody account or escrow account or as depositary or in other similar capacity] *as custodian, escrow agent, or depositary, or in any representative capacity:*

*And provided further,* That the indenture to be qualified may contain provisions excluding from the operation of [paragraphs (7), (8) and (9)] *paragraph (10)* of this subsection the ownership by the indenture trustee of not more than 25 per centum of any class of security referred to in [any of] such [paragraphs] *paragraph* for a period of not more than eighteen months from the date of acquisition thereof, or until a default (as defined in the indenture) shall occur, whichever shall be the sooner, if the trustee became the owner of such security through becoming executor, administrator or testamentary trustee of an estate which included such security.

For the purposes of this subsection, the term "underwriter" means every person who [is or], *within six years prior to the time as of which the determination is made,* was an underwriter of any security of an obligor outstanding at [the time as of which the determination is made] *such time, except as otherwise provided in paragraph (2) of this subsection.*

(c) The indenture to be qualified shall provide that if the indenture trustee shall be, or shall become, a creditor, directly or indirectly, secured or unsecured, of an obligor, within four months prior to a default in the payment of principal or interest under the indenture or subsequent to such a default, then, unless and until such default shall be cured, such trustee shall set apart and hold in a special account for the benefit of the trustee individually and the security holders,

(1) an amount equal to any and all reductions in the amount due and owing upon any such claim in respect of principal or interest, effected after the beginning of such four months' period and valid as against the obligor and its other creditors, except any such reduction resulting from the receipt or disposition of any property described in paragraph (2) of this subsection, or *from the exercise of any right of set-off which the trustee could have exercised if a petition in bankruptcy had been filed by or against such obligor at the date of such default;* and

(2) all property received in respect of any of its claims as such creditor, as security therefor or in satisfaction or composition thereof or otherwise, after the beginning of such four months' period, or an amount equal to the proceeds of any such property, if disposed of, subject, however, to the rights, if any, of the obligor and its other creditors in such property or such proceeds:

*Provided, however, That nothing herein contained shall affect the right of the trustee to retain for its own account (A) payments made on account of any such claim by persons, other than the obligor, who are liable thereon, and (B) the proceeds of the bona fide sale of any such claim by the trustee to a third person: And provided further,* That

nothing herein contained shall affect the right of the trustee to realize, for its own account, upon any security for any such claim held by it prior to the beginning of such four months' period, or to receive payment on such claim against the release of any such security, to the fair value thereof; and property substituted after the beginning of such four months' period for property held as security prior to such date shall, to the extent of the fair value of the property released, have the same status as the property released: *And provided, further,* That if the indenture is secured by the mortgage or pledge of property, and the indenture securities outstanding had a maturity at the time of issuance of five years or more, the trustee shall not be required to account for any such reduction or for any property so received or the proceeds thereof, if the trustee shall sustain the burden of proving that at the time such property was received or such reduction effected, the trustee had no reasonable cause to believe that a default in the payment of principal or interest under the indenture would occur within four months.

The indenture to be qualified shall provide that if any securities outstanding under the indenture had a maturity at the time of issuance of less than five years, or if the indenture is not secured by the mortgage or pledge of property, the trustee's rights in the funds and property held in such special account and the proceeds thereof shall be subject to the prior payment in full of all sums due and owing under the indenture, but that, subject to such prior payment in full, the trustee shall be subrogated to the rights of the *indenture* security holders, to the extent that such funds and property are applied to such payment. The indenture to be qualified shall provide further that if such indenture is secured by the mortgage or pledge of property, and the securities outstanding thereunder had a maturity at the time of issuance of five years or more, *the trustee's rights in the* funds and property held in such special account and the proceeds thereof shall be apportioned between the trustee and the *indenture* security holders in such manner that the trustee realizes no greater percentage of [his] *its deficiency* claim (after deducting therefrom all credits for which [the] *it* is not required to account *hereunder*) than the security holders realize in respect of their deficiency claim against the obligor *(after deducting therefrom all allowable credits).*

An indenture trustee who has resigned or been removed shall be subject to the provisions of this subsection as though such resignation or removal had not occurred, unless such resignation or removal occurred more than four months prior to such default, and the receipt of property or reduction of claim which would have given rise to the obligation to account, if such indenture trustee had continued as trustee, occurred more than four months after such resignation or removal.

As used in this subsection the term "default" shall include any failure to make payment in full of principal or interest under the indenture when and as the same becomes due and payable.

(d) The indenture to be qualified may contain provisions excluding from the operation of paragraph (6) of subsection (b) of this section and from the operation of subsection (c) of this section a creditor relationship arising from—

(1) the ownership or acquisition of indenture securities or any security or securities having a maturity of one year or more at the time of acquisition by the trustee, or

(2) advances authorized by a receivership or bankruptcy court of competent jurisdiction, or by the indenture, for the purpose of preserving the property subject to the lien of the indenture, provided that [prompt] notice of such advance and of the circumstances surrounding the making thereof is given to the security holders, *at the time and in the manner provided in the indenture.*

(3) *disbursements made in the ordinary course of business in the capacity of transfer agent, registrar, custodian, paying agent, fiscal agent or depositary, or other similar capacity;* or

(4) *an indebtedness created as a result of services rendered or premises rented; or an indebtedness created as a result of goods or securities sold in a cash transaction, as such term is defined in the indenture;* or

(5) *the acquisition, ownership, acceptance or negotiation of drafts, bills of exchange, acceptances or obligations falling within the classification of self-liquidating paper, as such term is defined in the indenture.*

*The Commission shall by rules and regulations prescribe the definitions of the terms "cash transaction" and "self-liquidating paper" which shall be included in the indenture.*

### Reports of Obligors

(e) The indenture to be qualified shall contain provisions which the Commission deems adequate, having due regard to the public interest and the interests of investors, requiring each obligor to file with the trustee and the Commission, and to transmit or otherwise make available to the *indenture* security holders, such annual and other reports, and such information with respect to the performance by such obligor of its obligations under the indenture, in such form and detail as the Commission may from time to time prescribe as necessary or appropriate in the public interest or for the protection of investors by rule or regulation adopted either before or after qualification becomes effective as to such indenture.

### Bondholders' Lists

(f) The indenture to be qualified shall contain provisions which the Commission deems adequate, having due regard to the public interest and the interests of investors, requiring each obligor to furnish or cause to be furnished to the institutional trustee thereunder, at stated intervals, all information in the possession or control of such obligor or of any of its paying agents as to the names and addresses of the *indenture* security holders, and requiring such trustee to make the same or the use thereof available to *indenture* security holders, subject only to such terms and conditions as the Commission deems not detrimental to the public interest or the interests of investors.  The disclosure of any such information in accordance with such provision, regardless of the source from which such information was derived, shall not be deemed a violation of any existing law or of any law hereafter enacted which does not specifically refer to this subsection.

### Duties of the Trustee Prior to Default

(g) The indenture to be qualified shall contain provisions imposing upon the indenture trustee such specific duties and obligations prior to default (as such term is defined in such indenture) as the Commission deems consistent with the duties and obligations which a prudent man would assume and perform prior to such a default if he were trustee under such an indenture, including, without limitation, action in respect of the following matters:

(1) [the determination that the indenture has been recorded and filed, and from time to time re-recorded and refiled,] *the recording, re-recording, filing, and refiling of the indenture* to the extent necessary to establish and preserve the validity and priority thereof or of any lien created or purported to be created thereby as against any person or persons;

(2) the [determination that] *application of* all indenture securities and the proceeds thereof [are applied] to the purposes specified in the indenture;

(3) the [determination that] *existence of or compliance with* all conditions precedent to *the authentication and delivery of indenture securities,* the release or substitution of any property subject to the lien of the indenture, [the authentication and delivery of indenture securities,] the satisfaction and discharge of the indenture, and any other action by the trustee under the indenture [, exist or have been complied with before taking such action or permitting the same to be taken]; and

[(4) the determination whether the obligors have performed their obligations under the indenture.]

(4) *the performance by the obligor of such of its other obligations under the indenture as the Commission deems necessary or appropriate in the public interest or for the protection of investors.*

The indenture to be qualified shall also contain provisions requiring the obligor to provide the indenture trustee with such information, such opinions and certificates of attorneys, accountants and other experts, and such other documents as the Commission may deem necessary or appropriate to enable the trustee to perform, or to facilitate its performance of, the duties imposed upon it pursuant to this subsection.

### Duties of the Trustee in Case of Default

(h) The indenture to be qualified shall contain provisions requiring the indenture trustee to exercise in case of default (as such term is defined in the indenture) such of the rights and powers vested in it by the indenture, and to use the same degree of care and skill in their exercise as a prudent man would exercise under the circumstances if he were a fiduciary and had the degree of skill which the indenture trustee has, or which the indenture trustee [expressly or impliedly] represents

itself as having, *as indenture trustee, at the time of the offering of the indenture securities*, whichever is the higher: *Provided, however,* That the indenture to be qualified may contain provisions—

(1) authorizing the holders of not less than a majority in principal amount of the indenture securities at the time outstanding (A) to direct the method and place of conducting all proceedings at law or in equity for any remedy under the indenture to be qualified, and (B) to direct the indenture trustee to waive any default and its consequences, except that a default in the payment of the principal of any indenture security at the date of maturity specified therein shall not be waived, and except that a default in interest shall not be waived for a total period exceeding one year, nor unless payment of all arrears of interest shall have been made or provided for; [and]

(2) protecting the indenture trustee in respect of any action taken in good faith in accordance with any direction authorized as provided in paragraph (1) of this [subsection.] *subsection; and*

(3) *protecting the trustee from liability for any error of judgment or for any loss arising out of any act or omission in the execution of the trust so long as it acts in good faith and without negligence.*

In determining whether the required proportion in principal amount of the indenture securities outstanding have concurred in any such direction, *indenture securities owned by any obligor or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with any obligor shall be disregarded, except that, for the purposes of paragraph (2) of this subsection, only indenture securities which the trustee knows [or has reasonable cause to believe]* are so owned shall be so disregarded.

### Reliance Upon Certificates and Opinions

(i) The Commission shall permit the inclusion in the indenture to be qualified of one or more provisions authorizing the indenture trustee conclusively to rely *as to the truth of the statements contained therein,* in the absence of bad faith or gross negligence on the part of such trustee, upon opinions or certificates of attorneys, accountants, or other experts (subject to such requirements as to independence and qualifications and the exercise by the trustee of reasonable care in their selection, and subject to such other terms and conditions, as the Commission may deem necessary or appropriate in the public interest or for the protection of investors) [as to a specified fact or matter involved in a particular determination or determination], if the Commission deems that such provisions do not materially conflict with the required standard of care and are not detrimental to the public interest or the interest of investors.

### Exculpatory Clauses

(j) The indenture to be qualified shall not contain any provisions relieving the trustee from liability for its own negligent action or failure to act, or for its own willful misconduct.

### Notice of Defaults

(k) The indenture to be qualified shall contain provisions requiring the trustee to give to the *indenture security* holders, *at such time and* in such manner as the Commission may deem adequate, having due regard to the public interest and the protection of investors, [prompt] notice of all defaults known to the [trustee, or of which the trustee should have acquired knowledge in the performance of the obligations imposed upon it by the indenture; except that] *trustee: Provided, however, That* the indenture may provide, *except* in the case of defaults [other than major defaults, that, if the trustee does not have any conflicting interest, as defined in subsection (b) of this section,] *(to be specified in the indenture) of which the Commission deems it necessary or appropriate in the public interest or for the protection of investors that prompt notice be given, that* the trustee shall be protected in withholding such notice if and so long as *the board of directors or executive committee or a trust committee of directors or* responsible officers of the trustee in good faith determine the withholding of such notice to be in the interests of the *indenture* security holders. [For the purposes of this subsection the term "major default" shall mean a default in the payment of the principal of or interest on any indenture security outstanding, and any other default (to be specified in the indenture) of which the Commission deems it necessary or appropriate in the public interest or for the protection of investors that prompt notice be given.]

## Undertaking for Costs

(l) The indenture to be qualified may contain provisions to the effect that all parties thereto, including the *indenture* security holders, agree that the court may in its discretion require, in any suit for the enforcement of any right or remedy under such indenture *or against the trustee, as trustee* the filing of an undertaking to pay the costs of such suit, and may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant, *having due regard to the merits and good faith of the suit or defense: Provided, however,* That the provisions of this subsection shall not apply to suits instituted *by the trustee or to suits instituted* by security holders for the enforcement of the payment of the principal of or interest on any indenture security, at or after the respective due dates expressed therein, or to suits instituted by any *indenture* security holder or group of security holders holding in the aggregate more than 10 per centum in principal amount of the indenture securities outstanding.

## Other Indenture Provisions

(m) The indenture to be qualified shall contain such provisions as the Commission shall deem necessary or appropriate in the public interest or for the protection of investors in respect of the following matters—

(1) Restrictions or conditions on the release and substitution of any property subject to the lien of the indenture, on the issuance of additional *indenture* securities, and on the satisfaction and discharge of the indenture.

(2) The obligations of the obligors with respect to the recording or filing of the indenture.

(3) The definition of what shall constitute a default thereunder.

(4) The rights, powers, and duties of the indenture trustee, including (A) the giving to the *indenture* security holders of notice of the release or substitution of property subject to the lien of the indenture and the issuance of additional *indenture* securities; (B) the making of reports by the indenture trustee to the *indenture* security holders with respect to its qualifications, the properties and funds held by it under the indenture and its administration of the trust; (C) the rights, powers, or duties of the indenture trustee with respect to the institution of foreclosure proceedings, proceedings for the judicial or other sale of the property subject to the lien of the indenture, or for obtaining, in its name as such trustee, a judgment for the entire amount due and owing under the indenture; with respect to entry into possession of the trust estate; with respect to the calling of meetings of the *indenture* security holders; with respect to keeping itself informed with regard to all bankruptcy, receivership or reorganization proceedings affecting the obligors, and all proceedings affecting the indenture securities or the property subject to the lien of the indenture; with respect to appearance and intervention in any such proceedings, and the filing of proofs of claim therein on behalf of the *indenture* security holders; and (D) restrictions upon the employment by the indenture trustee of attorneys or other experts who have [or have had, or who represent or have represented,] any interests which are likely materially to conflict with the interests of the *indenture* security holders.

(5) The rights, powers, and remedies of the *indenture* security holders and the manner in which and conditions upon which such rights, powers and remedies may be exercised, including the right and power of the *indenture* security holders with respect to accountings by the indenture trustee, bringing action to collect the principal of and interest upon the *indenture* securities at their respective due dates, and calling and holding meetings of the *indenture* security holders and taking action at such meetings.

(6) The qualifications, rights, powers and duties of paying agents, including the duty of each paying agent to hold for the benefit of the *indenture* security holders or the trustee all sums held by such paying agent for the payment of the interest on and principal of the *indenture* securities, and to give to the indenture trustee notice of defaults in the performance of the obligations of the obligors.

### RULES, REGULATIONS AND ORDERS

SEC. 8. (a) The Commission shall have authority from time to time to make, issue, amend, and rescind such rules and regulations and such orders as it may deem necessary or appropriate in the public interest or for the protection of investors and to carry out the provisions of this Act, including rules and regulations defining accounting, technical, and trade terms used in this Act. Among

other things, the Commission shall have authority, for the purposes of this Act, to prescribe the form or forms in which information required in any statement, application, report or other document filed with the Commission shall be set forth, and to prescribe or recommend forms of indentures or of any provisions required or permitted to be included therein. For the purpose of its rules or regulations the Commission may classify [persons and] *persons, securities, and other matters* within its jurisdiction and prescribe different requirements for different classes of [persons] *persons, securities,* or matters.

(b) Subject to the provisions of the Federal Register Act and regulations heretofore or hereafter prescribed under the authority thereof, the rules and regulations of the Commission shall be effective upon publication in the manner which the Commission shall prescribe, or upon such later date as may be provided in such rules and regulations.

(c) The Commission, by such rules and regulations or order as it deems necessary or appropriate in the public interest or for the protection of investors [or consumers], may authorize the filing of any information or documents required to be filed with the Commission under this Act, or under the Securities Act of 1933, or under the Securities Exchange Act of 1934, or under the Public Utility Holding Company Act of 1935, by incorporating by reference any information or documents on file with the Commission under this Act or any such Act. No provision of this Act imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule, regulation or order of the Commission, notwithstanding that such rule, regulation or order may, after such act or omission be amended or rescinded or be determined by judicial or other authority to be invalid for any reason.

### HEARINGS BY COMMISSION

SEC. 9. Hearings may be public and may be held before the Commission, any member or members thereof, or any officer or officers of the Commission designated by it, and appropriate records thereof shall be kept. The Commission may, by such rules and regulations or orders as it deems necessary or appropriate in the public interest or for the protection of investors, provide for the consolidation of proceedings under this Act with proceedings under the Securities Act of 1933, and/or under the Public Utility Holding Company Act.

### SPECIAL POWERS OF THE COMMISSION

SEC. 10. (a) For the purpose of any investigation or any other proceeding which, in the opinion of the Commission, is necessary and proper for the enforcement of this Act, any member of the Commission, or any officer thereof designated by it, is empowered to administer oaths and affirmations, subpena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, contracts, agreements, or other records which the Commission deems relevant or material to the inquiry. Such attendance of witnesses and the production of any such books, papers, correspondence, memoranda, contracts, agreements or other records may be required from any place in the United States or in any Territory at any designated place of investigation or hearing. In addition, the Commission shall have the powers with respect to investigations and hearings, and with respect to the enforcement of, and offenses and violations under, this Act and rules and regulations and orders prescribed under the authority thereof, provided in sections 20, 22 (b) and 22 (c) of the Securities Act of 1933.

(b) The Treasury Department, the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Reserve Banks and the Federal Deposit Insurance Corporation are hereby authorized, under such conditions as they may prescribe, to make available to the Commission, such reports, records, or other information as they may have available with respect to trustees or prospective trustees under indentures for which applications for qualification have been filed with the Commission, and to make through their examiners or other employees for the use of the Commission, examinations of such trustees or prospective trustees. Every such trustee or prospective trustee shall, as a condition precedent to qualification of such indenture, consent that reports of examinations by Federal, State, Territorial, or District authorities may be furnished by such authorities to the Commission upon request therefor.

*Notwithstanding any provision of this Act, no report, record, or other information made available to the Commission under this subsection, no report of an examination made under this subsection for the use of the Commission, no report of an examination made of any trustee or prospective trustee by any Federal, State, Territorial, or District*

*authority having jurisdiction to examine or supervise such trustee, no report made by any such trustee or prospective trustee to any such authority, and no correspondence between any such authority and any such trustee or prospective trustee, shall be made available to the public by the Commission.*

(c) Nothing in this Act shall be construed as empowering the Commission to conduct an investigation for the purpose of determing whether the provisions of an indenture as to which an application for qualification is effective are being complied with, or to enforce such provisions.

*Any investigation of a prospective trustee under subsection (a) of this section or under any of the provisions of this Act shall be limited to determining whether such prospective trustee is qualified to act as trustee under the provisions of section 7 of this Act.*

## AND SUITS

SEC. 11. (a) Orders of the Commission under this Act shall be subject to review in the same manner, upon the same conditions and to the same extent, as provided in section 9 of the Securities Act of 1933.

(b) Jurisdiction of offenses and violations under and jurisdiction and venue of suits and actions brought to enforce any liability created by, this Act or any rules or regulations or orders prescribed under the authority thereof shall be as provided in section 22 (a) of the Securities Act of 1933.

## LIABILITY FOR MISLEADING STATEMENTS

SEC. 12. (a) Any person who shall make or cause to be made any statement in any application, report or document filed with the Commission pursuant to any provisions of this Act, or any rule, regulation or order thereunder, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, or who shall omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, shall be liable to any person (not knowing that such statement was false or misleading or of such omission) who, in reliance upon such statement or omission, shall have purchased or sold a security *issued under the indenture to which such application report or document relates*, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading or of such omission. A person seeking to enforce such liability may sue at law or in equity in any court of competent jurisdiction. In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit and assess reasonable costs, including reasonable attorneys' fees against either party litigant. No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued.

(b) The rights and remedies provided by this Act shall be in addition to any and all other rights and remedies that may exist under the Securities Act of 1933, or the Securities Exchange Act of 1934, or the Public Utility Holding Company Act of 1935, or otherwise at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this Act shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.

## UNLAWFUL REPRESENTATIONS

SEC. 13. It shall be unlawful for any person in issuing or selling any security to represent or imply in any manner whatsoever that any action or failure to act by the Commission in the administration of this Act means that the Commission has in any way passed upon the merits of, or given approval to, any trustee, indenture or security, or any transaction or transactions therein, or that any such action or failure to act with regard to any statement or report filed with or examined by the Commission pursuant to this Act or any rule, regulation, or order thereunder, has the effect of a finding by the Commission that such statement or report is true and accurate on its face or that it is not false or misleading.

## PENALTIES

SEC. 14. Any person who wilfully violates any provision of this Act or any rule, regulation, or order thereunder, or any person who wilfully, in any application, report or document filed or required to be filed under the provisions of this Act or any rule, regulation, or order thereunder, makes any untrue statement

of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined not more than $5,000 or imprisoned not more than five years, or both.

### EFFECT ON EXISTING LAW

SEC. 15. Nothing in this Act shall affect (1) the jurisdiction of the Commission under the Securities Act of 1933, or the Securities Exchange Act of 1934, or the Public Utility Holding Company Act of 1935, over any person, security, or contract, or (2) the rights, obligations, duties or liabilities of any person under such Acts; nor shall anything in this Act affect the jurisdiction of any other commission, board, agency, or officer of the United States or of any State or political subdivision of any State, over any person or security, in so far as such jurisdiction does not conflict with any provision of this Act or any rule, regulation, or order thereunder.

### CONTRARY STIPULATIONS VOID

SEC. 16. Any condition, stipulation, or provision binding any person to waive compliance with any provision of this Act or with any rule, regulation, or order thereunder shall be void.

### SEPARABILITY OF PROVISIONS

SEC. 17. If any provision of this Act or the application of such provision to any person or circumstance shall be held invalid, the remainder of the Act and the application of such provision to persons or circumstances other than those. as to which it is held invalid shall not be affected thereby.

Amend the title so as to read: "A bill to provide for the regulation of the sale of certain securities in interstate and foreign commerce, and through the mails and the regulation of the trust indentures under which the same are issued, and for other purposes."

---

THE WHITE HOUSE,
*Washington, May 24, 1937.*

Hon. ROBERT F. WAGNER,
    *Chairman, Banking and Currency Committee,*
                *United States Senate, Washington, D. C.*

MY DEAR SENATOR WAGNER: I scarcely need recount to your committee the very great progress in the protection of investors which the Congress accomplished through enactment of the Securities Act of 1933. Since that date extensive investigations and reports by the Securities and Exchange Commission have demonstrated that further strengthening of that act is necessary in connection with the form and content of trust indentures and the duties to be assumed by trustees acting under them. The Commission has now concluded its investigations, and I believe the consideration of such supplementary legislation altogether appropriate at this time.

It seems to me to be beyond debate that trustees under indentures should be held to a duty of active, vigilant representation of bondholders; that they should be free of all conflicting interests; and that indentures should not be so drawn as to permit them to evade their rightful responsibilities.

I understand that there is before you for your consideration a bill introduced by Senator Barkley, S. 2344, which seeks to attain these ends. Certainly they are the essential objectives of the legislative program needed to meet existing deficiencies in the law and in corporate trust practice.

Very sincerely yours,

FRANKLIN D. ROOSEVELT.

I think Commissioner Douglas is here.
Do you want to make a brief statement first, Senator Barkley?
Senator BARKLEY. Yes; if you please.

## STATEMENT OF HON. ALBEN W. BARKLEY, A SENATOR OF THE UNITED STATES FROM THE STATE OF KENTUCKY

Senator BARKLEY. Mr. Chairman, before Mr. Douglas, a member of the Securities and Exchange Commission, makes his statement, I wish to make a very brief statement.

In the Securities and Exchange Act of 1934 it is provided by section 211 that the Commission is authorized and directed to make a study and investigation of the work, activities, personnel, and functions of protective and reorganization committees in connection with reorganization, readjustment, rehabilitation, liquidation, or consolidation of persons and properties, and to report the result of its studies and investigations and its recommendations to the Congress on or before January 3, 1936.

Pursuant to that authority and that instruction the Securities and Exchange Commission made an exhaustive investigation of all the matters referred to in that section, and made its report to Congress on June 18, 1936. The report consists of a document containing 227 pages. The investigation covered several months. During that investigation, as is shown by this report, some very startling conditions were revealed in the matter of reorganizations, trusteeships, trust indentures, and the issuance of all sorts of indentures, bonds, and securities by corporations, and with reference to the appointment and activity or nonactivity of trustees who had been appointed but who presumably did not look after the welfare of investors in these indentures, bonds, and securities that were issued.

As a result of this investigation and the report to Congress, this bill has been drawn to correct those glaring injustices, inequalities, and failures of trustees, issuers, guarantors, and obligors to protect adequately the interests of investors who had been induced, for one reason or another, to invest their money in the indentures issued by these organizations.

The bill which has been introduced is technical; it is complicated, as the subject of course must be, and it requires a great deal of intensive study to visualize the evils which it seeks to correct.

I am not going into that matter. Mr. Douglas, a member of the Commission, is here, and he will go into it in detail. He conducted the investigation, and he and his assistants have been primarily responsible for the drawing of this bill.

You will find from the confidential committee print, which is before you, that after the bill was introduced the American Bankers Association, through its representatives, some of whom are here, Mr. Hanes and Mr. Page, representing that association, which of course is interested in legislation of this sort by reason of the fact that it affects their members, many of whom are trustees of organizations and reorganizations and are supposed to look after the details of these debentures and other issues that are put out to the public, got together and have agreed on some amendments which are set out in this confidential print in italics in order that the committee might more readily understand them. A good many are technical and many are substantial, but they do not change the fundamental theory of the bill, which will be explained as we go along through the bill, by Mr. Douglas and his assistants.

I do not wish to take any more time of the subcommittee, and I will reserve my remarks for the floor of the Senate when the bill comes

up for consideration. Mr. Douglas is here, and I am sure the committee will find him completely conversant with this whole subject, with the background, the history of the investigation and the need for it and for the legislation. Mr. Page and Mr. Hanes are here from the American Bankers' Association, and other gentlemen are here who will be heard if they desire or if the committee finds it necessary.

I think the bill has been worked out through cooperation with the Commission and the bankers' association, and I do not think that there will be any serious opposition to this bill. There may be some provision that might be changed here and there, but substantially the bill meets the approval of the whole financial world, as I understand it, and those who will be expected to come under it and be governed by it.

The CHAIRMAN. The subcommittee will be very glad to hear from you, Mr. Commissioner.

## STATEMENT OF WILLIAM O. DOUGLAS, MEMBER OF THE SECURITIES AND EXCHANGE COMMISSION, WASHINGTON, D. C., ACCOMPANIED BY EDMUND BURKE, JR., MEMBER OF THE STAFF OF THE SECURITIES AND EXCHANGE COMMISSION, WASHINGTON, D. C.

Commissioner DOUGLAS. Mr. Chairman, if you desire it I might take a few minutes to sketch, in brief terms, the general background of the corporate trustee problem, to acquaint the committee with the point of view and the general philosophy expressed in the Barkley bill.

The CHAIRMAN. Yes; I think you should.

Commissioner DOUGLAS. If at any time I get too far away from specific detail I wish you would remind me; and thereafter I can go through, in such detail as the committee desires, the committee print of the Barkley bill, indicating what the major provisions are.

As a general background, in our judgment the problem presented by the Barkley bill is that of providing greater protection and safeguards for investors under trust indentures. It has been conservatively estimated that 40 billions of dollars of securities nationally distributed have been issued and are outstanding under trust indentures.

The inadequacies of law and of corporate practice which exist in connection with these instruments have created national problems which require present solution. To these the Barkley bill is addressed. To these problems the Securities and Exchange Commission in the past 2 years has given intensive examination and thought, and, last summer, submitted to Congress a report on the subject.

The current interest in the matter is evidenced also by the studies undertaken during the same period by special committees of the American Bankers Association and of the Investment Bankers Association, and by the earnest endeavor of the leaders among the corporate trustees to raise the standards for their profession.

The Commission, I would like to say, has received from these groups many constructive suggestions and ideas in the course of its study of these problems.

### EVOLUTION OF TRUST INDENTURE

The trust indenture is the product of a hundred years' evolution in the methods of financing commercial and industrial development by the widespread sale and public distribution of corporate securities. It is undeniably a convenient adjunct in the sale of issues of bonds, debentures, and notes wherever assets are to be pledged or mortgaged to secure such issues. The practice of giving security for a loan is, of course, as old as the history of private enterprise itself; as investment needs and markets grew, the sale of secured bond issues merely gave a broader scope to a very old institution.

Senator BARKLEY. Mr. Chairman, if I may interrupt just a moment: There is no objection to giving members of the press copies of this confidential print, is there?

The CHAIRMAN. I think not.

Senator BARKLEY. It has not been agreed to, but it is a matter of public information.

The CHAIRMAN. It is really your final submission?

Senator BARKLEY. Yes; but of course it is subject to any change that the committee may want to make. If the public is interested, I think you might as well let them have it.

Commissioner DOUGLAS. At a relatively early date in the development of the trust indenture device, the idea became fixed that it was preferable, for both legal and practical reasons, to make the pledge or mortgage of assets run to a single title holder, a trustee, instead of directly to the constantly shifting and changing body of persons who were the owners of the securities. Instead of having many mortgagees, there was therefore only one—the trustee—so that in the event of a default the borrower would not be subjected to the harassment and expense of many foreclosure actions arising out of the one default. Then, too, by placing in the trustee the principal right, and duty, to bring foreclosure actions when these became necessary, the convenience of the bondholders was also served, and a great deal of duplication of effort and expense avoided in regard to the enforcement of their security.

As an incident to this, if claims had to be filed by the bondholders to protect their interests in a judicial proceeding, the trustee was a convenient agent to perform this necessary function. In this way there were gradual accretions upon the powers of the trustees.

The trust indenture is the instrument embodying the obligations of the issuer; the powers, duties, and responsibilities of the trustee; and the powers and rights, as well as the disabilities, of the owners of the securities.

The vesting of important powers in the trustees was inevitable in the nature of the trust indenture device. The security holders themselves are generally widely scattered and their individual interest in any one issue is likely to be small. For example, I might say parenthetically that in our study of real-estate issues, all of which were uniformly secured by these indentures, the average holding by investors was about $2,000. They do not have the initiative, the knowledge, the time, or the funds necessary for the constant and continued safeguarding of their investments.

The trustee, on the other hand, soon came to be, and is generally today, a single large bank well equipped by training and competence for its responsibilities under these indentures. And it is to a great

extent empowered by the provisions of the typical trust indenture to take quick and vigorous action in a variety of ways to protect or enforce the security underlying the bonds, debentures, and notes.

Under the very terms of the trust indenture the trustee alone is capable of effective action in this connection. And it is the only agency avowedly designed for the protection of security holders during the entire life of the security from the date of its issue down to the final reorganization or final payment of the security.

### RELIANCE ON TRUSTEE

It is to be expected, then, that upon the public distribution of bonds' debentures, or notes secured by an indenture the institution which will act as trustee is frequently a prominent one. Persons are undoubtedly influenced, to some extent at least, in their purchase of securities by the size, prestige, and financial strength of the trustee. The individual security holder often assumes that the trustee is his alter ego in safeguarding his rights; the prominence of the trustee, therefore, ostensibly lends some assurance that the investors' interests will be adequately protected.

The necessity for reliance of the security holder upon the indenture trustee for protection of his investment is rather complete. It is common knowledge that purchasers of securities, though they are legally bound by the terms of the trust indenture, seldom examine its terms unless they happen to be large and substantial investors. In any event their effort to do so would be futile.

The significance of the elaborate provisions of a trust indenture can be understood only by specialists. The investor relies for the adequacy of the security underlying bonds, notes, and debentures, upon the reputation of the issuer, the underwriting bankers, and the trustee.

But for honest, faithful, and efficient operation of the provisions of the indenture, reliance must be primarily placed upon the trustee as representative of the securityholders.

The issuer—that is, the debtor—can hardly be expected to make adequate safeguards against weak or meaningless protective clauses. To a large degree the creditor and debtor interests are incompatible in this regard. And the underwriter, though admittedly performing at times a protective function, has too often been motivated by factors not compatible with the objectives of the prospective investors.

If a larger degree of protection is to be afforded in these situations, it must come from the trustee under the indenture.

Furthermore, investors buy securities and retain no effective control over the issuer's performance of its obligations in respect of them. Such control is in practice surrendered to or assumed by the trustee, which is invested with power to certify securities; to supervise the deposit and withdrawal of collateral and the application of the proceeds of the bond sale; to take action on the investor's behalf when default occurs; and, in short, to do everything upon which the protection and the enforcement of a bondholder's security depends.

In theory the result should be decidedly beneficial to the security-holder. He should benefit because of increased expedition, economy, and efficiency; and the trustee should be able to act vigorously and effectively under broad powers granted in indentures, without the delay and difficulty of consulting and reconciling the individual opinions of securityholders.

## NEED FOR GREATER RESPONSIBILITY

But in the past practice too frequently has fallen short of those objectives. Examination of the provisions of modern indentures and their administration by trustees has disclosed that the reliance of investors is to a large extent unfounded. Too commonly, though by no means always, trustees have not exercised the powers which are the bondholder's only protection. Though they have taken many powers designed to protect the bondholders, they have too frequently rejected the duty to exercise them. By means of involved provisions which by and large are unintelligible to the investor, the express duties of the trustees have been cut down, until too frequently they are practically nonexistent. And, furthermore, exculpatory clauses have been used in such a way as to leave trustees harmless despite their inactivity and, at times, despite even negligent conduct.

In other words, the responsibilities which trusteeship normally imports have too commonly been absent. The so-called trustee that was left has been a mere stakeholder and clerical agency. This perhaps was the intention. But the current of modern thought, including that of enlightened and progressive trust institutions, is that it should no longer be the case.

The Commission's study and investigation, and its report to the Congress, have made plain the critical conditions which have prevailed in segments of this field and the basic and the fundamental changes which should be made. A brief discussion of some of the major points emphasized by our report will, I believe, illuminate the nature of the present legislative problem and the Barkley bill which is designed to solve that problem.

They are, first, the degree of care and activity which the trustee should exercise, and, second, the problem of conflicting interests.

## DEGREE OF CARE NECESSARY

(1) First, as to the degree of care, it seems obvious, for example, that where assets are pledged or mortgaged to secure a bond issue, the first essential is to see that the mortgage is properly recorded. Individual investors cannot do so. In any case it is natural for them to rely upon the issuer and the trustee for such matters. Yet issuers may, deliberately or out of carelessness, fail to discharge this obligation.

A study was made by the Commission of some 424 typical indenture provisions in this connection, and there was found in 86 percent of the indentures an express provision to the effect that the trustee was under no obligation to see to any recording, registry, or filing of the indenture.

It would require no radical step to place this responsibility upon the trustee. It is the fact that in practice, though not in law, the conscientious trustee assumes that he has that duty in spite of the exculpatory clause in the indenture. To place that obligation on all trustees would, then, be doing no more than what is already done by the more meticulous and conscientious corporate trust institutions.

(2) Furthermore, it is a common duty of corporate trustees to certify bonds issued under indentures, at the time of their issuance. In legal effect this means no more than a guarantee that the particular security is issued under a described indenture, and is not a counterfeit or an overissue.

But frequently conditions precedent to certification are set forth in the indenture, relating to the deposit with the trustee of a certain quantity or quality of security; the existence of certain stated earnings of the issuer; and the like.

Though the consequences to investors are definitely harmful if these conditions precedent are not fulfilled, the trustee is normally given protection against liability for certifying in such cases if it obtains an adequate certificate from an officer of the issuer attesting to the happening of the conditions.

This means, in effect, that the trustee need act merely mechanically, need take no steps to investigate the adequacy of the certificates, and may proceed to certify bonds, notes, and debentures without careful inquiry and analysis.

So long as such conditions precedent can be safely circumvented and violated by issuers on account of acquiescence or passivity by the trustee, such provisions are inadequate. They promise investors a measure of protection which in practice may turn out to be unreal, unless actually exercised in the manner followed by a conscientious, high-standing corporate trustee.

What is required is an obligation upon the trustee to use reasonable care and diligence in ascertaining the truth of representations of the issuer in this connection.

(3) When a bond issue is sold to raise money for a particular and stated purpose, some supervision must be exercised by the trustee over the application of such proceeds. Yet in our examination of typical trust indentures, the Commission found that in more than half of 413 indentures examined there was an express statement that the trustee was under no obligation to see to the application of proceeds. And in only about 24 percent of the cases were the proceeds of the issue received by the turstee and disbursed.

The history of real-estate financing, for example, points to the tragic results which this absence of supervision may cause to investors. It seems clear that they should be given all practicable assurance that the funds which they pay are invested in the manner represented to them when they bought their securities, so that they will end up by owning an apartment house rather than a hole in the ground.

While it is conceded that it is impracticable for trustees to follow the proceeds of an issue so closely that it becomes involved in routine business of the issuer, there are proper cases, some of which we outline in our report, in which the trustee without undue hardship to itself or to the issuer can supervise the application of borrowed funds. This would demand merely the exercise of reasonable care on the part of the trustee, a standard of conduct to which the more reputable trustees have already come to adhere. This seemingly minor reform would provide investors with protection against practices which in the past have occasionally taken heavy toll and caused undue damage.

(4) Furthermore, some trustees have relied upon purely technical performance of their responsibilities, so as to slight such negligible duties, for example, as publication or announcement of notice of default, upon the nonpayment of interest, failure to meet sinking fund payments, delinquencies in the payment of taxes, and the like.

At times trustees have not bothered to see that they received from issuers schedules showing the issuer's assets and liabilities in a manner

specified in their indentures, even though this was an essential element in checking on the issuer's obligation to security holders to maintain a stated ratio of assets and liabilities.

These are acts which constitute defaults by the issuers. Yet 93 percent (some 391 out of 420 of the indentures examined by us were found to contain a standard provision that the trustee could shut its eyes to the existence of any default until formally notified of it by a specified percentage of the bondholders—a prime example of putting the cart before the horse.

Such type of provisions should, by and large, in our judgment, hereafter be avoided. Reasonable care and conduct on the part of trustees in matters such as these are required, so that security holders may be the better apprised of the true condition and expectations of the enterprise in which their money is invested.

The trustee must assume the affirmative obligation of taking all such steps as are reasonably necessary to advise security holders of impending or existing defaults.

I will revert to that complicated and difficult matter again when we get down to the specific provisions of this bill.

### INADEQUATE DUTIES ON DEFAULT

Throughout the life of its trust many occasions arise for the exercise of a trustee's powers and responsibilities. These occasions will increase in frequency and importance as the period of reorganization or liquidation draws near or arrives; and as we will show, when we get down to the provisions of the pending bill, there is quite a distinction between the functions of the trustee prior to default and the functions of the trustee subsequent to default. But even in these reorganization situations, trustees too frequently have been inactive.

The CHAIRMAN. Do you mind a question now and then?

Commissioner DOUGLAS. Not at all.

The CHAIRMAN. I am not going to ask very many. Some little while ago you spoke of trustees in some cases failing to register or record a mortgage.

Commissioner DOUGLAS. I was speaking not so much of any prevalent failure of trustees to do that, as of provisions in the indenture which did not require the trustee to do that.

The CHAIRMAN. Did you find cases actually where there was a neglect to record?

Commissioner DOUGLAS. Yes; there are such cases. I do not want to leave the impression that those cases are widespread and numerous. I say that there are occasional cases, but I think they are of importance in this connection for the reason that when they do arise they are cases where great hardship is occasioned.

The CHAIRMAN. I agree with you that there ought to be some definite obligation, and I wondered whether that was really neglected in many cases.

Commissioner DOUGLAS. In many, many cases it is not. Where it has been neglected, great hardship or great loss has occurred. But I do not point that out as one of the prime abuses or the sole occasion for this legislation. Other abuses transcend that in importance.

Senator BARKLEY. But it is sufficiently prevalent to justify the inclusion in the law of a requirement that the trustee look after that?

Commissioner DOUGLAS. I think so, sir; and I think the trustees

themselves, as they can tell you better than I can, agree on the principle of that.

The CHAIRMAN. The obligation ought to be somewhere; that is sure.

Commissioner DOUGLAS. Yes. As respects these reorganizations, the lack is not so much one of power as of affirmative duties. Trustees are generally given ample powers by their indentures to bring suit to collect principal, to foreclose, and to enforce all other rights under the indentures. But instances of trustees not taking such action unless and until they are forced to do so by bondholders have been too common in the past. Ninety-three percent of the typical indentures which the Securities and Exchange Commission examined (391 out of 420) provided expressly that, although defaults of one sort or another had occurred, the trustee had no duty to foreclose or to initiate other judicial proceedings or any other action specified in the indenture, unless enough bondholders to make up a stated percentage of the principal amount of securities then outstanding made demand upon it.

That percentage I think runs pretty close, in most cases, to 25 percent. To obtain that percentage you normally are faced with the necessity of forming a protective committee.

In more than half of the cases (226 out of 391) the trustee, by express provision, still retained the power to choose the remedy to be pursued. Only if a specified, and higher, percentage of the bondholders demanded it, could it be compelled to take the particular type of action which those bondholders desired.

A further barrier to action is also not uncommon. Even after all that I have related has been complied with the trustee may still refuse, and the indentures expressly permit this, to take any action which is likely to involve it in expense or liability unless the security holders furnish it with indemnity. About 96 percent of the indentures examined by us contained such provisions.

Insistence upon the formalities of written demand and indemnity, despite the lien for all their expenses which trust indentures ordinarily give to trustees, merely delays necessary activity on the part of the trustee, as do the other unwieldy, cumbersome, and inadequate provisions which I have just outlined.

In our judgment and, I think, in the judgment of the leaders of the corporate-trust business, only by requiring a more active trustee who will move whenever the occasion demands without waiting for direction from the security holders will the latter be adequately protected.

All trustees should be required to do what in practice the vigilant trustee has done, that is, to act with that vigilance and thoroughness which it could be expected to exercise if it were protecting its own investment.

That is a general standard that is made more specific in the Barkley bill; and I will revert to that later on.

I have mentioned the exculpatory clauses in indentures which commonly afford trustees protection from all liability for negligence and all acts or failure to act, except for outright fraud or gross negligence. Such exculpatory clauses, all agree, have been too common.

It follows, in light of the trustee's mechanical duties and its absolution from real risk or responsibility, that the use of the word "trustee"

is indeed a misnomer.  It is a misrepresentation to investors of the
nature of the protection for which they are paying.  The only remedy
is to require a return to the theory that a corporate trustee is a trustee
and that it should assume the duties and discharge the responsibilities
of a trustee.  That leads us again back to the specific requirements,
the specific standards of conduct in the Barkley bill, to which I will
refer later.

## CONTRACTUAL NATURE OF INDENTURE

At present the kind of provisions I have described are regarded, as
a matter of law, as parts of a "contract" between the trustee and the
security holders.  The trustee, however, is usually a passive partici-
pant in the drafting of this contract.  The trustee is usually selected
by the issuer or the underwriter, or by agreement of both.  Commonly,
the indenture is drafted by counsel for the underwriting bankers or
the issuer, or both, and is then presented to the trustee for its accept-
ance.  Out of 244 cases which we sampled, we found that counsel
for the trustee drafted the indentures in only 10, and had some kind
of participation in the drafting of 98.  Even in these cases, the evi-
dence would indicate that the trustee's concern was principally with
the provisions relating to its own protection.  A great deal of the
fault for inadequate care of investor's interests must therefore be
placed upon the trustee.

Bankers, lawyers, and courts have contributed to the evolution of
these indentures.  Almost exclusive consideration and weight have
been given to the intent of the parties to the indenture.  Accordingly,
it has been assumed that the trustee could take or refuse to take
practically any right or duty, power or privilege, which was agreeable
to him and the issuer.  It has also been assumed that this contract
between trustee and issuer is binding on security holders on the theory
that they acquire only such rights as the contract which these parties
have made gives them.  That is to say, the supposition is that the
indenture evidences the intent of the security holders whose loans it
secures.  But that mutuality of intent which is assumed is in fact
nonexistent.  To the extent that the indenture is the product of
the borrower, the underwriter or the trustee, only their respective
intents are reflected therein.  The individual purchaser of such
security cannot normally bargain for special provisions.  Nor can
prospective buyers normally unite in anticipation of an issue, to
exact desired terms.  Inequality of bargaining power between in-
vestor and issuer is inherent in the very technique of security distri-
bution.  Yet the courts in their treatment of the trust indenture
have proceeded on the same basis as the draftsmen and have concluded
that the indenture is a contract which binds the security holders even
though they had no part in its making.

As in the case of other contracts involving persons not capable or
not in a position to protect themselves, the contents of the trust in-
denture can no longer be left to the conventions of the issuer, the
trustee, or the underwriter.  The underwriting bankers have not
afforded adequate protection to security holders against emasculat-
ing and oppressive provisions in indentures.  Too frequently they are
interested in acceding to the wishes of the issuer.

Nor can adequate protection to security holders against emasculat-
ing and oppressive provisions in indentures be expected from issuers.
Their dominant interest will always be in retaining as great freedom

and flexibility of action as possible. They are interested in effectively tying up, by mortgage or pledge, as little property as possible; they are concerned to have the greatest possible freedom to withdraw collateral and sell pledged property; and they are anxious to have the most liberal opportunity to avoid and postpone the consequences of default. Each of these is a desire antithetical in principle to the interests of investors.

The basic problem is to refashion the trust indenture for the purpose of according greater protection for the holders of bonds, notes, and debentures. This means that a more proper balance between the interests of investors and requirements of issuers can be had only by enlarging the definition of the trustee's duties in those cases where its failure to take swift and positive action leaves the investors without effective protection of their interests. The contrary desires of issuer, trustee, and underwriter must be made to bow to the insistent demands of investors and of the public interest in such cases.

These contracts which the trustee and the issuer make are in a real sense affected with the public interest. There should be added to the drafting table, so to speak, a fourth person representing the public interest and the interest of investors.

And that concept of another person added to the drafting table is the basic concept running throughout the whole Barkley bill, as I will develop subsequently.

#### CONFLICTS OF INTEREST

The second point that I mentioned was that of conflict of interests. The remedy for the problems in the corporate trustee field is not to be found merely in the substitution of active for passive trustees. A prerequisite to any contractual or legislative mandate for active trustees is that trustees not have material conflicts of interests, so that they are free to discharge their responsibilities actively and vigorously.

One conflict, not uncommon, is the identity of interest between the trustee and owners of junior securities or equity interests. This has been conspicuous particularly in the real estate bond field. There the trustees were usually officers, directors, or affiliated corporations of the houses of issue. The house of issue, as a result of advances made by them to meet payment of taxes, principal and interest, had acquired junior securities or equities in the properties. It was to the obvious advantage and self-interest of these houses to preserve these junior securities and equities against being diluted or wiped out by the bondholders whom the trustee represented. It could hardly be expected that the trustee, so closely identified with the house of issue, would take adequate steps to preserve the bondholders' position against these adverse claims of the house of issue. And it is a matter of record that the trustees did not. The many ways in which the inaction of these trustees served to protect the investments of the houses of issue are matters of record. Even though, at times, the effect on the security holders of a trustee's identification or affiliation with owners of junior securities or equity interests may be difficult to measure or ascertain, and may mean merely that the advocacy of the cause of the securityholders is less aggressive and more timid than it otherwise would be, yet it is clear that it is incompatible with the

fiduciary obligations of a trustee that it own or represent or be affiliated with those who own or represent securities which conflict with or are adverse to those of the beneficiaries of the trust. Divorce of the trustee from such adverse interest is essential.

Senator BULKLEY. In a general way, who are these trustees that you are talking about? Are they big bankers?

Commissioner DOUGLAS. They are, by and large, at the present time commercial banks which have trust departments. They are not exclusively commercial banks. The vast percentage of them are commercial banks. There are occasionally separate institutions that do nothing but a trust business and that do not do a commercial banking business. In the latter category is a very large institution in Chicago by the name of the Chicago Title & Trust.

Senator BULKLEY. But this complaint that you are making in general terms lies principally against banks, does it not?

Commissioner DOUGLAS. Take the real-estate field, for example. In the later stages of the Straus financing the trustee under the Straus issues was a bank. However, in many of the real-estate issues the trustee was not a bank, but an individual, and he was, in the Straus and some other cases, an employee of Straus or the house of issue. That was conspicuous in the case of real estate issues. The employee relationship made the trustee subservient to the house of issue; it made him a "vest pocket" trustee of Straus.

The CHAIRMAN. Did the bank select the trustee or have the influence to select its own employee?

Commissioner DOUGLAS. Oh, yes; the house of issue would name the trustee in that case.

The CHAIRMAN. There was a relation between them?

Commissioner DOUGLAS. Yes.

Senator HUGHES. Is not that true almost invariably?

Commissioner DOUGLAS. The issuer together with the underwriter selects the trustee. But in the real-estate situation the issuer was relatively unimportant. He was a little fellow that had a piece of property—very often an impecunious person though not always—and he would incorporate himself and his wife and his eldest son, and Straus would sell the bond issue. Straus was the real dynamo.

When you go to the industrial field you do not find that situation precisely.

The CHAIRMAN. Do you find a lack of independence, nevertheless?

Commissioner DOUGLAS. At times you do, and I will get to that. On the ownership of junior or senior securities by the trustee, where the ownership is of a substantial amount, I think all agree that the trustee should not at the same time be in a fiduciary relationship under the indenture; that is to say, if he is trustee under a first-mortgage bond issue and, say, owns the entire second-mortgage bond issue and has it in his own portfolio, he is not in position to protect adequately the first-mortgage bondholder against himself, the second-mortgage bondholder.

Senator BULKLEY. Is it always undesirable to have the same trustee for a first- and second-bond issue?

Commissioner DOUGLAS. I think as a general proposition it is. I do not think there is any disagreement on that. The provisions of the Barkley bill generally disallow that; although when we get to that we will see that there is an exception for a very small isolated group of

cases. But I can explain that better, perhaps, when we get to the committee print.

Conflicts of interest may be present if the trustee is a banking institution which has made loans to the issuer of the bonds which are outstanding when default impends or occurs. As bank creditor it owes an obligation to its depositors and stockholders to take all steps necessary to protect and preserve its loan irrespective of the injury which such measures might cause to others who were investors in the same enterprise. But as trustee for bondholders its duty may lie in the direction of taking prompt and vigorous action to protect the interests of the bondholders.

The impact on the securityholders of the conflict of interest arising as a result of the trustee being a short-term creditor usually will be greatest immediately preceding or immediately following default. But such conflict of interest may be detrimental to the securityholders on other occasions as well. One such instance is the case where the trustee is a bank creditor as well as trustee of a debenture issue which contains a negative pledge clause. The issuer of the debentures may be faced with the necessity of incurring new long-term indebtedness in order to repay its bank loans. To float a new security issue the issuer may feel that, if it complies with the negative pledge clauses in debentures which are presently outstanding, it may have difficulty in selling the new securities. If the trustee of the debenture issue is likewise one of the short-term creditors to be paid with the proceeds of the new security issue, it can readily be seen how the self-interest of the trustee may result in its closing its eyes to the avoidance or circumvention of the negative pledge clause. In such situations the debenture holders are apt to find that their trustee is not a vigorous champion of their rights.

Senator BARKLEY. For the benefit of the record would you explain what you mean by the negative pledge clause? If you have done it elsewhere in your statement you need not do it now.

Commissioner DOUGLAS. I will make some comments on those clauses later.

Senator BARKLEY. Very well.

Commissioner DOUGLAS. A further danger lurks in affiliations which a corporate trustee may have with the underwriters of the bonds under its indenture. If it can exert influence upon the trustee, the house of issue may be able to conceal default and postpone action. Affiliated trustees might not accommodate a group hostile to the bond house, and could not be compelled to act unless bondholders massed that percentage of the total amount of outstanding bonds, as required by the indenture, and made demand on and furnished indemnity to the trustee. And a rival group could hardly do this because the house of issue possessed the only list of securityholders. Without such list, there would be small hope of organizing a substantial block of holders necessary to make the demand.

Such affiliations of the trustee with the underwriter, whose objectives in reorganizations are frequently incompatible with those of investors, tend to submerge the interests of the security holders and to make them subordinate to the wishes, desires, and possible selfish interests of the underwriter. The trustee will be either unable or unwilling to look at the situation coldly and objectively with a single eye to the protection of his beneficiaries.

To the extent, also, that the underwriter has an interest in securities which conflict with those which an affiliated trustee represents, the trustee is not an independent representative of his beneficiaries. Furthermore the underwriter may have reasons for concealing defaults when it would be to the best interests of the security holders to proceed forthwith to foreclosure, receivership, or bankruptcy. The underwriter may have junior securities to protect. It may have a market to maintain. It may have ties to the management which are so strong as to induce it to lull the security holders into a false sense of security. It may have a desire to obtain control over the whole reorganization when it does come and to conceal defaults until the reorganization stage is set, in order to obtain for itself the many emoluments that run to those who are able to control reorganizations. To the extent that the trustee is closely affiliated with the underwriter, the trustee shares the conflicts which arise out of these adverse interests of the underwriter. In sum, if trustees are to be expected to live up to the standards of conduct before and during reorganization which I have outlined, they cannot be allowed to possess antagonistic duties and loyalties to themselves as creditors or holders or representatives of conflicting securities, or to the management or its bankers.

### TRUSTEE AS PERMANENT PROTECTOR

What I have said briefly concerning the activities and possible objectives of underwriters in connection with reorganizations has implications in addition to demonstrating the undesirability of affiliations on the part of trustees with such underwriters. These facts lead irresistibly, I believe, to the conclusion that only the corporate trustee, once it is freed of its conflicting interests and charged with active duties and responsibilities, can be relied upon as the agency which will supply continuing, uninterrupted, and effective protection to bondholders during the entire life of their security. Underwriters and distributors of bonds undeniably have a moral obligation to do all within their power to foster and protect the interests of the investors for whom they have sold securities. But if the experience of the last decade has taught anything in this connection, it has been to demonstrate that too often conflicts of interest arise to inhibit proper performance of this obligation by underwriters. Furthermore, no permanence or guaranty of continuity attaches to the life of the ordinary underwriter. The Banking Act of 1933 ended the securities affiliates of commercial banks. The fortunes of underwriters are subject, also, to the ordinary hazards of competitive business. What investors in securities issued under indentures require is a permanent, stable, financially responsible fiduciary institution as their agent and representative.

The protection of investors will require not only permanent trustees but also, as I have said, some safeguards against impecunious and irresponsible trustees. This is essential lest the safety of funds be jeopardized and the administration of these vast trusteeships fall into irresponsible hands.

In summary, it seems to us necessary in the public interest and for the protection of investors that trustees under indentures should be disqualified from acting or serving if they have or acquire conflicts of interest inconsistent or inconsistent with their fiduciary obligations; and that they should be transformed into active trustees with

the obligation to exercise that degree of care and diligence which the law attaches to such high fiduciary position, along lines which I indicated earlier.

## INADEQUACY OF PRESENT LAWS

The Securities and Exchange Commission is at present vested only with limited powers which can be exercised to the end of reaching these desired objectives. While by virtue of the powers vested in it under section 19 of the Securities Exchange Act of 1934 it can by appropriate rules and regulations change the listing requirements for securities on national securities exchanges or by order alter or supplement the listing rules of such exchanges, there are practical limitations on such program. In the first place, such listing requirements would reach only the rather limited classes of securities dealt in on such exchanges. In the second place, the Commission cannot in justice to exchange trading, set up such strict standards for the indentures and the trustees acting thereunder as to make it more attractive for issuers to stay off the exchanges and thus to be able to use any form of trust indenture and any trustee desired. Hence, its powers under section 19 of the Securities Exchange Act of 1934 are inadequate for effectuation of the proposed reforms. Uniform legislation by Congress is accordingly necessary.

As in the case of the Securities Act of 1933, the point of administrative control should be the time of the public offering of securities. The legislation which is needed would be an extension of and supplement to that act. Such legislation should provide for the setting of minimum standards for indentures under which securities are issued and publicly offered and qualifications for those undertaking to act as trustees for such security issues. It should forbid the use of the mails or any means or instruments of transportation or communication in interstate commerce for the sale of securities issued under indentures, unless these indentures and the trustees thereunder meet the prescribed standards.

These remedial and administrative measures are in substance embodied in the Barkley bill. If the Congress enacts that bill, the result would be that investors will have in the trustee an active guardian of their interests throughout the entire life of the security. There would be carried over into the corporate field the standards of fiduciary relationships comparable—at least after default—to those which have long obtained in personal trusts and with which these professional trustees have had a long and rich experience.

I have indicated the problem of reform in this field, not for the purpose of condemnation of corporate trustees but in an attempt at an objective appraisal and critique of the institution of the trust indenture in its modern setting. The program of reform envisaged in the Barkley bill, as I read it, is not new and revolutionary. Nor should it have any disruptive effect on legitimate business. It brings to fruition the constructive thinking that has taken place in the corporate trustee field during the last decade. These ideas are by no means exclusively those of the Securities and Exchange Commission though we heartily endorse the Barkley bill as a constructive and progressive measure. But as important is the fact that the philosoply of the bill meets the highest standards of the corporate trust business. Enlightened and constructively minded corporate trust institutions

have, especially in recent years, moved toward the same general objective in their thinking and planning. This is evidenced not only by the various groups from the profession who have been working on the problem but also by the various codes of ethics which they have from time to time been promoting for general adoption and approval. The thought here has been toward uniformity of practice and policy. But progress in that direction has at times been difficult and slow in view of competitive conditions which prevail.

The corporate trust business like most other business has in it various levels of competency and efficiency. Here, as elsewhere, there has not been complete uniformity in practice. The problem of the responsible and enlightened corporate trust institutions has been to raise the standards of the entire business to the higher level. Great strides toward that objective should be made by reason of the Barkley bill since it affords uniformity of standards throughout the entire business and makes possible the injection into substantially all of this type of trust business the highest standards which prevail today. Experience may reveal the need for additional strength in parts of this bill but as it stands it is, in my judgment, an adequate, practical, and workable measure. With this, I am confident, responsible trust officials will agree.

You can obtain from them first-hand information on that.

Senator BARKLEY. Before you go into the details of the bill, I would like you in a word or two, for the record and for the benefit of the committee as well, to state two or three typical conditions leading up to the issue of these indentures and the appointment of trustees.

The CHAIRMAN. Where abuses exist.

Senator BARKLEY. Yes; for instance, the things that lead up to the issue of these debentures and the appointment of a trustee; just two or three instances that lead up to it.

Commissioner DOUGLAS. I believe I understand correctly what you desire. Take the case of a person who has a piece of ground and wants to build an apartment house on it. He has no funds. There is in business an underwriter—a person who devotes himself to the problem of getting those funds. He and that underwriter get together and decide on the amount of the issue and the types of provisions to be contained in the indenture. They hire their lawyers and sit down and draft what normally would be called a mortgage or a trust indenture—a mortgage on that piece of property and on the building that is to be erected thereon, and perhaps, also, on the personal property to be placed in the building.

It is conceivable that a thousand persons will buy those bonds; maybe more. Perhaps they are in thousand-dollar denominations; perhaps one-hundred-dollar denominations. That mortgage cannot run to a thousand different people; or even if it could, some of those people will die or sell and what not, with the result that there would be a constantly shifting group of mortgages. That would be unworkable. So the practice developed of executing the mortgage, so to speak, to the trustee. In the real-estate field it was too commonly the practice to have that person an individual working for the house of issue, and he would take the conveyance and hold the property under mortgage in trust—in trust for all these security holders.

The person who owned the property, the mortgagor, and the trustee would be the two parties to that contract—that is, the mortgage. The

house of issue and the obligor or mortgagor would select the person who was to be trustee. That person, together with the obligor, the issuer, would execute the mortgage and would, from time to time, release to the house of issue or the obligor the securities that had been sold. That is the general mechanism.

Senator BARKLEY. That would apply in the case of a real-estate-promotion scheme.

But let us have an instance of a corporation that is already in business; it has already outstanding securities in the way of stock and maybe bonds. I would like to have you put into the record just a brief explanation of the condition existing in connection with such a company where debentures are issued.

Commissioner DOUGLAS. The company has, say, outstanding stock and also a first-mortgage-bond issue. It needs some temporary financing, say, 3-year or 5-year financing, perhaps for certain capital requirements or what not. They discuss the problem with their customer, who is the underwriter, and they go over the situation thoroughly to determine what the interest rate should be, what the pricing should be, taking into consideration market conditions, money rates, and so on, and they decide on the protective clauses that the debenture holders should have. Here is one type of problem that will arise where the debenture issue is not to be secured: The issuer may execute another mortgage, thus taking away from the debenture issue some present unmortgaged assets. That raises a question of broad policy. Do the debenture holders need, for their protection, a provision in the indenture which forbids the issuer from mortgaging away those assets or which provides that if such a mortgage is issued the debenture holders will receive pro-rata protection thereunder?

That is a matter of business judgment. The issuer and the obligor decide that in view of a variety of circumstances they may or may not put in such a protective clause. So they work out the various protective clauses that they think the debenture holders need, and they draft an indenture. There is no property pledged under it, but the rights of the debenture holders are spelled out in it, and the trustee is set up to be the focal point for enforcement of the obligations of the debentures and also the protector of the investor against the violation of any of the covenants in the indenture.

In other words, the situation in the real-estate field that I have indicated is in miniature what the usual commercial transaction of an industrial enterprise is on a much larger scale.

Senator BARKLEY. Of course, the relative rights of the holders of these debentures are involved either subsequently in the liquidation or in reorganization, to a very large extent?

Commissioner DOUGLAS. Yes; that is true.

Senator HUGHES. "Debenture" is a very much misleading term, is it not? And it is also meaningless.

Commissioner DOUGLAS. There have been undoubtedly many debenture issues that have contained misleading and meaningless protective clauses.

The CHAIRMAN. You speak of real-estate transactions being miniatures of larger ones. Have there not been in late years most flagrant abuses in that field, where stockholders of these debentures have practically lost everything they invested?

Commissioner DOUGLAS. Oh, there is no doubt about that. There have been.

I could go at great length into details of those abuses, and I would be glad to if the committee desires. I think that in view of the great constructive thinking that has gone on in this field by the trustees themselves, it is not necessary to go into those things extensively for the reason that there is on all sides an admission that improvement is necessary and desirable.

The CHAIRMAN. State legislatures have been attempting to deal with the subject of late years, have they not?

Commissioner DOUGLAS. Certainly in New York, Senator, where I believe the Streit bill was passed a year or so ago.

The CHAIRMAN. Three years ago.

Senator BARKLEY. You said a while ago that the average purchaser of these debentures of course had no opportunity to look at the instrument and probably would not understand it if he saw it. On the average, how voluminous are these documents which are drawn up between trustees and issuers?

Commissioner DOUGLAS. An unsecured debenture issue may be a relatively simple document of 10, 25, or 50 pages.

I have here a first-mortgage bond indenture executed this year which contains 277 pages[exhibiting a volume to the members of the subcommittee]. Much of that, of course, is taken up with the description of the properties; other parts of it contain a detailed statement of various types of covenants, and so forth. Some of the railroad issues have involved even larger indentures than that.

The CHAIRMAN. Do you want to go to the provisions of the bill now, Mr. Commissioner?

Commissioner DOUGLAS. Yes; if the committee so desires.

Senator McADOO. I should like to ask a question or two before you do that.

Do you think there is any practicable way, through legislation, to secure for the intending purchaser of a debenture or other bond, a first- or second-mortgage bond, any adequate idea of what sort of security he is getting or as to the value or possible value of the security that he is buying?

Commissioner DOUGLAS. I think that substantial progress has been made as the result of the Securities Act of 1933. I think that the information which has been made available as the result of that very important and significant statute has permeated down to investors, sometimes indirectly, through investment services, banks, and so on, that have been advising their customers. It has got down to the investor by one route or another so that the investor has been able to exercise more intelligent judgment as to whether or not his thousand dollars should go into a particular enterprise. We have no further control, under the Securities Act, than the requirement that the truth, the whole truth, and nothing but the truth be told about all securities.

Senator McADOO. It has been my experience as a lawyer, with many clients who come to my office, that the average man who makes an investment cannot understand the truth, the whole truth, and nothing but the truth when it is given to him, because he does not understand the technical terms which are involved in conveying the information, and he relies, in the final analysis, upon his confidence in the bank which is selling the security.

Commissioner DOUGLAS. That may very well be true. Say I am an investor. I have a commercial bank up in New Haven, Conn., with which I do business. Say I have a thousand dollars to invest.

That bank that I rely upon for advice can give me more competent and intelligent advice, as a result of the Securities Act, because they have the information, and even though I cannot understand it, they can.

Senator McADOO. That is the point I am making. The value of this act is in compelling those who sell securities to convey truthful information. The bankers are the agents who distribute the information. The investor has to be taken care of, and he is more likely to get the truth about it than heretofore.

Commissioner DOUGLAS. That is true.

Senator BARKLEY. Not only that, but this bill requires that the trustee who is supposed to be looking after the investor's interest shall really devote himself to the investor's interest, instead of fooling around with other people and having an inconsistent interest which may cause him sometimes to neglect the interest of the real investor who has put his money into the enterprise.

Senator McADOO. That is another phase of the bill which is, to my mind, of great importance, because as a rule the trustee has felt that he was just performing a perfunctory act and that no particular responsibility rested upon him to protect the interest of the cestui que trust.

Commissioner DOUGLAS. Since you have raised the point, let me say this: I think it is probably obvious and clear, but there is something more required by the Barkley bill than merely disclosure. At the present time, under the Securities Act, there is the requirement for registration of bonds being offered. If there is a trust indenture, securing those bonds, that trust indenture has to be filed with the Commission. But, nevertheless, the fact is that what can go into that trust indenture is subject to the judgment and decision of the issuer, the underwriter, and the trustee—in practice, largely the issuer and the underwriter. And merely to disclose, to make public and available to any person who wants to read it, a 300-page trust indenture, is not supplying an adqeuate degree of protection, for the reason that the average investor would not be able to understand it if he did read it. And while the institutional investor might be able to step away from the thing or might, in consultation with houses of issue, get adequate protective clauses in, there is no possibility of the average investor exerting any influence upon the matter unless some one of his representatives does it for him.

The Barkley bill moves in the direction of requiring more than mere disclosure, in requiring that steps be taken to provide a greater degree of protection of investors in the types of covenants and protective clauses that are put into trust indentures. It does outrun the original concept of the Securities Act. It does not change it in any way, but supplements it in this respect.

The CHAIRMAN. Does it remove any possible conflict of interest?

Commissioner DOUGLAS. That is the second phase of it. As respects conflicts of interest, it sets up standards for trustees acting under these indentures. The bill, as I have previously indicated, is bottomed on the power of Congress to regulate the use of the mails and agencies of interstate commerce. In that respect it is squarely on the same basis as the Securities Act itself.

Senator HUGHES. Would it be at all feasible to require a trustee to be approved by some agency, such as your Commission, in order to secure uniformity?

Commissioner DOUGLAS. Under the statute there is not, in the strict sense, an approval of a trustee by the Securities and Exchange Commission, in the sense that the Securities and Exchange Commission could select a trustee, and say, "No; you will have to select this fellow or that fellow to act as trustee."

Senator HUGHES. I mean, including a proper provision to safeguard the investor; that the matter be submitted to some agency to examine it and make suggestions and also to require what shall be done.

Commissioner DOUGLAS. That is precisely what the bill does. There are usually three people at the drafting table at the present time, the issuer, the trustee, and the underwriter. What this bill does, in effect, is to add a fourth person to the drafting table, the Securities and Exchange Commission, if this bill were the law, would look at the standards set by Congress for these indentures, would read each provision in the indenture and ask itself this question: "Does this provision meet the legislative standard?"

For example, one of the standards, if this bill were the law, would be that the trustee shall exercise a reasonable degree of skill such as is required of a prudent man. The Commission would take that general standard and would look at each covenant and say: "Is this the kind of conduct which the Congress has said the trustee shall pursue?"

In other words, a person who came down, in case this bill were the law, and registered under the Securities Act a bond issue, a note issue, or a debenture issue, would qualify his indenture under this act.

Now, the Securities Act and the Barkley bill would become closely integrated. They would be parts of the same mechanism in effect; and under the provisions of this bill the Securities Act and the Barkley bill are geared up very closely one with the other.

There are some exceptions to that, but those exceptions relate only to those cases where at the present time a person who issues bonds does not have to register. In two instances of that kind a person issuing bonds, who does not have to register under the Securities Act, would have to qualify under the Barkley bill.

I do not think, Mr. Chairman, in view of the time spent in the introductory statement, that section 1, relating to the necessity for regulation, need be elaborated upon.

The CHAIRMAN. No; I think you have covered that.

Commissioner DOUGLAS. Section 2, the definition section, as I have said, and as the mimeographed analysis which has been distributed states——

The CHAIRMAN. You are referring to the last print?

Commissioner DOUGLAS. The confidential committee print. As indicated on page 4 of the mimeographed analysis, the indentures which would be covered by this bill would, for the most part, involve a registration of securities under the Securities Act. So far as possible, the procedure of the Securities Act has been followed.

Take line 17, page 6. The definitions of terms, by and large, are those of the Securities Act. That is merely indicative of the effort made to get a close integration so that there will not be too much variation between two pieces of legislation which are really companion measures.

There are in section 2 additional definitions of a number of terms. "Sale", on page 6, line 21, is substantially the same as under the Securities Act. There is one exception indicated at the bottom of

page 4 of the mimeographed statement to cover certain real-estate mortgages, where the mortgagor has executed a bond or mortgage to a trust company, receiving in exchange certificates of participation in such mortgage which he sells to the public. This transaction is held, under the Securities Act, to involve a public offering not only of the certificates but of the underlying bond. But for the exception made in this paragraph it would be necessary that the underlying bond, as well as the certificate of participation, be issued under a trust indenture with a qualified trustee.

As indicated in line 2, page 7, this exception does not apply if the eventual distribution of the underlying bond or bonds to the purchasers of the certificates is contemplated, as where the certificates are by their terms convertible into such bonds.

The term "underwriter", beginning on line 5, page 7, is given exactly the same definition as under the Securities Act, with the exception noted on page 5 of the Analysis.

"Director" is substantially the same as under the Securities Exchange Act.

Line 23, page 7: The definition of the term "indenture" is carefully worked out to include the type of instruments which I have been speaking about.

It will be noted that it covers cases not only of indentures secured by real or personal property, but also unsecured indentures.

The term "indenture to be qualified", running throughout the whole act, means the particular indenture that the Commission is examining; and the term "indenture security", used in line 16, page 8, is the security to be issued under this indenture to be qualified.

I do not know that I need to discuss in detail the term "obligor" in line 21, page 8. It means generally every person who is liable upon a security that is issued or to be issued under the indenture.

In the case of certificates of interest or participation the term includes persons liable upon the security or securities in which such certificate evidences an interest or participation.

The other definitions I do not think are more than merely technical ones that have no peculiar significance.

"Paying agent", line 4, page 9, means the person who is authorized by the obligor to pay interest. That frequently has been the trustee. Sometimes it is somebody else. In this statute there is no prohibition against the trustee being paying agent.

Exempted securities and transactions follow in some respects the exemptions under the Securities Act.

What the bill tries to do is to set up an exemption for all of those securities that in practice are not considered to be notes, bonds, debentures, or evidences of indebtedness.

Take interim certificates for bonds, notes, and debentures that are issued before the final definitive bonds are available. Quite properly the bill does not put into operation any heavy, cumbersome machinery for qualifying those separately.

Line 3, page 10: That exemption is designed, in effect, to exempt those issues that are commonly called fixed trusts, because there you get into an investment trust problem. A company with a portfolio that is changing back and forth as a result of selling and purchasing securities, is quite a different financial mechanism from one which issues the average note, bond, or debenture under an indenture.

Subsection 3 on page 10, line 7, in effect makes the effective date of the Barkley bill January 3, 1938. That is, I believe, merely suggestive of the desirability of not making it effective forthwith. Trustees would want time to get reoriented in order to do business under it. Issuers would want to get acquainted with it. The Commission would have the task of formulating rules and regulations. All of that would take time.

The exemptions in the Securities Act of 1933 are generally carried over here, as indicated on line 12, page 10. There are some exceptions. The type of exemptions that are carried over are those applicable to securities issued by the United States or any territory, municipal securities, securities of national or State banks, short-term commercial paper, securities of eleemosynary institutions and of building and loan associations, railroad securities coming under the jurisdiction of the Interstate Commerce Commission, receivers' certificates, and insurance policies.

It was our judgment in discussing this with Senator Barkley that securities over which the Interstate Commerce Commission has jurisdiction should not come under this bill any more than they should come in under the Securities Act; and I think the committee print exempts them from all of the provisions of the act.

The Federal Housing Administration has control over certain indentures, under the National Housing Act; and since it has control over the form of such indentures, it would seem that the application of this act to such securities would result in unnecessary duplication of function.

The CHAIRMAN. I would like to ask a question here. With respect to what I regarded as abuses in New York, I am not sure whether they were permitted by law or whether they were simply violations of law, but they issued mortgage certificates secured by certain properties, such as apartment houses or whatever it may have been, and then in the course of their administration they shifted the security from private houses to some lots or some other unproductive property. At the time was that a violation of law, or do you remember that at all?

Commissioner DOUGLAS. I am not acquainted with the details of those cases. I do not know whether or not the obligor and the trustee had the power to shift the portfolio — —

The CHAIRMAN. They actually did in a number of cases.

Commissioner DOUGLAS. It would depend upon the wording of the indenture.

The CHAIRMAN. Does this bill protect against such things?

Commissioner DOUGLAS. This act does not say, as I read it, that if you issue a bond secured by an indenture you cannot substitute or release or change the security under that indenture. It does not say that. That would set up a rigid, fixed formula that might paralyze financing, I think. What it does say is this, that if you have in there a provision for substitution and release, first, that that must be a meaningfull rather than a meaningless provision. There must be adequate safeguards set up for the exercise of it. Secondly, the trustee would have to exercise a degree of vigilance over that substitution and release, so that the issuer could not, willy-nilly, without any let or hindrance, put in some "cats and dogs" for first-mortagge bonds of operating companies.

The CHAIRMAN. It does in a way meet the situation?

Commissioner DOUGLAS. It does address itself, among other things, expressly to that type of situation. So that when that substitution or release is about to be made the trustee would look at it and say: "Is this proper under the indenture? Have all of the requirements of the indenture been fulfilled? Or is this merely an attempt upon the part of the issuer to circumvent the law?"

Senator HERRING. There would be no protection whatever to the investor if that were permitted. The investor is not even advised that the security has been changed.

The CHAIRMAN. He relied upon the security for his certificate at the time, and then he finds at the end, when he wants to collect, that the company went into bankruptcy or collapsed, and he is secured by some unproductive type of property.

Senator BARKLEY. Of course, there is no possible way by which the holder of these securities can know anything about them until it is too late.

Senator HERRING. Unless notice is provided for.

Senator SMATHERS. Do I understand you to say that there is no provision against that in this bill, except that a representative of your Commission would sit in on it and agree to it?

Commissioner DOUGLAS. There is no provision in the bill which would outlaw all clauses permitting a substitution. There are, I think, legitimate business reasons why in certain situations, at least, substitution should be permitted.

But as to what it does provide, it will be perhaps clearer if you will turn to page 40, line 7 [reading]:

The indenture to be qualified shall contain such provisions as the Commission shall deem necessary or appropriate in the public interest or for the protection of investors in respect of the following matters—

1. Restrictions or conditions on the release and substitution of any property subject to the lien of the indenture, on the issuance of additional indenture securities, and on the satisfaction and discharge of the indenture.

That is typical of the problem arising in drafting a bill of this kind. You have a choice between setting up an adequate legislative standard, with discretion in the Commission, or, as an alternative, spelling out in the statute the formula; and I doubt if all of the lawyers or all of the corporate trust officials in the country could work out an adequate formula. Don't you, Mr. Page?

Mr. PAGE. I do.

Commissioner DOUGLAS. Because you get into a degree of rigidity that would make the statute unworkable.

Senator HERRING. This leaves the authority with the Commission?

Commissioner DOUGLAS. This leaves the authority with the Commission to see whether or not the jokers in those clauses are dropped out or left in.

Senator HERRING. You indicated that you thought the trustee should be impressed with responsibility. Would that be the Commission's view?

Commissioner DOUGLAS. What the Commission would do would not be to exercise any control itself over that substitution. All the Commission would do would be to see to it that an adequate protective provision was made against unwarranted, unlawful releases and substitutions, and that that was put right into the indenture.

Senator BARKLEY. Under the power of approval or disapproval you could, in certain cases, practically outlaw a substitution by putting conditions in the debentures so as to protect the investor. It might not amount exactly to that, but the Commission's power of approval or disapproval might cover the whole field necessary to protect the investor against these irresponsible transfers and substitutions.

Commissioner DOUGLAS. Yes.

Senator HUGHES. Would it be going too far to have power over that substitution? It is a pretty high-handed thing, to take out a substitution of property without consulting the person who thought he was secured all the time.

The CHAIRMAN. There ought to be scrutiny somewhere.

Commissioner DOUGLAS. These matters gave us no end of difficulty, and in our deliberations and in our conversations with trust officers we have explored it backwards and forwards and inside and out.

Take a first mortgage on the property of an operating utility company. There are little segments of rights of way and what not. The company may have no need for them. They may be worth $2,000 or $20,000 in a $50,000,000 issue. To seek the consent of the security holders for the release of property so small that a lawyer would call it de minimis, would not be necessary. But where to draw the line is a difficult thing for the purpose of drafting a statute. To translate into terms of a business formula that concept would be virtually impossible, I think.

Senator HUGHES. I realize how difficult it would be, but I think it is desirable if it could be done.

Commissioner DOUGLAS. Offhand, I think this provision on page 40 would permit the Commission in an appropriate case to say that the restriction that is necessary for the protection of investors is a requirement that the consent of the investors be obtained, if it was such a vitally integral part of the whole indenture as to make it necessary or desirable for consent to be obtained.

That is true, as Mr. Page can tell you, in some indentures at present. I do not indicate that that should be the general policy in the administration of the statute. I merely indicate that that would be a possible solution in some cases.

The CHAIRMAN. Would not your inquiry into this question of substitution disclose the fact as to whether they were substituting a less valuable security than the particular bond was at the time when it was issued?

Commissioner DOUGLAS. That comes down to the meaning of the words "restrictions or conditions on the release and substitution" in line 11, page 40. I think, and I think all the trust officers will agree, that as a general proposition if there is to be a substitution of a material part of the property under that indenture, the trustee should permit it only on a certificate of a competent appraiser, a competent engineer, a competent auditor, or what not; and only on ascertaining that the property that is being substituted is substantially the equivalent of the property being taken away; that the auditor or appraiser or engineer should be independent, in the manner in which our rules under the Securities Act require accountants to be independent; and that the issuer or trustee should not be allowed to make that substitution merely on the certificate of an officer of the issuer.

Senator HERRING. I do not see why there should be a right to make a substitution anyway. To substitute for something that you have already sold is quite different, it seems to me.

Commissioner DOUGLAS. To illustrate the situation, Senator, here is X company that has issued bonds. Those bonds are secured by bonds of Y company. Y company goes through a reorganization. By process of law those bonds of Y company, under the X company indenture, must come out and new ones be substituted. Our Y company recapitalizes and an exchange of securities may be desirable.

Senator HERRING. That is only the evidence of the security. That does not change the fact. It is not really a substitution, is it?

Commissioner DOUGLAS. It is a substitution of collateral under X company's mortgage. In many of these cases such an indenture is used. It is normally called a collateral trust indenture; and, as Senator Wagner has pointed out, some of them have been too liberal and free in their substitution provisions.

I indicate merely the scope of the problem and I indicate that techinque that the Barkley bill uses in approaching the problem—not a hard and inflexible or fixed rule, but a flexible rule with a general standard, so that in light of the differences between the multitude of situations that will arise the Commission can require one clause here and another clause there, and conceivably, in some cases, not allow substitution at all.

Senator BARKLEY. Under the general authority on page 40 for the Commission to fix conditions under which substitutions might be brought about, in the indenture itself could you not fix a condition that in some cases or in all cases where there is a substitution attempted the Commission itself would have to give the approval? Could not that be one of the conditions? Although it might not be wise to do that always, you could do it under this language.

Commissioner DOUGLAS. That is conceivable, Senator. I would want to talk this over with my colleagues. I think that if the committee believes that the Commission should have that kind of power, it should be given expressly, for this reason. I believe that my colleagues probably would be reluctant to recommend that the Commission be injected into the situation at a point subsequent in time to the qualification of the indenture.

Senator BARKLEY. Yes; I can see the objection to that. I can see the embarrassment that might be caused the Commission, and it might carry implications along with it that are not justified.

Commissioner DOUGLAS. It would put upon the Commission a continuing obligation as respects the administration of these trusts.

The CHAIRMAN. Could you not insist upon a provision in the indenture itself that would protect the investors in the matter of substitution?

Commissioner DOUGLAS. Oh, yes. We could require independent auditors, independent engineers, and independent appraisers.

The CHAIRMAN. I used to be a judge, and I used to have appraisers on both sides of a question. They were supposed to be independent. They would be a million dollars apart, sometimes.

Senator BARKLEY. They were independent of each other, at least.

Senator SMATHERS. Depending upon whose clients they were.

Commissioner Douglas. We have had some experience with that problem under the Securities Act. The trustee would not, under this statute, be permitted to release unless the trustee was satisfied that the conditions specified in the indenture had been met.

These exemptions, as I said, on page 10, follow largely the exemptions in the Securities Act, with two exceptions. The exceptions are indicated in the last paragraph on page 8 of the mimeographed memorandum. The first covers securities issued in exchange for other securities of the same issuer.

The Congress set up an exemption from registration under the Securities Act for cases where a company was merely giving to its old first-mortgage bondholders another first mortgage bond. However, from the point of view of this bill it would seem as desirable to make the trustee an active agent for the bondholders there, as in the case of bonds being sold for cash. So I think the Barkley bill lifts that exemption, so to speak, and would require the issuer in that case to come in and qualify under the Barkley bill even though he would not simultaneously have to qualify under the Securities Act.

The other exception is that of securities issued under a plan approved by a court, in a reorganization. By and large those are exempt from registration under the Securities Act by reason of section 3 (a) (10); and that is because at the time, I believe, Congress thought, and, I think, with great justification, that that issuance was subject to the approval of the court, as to the terms of the issue, and so on. But I think that there may be a justification for bringing that issuance under the Barkley bill even though it is out from under the Securities Act. Otherwise you would have in all of the cases of indentures coming out of reorganizations under section 77–B, for example, the old rather than the new type of indentures. There is no persuasive reason why in those cases the new indentures should not comply with the standards of the Barkley bill.

With those two exceptions the bill is geared into the Securities Act.

The Commission has, under the Securities Act, certain exemptive powers. Line 3, page 11. That paragraph gives the Commission power to exempt issues where the aggregate amount of the offering does not exceed $250,000. That is a little different from the Securities Act. In the Securities Act it is $100,000.

I think there is justification for a little different treatment here, in view of the fact that until you reach your point of $250,000 you are not apt to get a wide offering; you are not apt to get actually the same problems as respects the responsibilities of the trustee.

We have no fixed, firm conviction on that. $250,000 is merely suggestive that somewhere a line ought to be drawn.

There is another exemptive power given to the Commission beginning on line 16, page 11, and that is to cover cases largely of this class. Here is an open-end mortgage. Some bonds are outstanding. By definition, additional bonds under the indenture may be issued. It may be desirable for the company to issue new bonds under the old indenture. It may be, as a legal proposition, impracticable or impossible to rewrite that indenture. The rights of securityholders have vested in them prior to the effective date of this statute.

. I think that that is perhaps made clear by reading the last part of subsection (d) on page 11. In such a case the Commission may exempt the new offering of additional bonds under the old indenture

· if it finds that compliance with the provisions of the bill, through the execution of a supplemental indenture or otherwise, would require the consent of the holders of the securities outstanding.

After all, they have a contract. As a matter of law they may have to give their approval to a change in the old indenture; and in some cases that would require 100-percent approval. In other cases equity courts have worked out a rule whereby a modest percentage may do it. But by and large, if the holders of securities presently outstanding must give their consent, you have got the issuer into a tough spot. To get that consent may require an awful lot of time and expense.

Then we have in line 7, page 12, another general exemption to cover cases of hardship, where compliance would place an undue burden on the issuer.

Mr. Burke, of our staff, Mr. Chairman, has prepared a schedule showing how these exemptions would have worked if this law had been in effect during the past year. I think it might be desirable for him to briefly mention that.

The CHAIRMAN. Very well.

Mr. BURKE. The figures are set forth on exhibit 1, of which copies have been distributed. The effect of the exemption of securities, where the amount offered is $250,000 or less, is shown in the left-hand set of figures. If applied to registration statements of bonds taking effect during the year ending April 30, 18 issues, in a total principal amount of approximately $3,800,000, would have been subject to that exemptive power. One hundred and ninety-eight issues, with a principal amount of approximately $2,500,000,000, would not have been entitled to that exemption.

The row of figures appearing across the bottom of exhibit 1 gives some indication of the extent to which the exemptive power conferred by subsection (d), to which Mr. Douglas has just referred—that is, with respect to additional issues under old indentures—could have been availed of. Apparently 14 out of a total of 216 issues were additional issues under existing indentures.

So that in those cases an application could have been made under subsection (d) for exemption in a proper case if it could be shown that the consent of the security holders was necessary or that an undue burden would be imposed upon the issuer.

In the line above that it appears that 37 issues were under old indentures combined with new indentures. In that case it would have been perfectly simple for the issuer to include in the supplemental indenture the provisions required by this bill, and it would not have been necessary in the ordinary case to resort to the exemptive power provided in subsection (d).

The CHAIRMAN. How do you predict that there would be an undue burden on the issuer?

Mr. BURKE. We cannot do that, sir, but we can tell that not more than 14 applications could have been made on the basis of last year's figures. The last line shows the number of issues for which registration statements were filed, where there was no trustee at all and no indenture. There were seven of those during the 12 months covered by this exhibit. Of those three, in an aggregate principal amount of $800,000, would have been exempt anyhow under the $250,000 limit, but four of them, aggregating $37,000,000, or an average of over

$9,000,000 for each of those issues—which would have been subject to the act—did not have any trustee or any indenture. That raises the problem that Mr. Douglas discussed, and that is suggested by paragraph 1 of sub-section (a) of the first section of the bill.

The CHAIRMAN. That would require a trustee and indenture?

Mr. BURKE. Otherwise it would be too easy a method of avoiding the requirements of the bill.

Commissioner DOUGLAS. Under the Barkley bill the issuer could not avoid its requirements by just ducking a trustee and not having one, as a practical matter.

On offerings of over $250,000 it is our judgment that, in view of the fact that the holdings are apt to be small and widely scattered, there ought to be in the situation one central agency, a trustee in all cases to watch out for the interests of security holders prior to default, and more especially after default.

Senator BARKLEY. I would suggest that this table be put into the record, Mr. Chairman.

The CHAIRMAN. Yes.

(The table referred to is here printed in full as follows:)

EXHIBIT 1.—*Bonds, debentures, and notes: Analysis of Securities Act registration statements* [1] *becoming effective May 1, 1936, to Apr. 30, 1937, classified in the light of the provisions of S. 2344*

|  | Principal amount offered | | | |
|  | $250,000 or less | | More than $250,000 | |
|  | Number of issues | Aggregate principal amount | Number of issues | Aggregate principal amount |
|---|---|---|---|---|
| Secured issues: | | | | |
| New indentures | 11 | $2,270,750 | 87 | $885,527,267 |
| Supplemental indentures | 2 | 376,360 | 29 | 426,194,977 |
| Old indentures | | | 10 | 126,006,900 |
| Total secured | 13 | 2,647,110 | 126 | 1,437,729,144 |
| Unsecured issues: | | | | |
| New indentures | 1 | 150,000 | 59 | 942,965,487 |
| Supplemental indentures | | | 6 | 39,225,170 |
| Old indentures | 1 | 200,000 | 3 | 3,000,000 |
| No indentures | 3 | 800,000 | 4 | 37,000,000 |
| Total, unsecured | 5 | 1,150,000 | 72 | 1,022,190,657 |
| Total, secured and unsecured | 18 | 3,797,110 | 198 | 2,459,919,801 |

|  | Total secured | | Total unsecured | | Grand total | |
|  | Number of issues | Aggregate principal amount | Number of issues | Aggregate principal amount | Number of issues | Aggregate principal amount |
|---|---|---|---|---|---|---|
| Total, all issues: | | | | | | |
| New indentures | 98 | $887,798,017 | 60 | $943,115,487 | 158 | $1,830,913,504 |
| Supplemental indentures | 31 | 426,571,337 | 6 | 39,225,170 | 37 | 465,796,507 |
| Old indentures | 10 | 126,006,900 | 4 | 3,200,000 | 14 | 129,206,900 |
| No indentures | | | 7 | 37,600,000 | 7 | 37,600,000 |
| Total | 139 | 1,440,376,254 | 77 | 1,023,340,657 | 216 | 2,463,716,911 |

[1] Does not include foreign issues.

Commissioner DOUGLAS. Section 4, on page 12, is simply an exercise of the power of Congress to regulate the use of mails and agencies of interstate commerce. In this respect this bill is comparable to the Securities Act.

Paragraph (b), page 13, in effect says that if the bond issue that is about to be offered has to be registered under the Securities Act, the registration statement under the Securities Act shall not become effective until the indenture has been qualified under this statute.

I mentioned before that there is an attempt to integrate the Barkley bill and Securities Act. That is one of those integrating provisions.

Beginning with section 5 on page 13, with respect to the machinery spelled out for qualifying an indenture under this statute, there is an important point that I do not think can be overemphasized. The Barkley bill, as I read it, is not designed, nor does it have the intent, to set up another governmental agency supervising these institutional trustees. They are now subject to Federal authority and to State authority; and I think it might be too much to place in the Securities and Exchange Commission a continuing jurisdiction over the trustee.

Consistent with that approach the application is an application filed by the issuer and made by the issuer. After all, he is the one who is going to be selling the securities through his underwriter. He is the person who files the registration statement under the Securities Act. So he is the person who files the application. The applicant is not the trustee; it is the issuer of the securities. To that extent, again, you have an integration with the Securities Act.

There is, beginning on line 13 and running to line 17 of section 5, some flexibility given as to the form of the application. The Commission can prescribe the general form. There, again, it is hard to set that out with precision in the bill.

Beginning on line 17 it prescribes such of the information that would be filed in a registration under the Securities Act, and such additional information, as the Commission may prescribe. Again, a close integration between the two.

The type of additional information that may be required is specified beginning on line 20 and runs through to line 4 at the top of page 14. That type of information would embrace generally information respecting paying agents, or the trustees themselves, or underwriters or obligors. That would be designed essentially to show to the Commission what the relationships between those congeries of persons are. When we get down to provisions on conflicting interests, we will see that the Commission will have to make a judgment from time to time as to whether or not there is or is likely to be a material conflict of interest in the trustee.

Section 5 gives the Commission the necessary information to make that judgment.

As in the Securities Act, the information that is filed in the application—filed by the issuer—becomes public property and members of the public can get it for a rate to be specified by the Commission—a reasonable charge.

Subsection (b) on page 14, beginning on line 11, spells out some of the mechanics. An application is deemed to have been filed when it is received by the Commission and when the filing fee has been received. There is some slight change from the Securities Act in the filing fee, but I think it is still within a rather low limit.

There is a little point worked in there which I should mention.   I do not need to bother you with it much, I think, but that filing fee under the Barkley bill is credited against the fee that is to be required under the Securities Act.   So there is not a multiplication of fees.

Some of the applications that will be filed will have to be amended. There will be deficiencies in them.   So, as under the Securities Act, the filing of an amendment to an application means that a new filing date for the application is fixed, because the Commission will be pressed with the problem of making an examination of all these amendments to applications.   If 19 days have passed and an amendment is filed, then the 20-day period starts running over again, as under the Securities Act; that is as respects amendments filed prior to the effective date of the application.

Even there, there is an element of flexibility.   Notice lines 7 and 8, page 15.   If it proves to be a very minor and immaterial amendment, as many of these amendments will be, and it is filed on the 19th day, there is no reason to hold up the issue for another 20 days; and the Commission is given the power to consent to the filing of the amendment nunc pro tunc, so that there will not be a running of the successive periods of 20 days as the result of filing of minor amendments.

If the application has become effective and the issuer is therefore at liberty to sell the securities, and the issuer finds that there is a deficiency in the application, or the Commission finds that there is a deficiency in the application, then amendments can still be filed and they can be filed after the effective date, on such terms and conditions as the Commission may prescribe.

Beginning on line 13, page 15, the effective date is 20 days after the filing.   That, again, is an evidence of an attempt to gear this bill into the Securities Act, because the same 20-day period is specified in the Securities Act.   The application becomes effective automatically in 20 days if there have been no amendments, unless the Commission shall have issued an order to show cause why such application should become effective.

The Barkley bill there, I believe, adopts the technique employed in the Public Utility Holding Company Act of 1935; and follows the procedural device that was worked out by the Congress in the Utility Act.   I refer to the show-cause-order provision in section 7 of the Utility Act.

If the Commission issues an order to show cause, for example, to the issuer, and it deems that the trustee has a conflicting interest, the application then becomes effective within a reasonable time after the issuer has had an opportunity to be heard, unless the Commission, prior to the expiration of that reasonable time, issues an order refusing to allow the application to become effective.

Line 24 at the bottom of page 15 to line 4 at the top of page 16 merely prescribes the details of service of the show-cause order.

Subdivision (d), page 16, is, I think, a rather important provision. I do not think that the matter that has been stricken and the new matter that has been added changes materially the meaning of the original provision.

What it is designed to do is this: The Commission is given certain rule-making powers.   The Commission, on May 1, say, when a particular indenture of X Co. is made, has a rule as to certain types of protective clauses; that indenture must contain such provisions.   X Co.'s mortgage is issued pursuant to the standard set up in that rule.

On May 2 the Commission changes its rule. The bonds are outstanding; and to require X Co. to keep constantly changing its indenture, to keep up to date with the most recent rules of the Commission, would place an unreasonable burden on the issuer, and would cause great confusion.

So that what subsection (d) attempts to do as respects a particular issuer is to freeze his indenture at the time of qualification. It is to be interpreted against the rules that were in force then and the particular provisions in the indenture. He is not subjected to the risk that 5 years later another rule will be passed which will make him go back and change his indenture.

Senator BARKLEY. That is a protection against any ex post facto acts?

Commissioner DOUGLAS. Yes.

Subdivision (e) on page 16 merely gives the Commission power to make an investigation to determine whether or not it should refuse to allow an indenture to be qualified; and the language in line 16 to line 21 of subdivision (e) is more or less the conventional language of the Securities Act.

Section 6 specifies conditions under which the Commission can prevent one of these indentures from becoming qualified under the Barkley bill. No. 1 relates to the application itself, the application of the issuer. That covers the case of an inadequate application; it does not reveal any information, say, about the trustee. The Commission can enter a refusal order because of that deficiency.

No. 2 is the inclusion in the application:——

The CHAIRMAN. And the applicant is informed, of course, of that fact?

Commissioner DOUGLAS. The applicant under section 5 has to be served with a show-cause order and has to be given an opportunity for a hearing. If the Commission does not act within a reasonable time thereafter, the application becomes effective. Within that reasonable time, the Commission can enter an order refusing to allow the application to become effective.

The CHAIRMAN. But it might very well be that he will supply the information you want?

Commissioner DOUGLAS. That is true. That would be a pre-effective amendment.

The CHAIRMAN. One of those nunc pro tunc matters that you spoke about.

Commissioner DOUGLAS. Yes; in which the Commission had power to make it a nunc pro tunc amendment. If it was a material amendment the Commission could insist that the 20-day period run again.

The CHAIRMAN. We are at 1 o'clock now, which is our usual time for lunch. How long do you think it will take you to complete your statement?

Commissioner DOUGLAS. I should think, Mr. Chairman, that it would take about an hour and a half. I hate to say that, because I know that you are busy.

The CHAIRMAN. You might be able to make it an hour. We will see how we get along. We will take a recess until 2 o'clock, and you may continue your statement then.

(Whereupon, at 1 p. m., a recess was taken until 2 p. m. of the same day.)

The subcommittee reconvened, pursuant to the recess, at 2 p. m.,
Chairman Robert F. Wagner, presiding.

The CHAIRMAN. We are ready to proceed, Mr. Douglas.

## STATEMENT OF WILLIAM O. DOUGLAS, A COMMISSIONER OF THE SECURITIES AND EXCHANGE COMMISSION, WASHINGTON, D. C.—Resumed

Commissioner DOUGLAS. Yes, sir. As I was saying, Mr. Chair-
man, before the recess, subsection (2) of section 6, on page 17, is
intended, as I read it, to give the Commission power to issue one of
these refusal orders preventing an application from becoming effective,
if the application contains false or misleading statements.

Subsection (3) is designed, as I read it, to give the Commission
power to issue a refusal order in case the trustee is not qualified, by
virtue of the existence of conflicting interests, or is not eligible, by
reason of the fact, say, that the institutional trustee has inadequate
financial resources to serve as a trustee.

Subsection (4), line 13, gives the Commission power to enter one
of those refusal orders if, for example, the substitution or release
clause in the indenture does not meet the standards of the statute.
I mention that purely as an illustration.

Subdivision (5) on line 16 gives the Commission a little broader
power to issue a refusal order if the indenture contains any provision
which limits, qualifies, or conflicts with a provision which is required
by the act to be in the indenture, or which is required by the rules
and regulations of the Commission to be in the indenture, or in case
the indenture includes a provision that is outlawed by the act. One
example of that would be the provisions on exculpatory clauses.
Under the statute, as I shall point out as we go along, the trustee is
not permitted to include in the indenture a provision which excul-
pates it for its own negligence. If an indenture should come along
with that provision in it, the Commission should refuse to permit it
to be qualified.

Line 22 has a provision giving the Commission permission to enter
a refusal order as to an indenture which contains deceptive or mislead-
ing matter. In a necessitous case of that sort, the Commission could
enter a refusal order.

Then there is a general clause at the end, giving the Commission
power to enter a refusal order if there is some provision in there which
it is necessary to eliminate in order to prevent the circumvention or
evasion of the statute, or the elimination of which is necessary in the
public interest. That provides a broad basis for administrative action.
It gives a flexibility to the administrative procedure that will enable
the Commission to adjust its techniques to the requirements of par-
ticular cases and, in necessitous cases, to step in and say, in effect,
"No; you can't go to the public with this type of security, because
these clauses are misleading and are inconsistent with the mandate of
Congress", and so on.

Section 7 needs, I think, a few words of preliminary comment. This
bill, as I read it, is designed to add the Commission to the drafting
table, as I said this morning. Once the Commission clears a trust
indenture and says, "Yes; the trustee under this indenture and the

provisions of this indenture meet the mandate of Congress as prescribed in this act", then the Commission is through with its job, once and for all. At the present time an indenture is drafted by the underwriter and by the issuer. The bonds are sold to the public. The enforcement of the covenants in that indenture is left to the trustee and to the security holders. Under this proposed system of regulation, after an indenture has been qualified, the enforcement of the covenants under the indenture will be left to the trustee and to the security holders. In some instances they would have recourse to the courts, as they do at the present time; but I think I should make it very clear to the committee that, as I read this statute, there is no continuing jurisdiction by the Commission over the indenture, once it goes out. It then rests precisely where it rests today - in the hands of investors and in the hands of trustees.

That comes back to a very important point that I mentioned this morning, and that is this: The philosophy of this bill, as I see it, is not to inject the Securities and Exchange Commission as an additional supervising agency over trustees engaged in the administration of these huge trusts. In the final analysis, in my judgment at least, that is a proper function for the banking authorities who, after all, do have supervision over trustees. So I think that this Barkley bill quite properly skirts the edges of that, and cuts off this additional supervision once and for all, after the indenture has been qualified.

So in a strict sense of the word I think the bill does no more than to add to the drafting table a public representative, an investor representative, who sees to it that the legislative mandate is worked right into each indenture, so that each covenant is properly balanced in view of the standards in the statute; and so that a proper trustee and a proper successor trustee are provided for in the indenture. Once that job is done the task of the Commission would end.

Senator HUGHES. When a certain percentage of the bondholders is required to make application to the trustee, to get action on the part of the trustee, of course there may be difficulty in getting enough to go in for that purpose. And then the next question is whether that would set the trustee in motion or not. Something that occurred to me is that you made the assertion, awhile ago, that these trustees or banks that become trustees are under the regulations of the States. Now, I am not sure of that.

Commissioner DOUGLAS. That varies.

Senator HUGHES. They have general power over them, as banks, to regulate the amount of money they are required to have, and also what they are to keep in reserves, and all that sort of thing, and pass on their soundness, by means of an examination. But I believe in some cases they do not supervise the trusteeship end of it.

Commissioner DOUGLAS. I think that is true, Senator. I think that Mr. Page, who is here, probably could speak more authoritatively on that than I.

Senator HUGHES. I did not mean to interrupt you.

Commissioner DOUGLAS. I think there may be an hiatus in there, so to speak.

Senator HUGHES. Yes.

Commissioner DOUGLAS. But in view of the fact that the Federal Reserve or the Comptroller of the Currency has, so far as your na-

tional banks are concerned, and so far as the member banks are concerned——

Mr. PAGE (interposing). I can speak for the State of New York: That the New York bank examiners do control the member banks. All member banks are examined, in their trust departments; and the New York State banks are examined by the superintendent of banking, in New York.

Senator HUGHES. But more than 80 percent of the banks are State institutions, and not Federal.

Senator BARKLEY. Is it not true, also, that all the banks insured by the Federal Deposit Insurance Corporation are examined, if they are permitted to operate trusteeships?

Senator HUGHES. Yes—as to their soundness. But I do not know whether that applies as to their trust relations.

Senator HERRING. Of course, we have a securities commission in our State.

Commissioner Douglas. Mr. Chairman, Senator Hughes raised one point that I think is of interest, and that will be illustrative of further phases of the same thing I was speaking of: Under the Barkley bill, the trustee must exercise due care after default, whether the bondholders demand action or not. But suppose a certain percentage of the bondholders want to compel the trustee to follow some specific course of action. Anticipating just a little bit, let me say that the Commission would have the discretion and power, as I see it, to insist that the percentage required for that not be too high. That is, it would have the power to say, "No." Let us take a clear-cut case: An indenture provides that the trustee is not under responsibility to take the action specified unless 100 percent of the bondholders should make a request of it. I cannot imagine the Commission allowing a thing like that to go through. If there were any percentage required, it would have to be a reasonable percentage. But that is the type of technique that this bill envisages, as I see it: Namely, are the provisions of the indenture adequate, in light of the legislative standard?

The CHAIRMAN. And reasonable.

Senator BARKLEY. In other words the Commission can supervise the inclusion of such provisions in the indenture so that it does not have to follow it up after the indenture is in the hands of the public, to bring about protection or supervise the administration of it, because they have done that in advance, insofar as they can.

Commissioner Douglas. Yes; insofar as they can.

Senator BARKLEY. And I suppose ultimately a thoroughly standardized percentage might be worked out, as to the number required to join, before action is forced on the trustee.

Commissioner Douglas. Yes. I shall come to the ramifications of that a little later.

Senator HUGHES. I thought of that as a long step in the right direction.

Senator BARKLEY. Yes.

Commissioner Douglas. That is one of the reasons why, Mr. Chairman, I said that this cannot be considered a new and revolutionary development because it does not put Government in at a new point in the supervision of the administration of banks and trustees; it does not do that.

Coming down, now, to section 7:

Section 7 (a) (1) The Indenture to be qualified shall require:

As I read it, that means that each indenture that is qualified will have to have in it a specific provision that the person or persons who act as trustees thereunder will conform to these legislative standards. That will be written right into the indenture. Those legislative standards require that at least one of the trustees shall be an institution incorporated and doing business under the laws of the United States or of any State or Territory or the District of Columbia, which is, first, authorized to do a corporate trust business (as not all institutions are) and second, is subject to supervision or examination by Federal, State, Territorial or District authorities. This is not restricted to banks; but it includes them.

That will do one thing, clearly: It will eliminate these vest-pocket trustees of the type which S. W. Straus had. You will not have an individual acting as sole trustee.

However there is a provision here, in subsection (3), line 11 on page 10, which I think makes clear that an individual cotrustee may be appointed. Under the laws of some States a foreign corporation cannot act in such a capacity. Take Mr. Page's institution, for example—the Bankers' Trust Co. of New York: I believe that under the laws of some States, the Bankers' Trust Co. cannot be the sole trustee.

Mr. PAGE. We cannot enforce the mortgage, under the laws of some States; under the laws of some States the enforcement of the mortgage would have to be done by a person resident in that State or by some individual as distinguished from a corporation.

Senator HUGHES. You say that is in New York?

Mr. PAGE. No; that is not in New York. But a number of States of the Union prohibit a foreign corporation from doing business within the State.

Senator HUGHES. Oh, yes; just like some of them prohibit a foreign executor.

Mr. PAGE. Yes; that is right.

The CHAIRMAN. Did I understand you to say in this case that in no case can an individual be a trustee?

Commissioner DOUGLAS. In no case can an individual be a sole trustee.

The CHAIRMAN. Is someone going to say that you are giving a monopoly to the banks and other institutions?

Commissioner DOUGLAS. I hardly think so, in view of the fact that, by and large, banks as well as other institutions throughout the country will qualify, under this. And I think that the experience in the recent depression has shown that unless these huge investments are in the hands of responsible people, investors will suffer and the public interest will not be served.

Senator HERRING. They had quite a lot of the banks which were not thought very responsible.

Commissioner DOUGLAS. That is true. But I mean more than just financial responsibility; I mean men of integrity, training, competency, skill and intelligence, as well as men of independence.

The CHAIRMAN. Can you not find that in an individual?

Commissioner DOUGLAS. It could undoubtedly be found in individuals. But the difficulty of selection and judgment as to whether

or not those individuals are qualified, would from an administrative point of view, be a very difficult proposition.

The CHAIRMAN. I think it usually works itself out in this way: I have known instances with which I have come in contact where there has been an individual as a cotrustee. But as a rule I think it has become rather generally accepted that the trust companies live forever and are perpetual, whereas an individual dies - and a number of things like that. Another thing is that most of the States permit a trust company to act as trustee without having to give bond; that is to say, their capital fund is sufficient so that they do not have to give bond; whereas an individual would have to give bond.

Commissioner DOUGLAS. That is a very pertinent point.

The CHAIRMAN. In New York I think a trust company would have to be a trustee; isn't that true?

Mr. PAGE. It is most unusual, today, to have an individual trustee under a corporate indenture.

The CHAIRMAN. Nevertheless I wondered whether it was fair to disqualify them altogether.

Senator HERRING. An individual may be a cotrustee.

The CHAIRMAN. Yes; I know that.

Senator BARKLEY. Also there is a wider supervision over the corporate entity than over the individual, even though he may be a trustee. With a bank or trust company, not only its trustee facilities are under supervision, but its whole conduct and setup are under supervision by the examiners of the State. I think the laws of most States are more limited with respect to the supervision and examination of individual trustees than of banks or trust companies. Of course that is of necessity, because there are many other reasons why banks and trust companies are under the supervision of State laws, in addition to the fact that they may be trustees.

The CHAIRMAN. There was a requirement in New York to the effect that all trustees should be trust companies. However, that was not satisfactory, apparently; and they permit individual trusteeships now.

Commissioner DOUGLAS. If we were confronted with a situation whereby the bulk of this business was in the hands of individuals, and the recommendation to this committee was to take it away from those individuals and put it in the hands of another group, then I think a more serious question might be raised. But what we have, as a practical question, is that where an individual trustee has been used, the record shows that by and large in such cases exploitation has taken place. The informed judgment of business is "We want a corporate trustee." That is what the situation is now.

The CHAIRMAN. I know something about the business in New York; when I was a young legislator, companies were formed to practice law. They did it in rather a slight way; but public sentiment was very strong not to permit companies to practice law, because there was not the relationship between lawyer and client that should exist. And in that situation, laws were passed to prevent such companies from practicing law.

I am not disputing your point, of course; but it is a question.

Senator BARKLEY. There is some difference between practicing law and practicing finance.

The CHAIRMAN. Of course.

Commissioner Douglas. Subsection (2), line 20, page 18, gives the Commission power to disqualify a trust company if it deems that it has such inadequate financial resources as to make it necessary in the public interest or for the protection of investors to keep that institution out. There would be considerable difficulty in spelling out a formula for this provision of the Barkley bill. We think that the present provision is appropriate and desirable.

What it is designed to do, as I read the bill, is to make it possible in the extremely rare and necessitous case, where there is a substantial bond issue, where there is a fourth-class, fifth-class, or sixth-class little bank that really has no business taking on such a big job, in view of its resources, for the Commission to step in and say, "The responsibilities here far exceed the financial condition of this particular institution."

It may be a company—usually I think it would be an institution of a very small size—which the banking authority itself would want to be disqualified. That is not a specific description; the language is general. We were thinking of trying to recommend to the committee something along the lines of a ratio between bonds outstanding under the indenture and the capital and surplus of the institution. But all our efforts as to that, in cooperation with banking officials, led us to abandon it and to recommend the more or less general provisions.

Coming back to subsection (3) on page 19—cotrustee: I think that is necessary. If there is a cotrustee, the powers exercised under the indenture must be exercised either by the institutional trustee or by the institutional trustee and the cotrustee, except insofar as local law makes it necessary for the cotrustee to act alone. As I visualize it, that is designed to prevent circumvention of the act by the corporate trustee dropping out and the individual trustee in effect going in and taking over the administration of the whole thing.

I think the next important item is the disqualification of the trustee. On page 20, line 4, we find this provision. Here again the bill visualizes, as I read it, that the indenture shall have in it provisions to the effect that if any indenture trustee has at any time, or shall acquire, any conflicting interest, as defined in the statute, the trustee shall within 90 days after he discovers it, either eliminate the conflict or resign. Say, for instance, he owns a prohibited amount of stock of the issuer: He must either sell the stock within 90 days or resign.

Now, just to prevent any disruption of the administration of these trusts, the lines beginning with line 14 and going to line 18 on page 20 provide that the resignation is to become effective on the appointment of a successor trustee, so there will be no gap in there, when there is no trustee. And then the indenture must contain a covenant that the obligor must take prompt action to have a successor trustee appointed. I think those are the proper mechanics: To have the obligor take such action rather than the trustee that is about to resign. It is the obligor's job.

Then there is the additional safeguard, that I think is very important where a trustee acquires a conflicting interest that disqualifies it but it does not resign. Let us say it does not resign or it does not diligently ascertain the existence of that conflict: Then any bona-fide holder of such securities—and as indicated by lines 20 and 21, "bona fide holder" means a person who holds such security and has held it for 6 months, which is designed, as I see it, to prevent a person from picking up a

bond and acquiring just a nuisance value—can petition any court, on behalf of himself, for the removal of the trustee and the appointment of a successor. In other words the bill takes care of the situation where a trustee either negligently or carelessly or willfully disregards its conflict and does not resign. This provision takes care of that situation by allowing any such security holder to institute such proceedings and have him removed.

The rest of subsection (b) defines the types of conflicting interest which brings about such disqualification. The first one is: "Can a trustee be a trustee under more than one issue under the same indenture?" I think the language of the committee reprint may be slightly garbled; I am not sure, but it looks as if there might have been some printer's error in there.

This is the general treatment of that problem. In the first place if a trustee is trustee under a first mortgage bond issue for X Co., it cannot be trustee under the second mortgage bond issue for that company, as a general proposition.

Senator MALONEY. Even though it is the same property involved?

Commissioner DOUGLAS. Yes; where it is the same property involved, in view of the fact that the first lien is over the second lien, and the interests of the second-lien holders are to keep the first lien from pushing upon the second lien too heavily.

The CHAIRMAN. Or pushing it out?

Commissioner DOUGLAS. However, if there is a first mortgage and also a collateral indenture outstanding, and the sole security under the latter indenture is made up of first-mortgage bonds issued under the other indenture, then the trustee can also be trustee under the collateral indenture, for the reason that the sole security for the collateral trust indenture is made up of the first-mortgage bonds of the other issue. So there is an equality of interest there, between the two indentures, you see. Hence the same person can be trustee under both.

That is the thought, as I read it, that is expressed in lines 14 to 18.

The CHAIRMAN. That would not be a first and second mortgage?

Commissioner DOUGLAS. That would not be a first and second mortgage.

Senator HUGHES. Line 15 [reading]:

Such other indenture is a collateral trust indenture secured exclusively by indenture securities.

Commissioner DOUGLAS. "Indenture securities", here, as I read it, means the indenture securities issued under the indenture, of which this trustee is trustee. As, for instance, X Co. issues first-mortgage bonds, and A is trustee under it. The company issues a collateral trust indenture. A can also be trustee under that collateral trust indenture, provided that the only security under the collateral trust indenture is composed of the first-mortgage bonds issued under the first indenture. Do you see?

Senator HUGHES. Yes.

Commissioner DOUGLAS. If the security under the collateral trust indenture is made up of more than that type of security, then there is a disqualification, because there is no equality in the position of the two indentures. That is it, in general.

Subsection (C), on line 18, is designed, as I read it, to take care of this situation: There may be, for instance, a real-estate company that owns buildings A, B, C, and D. That real-estate company has no

unmortgaged assets, as many of them do not have. That means, as a practical business matter, that the only security of each of those four mortgages is the specific real estate mortgaged under each indenture. So X Bank could be trustee under mortgage A, mortgage B, mortgage C, and mortgage D of the same issuer because there could be no conflict of interest in view of the absence of unmortgaged assets.

So in line 18 there is "Such obligor has no substantial unmortgaged assets."

As I visualize it, that would be a little-used exemption; but I think there would arise probably some hard cases where there would be no practical reason why the same trustee could not be trustee under A, B, C, and D.

The last provision is an important one; beginning on line 23, there is a power given to the Commission, as I read this bill, to make further exemptions and to allow a trustee to act under more than one indenture of the same issuer, if the trustee sustains the burden of proof, on application to the Commission and after opportunity for hearing, that trusteeship under that second indenture and trusteeship under the first indenture are not so likely to involve a material conflict of interest as to make necessary, in the public interest and for the protection of investors, the disqualification of the trustee from acting under the second indenture.

I think it will be, as a practical matter—and I think all the trust officials will agree—a rather unusual case. I think that, admittedly, there will be some cases. Conceivably there might be cases of trusteeship under two unsecured debenture issues where, by reason of a parity of position, you get substantially the same security. On the other hand I think, under many of these unsecured debenture issues, it would not be wise to grant that; and I think that this provision that it can be granted only on an affirmative showing on the part of the trustee indicates a wise legislative standard: Namely, that it should not be granted easily; the person who wants it should have the burden of establishing the absence of a material conflict of interest.

Now that gives a little flexibility to it. I think that probably such flexibility is deserved.

On line 6, page 22, the trustee is disqualified if the trustee is the obligor. For obvious reasons, the debtor should not be the trustee. Or if any of the directors or executive officers of the trustee is an obligor, the trustee is disqualified. For instance, let us say I am a director of X bank, and I am getting out a little real-estate issue, and I am the obligor on that little real-estate issue, and I want the bank to be the trustee: It cannot be done.

The last part of subsection 2 disqualifies the trustee if the trustee or any of its directors or executive officers were, subsequent to June 16, 1934, an underwriter. June 16, 1934, was, I believe, the effective date of the Banking Act of 1933, causing a separation of securities' affiliates from banks. This is put in so that trustees who, prior to June 16, 1934, were affiliates of underwriters could nevertheless qualify under this statute. In view of the fact that that relationship has been cut off, it seems to be a practical thing to draw the line there. The question is where to draw it; and obviously it has to be drawn somewhere.

If, under subsection 3, the trustee directly or indirectly controls or is directly or indirectly controlled by, or is under direct or indirect com-

mon control with an obligor or underwriter, by whatever method, then the trustee is disqualified. "No more vest-pocket trustees", is a popular way of stating it.

The CHAIRMAN. I do not think anybody would dispute that

Commissioner DOUGLAS. Yes.

The CHAIRMAN. May I interrupt, right here?

Commissioner DOUGLAS. Yes, indeed.

The CHAIRMAN. Unfortunately I am obligated just now to go to New York, so as to be there this evening. I have a request from a Senator that two gentlemen from his State be given an opportunity to appear in opposition to the proposed legislation. I was going to suggest this procedure, if my colleagues will agree to it: that after you finish today, perhaps an adjournment could be taken until Tuesday of next week. I am going to ask Senator Maloney to preside for the rest of the session this afternoon. And if that suggestion seems feasible to him and to the other Senators here today, then perhaps an adjournment can be taken, at the conclusion of the session today, until that time; and if someone also wishes to appear in favor of the legislation at that time, then we shall finish the hearings on Tuesday.

Commissioner DOUGLAS. That is perfectly agreeable with me, Senator; I am at your service.

The CHAIRMAN. It would be somewhat of a convenience to me. If this legislation is not of an emergency character, perhaps that can be done. But I think you had better finish your statement.

Commissioner DOUGLAS. I think I can finish it in a relatively short time.

The CHAIRMAN. Yes. I am going on the 4 o'clock train. It is very kind of you to indulge us to that extent; but I think it is fair, where a Senator asks that a constituent be heard, that we hear him. This request comes from Senator Gerry, of Rhode Island, who asks that we hear these people.

So when we adjourn today, the adjournment will be taken until next Tuesday. Do you wish to be heard, Mr. Page?

Mr. PAGE. Very, very briefly, if at all.

The CHAIRMAN. Would you prefer to be heard on Tuesday?

Mr. PAGE. That would be very much more appropriate, if you please.

Commissioner DOUGLAS. Mr. Chairman, it may be that the persons you indicate as wishing to appear in opposition might wish to have a copy of the committee print; perhaps it would be to their advantage to have such a copy of the committee print, because conceivably those changes given in the committee print will have a material bearing upon their position.

The CHAIRMAN. May I suggest that perhaps you may meet with them; and perhaps some of their action may be anticipated.

Commissioner DOUGLAS. I should be very happy to meet with them.

Senator BARKLEY. Also I should like to make the reservation that if they do appear in opposition and something should develop which would require rebuttal, then perhaps we could have such rebuttal.

The CHAIRMAN. Of, yes; that should be done, of course.

Commissioner DOUGLAS. There are quite a few trust officers, Mr. Chairman, who have indicated that if the committee desires they

would be very happy to come down here and speak in support of this measure.

The CHAIRMAN. Perhaps some of them can be on hand on Tuesday. It may not be necessary; I do not know.

Very well; thank you very much, gentlemen. I shall study it in the meantime.

(Whereupon the chairman left the hearing room.)

Senator MALONEY (presiding). Very well, Commissioner Douglas; will you continue?

Commissioner DOUGLAS. Mr. Chairman, line 14, page 22, sets up some important provisions which involve a rather difficult problem of interlocking directors. There are two main phases of subsection 4. We start off—or at least I start off in my reading of this bill—with the point of view that the intent is to eliminate those situations of interlocking or common control between the obligor and the trustee. I think it is sound philosophy; I think businessmen as well as lawyers interested in this subject agree. However, there are certain practical considerations. Take the situation in the average town in the country: Directors of banks, responsible men who serve as directors of banks, are said to be difficult to find. If no director of the trust company can have any connection with the obligor, I am told that in many situations—at least in the smaller towns—the bank will lose the advantages of some competent men. It is difficult to know where to draw the line.

Line 23 says that one person may be a director—either a director or an executive officer of the trustee and of the obligor. But he cannot be both an executive officer of the trustee and an executive officer of the obligor. That is to say, if I am the president of the company that has issued these bonds, I can be a director of the trustee. If I am the president of the trustee, I can be a director of the issuer. I cannot be both the president of the issuer and the president of the trustee, or the secretary of the trustee and the secretary of the issuer.

Subdivision (B) at the top of page 23 provides that one person in addition to the person just described may be a director and/or an executive officer of the trustee and a director of the obligor. That second person cannot be an executive officer of the obligor. That is, under this statute as I read it, the obligor cannot put on the board of the trustee its president and its treasurer. It could put on its president and one other of its directors, provided that second person qualified under (B).

Senator BARKLEY. He might be both a director and an executive officer of the trustee, and at the same time be a director of the obligor?

Commissioner DOUGLAS. That is correct.

Senator BARKLEY. He may be simply an executive officer or a director of the trustee and be a director of the obligor?

Commissioner DOUGLAS. That is correct.

Senator BARKLEY. Yes; that is, provided his pecuniary interest, and so on, is proper?

Commissioner DOUGLAS. Yes; provided his pecuniary interest is proper.

Senator BARKLEY. Yes.

Commissioner DOUGLAS. As I see it, there are two main objectives being served here: One is not to deprive banks of competent men to serve as directors. Subsection (B), I think, has another significance;

it would make it possible, as I see it, for the trustee to designate one of its officers to serve on the board of the obligor. There might be a very good reason for that. We talk a lot, and I have talked a lot, about making these trustees active trust-es. Well, perhaps one of the best ways in which a trustee could be active would be to have a representative, so to speak, on the board, sitting there, watching management policies, watching financial policies, and so on, alert to the interests of the security holders represented by the trustee.

So I think that subsection (B) does more than serve merely any selfish interest of a trustee; it has a much broader concept of making it possible for the trustee to serve the investors. However, that qualification of subsection (B) is important, and means—as I read it—that this second director must have a very limited pecuniary interest; it should not exceed 1 percent of the total outstanding securities of the obligor. There is not such a requirement under the previous clause as respects the first director.

Within that limit of 1-percent, but not over that limit, the Commission can prescribe. Now, a 1-percent interest for a man who is worth $5,000,000 may be insignificant; but a 1-percent interest for a man who is having a hard time to live on a modest salary may be very important. I believe that the idea there is to permit a normal investment interest of this director. That is more or less an arbitrary figure. But a figure has to be placed somewhere, if you are going to put a top on it, as I think a top should be placed.

There is one other very important provision, I think; and that is this: If the board of trustees is composed of only nine men, then there can be only one common director; if there are more than nine, then there can be these two. I think there is sound reason for that. When you get down to a small board, you ought to reduce the number and not permit too close an interlocking relationship.

Subdivision (C) permits the trustee to have other relationships with the obligor, which I think are wholly legitimate and beyond dispute—transfer agent, registrar, custodian, paying agent, fiscal agent, escrow agent, or depositary, and similar relationships which, by and large, merely involve the performance of mechanical, ministerial, routine acts.

Coming down to subdivision (5), line 21, we reach a more substantial item. If 5 percent or more of the voting securities of the trustee— that is, of the bank—is beneficially owned, individually or in the aggregate, by an obligor or by a director, partner, or executive officer of the obligor—with one exception—then the statute says the trustee is disqualified. Then you begin to approach, or perhaps have already arrived at, a point where the obligor has such a substantial voting block of securities as to be in a strategic, controlling position. Five percent, from one point of view, might be thought to be a number drawn out of a hat. However, it is more than that; because we know from experience that voting securities—the way corporations are run—which are held in blocks of more than 5 percent are likely to be a controlling interest.

Senator HUGHES. Is it clear what you mean by "voting securities"—page 23?

Commissioner DOUGLAS. Yes, sir; voting securities?

Senator HUGHES. Are they defined somewhere?

Mr. PAGE. Yes; over in definitions, on page 9, paragraph (15).

Commissioner DOUGLAS. Oh, yes; that definition of voting security excludes the case where the preferred stock has the right to vote after four dividends have been passed, but where they have not presently got that right.

Now, there is not computed, in this 5 percent, the amount held by the director falling under clause (A) of subdivision (4): Provided that he has 2½ percent or less of those securities. Any amount that he holds, of the obligor, over and above 2½ percent is figured into the 5 percent.

The last clause of subdivision (5), beginning on line 7, page 24, sets up the same disqualification of the trustee in case 5 percent or more of the voting securities is beneficially owned by the underwriter or by any director, partner, or executive officer thereof. I think all will agree that control of trustees by underwriters is not in the interest of investors.

Subdivision (6), line 12, is one of the most important provisions of the bill, I think. It provides that in case the securities under the indenture are unsecured—and that normally would embrace debenture issues and note issues—or if those indenture securities, whether or not secured, have a maturity at the time of issuance of less than 5 years, then the trustee is disqualified, if he becomes a creditor, directly or indirectly, of the obligor. To put it broadly; when the indenture is unsecured or when the notes or bonds or debentures are less than 5 years—short-term securities—in that case the trustee cannot become a bank creditor; he cannot lend money to the obligor. That has been one of the most troublesome provisions, one of the most difficult ones. I think the Commission is convinced that it is very necessary and very desirable, for the following reason: Take the debenture-issue case, where the debenture issue is unsecured. The trustee is a bank creditor. That debenture issue has no security; it is an unsecured loan. If there is a default, the only thing the debenture holders have is a claim against the unmortgaged assets of the estate. And the situation is such that you get a race of diligence there; and the trustee, as a commercial bank, must, in fairness to its depositors and stockholders, get every nickel that it can in payment of its own claim. But as a trustee for the debenture holders it may be under an obligation to see to it that an assiduous bank creditor in that position does not get its loan paid, or that a receiver is appointed, or that additional security is not given.

We reviewed that situation at some length in our report to Congress; and we concluded that, by and large, it is undesirable to have those two relationships combined in one, in those types of cases. As a practical matter, I think that at least in some situations a bank that is acting as trustee in the corporate-trust business, and has to choose between being a bank creditor and being a trustee under a debenture issue, will choose to be a bank creditor. That will mean that the obligor will have to go to somebody else—some other trustee—for the debenture trusteeship. But though one possible incident of this provision might be the spreading out of debenture trusteeships to other trust companies of a smaller size, I cannot see that there is anything objectionable in that.

Subdivision (7), line 19, provides that if the trustee is the owner of 5 percent or more of the voting securities of the obligor, or 10 percent or more of any other class of security of the obligor other than the

securities issued under the indenture, or of 10 percent or more of any class of security of an underwriter, then the trustee is out. This is proper because then the trustee is in a position of presumptive control over the debtor, with an affinity of interest; the same is likewise true with respect to the trustee's control of the underwriter.

Subdivision (8), page 25, disqualifies the trustee if the trustee is the owner—the beneficial owner—of 5 percent or more of the voting securities of, let us say, a holding company, where that holding company owns 10 percent or more of the voting securities of a subsidiary, which subsidiary is the obligor under the indenture. This is the same as (7), adapted to the parent-subsidiary set-up. And (9) is a further adaptation: That if the trustee is the beneficial owner of 10 percent or more of any class of security of a parent company, whether voting securities or not—first-mortgage bonds, debentures, stock—and that parent company owns 50 percent or more of the voting securities of the obligor, then the trustee is out. That is for the reason that that 10-percent ownership would be likely to be, first, a strategically important ownership and, secondly, it would be likely to have a direct relationship to the parent's ownership in the equity of the debtor. Those are rules of thumb; the Commission, under this statute, has no authority to make exceptions therefrom. And I think probably it would be wise not to leave these matters to discretion. The business is a competitive business; these matters of pecuniary interest will at times loom large. A uniform rule prescribed by Congress should be applied. Exceptions should not be permitted, as a general rule. Our suggestion is that rules of thumb be applied, and that it not be left to discretion.

Subsection (10), line 13, sets up a different provision governing the other type of ownership. I mean representative ownership. The trustee "X" bank reads the paper some morning and finds out that Jones, who has died, has made "X" bank co-trustee of his estate; and in that estate were 1,000 shares of stock of the obligor under the indenture. Now, "X" trustee may in fact have very little investment control over that; it may be in the other trustees. There is not the same acute, adverse interest present when the trustee is trustee under one of these personal trusts, or trustee under 1,000 personal trusts, with a few shares here and a few shares here and a few shares here, in the aggregate making up more than 5 percent. He will have, over those trusts, varying degrees of control and supervision—in some the supervision will be practically nonexistent. Mr. Page can amplify this, from the point of view of a practical trust officer.

So I think there is a justification for a differentiation in treatment of a beneficial ownership on the one hand and a representative ownership on the other.

The Barkley bill, paragraph (10), provides a routine, mechanical method for that, provided there has not been a default. It provides that once a year the trustee must take an inventory of all of its personal trusts. And if, upon taking an inventory, it finds that it is a representative owner, in the aggregate, of 25 percent or more of that type of securities which would have disqualified it under paragraphs 6, 7, 8, and 9, then it must resign. But if it does not have that 25 percent, it need not resign. In other words, all of those percentages in paragraphs 6, 7, 8, and 9 are raised, in case of representative ownership, to 25 percent. However, there is one important exception; it begins on

line 3, page 26: If there is a default under the indenture, in principal or interest, then the percentages of paragraphs 6, 7, 8, and 9 are applicable, and beneficial ownership comes into play, for the reason that then the conflict of interest between your trustee as a personal trustee and your trustee as a corporate trustee, involving the securities of the same issuer, is apt to be most acute. Where there is a default and a reorganization coming along, all creditors are reaching out, each for as much as he can get. As I read it, that is the general meaning of lines 3 to 13 on page 26. However, there is this important modification: The trustee must count in those securities, in making up the percentages in paragraphs 6, 7, 8, and 9, after default, only those securities over which the trustee has sole or joint control. He may be just a stakeholder or custodian, so to speak; and the fact that he sits there, holding them, without any control over them, may not mean that he has a conflict of interest. So with that modification in line 9 and line 10, on a default in principal and interest, the original percentages for beneficial ownership come into operation, and the 25 percent ownership provision just disappears.

Now, there are other exceptions— line 17, page 26: The trustee, in computing these percentages, shall not be deemed the owner of any security which it holds as collateral security, where the loan is not in default, or where it holds as custodian, escrow agent, or depositary, or in any representative capacity.

The first 12 lines of page 27 create another exception for representative ownership; and that is that a trustee may act as administrator, executor, or testamentary trustee of an estate for a period of not more than 18 months, where that estate does not include more than 25 percent of the securities of the obligor.

These various subsections carry the term "underwriter" throughout. As I visualize it, the term "underwriter", as used in this section, means any person who underwrote a security of the obligor that is outstanding at the present time, with this exception: If he underwrote the security presently outstanding, but the underwriting was 30 years ago, he is not, under this statute and for the purposes of this statute, an underwriter. That relationship of underwriter to securities is apt to become more and more tenuous as time passes. Six years is a number that is suggested as a line which should be drawn somewhere. It might be 10 years; I doubt the advisability of making it less than 6 years.

Senator HUGHES. Do you mean that underwriting is disappearing?

Commissioner DOUGLAS. No; not that. I mean that if there are securities outstanding which "Y" has underwritten 10 years ago, those securities never having defaulted, the underwriter's interest in those securities is not such that it has completely vanished or gone; but the significance of the relationship between the trustee and the underwriter, with the passage of time, begins to become a little more tenuous, I think. So I think it is proper to draw a line somewhere; the question is where the committee would like to draw it. Six years is suggestive; it might be more, and I doubt if it should be less.

Subsection (c) at the bottom of page 27, covers the situation both of the type of bank-creditor relationship that is permitted by the Barkley bill and the type that is not permitted by the bill. I have spoken of the type of bank-creditor relationship that is not permitted, where the trustee is trustee under an issue that is unsecured or that

has a maturity of less than 5 years. But take a case of a first-mortgage bond issue secured by the plant and real estate of the manufacturing company in question. "X" bank is trustee under that. There is nothing in the bill, as I read it, to prevent "X" company from also being a bank creditor of the trustee in that situation. And a justifiable reason for creating a distinction between that case and the case of the unsecured debenture issue is that in the case of a secured mortgage of a long maturity, the real security, by and large, of the bondholder is the physical assets pledged under the mortgage. So, speaking generally, any action by the trustee in collection of his debt is not as apt directly to impair the bondholders' status under that mortgage.

However, in subsection (c) there is a recognition that even in the case of a long-term mortgage, on the eve of default, when there is a wild scramble for loose assets, the trustee might conceivably be more vigilant in its own cause than in the cause of the people it represents. So it draws a line at 4 months preceding a principal or interest default. As respects realization upon security held by the trustee for its own claim prior to the beginning of the 4 months' period, or payments received by the trustee prior to the beginning of the 4 months' period, the trustee is entitled to keep them.

However, subsection (c) provides for an accounting as to the funds received within that 4 months' period in the case of permitted loans as well as prohibited loans.

Perhaps I can state it this way best: Generally, in the case of permitted loans, any improvement of the position of the trustee as a bank creditor in that 4 months' period is apportioned between the trustee and the bondholders in such a manner that the trustee realizes no greater percentage of its deficiency claim than the bondholders realize on their deficiency claim. So it is not quite the bankruptcy concept; but, nevertheless, the line is drawn at the 4 months' period. That is the danger zone. The trustee cannot be preferred by getting an improved position on the eve of default. Under the Barkley bill the trustee, during that 4 months' period, cannot be working exclusively for itself as a bank creditor. If he gets additional security or payment, then he must hold that in a special account for the pro-rata benefit of himself and the security holders. So it forces the trustee, if he does get busy and if he starts working hard, to work jointly for the security holder and himself. That is a long and rather complicated provision, that runs down to line 8 on page 31.

Senator HUGHES. That is a brand new thought to me; I never thought how you might accomplish that. It is quite a problem.

Commissioner DOUGLAS. There are some important exceptions to this.

Paragraph (A), at the bottom of page 28, is to be considered in that connection. For example, a claim of the trustee, that the trustee holds against the issuer, is guaranteed by another person; the trustee can collect from that other person and hold it for his own account, because he is not in a race of diligence with his beneficiaries. Or if he makes a bona-fide sale of the claim to another person, he may keep it.

Then the next to the last paragraph of the subsection, line 21, page 30, provides, in effect, that the trustee cannot escape the onerous provisions of this accounting for payments received within the 4

months' period by resigning. That does not mean that the trustee holding security for his bank claim can be forced to account for the funds he got before the 4 months' period, and be forced to give that up. The bill does not take anything away from him that he got before this 4 months' period began. It is only when he is reaching out and getting this additional security or additional payment, to the possible detriment of his security holders, that the Barkley bill says, "You can't keep it; it has to be apportioned."

There are some important exceptions in subsection (d), page 31, to this whole requirement—that the trustee can have only certain types of creditor relationships with the obligor.

Subdivision (1) of subsection (d), page 31, excepts claims against the obligor which would not be properly classed as short term bank claims—securities having a maturity of 1 year or more, at the time of acquisition. And if that security which has a maturity of more than 1 year comes within the classification of corporate securities—say it is a 3-year-note issue, and the trustee picks up some of that—then it is computed into the 5-percent or 10-percent clause that I mentioned earlier. But the acquisition or ownership of that does not, per se, disqualify the trustee; the other percentage requirements then come into operation. You see, the bill visualizes these 5- and 10-percent clauses governing the ownership of corporate securities as operating independently of short term bank claims.

Now, there is another exception—line 18, page 31: Conceivably the reorganization court directs or authorizes or permits the trustees to make advances to the estate. Presumably if that is done, it is authorized by a disinterested person with an eye to the interests of all the security holders. If the court permits that, the trustee can have a creditor relationship.

On page 32 there are certain other important provisions: Subsection (3) permits a creditor relationship arising out of the ordinary business transactions of the trustee as transfer agent, registrar, custodian, paying agent, fiscal agent, or other similar capacity. For instance, consider the trustee as a transfer agent: He has a great deal of postage, telephone calls, and other expenses incidental to performing the duties of transfer agent. He can collect those from the obligor; he does not run afoul of this 4 months' provision. Those are treated as minor matters, in relation to these large claims, under these indentures. At the same time, those words "in the ordinary course of business", do, in my judgment, prevent the trustee, under the guise of a fiscal agent, from making a bank loan. Because "in the ordinary course of business" in the capacity of paying agent would, in my judgment, imply that it has to be legitimate paying agent's expense.

Subsection (4) covers questions of the compensation of the trustee, rental of premises to the obligor by the trustee, indebtedness created as a result of goods or securities sold in a cash transaction, as such term is defined in the indenture.

Now, Mr. Page and Mr. Hanes can elaborate in more detail, from the point of view of the commercial banker, as to the concept of a cash transaction. But there are certain situations where a transaction is completed, not with cash in hand but with drafts or what not, which take a few days to clear, so for an interim of 2, 3, 4, 5, 6, 7, 8, 9, or conceivably 10 days, the trustee is in a creditor position—purely a

temporary situation, where the essence of the transaction is cash payment.   Now, that is a difficult matter for definition within the statute.
Perhaps, if the committee desires, we could submit to the committee
a definition that might possibly be substituted for the words "cash
transaction."

This draft leaves that power of definition with the Commission.
There may be some advantages in leaving it that way permanently,
so that there can always be a nice adjustment to changing business
practices.   But at the present time I am not in a position to suggest
to the committee the precise, authoritative definition of "cash transactions" and one that will cover all of the legal niceties.

There is a similar problem under section 5, line 9, where the trustee
can be a bank creditor in case of self-liquidating loans.   I think that
may be a desirable exception; I think it is important th.t it be carefully guarded so that the loans prohibited in the earlier sections will
not slip through the back door of this section.   But I think there may
be a wholly legitimate category of transactions usually arising out
of the shipment of goods, where you get acceptances, bills of exchange,
drafts, or what not, that do, as a matter of experience in banking
circles, automatically liquidate, by and large—not from the obligor,
but from the collateral itself.

That, again, is a subject that I thought I might possibly have something more specific on, for the consideration of the committee today.
Unfortunately, we at the Commission have not been able to work out
a definition that is wholly satisfactory to us, that we could recommend
to the committee.   There, again, if the committee feels that there
should be a definition in the statute and the power of definition should
not be left to the Commission, we should be very happy to give the
committee the benefit of our best thinking on that matter.

That covers that important subject of conflicts of interest.   As
you see, the Barkley bill sets up fixed standards, rules of thumb.
And I think that procedure has great virtue by making for uniformity
in practice.

Coming down to subdivision (e) page 32, a very important improvement in practice is envisioned there, where each obligor is required to
file with the trustee and the Commission, and transmit or otherwise
make available to indenture security holders, its annual report and
other reports.   That is putting the obligor in the position of having
to send out to bondholders, as well as stockholders, financial reports.
I think it is a decided improvement.

Senator BARKLEY. It puts on him the obligation and duty to seek
out the security holders and give them information, rather than have
them seek him out to do that, anyway.   But he does not have to
wait for a request for these things.

Commissioner DOUGLAS. That is right.   And it sets up a system
whereby this financial information would be disseminated at regular
intervals, either by publication or by notice to security holders, that
all who wish such information can get it by writing in.

Senator MALONEY. But it is not automatic?   It is only as you
require, in the commission?

Commissioner DOUGLAS. That first requires the trustee to make
available such annual reports and other reports and such information
concerning the performance by the obligor of its duties under the
indenture, in such detail as the Commission may from time to time
prescribe.

Senator Hughes. It reaches trusteeship?

Commissioner Douglas. I think you are right, Senator Maloney, in suggesting that the sending out of the information would not be automatic by terms of the bill. As I see it, it would be made automatic under each indenture. The Commission is given the duty of seeing to it that each indenture contains a provision that on May 1 or October 1 the obligor shall send its annual report, containing such-and-such information, to the security holders.

Senator Barkley. If that provision is inserted, it becomes automatic?

Commissioner Douglas. Yes; I think the Senator is right. It does not become automatic by the statute.

The bondholders' list provision is an important one; this requires the obligor to file with the trustee all the information it has, or that is in the hands of its paying agent, as to the names and addresses of bondholders. Under the requirements of the "income tax" title of the Revenue Act of 1936, ownership certificates setting forth the names and addresses of persons receiving interest payments on bonds are required to be filed. This subsection would require that information, so obtained, to be turned over to the corporate trustee. The trustee's obligation to make such information or the use thereof available to the bondholders is subject only to such conditions as the Commission approves

Senator Hughes. You could provide for it, I suppose, whenever it was asked for, let us say, by a certain number, or by individual bondholders? Everything would start, perhaps, with one or two bondholders; and they would have to get the list, in order to find out who the others were, in order to get enough interest regarding it, to make a foreclosure?

Commissioner Douglas. Yes; that is the prime function that would be performed by the availability of lists; that is, your security holders would no longer be at the mercy of the inside few who have a monopoly on those lists. They would be the common property o the bondholders.
f

There is this one danger: We all know that a person may buy a bond merely for the purpose of getting a list. He does not want it for any legitimate purpose; he wants it because he has some cats and dogs that he wants to sell, and he thinks that this list may be a good sucker list. I think those words "subject only to such terms and conditions as the committee deems not detrimental" contain an important qualification. I think that the statute should not require the trustee to give to every person who seeks a list a physical copy of the list, because a lot of damage has been done by people with such sucker lists. Conceivably one of the terms and conditions imposed would be this—and there is a question in my mind as to whether or not that ought not be somewhat more amplified in subsection (f): One condition might be that the person must have held the security for at least 6 months, let us say—as just a rough test of good faith. Another term or condition might be this: The trustee would have the discretion to say: "No; I will not give you a copy of that list; but you give me your letters and your envelopes and stamps, and I will have one of the girls at the office address the envelopes to all these people and mail out these letters for you, so that they will all be reached."

In that case, such a person would get the use of the list without getting improper use of it.

Senator HUGHES. A considerable study has been made of that and all sorts of usages have been found.

Commissioner DOUGLAS. Yes; they have. A recent system was one that was employed by Judge Lockwood, in Brooklyn, N. Y., in connection with the S. W. Straus receivership. We made a study of that and described it at length in our report on real-estate committees. He did not give out lists, as I recall, but saw to it that proper literature was mailed. I do not want to continue too much along that line, though I think the matter is important.

The last sentence of the subsection is intended to exempt the disclosure of such information, in accordance with the terms of the indenture, from the nondisclosure provisions of the revenue act. The fact is that if this were the law, some change under the revenue act would be involved; and I thought this should be called to the attention of the committee very specifically, because it does, by clear meaning, I think, alter an important provision of the nondisclosure provisions of the revenue act.

Senator BARKLEY. But it deals with a subject not really contemplated by the revenue act?

Commissioner DOUGLAS. That is correct; it deals with a wholly new idea.

Senator BARKLEY. Yes.

Commissioner DOUGLAS. Now we come to subsection (g), and reach the question of what should be the standard of care of the trustee. So far, I have talked mostly about the conflicts of interest. Earlier this morning I indicated there were two main phases: conflicts of interest, and the degree of activity of the trustee.

Under the Barkley bill the duties of the trustee are distinguished—duties prior to default, first; and duties subsequent to default, second. Duties prior to default have a different standard than do the duties after default. The duties prior to default are relatively less important, in these corporate trusteeships—relatively less important, because the trustee, as I visualize it, never could be engaged in management of these companies, at least prior to default. It is a different kind of trusteeship. So I think this involves a different standard, as I read it.

It says the indenture must impose upon the trustee such specific duties [reading]:

prior to default (as such term is defined in such indenture) as the Commission deems consistent with the duties and obligations which a prudent man would assume and perform prior to such a default if he were trustee under such an indenture.

In other words, it says to the Commission: "What the trustee should do prior to default should be measured by what a prudent man would do if he were a trustee under such an indenture"—not a man who is trying to get away from every possible liability, but a reasonably careful man, a responsible man, an intelligent man. "Now, what would he do for investors, if he were in this position?"

I have given, and we at the Commission have given, a lot of thought to this standard of care in the Barkley bill—prior to default. I think that is an adequate standard.

Senator MALONEY. A very interesting thought for prudent men.

Commissioner DOUGLAS. It is vague, and it is general. I had hoped that I might have something more specific. But after all, it is about the closest that the common law and the rules developed by the equity courts have come to the problem.

Senator BARKLEY. You could not make it any more specific, unless you were wise enough to foresee all the contingencies and exigencies that may arise in any trusteeship in the future.

Commissioner DOUGLAS. Yes; and I think that would be very difficult to do.

All that subdivision (g) does is to tell the Commission: "Here is the standard that Congress thinks these trustees should live up to prior to default. You at the Commission should see to it that the provisions in an indenture, governing the situation prior to default, should be written in light of that certain standard."

The rest of the subdivisions, there, merely indicate, as purely exemplary, the types of things that should be covered. I have mentioned recording, rerecording, filing, and refiling, this morning. That does not mean that the trustee himself necessarily has to run around to every county clerk's office and file it, and sit there until he gets a certificate. But what would a prudent man do? Would he do it himself, or get somebody to do it for him? That would vary, from case to case. In an industrial company, scattered over 12 States and in 365 counties, would a delegation of that by the trustee be proper? I think it probably would. I indicate that merely by way of illustration.

The second is the application of all indenture securities and the proceeds thereof. If it is an indenture covering an apartment house, would the trustee release the proceeds until he has received a certificate from the engineer or the architect? One standard might be used there, another in case the proceeds were for the general purposes of the corporate issuer.

Senator HUGHES. I can realize some difficulty about that—making the trustee responsible for the application of the proceeds. I do not know how far he could go on that. I had not given it a thought.

Commissioner DOUGLAS. As I see it, under subsection (g) the Commission would take this standard of care of the prudent man, and pick up the first indenture that came along, and say, "Well, the proceeds are going to be used for construction of a building; what the trustee, there, should do would be to release, on the certificate of some responsible person—not just pay it over to the issuer and run the risk that the issuer would not put up the building, but use it for something else."

If it is for general corporate purposes, a different provision might be included. I think that what a prudent man would do, would change from case to case; and it would certainly fall short of making the trustee an insurer.

Senator HUGHES. The responsibility would change from case to case, and your commission ought to be a party to those changes. Because if you are to carry out a building project, and the material men are not paid, and liens are not satisfied, you have a job on your hands, and somebody has to do a lot of work.

Commissioner DOUGLAS. It might be a complicated matter. Some of these trust men who are here could speak more authoritatively on the developments of that than I. In other cases, it might involve just getting a certificate from a proper person. But it seems to us that the standard of care there is not too high. We have seen instances where bondholders have put in $10,000,000 for a nice apartment house, and have had nothing but a nice excavation, or the foundations, and then the money is gone. I am thinking of some G. L. Miller issues.

Senator Hughes. Of course, it is an easy matter, in connection with the issue of bonds, for a trustee to see that the money is applied to discharging the old bonds; that is simple.

Commissioner Douglas. Yes.

Senator Hughes. But you find some very difficult cases that are hard to deal with.

Commissioner Douglas. Yes; you do. I think the virtue of this kind of treatment is that there will be contained in each indenture a very definite and very specific formula that the trustee can follow through, in most of these cases. He will know what he has to do, and he will know what will relieve him of responsibility.

Earlier this morning I mentioned the problem of release or substitution of securities. The Barkley bill says that the trustee must exercise that degree of care that the prudent man would exercise— what would the prudent man do? Certainly in many cases that have arisen in the past, the prudent man would not be justified in taking the debtor's word for it that the new security, to be substituted, was as good as the old security. Some person other than the interested debtor should do it.

As I read the Barkley bill, I visualize that there might be included in the indenture such a provision as this: "The trustee may release, on the certificate of an independent accountant, and shall be protected in so releasing."

A prudent man would do that; a prudent man would not do anything else.

Senator Hughes. Or, as Senator Wagner suggested this morning, I think, we would come to a matter of substituting one property for another, and would have an appraiser employed, to see whether the substituted property would be as valuable as the property that you were releasing.

Commissioner Douglas. Yes.

Senator Hughes. Or something of that sort, I think.

Commissioner Douglas. Yes.

Senator Hughes. And you would do what a prudent man would do. You would not just let the security go, and simply take the word of someone that another property was of equal value, and to be substituted.

Commissioner Douglas. As I see it, this subsection would entail description in the indenture of acts which the trustee must perform in order to satisfy this standard of care. Whether or not those mechanical acts were adequate, would depend upon the judgment of the Commission, in light of the particular acts involved.

Subsection (4) on page 35 is a general provision covering other covenants of the obligor. There will be some covenants of the obligor that will be relatively unimportant. I think subsection (4) particularly conveys the impression that only the major covenants are of importance, here. and not every tiny, little thing.

Then to implement the position of the trustee, lines 9 to 16, page 35, require the indenture to contain covenants on the part of the obligor to furnish the trustee with necessary and appropriate information for the trustee to have before it in order to perform its obligations.

After default, we have a little different standard, as I read it—a little higher standard, made necessary, I think, and made desirable by reason of the fact that in case of default under these corporate trust

indentures, the trustee must move. He is in the danger zone there, and immediate action has to be taken. Investments are at stake which are about to be lost; the senior interests are about to wipe out the interests of the junior interests. There is about to be a reorganization, and the securityholders need an active agent in there. The main impact of the bill, as I see it—not the exclusive, but the main impact—is upon the trustee, after default. The bill makes it exercise such rights and powers invested in it, and to use a degree of skill comparable with that which a prudent man would exercise under the circumstances, if he were a fiduciary and had the skill which the trustee has or which the indenture trustee represents itself as having, as indenture trustee, at the time of the offering of the indenture securities, whichever is the higher. The Commission has observed quite a number of cases in the last few years where the literature or prospectuses offering securities play up the trustee as a very important element—and with, I think, a totally misleading effect upon investors, because the trustee has been too commonly nothing but a stakeholder. Playing up on the word "trustee", and playing up the skill and competence of this particular trustee with a big name in that community, with the suggestion that that trustee is an active trustee is commonly misleading.

Now, if there are public representations in connection with the offering of securities, that the trustee has the highest degree of skill, and when in fact he does not have it, then he is presumed to have the degree of skill which he represents himself as having. It is a sort of double-edged test. It is in effect the test that the courts have worked out for personal trustees. This comes close to a statement of the duties of a trustee in the recent restatement of the law of trusts. It does not follow it precisely, but I think the substance of it is there.

So, after default, I think as a legal proposition it would be safe to say that the corporate trustee, under these indentures, would be held to the same standard of care after default as the personal trustee. That is a general statement.

There are certain important qualifications about that. Thus, line 6, page 36, authorizes the holders of a majority and principal amount of the securities to direct the trustee what to do; and if he does that at their direction, then he is protected. If they move in and say, "Now we are boss", then they can become boss, and he is not liable for acting pursuant to that direction.

Subsection (3), at the bottom of page 36, makes clear what I think is implied in other provisions of the Barkley bill: That if the trustee makes a mistake and causes a loss, or omits to take necessary action, but acts in good faith and is not negligent, there is going to be no liability placed on him. The outside limit of liability, so to speak, is stated in that subsection: If he acts in good faith and if he is not negligent, he is not going to be liable. In other words, there is a clear recognition of the fact that there is no attempt to make the trustee an insurer nor to provide that he is going to pay damages no matter how meticulous he was, provided he was wrong.

Senator BARKLEY. He is not going to be penalized for the exercise of what turns out to be wrong judgment, provided he acts in good faith?

Commissioner DOUGLAS. And without negligence. That is right.

Subsection (i) has a further protective clause for these trustees. As

a practical matter it is clear to me that the trustee is going to have to rely in many situations upon the opinions and the certificates of other people. Suppose it is the question of the condition of a plant out in the Midwest, or the question of the appraisal of a piece of property up in Maine: He has to rely upon appraisals, upon the advice of appraisers or engineers or accountants, or attorneys, or what not. Now, if he acts in good faith and is not negligent, he can rely upon those opinions, with one important qualification—that he could not pick out any attorney or any engineer or any accountant or any appraiser; the Commission has power to set up requirements as to the independence of those experts. I think that is very important. Too often the executive officer of the debtor has qualified himself easily as an expert, and has served the interests of the debtor rather than the interests of the creditor. That would not be possible here, if the Commission does its job, for the reason that the Commission has power to set up standards for the independence of these experts, and also standards for their qualifications and standards for the exercise of care in their selection.

That is a necessary section of the bill, in my judgment, in order to make it practicable for the trustees to operate as such.

Subsection (j), here, I think is one that all constructive, progressive trust companies will endorse; and that is that the trustee cannot incorporate in the indenture an exculpatory clause immunizing it from liability for its negligent action or failure to act, or for its own misconduct.

Senator BARKLEY. That subsection is practically a foil for subsection (3), at the bottom of page 36, is it not?

Commissioner DOUGLAS. Yes; it is.

Included in this prohibition, of course, are provisions relieving the trustee from liability for the negligence of its employees, except to the extent that such provisions are permitted by subsection (i), where it may rely upon the certificates and the opinions of others.

The subsection on "Notice of defaults" is a rather flexible subsection. That is subsection (k), on page 38. The general standard is that the indenture must contain adequate provisions with respect to giving bondholders notice of default. But the indenture may provide that except in the case of what we might call major defaults—or, to be more precise, the defaults specified in the indenture, where the Commission deems it necessary for the public interest and the protection of investors, that prompt notice shall be given—the trustees shall be protected in withholding notice, so long as it may be determined that that withholding is in the interest of the bondholders. The determination of that matter—lines 2, 3, and 4, at the top of page 39, is to be made by the board of directors of the trustee or the trust committee of the directors or responsible officers of the trustee.

Senator HUGHES. That is for the trustee?

Commissioner DOUGLAS. Yes; that is for the trustee. But as I say, the determination of that, for the trustee, is to be made by the board of directors of the trustee or the trust committee of the directors or responsible officers of the trustee. It is a difficult matter to cover in legislation. As particular cases come along, it is easier to deal with them.

Senator HUGHES. What did you have in mind?

Commissioner DOUGLAS. This is the type of situation I have in mind: A trust officer recently was telling me about a case where some

first-mortgage bond issues were outstanding. They were good securities. The company was nowhere near a default; it would pay out right along, and regularly, and had a fine history. It turned out that on one given unit of property there was a lapse in a fire-insurance policy. Through a slip of some insurance agent or some officer of the company, that insurance policy lapsed, or there was some failure to comply with some requirement of the policy, that made it ineffective. That condition lasted about 12 hours. It was fixed up very promptly; but technically, there was a default—and with the right to the bondholders, and the power to them, to come in and foreclose. There are situations like that in which probably, from the point of view of prudent trust management, it would be disastrous to put a notice upon the ticker, "X bonds are in default"—although that is technically true. If such a statement were made, then immediately the price would drop from 90 to 20, overnight, and many people would lose money. Then it would be found that there was a technical default only; and in such a case the trustee would be severely criticized.

The protection afforded is with relation to conduct in good faith, by responsible officers—the board of directors, the executive committee, or trust committee. It is a troublesome problem I know of no rule of thumb, such as in the Barkley bill, on conflicting interests, that would be adequate. By and large, it seems of necessity a matter for judgment. I have indicated to you what I think this means; and I think this means just that.

I think the Commission would have the power to say this: "If there is a default in principal or interest, immediate notice shall be given. Or if in some indentures there should be very important sinking fund requirements, that conceivably might entail prompt notice to the security holders."

It would be a question in the light of the set-up of the particular indenture and the requirements of that particular business, whether or not the Commission should put a label of major default on some of these. I think as a matter of general policy it should and would be put upon principal and interest payments.

Subdivision (1), on page 39, is nothing more or less than an adaptation from the provision that the Congress inserted in the Securities Exchange Act of 1934, whereby a person who brings a suit under the indenture and sues the trustee may be required to file an undertaking to pay the costs. That is here, I believe, for the same reason that a comparable provision is in the Securities Exchange Act—so as not to make too profitable just plain, ordinary strike suits, where suits are brought by irresponsible people merely in order to get a little money from the trustees. I think it is important that the trustee have that modicum of protection in this respect, in view of the fact that it is moving into an area of a greater activity.

There are other provisions that I can touch on briefly—subdivision (m), on page 40: Here is a mandate to the Commission to pick out from the indenture such other covenants as seem necessary and important from the point of view of investors, and to see to it that those covenants are adequately drawn in light of the standard of care enumerated earlier in the bill. And they cover a wide variety of subjects.

I have mentioned no. 1, on line 11, already—release and substitution, recording and filing. There are also the definition of defaults, the giving by the indenture trustee to the indenture security holders of notice of release and substitution of securities—a matter that one

member of the committee raised this morning, I believe, when he said that the security holders seldom knew about the release. Under this power—subdivision (m)—the Commission could require that if certain substitutions and releases are made, then the trustee shall tell the security holders that that has been done.

Then, clause (B) of subsection (4) is rather important, because it visualizes a system whereby the trustee will be making some kind of reports to the beneficiaries of the trust with respect to the trustee's qualifications, the properties and funds held by it under the indenture, and the administration of the trust. I think it is an important paragraph, so that the trustee will be giving out at regular intervals to the beneficiaries of the trust a report on his custody of the estate.

Clause (C), line 3, page 41, covers the rights, powers, and duties of the trustee on institution of foreclosure proceedings or enforcement of liens or suits on the bonds, or the right of the trustee to enter and take possession, the duty of the trustee to call meetings of bondholders—a practice which has been growing somewhat in the last year. In other words, there are rather broad powers given to the Commission to require that adequate clauses and provisions be inserted in the indenture; and they include all of these matters mentioned under subsection (m).

One interesting clause is (D), line 19, page 41. From our observations there has been too frequently the employment by the trustee of lawyers whose interests with other clients have at times tended to disqualify such lawyers as adequate legal advisers to the trustee. The lawyers are touched by this subsection "Disqualification of lawyers."

Paragraph (5), at the top of page 42, covers such matters as when can indenture security holders get an accounting from the trustee. The trustee may, at certain times in the life of the indenture issue, hold in its possession funds which should be disbursed. Up in New York, a year or so ago, there was quite a racket developed, of people bringing hundreds of actions against the trustee, merely for lawyers' fees. We covered that in our real-estate report. We think it is sound corporate trust practice to make an accounting; and this is designed as I read it, to have the indenture make adequate provisions for an accounting by the trustee to the beneficiaries. The others relate to suits by the trustee or suits by the security holders on the coupons and on the bonds, and the holding of meetings of security holders.

Subsection (6) I think is fairly important. This would require, in effect, the paying agent—that is, the people who receive funds from the obligor at regular interest payment dates, and disburse them to the people who have the coupons or the bonds—to hold such funds received for that purpose, for the security holders, and not for the obligors. There has been a diversity of legal decisions on that point, some holding that the paying agent holds that money, until disbursed. As I read this, this says in effect: If the obligor pays $100,000 to the paying agent, to pay these coupons, and then goes into default, that $100,000 is held for the indenture security holders, and is not repayable to the obligor. If it is repayable to the obligor, then any creditor of the obligor could seize it.

The rest of the sections, Mr. Chairman, I should be very happy to discuss; but unless you think it desirable, I think that they can receive very summary treatment, so far as I am concerned. Because they are what a lawyer would call sort of "boiler plate"; they are formal provisions—with one exception which I shall mention; formal