provisions designed to give the Commission adequate administrative powers. They are of the same general type as are in the Securities Act and the Securities Exchange Act.

Senator BARKLEY. The Holding Company Act and all the similar acts?

Commissioner DOUGLAS. Yes; the Holding Company Act. There is nothing unique here, with one exception. That is subsection (b) of section 10, on page 45, line 17. That subsection authorizes the Treasury Department, the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Reserve banks, and the Federal Deposito Insurance Corporation, to make information available to the Commission and to make examinations for the use of the Commission, under such conditions as those agencies may prescribe. There is also a provision prohibiting the Commission from making such information available to the public. This begins on line 11, page 46: Prohibiting the Commission, when it receives any such information, let us say, from the Federal Reserve Board or the Comptroller of the Currency, from making that information public.

That raises a question of some importance. These supervising agencies that have control over these banks that act as trustees, have in their possession information pertaining to the solvency of the banks. And we all know that such information at times, if made public, may cause great damage. There are evidences in the banking statutes of a meticulous attempt made not to release that information too freely. It is a great risk to the banks, at times.

Senator BARKLEY. I note that the printer has included there a notation on the side, which should have no place in the bill; the notation on lines 9, 10, and 11 should not be there. That section should begin with the word "Notwithstanding".

Commissioner DOUGLAS. Yes.

So I think there is a sound policy there, not to make public the information that the Federal Reserve Board or the Comptroller of the Currency otherwise would not make public.

Subsection (c) reemphasizes the point I mentioned earlier. Once the indenture is qualified, the Commission is through. The powers given to the Commission in the bill, as I read subsection (c) are not to be interpreted as giving the Commission power to go into the administration of these estates, 5 years after the indenture has been qualified, to start an investigation to determine whether or not the trustee has been a faithful trustee. The whole symmetry of the Barkley bill, as I see it, is to cut off the Securities and Exchange Commission supervision, once the indenture becomes qualified. Then the indenture is—if the Commission does its job—full of adequate protective clauses so that the trustee will have an adequate standard of care to measure up to and will be free of conflicting interests; and the enforcement of it will be in the hands of the investors, in the hands of the trustee, in the hands of the obligor.

Line 5, page 47, ties back closely to lines 9 to 22 on the previous page, because it reemphasizes the point that while the Commission can investigate these banks acting as trustees, or any trustee, to determine whether or not it is qualified, nevertheless that investigation by the Commission shall be limited to one issue, and that is this: Is that prospective trustee qualified to act as a trustee under the provisions of section 7?

That makes clear, I think, that the Commission would not be warranted in going in and making a general investigation of the financial condition of the bank, that might disclose to the public, at an inappropriate time, facts pertaining to the bank's liquidity, solvency, or what not. The Commission would be strictly limited, by virtue of the italicized sentence on page 47, to a very narrow issue, such as this: "Does the bank own more than 5 percent of the stock of the obligor?" That is the type of situation envisaged.

Senator BARKLEY. Judge Birdzell has called my attention to the fact that the language on page 46 prohibits the divulgence of the information obtained from the Federal, State, or Territorial authorities to the public, and may have some relation to, or may be qualified by the provisions of subsection (a) of section 10, which authorizes the Commission or any officer thereof to make investigations and examinations and all of that—which may be public, I suppose—may be public hearings. What have you to say about that?

Commissioner DOUGLAS. On that, Senator Barkley, I should say that the italicized sentence on page 47 would set up proper limitations on that general investigatorial power; because it says: "Any investigation of a prospective trustee under subsection (a) of this section"—in other words, it qualifies subsection (a) and must be read in connection with subsection (a).

Senator BARKLEY. Let us see what that says [reading]:

Any investigation of a prospective trustee under subsection (a) of this section or under any of the provisions of this act shall be limited to determining whether such prospective trustee is qualified to act as trustee under the provisions of section 7 of this act.

Of course, that limitation undoubtedly qualifies the power of examinations under section 10.

Commissioner DOUGLAS. Yes; I should think so.

Senator BARKLEY. At the same time that does not necessarily presuppose that the examination or investigation referred to in section 10 would be private. It might be a public hearing of some kind.

Commissioner DOUGLAS. Yes; it might. Let me give you one type of case of that sort.

Senator BARKLEY. Because it provides that you shall have power to bring memoranda, contracts, agreements, force the attendance of witnesses, and all the usual authority for holding a hearing.

Commissioner DOUGLAS. Yes; I am not certain that section 10, as presently set up, is properly delimited. But I think that care must be taken lest the Commission not be wholly crippled in enforcing the statute. Let me give you two instances that I have in mind, Senator Barkley: The first is where the Commission enters a refusal order on the ground that the trustee is disqualified. The trustee, under our form of government, has a right to appeal to a court. Now, the Commission has to have substantial facts in support of its findings, and those facts are reviewable. There has to be a record to go up on appeal; and I do not know of a record that goes up that does not go up as a piece of public property. There has to be a way of getting those facts before the court; otherwise, just look at what would happen: The Commission would have in its possession facts adequate to disqualify the trustee, and yet the Commission could not disclose those facts to the public. Therefore, the Commission would have to enter an order without any facts to support it; and it would go up to the

district court, and the district court would reverse it, quite properly, because there would not be a fact in the record to support it. That is case no. 1.

Case no. 2 is this: One of the functions of an administrative agency is reporting its findings to the public. That is a rather important function, I think. I think it may be less important under this statute than it was under the Securities Act. But I do not think it is out of reason to have a situation like this: Suppose there developed in this country, on the next wave of a boom, the type of real-estate practice that developed in the last boom—underwriters with vest-pocket trustees, so to speak—a situation that everybody admits is very, very bad from the point of view of investors and the public interest: If the Commission is foreclosed from using all the facts that it gets in its investigation—foreclosed from using all such facts that it gets from its investigation—the Commission would never, under any circumstances, be able to write an opinion about the most nefarious case that came along, and of which the public should have notice.

I indicated this not for the purpose of suggesting to the committee that I think section 10, as it stands, is necessarily the section that should receive the committee's approval. But I think the problem is one of greater difficulty than appears on the surface. There are two interests there, and I do not think either one of them can be completely foreclosed.

Senator BARKLEY. Of course, if you can obtain the information carried in subsection (b) and if you can obtain it through the use of examiners of national banks, the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation, or any other governmental agency, and if you can obtain it under that subsection, you do not have to obtain it under the other subsection.

Commissioner DOUGLAS. That is right.

Senator BARKLEY. In other words, you can obtain it in a confidential way, and retain it as confidential information, under that subsection.

Commissioner DOUGLAS. I think that is right, with this possible exception: If we have to sustain the validity of one of our orders, we have to have some facts in the record. I think that a court that found the Commission entering orders without any facts would quite justifiably brand the Commission as engaged in arbitrary, capricious, and oppressive practices.

Senator BARKLEY. Do you think the language in the italicized paragraph on page 46 would prevent you from divulging to the court the information you had obtained through these sources, and upon which you based an order?

Commissioner DOUGLAS. I think so. I would so read it. I think something like the italicized sentence on page 47 is necessary. I do not think subsection (a) should stand alone; I think there should be some qualification of that.

Senator BARKLEY. That is a matter that probably can be worked out, if there is any conflict.

Commissioner DOUGLAS. I do not think there would be any disagreement, from the point of view of the Commission, on the problem. I think it is merely a question of adequacy of language.

Senator BARKLEY. Yes.

Commissioner DOUGLAS. As we see the situation, these reports on the condition of banks—which reports are received from the Federal agencies—clearly should be used very circumspectly.

Mr. Burdzell. It is not so much to hamper the use by the Commission, as to see that the confidential character is protected.

Commissioner Douglas. I mean use in the sense of the Commission making them public.

Mr. Burdzell. For instance, in section 5 you may determine that the commission conduct a hearing to determine the qualifications of a trustee, basing its decision passing on that application and the applicant's motion, on certain stated facts. Now, conceivably you might require the applicant to present a copy of the examination made by a Federal agency of the proposed trustee and bank; and we would not necessarily make that public.

Commissioner Douglas. Well, that information would not be current. The issuer is the applicant, and the issuer would not have that information, would he, Mr. Page?

Mr. Page. I wonder if we could not perhaps cure this thing; because we both have the same thing in mind. If in section (a) in subdivision 10 you limited your subpena power on the trustees, so that you could not subpena from the trustees copies of examination reports; you got those from the Federal agencies, under section (b).

Commissioner Douglas. I think that might be the answer.

Mr. Burke. I think that is done already.

Mr. Page. I doubt if it is done.

Commissioner Douglas. Mr. Chairman, I do not think there is an issue here, in substance. I think there may be an issue in form. But if the committee should desire a reexpression of opinion on the part of the Commission, we should be glad to submit suggestions.

Senator Barkley. I think it is well to think that over.

Senator Hughes. And the suggestion that that should not be made public.

Commissioner Douglas. Yes; certain information certainly should not be made public. I do not think the information from examiners of banks should be made public. Nevertheless, there is, on the other side of the question, the matter of not crippling the Commission and making it impossible for the Commission to enforce the statute.

Senator Hughes. You do not want to shut off their right to appeal?

Commissioner Douglas. Yes.

Senator Barkley. If there is such a condition existing in connection with any bank or trust company as would make it unsafe as a trustee, because of its financial condition, certainly the interests of the public ought not require that that fact be kept secret.

Commissioner Douglas. Yes. On that point, Senator Barkley, at page 19 the bill provides—perhaps we had better go back to line 20, page 18 [reading]:

If the Commission deems it necessary or appropriate in the public interest or for the protection of investors, in view of the type of indenture, the amount of securities outstanding and thereafter issuable thereunder, and the duties and responsibilities imposed thereby on the trustee or trustees, the indenture to be qualified shall require that such institutional trustee have at all times a combined capital and surplus of such specified minimum amount as the Commission deems adequate, having due regard to the public interest and the interests of investors.

Now, coming to your question [reading]:

If such institutional trustee publishes reports of condition at least annually, pursuant to law or to the requirements of such supervising or examining authority, the indenture may provide that for the purposes of this paragraph, the combined

capital and surplus of such trustees shall be deemed to be its combined capital and surplus as set forth in its most recent published report of condition.

So if such a report were available, as I read this, the Commission would be justified in basing its findings upon the published report. If that published report was not available, then the Commission would be foreclosed from making available a report that it received from the examining authority. So for all practical purposes there is in that situation this result, as I see it: Inasmuch as such reports are already made available to the public, the Commission would not encounter any legal difficulty in making them public.

Senator HUGHES. Most of the smaller banks refer to the examination. They would make a summary. You have seen those summaries?

Commissioner DOUGLAS. Yes.

Senator HUGHES. That does not give you the information.

Commissioner DOUGLAS. For the purposes of section 7 (a) (2), that probably would, because all that talks about is combined capital and surplus, and I think that many of those reports, Senator, would give combined capital and surplus.

Senator HUGHES. Of course, they have got in the habit of making their examinations together. They make up the report, but it is not published.

Commissioner DOUGLAS. No; and I do not think the Commission should, certainly not without written permission of such examining authority, be permitted to make public reports which otherwise would not be made public; but I think, intermediately there, between that on the one side and making no disclosure on the other, there can be worked out a power in the Commission, so that it can operate effectively as an administrative agency on the limited aspects of this problem.

Mr. BRIDZELL. I should think there would not be any limitation on the power of the Commission; when it comes to the public, it is another matter. I mean for the purpose of justifying your order you can take your facts from the reports which are confidential. If you have to justify them in court, you can justify your record.

Commissioner DOUGLAS. If nobody else made it public.

Mr. PAGE. That would be true only on appeal from an order?

Commissioner DOUGLAS. That would be true only on an appeal from an order.

Senator HUGHES. If you have a bank that is qualified as trustee, and it is turned down, it does not hurt anyhow.

Senator MALONEY. Have you anything further to say, Commissioner Douglas?

Commissioner DOUGLAS. I have nothing more, I think. The other provisions that are left, that I have not mentioned, are mere armor plate.

Senator BARKLEY. You mean boiler plate.

Senator MALONEY. No; he means armor plate, Senator.

Senator BARKLEY. The rest of the bill has more or less standardized provisions that have been included in other legislation giving authority to the Commission to do the necessary things for the enforcement of the law.

Commissioner DOUGLAS. That is all. There is nothing new except this section 10.

Senator BARKLEY. Yes.

Senator MALONEY. Are there any other questions?

Senator BARKLEY. I have none.

Senator MALONEY. I presume that we shall meet again at 10:30 next Tuesday morning.

Senator BARKLEY. We might start at 10, if we want to conclude on Tuesday.

Senator MALONEY. We have three witnesses here, and 1 do not think we are going to finish on Tuesday, anyway.

Senator BARKLEY. The difficulty is that we are likely to be in session on Tuesday. If we are not, we can hold an afternoon session.

Senator MALONEY. Suppose we agree tentatively to meet at 10 o'clock, if that is all right with everybody else. 1 shall have the clerk of the committee notify the chairman to that effect.

(At 5 p. m. an adjournment was taken until 10 a. m., Tuesday, June 15, 1937.)

# REGULATION OF SALE OF SECURITIES

### TUESDAY, JUNE 15, 1937

#### United States Senate,
#### Subcommittee of the Banking
#### and Currency Committee,
*Washington, D. C.*

The subcommittee met, pursuant to call, at 10:30 a. m., in the Banking and Currency Committee room, Senate Office Building, Senator Robert F. Wagner (chairman of the committee) presiding.

Present: Senators Wagner (chairman), Hughes, Townsend, and Frazier.

Also present: Senator Alben W. Barkley; Mr. William O. Douglas, a Commissioner of the Securities and Exchange Commission, Washington, D. C.

The CHAIRMAN. Commissioner Douglas.

Commissioner DOUGLAS. May I offer for the record an analysis of S. 2344 which was prepared by the staff of the Securities and Exchange Commission?

The CHAIRMAN. Yes; we shall have that put into the record.

(The analysis referred to is as follows:)

#### ANALYSIS OF S. 2344

##### TRUST INDENTURE ACT OF 1937

The following is a detailed analysis, section by section, of the Trust Indenture Act of 1937 (S. 2344) introduced by Senator Barkley on May 6, 1937, and referred to the Committee on Banking and Currency. It is understood that a confidential committee reprint, showing certain changes which have been suggested since the introduction of the bill, has been prepared and is now in the hands of the committee. Attention will therefore be called in this analysis to the changes which have been suggested and the reasons for such changes.

##### TITLE

The bill is given the short title of the Trust Indenture Act of 1937. The change which has been made in the long title is designed merely to call attention to the fact that the bill is based not only on the commerce power but also on the mail power.

##### SECTION 1. NECESSITY FOR REGULATION

Subsection (a) contains an enumeration of the conditions which necessitate Federal regulation, in the interests of investors and in the national public interest, of public offerings of notes, bonds, debentures, and evidences of indebtedness, through the use of means and instruments of transportation and communication in interstate commerce and of the mails.

In the committee reprint the manner of presentation of the facts necessitating Federal regulation has been improved. In the following discussion, which is based upon paragraphs (1) to (5), inclusive, of subsection (a) of the committee reprint, attention will be called to the changes which have been made.

(1) This paragraph emphasizes the necessity of having a trustee to represent the interests of bondholders. Reference was made, in the former paragraph (3), to the fact that concerted action by bondholders was impeded by management-investment banker control of bondholders' lists. In the new paragraph reference is also made to the obvious impracticability of individual action.

(2) This paragraph is a revision of paragraph (2) of the original subsection (a). The necessity that the trustee have adequate rights and powers and adequate duties and responsibilities with respect to the protection and enforcement of the rights of the bondholders was mentioned in the original paragraph. The second clause of the revised paragraph puts into concrete terms what was covered by general statement in the original paragraph. This clause also refers to the general and reasonable assumption by investors that the trustee is under an affirmative duty to take action for the protection and enforcement of their rights, an assumption which is certainly incorrect under the form of trust indenture in common use. This is the idea intended to be conveyed by the matter eliminated from the original subsection (b).

(3) In the second clause of the former paragraph (1), mention was made of the necessity that the trustee have resources commensurate with its responsibilities and that it not have any relationship to, connection with, or interest in the obligor or any underwriter of its securities which involved a material conflict, actual or potential, with the interests of the bondholders.

(4) This paragraph, which is substantially the same as the former paragraph (3), has reference to the fact that trust indentures generally fail to require the obligor to furnish to the trustee and to the bondholders adequate current information with respect to its financial condition, and fail to provide machinery for the transmission of such information to the bondholders.

(5) This paragraph answers the natural question why bondholders have not taken steps to protect themselves by insisting upon the inclusion of adequate protective provisions in trust indentures. The explanation given is that trust indentures are commonly prepared by the obligor or underwriters, and that the fact that the securities are publicly offered (the very fact which brings them within the scope of the act) makes bondholder participation in the drafting process impracticable, even if they understand the problem.

Subsection (b) states that abuses of the character enumerated in subsection (a) have been so wide-spread and have occurred in a sufficient number of instances that the public offering of such securities, unless regulated, is injurious to the capital markets, to investors, and to the general public. This section also declares the general policy of the act to be to meet these problems and eliminate these evils connected with the public offering of such securities by the use of means and instruments of transportation and communication in interstate commerce and of the mails.

## SECTION 2. DEFINITIONS

As will appear from the discussion of section 3 of the act, an application for the "qualification" of an indenture under which securities are to be issued will, with few exceptions, be accompanied by registration of the securities themselves under the Securities Act of 1933, and so far as possible the Securities Act procedure has been followed. Accordingly, paragraph (1) of section 2 of this act provides that any term defined in section 2 of the Securities Act, as heretofore amended, and not otherwise defined in the Trust Indenture Act, shall have the meaning provided in section 2 of the Securities Act. Thus the Securities Act definitions of "security" and "issuer", among others, are carried over into this act.

In addition, section 2 of the Trust Indenture Act contains definitions of 15 terms used throughout the act, such as sale, underwriter, director, executive officer, indenture, and voting security.

"Sale" (2) is defined in the same terms as in section 2 (3) of the Securities Act, with the exception mentioned in the latter part of the paragraph. The reason for this exception can best be illustrated by an example. If, as is not an uncommon practice in the case of real-estate mortgages, the mortgagor executes an ordinary bond and mortgage to a trust company, receiving in exchange "certificates of participation" in such mortgage which he then sells to the public, this transaction is held, under the Securities Act, to involve a public offering not only of the certificates, but of the underlying bond. But for the exception made in this paragraph, it would be necessary that the underlying bond, as well as the certificate of participation, be issued under a trust indenture with a qualified trustee. The exception does not apply if the eventual distribution of the underlying bond or bonds to the purchasers of the certificates is contemplated, as where the certificates are by their terms convertible into such bonds.

"Underwriter" (3) is defined in exactly the same terms as in section 2 (11) of the Securities Act except that the last sentence of the Securities Act definition is omitted. Under that sentence, a person who undertakes the public distribution of a block of outstanding securities for a controlling stockholder of the issuer is held to be an underwriter, just as though he were distributing for the issuer itself, and registration was required. The elimination of the sentence in question makes it unnecessary in this situation to "qualify" under this act the indenture (if any) under which such outstanding securities were issued.

"Director" (4) is defined in substantially the same terms as in section 3 (a) (7) of the Securities Exchange Act of 1934.

"Executive officer" (5) is a term used primarily in section 7 (b) of the act.

"Indenture" (6) means any mortgage, deed of trust, trust, or any other indenture or similar instrument or agreement, whether or not secured, under which securities are outstanding or are to be issued. The term includes any supplement or amendment to any of the foregoing.

"Indenture to be qualified" (8) means the indenture in respect of which a particular application is filed, and the next four terms are defined with reference to that indenture. Through this device, the language of section 7 has been considerably simplified.

"Indenture trustee" (9) means each trustee under the indenture to be qualified and each successor trustee.

"Indenture security" (10) means any security issued or to be issued under the indenture to be qualified.

The definition of the term "security holder" contained in the former paragraph 11 has been eliminated as being unnecessary, and the succeeding paragraphs of the original bill have been renumbered. The paragraph references for the following definitions are those of the committee reprint.

"Obligor" (11) means every person who is liable upon a security issued or to be issued under the indenture to be qualified. In the case of certificates of interest or participation, the term includes persons liable upon the security or securities in which such certificate evidences an interest or participation. This provision is of particular importance in connection with the prohibitions against conflicting interests, for in the case of such certificates it is the indenture trustee's interest in or connection with the obligor under the underlying security which really matters. The last clause of the paragraph is intended to make clear that the trustee under an equipment trust is not itself to be regarded as an obligor, merely by reason of the fact that it agrees to pay over to the equipment trust certificate holders rentals received from the lessee of the equipment. The reference, in the committee reprint, to equipment trust certificates "or like securities" brings this provision into line with a similar expression used in section 2 (4) of the Securities Act.

"Voting security" (15) means a security presently entitling the holder or owner thereof to vote for the election of directors. For the purposes of the prohibitions against conflicting interests, potential voting power, or voting power temporarily in suspense, is comparatively unimportant.

"Securities Act of 1933" (17) is to be deemed to refer to such act, as heretofore or hereafter amended. Where, in various portions of the act, the intention is to incorporate provisions of the Securities Act as they now stand, regardless of future amendments, specific reference is made to the Securities Act of 1933 "as heretofore amended." Wherever this is done, attention will be specifically called to that fact. The purpose is to prevent the inadvertent dislocation of provisions of this act by reason of future amendments of the Securities Act. A similar provision is made with respect to the "Securities Exchange Act of 1934" and "Public Utility Holding Company Act of 1935."

## SECTION 3. EXEMPTED SECURITIES AND TRANSACTIONS

Subsection (a) exempts certain securities from the provisions of the entire act. Under the original subsection, the exemption was restricted to the provisions of section 4. The reference to "classes of" securities has been eliminated in order to avoid possible conflict with the provisions of section 8 (a) of the committee reprint, which would authorize the Commission to define the term "class of securities."

(1) This is the provision which limits the applicability of the act to notes, bonds, debentures, or evidences of indebtedness, or certificates of interest or participation in, temporary certificates for, or guaranties of any of the foregoing. The insertion in the committee reprint of the words "and other than" is merely a clarifying change. On principle, certificates of interest or participation of the character referred to in the discussion of section 2 (2) of the act should be subject to the provisions of the act. Practical considerations also demand their inclusion, for adop-

tion of the certificate of interest device would provide too easy a method of avoiding the requirements of the act. The specific mention of these types of security, and the failure to mention other types specifically mentioned in the definition of the term "security" contained in section 2 (1) of the Securities Act and incorporated by reference in this act (such as interim certificates and certificates of deposit), makes clear that such other types of security are exempted from the provisions of this act.

(2) This paragraph, in effect, limits the meaning of the term "certificate of interest or participation" to the general type of certificate referred to in the discussion of section 2 (2). It would exempt, for example, fixed trust certificates evidencing an interest in an assorted batch of bonds.

(3) This paragraph takes the place of a provision as to the date on which the act is to become effective. The same device was used in section 3 (a) (1) of the Securities Act, and this paragraph follows the language of that section. The "effective date" thus fixed is now January 3, 1938.

(4) The effect of this paragraph is to exempt from the provisions of this act all securities exempted from registration under the Securities Act, with the two exceptions noted below. The category thus exempted includes governments and municipals, securities of National or State banks, short-term commercial paper, securities of eleemosynary institutions and building and loan associations, rails, receiver's certificates, and insurance policies.

The two exceptions are securities issued in exchange for other securities of the same issuer, and securities issued under a plan approved by a court, which are exempted from the Securities Act by sections 3 (a) (9) and 3 (a) (10) thereof. It may be reasonable to suppose, for the purposes of exemption from the disclosure requirements of the Securities Act, that one who already holds securities of a company which are to be exchanged for new securities is reasonably familiar with its affairs, but there is no reason why the indenture under which the new security is issued should not conform to the higher standards prescribed by this act. With respect to the failure to carry over the section 3 (a) (10) exemption, it should be noted that while courts may pass on the fairness of the reorganization plan under which securities are issued, they do not commonly examine the trust indenture.

The distinction thus taken indicates why, in this paragraph, reference is made to the Securities Act of 1933, as heretofore amended. It is quite possible that future amendments of the Securities Act will exempt from the operation of that act securities which, for similar reasons, are not entitled on principle to an exemption from this act.

Although securities issued by National or State banks are exempted from this act, it would not be possible for an issuer to evade compliance with this act by making a bond and mortgage to such a bank, and then causing the bank to issue certificates of interest or participation in such bond and mortgage. Similar questions have arisen under the Securities Act, and the Commission has ruled that the company itself, and not the bank, is the issuer of the certificates of participation under such circumstances. Such administrative interpretation of section 3 (a) (2) of the Securities Act would, of course, be controlling in the interpretation of this paragraph.

(5) This paragraph exempts securities issued under a mortgage indenture as to which a contract of insurance under the National Housing Act is in effect. Under that act the Federal Housing Administration has control over the form of such mortgage indentures, and the application of this act to such securities would result in an unnecessary duplication of function.

(6) This paragraph exempts any guarantee of any security exempted from the provisions of this act by subsection (a). If it is not necessary to comply with the indenture requirements with respect to the security itself, there would be little point in making such requirements applicable to a guarantee of such security. The change made in this paragraph by the committee reprint corresponds to that made in the opening sentence of subsection (a).

Subsection (b) in effect, restricts the applicability of the act to public offerings by issuers or underwriters, as under the Securities Act itself, transactions by dealers being covered only to the limited extent deemed reasonably necessary to prevent evasions. As has already been noted, the term "underwriter" is more narrowly defined under this act than under the Securities Act. The last sentence of this subsection is necessary in order to prevent persons who would be underwriters under the broader Securities Act definition from losing the exemption provided by this subsection. Here again the reference is to the Securities Act of 1933, as heretofore amended.

Subsection (c): The Commission may, by rule and regulation, exempt additional classes of securities publicly offered where the aggregate offering price does not exceed $250,000. The Securities Act maximum under section 3 (b) of that act was $100,000. The difference is accounted for by the fact that in the case of issues as small as $100,000, the advantages of requiring a trustee are not commensurate with the expense necessarily involved, since the limited number of security holders makes individual action less impracticable.

Subsection (d): Under this subsection the Commission is authorized, on application by the issuer and after opportunity for hearing thereon, to exempt from the act offerings of additional securities issued under trust indentures executed prior to the effective date of the act, if certain conditions are shown to exist. This exemptive power may be exercised with respect to any one or more provisions of the act, but only to the extent that the Commission finds that compliance with such provisions, through the execution of a supplemental indenture or otherwise, would require the consent of the holders of securities outstanding thereunder or would impose an undue burden on the issuer, having due regard to the public interest and the interests of investors. It will be noticed that compliance with many of the provisions of the act could not conceivably be regarded as necessitating the consent of the holders of outstanding securities, and the necessary basis of Federal jurisdiction existing, there is no reason why the issuer should not be made to comply to that extent with the required standards, particularly in view of the safeguard provided by paragraph (2) of this subsection.

### SECTION 4. PROHIBITIONS RELATING TO INTERSTATE COMMERCE AND THE MAILS

Subsection (a) in effect, requires that all securities, the public offering of which is subject to the act, be issued under an indenture as to which "qualification" is effective. It prohibits, in language substantially similar to that of section 5 of the Securities Act, the use of means or instruments of transportation or communication in interstate commerce or of the mails to sell any such securities or to deliver the same after sale.

Subsection (b) postpones the effective date of registration under the Securities Act until qualification has become effective as to the indenture under which the security is issued.

### SECTION 5. APPLICATIONS FOR QUALIFICATION AND THE TAKING EFFECT THEREOF

This section establishes machinery for the qualification of an indenture which is not unlike the registration machinery of the Securities Act, sections 6, 7, and 8 thereof.

Subsection (a) requires that an application for qualification be filed by the issuer, as under section 6 (a) of the Securities Act. The application must contain such of the information and documents which would be required to be filed in order to register the security under the Securities Act, and such additional information as the Commission may by rules and regulations prescribe. The last sentence of the subsection provides that the information and documents so filed shall be available to the public under such regulations as the Commission may prescribe. This provision is identical with section 6 (d) of the Securities Act.

Subsection (b): The provisions of this subsection with respect to the filing of applications and of amendments thereto are substantially similar to those of section 6 (c) of the Securities Act, except that the Commission is given some discretion as to the medium of payment of the filing fee, where a filing fee is payable. If a registration statement under the Securities Act covering securities issued or to be issued under the indenture has been filed prior to, or simultaneously with, the application, no filing fee is payable under this act. In all other cases, a filing fee of $100 is payable; but if a registration statement under the Securities Act is subsequently filed, the amount so paid is to be credited against the filing fee payable under the Securities Act, and any excess is to be returned to the applicant. As under section 8 (a) of the Securities Act, the filing of an amendment to an application prior to its effective date has the effect of postponing the effective date, unless the amendment is filed with the consent of the Commission and pursuant to an order of the Commission. Amendments after the effective date may be made on such terms and conditions as the Commission may prescribe.

Subsection (c): An application for qualification becomes effective 20 days after the filing thereof (the same period as prescribed by sec. 8 (a) of the Securities Act), unless the Commission issues an order to show cause why the application should become effective. If a show cause order is issued, an opportunity for hearing thereon must be given within 10 days, and the application becomes

effective within such reasonable period of time thereafter as the Commission prescribes by rules and regulations, unless the Commission issues an order pursuant to section 6 refusing to permit the application to become effective.

Subsection (d) makes clear that an indenture as to which qualification has become effective is not affected by the subsequent adoption, amendment or rescission of rules, regulations, or orders, except as otherwise expressly provided in the act.

Subsection (e) empowers the Commission to make an investigation to determine whether a refusal order should issue. As in section 8 (e) of the Securities Act, if the issuer or any obligor, underwriter, or trustee fails to cooperate or obstructs or refuses to permit the making of such investigation, such conduct is a ground for the issuance of a refusal order.

### SECTION 6. REFUSAL ORDERS

This section requires the Commission to refuse to permit an application to become effective if it finds that:

(1) The application does not conform to the requirements of the Act.

(2) The application contains any material misstatements, misleading statements, or omissions.

(3) Any person designated as trustee is not eligible under section 7 (a) or has any conflicting interest, as defined in section 7 (b).

(4) The indenture does not conform to the requirements of section 7.

(5) The indenture or any security to be issued thereunder contains any provision which limits, qualifies, or conflicts with a provision required to be contained therein; or any provision prohibited by the act; or any provision which is misleading or deceptive or the elimination of which is necessary or appropriate in the public interest or for the protection of investors, or to prevent the circumvention or evasion of the act.

The provision with respect to misleading or deceptive provisions will permit the Commission to prevent the inclusion in an indenture of a so-called negative pledge clause which, though purporting to provide protection to the bondholders, can be so readily circumvented that the protection afforded thereby is illusory.

Provision is made for the rescission of a refusal order when the Commission deems that the objections on which it was based have been met.

### SECTION 7. CONTENTS OF INDENTURE

This section sets forth the standards to which the indenture must comply. It should be noted that the section applies only to indentures with respect to which an application for qualification has been filed and merely states what provisions such indentures must contain.

#### Subsection (a). Persons eligible for appointment as trustee

Paragraph (1) requires that at least one trustee under the indenture be an institution, with corporate trust powers, which is subject to governmental supervision or examination.

Paragraph (2) permits the Commission to require that such institutional trustee have at all times a combined capital and surplus commensurate with its responsibilities, such determination to be made in view of the type of indenture, the amount of securities outstanding and thereafter issuable thereunder, and the duties and responsibilities imposed upon the trustee. If the indenture so provides, however, the combined capital and surplus set forth in the most recent annual report of condition published pursuant to law or to the requirements of the supervising or examining authority will be conclusive evidence as to the amount thereof.

Paragraph (3) makes provision for individual co-trustees, as is necessary under some State laws.

Paragraph (4) requires that in the case of certificates of interest or participation, the trustee have the legal power to exercise the rights of a holder of the underlying securities.

#### Subsection (b). Disqualification of trustee

This subsection of the committee reprint requires that if the trustee has or acquires any conflicting interest as defined in that subsection, it shall within 90 days after ascertainment thereof, either eliminate such conflicting interest or resign. If the trustee fails, on written request, to resign or to eliminate the con-

flicting interest within the specified period, any security holder may institute removal proceedings. The revised subsection requires that such security holder have been a bona-fide holder of indenture securities for at least 6 months. The subsection then proceeds to state what shall be deemed to be a conflicting interest. The provision of the original subsection prohibiting any person having a conflicting interest from accepting or holding the position of trustee has been eliminated in the fear that the retention of that provision would cast a doubt upon the validity of action taken by the trustee during the 90-day period. In the revised subsection, the 90-day period starts to run upon ascertainment of the conflicting interest rather than upon the acquisition thereof.

(1) Trusteeship under more than one indenture made by the same obligor is to be deemed a conflicting interest with the exceptions mentioned in this paragraph. Cases in which one indenture is a collateral trust indenture secured exclusively by bonds issued under the other indenture are excepted. The modifications made in this provision were in the interests of clarity. A similar exception is provided where the obligor is a real estate company having no substantial unmortgaged assets and both indentures are secured by wholly separate and distinct parcels of real estate. No real conflict of interest exists in such cases. The Commission is authorized to make further exceptions where the trustee establishes to its satisfaction that trusteeship under both indentures is not likely to involve a material conflict of interest.

(2) A trustee is to be deemed to have a conflicting interest if it or any of its directors or executive officers is an obligor or was, subsequent to June 16, 1934, an underwriter. The latter term is defined in the last paragraph of subsection (b) as including all persons who were underwriters of outstanding securities of an obligor within 6 years prior to the date as of which the determination is made. Underwritings prior to June 16, 1934 are to be disregarded under the revised paragraph (2). It was on that date that the Banking Act of 1933 required national banks to cease the underwriting of securities.

(3) This paragraph deals with cases in which the trustee controls or is controlled or is under common control with an obligor or underwriter.

(4) This paragraph prohibits the trustee itself or any of its directors or executive officers from being an officer, director, partner, employee, appointee, or representative of an obligor or underwriter. The revised paragraph permits, in common parlance, one director or executive officer "each way" between the trustee and the obligor, but no person may at the same time be an executive officer of both. The second common director is now to be permitted only if the number of directors of the trustee is more than nine. In the original bill the exception provided in clause (A) did not apply to executive officers of the trustee. Instead of limiting the pecuniary interest of the "clause (B)" director to his qualifying shares in the obligor, as was done in the original bill, such director's holdings in the obligor are now to be restricted to what may properly be regarded as a "normal investment" in the obligor, the amount to be fixed by the Commission, with an upper limit of 1 percent.

Clause (C) of the original paragraph (4) has been retained substantially unchanged, thus permitting the trustee to be designated to act as such, or in certain specified ministerial capacities, by an obligor or underwriter.

(5) This paragraph, as revised, in effect prohibits the obligor and its officials, or an underwriter and its officials, from being the beneficial owner of 5 percent or more of the voting securities of the trustee. The principal change made in this paragraph is that the obligor and each underwriter, and their officials, are to be considered separately. The exclusion from this calculation of holdings by a director or executive officer or an obligor who is also a director or executive officer of the trustee, by virtue of clause (a) of paragraph 4, is limited to holdings not in excess of 2½ percent.

(6) This paragraph in effect prohibits a trustee under an unsecured issue, or a trustee under a secured issue having an original maturity of less than 5 years, from being or becoming a creditor of an obligor, except as authorized pursuant to subsection (d) of section 7.

(7), (8), and (9): These paragraphs deal with the matter of the beneficial ownership by the trustee of securities of an obligor or underwriter. The corresponding paragraphs of the original bill applied to ownership in a representative capacity as well. Ownership in a representative capacity (i. e., as executor, trustee or in a similar capacity) is now given separate treatment in paragraph (10), on the theory that such ownership does not involve as direct a conflict as beneficial ownership.

(10) This paragraph, which had no counterpart in the original bill, requires the trustee to make an annual check of its holdings of such securities in a representative capacity, and if such holdings aggregate 25 percent or more, the trustee

is to be deemed to have a conflicting interest.    The last sentence of the new paragraph (10) requires a similar check to be made upon the occurrence of a principal or interest default under the indenture, and provides that all such securities held by the trustee in any representative capacity, with sole or joint control over such securities, shall thereafter be considered as though beneficially owned by the trustee.

The first proviso following paragraph (10) excludes from the operation of the last four paragraphs securities held as collateral, and securities held in a ministerial capacity.    The changes in this proviso were for the purposes of clarification. The second proviso permits the exclusion, for a limited period, of any such security acquired through becoming executor, administrator, or testamentary trustee of an estate.

Subsection (c): This subsection is designed to eliminate competition between a trustee, who is also a creditor of the obligor, and the bondholders he represents, during and after the 4 months' period preceding a principal or interest default under the indenture.    If a trustee under an unsecured indenture, or a trustee under a secured indenture having an original maturity of less than 5 years, makes a loan in violation of the provisions of subsection (b) (6), any improvement of his position during or after such period must be held subject to the prior payment in full of all sums due and owing under the indenture.    In the case of a trustee under a secured indenture having an original maturity of more than 5 years, on the other hand, the trustee is not required to account for any such improvement if it establishes that at the time such improvement was received the trustee had no reasonable cause to believe that a default would occur within 4 months.    Subject to this limitation, any improvement of the position of such a trustee is to be apportioned between the trustee and the bondholders in such manner that the trustee realizes no greater percentage of his deficiency claim than the bondholders realize in respect of their deficiency claim.

The provisions of this subsection do not apply to the realization upon security held by the trustee prior to the beginning of the 4 months' period.    In the committee reprint a provision has been inserted immediately after paragraph (2) of this subsection which excludes from the accounting requirement (A) payments made by persons other than the obligor, who are liable upon the claim in question, and (B) the proceeds of the bona-fide sale of the claim by the trustee to a third person.    Transactions of this character cannot be said to involve competition between the trustee and the bondholders it represents.

The next to the last paragraph of the subsection is intended to discourage a trustee from resigning in order to avoid the accounting requirements.

Subsection (d): This subsection permits the exclusion of certain classes of credits from the operation of subsection (b) (6) and subsection (c), the ownership or acquisition of which does not involve an acute conflict of interest.    The original bill included in this category (1) credits evidenced by securities having a maturity of one year or more at the time of acquisition by the trustee, and (2) advances authorized by a receivership or bankruptcy court, or by the indenture, for the purpose of preserving the mortgaged property.    The committee reprint requires that notice of such advances be given to the security holders, at the time and in the manner provided in the indenture, instead of imposing an inflexible requirement that "prompt notice" be given.

The committee reprint permits the exclusion of three additional classes of credits.    Paragraph (3) covers certain disbursements of a minor nature.    Paragraph (4) includes temporary credits arising from the sale of goods or securities sold in what is substantially a cash transaction, as for example, cases where payment is made by check which may take several days to clear.    Paragraph (5) is intended to cover credits arising from the discount of drafts with bills of lading attached, which are ordinarily liquidated out of the proceeds of the goods, and credits arising out of similar transactions.

### Subsection (e).  Reports by obligors

Under this subsection the indenture must include adequate provisions for periodic financial reports by the obligor to the trustee and the Commission, and adequate provisions for the transmission thereof to the bondholders.    The Commission is empowered to prescribe the form in which such reports are to be made. This is the only respect in which the Commission is given any continuing jurisdiction after an indenture has been qualified.

### Subsection (f). Bondholders' lists

This subsection requires the obligor to file with the trustee at stated intervals all information in its possession or control, or in the possession or control of any of its paying agents, as to the names and addresses of the bondholders. Under the requirements of the income-tax title of the Revenue Act of 1936 "ownership certificates", setting forth the names and addresses of the bondholders, are now required to be filed with paying agents in connection with interest payments. This subsection would require that information so obtained be turned over to the trustee. The trustee's obligation to make such information, or the use thereof, available to the bondholders is to be subject only to such conditions as the Commission approves. Under this authority the Commission could, in a proper case, approve a provision which, in lieu of requiring disclosure of the list itself, merely required the trustee to mail out, at the expense of any bondholder, communications directed to his fellow bondholders. The last sentence of the subsection is intended to exempt the disclosure of such information, in accordance with the provisions of the indenture, from the nondisclosure provisions of the revenue act.

### Subsection (b). Duties of the trustee prior to default

This subsection in effect requires that the indenture impose upon the trustee certain specific duties and obligations, prior to default, to be worked out against the background of what a prudent man would do under similar circumstances. Specific mention is made of certain of the more important matters, such as recording; the application of the proceeds of the securities to the purposes specified in the indenture; compliance with conditions precedent to the release and substitution of the mortgaged property; and the performance by the obligor of its obligations under the indenture.

To the extent that the changes made in this subsection are not purely formal, they are designed to provide greater flexibility. This subsection should be read in conjunction with subsection (i).

### Subsection (h). Duties of the trustee in case of default

In case of default, the indenture must impose upon the trustee the duty of acting as a prudent man would act under the circumstances if he were a fiduciary and had the degree of skill which the indenture trustee has, or represents itself as having. If the trustee has a greater degree of skill than a man of ordinary prudence, it is held to the exercise of that degree of skill. Such requirement merely imposes upon an indenture trustee the same standard generally applicable to trustees under personal trusts. The committee reprint makes clear what was originally intended, namely, that the representations intended to be covered were representations made at the time of the offering of the indenture securities.

The requirements of this subsection are subject to provisions authorizing the holders of not less than a majority in principal amount of the outstanding bonds to direct the trustee's action in certain respects. The committee reprint adds a provision protecting the trustee from liability for any error of judgment or for any loss, so long as it acts in good faith and without any negligence. This provision is merely an express statement of what was already clear as a matter of interpretation of the original bill.

### Subsection (i). Reliance upon certificates and opinions

This subsection permits the inclusion of provisions authorizing the trustee to rely upon opinions or certificates of attorneys, accountants, or other experts, if the Commission deems that such provisions do not materially conflict with the required standard of care, and are not detrimental to the public interest or the interest of investors. Here again, the changes made in the committee reprint were for purposes of clarification only.

### Subsection (j). Exculpatory clauses

The indenture must not contain any provisions relieving the trustee from liability for its own negligent action or failure to act, or for its own willful misconduct. Included in this prohibition, of course, are provisions relieving the trustee from liability for the negligence of its employees, except to the extent that such provisions are permitted by subsection (i).

### Subsection (k). Notice of defaults

The indenture must contain adequate provisions with respect to the giving to bondholders of notice of defaults under the indenture. But the indenture may provide that, except in the case of defaults as to which the Commission deems it necessary or appropriate that prompt notice be given, the trustee shall be protected in withholding notice so long as it determines that course to be in the interests of the bondholders. Such determination must be made in good faith, by the board of directors, or executive committee, or a trust committee composed of directors or responsible officers of the trustee. The original bill was less specific in this regard. The other changes introduce a greater degree of flexibility.

### Subsection (l). Undertaking for costs

This subsection authorizes the inclusion in the indenture of provisions requiring the filing of an undertaking for costs, and the assessment of reasonable costs (including reasonable attorneys' fees), in the discretion of the court, in any suit for the enforcement of rights or remedies under the indenture. Precedent for this provision is to be found in section 18 (a) of the Securities Exchange Act of 1934. In addition to several minor changes, the committee reprint provides that in the assessment of such costs due regard is to be had to the merits and good faith of the suit or defense. The provisions of the subsection do not apply to suits by bondholders to collect principal or interest, or to suits instituted by bondholders holding in the aggregate more than 10 percent in principal amount of the outstanding bonds. The reprint also excludes suits by the trustee.

### Subsection (m). Other indenture provisions

This subsection confers upon the Commission general power to require the inclusion in the indenture of such provisions as it deems necessary or appropriate in the public interest or for the protection of investors in respect of certain specified matters, including releases; the recording of the indenture; the definition of the term "default"; notices and reports by the trustee to the bondholders; the rights, powers and duties of the trustee with respect to proceedings for the enforcement of the indenture; the employment by the trustee of attorneys or other experts having conflicting interests; the rights, powers and remedies of the security holders; and the qualifications, rights, powers, and duties of paying agents.

### SECTION 8. RULES, REGULATIONS, AND ORDERS

This section covers the rule making power of the Commission. Among other things, the Commission may prescribe or recommend forms of indentures or of any provisions required or permitted to be included therein.

Subsection (e) includes the now standard provision exempting any person from liability for action taken in good faith in conformity with rules, regulations or orders of the Commission notwithstanding the subsequent amendment, rescission, or invalidation thereof.

### SECTION 9. HEARINGS BY THE COMMISSION

The only novel feature of this section is the provision authorizing the Commission to provide for the consolidation of proceedings under this act with proceedings under the Securities Act of 1933 and the Public Utility Holding Company Act of 1935.

### SECTION 10. SPECIAL POWERS OF THE COMMISSION

Subsection (a) empowers the Commission to subpena witnesses and require the production of documents, in substantially the same language as section 19 (b) of the Securities Act. This subsection also incorporates by reference the provisions of section 20, 22 (b) and 22 (c) of the Securities Act with respect to investigations and hearings, the enforcement of the act, and offenses and violations thereunder.

Subsection (b) authorizes the Treasury Department, the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Reserve banks, and the Federal Deposit Insurance Corporation to make information available to the Commission, and to make examinations for the use of the Commission, under such conditions as they may prescribe. The committee reprint adds to this subsection a provision prohibiting the Commission from making such information available to the public.

Subsection (c) makes clear that the Commission has no powers with respect to the enforcement of the provisions of an indenture—its responsibility ceases when the form of indenture has been "qualified". The committee reprint adds to this subsection a provision limiting the Commission's investigatory powers over a prospective trustee to matters relating to the qualifications of such trustee under the provisions of section 7 of the act.

### SECTION 11. COURT REVIEW OF ORDERS; JURISDICTION OF OFFENSES AND SUITS

This section incorporates by reference the provisions of section 9 and section 22 (a) of the Securities Act.

### SECTION 12. LIABILITY FOR MISLEADING STATEMENTS

Subsection (a) imposes the civil liability of the Securities Exchange Act of 1934 in connection with false or misleading statements in any application, report, or document filed under the act.

Subsection (b) is substantially similar to section 28 (a) of the Securities Exchange Act and provides that the rights and remedies provided by the act shall be cumulative.

### MISCELLANEOUS PROVISIONS

Sections 13 to 17, inclusive, substantially follow the Securities Act of 1933. These sections deal with the following matters:

Section 13: Covers unlawful representations.
Section 14: Sets forth the criminal penalties for violation of the act.
Section 15: Covers the effect of the act on existing law.
Section 16: Makes invalid contracts to waive compliance with provisions of the act.
Section 17: Contains the separability provision of the act.

The CHAIRMAN. The first witness is Mr. Hanes, whom we shall be glad to hear at this time.

## STATEMENT OF ROBERT M. HANES, CHAIRMAN, COMMITTEE ON FEDERAL LEGISLATION OF THE AMERICAN BANKERS ASSOCIATION, AND PRESIDENT OF THE WACHOVIA BANK & TRUST CO., WINSTON-SALEM, N. C.

Mr. HANES. Mr. Chairman and gentlemen, as Mr. Douglas stated to you gentlemen in his testimony on last Wednesday, representatives of the American Bankers Association have been privileged to cooperate with the Securities and Exchange Commission in making suggestions to Senator Barkley for this bill. We have received the kindest and most considerate and cooperative treatment from Mr. Douglas and his associates, from Mr. Burke, his assistant, Mr. Landis, the chairman of the Commission, and the other gentlemen. We have been able, as we have gone along in the consideration of this bill, to point out certain practical difficulties in the administration of this proposed act, which these gentlemen have been good enough to listen to and accept in the same spirit in which they were given, for the betterment, as we think, of the proposed act, and for its improvement.

This seems to me a perfect example, gentlemen, of what can be accomplished by Government and business if their representatives will, with open minds and a cooperative attitude, sit down together to draft legislation in a fair and frank manner, and discuss the problems before them and try to work out their differences in an honest, frank attitude. Certainly it seems to me that the Government, business, and the general public, which they both represent, are the better served by such a procedure.

Our conferences with Mr. Douglas and his associates have been held in absolute frankness, honesty, and good feeling; and we believe, in the words of Mr. Douglas, that a "workable, practical, and livable" bill has been the result.

Mr. Douglas has given you in detail a fair explanation of the bill, which makes it unnecessary to discuss it further. He has frankly said to you that the whole purpose of this legislation is to bring the procedure of corporate trustees to the high standards set by the best and most responsible persons in the profession.

We agree with the fundamental concepts of the bill. We wish, as much as anyone, to see that the interests of bondholders and the investing public are properly protected, and we shall cooperate fully with the Securities and Exchange Commission to the end that the provisions of the bill are rigidly lived up to and honestly carried out.

Many of our banks do feel that the loan conflict provisions on trustees acting under unsecured indentures are too stringent and are not in the best interests of the bondholders themselves. If, after a year's experience, we can prove to the Securities and Exchange Commission that changes are desirable, we believe they will join us in suggesting to you gentlemen amendments to the act.

The CHAIRMAN. You have no alternative to propose at the present time?

Mr. HANES. No, sir; we have not.

The CHAIRMAN. Yes.

Mr. HANES. We feel that an honest job has been done, and that a fair job has been done.

The CHAIRMAN. Yes. Thank you very much.

## STATEMENT OF R. G. PAGE, VICE PRESIDENT, BANKERS TRUST CO., NEW YORK CITY

The CHAIRMAN. Mr. Page, we shall be glad to hear from you.

Mr. PAGE. Mr. Chairman and gentlemen, I am a vice president of the Bankers Trust Co., of New York. I am also chairman of a committee on mortgage trusteeships, appointed by the Trust Division of the American Bankers Association, at about the time when Commissioner Douglas began his investigation into mortgage trusteeships.

I might say that the committee has representatives from 12 cities across the country, from Boston and Atlanta on the east to St. Louis and Los Angeles on the west, and that each member of the committee in turn has organized an informal committee of his own district. So that it fairly may be said that my committee represents the thought of trust officials generally throughout the country.

We have been in contact with Commissioner Douglas and his associates for a year, and during the last month have been in almost constant contact with him. I desire to reaffirm all that Mr. Hanes has said about the spirit of cooperation which has been accorded us by the Commission, and particularly by Mr. Douglas and his associate, Mr. Burke.

While the Commission has accepted and recommended to Senator Barkley many of my committee's suggestions which were designed to make the bill more flexible, we regret that other of our suggestions did not meet with the viewpoint of the Commission, because we think that they were sound. I have particularly in mind the present prohi-

bition in the bill against the making of short term loans by banks which are acting as trustee for unsecured or short term issues. We at present are discussing with Mr. Douglas several other matters of some importance: One is the exclusion from the provisions of this bill of issues of foreign governments; because we do not believe the provisions of this bill would fit a foreign government issue; and second, the suggestion that paragraph (j) of section 7, subdivision B, be extended, so that in proper cases the Commission will be authorized to permit the inclusion in indentures of a provision limiting the monetary liability of a trustee, in the case of any given issue.

Despite the feeling of my committee that the bill in some respects is unnecessarily rigid and that the prohibition against certain types of short-term loans will substantially handicap not only the banks doing a corporate trust business, but also the obligor corporations who desire the loans, without commensurate benefit to the bondholders, nevertheless, we do believe that the bill is otherwise workable and livable; and I have been authorized on behalf of my committee to say to you gentlemen that we do not oppose the passage of the bill.

I should like to say that our committee is prepared, if the Commission so desires, to continue our work with them on questions involved in the preparation of regulations and on other problems of administration, under the bill. We are as anxious as you gentlemen that the bill, when enacted, shall accomplish its purpose promptly and with as little handicap to legitimate business as possible. To this end we pledge our full cooperation.

The CHAIRMAN. Thank you very much. That is a very fine spirit, Mr. Page.

Mr. PAGE. Well, we have found a fine spirit on the other side.

## STATEMENT OF A. A. TILNEY, CHAIRMAN OF THE BOARD OF DIRECTORS, BANKERS TRUST CO., NEW YORK CITY

The CHAIRMAN. Very well, Mr. Tilney; we are glad to hear from you.

Mr. TILNEY. Mr. Chairman and gentlemen, I am chairman of the board of directors of Bankers Trust Co., New York, and appear as a representative of my own institution and also as chairman of an informal committee of New York bank executives who represent many of the banks of New York City doing a substantial corporate trust business. This committee was appointed, at about the time the Barkley bill was introduced in the Senate, to consider the bill on behalf of the New York institutions it represents.

We have consulted with the American Bankers Association committee which has been working with the Securities and Exchange Commission on the bill, and have studied the confidential committee print under date of June 9. We desire to join with the American Bankers Association in expressing appreciation of the spirit of cooperation extended by the Securities and Exchange Commission in discussions on the bill.

We do not oppose the enactment of the bill as amended in the confidential committee print. With the fundamental objectives of the bill we are in accord, however, we may differ as to the best means to accomplish the desired ends. However, we do wish to note upon the record that, in our judgment, first, the prohibition against short-term

bank loans to a corporation for which a bank is acting as trustee under an unsecured or a short-term issue is unnecessary and unwise and will be burdensome to corporations and will work to the disadvantage of the bondholders themselves. We believe that it would have been wiser to remove this prohibition and to have concentrated on the penalty provisions against improvement by a trustee bank of its creditor position at the expense of its bondholder beneficiaries

Second, certain other provisions of the bill seem to us too rigid and in some instances too severe and may prove unduly burdensome to legitimate business and many banks.

The broad discretionary power granted to the Securities and Exchange Commission by the bill will require in its administration, if the objectives of the bill are to be attained, a high degree of common sense, reasonableness, and cooperation both by the Commission and the trustee institutions. To this end we pledge our support.

We do not accept as well founded many of the statements and conclusions in the report of the Commission upon which the bill is based. We are, however, prepared to try in good faith to do our part toward the successful administration of the bill. We ask of the Senate a sympathetic hearing if after a fair trial we then find it necessary to suggest amendments. That is all I have to say, gentlemen.

Senator TOWNSEND. You have no suggested amendments, have you, sir?

Mr. TILNEY. The fundamental difficulty, if I may put it that way, that we see in the bill, is the question of the conflicts which may occur in loans made by trustee institutions, where they happen to be trustee under an indenture covering an unsecured or a short-term issue. We have suggested here that the emphasis should rather be placed on the penalty for the betterment of the position by the trustee institution, rather than on the prohibition of such loans themselves. I should think that it probably would improve the bill—at least, from our standpoint, gentlemen—if short-term loans, which we call bank loans in our section, were limited to 6 months rather than a year. I cannot see that it makes any particular difference to the purposes at which the Commission is aiming and certainly it is much more in accordance and in keeping with the general usages of the banking business.

That is fundamentally the only suggestion I have to make.

The CHAIRMAN. Thank you.

Senator TOWNSEND. You mean loans made by the trustee bank to the obligor?

Mr. TILNEY. Yes.

Senator TOWNSEND. Six-month loans?

Mr. TILNEY. Yes.

Senator BARKLEY. The bill provides for a year?

Mr. TILNEY. Yes.

Senator BARKLEY. And you think 6 months would be preferable?

Mr. TILNEY. Oh, I should think if that term were shortened to 6 months, you would make the operation of many business transactions which take place between corporate trustees—who in many instances have important banking connections with the obligor—and the obligors very much simpler and easier. In the last analysis, I cannot see that such a change would do violence to anything at which the bill aims.

The CHAIRMAN. Thank you, Mr. Tilney.

## STATEMENT OF CHARLES B. BRADLEY, GENERAL SOLICITOR, PRUDENTIAL INSURANCE CO. OF AMERICA, NEWARK, N. J.

The CHAIRMAN. Mr. Bradley, are you ready to address the committee?

Mr. BRADLEY. Yes, sir; I am here primarily as the direct representative of my company, the Prudential Insurance Co., and I cannot say that I am authorized to speak for the business of life insurance as a whole. However, I may say that we of course have been in conference with our colleagues, both the financial and legal staff of many of the other companies, ever since the question of legislation of this character was first discussed; and the views that I express here today may be taken as the views of a number of the larger companies, from different parts of the country. I know of no company that dissents from the views that I may express here, although I wish it to be understood that I am not purporting to speak officially as the representative of any company other than my own.

Of course we, as a large institutional investor—and the whole business of life insurance constitutes perhaps the greatest institutional investors' interest in the country—are particular beneficiaries of this legislation; the investors are those whom it seeks to protect. I may say that we feel that the general conception of this legislation is wise and beneficial.

To regard it in detail: We do not feel that we are properly qualified to discuss the question of the qualification of trustees. Of course it is desirable, and wherever possible we always see to it, that the trustee shall be an institution of high financial responsibility.

With regard to the question of conflicts, I understand from the testimony given here today and from informal conversations that I have had, that essentially the trust companies are satisfied with these provisions, barring the question of short-term loans. I think I can serve no useful purpose by making any comment on them.

Our concern with the conflict provisions is only that we should not be in a position of having to deal with a trustee who will not faithfully serve the interests of the investors; and we are entirely satisfied to support those provisions as they stand today, without wishing to comment on them one way or the other. We do not oppose them in any way.

As to the affirmative provisions of the act directly touching the conduct of the trustee, we are in sympathy with practically all of them. We believe them to be beneficial, wise, in the interest of investors—realizing, however, and I should like to go on record as saying, that much of this regulation is in a wholly novel field. It may well be that this legislation, if enacted, will prove unworkable in some of its details. We have no experience to guide us as to the effect of some of the provisions. I think, perhaps, that from the point of view of the bondholders and the investors, the most important of all the provisions are those which confer a very broad discretion upon the Commission. With those provisions we are in very hearty sympathy; because we feel that with an able, skilled Commission, experience will from time to time point out what those regulations should be and in what respects any changes should be made.

The particular provision to which I wish to refer is section 7, subsection (m), page 40. The administration of that subsection undoubtedly will prove difficult; but we regard it as exceedingly wise that it is

left to the discretion of the Commission and that the obligor and the trustee are not put in a legislative strait jacket, as it were, by rigid, statutory provisions touching that subject matter.

On the whole, then, I think we may say, as an investor, that not only do we not oppose this bill in any particular, but that we are heartily in favor of the legislation as a whole, enthusiastic about some of its provisions, but do not wish to be understood as making any comment upon those features of the bill that concern the qualifications of trustees.

Senator BARKLEY. Let me ask a question which probably I should have asked the last witness: What is the particular disadvantage of having this period 1 year instead of 6 months, as suggested for bank loans?

Mr. BRADLEY. That is a question I should prefer to have the bankers answer. Again, that runs to the qualifications of the trustee and the question of conflict.

## FURTHER STATEMENT OF A. A. TILNEY, CHAIRMAN, BOARD OF DIRECTORS, BANKERS TRUST CO., NEW YORK CITY

Senator BARKLEY. I should like to ask the last witness that question: What is the particular disadvantage in having the period 1 year instead of 6 months?

Mr. TILNEY. Because in very many instances the corporation temporarily wants money for particular legitimate purposes—for an increase in inventory, or some similar use; they want that money only for a relatively short time; and for that purpose, a year probably would not be wise.

Senator BARKLEY. They do not have to take it for a year; that is a maximum, I understand.

Mr. TILNEY. No, sir; that is "a year or over"; a year is the minimum, and not the maximum.

Senator BARKLEY. Yes; that is right. It is the minimum.

Senator TOWNSEND. Then, if the minimum is made 6 months instead of a year, that would take care of your point?

Mr. TILNEY. I think it would facilitate many of the transactions that will occur under the terms of this bill.

Senator HUGHES. Will you explain why? How would it simplify them?

Mr. TILNEY. Well, I suppose perhaps custom has a lot to do with it. The ordinary bank loan that is made for the purposes I indicated is probably a 90-day loan or a 4 months' loan. The closer you put the limit to the customary period, the more facility it seems to me you give to that particular kind of transaction.

Senator BARKLEY. The period referred to of course is the single period of the loan; it is not cumulative by reason of any renewals or anything of that sort?

Mr. TILNEY. Oh, no, sir; absolutely.

The CHAIRMAN. Thank you very much, Mr. Tilney.

## FURTHER STATEMENT OF CHARLES B. BRADLEY, GENERAL SOLICITOR, PRUDENTIAL INSURANCE CO. OF AMERICA, NEWARK, N. J.

Senator Hughes. On page 40, I believe, is the provision to which you were referring, which is with relation to the restrictions or conditions on release and substitution subject to lien of the indenture. You thought that this particular provision might not be workable, did I understand you to say?

Mr. Bradley. No, Senator; I meant to express myself this way: that I thought it exceedingly wise that those particular types of provisions, which vary very much in accordance with the circumstances of each case, should be left elastic, as they have been, to the judgment and discretion of the Commission in each instance.

The Chairman. You favor those?

Mr. Bradley. Yes; I do favor those provisions, and in their present form.

Senator Hughes. You favor release of a lien? You would favor that being safeguarded, would you not?

Mr. Bradley. Yes; by such regulations as the Commission might make, or such provision as they might prescribe in any particular instance.

The Chairman. There have been some abuses disclosed in the real-estate field, particularly, of making substitution of property that was valueless in place of property that was valuable.

Mr. Bradley. Yes; that is indeed true, and it is by no means limited to the real estate people.

The Chairman. Well, I happen to be familiar with some of those abuses.

Mr. Bradley. Yes; that is indeed true.

Senator Hughes. That is a common evil that has crept in?

Mr. Bradley. That is an abuse of the administration of a trust indenture that we, as investors, keep as careful a watch upon as we can; for experience has shown that a careful watch is necessary.

Senator Barkley. If we have to assume that there may be some provisions of the bill which may not be workable or which may be poorly workable, nevertheless we never know that until we try them. So, from a legislative standpoint, it is better to include them, rather than leave them out; because otherwise you will never know whether they are workable or unworkable, until you try them. I think any responsible commission administering an act of this sort, of course would not desire to retain provisions which, from their own experience, they find out to be unworkable or hard to administer. For that reason there are probably some provisions here which, if we already had had the experience, we would leave out; but since we have not had the experience, we leave them in.

Senator Hughes. From the investor's standpoint, I think you can assume that the Commission will require provisions safeguarding the release of securities.

Mr. Bradley. We do so assume; and we are satisfied to have these powers rest in the Commission, recognizing at the same time that it is an exceedingly novel power. In effect, what this subsection does is to give the Commission power to write a contract between the two parties—an exceedingly novel power of regulatory legislation.

Senator BARKLEY. At least it sits in on the writing of the contract and probably has the deciding voice?

Mr. BRADLEY. Yes; because it may prohibit the writing of a contract that is not agreeable to its views. That is highly novel; and I recognize that we do not know into what waters that may carry us.

The CHAIRMAN. In other words, the contract itself may prohibit these possible abuses?

Mr. BRADLEY. Yes, sir.

The CHAIRMAN. And the insistence by the governmental agency might require the incorporation of such a provision in the contract?

Mr. BRADLEY. Yes. I understand the Commission may require the inclusion of such enumerated matters as it sees fit.

The CHAIRMAN. Yes.

Senator BARKLEY. Well, it is novel; but nevertheless, experience in the past seems to indicate the wisdom of exploring the situation.

Mr. BRADLEY. We are very willing to have it explored.

The CHAIRMAN. Thank you.

## STATEMENT OF SAMUEL UNTERMYER, OF NEW YORK CITY, N. Y.

The CHAIRMAN. Mr. Samuel Untermyer.

Mr. UNTERMYER. Mr. Chairman, I am not here to represent any private interests; I am here in the public interest, and because of the fact that some of the provisions of this bill I have been urging for about 25 years, from the time of the "Pujo committee" and then on. But I am afraid this bill does not quite accomplish what I had in mind, or all that it should. I think it can be made to accomplish one of the factors, by amendment.

May I refer, first, to an address that I made before the law alumni of the University of Southern California, in March 1933, on the subject of bondholders' lists and the requirements of bondholders' lists. I suppose you know that the financial institutions and trust companies have had things all their own way for a great many years. For a great many years no bondholder or bondholders' committee that wanted to communicate with its fellow bondholders has been able to do so; because the trust company says it does not have the list, and of course the company does not have the list. In fact, when we have taken them into court, time and time again they say, "We have no lists; these are bearer bonds and coupon bonds." And the company says, "All we do, periodically, is to turn over the money for the payment of the coupons; we do not know to whom it goes. The coupons come in from different banks of deposit, where the owners do their business; and they are turned in to the trustee, and the trustee alone."

It is that sort of thing, continued for years, that has made it so difficult for bondholders to protect themselves. I had an illustration of that in the Kreuger & Toll and International Match reorganization, in which I represented a committee of the bondholders. We could not get the lists. But the issuing houses that had gotten the American public in for about 250 million dollars, were able to get the lists for their associate bondholders. So we took that question into court. But the courts do not help us at all, and we never have been able to get any help. It is a crying evil which ought to be corrected and is attempted to be corrected in this bill, but is not corrected, as I shall show you.

Senator TOWNSEND. You say it is not?

Mr. UNTERMYER. No, it is not; I wish to call your attention to that.

I think perhaps you can better understand this question, which is somewhat involved, if I call your attention to this address I made in 1933 before the law alumni of the University of Southern California:

> If the bondholders of a corporation now get into trouble and the bonds are, as they usually are, what is known as "bearer" bonds, neither the company nor the trustee for the bondholders is required to or keeps a list of holders of bonds that are in default of interest, and there is no way in which they can reach one another for mutual protection.  The trustee, through whom interest coupons are paid, either knows or has the means of knowing the names and addresses of these bondholders.  Sometimes the company knows.  They get that information from having paid previous coupons but are not required either to keep records of it or to disclose it, as they should be.  If the stock exchange had been under official control—

this was before the bill was passed—

> it would long since have been prevented from listing any issue of bonds without imposing a condition prescribing the machinery whereby the bondholders could reach one another, and that is what will be done when regulation is brought about. Somehow or other, the insiders get the information but the outsiders are helpless. Although the attention of the exchange has frequently been called to the situation, they refuse redress in the interest of the insiders.
>
> The requirement is still more urgent in the case of the holders of the stock of a company that has not been paying dividends, who want to reach one another for mutual protection.  The certificates of stock in such companies are carried largely in the names of members of the exchange who hold or held them as collateral. When they part with the certificates, they continue to be registered in their names. Until I recently stopped the practice, these brokers would freely sign proxies without even consulting the owners of the stock, and still more frequently long after they had parted with the possession of the certificates.  In that way the voting control of these companies was retained and exercised by banking houses with no interest in the companies to whom the proxies of the brokers were always available.  This abuse has now been partly mitigated but only to the limited extent that the brokers are no longer permitted to sign proxies without the consent of their clients or after they have parted with the stock.
>
> But the stock continues to be registered in their names long after they have ceased to have any interest in it or to know who holds it.  The result is that the stockholders are unable to reach their coholders to invite them to join, to protect their interests.  All efforts to induce the exchange to change this vicious practice have failed, but with the advent of regulation I believe a means will be found of breaking the power of the exchange to help these bankers to control corporations in which they have no interest and to prevent stockholders from getting into communication with one another for the protection of their rights.

When this stock exchange bill was before the Fletcher committee, I collaborated with Senator Fletcher, and went before the committee—I think you were there, Senator Wagner—and advised them of a number of changes, most of which were inserted in the bill. Then Senator Fletcher wrote me, in May 1934:

> I think we have all agreed on a number of the items suggested by you and I will be glad to submit this additional data.
>
> I am sending you a copy of the last reprint for the use of the committee, and will thank you to examine it and let me have any further comments you may be willing to make.

Thereupon I made a number of comments, and among them this one—most of which were adopted:

> If your committee will amend the bill, as heretofore suggested by me, so as to require the trustee of every mortgage or debenture that is listed or sought to be listed on the exchanges, to keep lists of the names and addresses of security holders to whom the coupons are being paid, and will require the brokers to register the stocks they hold as collateral, in their names or those of their customers, so that the owners can be reached by committees of security holders,

you will correct a long-standing abuse that has stood in the way of security
holders and has served to perpetuate directorates and bondholders' reorganiza-
tions in the control of the very men who issued the defaulted securities or are
responsible for the misfortunes of the security holders.

The two suggestions in this connection that were advanced by me when I was
before you, which I regard as of great importance, upon which no action has been
taken and which I beg here to repeat, were as follows:

"I urge that there be included in the bill the necessary machinery to enable
holders of bonds and debentures that are listed on the exchange to communicate
with one another for mutual protection, and that no such security should be listed
or retain its listing that does not provide for such protection. As matters now
stand, the trustee for the bonds through which the interest coupons are paid is the
only one that has the means of ascertaining the real owners—where they are
'bearer' bonds, as most of them are. The trustee should be required to furnish
the company with these lists, from time to time, and the latter in turn should be
under the duty of supplying them to bondholders. The result of the present situa-
tion is that it is well-nigh impossible for protective committees on defaulted bonds,
or other contesting bodies of bondholders to communicate with one another, and
their protection against the 'powers that be' in the corporation is impossible. We
have recently had many, many object-lessons in this connection, a typical one in
which I was concerned for the protective committees, in the cases of Kreuger &
Toll and the International Match Co."

Here is the provision relative to that subject; it is on page 33 of the
new bill, I believe [reading]:

(f) The indenture to be qualified shall contain provisions which the Commission
deems adequate, having due regard to the public interest and the interests of
investors, requiring each obligor to furnish or cause to be furnished to the institu-
tional trustee thereunder, at stated intervals, all information.

Now, then, the obligor cannot do it; he has no such information.
It is the trustee who has the information; he is the one who pays the
coupons; he is the one with whom they are deposited. As for a
company, for instance, that makes an issue of bonds, all it does is to
pay the semiannual interest into the trust company, and this is a
perfectly useless, unworkable provision; because it does not require
the performance of the duty by the concern with whom the duty
properly rests.

Therefore I have taken the liberty of preparing a proposed amend-
ment to that.

Senator BARKLEY. Mr. Untermyer, right there let me ask you this,
if I may: Of course this language does not attempt to require the
obligor to furnish a complete list of the bondholders or security
holders, but it requires the obligor to furnish to the trustee all the
information which it has on that subject.

Mr. UNTERMYER. Which is nil.

Senator BARKLEY. Then it requires the trustee to furnish this
information and these lists to the indenture security holders.

Mr. UNTERMYER. Well, he will answer what he answered to me in
the Federal courts.

Senator BARKLEY. How is that?

Mr. UNTERMYER. The trustee will answer, as it answered me and
the court, in the Federal court: Because we had securities or a com-
mittee, did not mean anything, and we could not get any relief.

Here were hundreds of millions of bondholders, scattered all over
the world, and nobody could get at that except the trustee and the
issuing house with which the trustee was identified. The result was
that although there were very grave questions in the reorganization,
the committee that we had could not obtain the information as to the
names and addresses of the security holders. The committee, by the

way, that we organized was a nonfinancial committee; it consisted of men like Lindsay Rogers and Professor Ripley, of Harvard, who afterward resigned on account of illness; and it was a very distinguished committee. Not one of the members of the committee had any bonds; they all went on this as a public duty because they were scandalized by the fact that Leo Higginson would issue these hundreds of millions of dollars of bonds on different securities and sell them on the strength of their reputation. They had organized committees, on the default of these bonds—committees of their own, from their own firm. And we went in to fight that situation. I think Bainbridge Colby was the chairman of the committee; and we went in to see if we could get justice for the bondholders. But we had a pretty hard time. And this provision does not cover that situation.

Senator Townsend. Mr. Untermyer, how would you change the language?

Senator Barkley. He has an amendment which he is going to suggest, I believe.

Mr. Untermyer. I have a proposed amendment: After the word "obligor" [reading]:

and the institutional trustee, separately to keep and furnish or cause to be furnished and exchanged with one another at intervals of six months alphabetical lists of the names and amounts and residences or places of business and all other information in the possession or control of either of them, and to furnish such copies of such lists or to make the same or the use thereof available to any security holder on payment of a charge deemed by the Commission to be reasonable to cover the actual cost of transcribing such list. To that end the obligor, institutional trustee, or other paying agent by or through whom the interest or interest coupons representing the interest payments shall, before or at the time of the presentation of such coupons or otherwise, be charged with the duty of ascertaining from the persons or institutions presenting such coupons for payment or to whom such interest payments are made, the names and residences of the owners of such bonds or other security and of the coupons appertaining thereto and the respective amounts so owned, provided only that the obligor or institutional trustee or the Commission is satisfied that the person making such request is a bona fide bondholder or holder of the security represented by such institution.

Upon the failure of the Commission to comply with such request, the applicant shall be entitled to review such decision or motion in a summary proceeding in any court having jurisdiction of the person or property of the obligor or institutional trustee.

Now, under this proposed amendment, that suggested language will satisfy the requirements of the law, as we have had them laid down by the courts.

As I say, this present language, unless modified as I have suggested, seems to me meaningless.

The Chairman. That will be a change on page 33, I believe, will it not?

Mr. Untermyer. Yes.

On page 37, "Reliance upon certificates and opinions", I think they are the same—the print which I was furnished and this reprint which we are now considering [reading]:

(i) The Commission shall permit the inclusion in the indenture to be qualified of one or more provisions authorizing the indenture trustee conclusively—

I think that ought to be "presumptively", at best—

to rely as to the truth of the statements contained therein, in the absence of bad faith or gross negligence on the part of such trustee, upon opinions or certificates of attorneys, accountants, or other experts.

It seems to me that the institutional trustee ought not to be permitted "conclusively to rely" upon those things; because as a rule—in fact, almost in all cases—they are furnished by the reorganization committee or by the company.

Senator BARKLEY. Furnished by whom?

Mr. UNTERMYER. By the reorganization committee or by the company, and who ought to exercise a higher order of diligence than that. I do not think that word should be "conclusively"; I think if you made the word "presumptively", that would answer every fair intent of it.

Senator BARKLEY. In the parenthetical clause, there [reading]:

(subject to such requirements as to independence and qualifications and the exercise by the trustee of reasonable care in their selection, and subject to such other terms and conditions as the Commission may deem necessary or appropriate in the public interest or for the protection of investors)—

And so forth. Is that it?

Mr. UNTERMYER. Yes. Well, these men as a rule are of high standing and character in the community; but that is no reason why they may not do the most outrageous things—such as the Chase Bank, where millions of dollars have not been recovered. I think that many outrageous things have been done, in a financial way, by some of the biggest organizations.

Senator BARKLEY. What amendment do you offer?

Mr. UNTERMYER. To use the word "presumptively" instead of "conclusively."

Senator BARKLEY. Oh, yes.

Mr. UNTERMYER. They cannot be hurt by the use of the word "presumptively"; because they have the presumption in their favor, and it has to be overcome by evidence. But it should be possible to overcome it.

I hope I am not wearying you.

Senator BARKLEY. That is quite all right.

Mr. UNTERMYER. I have this legislation very much at heart. It seems to me there is a tremendous amount of repetition as between this and the Lea bill and the Chandler bill, on practically the same subjects. I think it would be very profitable if those three committees could get together; because you have 150 or 160 pages of print in the body here.

The CHAIRMAN. The other bills are not pending in the Senate; no one has been asked to introduce them.

Mr. UNTERMYER. No; the Lea bill is a House bill, and the Chandler bill is an amendment of the Bankruptcy Act.

The CHAIRMAN. Yes.

Mr. UNTERMYER. Nevertheless they largely cover the same general subjects, in many respects.

The CHAIRMAN. I think they all emanated from the Securities and Exchange Commission.

Mr. UNTERMYER. Yes; they all emanated from it.

Mr. Douglas, they all were prepared by the Securities and Exchange Commission, were they not?

Commissioner DOUGLAS. Mr. Chairman, the Securities and Exchange Commission did participate in making suggestions on the Chandler bill and on the Lea bill.

Mr. Untermyer. Mr. Chairman, the trouble is that the people who are most interested in these bills are the financial interests, apart from the Commission. For instance, the Commission in its report which I have read has done a superb job, and done it with a great deal of fairness and a great deal of ability.

The Chairman. The Commission has done good work; don't you think so?

Mr. Untermyer. Oh, there is no doubt about it. I am a great admirer of the work of the Commission; but I do not concede that in drawing all these bills, it cannot make some mistakes—as we all do; if we do not make any mistakes, we do not make anything else.

Commissioner Douglas. I should say for the record, Mr. Chairman, that there is no duplication, insofar as I am aware, between the Barkley bill, the Chandler bill, and the Lea bill.

Mr. Untermyer. Well, there is; for instance, in the bankruptcy bill you have the provision that you have here with respect to the lists.

Senator Barkley. These various bills may deal in a way with the situations which may arise in connection with corporations that might be included under all these bills, but they deal with a different phase of the work.

The Chairman. Mr. Untermyer, if I may make a suggestion, as only the presiding officer here, may I say that perhaps we had better deal only with this bill and not with the other two bills, which are not even before us.

Mr. Untermyer. Yes.

Now, "Notice of defaults", on page 38 of the new bill, I believe, contains this provision [reading]:

(k) The indenture to be qualified shall contain provisions requiring the trustee to give to the indenture security holders, at such time and in such manner as the Commission may deem adequate, having due regard to the public interest and the protection of investors, notice of all defaults known to the trustee.

The point of the criticism I make is that the trustee is to have the discretion in any event of withholding from the bondholders notice of default under the indenture, unless a default is of principal or interest.

Why should not the trustee notify the bondholders of defaults, whatever they may be? I cannot understand what the purpose of that may be, except that some trustees have been held accountable by the courts for not having given notice. And I wanted this provision put in here.

Senator Hughes. What is your suggestion?

Mr. Untermyer. My suggestion is to eliminate that language. The board of directors are the people who may be culpable and may be held responsible.

Senator Townsend. The bill provides [reading]:

that the trustee shall be protected in withholding such notice if and so long as the board of directors or executive committee or a trust committee of directors or responsible officers of the trustee in good faith determine the withholding of such notice to be in the interests of the indenture security holders.

Mr. Untermyer. I cannot conceive of such a condition.

Senator Barkley. What is the language that you want stricken?

Senator Hughes. I think Mr. Douglas had an explanation of it the other day.

Mr. Untermyer. Perhaps it would be well to hear Mr. Douglas.

Senator Barkley. I would like to know the language that you want eliminated.

The Chairman. Do you have an amendment, Mr. Untermyer?

Mr. Untermyer. No. The part that I think should be stricken is the following [reading]:

that the trustee shall be protected in withholding such notice.

I would strike that out.

Senator Barkley (reading):

that the trustee shall be protected in withholding such notice.

You would strike that out?

Mr. Untermyer. Yes. I would strike it all out. You have stricken out most of the rest of that paragraph.

Senator Townsend. You would not leave that to any source to determine?

Mr. Untermyer. No; it seems to me that the trustee, after all, is the only representative of the bondholders. Why should not the bondholder know when there is a default? Is he a babe in the woods, to be protected against his own knowledge? Is his ignorance any protection to him? Is it not right that he should know?

Senator Barkley. That only provides that he shall be protected in the event that the board of directors or the executive committee or a trust committee of directors or responsible officers of the trustee in good faith determine the withholding of such notice to be in the interests of the indenture security holders.

Mr. Untermyer. Yes; but, Senator, I am dealing with corporations that get into trouble and bondholders who get into trouble. The trustee and the board of directors are not the best qualified to determine that question. They ought to know for themselves, and then they can act. But to keep them in the dark on the ground that it is for their protection and their interest to be kept in ignorance of their rights does not seem to me to be proper.

Senator Townsend. You think that the trustee should be left absolutely free?

Mr. Untermyer. No; I think he should be left with his liability to give notice.

The Chairman. You mean, he should be required to give notice?

Mr. Untermyer. Yes; he would if that were stricken out.

Senator Barkley. In other words, you do not want the board of directors or the institutional trustee to have any power?

Mr. Untermyer. Not with respect to a trust indenture. They have nothing to do with that. All they do is to collect fees.

Senator Hughes. The language is as follows [reading]:

The indenture to be qualified shall contain provisions requiring the trustee to give to the indenture security holders, at such time and in such manner as the Commission may deem adequate, having due regard to the public interest and the protection of investors, notice of all defaults known to the trustee: *Provided, however*, That the indenture may provide, except in the case of defaults (to be specified in the indenture) of which the Commission deems it necessary or appropriate in the public interest or for the protection of investors that prompt notice be given——

And you would leave out the remainder of it?

Mr. Untermyer. I would leave out everything. The trustee should be required to give notice.

Senator BARKLEY. Is it not true that frequently there are small technical defaults of which there may be no need to give notice and not subject, necessarily, to any action?

Mr. UNTERMYER. In practical operation, I do not know.

Senator BARKLEY. It is my understanding that that language is put in there in order to give the board of directors of a bank or trust company, acting as trustee, some discretion in determining whether the default is of sufficient importance to make it advisable or wise or necessary to give notice.

Mr. UNTERMYER. I am speaking from the standpoint of an experience of a great many years, and I do not know of any case in which it would not have helped the bondholders. This covers any default except principal or interest. In the case I spoke of before, the trustee had an outrageous provision hidden away somewhere that they could substitute securities. They substituted for gilt-edged securities a whole lot of worthless securities. That was not a default of principal or interest. They certainly ought not to have had the right to do that, and they would not, under proper legislation, have had a right to make that substitution of high-class Government securities, which they did, to the tune of about $30,000,000, substituting poor securities that turned out to be worth very little.

Under the Commission I do not think that would be possible, provided they were required to report such a thing to the Commission. They were not then. There was no commission. When you look at the securities on the strength of which the bondholders had made their investment of $50,000,000, you find that an entirely different class of securities had been substituted. There was no liability anywhere for it, because they were exonerated and indemnified against liability by the terms.

I may appear to be a little hypersensitive on this subject, although I am very much in favor of this legislation. But it has got to be effective legislation. We have had plenty of ineffective legislation in the past.

Senator HUGHES. Mr. Untermyer, you spoke of substitution. The bill contains a provision as to substitution. I wondered if you had examined that. I am trying to find it.

Mr. UNTERMYER. I do not remember it.

The CHAIRMAN. It is on page 40, "Other indenture provisions." That is on page 40 of the confidential print.

Senator HUGHES. Yes; it is under "Other indenture provisions." I refer to paragraph (1) under that heading.

Mr. UNTERMYER (reading).

Restrictions or conditions on the release and substitution of any property subject to the lien of the indenture, on the issuance of additional indenture securities, and on the satisfaction and discharge of the indenture.

I do not think that is in my copy. I think that answers the point.

The CHAIRMAN. I think so.

Mr. UNTERMYER. Here is a provision which runs through all these bills [reading]:

#### UNDERTAKING FOR COSTS

(1) The indenture to be qualified may contain provisions to the effect——

The CHAIRMAN. What page is that?

Senator TOWNSEND. Page 39.

Mr. UNTERMYER (continuing reading):

that all parties thereto, including the indenture security holders, agree that the
court may in its discretion require, in any suit for the enforcement of any right
or remedy under such indenture or against the trustee, as trustee, the filing of an
undertaking to pay the costs of such suit, and may in its discretion assess reason-
able costs, including reasonable attorneys' fees, against any party litigant, having
due regard to the merits and good faith of the suit or defense.

That is simply turning a lot of security holders out of court who go
there to get redress. As I say, that same provision is in the other
bill. Why should the security holder, who has a claim based upon
his bond, be in a different position from any other man who has a
claim against anybody else? He is not assessed reasonable attorneys'
fees. It may mean vast allowances in some cases. He pursues the
even tenor of his way like any other litigant. And what is there so
sacrosanct about this sort of a litigant that he has got to be hedged in
and hampered by such a provision?

The CHAIRMAN. I suppose this is to prevent strike litigation, is
that it? I know that there are two sides to that.

Mr. UNTERMYER. I do not know much about strike litigation,
except that my clients are subjected to it very often; but I would
rather see them subjected to strike litigation than to see an honest
claimant or creditor barred from the courts by undue and unusual
restrictions upon his right to get into court, that are not applied to
other litigants.

The CHAIRMAN. I do not want to express my views here, because
I know that the Commission knows much more about it than I do;
but when I was on the Supreme Court of New York there was a
movement on foot to increase the costs so as to make litigation ex-
pensive, and of course it would have resulted in a poor man never
getting into court at all. I went before the legislature myself at that
time.

Mr. UNTERMYER. Senator, that has been tried for 55 years, since
I have been at the bar; and although my practice is mainly with cor-
porations and litigants who can pay, I have always fought that sort
of thing, because I think that one of the fine things in our adminis-
tration of law is the ability of the poor man to get justice.

Senator HUGHES. I call your attention, Mr. Untermyer, to the
proviso under the same heading, "Undertaking for costs." I wonder
whether that covers your point to any extent or not.

Mr. UNTERMYER. Where is it?

Senator HUGHES. Further down, after what you read [reading]:

*Provided, however,* That the provisions of this subsection shall not apply to
suits instituted by the trustee or to suits instituted by security holders * * *

And so forth.

Mr. UNTERMYER. Yes; I read that. That does not help it at all.
In other words, a suit against a trustee for gross neglect, of which
there have been quite a number of cases, is not covered there. It is
only suits for principal or interest. A bondholder is usually repre-
sented by his trustee when there is a suit. But in a suit for mis-
management why should the litigant have to go into court handi-
capped?

Senator HUGHES. What do you think of the other provision there
[reading]:

shall not apply * * * to suits instituted by any indenture security holder or group of security holders holding in the aggregate more than ten percentum in principal amount of the indenture securities outstanding.

Mr. UNTERMYER. I think that is just as vicious as the other. You cannot get, as a rule, 10 percent of the bondholders into a thing of that kind. Securities are issued through an issuer. Issuing houses do not encourage their joining in such things. They discourage it to the greatest extent possible.

Senator TOWNSEND. You would favor taking that out of the bill?

Mr. UNTERMYER. I favor taking that out; and I am going to suggest its being taken out of the other bill, unless Commissioner Douglas has some good reason for it - because I might be persuaded by him if he had any good reason. He has studied it. At the same time, I have studied it for a lifetime, also.

The CHAIRMAN. Do you care to comment on that now, Mr. Douglas?

Commissioner DOUGLAS. Senator, I commented on it at the hearing last week. It was merely to place in the courts discretion to select those cases, if any, which the court deemed are not brought in good faith or which are not meritorious, so that the court may, in the exercise of a sound discretion, require the filing of an undertaking for costs. It is not a mandatory, iron-clad provision. It merely leaves discretion in the court. Speaking for myself, and for the Commission, we felt that we could trust the courts in situations of that sort.

Mr. UNTERMYER. The answer to that is, why differentiate between a case in which the trustee is sued and a case in which anybody else is sued? Why should not a litigant have the same permission to go into court under the same conditions as anybody else? Why, because he is a trustee, should he be under that disability?

Mr. Chairman, some of the litigation to which reference has been made has resulted in very good things. Take the very recent case in which Mr. Wiggins turned over $2,000,000 to the National City Bank. The courts nowadays do not allow those cases to be settled. A corporation cannot settle without the permission of the court. If a stockholder has brought his suit ostensibly for the benefit of the corporation, he should not be allowed to be bought off. Those things are wise, and I think they are necessary.

But to say to a litigant that he has got to give security for costs and subject himself, perhaps, to a heavy allowance by the court because he holds bonds or shares of stock and does not hold a claim of some other kind, does not appeal to my sense of fairness at all.

I do not think I have any other suggestions to make. The purpose of the bill is fine and right, as is the purpose of all this kind of legislation. The more regulations we get of these financial institutions the better.

The CHAIRMAN. Are there any questions of Mr. Untermyer?

(No response.)

Thank you very much, Mr. Untermyer.

(Mr. Untermyer withdrew from the committee table.)

The CHAIRMAN. Commissioner Posner, of the New York State Mortgage Commission, is here and would like to be heard.

Mr. AMBERG. Mr. Chairman, could you indulge me for a short time? I do not want to interrupt the order of the proceedings at all.

My name is Harold V. Amberg. I am vice president and general counsel of the First National Bank of Chicago.

Mr. Canright is here, from the Continental Bank of Chicago, to be a witness this morning.

I am sorry to throw a discordant note into this picture. All these gentlemen have worked in a very friendly way with the Securities and Exchange Commission. But the Continental Bank of Chicago believes that there is a serious fundamental problem to be explored in this bill. Strangely enough, we are in disagreement with our good friends, the bankers in New York. We are in disagreement with our good friends the Prudential Life Insurance Co., and other big institutions; and it is not a pleasant thing to be in such disagreement. So I want to assure you that it is a serious conviction that leads us to take this position.

Mr. Brown, our president, wants to come here personally to testify.

Our thought, briefly, is this. The old practice has been that after a default the trustee represented the bondholders. This bill purports to take away from the bondholders the control of their own destiny, and the trustee is to become an active trustee. There are some qualifications in the bill, although the official responsible is the trustee ——

The CHAIRMAN. You are now testifying.

Mr. AMBERG. I am sorry.

The CHAIRMAN. Would you like to make a statement in behalf of your institution today?

Mr. AMBERG. No, Mr. Chairman. Mr. Brown wants to do that.

The CHAIRMAN. Is he here?

Mr. AMBERG. No.

The CHAIRMAN. I did not want any duplication.

Mr. AMBERG. I just wanted to ask that Mr. Brown be given an opportunity to be heard.

The CHAIRMAN. I am sure the committee will give him an opportunity to be heard. Perhaps we can fix it now.

Mr. AMBERG. Mr. Brown can be here tomorrow. But he will hold himself at the convenience of your committee.

Senator TOWNSEND. Tomorrow morning?

Mr. AMBERG. Yes.

The CHAIRMAN. Is there anybody else here who desires to be heard?

Mr. PAGE. I have been asked by the bankers of Philadelphia to request a further week's postponement so that they may study the bill further.

The CHAIRMAN. I think, under the circumstances, we ought to do that.

Senator TOWNSEND. Yes. There is a lot of new material in the bill.

The CHAIRMAN. This committee has always had the attitude that everyone interested should be heard. The committee has always adopted that policy, so long as we are not delayed too long so that we will be unable to go on with the legislation. We had better make it a week from today, because there is a request now from Mr. Page to hear others. The committee can probably hear you in 1 day, next week.

Senator TOWNSEND. Is Mr. Brown coming for the purpose of testifying?

Mr. AMBERG. Solely for the purpose of testifying.

Senator TOWNSEND. Is he on his way?

Mr. AMBERG. No, sir.

Senator TOWNSEND. Next week will do as well, then.

Mr. POSNER. I can return next week, Mr. Chairman.

The CHAIRMAN. The committee would like to recess at 12 o'clock.

Mr. POSNER. I saw you looking at the clock, and I did not want to impose myself on the committee.

The CHAIRMAN. There is some important legislation coming up this afternoon. Would it be all right with you if the committee hears you next week?

Mr. POSNER. Yes; I think so. Will I be heard quite promptly?

The CHAIRMAN. Yes. We will consider the fact that you were ready to be heard.

Senator BARKLEY. We will make your statement the "unfinished business."

The CHAIRMAN. We will adjourn until a week from today, at which time Mr. Posner, Mr. Page, Mr. Brown, and the representatives from Philadelphia will be heard. We will adjourn now until next Tuesday at 10:30 a. m.

(Whereupon, at 12 noon, an adjournment was taken until Tuesday, June 22, 1937, at 10:30 a. m.)

# REGULATION OF SALE OF SECURITIES

---

**TUESDAY, JUNE 22, 1937**

United States Senate,
Subcommittee of the Banking
and Currency Committee,
*Washington, D. C.*

The subcommittee met, pursuant to adjournment on Tuesday, June 15, 1937, in the Banking and Currency Committee room, Senate Office Building, at 10:30 a. m., Senator Robert F. Wagner (chairman of the committee) presiding.

Present: Senators Wagner (chairman), Bulkley, Hughes, Herring, and Townsend.

Also present: Senators Alben W. Barkley and William H. Smathers; Mr. Ronald Ransom, vice president, Board of Governors of the Federal Reserve System; Mr. William O. Douglas, a Commissioner of the Securities and Exchange Commission, Washington, D. C.

The CHAIRMAN. The committee will come to order. Mr. Ransom, I believe, wished to read into the record a certain letter.

## STATEMENT OF RONALD RANSOM, VICE CHAIRMAN, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, WASHINGTON, D. C.

Mr. RANSOM. Mr. Chairman, this letter is addressed to you as chairman of the committee, signed by me as vice chairman of the Board of Governors of the Federal Reserve System. It is dated yesterday. [Reading:]

References appearing in the press this morning give the impression that a report prepared by the Federal advisory council relative to the trust indenture bill had been submitted to the Banking and Currency Committee of the Senate at my suggestion or with my advice.

The facts are that the report emanates entirely from the council, which is a statutory group composed of as many members as there are Federal Reserve districts. The directors of each Federal Reserve bank annually select one member. The council is empowered to confer with and to make oral or written representations to the Board of Governors of the Federal Reserve System concerning matters within the Board's jurisdiction.

As a matter of courtesy, the council asked the Board whether there was any objection to the submission of this report to your committee and the Board replied that it had no objection. The views expressed in this report, however, are those of the council.

I desired to make this clear in order that there might be no impression that the report is an expression of my own views or those of the Board of Governors.

Senator BARKLEY. What is the date of that so-called report? I have never seen it.

The CHAIRMAN. It just came in today; that is the reason you have not seen it.

Mr. RANSOM. It is dated June 17.

Senator BARKLEY. Is this a report to the committee or to the Wall Street Journal? It seems they got it first.

Mr. RANSOM. They frequently do.

Senator TOWNSEND. Is it a critical report?

The CHAIRMAN. We shall have it read to the committee later on.

Mr. RANSOM. I simply wanted the position of the board to be clearly before the committee.

The CHAIRMAN. Thank you very much.

## STATEMENT OF LOUIS S. POSNER, MEMBER OF THE MORTGAGE COMMISSION OF THE STATE OF NEW YORK, NEW YORK CITY

The CHAIRMAN. We shall hear from Mr. Posner. Mr. Posner is a commissioner of the Mortgage Commission of the State of New York. Perhaps, Mr. Posner, you will state your position and connections yourself. And will you give a brief statement of your background for the purposes of the committee?

Mr. POSNER. You referred to the Mortgage Commission of the State of New York. I am a member of that commission. Some 2 years ago, when it commenced operations in New York, we took into our jurisdiction nearly 700 millions of defaulted guaranteed mortgages—probably the largest private trust ever administered by a public office, if not indeed by a private group.

Senator TOWNSEND. How is the commission constituted?

Mr. POSNER. It is constituted of three members appointed by the Governor.

Senator TOWNSEND. They are appointed by the Governor, you say?

Mr. POSNER. Yes.

Senator TOWNSEND. For what purpose?

Mr. POSNER. For the purpose of administering and conserving these properties covered by mortgages. These are mortgages whose payment is guaranteed by mortgage guaranty companies, all of which defaulted in their guaranties. The mortgagors themselves defaulted. Some 250,000 holders, distributed throughout the country—and mainly in New York—hold these shares or participations in mortgages. Nobody seemed to have the authority adequately to handle the situation; and after perhaps a year of agitation this body, for the first time, I think, created under the laws of any State, was created in New York. We administered the property. We foreclosed and took care of management and saw that the property was put in proper shape, reorganized the mortgages and terms, and studied what the properties could produce, and the like. Of course, in many of those situations we found the equivalent of what you had here, in the way of trustees under mortgage indentures.

My own appearance here, I should say, has nothing to do with that; because I speak wholly in a personal way, and with no relation to the mortgage commissioners. The subject of trust indentures for more than 30 years in New York has interested me very greatly; and some 10 years ago, my practice having been largely in the financial field until then, I decided to write upon the subject of indenture trustees having found that there had not been any legal writing on that subject in this country.

Senator TOWNSEND. What you may say has the approval of the other commissioners?

Mr. POSNER. Oh, no.

The CHAIRMAN. No; he is appearing as a private individual and as a man who has studied the situation himself. I am very familiar with his work in that connection.

Mr. POSNER. Yes; purely as a personal opinion.

About 10 years ago I wrote an article on the subject of liability of the trustee under the corporate indenture, published in the Harvard Law Journal of December 1928, and this winter, in response to a request from the editors of the Yale Law Journal, I wrote a summary of the law of the country, entitled, "The Trustee and the Trust Indenture", which appeared in the March issue of the Yale Law Journal, which included a discussion of the recommendations of the Securities Commission in its report of June of last year.

I am very glad to be invited to express my views on the present Trust Indenture Act. I have taken the occasion to prepare a brief summary, which I hope will not be found unduly long; because I have, myself, a very sharp appreciation of what time means. But the subject is one which, from my studies—and even without any study—it is plain is of prime importance in this country. As late as the end of 1934 there were some $37,000,000,000 of these issues represented by trust indentures. To those who may not realize the situation, that gives an idea of its importance—an amount substantially in excess of the then public debt of the United States.

The proposed Trust Indenture Act appears to be well designed to accomplish the important objectives foreshadowed in the report of the Securities and Exchange Commission in June of last year. In the main its provisions appear to be adequate, and to safeguard the investing public in the many directions in which it has long needed protection. The origin of the difficulties so adequately portrayed in the Securities and Exchange Commission report of June last is not difficult to trace. The trust indenture as we now know it is the product of hardly more than 50 years of American experience. As the devices of finance varied and multiplied, the trust indenture kept pace in size and complexity until it has become in fact the largest of all legal documents. With the growth in volume of finance the powers of the trustee to take action were correspondingly enlarged, but the duty of the trustee to take action was not commensurably increased. That, I think, is the origin of the difficulty in which the whole situation is now involved.

The trustee invariably protected itself against liability for inaction by the use of clauses which created such liability only in the event of gross negligence, willful default, or bad faith. The modern trust indenture fairly bristles with such exculpatory clauses. In this way the investing public not infrequently was deprived of the protection which it needed. The day of reckoning was bound to come and I think it has come. I am in hearty accord with many of the provisions of the act, well designed to remedy these conditions and to enforce appropriate standards. At the same time I must confess my belief that certain of the provisions of the act appear to go beyond the necessities of the case, are unnecessarily rigid, and may at certain points result in hurt to the investors whom it is designed to help.

Senator TOWNSEND. Have you any modifications?

Mr. POSNER. Yes; I shall suggest two or three of the essential ones here.

The provisions concerning maintenance of lists of bondholders I regard as of an importance exceeded only by the higher degree of care which the trustee will be required to exercise. If these two improvements alone are accomplished, without more, the great labors of the Securities and Exchange Commission will have been justified. Lists of security holders have long constituted a sort of battleground between the "ins" and the "outs", with the lists as the fortress of the "ins." These lists were so valuable for unified and effective action that, as the Commission's report shows, occasionally those who possessed such a list would succeed in extracting for its surrender the impudent price of a general release to themselves against any claims of wrongdoing. This was notably so in the real-estate mortgage situation. With such lists readily available, no longer will the bondholder, first concerned, be the last consulted. Upon bondholders the burden of ultimate loss must fall, and to them should be given the earliest opportunity, in cooperation with the trustee, to preserve the status, conserve the assets, and reduce the loss.

Since I intend to speak only in general terms of the proposed act, though I am prepared to discuss it with such particularity as this committee may wish, perhaps I should say at this point that I do not agree with Mr. Untermyer's view, expressed at your hearings last week, that the provisions with respect to these lists are inadequate. If they can be strengthened, well and good, but I believe that section 7 (f) covers the situation fully, and the reservation to the Commission's judgment of the terms and conditions upon which the lists may be made available to security holders is a precautionary clause that emphasizes the care with which this entire paragraph was drawn.

Nor do I agree with Mr. Untermyer that the trustee be required to give notice to security holders of all defaults whatsoever that may occur.

I noticed, Senator Barkley, that you were particularly interested at last week's hearing on that point; and it seemed to me, if I may say so, that your views were completely justified, if I correctly interpreted them.

There are many situations of delicacy where a default is technical, or goes even beyond that, or occurs under circumstances which promise early remedy, or at least does not threaten immediate serious consequences. Premature notification in such cases might well precipitate a disaster that could otherwise be weathered, and inflict serious and avoidable damage upon the investors. In the past, shielded by the general immunity clause, trustees have ventured to withhold notifications of default in certain situations and have granted the obligor a reasonable period within which to repair the default. There have been many such instances in the past whereby financial collapse has been avoided and the security of the investor safeguarded, due to the sound judgment of the trustee in withholding notification. Personally, I would have been interested to see some such instances disclosed in the Commission's report. It is my opinion that section 7 (k) is altogether adequate.

I am in full accord, however, with Mr. Untermyer in opposing the provision of the next succeeding subsection (1) which grants discretion to a court, in a security-holder's suit, to assess reasonable costs, including reasonable attorney's fees, against any party litigant, having due regard to the merits and good faith of the suit or defense.

Senator HUGHES. I am greatly concerned about that matter, as to whether the provision is sufficient.

Mr. POSNER. The provisions of the statute seem to safeguard that, rather thoroughly. In the main, the decision as to whether there shall be notification or shall not be notification, depends—if I am correct upon the requirements and regulations of the Securities and Exchange Commission. There is only a narrow margin, I feel, for the trustee's independent action in that regard. As to notices of all defaults, subdivision (k) of section 7 covers that.

Senator HUGHES. Yes.

Mr. POSNER. It seems to me that the margin is really very narrow. I think there is really very little danger there. You must remember that heretofore trustees may not have been as quick to notify security holders of defaults as they should have been; but now they are under a high fiduciary duty, and when default occurs you may take it for granted that they are not going to run any risk of possible claims against them by violating their duties in a fiduciary capacity in not telling the security holder what he ought to know. Indeed, I think you should protect them in their liability, because it is only upon the bondholder that the loss would fall, if there is a premature notice. That is the "rich-picking" time in the market, for those who know that the default is technical, when the great bulk of security holders could not be notified of that. And if the trustee considers whether not to notify, so as to protect the security holders, or to notify so as to protect itself, in case of such a required choice the trustee will notify, whatever the result may be and protect itself. I think the burden is wholly upon the shoulders of the trustees.

Senator HUGHES. I think probably you are right about that.

Mr. POSNER. I have said that I am in accord with Mr. Unter-myer's suggestion regarding the provision which grants discretion to a court, in a security-holder's suit to assess reasonable costs, including reasonable attorney's fees, against any party litigant, having due regard to the merits and good faith of the suit or defense.

This is presumably aimed at the so-called strike suits. As a matter of fact, such suits brought by aggressive bondholders have often served valuable ends and resulted in the recoupment of considerable sums. This fact is recognized in the S. E. C. report. It is not sufficient to say that the assessment of costs and fees is not mandatory but rests in the discretion of the court. Such litigation is usually difficult, often intricate, and always expensive. One who seeks to assert in a law court what he deems to be his rights and those of his fellow investors should be unhampered in the opportunity to do so and should not be faced with the threat of such costs and fees. The provision is directly contrary to the policy of our American law and I think the clause should be eliminated.

With certain specified exceptions, the act takes control of all issues of securities. It requires that all be governed by trust indentures "as to which an application for qualification is effective." The indenture can thus become qualified only if the application therefor filed with the commission shall show conformity to the provisions of the act and the regulations adopted by the commission pursuant thereto. The commission may issue refusal orders until it does thus conform. In this manner the commission can regulate and govern all indentures so as to eliminate the clauses and provisions which its

studies show to have been the source of the difficulties and evils theretofore encountered.

It would seem to me that that is a very broad power to give to it, and goes very far toward remedying the situations thus far disclosed: The power to regulate clauses, the power of virtual prohibition of the issue unless the security indenture conforms to provisions satisfactory to the Securities and Exchange Commission, and, thirdly, the power to compel lists of bondholders to be produced upon necessity, so that they may be quickly foregathered.

What are the additional features which this bill provides? In the main, and for this purpose, there are two fields or divisions with which the act deals. One relates to the degree of care which the trustee shall exercise before and after default, the other to conflicts of interest in which the trustee may find itself.

I am afraid that there may not be time for me to do it, although I have devoted a little more than one page to the background of indenture trusteeships, but, I believe, a few words about that might here be in order as perhaps helpful in considering these two main divisions of proposed remedy.

The first instance of a trustee device in the United States goes back to about a hundred years ago. The term "trustee" was a misnomer; the trustee was a mere stakeholder. Usually an individual was appointed for this purpose, often an officer of the obligor. He held nominal title to the security; if the obligations were satisfied, he returned the security to the obligor; if not, he held it for the benefit of the investors. But for the convenience of a single representative to hold the security for a large body of investors, shifting in number and person, the indenture could have been executed directly to them, as indeed was the case in one instance where a dozen bondholders who took a railroad issue were named in the indenture.

In modern financing such a single representative has become, of course, indispensable. Thirty years elapsed before the nature of such a trusteeship came before the courts for decision. It was an important railroad case. The court observed that "trusts of this complicated and public character are so entirely new that very little light can be gained from any analogy to other trusts"; and concluded that it was a trusteeship in the full sense of the private trust. Undoubtedly this decision gave impetus to the inclusion in the trust indenture, to a greater degree than before, of provisions, now common in all indentures that the trustee shall be exonerated from all liability except for willful negligence or bad faith. It was not until about 1880 that the institutional trustee, the modern trust company or financial institution, as we know it, came into the field. These institutions rapidly replaced the individuals who had theretofore served as indenture trustees. Of course the idea of a trust is very old; that of a mortgage is even more ancient; but although the modern trust indenture is a descendant of both, and ancient in lineage, it is really modern in its form as developed and currently used. So rapidly did the use of this device grow, at first as a matter of convenience and later as a matter of necessity, that, as I have stated, the security issues represented in the United States by such trustees are estimated at the close of the year 1934 to have reached the huge total of 37 billion dollars.

Courts have wrestled with various phases of the indenture trustee problem from time to time; but as a matter of fact, the cases which

reached the court, until the last decade, were surprisingly few in number when you consider the huge proportions the business has attained. With the past 10 years, however, there came a flood of legal decisions. Indeed, in that time there have been twice as many court decisions in this field of the law as in the preceding 50 years. The clause exempting the trustee from all liability except for gross negligence or bad faith commanded frequent attention. Some courts recognized that with the vast sums involved it was not to be expected that a trustee should subject itself to any greater measure of responsibility. However that may be, I am not at all sure that the enormous industrial and financial developments of the country would have been possible or as rapid under a much severer rule of trustee liability, and from that standpoint something may be said for the propriety of these exculpatory clauses in the past. The indenture trustee is now a vital and indispensable instrument. Legislation should not, I believe, interfere with this instrument to a point beyond the adequate control of the evils disclosed. In applying remedies great care is imperative, and one must be very careful lest the swing of the pendulum go too far in the opposite direction. And I think that is what, in some respects, appears here in this proposed act.

The proposed act abolishes the exculpatory clause. Further, it places upon the trustee the duty of reasonable care before as well as after default. I believe that regulative control must recognize the fundamental differences between conditions which precede default and those which follow. Courts have recognized this distinction and in a number of instances have declared the duties of the indenture trustee to be passive before default and active only after default occurs. Appropriate certifications from time to time filed before default with the trustee and, if desired, with the Securities Commission, emanating from approved and dependable sources, would establish compliance or noncompliance of the obligor with the requirements of the indenture. They can control the terms of the indenture and, in that way, can enforce compliance with the terms of the indenture.

Frequently complicated indenture conditions, or at least conditions difficult of accurate ascertainment, may exist which the indenture trustee in the ordinary course of events cannot ascertain, or which could be ascertained by it only at great expense and by the assumption of supervision over the business of the company, which would amount almost to a degree of suzerainty. This would constitute an unnecessary, impracticable, and undue interference with business, particularly where, as is often the case, large industrial institutions maintain offices scattered throughout the country. It is normally sufficient to require that the obligor furnish to the trustee properly certified statements establishing compliance. Indenture provisions and regulations could and should be strengthened to accomplish this adequately and satisfactorily. Such certificates are common in the business world, and the trustee should be enabled conclusively to rely upon them. The proposed act so provides. The trustee should be required to use reasonable prudence and care in the study of these certificates. In the narrow field beyond this and before default, it seems to me the new statute should not impose upon the trustee any measure of duty greater than that heretofore commonly imposed.

Other conditions of default not disclosed by such statements are unlikely to be of moment and in any event, not being obvious, would

require for discovery a degree of participation in the detailed affairs of the obligor coextensive with its business, a duty hardly to be demanded of the trustee, and normally needless. If the trustee be not protected by the usual immunity in this narrow remaining field before default, it is likely, with the best of faith on its part, to be faced by claims and demands that might involve it in tremendous losses and perhaps serious consequences to its depositors.

In that field I believe the trustee should be protected with the same immunity which it now enjoys. I am holding no brief for banks or trust companies, but it must be remembered that when we talk of liabilities of indenture trustees we speak of claims that might reach enormously large sums, with the result depending upon a court's technical decision of the difference between care that is reasonable and care that falls just short of that standard.

What I say, I say without suggestion from any source; because I think it is my duty to speak. I believe that in the effort to remedy conditions, there may be too great an interference- entirely unintentional - with the normal, safe channels. My opinion is the result of a long and full study of indenture financing, of court decisions, and of my own experience as a lawyer in the field of financing. By comprehensive regulations the S. E. C. can require appropriate certificates for all reasonably foreseeable conditions. No more can be asked or expected beyond this, until default, either from the Securities Commission or from the indenture trustee.

Senator SMATHERS. What is your suggestion, right there, on the question of this narrow field and the degree of care?

Mr. POSNER. The degree which has heretofore existed: There must be something in the nature of gross negligence or bad faith or willful default. Because, unless you do that, you have a very narrow field which requires a most extensive entrance of the trustee into the business of an obligor to determine whether or not a default exists. Certificates ought to cover that situation, it seems to me.

Senator SMATHERS. Would you not be in the same situation that we are in today, where the courts may hold technically that the degree of care was gross, and the same loss will occur to the investors?

Mr. POSNER. Well, that is so with regard to all human relationships, and there must be some fixed measure of duty, of course. Because that is necessary for human intercourse, social and business. But that at least is the measure of duty before default under which they have acted for 50 or more years, and that does not constitute a new field.

Once a condition of actual default comes to the knowledge of the trustee, what shall be the measure of its duty? I am in complete accord with the views of Senator Barkley and of the Securities Commission in this regard: That these exculpatory clauses should at once disappear, and that a full measure of good faith and prudence should apply. Whether the default be technical or otherwise, the time has come when the general immunity clause should disappear at this point and reasonable care and prudence become at once the measure of the trustee's duty. In this regard I note the language of subsection (h) of section 7, that in case of default the indenture trustee shall in exercising its powers—

use the same degree of care and skill in their exercise as a prudent man would exercise under the circumstances if he were a fiduciary and had the degree of skill which the indenture trustee has, or which the indenture trustee represents itself

as having, as indenture trustee, at the time of the offering of the indenture securities, whichever is the higher.

I am wondering only whether these provisions lend uncertainty to the measure of duties which should be made clear and certain. Indenture trustees are usually institutions of highest skill and experience. New institutions that may come into the field if the presently acting trustees are forced to abandon the field because of the provisions of the act or because regulations adopted by the Commission are too highly restrictive or onerous, will certainly not possess an equal degree of skill. They certainly will not have such a degree of skill, because such skill is the development only of many years of experience. Are we not thus creating differing standards and injecting uncertainty and perhaps confusion as to the measure of the trustee's liability? It seems to me it would be sufficient if the paragraph were to end after the words "under the circumstances", or, at most, after the words "if he were a fiduciary." And I would stop there. It seems to me that that covers it. I am only concerned about making it clear so that there will be no escape from responsibility.

The other division of activities with which the act deals—the subject of conflicts—calls for much more detailed discussion than I can permit myself, for I believe it is here that the pendulum swings too far, that conditions are imposed which are much too rigid and of doubtful value, and that in some instances the security holder is more likely to be hurt than helped. The conflicts with which the act deals are fourfold: Those which provide that the trustee may act under only a single indenture of a given obligor; those aimed at the prevention of common officership; those which deal with stock control of the obligor, the trustee, and the underwriter; and finally, those which concern the creditor position of the trustee. It is with this last that I am most concerned, and I shall say only a word as to the others, important as they are.

As a matter of fact, I believe it will be found that few difficulties have arisen, if indeed any, in spite of the exceedingly comprehensive report of the Securities and Exchange Commission, in situations where the trustee has acted under more than one indenture. I can see no good reason why the same trustee cannot act, for example, in refunding issues or in secured issues, especially where the securities are altogether separate and do not overlap. A common trustee, even in the case of first and second mortgages, does not necessarily create a conflict, if the instruments be capably drawn.

You must see that the difficulties of investors disappear materially with the high fiduciary duty thus placed on the trustee. You can well leave it to the fiduciary to take care of the situation and to protect the investors, when that high fiduciary duty is placed upon it. As to the case of trustees under more than one mortgage of the same obligor, my position is that the burden under the act should be the other way, and the attitude should be reversed.

Senator BARKLEY. Are there not certain conditions where the control would not be automatic?

Mr. POSNER. Undoubtedly. In the flagrant cases there would be no doubt. But the holding of two trust indenture issues by the same company in itself does not create that conflict, but the Securities and Exchange Commission bill takes the position that the rule is to be that there will not be more than one trusteeship by the same trustee

of the same obligor, unless the trustee establishes there is no conflict. There are types, here, where no conflict necessarily arises. But of course no grown-up person—21 years of age or older—let alone a trustee under high fiduciary responsibility, would accept more than one of the trusts if the conflict exists at the outset.

Senator SMATHERS. In other words, you think the Commission ought not to require the trustee to prove that the interest is dual or incompatible?

Mr. POSNER. But the Securities and Exchange Commission, with all the facts before it, can so declare, and the burden of proof should be that way. After all, the trustee institutions and the trust companies, of themselves, are not anathema. They hold an important place in the financial structure of the country. They know what their duties require, and I do not think they need any guardianship.

Senator SMATHERS. Unless the investigation shows dual conditions do exist, it ought to be permitted as a matter of course?

Mr. POSNER. Yes; it ought to be permitted as a matter of course.

Senator SMATHERS. Without requiring the trustee to produce proof that it does not exist?

Mr. POSNER. Yes; and without having to argue the point that the situation does not create a conflict.

In other words, it is upon the honor and the high fiduciary responsibility of the trustee to determine whether it will accept it. And this is no unimportant phase of the matter, either; because, with the enormous number of security issues in the offing—and I hope that number will be extremely large, with the return and rise of business—there are not so many trustees of the highest responsibility which will be found. And the moment you appoint one, he is inoculated and is out, so to speak. So I think it is a mistake, and would retard the financial progress of the country.

The common practice is for the trustee who acts under more than one indenture of an obligor to resign from all but one whenever a default occurs under any. The indenture could make the practice obligatory. It is true that the act grants discretion to the Commission to permit a trustee to act under more than one issue of an obligor if the trustee satisfies the Commission that to do so is not likely to involve a material conflict of interest. But that does not cure the objection, for it is apparent that such permission is to be treated as the exception. In my judgment, the proper policy requires the direct reverse of this.

A trustee who is or permits himself to be in a position of conflict is subject to removal and must resign within 90 days. What constitutes a conflict of interest is rarely susceptible of clear definition in the ordinary affairs of life and is certainly less readily determinable by nice mathematical calculation. Looked at realistically, there is little difference between the position of a trustee which appoints 2 of its 9 directors to the board of the obligor and becomes thereby immediately disqualified on the ground of conflict of interest, and one which, by increasing its board of directors to 10 from 9, is no longer in a position of conflict. What creates or cancels such a conflict if the second director, by owning eleven-tenths of 1 percent of the voting trust and other securities of the obligor, other than its indenture securities, disqualifies the trustee and forces its removal, whereas by owning only ten-tenths of 1 percent, removes the trustee's

disability so that the holders of, say 25 million dollars of an issue may breathe freely again because a complete break and interruption in the trusteeship is avoided.

Take one other phase, and then I have finished with the whole question of conflicts of this character. If the trustee and its directors and executive officers individually or collectively own 4.9 percent of the voting securities of the obligor, all is well; but if anyone of them acquires an additional one-tenth of 1 percent of this stock, or if the trustee bank happens to hold that small additional percentage as part of the security loan account of a customer who has been unable to meet his obligation, then all is lost, not only the two directorships but also the trusteeship itself.

The position I take is that it is no answer to say that the percentages must be fixed somewhere. Why must they be fixed at all? To do so is to set up misleading standards. In what laboratory, whether of law or alchemy, was the formula found for these percentages? They certainly could not have been drawn from the actualities of industry and finance. We know that conflicts of interest frequently exist where the percentages are much less, and are absent where the percentages are much, much greater. Our courts sitting in equity have been quick to find these conflicts and will disregard forms and percentages in order to reach the substance. Why confuse the situation and create a form of defense—and I think, Judge, you realize how lawyers, drawing their points from analogous statutes, are quick to seek a defense based upon this; so why create a defense? Why establish a defense based upon statutory declaration of the standards and percentages that create conflict? However all-inclusive may be the definition of the act defining conflicts, it must still fall far short of the possibilities of human ingenuity. Why attempt to do by statute, with all its inescapable rigidity, that which courts of equity have long been able to achieve with all the necessary flexibility?

On the question of the creditor responsibility—and then I have finished—by this act the Government through its S. E. C. regulations will control the terms of the indenture and enforce certificates and standards that will insure compliance with those terms and protect the investor. On the happening of a default, the act enables the investors quickly to rally for their own protection. By the high duty of fiduciary care imposed upon the trustee, the investor is still further protected; and under its impetus there can be no doubt but that many of the trustee conflicts heretofore encountered will disappear, regardless of the remaining provisions of the act. What more need the Government propose?

You cannot hope, by an act, to cause to spring forth full panoplied a great body of the law. That calls for the development of the courts throughout the years; and there is danger, when one attempts to do that, of creating unnecessary conflicts and difficulties which may be destructive.

So, with all this, what else is there to be done? Well, instead of resting there, the Government goes farther. Here it might well rest and, having set up these full safeguards, allow the normal procedures of the courts of the land to operate in the normal way.

But the proposed act does not rest here, even with the inclusion of these provisions. It goes further forward and proposes formulas under which the trustee may or may not become a creditor of the

obligor; in one set of conditions the right to become such a creditor is absolutely prohibited; in another set of conditions it is permitted, although on terms which are onerous and harsh, if not prohibitive.

There are few businesses which do not require short-term loans, usually for 3 or 4 months, to meet seasonal needs or stock turnover, or where collections temporarily are slow. The indenture trustee of such a company, usually informed of its financing requirements and the nature of its seasonal and other needs, readily and customarily makes such a loan. Normally these loans are unsecured, and the total of such business aggregates billions of dollars a year. Such a loan by a bank, whether secured or unsecured, is absolutely prohibited if it is the trustee under a debenture issue of the obligor, and prohibited also if it is the trustee even under a secured issue whose maturity at the time of issuance was less than 5 years. So much for prohibited loans.

Permitted loans are those in which the bank is indenture trustee under a secured issue having an original maturity of 5 years or more. Then you would think the situation was cleared. Whatever virtue or magic there might be in the other situation, here at least you might think the indenture trustee could lend to its obligor. But not even there may that be done; because if, at any time within 4 months prior to an uncured default in the payment of principal or interest on the bonds, the trustee has received any payment or any additional security on its claim, it must account therefor to its bondholders, and this regardless of the fact that the loan may have been made long before the 4-month period.

The nature of the duty to account differs in prohibited and permitted loans. In those permitted the funds or property to be accounted for must be apportioned between the trustee and the bondholders pro rata on the net amounts of their deficiency claims. But in prohibited loans the funds and property must be accounted for subject to prior payment in full of the bonds.

An exception to the trustee's obligation to account exists in the case of permitted loans where the trustee succeeds in proving that at the time it received a payment or additional security within the 4-month period it had no reasonable cause to believe that default in payment of principal or interest on the bonds would occur within such 4 months.

The third phase regarding which I wish to make a suggestion, and then I conclude with a suggested amendment, is this: It is settled law that I may safely lend money to an enterprise in concededly failing circumstances, and take security contemporaneously with such loan. This may be, indeed, the means of saving the enterprise from disaster, but if the business fails I may collect against the collateral which I received at the time of the loan; I may not, however, knowing the threatened conditions, improve my position beyond the value of that collateral. But not so with the indenture trustee; and even in the case of a "rescue loan" which may tide over the threatened trouble and give a chance to bondholders to be saved from serious loss, aid is denied to the bondholders by this special rule of the proposed law.

These provisions, I submit to this committee, are much too harsh. The amount of loss which American corporation bondholders have suffered in the past from disloyal trustees bending their activities to collect their individual loans from the obligor on the bonds is insignificant compared to the losses of American corporation bondholders

generally. No evils exist that are commensurate with the harshness of the remedy. These provisions make it impossible for the trustee to help the obligor on loans just at the time when many an obligor needs help to save a situation that otherwise may result in a default on its bonds and where the obligor may not be able to find any other bank than the trustee to make the loan. Indeed, corporate trustees often make loans to help an obligor of their bonds where they would not make the loan if they had no trust relationship.

I have suggested various amendments; and if this committee will permit me, I should like to submit them for the record and for the committee. The point to be made here is clearly drawn. The mere making of the loan is not the thing that should be prohibited. The thing that should be prohibited is the improvement of the position of the creditor.

It is submitted that the above provisions would be much fairer if paragraph (6) above quoted were eliminated from the definition of "conflicting interest", so that the mere making of a loan by the trustee to the obligor of its bonds in itself is never a cause for the trustee's resignation; and then to recognize that the trustee should never be allowed within 4 months before an uncured default in principal or interest of the bonds to improve its net creditor position at the expense of its bondholders; but in every such case, regardless of its knowledge or suspicions of an impending default, it should share pro rata with its bondholders the amount by which its net creditor position has been improved during this 4-month period, subject to the burden of the trustee to show, as provided in the act, its lack of knowledge or grounds for believing that default in interest or principal was impending. That is the crux of the situation—the improvement of its position, not the making of the loan in itself. The advantage of this change will be that the trustee's loan business could still go on and that there would be less danger of the larger banks and trust companies now acting as corporate trustees gradually discontinuing this activity and leaving the business to smaller and less responsible banks and institutions.

To accomplish this change it would be necessary to eliminate paragraph (6), page 24, lines 12–18, and also to omit from page 29, line 12, through page 30, line 20, and insert at page 29, line 12, the following:

*and provided, further,* That the indenture to be qualified shall provide that the trustee's rights in the funds and property held in such special accounts and the proceeds thereof shall be apportioned between the trustee and the indenture security holders in such manner that the trustee realizes no greater percentage of its deficiency claim (after deducting therefrom all credits for which it is not required to account thereunder) than the security holders realize in respect of their deficiency claim against the obligor (after deducting therefrom all allowable credits).

I think that in that way you could have the loan still go on, and they may not improve their position in any way.

Then of course another amendment should be made—that they may, contemporaneously with the loan, take security. I could never understand why that could not be done, or why this should be singled out of the whole finances of the country and put upon the block, when it is so common and well recognized in equitable and proper practice throughout the country. This change would permit the trustee to make secured "rescue loans" within the 4-month

period, without any duty to account, so as to be able to help the company over a tight place. To accomplish this there can be inserted at page 29, line 6, after the word "period", the words "or any security for a claim received contemporaneously with the creation of such claim."

In conclusion I should like to add just this: Large temporary loans running into the millions of dollars, are from time to time required by important industrial institutions, and are usually taken by a half dozen or more banking institutions, as was the case not long ago. It can be readily understood that if such institutions are disenabled from lending to enterprises for which they act as indenture trustees, industrial managers with even ordinary foresight would immediately exclude these banks from trusteeships in order not to preclude them from making loans as seasonal requirements arise. A lucrative part of the business of banks and trust companies is in these short-term loans to the obligor; these loans, rediscounted at the Federal Reserve bank, form the basis of an appreciable fraction of the money issue of the country. Nor is it likely that trusteeships would be accepted by responsible banks if the resulting penalty were the prohibition of such loans. I believe this would be fraught with serious consequences; it is my firm belief that, with comparatively few exceptions—and I say this firmly to this committee—the banking interests of the country engaged in the field of indenture trusteeships have acquitted themselves well during the exceptionally difficult 10 years through which we have just passed.

Of course we may take our horrible examples, but they are the exceptions. Who knows of the billions upon billions of dollars which have been saved to security holders by the pertinacity and assiduity and alertness of the indenture trustees throughout the country?

Senator BARKLEY. Do you not have to legislate, on all matters, largely for the exceptions? Is not legislation designed to cover those situations where men are not willing or, for any reason, do not recognize what the great majority of people recognize as a duty and a moral obligation? Nearly all legislation which prevents someone from doing something is designed with regard to these exceptions.

Mr. POSNER. I think so, Senator; and that should be taken care of to the full extent necessary and adequate, but not beyond that.

The CHAIRMAN. The 10 percent?

Senator BARKLEY. Yes.

Mr. POSNER. Yes. But I say you do it adequately when you fix the fiduciary control, when you see to it that the clauses of the indenture, which have been the source of so many difficulties, are checked and controlled, when you see that proper certificates are given, when you see that stockholders' lists are provided, when you see that the care which a trustee must exercise should be a high degree of fiduciary care. I think you are doing all that. But I think that when you go beyond that, you go way beyond the necessities of the case.

But even if you think this provision of one-tenth of 1 percent is all right, and even if you think it is proper to supersede the courts and leave it to the statute, with its rigidity, then certainly you have gone as far as you should and as far as the worst of the evils you have discovered would require.

Then to go beyond that also, and to begin to regulate these conditions under which one may not become a creditor, and to do what commonly is done throughout the country—and, as in this case,

often for the benefit of the investors of the country—I think is going too far. More than that, I think it is going to drive out of this business experienced institutions which I think should be induced by all the fair means possible to remain in it.

Now, Mr. Chairman and Senators, I conclude with this thought: Banks of sufficient financial responsibility to undertake trusteeships of important issues are not numerous, as compared with the needs of finance; and the difficulty would be aggravated if those to whom the obligor intends later to look for funds are precluded from becoming trustees. The consequence would be that such trusteeships would inevitably be forced into hands of questionable responsibility. Impecunious or inexperienced trustees would, I believe, raise far more serious problems than those which arise when the indenture trustee becomes a banking creditor of the obligor, particularly when the trustee is under a high fiduciary responsibility toward the security holder, and when conflicts of interest will inevitably be considered and judged by the courts in the light of these higher standards.

There are some other matters which I cannot go into now. I think the security holders are unduly hampered by some of the provisions which appear in the statute. I think, particularly, that subdivision (h), with regard to the authority of holders to control what shall be the development of their situation in the way of default, is too greatly limited.

The CHAIRMAN. In what respect?

Mr. POSNER. You have a provision here by which a majority may ask concerning the remedy, here, but may not extend the time of payment of interest or principal, and the like. But there are very few reorganizations where that is not done; and it would seem to me that a study of that phase of it is called for here, and should be submitted with a view to the appropriate change in this statute, so that the bondholders themselves should not be hampered.

Senator TOWNSEND. Have you the amendments that you could leave with the committee, for remedying the bill in those respects?

Mr. POSNER. None, sir, in that respect. Frankly, I confess that when I finished preparing this statement, late last night, I thought I had gone as far as the patience of this committee would permit. I am very deeply interested in the subject, I need not tell this committee. I need not tell Professor Douglas how eager I am to cooperate and to help. It is only with that view that I have undertaken the trouble and the expense of coming here last week and this week.

Senator Townsend, I shall submit, as you suggest, one or two amendments with respect to what I have suggested.

The CHAIRMAN. I think that would help the committee, if you will do so.

Mr. POSNER. Thank you, sir. I am sorry if I have gone beyond the appropriate time limits.

The CHAIRMAN. You have spoken for an hour instead of half an hour; but we find no fault with you for that.

Mr. POSNER. Thank you very much, sir; I am very grateful to you all.

(The following are amendments submitted by Mr. Posner in accordance with the committee's request.)

Strike from section 7 the subsection (6), page 24, lines 12 through 18.

After the word "period," page 29, line 6, insert: *"or any security for a claim received contemporaneously with the creation of such claim,"*.

After the word "date", page 29, line 10, insert: "*or received contemporaneously with the creation of such claim*".

Strike on page 29, line 12, beginning "If the indenture" to and including "of five years or more" on line 15.

After the word "thereof," page 29, line 17, insert: "*held in such special account*,".

Strike from beginning of page 29, line 23, to line 8 on page 30 ending with the words "to such payment." On page 30, line 9, strike the word "further." On page 30, line 9, strike beginning with the words "if such indenture" through the words "years or more," on line 12.

Strike, page 31, lines 10 and 11, "from the operation of paragraph (6) of subsection (b) of this section and".

The CHAIRMAN. Our next speaker will be Mr. Brown, president of the First National Bank of Chicago.

## STATEMENT OF EDWARD E. BROWN, PRESIDENT, FIRST NATIONAL BANK, CHICAGO, ILL.

Mr. BROWN. My name is Edward E. Brown. I am president of the First National Bank of Chicago. I have been connected with the bank for over 27 years, originally entering the law department of the bank, becoming after 2 or 3 years its general counsel, then general counsel and vice president, senior vice president, and, since 1934, president.

The CHAIRMAN. You are a member of the Federal Advisory Council?

Mr. BROWN. Yes, sir.

The CHAIRMAN. That is the council that submitted this report?

Mr. BROWN. Yes, sir.

The CHAIRMAN. To the committee and to the newspapers?

Mr. BROWN. I did not give it to the newspapers, Judge; I do not know who did.

Senator BARKLEY. Was that report prepared before certain amendments were suggested to this bill, which are written in here?

Mr. BROWN. The detailed report was accompanied by a letter sent by the Council, and a telegram sent by Mr. Loeb and myself, who were two of the three members of the subcommittee, Mr. A. A. Tilney being the third member. We stated that in our opinion—and Mr. Tilney disassociated himself from it—the revised committee draft of the bill was still objectionable from the standpoint of the safety of the banking structure of the country.

The CHAIRMAN. Mr. Tilney did not enter into this report, did he?

Mr. BROWN. Mr. Tilney signed this report before the second committee bill was submitted.

The CHAIRMAN. I see. Because we heard his testimony at the last hearing.

Mr. BROWN. But he did not join in the telegram stating that the second redraft by the committee was still objectionable.

The CHAIRMAN. Very well, Mr. Brown; we shall be glad to hear you.

Mr. BROWN. Until 1933 I was also an officer of the First Trust & Savings Bank, an affiliated trust company doing a large corporate business, which was merged with the First National Bank of Chicago in 1933. My duties and experience in the bank caused me to be active in connection with the problems arising out of the bank acting as corporate trustee under trust indentures where the issue defaulted and also with protecting the investments of the bank secured by corporate trust indentures, of which we were continuously large

holders through the period. I am a member of the Chicago Clearing House Committee. I have been chairman of it; and for many years prior to my being a member, I was counsel for it and, as such, came in contact with banks in financial difficulties and was able to observe the effect on their solvency and ability to continue, of liabilities existing in their trust departments.

I want to make it clear that I am here as president of the First National Bank of Chicago to express its views, and not of the Advisory Council. I thank you for continuing this hearing in order to give me an opportunity to do this.

I have read the testimony before this committee on last Tuesday and regret that we cannot agree with those who spoke for the American Bankers Association and the larger trust companies in New York. In fairness, I should state that two of our officers who were privileged from time to time to join in the internal discussions of the American Bankers Association committee agreed that this committee should confer with the Securities and Exchange Commission with a view to working within the structure of the proposed bill; that is, that the regulation is to be done through the Securities and Exchange Commission. It was, however, clearly understood that any bank was to be free to express its individual opinion regardless of the outcome of the committee's negotiations with the Securities and Exchange Commission. Although our original hope was that the whole question might be explored more fully before the enactment of any legislation and that possibly, inasmuch as most corporate trusteeships are held by banking institutions, reform in existing trustee machinery might well be approached on the basis of an improvement in practice under the jurisdiction of the Federal Reserve Board and the Comptroller of the Currency, nevertheless I shall confine my remarks to the structure of the present bill providing that the regulation is to be done through the Securities and Exchange Commission.

Coming to the bill itself, its primary purpose is to protect the investor, particularly the small investor who has not the ability or the means available to the large investor to protect himself. With this object, no one can quarrel. The chief means by which this is proposed to be done under the bill are, first, by requiring that a corporate trustee be appointed under every indenture and that such trustee have responsibility commensurate with the responsibility to be placed upon it under the trust undertaken; second, by disqualifying the corporate trustee if he has certain enumerated conflicts of interests; third, by requiring the corporate trustee to share with indenture holders collections or security received from the obligor under certain conditions; and fourth, by requirements that the corporate trustee shall assume various active duties not now generally assumed, and prohibiting various exemptions from liability now practically universally found in corporate trust deeds.

As to the first—that a responsible corporate trustee shall be named in every indenture—I assume from the bill and the Commission's report, and the tenor of the testimony before the committee, that the Commission feels that the only institutions, generally speaking, with sufficient capital resources and experience properly to undertake the responsibilities of being corporate trustee are banks of deposit, whether called banks or trust companies, and that it is the expectation that most corporate trustees under indentures conforming to the bill

will be banks of deposit. With this I have no quarrel except to point out that the primary duty of a bank of deposit is to its depositors and that it is not good public policy to allow or encourage a bank of deposit to accept contingent liabilities which might possibly exhaust its entire capital resources and put its depositors in jeopardy. The failure of one or two larger banks or a number of smaller banks, through liabilities imposed upon them as a result of trust operations, might easily produce another national banking crisis. It seems to me obvious that the entire capital of a bank should not be put at the risk of its trust operations as against its liability to depositors, both commercial and savings.

As to the second means—the disqualification of the trustee because of conflicts, actual or potential—I have no quarrel with the general theory that a trustee having a conflict should be disqualified.

Senator BARKLEY. At that point, let me ask you this: Is it your view that where a bank voluntarily assumes the responsibility of a trustee, its duty to its depositors is greater than its duty to the investors in the indenture for which it is acting as trustee?

Mr. BROWN. Well, if it assumes that liability, it assumes it, with exoneration clauses or with certain limits upon its liability, Senator Barkley. I think that with banks such as ours, that are acting as corporate trustees under indentures of 10 or 15 times their capital resources—and the same situation exists in New York: Frequently they are indenture trustees for securities in excess of their total deposits—it is not fair that the depositors, by reason of the single failure of a hundred-million-dollar mortgage or some such great liability, should have their money put in jeopardy

Senator BARKLEY. If the bank of deposit, which of course has an obligation to its depositors, voluntarily—and it can only be done voluntarily—assumes the obligation of trustee under bonds, and so forth, where the holders of the bonds or indentures have no relationship whatsoever with the bank, have no opportunity to know what the trustee is doing, commensurate with the knowledge or opportunity for knowledge that a depositor may have with respect to his bank, where is the priority of obligation there, if there is any, as between the investors in the bonds for which the trustee is acting and the depositors? And if there is a conflict of interest there, where should there be any priority of interest? And what should that bank be permitted to do—just continue that double relationship and devote its attention chiefly to the one which it prefers, and let the rest go?

Mr. BROWN. The answer to that is that the only corporate trustees today with sufficient capital and experience are banks of deposit. The only institutions with sufficient knowledge, particularly in industrial business and industrial trusteeships, and the problems of business, are banks of deposit which, through their lending operations, have become acquainted with the problems of the particular businesses. And this bill says that a bank shall not accept a trusteeship unless it accepts certain duties, and is prevented from certain exonerations.

Senator BARKLEY. Yes.

Mr. BROWN. I merely say that a bank of deposit, for the good of the whole banking structure of the country, should not be allowed to put its entire capital funds in jeopardy. In many States part of the capital of a bank is segregated to savings depositors, as against commercial depositors.

Senator BARKLEY. Of course, banks of deposit may become creditors of the obligors, at the same time acting as trustees. There ought to be some way in which the eggs can be unscrambled there, so as to differentiate between the bank's duty to its depositors—which, of course, links up with its duty as a creditor of the obligor—and its substantially impartial duty as a trustee among all of them. How are you going to do that unless you draw some limitations as to what it may or may not do?

Mr. BROWN. Well, I come to the question of conflicts, Senator, if you will wait for that discussion.

Senator BARKLEY. Very well.

Mr. BROWN. I have not given any intensive study to the way in which the bill treats the question of conflicts, because I do not think it is the primary problem created by the bill. The Commission and the A. B. A. committee have greatly improved the conflict portion of the bill as originally drafted. My general impression is that the conflict provisions of the bill are geared in the light of very large security financing of large corporations and that they may prove unduly restrictive in the case of smaller corporations locally financed and not meet the requirements of smaller communities.

You get a city like Grand Rapids, or even like Louisville: It may very well happen that considerable business requires the total banking lines of the community; and to prohibit borrowing like that is merely to force the trusteeship to some other center, such as New York, Chicago, or Philadelphia.

The CHAIRMAN. Mr. Brown, several of us have to be on the floor of the Senate at 12 o'clock. But I think all but Senator Barkley will be able to be back here at 2:30. Will it be all right if we continue our meeting at 2:30 this afternoon, and consequently stop at this point?

Senator HUGHES. I think that will be satisfactory.

Mr. BROWN. Yes; Mr. Chairman.

The CHAIRMAN. Then, if that is satisfactory, we shall continue our hearing at 2:30.

(Whereupon, at 11:50 a. m., a recess was taken until 2:30 p. m. of the same day.)

#### AFTER RECESS

The hearing was resumed at 2:30 o'clock p. m., at the expiration of the recess.

The CHAIRMAN. You may proceed, Mr. Brown.

## STATEMENT OF EDWARD E. BROWN, PRESIDENT, THE FIRST NATIONAL BANK, CHICAGO, ILL.—Resumed

Mr. BROWN. As to the third provision, that the corporate trustee shall share with indenture holders collections on its own obligations, or security obtained therefor under certain conditions, I fully approve the theory that the trustee should not better his position as against holders of indenture securities. One of the provisions of the bill is, I think, highly detrimental to the interests of investors and business generally, and I believe your committee should carefully consider it and hear evidence thereon. It frequently happens that shortly before or after a default a concern has to meet payrolls, rentals, taxes, or other current expenses which, if not met, will mean bankruptcy or a

77-B proceeding; and in the case of an industrial concern far more than in the case of railroads or other public utilities, bankruptcy generally means grave loss to all types of creditors, whether security holders, banks, or trade. It has been quite general practice in the past for the trustee in its individual capacity as a bank under such circumstances to make a secured loan to avoid immediate disaster. Frequently no one but the bank which happens to be the trustee will make such a loan. Under the bill as drafted the making of such a loan would not only disqualify the trustee unless the indenture indebtedness was secured, but the trustee could not realize upon its security without sharing it with the indenture security holders.

My purpose today is to address my remarks primarily to the fourth means proposed for protecting the investor, namely, the mandatory imposition of active duties on the trustee, both before and after default, with the prohibition of exoneration clauses such as are now universally found in corporate trust deeds. I assume that the committee clearly realizes that the bill prohibits the freedom of a borrower to contract with prospective investors regarding the duties and obligations which the trustee is to assume, and gives overriding rights to the Commission to write the provisions of the contract if one is to be made. I am not here today to discuss the question as to whether such a policy is in the interest of the investor or of the public. But I do want to point out that in the bill as drafted the imposition of such active duties on the trustee, both before and after default, imposes very grave liabilities on the trustee, and such liabilities, coupled with the prohibition of adequate exoneration clauses, may cause corporate trustees to suffer losses which, if they are banks of deposit, may threaten their solvency, and with them the integrity of our banking structure, and also cause many bankruptcies that would otherwise be avoided.

If it be said that a bank of deposit need not accept such a corporate trusteeship if it deems the terms of the indenture too onerous, the answer is that many banks, even reluctantly, will do so under the pressure of competition. And if no bank of deposit does accept it, there is no considerable number of nonbanking trust companies with sufficient capital, experience, and reputation to meet the intended responsibilities under this bill.

I propose to make a general presentation of this subject, although, if the committee desires, I am prepared to point out, section by section, provisions which bear on this subject.

At the risk of going over ground familiar to your committee, I wish to point out briefly the difference in trust mechanics and theory now existing in the personal and corporate trust fields. In the case of personal trusts, a trust company is charged with the management of property of various kinds and is paid a real fee for performing such duties and accepting the responsibility which goes with their performance.

It rarely happens that in the case of a single personal trust the entire corpus of the trust is more than a fraction of the trust company's capital and surplus. The corpus of a large trust is generally distributed through many classes of securities and property, so that the liability for improvident or negligent conduct is a risk which, if ordinary prudence is exercised, does not threaten the bank's capital structure or its depositors. The high scale of fees paid for servicing personal trust business compensates for whatever risks are assumed.

The existing theory in the mechanics of corporate trusteeships is entirely different. The theory and practice has been that the trustee is primarily an agent of the bondholders, taking his instructions from them, and he rarely has any active duties prior to default; and subsequent to default the trustee, although in most present-day indentures it is given the right to take action on its own initiative, with proper exoneration clauses, acts primarily as an agent in carrying out the instructions of the security holders. The trust indentures generally provide that the trustee shall be under no duty to act unless a certain percentage of the security holders request it to do so, and that if it does act on such request with reasonable diligence it shall not be responsible for the consequences of such action; and, further, that it shall be exonerated for nonaction in the absence of any request on the part of the security holders.

Under existing practice the first thing a responsible trustee does when a default has occurred is to acquaint itself with the facts, contact bondholders, and seek instructions as to their wishes. The theory of the bill is to largely take away from the security holder the control of his own destinies and put that duty on the trustee. In view of the fact that a single corporate indenture frequently has an amount of securities issued thereunder in excess of the total capital assets of the trustee, it is readily apparent that a mistake or error in judgment or a course of action which might appear negligent to a jury after the event in a period of depression could bankrupt the trustee.

It has been my experience that it is very easy to put a corporation into the hands of a receiver or into bankruptcy, and it is generally a very difficult thing to get it out. Generally, and in normal times particularly, trustees, security holders, bank creditors, and the management work to avoid a receivership and bankruptcy because it involves loss to all of them. If a trustee is confronted with a possible liability for an action taken or omitted in good faith in the belief that it was to the best interests of the security holders and has to consider that not a group of businessmen but an ordinary jury might surcharge him with being negligent, he will avoid a responsibility which may well break him, by following the easy and safe course of projecting the company into bankruptcy and putting the responsibility of action or nonaction up to the court.

On numerous occasions in my life as an officer of a trustee which was acting for security holders I have taken part in many conferences, extending days and nights, for weeks, seeking to determine what was the proper course of action and how receivership could be avoided. The proper course to pursue was always a matter of debate, and it rarely was clear. Some authority in the trustee, even with bondholder representation and advice, did eventually have to decide on a course of action or, in some cases, on a course of inaction. In most cases the problem was worked out without court proceedings and with the saving of the value of a going concern, to the great advantage of the indenture security holders. In some cases, viewed in retrospect, the course of action proved to be a failure. Negligence is a question of fact, and fact is a question for a jury under our system of law. A jury may be instructed by a judge to disregard subsequent events in determining negligence; but juries, being human, have a habit of being influenced by the subsequent course of events. Hindsight is all-

knowing. It is for these reasons that the trustee ought to have exoneration beyond the scope contemplated in this bill.

It is for these two reasons—first, the danger to the banks and banking structure of the country of the imposition of liabilities contemplated by this bill, and secondly, the danger that trustees, under fear of liability, will force concerns that could otherwise be saved, into bankruptcy or 77B—that I think the provisions of the bill in respect to the liabilities assumed by the trustee should be qualified, and exoneration of the trustee should be greatly liberalized and definitively stated in the bill.

In conclusion, I would be lacking in candor if I did not express my personal conviction that the subject matter of this legislation, in its relation to a delicate economic, financial, and banking structure, is of such public interest that it deserves a more complete exploration and study before it is incorporated into statutory law. If we are to have legislation at this time, my suggestion is that it might well be confined to the conflict features of the bill. Further, if we are to have legislation including the "active" trustee features of the bill, I urge that the bill be amended so as to afford definitively in the bill proper exonerating provisions for the trustee's protection. Finally, if the bill is to be passed substantially in its present form, I would urge that the Federal Reserve Board be required to concur in rules and regulations of the Securities and Exchange Commission having to do with the active responsibilities of the trustee and the exoneration afforded the trustee.

I have not come here with any prepared amendments to cover the points I have raised, because I believe the drafting and editing of the language of the bill should remain in the hands of people who know its structure through past contact with it, and I am quite ready to accept the draftmanship of the Securities and Exchange Commission and the committee of the American Bankers Association, who together have been editing the bill.

I might add that at lunch I did, with Mr. Amberg, prepare an amendment to the exoneration section, which I can submit and leave with the committee, if it so desires.

As a judge, Mr. Chairman, you know that the difference between negligence and gross negligence is very wide. I do not think any trustee desires to be exempt from clear negligence; but I also do not think that any responsible trustee wants to have a common jury, after the event, and in the light of the unfortunate circumstances, pass on whether a certain standard of conduct has been negligence.

Gross negligence is a term which is well understood. It is probably too broad for the purposes of this bill.

Senator TOWNSEND. Would you care, Mr. Brown, to work out a series of amendments which would carry your ideas into the bill, or can you submit such an outline to the committee?

Mr. BROWN. I could.

The CHAIRMAN. I think that would be the better plan.

Mr. BROWN. I can submit an amendment on the mandatory clause. If the committee cares to ask me any questions about any sections of the bill, I would be glad to discuss them.

The point that I want to make, particularly in view of the liabilities of the trustee, is that while the trustee might be willing to submit to judgment on its conduct as to whether or not it was negligent, to a group of men who were familiar with reorganization procedure—with what had to be done under such circumstances—it does not want

to be placed at the mercy of a jury on the question of fact, where the judgment of a jury is conclusive as to whether or not the trustee was negligent.

It was my thought that some word should be chosen which would be an affirmative standard, and which would provide that if the trustee does certain things, he shall be exonerated.

Gross negligence is probably too strong a term to use, but there may be some intermediate term, such as "clear negligence", that could be used.

The CHAIRMAN. I think that so far we have "reasonable care" and "gross negligence." What is there in between?

Mr. BROWN. You have got a proviso, as I understand it——

The CHAIRMAN (interposing). I am speaking now of the different degrees of negligence that are ordinarily used. In some cases only the care that a reasonably prudent person would use is required; in other cases one is required to use extreme care, the care that an extremely prudent person would use. There is that distinction in negligence.

Mr. BROWN. I fully concur in Mr. Posner's remarks. If you go beyond the degree of care which a prudent man occupying any fiduciary position should exercise, you get into a new realm of conjecture, which the courts have not yet passed upon. I think there is a difference between negligence, clear negligence, and gross negligence.

The CHAIRMAN. I do not know the distinction between negligence and clear negligence. I do not know what you have in mind there.

Senator TOWNSEND. Mr. Brown says gross and clear.

The CHAIRMAN. Gross and reasonable are the two. We have reasonable care and gross negligence.

Mr. BROWN. I think language could be found to provide an intermediate ground, which would protect the trustees against the vagaries of juries, particularly when there has been a group of bondholders which has suffered a great loss, on the one side, and a large bank or corporation on the other side. Juries are bound to be prejudiced and are bound to look at the action of a trustee in the light of subsequent events and not in the light of events as they existed at a prior time.

The CHAIRMAN. Of course, when we say reasonable care, we always measure it by what a reasonably prudent person would do under like circumstances, and I suppose that one acting in a fiduciary capacity, using that definition, would be subject to a higher degree of care than one who was just sweeping a sidewalk or doing something of that kind.

Mr. BROWN. I grant that.

Senator TOWNSEND. Mr. Brown, you and Mr. Posner are agreed on many of your objections to the bill, are you not?

Mr. BROWN. We are agreed on some of them; I do not think we are at all agreed on others.

Senator TOWNSEND. I think that if we could get the amendments which would revise the bill in accordance with your views, they would, at least, help the committee to understand your contentions.

The CHAIRMAN. I think you have enough help. You ought to be able to prepare the amendments to carry out your objections.

Mr. BROWN. All right. I know, however, from experience in drafting legislation, that it is a very difficult and dangerous matter to attempt to amend one section of the bill without throwing a lot of the other sections and provisions of the bill out of kilter.

The CHAIRMAN. The committee will have to assume that responsibility eventually.

Mr. BROWN. Thank you, gentlemen.

The CHAIRMAN. Mr. Canright, would you care to be heard?

Mr. CANRIGHT. Yes, Mr. Chairman.

(The following is a letter from Mr. Brown presenting certain amendments in accordance with the committee's suggestion:)

FIRST NATIONAL BANK,
*Chicago, June 25, 1937.*

Hon. ROBERT F. WAGNER,
*Chairman of the Committee on Banking and Currency,*
*United States Senate, Washington, D. C.*

DEAR SENATOR WAGNER: Complying with your request at Tuesday's hearing on the Barkley bill before your committee, I am submitting amendments which, I am definitely convinced, represent the minimum required to protect the security-holders' interest and to safeguard trustees to the end that responsible and experienced trustees may be available and participate in the essential function of corporate financing under conditions that will not place the banking structure of the country in serious jeopardy. I will note in connection with each proposed amendment the reason underlying its suggestion. My references will be to committee print no. 2.

As to the security holders:

1. To meet the requirements of local financing of local industry in other than the biggest cities and to lessen to that extent at least the tendency of the bill to force corporate financing and corporate trusteeships into the biggest financial centers (where local conditions and what is good for the local obligor and the security holders is not as intimately known) and further to protect the security holders by keeping open the obligor's lines of current short-term commercial credit, I urge that the prohibition against loans by a trustee should be eliminated, and that the apportionment penalty provision of subsection (e) be applied to all "penalized" loans, eliminating the question of proof. The potentiality of a detrimental conflict of interest does not justify the prohibition against loans, particularly when in most cases the conflict never materializes. I suggest, therefore, to accomplish this purpose, that subparagraph (6) beginning at line 12 and ending at line 18 of page 24 be stricken. The reference to this section in paragraph (d) on page 31 would thereupon become superfluous so the language at line 10, page 31 "from the operation of paragraph (6) of subsection (b) of this section and" should be deleted. This amendment also involves a deletion of lines 12 to 25 on page 29 and lines 1 to 8 through the word "payment" on page 30. Finally, there should also be eliminated the last four words of line 9, all of lines 10 and 11, and the first seven words of line 12 on page 30.

2. To preserve the time-honored so-called "rescue" loan by a trustee bank to a corporate borrower to carry it over emergencies, which experience clearly demonstrates is for the interest of all concerned, I suggest changes as follows:

Page 29, line 6: Insert after the word "period" the words "or to the extent of such claim only, any security for a claim received simultaneously with the creation of such claim whether prior to or after the beginning of such four months' period,".

Page 29, lines 9 and 10: Strike out the words "prior to such date" and insert the words "and simultaneously released."

3. After default of a corporate issue, the waiver of the interest or principal payments on the indenture securities by the bondholders, is frequently an absolute essential of any businesslike work-out of the obligor's difficulties. Clearly this should be left to the determination of the security holders in cooperation with the trustee under the circumstances of the particular case and should not be circumscribed by a fixed prohibition in the indenture. This change is solely for the benefit of the security holders and affects the trustee only in that it restricts its field of action for security holder's protection. To this end I suggest that the language of subsection (1) on page 36 beginning with the word "except" on line 12 of page 36 and ending at line 18 should be stricken.

As to the trustee:

Reiterating my testimony of last Tuesday, I fear the potential danger to the banking structure contained in the proposal to impose affirmative active duties on the trustee and denying protection to the trustee except on the narrow test of simple "negligence." The existing test commonly used of "gross negligence" may be too broad but by the same token the proposed test of "negligence" is

clearly too narrow; I suggest, therefore, there be added at the end of subsection (j) on page 38 the following language:

"but may contain provisions protecting the trustee from liability for any error of judgment; for any action taken or inaction deliberately suffered (a) at the request of the holders of not less than a majority in principal amount of the indenture securities at the time outstanding or (b) independently of the security holders, in good faith and without negligence; and for any omission in the execution of the trust not the result of bad faith or negligence. Such indenture may also provide that as to claims against the indenture trustee predicated on negligence reasonable doubt in respect thereof shall be resolved in favor of the indenture trustee."

If this or similar language is added, then subsection (3) on page 36 beginning at line 23 and ending at line 2 on page 37 should be stricken.

Incidentally, the indenture trustees do not now, and probably will not in the future, receive fees commensurate with the assumption of any greater degree of liability than suggested in the above provision.

My final suggestion is that if the Securities and Exchange Commission is to have the contemplated unlimited authority to insist on the inclusion of additional provisions in the trust indenture affecting the rights of the borrower, the lender, and the trustee, then, inasmuch as the Securities and Exchange Commission is by law charged with protecting the interests of security holders and would be remiss in its duties if it did not resolve all doubt in favor of the security holders, it seems to me that some governmental agency charged with the protection of our banking structure should sit around the table when provisions affecting the trustees are to be adopted. Without specifying any particular language, I believe, as I testified on Tuesday, that the rules and regulations of the Securities and Exchange Commission, promulgated under this bill should, so far as they affect the trustees' responsibilities and liabilities, be subject to the approval of the Federal Reserve Board, which is now by law charged with a general control of trust operations of member banks of the Reserve System, which encompasses practically all banks doing a trust business in this country.

In conclusion, I repeat, as I testified on Tuesday, that the subject matter of this bill merits much more complete exploration before it is fixed in our statutory law, and that the suggestions in this letter represent a minimum of amendments to make the bill useful and desirable in a workaday world, if we are to have legislation at this time. Anything less would be risking too great a tearing of our economic, industrial, and financial fabric, and therefore clearly is not in the public interest.

I am sending under separate cover a number of mimeographed copies of this letter, so that they will be available for such distribution to your fellow members of the Committee as you may deem desirable.

Thanking you again for your courtesy in continuing the hearings so that I might testify, and further for the courtesy extended to me by you and your fellow members at the hearing, I am

Sincerely yours,

E. E. BROWN.

## STATEMENT OF G. S. CANRIGHT, COUNSEL FOR THE CORPORATE TRUST DIVISION, CONTINENTAL ILLINOIS NATIONAL BANK & TRUST CO. OF CHICAGO, ILL.

Mr. CANRIGHT. Mr. Chairman and Senators, our approach to this bill is somewhat different from that of any of the others who have testified here, and our conclusions are different. We do not believe that a trustee has only routine duties or is only a mechanical agency.

The CHAIRMAN. When you say "we," whom do you mean?

Mr. CANRIGHT. I am representing the Continental Illinois National Bank & Trust Co. of Chicago, and I am speaking only for it.

The CHAIRMAN. I see.

Mr. CANRIGHT. We have always regarded or assumed that a trustee was appointed because there should be someone to see that a contract made by a corporation for the protection of its bondholders was carried out. To that extent we agree with the Securities and Exchange Commission that a trustee should be an active trustee, although we might differ to some extent as to what that action should be.

We appreciate the work that the Securities and Exchange Commission has done in this investigation. We think it has been helpful. We think it has even pointed out to trustees some pitfalls that they ought to avoid. But it is evident from the report of the Commission that its study is not based upon a full consideration of the problem of financing industry; it is only a study of a relatively few cases, in which bondholders lost money partly through the failure of trustees to do their duty or to perform their duties properly.

Nevertheless, we believe that the Commission has shown a need for greater supervision over the trusteeships. We feel, however, that all parties will agree that in any remedial legislation consideration of the good to be accomplished must bear some relation to the harm that may be done. It is from that standpoint that we approach this proposition.

We have given this thing very careful study. We started with a predilection in favor of the idea of the Commission before we had seen their bill. We have given a lot of thought to it. After careful consideration, we are convinced that the whole theory of the bill is wrong.

Trust companies and banks exercising trust powers are not fly-by-night concerns; however, some of them may abuse their powers or fail to perform their duties as trustees. They are creations of the state, and they exist at the will of the state. If there are some trust companies which by reason of incompetency or lack of integrity do not perform their duties properly, it would seem to us that the proper remedy is to take away their right to act as trustees.

This brings us to our objections to this particular bill. I am not going to discuss it in detail, as I would if I were proposing amendments to it; I am going to discuss it from the standpoint of the theory of this manner of accomplishing what the Commission feels should be accomplished.

Section 7 of the bill sets up certain standards by which to determine whether a trust company is disqualified to act as trustee. Some of these standards are harmless; some are very serious. There is no attempt to eliminate the incompetent or dishonest trustee but only to eliminate certain artificial situations, which at some time, and under certain conditions, may tend to dissuade the trustee from performing its functions properly. A trustee could be free from all the disqualifications that are mentioned in the bill and still be a very unsatisfactory trustee; and, on the other hand, it could have practically all the disqualifications mentioned in the bill and still be a very excellent trustee. The real qualifications of a trustee are integrity, experience, good business judgment, and a high sense of moral responsibility. If a trust company has these qualifications, it will see that it does not have relationships that are actually conflicting; or if by change of situation or conditions inconsistent relationships should develop, it will take prompt steps to prevent them, whenever that situation arises. The real test of whether a trustee measures up to its responsibilities is how it performs its job, and that cannot be determined by any set of arbitrary standards or by rule of thumb.

Section 7 (b) of the bill provides an indenture trustee shall be deemed to have a conflicting interest if—

(6) such trustee shall be or become a creditor, directly or indirectly, secured or unsecured, of an obligor, except as authorized pursuant to subsection (d) of this section, if the indenture to be qualified is not secured by the pledge or mort-

gage of property or if any indenture securities outstanding had a maturity at the time of issuance of less than five years;

As was pointed out this morning, there is nothing inherently inconsistent in a bank's loaning money to a corporation when it is acting as trustee under one of its indentures. For example, a company in good financial condition, well managed, with good earnings, has an issue of debentures outstanding. It comes into the bank with whom it has customarily done business and which is trustee under that indenture, and says, "We should like to borrow $100,000 for our seasonal purposes, for our normal operations."

There is no reason in the world why the bank should not lend money to that company simply because it is trustee under its indenture.

Naturally, the bank is not going to lend money if it does not expect that it is going to be repaid. It is not going to lend money if it thinks the company is going to default under its debenture issue. Nobody wants to lend money and later be dragged into a creditors' action or a bankruptcy court. Banks lend money only when they have reasonable expectation that those to whom they lend are going to continue to do business and not get into financial difficulties.

Senator Townsend. Under the provisions of this bill could the bank lend to the company?

Mr. Canright. Only as permitted by the provision I have just read. That provides that if you are trustee under a secured indenture—that is, where there is a pledge of property or a mortgage of property—then the bank can lend to the obligor on the indenture securities, if the securities issued under that indenture have a maturity in excess of 5 years; otherwise, it cannot.

There is another exception, but it does not bear upon the point I have in mind.

There may come a time, if the borrower gets into financial difficulties and the bank is still a creditor of the corporation, when there may arise a conflicting interest. If that situation should arise, that is the time when the bank could either sell its note that it had taken from the corporation, or resign as trustee and eliminate that conflict.

Frankly, we are and have been for years trustee under indentures of a great many corporations. Those corporations are customers of the bank. I have no doubt that we lend money to them from time to time, but it has never affected our operations. In the corporate trust division we have never known whether they borrowed money from us or not. Certainly, not knowing whether they borrowed money, our judgment could not have been affected as to what we should do as trustees, and it has not.

We have had two or three cases—not more than three—in which the companies did get into financial difficulties, and the bank was a creditor. There we resigned as trustee, because we felt that there might be some conflict when we came to the enforcement of the obligations. We resigned as trustee, and another trustee was appointed in our place.

Furthermore, a bank likes to be trustee for its own customers. It would rather lend money to a man whom it knew paid his bills and who it knew had a proper regard for his obligations. No bank wants to take over a trusteeship if it feels that it is not going to succeed. A bank does not like to have bondholders lose money by it. Its good name is at stake. But when you have a customer who has been

doing business with you for many years who wants you to act as trustee, and you know he has always paid his debts promptly, you know how he manages his business, and you know what his whole history has been, you accept his trusteeship with a great deal more confidence than you do the trusteeship of some stranger who comes to you, because you cannot know the facts with respect to a stranger in the same way you can of a man or a company with whom you have been dealing over a period of years.

A corporation also has an interest in who is going to be its trustee. It is the most natural thing in the world that it should want the bank with whom it has been doing business for years to be trustee, and that is a perfectly legitimate relationship. It is going to deposit money with the bank for the payment of interest. It is going to deposit money with the bank for the payment of installments of principal or for the redemption of its bonds or debentures. It wants to know that when those bonds or coupons or debentures, or whatever else they may be, are presented for payment, they are going to be paid. The money has got to be there to pay them. A corporation has an interest in keeping its credit good, whether it is credit at the bank or long-time credit. It is money in its pocket.

The way in which a trustee manages its corporate trust matters has a great deal to do with whether or not its customers are satisfied. This bill disturbs all of those normal relations. It casts great burdens on banks and trust companies. It entirely upsets the whole credit structure.

A bank may have had customers for years, and it has got to decide whether it is going to continue in the future to do a commercial banking business with them or whether it is going to act as trustee for them, and all unnecessarily.

If those interests were really conflicting, that would be a different proposition; but in the great majority of cases they never become conflicting. Most of our corporate trust indentures do not go into default; and some of them, where we have lent money to them, were not creditors at the time they did go into default, or have not been for years. Those things are not fixed situations.

Paragraphs (7) to (10) of the same subsection (b) of section 7 of the bill sets out with great particularity the disqualifications of the trustee because of the ownership by the trustee of a specified percentage of stock or other securities of the obligor.

I have discussed the matter of credit relationship. I shall confine this to the matter of stock. The percentages are purely arbitrary, as was pointed out by Mr. Posner here this morning, and of necessity they must be. But they are not only arbitrary; they are more or less artificial. They bear very little relation to the object they are attempting to accomplish.

Take this as an illustration: Section 7 (b) provides that an indenture trustee shall be deemed to have a conflicting interest if such trustee is the beneficial owner of 5 percent or more of the voting securities or 10 percent or more of any other class of security of an obligor. I shall not refer to the whole section; it is only that part that bears upon what I have to say.

You will note that it says "5 percent of the voting securities" and 10 percent of others. Why that distinction?

If approximately 50 percent of the other stockholders of the corporation felt it was to the interest of the stockholders to pay the obligations and perform their duties and covenants under their debenture issue, is it conceivable that the trust company is going to be so much more interested in fleecing its own security holders than other people who have no interest in them whatever? If the majority of the other stockholders wanted to pay it, is it at all probable that the trustee is going in to say, "No, don't pay them, even though we are trustee under that obligation?" If a majority of the stockholders do not want to pay, it does not make any difference whether the bank has 5 percent or not.

Consider this also: After all, if a shyster lawyer is going to deliberately lose a case and risk his reputation for winning cases, or if a jockey is going to lose a horse race, it is not the percentage of something that he is interested in; it is what amount he is going to get out of it. So it is with the trustee. It is not a question of whether it owns 5 percent of the stock, but what that 5 percent represents to it as an investment, if it can protect it, and what it is going to get out of the stock.

Conceivably, an unscrupulous trustee might have $100,000 or $500,000 and fail to do its duty by its debenture holders or bondholders, when the same trustee would not do it if its interest were only $500. It might violate its duty if that $500,000 were only 1 percent of the stock, if it were that kind of trustee. If $500 represented 10 percent of the stock, it still would not have any interest in violating it. It could not afford to risk its reputation.

Why did they not put some standard of that kind in there? I will tell you why they did not. It could not be put in because what affected one bank would not affect another. What would affect a bank with a capital and surplus of, say, $75,000,000 would not affect the bank that is a little bank. In other words, they could not put in standards that were real standards, so that they had to put in the best they could and make an artificial standard, and they put it in on percentages which could be applied to all trustees.

Coming a little further to this matter of stock, the stockholders' relation normally is not adverse to that of the bondholders. You have held bonds and stock in the same corporation, and you have never thought you were at war with yourself. The interests of the stockholders and bondholders, at least until the time the company gets into financial difficulties, are practically one. They are interested in good management and in good profits. What is good for one is good for the other one. It is only when the company gets into financial difficulties that you have a real conflict of interest.

Then, consider this, too: Banks do not invest their own assets in stock of a corporation, as a general thing. They get this stock in order to realize on some note or through some obligation. They accept it in payment of some obligation that cannot be paid otherwise, intending to dispose of it as soon as the market permits and whenever they can dispose of it without too great a sacrifice. In other words, this thing is in a state of flux. We might own 10 percent of the stock of a corporation today and not own any tomorrow. We might be qualified as a trustee today and tomorrow be disqualified, depending upon a thing that has no relationship to our ability or desire to carry out our duties as trustee.

Someone may say, "You admit that this may be conflicting at some time. Therefore, is it not better to eliminate the possibility of such a situation ever arising?"

My answer to that would be this: That if the only thing we were interested in were to prevent trustees—I mean that if all that society were interested in were to prevent trustees from ever getting into a conflicting situation, the prohibitions of the bill might have some justification, even though under those circumstances it would be unjust to the trustees and borrowers.

But that is not the only interest of society. The interests of society are many. As I said before, this affects society all along the line. It affects the whole credit structure. It affects the whole business relationship. It affects, indirectly, matters of employment, because if you cannot make proper provision for the borrowing of money, you cannot employ people.

No one can conceive of all the ways in which this thing will operate, except that we know that every day we will be confronted by some question arising under this bill which will impede us in our normal course of doing business, by reason of the restrictions that are placed upon us and which, as I say, is unnecessary.

Take this little instance, just to show how this affects us: For example, a man comes into a trust company and says, "I have always been a customer of your bank. I like the way you do business. I want you to be executor and trustee under my will which I am having drawn up."

We say, "Our relations have always been very pleasant, and we will be very glad to act as executor and trustee under your will."

The years roll by, and the man dies. We get the inventory of his estate. We look it over. We check the securities of all the companies for which we are trustee under corporate trust indentures. Then we add those shares in each company to the shares we already hold as guardian, executor, administrator, trustee, conservator, and all the other representative capacities. When we have gone over all these things, we find that unfortunately we have got a half percent more of the stock of one corporation than we are authorized to have under this bill.

Then we are confronted with the case of saying to the heirs, "We are sorry we did not know and the testator did not know at the time he drew the will and appointed us as executor what shares he would own at the time of his death, but under the Trust Indenture Act of 1937 we cannot act as executor and trustee under the will."

It just unfortunately happens that his stock added to what we then have is more than we can have. The bill makes one provision for that. It says that we can be trustee under this indenture issue, notwithstanding the ownership of this stock, provided we sell it in 18 months. The trouble with that is that we cannot be sure we are going to sell it in 18 months. After all, we cannot sell the stock of a deceased's estate in order to do away with the conflict. If it is not the proper time to sell the stock, we must continue to hold it, and we do not know what the situation will be in 18 months. Therefore, the only thing we could properly do would be to refuse to act as executor or to resign under the trust indenture, neither of which would be desirable.

I now come to another feature of the bill that is entirely different, and that is the control of the Securities and Exchange Commission

over indentures. In this respect, the proposed legislation differs from any legislation which I can recall.

Section 8 (a) provides:

> Among other things, the Commission shall have authority, for the purposes of this act, to prescribe the form or forms in which information required in any statement, application, report, or other document filed with the Commission shall be set forth, and to prescribe or recommend forms of indentures or of any provisions required or permitted to be included therein.

I have just taken an excerpt from the middle of the paragraph. Notice these words: "the Commission shall have authority." In other words, the Commission is given authority to write the contract. If a man goes to borrow money, for example, he meets the underwriter and he meets the trustee, and they all agree upon it. The Commission is given authority to set that all aside and to write its own indenture and say, "Take this indenture here, or you don't sell the securities."

I do not anticipate that the Commission is going to exercise that full power; nevertheless, it is given to it. It is also given the power to require certain provisions to be inserted in the contract and to prevent any other provisions being inserted which it feels should be omitted. Frankly, I say to you that is giving more power to any commission than should be given to it without restriction.

The CHAIRMAN. What power? I am sorry I missed that.

Mr. CANRIGHT. The power of the Commission to dictate what the terms of the contract are going to be between the borrower and the lender and the bondholder and the trustee.

Senator HUGHES. I thought that that was a suggestion.

Mr. CANRIGHT. No.

Senator HUGHES. A suggestion as a form or a guide.

Mr. CANRIGHT. No; let me read the whole provision to you.

> SEC. 8. (a) The Commission shall have authority from time to time to make, issue, amend, and rescind such rules and regulations and such orders as it may deem necessary or appropriate in the public interest or for the protection of investors and to carry out the provisions of this act, including rules and regulations defining accounting, technical, and trade terms used in this act. Among other things, the Commission shall have authority, for the purposes of this act, to prescribe the form or forms in which information required in any statement, application, report, or other document filed with the Commission shall be set forth, and to prescribe or recommend forms of indentures or of any provisions required or permitted to be included therein.

They can recommend them, but I call your attention to the fact that they have the right to prescribe forms of indenture.

Senator HUGHES. Is that any more than the power to say to them that they shall not put in this and they shall not put in that, by reason of the rules and regulations?

Mr. CANRIGHT. No.

Senator HUGHES. The prescribing or recommending of forms is not any more than their exercising of the authority they have in the other part of the bill.

Mr. CANRIGHT. But whether you put it under one provision or the other, it gives the Commission that authority.

Senator HUGHES. If you left out the part that gives the Commission the right to prescribe the form—it may do that—you still under the bill have the same right, by another means, of prescribing the form, by saying, "You shall not do this, and you shall not do that."

Mr. CANRIGHT. That is right. They would still have the right by working under particular provisions.

Senator SMATHERS. Do you regard that sentence which says that the Commission may prescribe the form, to authorize the Commission to provide, also, the substance that goes into it?

Mr. CANRIGHT. Really I do not see how you can prescribe the form without putting in the substance. Certainly, they do not mean to write in the part that has no bearing on the contract. Unless they are going to put in the vital things of the contract, there would be no purpose in their having control over it at all.

Senator SMATHERS. I understand that you mean that the Commission shall say to you the form in which you shall file with them the substance of whatever agreement you may enter into as trustee?

Senator HUGHES. And that those things that are essential to letting you make your own contract must be kept out?

Mr. CANRIGHT. That the Commission has the right to prescribe the form of indenture in the contract between the trustee and the borrower and the bondholders. There is no limit upon them. There are provisions in here giving the Commission the power to prevent the writing into the indenture of anything that it feels should not be in there and to insert any provision that it feels should be inserted.

Let me give you a practical idea of this. Let me say that I have worked all day and all night representing the trustee; that the underwriter was there and the borrower was there; and that the underwriter was demanding certain things that he thought would be of advantage and protection to the bondholders. The company had there its accountants, its engineers, and its operating men to see whether it could afford to make those agreements. As the borrower said to the underwriter, "There is no need of our agreeing to these things if we cannot perform them."

I have spent weeks working on some indentures in the same way. There seems to be an impression that these indentures have been worked up by underwriters, trustees, and corporations with an idea of seeing how they could fleece the lender out of his money; but, as we all know, that has not been true. These indentures represent the experience of many years in long-term borrowing. For the most part, it has been done honestly. The underwriter does not want his security holders to lose. The corporation does not want its securities to go into default, for that would hurt its reputation. The company is practically gone if its securities go into default. The trustee does not want them to go into default. Why should they work on a trust indenture that is not going to protect the bondholders? I say to you that in every case in which I have worked on a trust indenture, that has been the attitude of the men engaged in the work.

Sometimes underwriters have not the ability they should have when they attempt to underwrite securities. Sometimes they are careless, but I have yet to deal with the underwriter of securities of national importance, such as we are trying to control here, who was not vitally interested in seeing that those securities were properly protected. I do not say that there are no cases, but rather that they are certainly very few in proportion to the other cases. It is not the normal case, in which the underwriter does not try to protect his security holders.

Senator HUGHES. It would be your thought that the provisions of the law should require the trustee to exercise reasonable care, and

that there should be left out the provisions relating to his responsibility, relieving him of almost all of the trust liabilities? You think that if that is done, this would not be necessary?

Mr. CANRIGHT. That is not exactly my thought, frankly. I have never regarded the so-called exculpatory clauses as relieving a trustee from obligations other than damages—money damages. I have never felt, because it is said that we do not have to act that we did not have to pay any attention to the trust indenture unless somebody called our attention to it. We are always doing it. We are doing it every day. There is not a day passes but that there is some problem which comes up under the trust indenture, as to whether the company is doing what it ought to do, or a company comes in to see whether under its indenture it can do these things. I do not believe there is any trustee of any size, or handling any of these other propositions, that does not have the same experience. I had not intended to dwell upon this question of negligence, but I may say a word in passing, adding to what Mr. Brown has said and to what Mr. Posner said this morning.

This exemption of the trustee for liability for negligence was not put in there for no purpose. Underwriters sell the securities, and they are going to have to depend on the trustee to protect those securities to a considerable extent. They are not going to let the trustee relieve itself from liability for negligence, unless there is some good reason for it, and there is a good reason. Some reasons were mentioned by Mr. Brown and by Mr. Posner, so I shall not repeat them. But another reason that was not mentioned by them expressly is that the responsibility which the trustee must assume is out of all proportion, not only to the fees that it does receive now but to any fees that it could possibly be paid.

For example, you know what it was in the old days—and it may be the same way today—with railroad companies in the country. If the railroad company had had an accident and came up before a country jury, the railroad was wrong. That was all there was to it. The railroad company could stand those liabilities, because, after all, its liability for negligence was small in comparison with its total income from the business.

But here you may have a trust indenture out of which you will receive a total of $5,000, and you may have $50,000,000 of liability. You cannot increase that $5,000 sufficiently to underwrite that $50,000,000 of liability. Furthermore, it would not be so bad if a trustee were going to be liable for negligence because it did not get some insurance policies it was supposed to have, or did not get some certificates it was supposed to have, when it released some property. If the trustee were going to be liable for only that negligence, that would not be so bad. But the negligence that the trustee fears is the liability where it is a matter of good business judgment.

A certain default arises. The bank has either got to foreclose or not foreclose, or do something else. The only thing the bank can do is bring to bear on that its best business judgment. After it has done that and has thought over it nights, as my friend has stated he has thought over such things, and as every trustee has thought over what he is going to do under those circumstances, and the bank has done the very best it could, and the thing goes wrong in spite of all that, and even though the majority of the bondholders are satisfied that

the bank did the right thing under the circumstances, still a disgruntled bondholder can come along and bring an action against the bank for negligence.

You know what the situation was during this depression. Let me ask you what chance a bank would have had, no matter how well it had done its job as trustee. Juries would have thought you did wrong in view of the circumstances.

The CHAIRMAN. You are talking about juries. You have very much less confidence in juries than I have. I have sat for 6 out of 8 years presiding at jury trials. I do not know what I would have done without juries. I think that when the average American citizen becomes a juror, he becomes suddenly conscious that he has got to do a great service. - I do not agree with you on the cases of the little fellow against the big fellow. I just want to make this defense for the jury system.

Mr. CANRIGHT. I am not criticizing the jury system; I agree that the jury system is the best way in which we can work these matters out. It is in times of hysteria that banks are going to be hit the hardest.

The CHAIRMAN. Was it not because of the fact that there were some disclosures made that the better banks had to suffer?

Mr. CANRIGHT. Yes; many banks had to suffer because of the faults of a few, but it would not have made any difference if it was the bank that had done its job properly, for when it came into that trial, it would have been affected by this hysteria against banks. There would not have been a bank in the country that did a trust business of any size that would have existed. Unless you are going to destroy the banking system of this country, you cannot throw on this burden of negligence. You have got to get some other way of assuring yourselves that a trustee is going to do its job.

I was talking about the Commission having the power to write trust indentures or to say what should go in and what should not go into the indentures. Let me say with all frankness and with all kindness, and without any depreciation of the high quality of the men who are on the Securities and Exchange Commission, men with whom I have had the opportunity to talk and for whom I have great respect, that there are written into this bill provisions which seem to me to indicate that this very body which is going to have the right to say what shall go into trust indentures and what shall be taken out of trust indentures has not had the experience that is needed to deal with practical problems, otherwise those provisions would never have been put into the bill.

For example, section 7(f) provides [reading]:

The indenture to be qualified shall contain provisions which the Commission deems adequate, having due regard to the public interest and the interests of investors, requiring each obligor to furnish or cause to be furnished to the institutional trustee thereunder, at stated intervals, all information in the possession or control of such obligor or of any of its paying agents as to the names and addresses of the indenture security holders, and requiring such trustee to make the same or the use thereof available to indenture security holders, subject only to such terms and conditions as the Commission deems not detrimental to the public interest or the interests of investors.

In the same section, paragraph (g) reads:

The indenture to be qualified shall—

Notice that these are mandatory provisions—

contain provisions imposing upon the indenture trustee such specific duties and obligations prior to default (as such term is defined in such indenture) as the

Commission deems consistent with the duties and obligations which a prudent man would assume and perform prior to such a default if he were trustee under such an indenture   *   *   *.

Section 7(m) of the bill provides:

The indenture to be qualified shall contain such provisions as the Commission shall deem necessary or appropriate in the public interest or for the protection of investors in respect of the following matters—

Then, under that section and paragraph, there is section (4) (C), which reads:

the rights, powers, or duties of the indenture trustee with respect to the institution of foreclosure proceedings, proceedings for the judicial or other sale of the property subject to the lien of the indenture, or for obtaining, in its name as such trustee, a judgment for the entire amount due and owing under the indenture.

Notice what the trustees are to do in the case of foreclosure.

The Commission is not going to decide these things in the light of circumstances as they exist when the problems arise; they are telling you what you are going to do 15 or 20 years ahead when these circumstances arise. These limitations are going to be written into the indenture. They will put you in a strait jacket, throw you out, and tell you to sink or swim at your peril. They are going to write these things into the indenture when the facts are not known.

I say to you, in all seriousness, as one over whose desk these problems come every day, that only an omniscient God could write such provisions and write them intelligently; it cannot be done by Man.

Let me give you a simple illustration. Suppose a man owes you $1,000 on a note that is due September 1. Can you tell me today what you will do if he fails to pay his note when it matures? Of course you cannot. That will depend on very many circumstances which will affect your action. It will depend on whether he can pay part of it, what his chances are to give you additional security, and a thousand and one other things. You cannot tell today what you are going to do then or even 2 months from now. Yet the Commission proposes to write into the indenture what the trustee shall do 15 or 20 years from now, when the times may not even be the same as those in which we are now living.

I tell you, gentlemen, that it cannot be done. If you attempt to write those things into an indenture, you will either destroy the obligor or the trustee or the bondholder, or all three of them.

Senator HUGHES. Your conclusion is that it should not be written in at all, then, because you certainly would not wait 20 or 30 years hence to see what you would do. It ought to be done to safeguard it.

Mr. CANRIGHT. My thought is that you have got to have some provision by which you are going to have reasonable assurance that you have got trustees which are honest, which have a proper regard for their duty, and that have reasonably good business judgment; and you have got to rely on those trustees exercising their best judgment. That is what they are paid for.

Senator HUGHES. But let me come back to what I suggested a moment ago. The courts have laid down rules in cases of that kind that a trustee is held to reasonable care.

Mr. CANRIGHT. Yes.

Senator HUGHES. Without any of those provisions in there, you will be left out and be held liable as a trustee for exercising trust powers.

Mr. CANRIGHT. I pointed out that I do not think it is practical to accomplish this purpose by holding trustees liable for negligence, particularly in cases depending on the good judgment of trustees, when it is any man's guess as to what is the best thing to do. I do not think this is a practical way of accomplishing your purpose.

I have a suggestion, Senator, which I should like to make a little later as to how I think this can all be accomplished, and without placing any intolerable burdens on industry, finance, or anybody else.

Senator TOWNSEND. How many years' experience have you had?

Mr. CANRIGHT. I have been indirectly connected with this type of business for over 25 years. I have been with the bank about 10 years. I have been directly in connection with the corporate trust work there for about 10 years.

Senator HUGHES. I did not get the name of the bank with which you are connected; I was not here at the time.

Mr. CANRIGHT. I am with the Continental Illinois National Bank & Trust Co., Chicago.

A suggestion was made at the meeting of this committee, held on June 15, by one of the witnesses assenting to the bill, that there were some features of the bill which they felt were not satisfactory, but they were willing to give it a trial. If it did not work out all right, the Congress and the Commission would agree to the changes.

In 1 year's time, gentlemen, there will be many trust indentures written. If there are written into those trust indentures things that ought not to be in them, or if there have been omitted from those indentures things that ought to be in them, there is no way on God's earth by which you can change them without the consent of the bondholders. Those things will have to go on, whether they protect the corporation or defeat the bondholders or what not, unless you can convince the bondholders that the changes ought to be made. If you do that, it is going to cost a lot of money, and the delay might be disastrous.

There is just one little thing that I want to mention here in passing. Section 7, paragraph (h) (1) provides that the bondholders shall control the procedure—that is, 50 percent of the bondholders shall control the procedure—of the trustee. That is a common provision in trust indentures today. I do not know why they have said they should control the place of conducting the meeting or litigation. I do not know why they should control the place, but I do not care. However, in our trust indentures today we have a provision which apparently the Commission objects to very seriously; namely, that the bondholders are obligated to put up the funds or to furnish the trustee indemnity before the trustee is obligated to act.

I submit to you that in the whole law of trustees and trusteeships, whether it be as to trustees under wills, trustees under living trust indentures, or otherwise, I have yet to find a case making it the job of the trustee to use its own funds to protect the trust estate. There isn't any such thing, and naturally it would be very unjust if there were. In your personal trusts you do not need it, because the trustee has the funds in his own hands to protect the trust estate. In this particular case he seldom does have the funds, and that is why the trustee demands it.

It may not be known, but trustees do sometimes, in emergency cases, advance funds. We have advanced thousands of dollars, that we have outstanding today. I imagine that we have advanced $30,000

in certain cases where there were emergencies, where the bondholders were not organized, and where we had to act promptly. But we do not like to do that. We haven't any right to do it. The Federal Reserve Board or the Comptroller comes along and writes it off as a bad debt. We think the money will be collected in time. We are satisfied that it will be collected, but certainly it is not liquid. We do not like to use our own money, and it ought not to be necessary to do that. The only way I know of meeting that situation is at the time when the corporation becomes obligated under trust indenture to require it to put up $2,000 with the trustee, to be held until such time as it defaults. That is the only way I see of meeting it, if the bondholders are not going to pay the money.

Senator SMATHERS. Is there any regulation today of the relation between the bondholder, the public, the trustee, and the underwriter?

Mr. CANRIGHT. Well, I don't know of any regulations today governing those things. That is, they are not common. There may be isolated instances of it.

Senator SMATHERS. Is it your opinion that there should be no regulation of that relation?

Mr. CANRIGHT. Not at all. I shall come to that a little later.

Senator SMATHERS. All right.

Mr. CANRIGHT. I started in the beginning by saying that the Commission, I believed, had shown the necessity for greater supervision over corporate trustees, and I still stand on that position. However, I do not believe they are going about it in the proper way.

There is one other thing. It may be said that the party has a right to appeal to the court. There are two answers to that. First, the law permitting appeals to the court provides that the findings of fact by the Commission shall be conclusive on the court. Practically all of the things to which we have objected will be findings of fact and, therefore, not subject to be set aside by the court.

In the second place, as anyone familiar with these things knows, if you are going to get out any financing, it has got to be done in a reasonably short time. If you appealed it and the court did sustain you, you would find it an empty victory, because by the time you got back with the victory, the opportunity for making a loan would be gone.

If I may just summarize, I may bring these ideas together, which have been rather loosely put.

The provisions of the bill as to what constitutes a conflicting interest are not actually conflicting or inconsistent interests.

In the great majority of cases they will never become conflicting. The obligor may never default. Most obligors do not. Or if it does, it is quite probable the trustee will not then be the holder of the stock or note of the obligor.

The provisions of the bill unnecessarily hamper legitimate business deals, prevent normal business relationships, and place useless burdens on trust companies and banks.

The bill gives the Commission the power, and in some cases the duty, to determine and specify when the indenture is prepared what the trustee shall do years hence if certain events occur.

This makes a machine of the trustee. It will prevent the trustee from using good business judgment, which should be its chief duty, and may prove disastrous to some or all concerned, including the bondholders.

No effective provision is made to assure proper performance of its duties by a trustee, nor to assure that you are going to have the proper kind of trustee.

All that is intended to be accomplished by the bill can be accomplished, and much more effectively, without any disturbance or hindrance of normal business activities and with much less burden on banks and trust companies, and at very much less cost to all concerned by a very simple procedure, which I will suggest.

Both the Governors of the Federal Reserve System and the Comptroller of the Currency have at the present time very broad powers of examination and have the right to demand from banks under their jurisdiction reports of their activities. If it should be determined that it is necessary to give them any broader powers than they have at the present time, or if it should be feared that they would not exercise their existing powers to the extent they should, a very simple amendment to the sections relating to either the powers of the Governors of the Federal Reserve System or relating to the powers of the Comptroller of the Currency could be made, which would accomplish the purpose. For convenience of reference, I will assume that it would be the duty of the Comptroller to determine whether the bank was performing its duties as trustee properly.

With reference to conflicts, the Comptroller could require a bank which is both trustee and creditor or stockholder of the obligor to report immediately—he could require it to report all the time, though I think it is unnecessary—if there was any indication that there would be a default under the indenture or that the loan of the bank might not be paid at its maturity, with a statement of what action the bank proposes to take or has taken to eliminate the conflicting interest.

In that connection, I would say that if a bank had an existing loan and a corporation increased its collateral, the Comptroller might very well provide by regulation, or you could have a provision in the law, which ever was thought desirable, that that should be prima-facie evidence that it was known that the company was getting into financial difficulties.

Senator SMATHERS. What about an individual named and acting as a trustee?

Mr. CANRIGHT. Well, you won't have an individual trustee applying to any of the cases such as the Commission has here involved. You are talking about securities that are sold in interstate commerce; you are not talking about the little $10,000 issues or even $50,000 issues. You are talking about the issues that are of national importance. The Commission itself has the right to exempt issues up to $250,000. I do not think you are going to have individual trustees.

Senator SMATHERS. I understood that some of the greatest complaint here was against individual trustees, in land deals, for instance, in one State or another.

Mr. CANRIGHT. Well, I would say this: If you have got a case of the individual trustee, do not try to deal with it under the same indenture or under the same legislation by which you are attempting to regulate corporations or trust companies which are representing large industrial users of money. That is an entirely separate and distinct situation.

The CHAIRMAN. You may have an individual trustee here, may you not—a cotrustee?

Mr. CANRIGHT. A cotrustee; yes. He is just there so that he can take title to the property and act when the corporate trustee could not.

Returning to what I was saying. On receipt of such report, the Comptroller could not only make it the duty of the trustee to change its dual capacity, but he could see that the conflict was actually eliminated.

With reference to defaults, the Comptroller could require reports from the trustee as to the fact of such default and what action it had taken in the matter. The Comptroller could, in view of all of the known circumstances, pass intelligent judgment upon whether the trustee was performing its functions properly, instead of attempting to decide that 10 or 15 years in advance. Then he knows what the situation is. He is not predicting 15 or 20 years ahead what he should do, but he knows what the circumstances are, and the Comptroller, after conferring with the trustee, is in a position to determine whether the trustee is doing his job properly or not.

With respect to the action of the trustee prior to default, the Comptroller could require reports from the trustee as to what action it was taking with reference to such matters as he deemed of sufficient importance to justify the inquiry and again the Comptroller could be given information as to all of the circumstances and in the light of existing conditions could determine whether the action of the trustee was reasonable and proper. The Comptroller with his power of examination could readily determine whether any trustee was falsifying or withholding facts.

Thus, at very much less cost and with much less trouble to all interested parties and without unnecessary interference in the normal activities of the people of the country and with no undue burden on commerce and industry, the Comptroller acting on known facts, actually existing, could see that the trustee was affording to bondholders the protection to which they are reasonably entitled. The advantage of this proposed change is, first, that it leaves it in the hands of men who are not looking at one aspect of our credit situation, but who can see the thing as a whole. You are not setting up artificial standards, because it is the best you can do, but the Comptroller would be dealing with circumstances as they arise. You are not trying to say a thing will be a conflicting interest, when it might not be a conflicting interest, and it might not cover some things which are conflicting interests. You are not going to have a rigid rule there. It enables the Comptroller to determine those things from time to time as they come up, and there is no reason why the Comptroller cannot get all the information that is necessary for him to keep track of it. And so with each of these other things——

Senator HUGHES (interposing). Can the Commission do that?

Mr. CANRIGHT. As I said, it is important to have somebody who is dealing with our entire credit situation, and who sees the picture as a whole, rather than just one thing. The possibility of security holders losing money out to be considered in its relation to the whole credit structure.

There is one thing that would probably have to be added to the bill. I think there should be a provision that if the Comptroller should find that any institution, by reason of lack of ability, experience, integrity, or for any other reason, cannot or will not perform its duties properly as trustee, it should be the duty of the Comptroller to report the same to the Governors of the Federal Reserve System.