He will know whether the banks are doing their job. He can report it to the Governors of the Federal Reserve System and, after a hearing, if they should decide that the Comptroller is correct, the right of the institution to act as trustee should be terminated. I think that gives you all the control over trustees that you need. It coalesces all your work relating to credits. It causes no undue burden on banks. It is not going to hamper normal relationships, and it will enable a first-class job to be done, instead of having artificial standards as to what constitutes a real trustee, and will provide a method by which you can have real trustees.

Therefore we submit that the recommendation of this committee should be that the bill be not passed.

The CHAIRMAN. Thank you very much, Mr. Canright.

Mr. Loeb.

## STATEMENT OF HOWARD A. LOEB, CHAIRMAN, TRADESMEN'S NATIONAL BANK & TRUST CO., PHILADELPHIA, PA.

The CHAIRMAN. Mr. Loeb, you are the chairman of the Tradesmen's National Bank & Trust Co. of Philadelphia?

Mr. LOEB. Yes, sir.

The CHAIRMAN. Is it in that official capacity that you are appearing here?

Mr. LOEB. Yes, sir.

Mr. Chairman, I have just a short statement to make. As I am in thorough accord with the formal statements made to you by Mr. Brown and Mr. Canright, I feel that you will agree with me that a substantial repetition will only needlessly encumber your records and that no useful purpose will be served. I do not possess their eloquence and experience to present views on this bill, and I am glad that they preceded me.

I do, however, wish to stress my belief that some of the provisions of this act are a menace to the stability and solvency of those banking institutions accepting trusteeships and therefore a menace to the banking system as a whole.

I am in accord with the purposes of this act insofar as it affords protection to security holders, but I question whether that protection is very real in the final analysis if capital funds of trustee institutions are subjected to some of the liabilities implicit in this act.

Generally speaking, liabilities will be determined by juries. Actions for surcharge always increase in adverse times and because of business depression and fall in security prices the urge to recoup losses in every conceivable manner is at a maximum. Juries at such time are apt to be more influenced by public sentiment than by evidence. Large damages usually result and even if after protracted litigation they are reduced, in the meantime the reputation and standing of the bank may have been adversely impaired. The mere starting of an action involving a large sum of money may cause apprehension among depositors, particularly in smaller communities that quite conceivably may affect the ability of a bank to serve the requirements of its depositors, resulting in restrictions to business and employment. Before commenting on the provisions of the act relating to duties of the trustee prior to default and the duties of the trustee in case of default, I should like to refer to some other features of the act, taking them up in the order of their appearance.

Page 11 (c), limiting exemptions to issues not in excess of $250,000 may work a hardship on smaller communities. Issues in such an amount or somewhat larger would not, because of obligations involved and costs of administration tolerable to an obligor company, be apt to interest a distant bank in a larger financial center to act as trustee. Then again, the capital funds of a local bank may not, in the judgment of the Commission, qualify it to act as trustee. Should, therefore, the development in such a community be denied merited capital? The impression is created in reading the act that in an attempt to surround large issues with safeguards, smaller issues are to some extent embarrassed by provisions that practically eliminate them.

Senator HUGHES. May I interrupt?

Mr. LOEB. Yes, indeed.

Senator HUGHES. I have not been present at all the hearings. I did not understand that that necessarily eliminated those under $250,000.

Mr. LOEB. It does not necessarily, but the Commission has the right to exempt from the provisions of the act issues up to $250,000.

Senator HUGHES. That exempts them, and the trustee is appointed without any provisions of the law applying to it.

Mr. LOEB. That is for $250,000 and less. In local communities you frequently find a set-up that requires capital somewhat in excess of $250,000, in which the enterprise seeking capital is well known locally, and the securities are purchased locally to a great extent. It is part of the activities of the community, and sometimes the sole activity, and the whole employment and prosperity of the community is dependent upon it.

My next reference is to page 16, line 13. May I ask you to consider the addition of the following words after the word "indenture": "or the obligations of the trustee under any such indenture." It occurred to me that this was implied, but I think there should be a clear statement. The wording of that particular section of the bill is inconclusive to me, and it seems to me that if that is intended it should be included.

My next reference is to section 7 (a) (2), pages 18 and 19. I am wondering if the Commission has in mind any general formula for setting the minimum combined capital and surplus base for trustee qualification. Here again, unless flexibility is provided to compensate for the downward valuation of assets in times of great stress, so that removal or resignation of trustees in such times may be reduced to a minimum, a very real danger to the banking situation exists.

I am generally in accord with the provisions of the act regarding conflict of interest, but caution against the use of rigidity not in the interest of security holders. From such experience as I have had, either acting as a trustee or as a holder of indenture securities, I am firmly convinced that so-called "rescue loans", made in good faith, have for the most part resulted in improving the position of the security holder and in reestablishing values. Such "rescue loans" should not be permitted to improve the position of the trustee as security holder over other security holders. I suggest that a very careful study be made of this entire subject.

Page 33—duties of trustee prior to default: The obligations imposed upon a trustee prior to default contain, contrary to present practice, provisions for positive action entailing vast responsibility.

Reliance may be placed upon certificates and opinions under (i), page 37; yet this reliance, in turn, is qualified by subjecting it to such terms and conditions as the Commission may deem necessary. There is not included in this section a provision—see (3), page 36—protecting the trustee from "any error of judgment or from any loss arising out of any act or omission in the execution of the trust so long as it acts in good faith and without negligence." The liabilities are of a continuing nature. Again, from the angle of the stability of the banking system, it would seem quite impossible for any authorized examining body to determine the active or contingent liability of a trustee bound by the undertakings involved in this section. In the current examination of trust departments of banks a careful review is made by the examiners of personal trusts in order to measure potential losses. This has added considerably to the costs of examination. Consideration should be given to just what is involved in an attempt to determine the liabilities arising out of the failure to conform to the provisions of this section.

My next reference is to page 35—duties of the trustee in case of default. While the provisions of this section are more in line with present practice, duties are imposed upon a trustee that might well result in defeating the best interests of the security holders and the obligor company, with its consequential effects upon industry and employment. The comments regarding examination by examining bodies made heretofore are equally applicable to liabilities incurred in the case of default.

The CHAIRMAN. Thank you very much, Mr. Loeb.

Mr. Oliver.

## STATEMENT OF FRED N. OLIVER, GENERAL COUNSEL, NATIONAL ASSOCIATION OF MUTUAL SAVINGS BANKS, 60 EAST FORTY-SECOND STREET, NEW YORK CITY

The CHAIRMAN. Mr. Oliver, you are general counsel for the National Association of Mutual Savings Banks, of New York City?

Mr. OLIVER. That is correct. My name is Fred N. Oliver, and I am general counsel for the National Association of Mutual Savings Banks, at 60 East Forty-second Street, New York City. This is a central agency maintained by the mutual savings banks of the United States to act in those cases where unified action seems desirable. Its duties have particular reference to those default situations where the mutual savings banks have had substantial interests in the last few years.

I am appearing especially for a special committee of mutual savings bankers formed in connection with this Trust Indenture Act. This special committee is composed of: Mr. Charles A. Miller, president Savings Banks Trust Co., New York City; Mr. Henry Bruere, president, Bowery Savings Bank, New York City; Mr. Carl M. Spencer, president, Home Savings Bank, Boston, Mass.; Mr. E. K. Woodworth, president, New Hampshire Savings Bank, Concord, N. H., Mr. Austin McLanahan, president, Savings Bank of Baltimore, Baltimore, Md.

Senator TOWNSEND. The gentlemen you have named are united in this report you are about to make?

Mr. OLIVER. Yes, sir. Due to the importance of this measure, a special committee was formed sometime last fall. Its duties were primarily to follow the recommendations, analyze the suggestions of the Securities and Exchange Commission, and be as helpful as possible in connection with this legislation, insofar as it affects our interests.

For the information of the committee, the mutual savings banks are mutual in character, as their name implies. Their assets are owned entirely by the depositors, and the profits are paid the depositors in the way of dividends or interest. They are fiduciary institutions operated by trustees who usually serve without compensation. While they are located in 18 States, they are primarily along the eastern seaboard, in the New England States, New York, New Jersey, Delaware, Pennsylvania, and Maryland. Their combined assets aggregate in excess of $11,000,000,000, and their deposits normally range from 20 to 25 percent of the total bank deposits of the country. They have a total of 14,000,000 deposit accounts, with an average deposit of around $700, and their depositors are primarily the small savers.

These mutual institutions are regulated by law as to the type of their investments and also as to the standards. They are not only restricted as to the type, but also the standards within the type.

Investments in most of the States are confined by statute to mortgages, rails, public utilities, municipals, and governments. In the case of mortgages I think it is almost universally true that they are confined to whole mortgages, so we are not interested in the situation that principally brought about this bill, with reference to real-estate participation certificates, and so forth. A few of the States permit investments in industrials of the better grade.

So that this bill, insofar as the mutual savings banks are concerned, applies only to public-utility bonds, and to a limited extent to industrial bonds of the better grade. I might say that while it applies only to a limited extent to industrials at the present time, it is quite possible that mutual banks may find it necessary to invest to a greater degree in industrials in the future. Experience in the depression has convinced them of the desirability of revising their investment tests as to rails and municipals particularly, which will restrict that field more than it has been restricted in the past, and they will have to find an outlet, perhaps, in the industrial field for their investments. So, in that event, the bill would be important from our standpoint.

Our committee agrees with the general principles of the bill, believing that legislation of this general character is not only desirable but is necessary. Consequently I have been instructed to appear and support, in general, the proposals embodied in this bill, with certain qualifications.

We commend the Securities and Exchange Commission and Professor Douglas and associates for the studies which they have made, believing that they represent an earnest effort to better corporate trustee routine and practices.

Generally speaking, the experience of mutual banks has been restricted to those securities which have had a greater degree of safety and stability, and consequently our experience in the situations criticized in the report of the Securities and Exchange Commission has been limited. Our experience generally has been that the corporate

trustees in those larger and safer issues have performed their functions in a most creditable manner and we have found only a few instances where there have been exceptions.

I may say that the desirability of some general supervision over corporate indentures is demonstrated by the fact that there have been discussions among certain of the institutional investors during the past year or two, with regard to setting up a bureau for the purpose of examining corporate indentures before they became effective, and in the preparation stage.

We have had instances where securities were purchased prior to the examination of the corporate indenture, and subsequently an examination was made and the purchasers sold the securities because they disagreed with some of the terms of the indenture.

I have intended to make no comments on the sections of the bill dealing with the persons eligible as corporate trustees, and the disqualifications of trustees. However, as I understand the bill, it would not interfere with the present trend of investment practice by institutional investors. I refer by that to the growing trend of group purchases of securities by institutional investors, and to some extent by the savings banks. In instances where savings banks might find it desirable to purchase a substantial part of the issue, it might be helpful if they should have the privilege of nominating a cotrustee to represent them in the event of default, under the provisions of the mortgage. This method would hold the banks a little closer together and enable them to act more effectively.

As I read the bill, however, there is no restriction against the appointment of a cotrustee to act in this capacity. While I had not intended to comment on the eligibility of cotrustees, I cannot help referring to the testimony of the gentleman representing the Continental Bank.

My concept of the situation is quite different, I believe, from his. I do not think the primary test should be whether it interferes with the normal functions of some other department of the trustee. As I understand it, the indenture is devised to protect the investors. The primary test should be whether or not the particular relationships of the particular trustee are such as to prevent an investor receiving adequate protection. The fact that it may interfere with his normal business otherwise, it seems to me, should be subordinate to the primary purpose of the indenture. Our group, however, feels very strongly that the measure should not go so far in its terms as to prevent a responsible trustee from acting.

The provisions of the bill in which we have the greatest interest are those sections which impose active duties upon the corporate trustee, and we are more interested in those duties prior to default than those which are imposed subsequent to default.

Prior to default, the bondholders usually are not organized and are not on the alert, and they are not in a position to obtain sufficient detailed information in order that they may be fully advised as to what is happening. It is during this stage, it seems to us, that the corporate trustee should intervene to afford to the bondholders a reasonable amount of protection.

Our committee believes that the affirmative duties should be imposed to the extent that it is practicable, but not so far as to make the performance of the duties so burdensome as to prevent a responsible trustee from acting.

We have gone over the provisions of the bill imposing affirmative duties upon corporate trustees prior to default. It seems to us that those specific provisions are all desirable. We have, however, a particular interest in two of the provisions. One is the provision which requires that the obligor furnish periodically information to the corporate trustee, and that the corporate trustee provide some medium for transmitting that information to the interested bondholders. I have in mind one or two instances demonstrating the need for such information. These instances which I shall mention are isolated cases that have arisen, rather than general cases. Only recently, within the last 2 or 3 months, when a bankruptcy case arose, we found that a small tramway, a small electric line which was a subsidiary of a larger company, had been abandoned about 10 years ago. The entire property had been scrapped and sold, and nobody knew anything about it until the road went into default. It was not the fault of the trustee, because the trustee was living up to his duties under the corporate indenture, but if there has been periodical information furnished that situation would not have arisen. As it is now, it is too late to determine whether or not the sale price of the material was adequate. It is too late to determine whether or not the abandonment was proper.

The second feature in which we are particularly interested is contained in section 7, subsection (g), paragraph (3), requiring more careful investigation and scrutiny of transactions relating to the release or substitution of property. In the same instance to which I have referred, the corporate indenture provided that the corporate trustee might release the property merely upon a resolution of the board of directors of the obligor, and it also provided that the obligor had the right to substitute for the physical property released bonds of the same issue. Under the provisions of this indenture the physical property was sold, and there were substituted bonds of the same issue. When the bankruptcy occurred, we found this subsidiary company with no physical property at all, having as protection for the bonds outstanding only bonds of the same issue supported only by the guaranty of the parent company, which was bankrupt.

So, it seems to me that the question of supervision of the substitution of property in these corporate indentures is particularly important from the standpoint of savings banks, and that reliance should not be had entirely upon some certificate of the obligor itself.

We think also that paragraph (4), with reference to active duties, which requires that the corporate trustee shall see to it that the obligor performs such other obligations under the indenture as are deemed necessary, is desirable. I have in mind there an instance of this kind, Senator Wagner. A great many of our corporate defaults have occurred because the corporations, after the issuance of bonds, continued to expand their debt structure by issuing other bonds for additions and betterments, and increasing the debt until it became top-heavy. As a preventive in the future, I think the trend is to require that the issuing company, the corporation, refrain from capitalizing a certain proportion of its additions and betterments, so as to prevent this tendency toward increased debt. Someone will have to supervise that. I do not know of any other agency to do that, other than the corporate trustee.

With respect to the duties imposed on corporate trustees subsequent to default, we are not interested in these active duties as much

as we are in those which are imposed prior to default. Institutional investors are usually very well organized to protect themselves subsequent to default, and I think as a general rule they would prefer to do so rather than leave the matter in the hands of a third party. So, our principal concern with this section—that is, subsection (h) of section 7—is that the act will not restrict freedom of action on the part of mutual savings banks in protecting their own holdings. My understanding is that the intent of this act is to impose on the corporate trustee the duty to take action in the interim until the bondholders have had an opportunity to organize for protection on their own account. If I am wrong in that, we will except to that particular portion.

We do query, however, a portion of subsection (m) of section 7 with reference to other indenture provisions, and particularly with reference to paragraph (5) of that subsection. It may be that the broad powers presumably conveyed by this subsection (m) are not intended, but as now written it would seem that the Commission would have a right to almost write the contract between the bondholders and the issuing corporation, particularly with reference to the rights, powers, and remedies of the security holders. We would prefer that the jurisdiction conferred upon the Commission with reference to indentures be confined to the question of the duties of the corporate trustees, the scope of their powers, and related matters, rather than going into the broad field of the terms of the contract itself. I think that is all, sir.

The CHAIRMAN. Thank you very much.

Senator HUGHES. You would not want the Board to have the power to make the contract, or to dictate the contract, or to advise as to the contract?

Mr. OLIVER. No, sir; nor to substitute its judgment for what we may consider as being the rights and powers of the security holders themselves.

Senator HUGHES. And yet, if the contract were defective, if the contract were written in the interest of the trustee, excusing it from liability, and all that kind of thing, to use a homely phrase, are not the beans spilled at that time? When you come on later, the mischief has been done if the contract is not right in the first place.

Mr. OLIVER. I do not quite follow you.

Senator HUGHES. If you do not safeguard the investor in your contract, how are you going to safeguard him later?

Mr. OLIVER. I do not know whether I quite follow you or not, sir, but my point is that it seems to me that the powers conferred on the Commission should be confined to the things which they are attempting to remedy, that is, first, the alleged inactivity of corporate trustees, and the question of conflicts; and that they should not go into the broader field of attempting to write the entire terms of the indenture.

The CHAIRMAN. How about exoneration?

Mr. OLIVER. I have not touched on that. My personal view is that there should not be any.

Senator HUGHES. It should not be in the contract.

Mr. OLIVER. Yes, sir; you are talking about the ordinary exculpatory clause, which relieves them from everything except gross negligence.

Senator HUGHES. Those provisions should not be there?

Mr. OLIVER. No, sir.

Senator HUGHES. They should exercise the powers of trustees, and should assume the responsibilities of trustees.

Mr. OLIVER. I think they should, sir.

This is all subject to the qualification that our people do not want the act to go too far, and to prevent a responsible corporate trustee from acting.

The CHAIRMAN. You are usually so very clear, Mr. Oliver, that I could not quite understand what you meant by limiting the jurisdiction to—I have even forgotten your limitation, but you would not have the Commission write the contract.

Mr. OLIVER. What I meant was this——

The CHAIRMAN (interposing). You still want some supervision, to see that certain clauses are not put in there, such as exoneration from certain duties or obligations?

Mr. OILVER. Yes; I have particular reference to the language found in paragraph (5) on page 42, starting at the beginning of subsection (m). It says:

The indenture to be qualified shall contain such provisions as the Commission shall deem necessary or appropriate in the public interest or for the protection of investors in respect of the following matters:

\*       \*       \*       \*       \*       \*       \*

(5) The rights, powers, and remedies of the indenture security holders and the manner in which and conditions upon which such rights, powers, and remedies may be exercised,

and so forth.

It goes far beyond the supervisory powers with reference to corporate trustees.

Senator HUGHES. You do not mean that the Commission's duties should start after the contract has been made and the bonds issued?

Mr. OLIVER. I think that the Commission, under this bill, does not presume to do anything after the indenture has been approved, after it has been filed, and there has been no exception to it. It is not a continuing supervision.

Senator HUGHES. Except that it supervises the approval of the indenture.

Mr. OLIVER. That is right.

Senator HUGHES. That is the most important thing in it, it seems to me, because then you have fixed the liabilities, the duties, and so forth, of the trustee.

Mr. OLIVER. That is all right. I will go that far with you, but I do not want to go further than that, and let them write the terms of the contract as a whole. I do not know that that was intended at all. I am merely calling attention to the language of the bill.

Senator TOWNSEND. Mr. Oliver, what would you think of the suggestion of Mr. Canright, that the Comptroller have supervision? Would the banks feel safer with the Comptroller's supervision?

Mr. OLIVER. I did not hear Mr. Canright's suggestion. I was in the back and I did not hear him very well.

Senator TOWNSEND. It was that the law be amended so that the Comptroller would have supervision, and that, having close contact with all the banks' resources, he was the logical man to supervise it.

Mr. OLIVER. My personal view, Senator Townsend, is that it is not particularly important who administers this bill, inasmuch as the bill sets up, itself, certain minimum standards, with some discretion,

of course, in the regulatory agency. I would rather think, however—
and again that is my own personal view, without having considered
the matter—that inasmuch as the Securities and Exchange Commis-
sion deals with the very securities that are being issued, and the two
matters are somewhat related, it might be advantageous for the
Securities and Exchange Commission to likewise supervise the prepa-
ration of the indentures.

The CHAIRMAN. Of course, they also conducted the investigation,
did they not, which brought out many of the abuses attempted to
be corrected?

Mr. OLIVER. That is correct.

The CHAIRMAN. Thank you very much, Mr. Oliver.

The CHAIRMAN. Mr. Page.

## STATEMENT OF R. G. PAGE, NEW YORK CITY, REPRESENTING COMMITTEE ON TRUST INDENTURES OF AMERICAN BANKERS ASSOCIATION, TRUST DIVISION

Mr. PAGE. Mr. Samuel Untermyer in his testimony on June 15
made certain recommendations for amendments to the bill having to do
particularly with bondholders' lists, notice of defaults, undertaking
for costs, and reliance upon certificates and opinions.

While, in my opinion, Mr. Untermyer's testimony contained a
number of inaccuracies, I shall not take the time of this committee to
answer any except those which relate to his proposed amendments.
As to those, I believe the record should be cleared.

On the subject of bondholders' lists, section 7, paragraph (f), page
33 of the committee print of the bill, Mr. Untermyer in his testimony,
beginning at the foot of page 156 of the minutes of this hearing stated:

> Now then, the obligor cannot do it; he has no such information; it is the trustee
> who has the information; he is the one who pays the coupons.

This is incorrect. In practically all indentures it is provided that
principal and interest are payable "at the office or agency of the
company." It is true that in many cases the trustee institution acts
also as paying agent, although this is far from always the case, and the
appointment is revocable. The information belongs to the obligor
and n. the trustee. Consequently, the bill, as submitted, is correct
in placing the obligation upon the obligor for maintaining the record
and supplying it to the trustee. The bill on page 33, line 12, specifi-
cally makes available to the trustee all such information in the pos-
session of the paying agent or obligor.

Mr. Untermyer in his proposed amendment beginning at the foot
of page 158 and carrying over to page 159 of the minutes of the hearing
proposes that the trustee or paying agent —

> be charged with the duty of ascertaining from the persons or institutions presenting
> such coupons for payment or to whom such interest payments are made the names
> and residences of owners of such bonds.

This is an impracticable suggestion, would not only seriously slow
up the payment of interest but would involve the imposition of a
second ownership-certificate system upon the present ownership-
certificate system required under the Federal Revenue Act. This
for the reason that the Federal Revenue Act ownership certificates,
because of certain exemptions granted by the act and regulations
thereunder, do not always disclose the names of the actual owners,

and particularly in the case of corporate owners require only a statement of the fact of corporate ownership. The imposition of a second ownership-certificate system would involve a serious additional burden on business.

In his proposed amendment Mr. Untermyer proposes that the lists shall be available to any bondholder, at any time, upon the payment of reasonable cost of preparing the list. Paragraph (f) of section 7 of the bill as presented requires the trustee—

to make the same or the use thereof available to indenture security holders subject only to such terms and conditions as the Commission deems not detrimental to the public interest or the interests of investors.

In other words, the bill now requires the trustee to make the list or the use thereof available to any bondholder subject only to such conditions as the Commission may impose in the public interest or the interest of investors. I need not tell you gentlemen that a mandatory provision that such lists be at all times available to any bondholder is not in the public interest nor in the interest of bondholders themselves. You gentlemen are familiar with the laws of a number of States putting restrictions upon the availability of stockholders' lists, and in the case of New York also upon lists of bondholders. I feel strongly that this question may be safely left in the hands of the Commission.

Mr. Untermyer's next proposal is that section 7, paragraph (i), on page 37 of the committee print of the bill be amended to eliminate the right of the indenture trustee "conclusively to reply as to the truth of the statements contained therein" upon certificates and opinions submitted to it under the conditions imposed by that paragraph. Mr. Untermyer states that this is improper because such certificates are usually furnished "by the reorganization committee or the company itself." This statement is not only inaccurate but wholly at variance with the provisions of the bill. Senator Barkley called Mr. Untermyer's attention to the parenthetical phrase now contained in paragraph (i) to the effect that the provisions on this subject contained in an indenture shall be subject to such requirements as to independence and qualifications and the exercise by the trustee of reasonable care in its selection, as the Commission may deem necessary or appropriate in the public interest or for the protection of investors, and if the Commission deems that such provisions do not materially conflict with the required standards of care, it would seem that this is a conclusive answer to Mr. Untermyer's suggestion.

His next proposed amendment deals with section 7, paragraph (k), appearing on page 38 of the committee print of the bill. He desires the bill amended so that there shall be a mandatory requirement upon the mortgage trustee to give prompt notice of every default. Such a provision would make the duty of the trustee simpler and perhaps less dangerous but in many instances certainly would not be in the interest of the bondholders themselves.

It is not necessary to point out to you gentlemen that public notice of default is certain to be harmful to the credit of the company and probably to the market price of the securities of the company. Defaults vary greatly in importance. On one extreme there may be an honest oversight—perhaps in some large company an insurance premium or certain local taxes may not be paid. Is it wise under these circumstances for the trustee to publish immediately a notice, rather

than to take reasonable time and reasonable care to determine whether or not the default may be cured without danger to the bondholders? A sinking-fund default is often of real importance. On the other hand, I can conceive of circumstances where the trustee may have substantial evidence that the default is only temporary and that it may be much in the interest of the bondholders to give the company reasonable time to work out of its difficulty rather than to destroy what chances the company has by public notice of default with consequent injury to its credit.

His last proposal for amendment deals with section 7, paragraph (1) on page 39 of the committee print of the bill. Here he objects to the discretion given to the court to 1 equire an undertaking for costs and to assess reasonable costs against any party litigant having due regard for the merits and good faith of the suit or defense.

You gentlemen all know of the so-called strike suits which Mr. Untermyer himself mentions in his testimony. Unfortunately, they are all too frequent. All this section does is to empower the court in its discretion to require an undertaking for costs when it believes that a suit is without sufficient merit and to assess the costs after the litigation where it is satisfied that one party or the other to the litigation acted without good faith and without a meritorious cause. The language of this paragraph is modeled on a similar provision in section 8 of the Securities and Exchange Act.

In general, it appears to me that each one of Mr. Untermyer's proposed amendments would tend to make easier the path of the strike suit. The bill, as proposed, puts no real handicap on any meritorious action of any bona-fide bondholder.

The CHAIRMAN. Thank you, Mr. Page.

Mr. McCOLLOM. Mr. Chairman, my name is H. C. McCollom. I am an attorney at law, in New York City. My address is no. 1 Wall Street. I should very much like to obtain the permission of the committee to add a statement to the record, if it seems desirable upon further consideration.

The CHAIRMAN. I am very sure the committee will be glad to have your views, because I know your practice involves a great many of these very questions that are raised.

Mr. McCOLLOM. Yes; I have had about 30 years' experience with these questions.

The CHAIRMAN. We would be very glad to have your statement. I will ask you to get it in very soon.

(The statement referred to is as follows:)

### STATEMENT OF H. C. McCOLLOM

#### NATURE OF APPEARANCE AND EXPERIENCE OF WRITER

At the hearing on June 22, 1937, I was granted permission to file a memorandum, which I am now submitting, as an interested citizen and attorney. In so doing I am not acting under any retainer or for compensation. The views set forth in this memorandum, although perhaps held by many others, are expressed by and for the writer only.

I am an attorney at law, with my office at no. 1 Wall Street, New York City. I was admitted to the bar of the State of New York in 1905. I have also been admitted to the bar of the United States Supreme Court and of various other Federal courts. For nearly 30 years much the greater part of my time has been spent in advice to and representation of trustees under corporate indentures, both before and after default. To a lesser extent I have represented also issuing corporations, bondholders, and other security holders.

I have made a careful study of the Barkley bill in the form in which it was introduced and in its form of June 10, 1937, and of the report (hereinafter termed "report") of the Securities and Exchange Commission (hereinafter termed "Commission") dated June 18, 1936, entitled "Trustees Under Indentures", this being the report from which the Barkley bill originated.

## BACKGROUND OF BARKLEY BILL

In order not to encumber this memorandum with details which may or may not interest the subcommittee (hereinafter termed "committee"), I annex hereto a copy of my article which appeared in the Columbia Law Review of December 1936 under the title "The Securities and Exchange Commission and Corporate Trustees." This article discusses the above-mentioned report of the Commission. There are certain parts of this report, particularly those which may be read as suggesting general maladministration by corporate trustees, which are not urged by anyone; and in this respect the article is not presently in point.

However, it is annexed for two reasons:

First, because it states accurately the extensive duties now commonly performed by corporate trustees; and the committee may wish to study the existing situation in order to determine the extent to which legislative changes are desirable;

Second, because the recommendations contained in the report are substantially embodied in the Barkley bill, and therefore the comments made in the article upon these recommendations are entirely pertinent.

The appended article does not discuss the portion of the report which deals with conflicts of interest. However, the most important alleged conflict of interest is discussed herein.

## ADVANTAGES AND DEFECTS IN PRESENT CORPORATE ADMINISTRATION

There is no basis whatever for any argument that present administration of corporate trusts, in any substantial percentage of cases, is incompetent, self-seeking, or dishonest. The quality of administration naturally varies with the experience and competency of the trustees; but inasmuch as the vast majority in amount of these trusts are administered by banking institutions of long experience, good character, and full competency, the general standard of administration is very high. Responsible trustees are jealous of their reputations. They are anxious to avoid any basis for proper criticism. During recent years, and before as well as after the criticisms contained in the above-mentioned report, they have assumed increasingly active functions. The extensive duties which they presently perform, before and after default, are stated quite fully in the annexed article. There are not a large number of banking institutions which have the experience, personnel and resources to serve as competent and responsible corporate trustees. Therefore, legislation which would tend to force fully qualified trustees out of the administration of these intricate trusts and transfer such administration to inexperienced or irresponsible trustees would be a major catastrophe. The harm which would thus be done would be out of all proportion to any defects which presently exist.

Nevertheless, most informed and fair-minded persons would admit that there are defects in the present system. The most important of these are, in my opinion, the following:

There have been some instances wherein, immediately preceding default under an indenture, banks have obtained the repayment of a larger part of their unsecured loans than unsecured debenture holders have realized. This practice is improper, and now is commonly so regarded. Undoubtedly the practice existed to a substantial extent in the past; but it should be realized that there was a fairly general acquiescence therein by other creditors because of the view that bank loans, although not legally entitled to preference, should be preferred in order to continue credit for the new company.

The provisions of many indentures have been weak in that they did not adequately safeguard the interest of the security holders in respect, for example, of substitution of collateral or release of property.

The trustees have been under no obligation to keep the security holders informed as to matters substantially affecting the trust estate, such as substitution of collateral, release of important property, or major defaults in payments to the trustee (for example, for sinking fund, or for interest in cases where the trustee acted also as paying agent). No machinery has existed for the supplying to the trustee of a list of the names and addresses, so far as known, of security holders and for the supplying by the trustee to the security holders, in proper cases, of

such lists. On the other hand, there have existed no such provisions as are properly contained in section 7, subsection (1) of the Barkley bill, permitting the court in its discretion to assess costs and attorneys' fees against a losing party in strike suits.

The trustees have been relieved in practically all cases from liability for ordinary negligence as distinguished from gross negligence. This was entirely proper when trustees were not paid for assuming the risks of ordinary negligence; but there is much to be said in favor of the view that trustees should assume and should be paid for assuming, the risks of ordinary negligence, but only if proved beyond a reasonable doubt.

These existing defects can be eliminated in a practical way by the bill if changed as hereinafter suggested.

### SPECIFIC COMMENTS ON BILL

*1. It would prevent loans for less than 1 year by a bank to a corporation for whose debenture issue the bank was ⟨ ⟩ting as trustee*

This provision, in my opinion, is one of the most harmful, and one of the least justified, of the important provisions in the bill.

The provision is contained in section 7, subsection (b), paragraph (6) of the bill (p. 24, lines 12–18) the exception which would prevent disqualification in certain cases being found in section 7, subsection (d), paragraph (1), (p. 31, lines 9–17).

The principal effect of this provision is, of course, apparent. If the bank was acting as trustee for the corporation's debentures when the loan was applied for, it would have to refuse the loan or resign as trustee. If it had an outstanding loan when requested to act as trustee, it would have to refuse so to act.

Debentures outstanding under corporate indentures aggregate many millions of dollars, and the trusteeships thereunder are extremely important. Many corporations require seasonal loans but do not wish to borrow for a year. Conditions are often such that banks would be justified in making short-term loans but not loans for a year. The great disruptions in financing which this provision of the bill would cause are plain.

The most serious effects would probably occur when conditions were not good. The source to which the corporation would have to look in such times would be its usual bank. A bank having no prior relations with the corporation could not be expected to extend credit under such conditions. If the corporation had debentures outstanding, the same bank would usually be the trustee. Under the provisions of the bill, the bank, in order to make the loan, would have to resign and the trusteeship would be transferred to some other bank which, if not less qualified and less responsible, would at least be entirely unfamiliar with the affairs of the corporation. If the bank should keep the trusteeship, the corporation would have great difficulty in obtaining the loan. Wholesale resignations or wholesale failures or both might well be the result of this provision of the bill. The making of the loan in bad times might be of great benefit to the debenture holders themselves.

Assume, on the other hand, good times. What possible reason can there be in such times for preventing a bank from making short-term loans to a corporation for whose debentures it is acting as trustee? This is a normal and beneficial relationship.

The great fault in this provision of the bill is that it supposes a conflict long in advance of actualities, and is purely theoretical. There is no reasonable justification whatever for the provision, provided that the bank is prevented, as should be the case, from gaining an advantage over the debenture holders. The fundamental error is that a conflict is presumed to exist as of a date when there is in fact no conflict, whereas the bill should be limited in application to a date when the possibilities of conflict are real. The bill presently contains provisions designed to prevent the betterment of the position of the lending bank as against the debenture holders. These provisions are contained in section 7, subsection (c), (p. 27, line 22, to p. 31, line 8), although this language would require some revision.

Also it is not apparent why the trustee's rights in funds collected by the bank should be entitled to priority over the bank loan, as is presently provided in section 7, subsection (c), paragraph (2) (p. 30, lines 3–8). If, as is unquestionably true, there is no vice merely in the fact that the same bank is both the lender and the trustee, obviously there is no reason why the bank should be penalized by deferment of its loan any more than there is a reason why the bank should obtain prior payment of its loan.

*2. Inasmuch as the Commission is given power to determine the new duties of trustees, such duties may be unlimited (except, of course, that they would have to have some connection with the trust)*

The bill provides certain specific duties but permits the Commission, without limitation, to impose other duties. These provisions are found in section 7, subsection (g), (p. 33, line 24 to p. 34, line 6); section 7, subsection (m), (p. 40, line 7 to p. 41, line 19). The bill, therefore, would give to a commission, whose future personnel, experience, and character is presently unknown, the power to impose duties which no trustee having regard to the interests of its depositors could undertake. It is no answer to say that such trustees as are unwilling to risk their depositors' funds would not have to accept such trusts. I do not believe that this committee is willing to recommend a bill which would prevent the acceptance of trusts by banks which take seriously their duty to safeguard depositors; and, therefore, unless these provisions can be adequately amended, the only alternative, assuming the adoption of such provisions, is to give reasonable and proper protection to the trustees by the methods hereinafter suggested under specific comments 4 and 5.

I do not see how those provisions could be fully amended in a practical way. As to duties after default the bill would be much better if it did not give to the Commission power to prescribe duties—which in any event would be most difficult for the Commission—but were limited to providing, as it now provides, that after default the trustees shall be required "to use the same degree of care and skill in their exercise as a prudent man would exercise under the circumstances if he were a fiduciary * * *." The language just quoted comes from section 7, subsection (h), (p. 35, lines 22–24).

As to duties before default, it would be practically impossible to specify in the bill the duties to be performed under future indentures. On the other hand, as is recognized above, there are additional duties which before default trustees might properly undertake, assuming reasonable protection as hereinafter suggested. Therefore and upon the assumption that trustees will be reasonably protected, I see no helpful suggestions which can be made regarding the provisions now under consideration, except that as to duties before default the Commission's powers should be limited by the use of the word "reasonable" or similar language, and except that as to duties after default there should be the same limitation unless, which I think is preferable, there should be no power in the Commission to specify duties after default. It would be entirely adequate to prescribe "prudent man" duties as presently prescribed by the language from subsection (h) just quoted above.

The bill in section 7, subsection (k), (p. 38, line 11, to p. 39, line 5) contains language relating to the duty of trustees to give notice of defaults.

I believe that these provisions would be better and more workable if they required the trustees to give notice of specified major defaults; that is, defaults in payment of interest, sinking fund or principal, and left discretionary with the trustees the giving of notice of other defaults. Clearly, the trustee should have the duty to give notice of such defaults. It should not have to exercise discretion (as possibly it might have to do under the bill as drawn) with possible consequent charges of mismanagement in the event that it should give notice of such defaults. On the other hand, in the instance of other defaults, the trustees should exercise their discretion, as provided in this subsection of the bill. It seems to me to be entirely unnecessary to impose upon the Commission the additional function of determining the defaults in respect of which the trustee shall or shall not exercise its discretion.

*3. All indentures (with some minor exceptions) must be approved, or may even be "prescribed" by the Commission*

These provisions—which are contained principally in section 8 subsection (a), (p. 42, line 20, to p. 43, line 7), also section 6, paragraph (4), (p. 17, lines 13–15)—and the other provisions just mentioned confer upon a commission of unknown future membership vast powers and duties which they cannot properly perform except by means of a very comprehensive, expensive, capable, and judicially minded organization. Without such an organization it can readily be seen how greatly they might disrupt the financing of the country's business by delay, incompetence, favoritism, prejudice, or otherwise.

Consideration might well be given (and I understand that some consideration has already been given) by corporate trustees to the forming of an organization for the specific purpose of framing standard important compulsory indenture provisions for the proper protection of security holders; and I believe that such

procedure, taken in consultation with the Commission, would be far preferable—until demonstrated to be unworkable—to conferring upon a future commission the power to prescribe the indenture provisions.

If, on the other hand, this committee shall be of the opinion that such powers should be given to a commission at this time, then, at the least, these powers should be limited to the right to require "reasonable" provisions and the trustees should be properly protected as hereinafter suggested.

### 4. The liability of trustees would be vastly increased by changing the test of liability from gross negligence to ordinary negligence; suggested protection to trustees

These provisions are contained in section 7, subsection (j) (p. 38, lines 6-9), and elsewhere.

If any of the members of the committee are not attorneys, they may not realize the vast difference in possible liability between the standard of gross negligence and that of ordinary negligence. A striking illustration may be found in the *Hazzard case* (159 Misc. 57), decided by New York Supreme Court, special term, in 1936. In that case, the indenture contained provisions exempting the trustee from liability except for "gross negligence or bad faith." The indenture provided that the collateral originally pledged should be released upon the delivery to the trustee of the substituted collateral and of specified documents. Upon receipt of such collateral and documents, the trustee released the original collateral. Subsequently the substituted collateral proved to be less valuable than the original. The security holders brought suit against the trustee, claiming as damages several millions of dollars. The court said that, while the trustee would have been liable under a standard of ordinary negligence (because some of its officers, in departments other than the corporate trust department, should have known that the substituted collateral was of less value than the original collateral) it was not guilty of gross negligence, and the complaint was dismissed. In that case, wherein the trustee was held to have followed exactly the provisions of the indenture, the difference between the standard of gross negligence and that of ordinary negligence made a difference to the trustee of several millions of dollars in respect of one trust.

There is much which may properly be said on both sides of the question whether trustees should be willing to accept liability for ordinary negligence, provided that they are adequately compensated. Of course, present rates of compensation are not based upon any such liability; and one of the great difficulties in the present situation arises from the fact that it is almost impossible to calculate, in the absence of actual experience with the new obligations, the extent of the liability which trustees would be undertaking, and the compensation which they should receive, if they should accept trusts under which they would be liable for whatever a court or a jury might hold to be negligent.

Because there is so much difference of opinion among competent persons as to whether trustees, in view of their duties to depositors, could accept a standard of ordinary negligence, I am not expressing an opinion with regard thereto. I do urge, however, that this change in the standard of liability should not be made without adequate understanding of the enormous increase in liability which may follow therefrom.

If the committee believes that this new standard should be adopted, then, for plainest reasons of justice, the trustees should be given reasonable and proper protection.

It was suggested at the hearing on June 22 that the standard of ordinary negligence should not be imposed without qualification, and that use might be made of a term such as "clear" negligence. This term could not be used because presently it has no accepted meaning. However, if ordinary negligence is to be adopted as the test, the bill should provide that trustees shall not be liable unless the negligence shall be proved beyond a reasonable doubt. This would give a fuller right of court supervision, upon appeal or otherwise, and would properly tend to prevent the taking away from bank depositors of millions of dollars which might be lost to them in a very close case.

For the same reason; viz, that if the possible liabilities of the trustees are to be enormously increased they should have all reasonable protection, there should be a change in the provisions of the bill which are contained in section 7, subsection (h), paragraph (3) (p. 36, line 23 to p. 37, line 2), which states, with reference to duties of the trustee in case of default, as follows:

"(3) protecting the trustee from liability for any error of judgment or for any loss arising out of any act or omission in the execution of the trust so long as it acts in good faith and without negligence."

This provision should be equally applicable to the duties of the trustee prior to default and therefore—after the changes next suggested—it should be transferred in substance so as to form a part of section 7, subsection (j) (p. 38, lines 6-9).

The language of paragraph (3), just quoted, should be changed by inserting a semicolon after the word "judgment" (p. 36, line 24); and the remaining language of said paragraph, in conjunction with the language of section 7, subsection (j), should be changed so as to embody the above essential suggestion that trustees should not be liable for negligence unless proved beyond a reasonable doubt.

*5. Trustees are not reasonably and properly protected against large and unjustified liabilities; further suggested protection to trustees*

Section 7, subsection (i) (p. 37, line 13 to p. 38, line 4), begins by permitting the trustee "conclusively to rely * * * upon opinions or certificates of attorneys, accountants, or other experts (subject to such requirements as to independence and qualifications and the exercise by the trustee of reasonable care in their selection * * * as the Commission may deem necessary or appropriate in the public interest or for the protection of investors)." However, it then goes on to qualify this right of reliance by stating that it shall be "subject to such other terms and conditions, as the Commission may deem necessary or appropriate in the public interest or for the protection of investors", and further qualifies the right of reliance by the words "if the Commission deems that such provisions do not materially conflict with the required standard of care and are not detrimental to the public interest or the interest of investors."

In substance, the right of reliance, which clearly should be absolute, is so qualified that the Commission could destroy it. This right of reliance is, in my opinion the most important provision in the entire bill for the proper protection of trustees. Certainly, if the Commission is to have vast powers in prescribing trustee duties and indenture provisions, and if they are to have such duties as are specified in section 7, subsection (g), paragraphs 1, 2, and 3 (p. 33, line 24, to p. 34, line 24), the trustees could not possibly accept the trusts unless they have the absolute right to rely upon certificates, opinions, etc., subject as the bill presently provides and as is above quoted, "to such requirements as to independence and qualifications and the exercise by the trustee of reasonable care in their selection as the Commission may deem necessary or appropriate in the public interest or for the protection of investors." I do not see how any reasonable person having proper regard to the interests of banks and of their depositors could possibly disagree with the proposition that, since a trustee must perform many of its duties by the aid of experts, it must have the right to rely upon the opinions or certificates of experts properly selected. Otherwise, the funds of the bank would be subject to enormous liabilities if the experts should make mistakes.

*There is a prohibition against waiver of certain defaults, which prohibition would make it impossible, even by agreement of a large percentage of the security holders, to extend certain maturing obligations, even though in many cases such extension might be far preferable to receivership or bankruptcy*

This provision is found in section 7, subsection (h), paragraph 1, subparagraph (B) (p. 36, lines 12–18). While this is stated as a qualification upon the right of the holders of a majority in principal amount of the securities, and it may be a proper qualification upon the rights of such majority, I believe that the bill would be greatly to the public advantage if it contained a provision permitting the holders of two-thirds in principal amount of the securities to waive default in the payment of principal and to waive a default in interest for a total period exceeding 1 year. While a majority may be too small an amount to have such power, it seems to me that two-thirds in amount should have the power. There will be many cases wherein this power might prevent a corporation from receivership or bankruptcy, whereas under the present bill the corporation would have to go into receivership or bankruptcy. The disadvantage of forcing corporations into receivership or bankruptcy, when by extension or readjustment they might avoid it, is far greater than any improper disadvantage to a minority when so large a percentage as two-thirds should agree to the extension. All security holders would know of the provision, if included in their indenture; and they would not buy the security if they objected to the provision.

*7. The bill properly permits the courts in their discretion to impose penalties in strike suits*

There have been some suggestions that one of the valuable provisions of the bill be eliminated, that is, the provision contained in section 7, subsection (l) (p. 39, line 13, to p. 40, line 5). This states that the indenture may contain provisions to the effect that the court may "in its discretion" require the filing of an undertaking to pay the costs of a suit for the enforcement of the indenture or against the trustee, and may "in its discretion" assess reasonable costs including reason-

able attorneys' fees against the unsuccessful party (with certain exceptions not presently material). This provision, of course, was designed to prevent strike suits. It is a very wise provision. It does not force the court to require an undertaking or to assess costs and attorneys' fees. Inasmuch as this would be entirely in the court's discretion, it is inconceivable that the court would ever do so in a meritorious case apparently brought in good faith. On the other hand, it would prevent the growing menace of suits deliberately brought without proper foundation in order to obtain a consideration for withdrawal.

### CONCLUSION

If this committee shall decide to recommend a bill, it is most sincerely requested to recommend only such a bill as will minimize uncertainties and dangers in corporate trust administration and will not disrupt the country's business by either forcing out of corporate trusts capable and responsible trustees or requiring them to gamble with the funds of their depositors.

## APPENDIX

[Reprinted from Columbia Law Review vol. XXXVI, No. 8 December 1936]

### THE SECURITIES AND EXCHANGE COMMISSION AND CORPORATE TRUSTEES

#### By H. C. McCollom

Under date of June 18, 1936, the Securities and Exchange Commission [1] made a report [1] to Congress recommending radical enlargement by federal legislation of the duties of corporate trustees. By the term "corporate trustees" as used in this article is meant trustees (whether they be corporations or individuals) under corporate trust indentures—that is, mortgages or deeds of trust, collateral trust agreements, and unsecured debenture agreements.[3] The Report states that such trustees are presently no more than passive stakeholders; and the substance of the recommendations is that they be transformed into "active trustees," like testamentary or other personal trustees, so that investors will have "an active guardian of their interests throughout the entire life of the security." [4] Uniform federal legislation is considered by the Commission to be necessary because its powers are inadequate.[5]

The Report is stated to have been made pursuant to Section 211 of the Securities Exchange Act of 1934 as an outgrowth of the study and investigation by the Commission of protective and reorganization committees. The theory of the Report appears to be that, in order to afford to investors maximum protection against "exploitation", it is necessary not only to suggest legislation regulating committee personnel and activities but also to change corporate trustees into guardians of investors as against issuing corporations, underwriters or sellers of securities, and protective and reorganization committees.[6]

---

[1] Herein termed the Commission.

[1] Herein termed the Report. The Report is entitled "Trustees under Indentures," and is Part VI of "Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees." The last mentioned report is proposed to be in six parts, of which there have already appeared Part IV dated April 30, 1936, and entitled "Committees for the Holders of Municipal and Quasi-Municipal Obligations." Part III dated June 3, 1936, and entitled "Committees for the Holders of Real Estate Bonds," and Part VI above mentioned. In its letter transmitting Part VI to Congress the Commission states:

"There are in preparation other parts which deal with (1) committees and other agencies for holders of foreign governmental issues; (2) general problems of all reorganization and protective committees; and (3) the various techniques for effecting reorganizations, further recommendations of this Commission for appropriate legislation in the light of the situation which this study and investigation have revealed, and a consideration of the necessary machinery to effectuate these recommendations."

[?] The peculiarity of corporate trust deeds has long been recognized. Fosdick v. Schall, 99 U. S. 235, 252 (1878); Gilfillan v. Union Canal Co., 109 U. S. 401, 403 (1883). The particular characteristics of corporate mortgages, collateral trust agreements and debenture agreements are explained in Stetson, Preparation of Corporate Bonds, Mortgages, Collateral Trusts and Debenture Indentures in Some Legal Phases of Corporate Financing, Reorganization, and Regulation (1922) 1; Page and Oates, The Work of Corporate Trust Departments (1926).

[4] Report, at 4, 70, 110, 112.

[5] The Commission states that its control over the listing requirements for securities on national exchanges, and its control over the securities of registered holding companies and subsidiaries, are inadequate for effectuation of its proposed reforms; and Congress is asked [Report, at 110, 111] to adopt uniform legislation, as a part of an integrated program dealing with all phases of the reorganization problem, forbidding the use of mails or other means of interstate transportation for the sale of securities issued under indentures, unless the indentures and the trustees thereunder shall meet the prescribed standards.

[6] In addition to the recommendations which have been mentioned, the Report also contains recommendations designed to prevent corporate trustees from occupying positions which are believed to conflict with fiduciary responsibilities. They present a large subject not permitted by limitations of space, nor required by the scope of this article, to be considered herein. The question whether there should be restrictions against the occupation of possibly conflicting positions is not necessarily involved with the question whether the functions of corporate trustees should be revolutionized, although the two questions are closely tied together in the Report (at 71, 110).

By the Report attention is focused upon views which, while they may have been held by some persons for a long time past, have found concrete expression only recently. The losses of New York investors in real estate securities led to a resolution adopted by the New York Legislature on April 16, 1935, for the appointment of a Joint Legislative Committee to investigate real estate committees, trustees and fiduciaries, and to study related matters with a view to devising remedial legislation. This Committee with Mr. Streit as chairman after holding various hearings, made a report [7] to the Legislature discussing instances of improper real estate financing, of failure to protect investors, of too close relations between underwriters or others and mortgage trustees; and it recommended, among other things, that trustees be required to assume additional activities prior to default and to become active trustees after default. These recommendations were adopted in large part by the law known as the Streit Law [8] which became effective on June 8, 1936, and, in addition to providing against conflicting positions of trustees, prescribes that no trustee shall accept a trust under any so-called "real estate" indenture [9] unless the instrument creating the trust shall impose upon the trustee specified duties which, prior to default, are of a servicing nature (such as to collect the payments required to be made under the indenture) and, after default, include the duties—without any indication of the bondholders' wishes but "with due diligence, prudence and care and in his discretion"—to obtain the income by having a receiver appointed or otherwise, to declare the principal amount of the debt to be forthwith due and payable, to commence foreclosure, to apply in specified ways moneys collected by it or turned over to it by the receiver, to render annual accounts to the bondholders, and to bid for the property at the sale the minimum price fixed by the court.

While the Streit Law makes very substantial changes in the duties of New York corporate trustees, it is not comparable in scope to the recommendations made by the Commission, because the Law applies only to "real estate" indentures and thus relates to far more restricted subject matter than would be involved if similar duties were to be imposed, for example, upon the trustee under a railroad mortgage. Also, the Law is much more limited, in respect to the nature of the required duties, than are the recommendations.

After the Streit Committee had made its report to the Legislature and after legislation had been introduced to carry out its recommendations, the opinion in the *Hazzard case* [10] was rendered by Mr. Justice Rosenman. In that case the suit was brought by debenture holders to compel the corporate trustee to replace collateral securities which it had surrendered in substitution for other securities, or in lieu thereof to pay damages to the plaintiffs. It appeared that under the indenture there had been deposited with the trustee stock of certain operating utility companies; that the indenture provided that "the company shall be entitled to withdraw, and the trustee shall deliver to the company", the deposited securities upon the delivery to the trustee of the substituted collateral and of specified documents containing a specified showing as to the earnings (but not the value) of the collateral which, after the substitution, the trustee would hold; that the trustee received the substituted collateral and the specified documents containing the specified showing and delivered the original collateral; that the substituted collateral was the stock of a holding company; and that the substituted collateral eventually proved to be worthless, while the original collateral retained substantial value. The indenture provided that the trustee should not be liable except for "gross negligence or bad faith." The court was of the opinion that officers of the bank in departments other than its trust department knew of the highly speculative nature of the substituted collateral; that such knowledge was imputable to the trustee; that the trustee, if judged by the standards of care imposed upon a common-law trustee, was negligent; that it was not acting, and was not paid to act, as a common-law trustee; that it had complied "with every detail of its contractual duty"; that the indenture contract relieved it from liability except for gross negligence or bad faith, neither of which had been proved; and that the case should be dismissed. With this part of the opinion we are only generally concerned; but the court went on to state that a corporate trustee "should be made

[7] Report of the Joint Legislative Committee to Investigate Bondholders' Committees, Stockholders' Committees, Creditors' Committees, Certificate Holders' Committees, Corporations, Trustees and Fiduciaries, Legislative Document (1936), No. 66.

[8] Laws of 1936, c. 900, adding a new Article 4-A (consisting of §§124 to 129, 130 (a) to 130 (j) inclusive) to the Real Property Law.

[9] By the term "real estate" indenture, as used herein, is meant an indenture secured primarily by real estate, for example, a hotel or an office building. Almost all corporate mortgages cover some real estate; but where the ownership and management of such real estate is not the principal business of the issuer but is merely incidental thereto, the mortgage would not be a so-called "real estate" indenture. The securities and indentures to which the Streit Law applies are defined in §§124 and 125 of Article 4-A of the Real Property Law.

[10] *Hazzard* v. *Chase National Bank*, 159 Misc. 57, 287 N. Y. Supp. 541 (Sup. Ct. 1936).

to live up to the responsibility which nearly every purchaser assumes it has, and which it represents to the public as having undertaken, in a sense, by the very advertisement of the designation 'trustee'"; and that the entire system "should be changed by legislation, so as to provide more adequate compensation to the trustee, and the imposition of a duty of active vigilance akin to that placed upon ordinary fiduciaries."[11]

The extent, if any, to which these expressions in the *Hazzard* opinion influenced the adoption of the Streit Law does not appear. However, it does appear, from the references to the opinion in its Report that the Commission was much affected by it. Thus, the recommendations made by the Report as to legislative changes in the duties of corporate trustees have some degree of support in the expressions of one of our ablest judges; but, of course, the court was not a forum in which could be presented or considered the arguments for and against such changes. The view expressed in the *Hazzard case*, as to misunderstanding by investors of the duties of corporate trustees, has been recently repeated by two other judges.[12]

The recommendations made by the Report cannot be considered by Congress until its session beginning in January 1937. In the meantime, however, suggestions as to legislation of so revolutionary a character should be carefully weighed. If action is to be sought from Congress, it should be sought in an atmosphere free from misunderstanding as to what the present duties of corporate trustees really are and as to the services which they now render, and free from criticisms of the existing situation which are based upon such misunderstanding or are otherwise unjust. Only in such an atmosphere can fair and reasoned consideration be given to the paramount question whether, in view of the admittedly limited nature of the present duties of corporate trustees, it is necessary, practicable, and in the public interest that such duties should be enlarged as suggested. Before examining the recommendations made by the Report, attention should be paid to the true nature of the present duties of corporate trustees, to the services which they perform, and to the criticisms from which the recommendations contained in the Report have arisen.

Therefore we discuss:

1. The duties of corporate trustees and the services rendered by them;
2. Criticisms of the existing situation; and
3. Recommendations to Congress as to changes in corporate trustee duties.

### I. DUTIES OF CORPORATE TRUSTEES AND SERVICES RENDERED BY THEM

The history of corporate trusts has been set forth in text books and legal periodicals.[13] The duties and liabilities of corporate trustees have been considered extensively.[14] It is far beyond the possibility of reasonable dispute that corporate trustees have never intended to accept, and there is no reason why any informed person should suppose that they do accept, fully active duties, for example, the management of the trust estate.

Personal trustees assume active management. Personal trusts were introduced into England shortly after the Norman conquest, having their origin either in the ancient German or the ancient Roman law.[15] Those who accept such trusts do

---

[11] 159 Misc., at 85, 287 N. Y. Supp. at 571-572. The full text of the opinion in this connection is as follows:
". . . It would be far better for the bondholders to pay a much larger compensation to the trustee, and be able to insist upon the usual vigilance of a fiduciary. The trustee need not become an insurer any more than, for example, a testamentary trustee. But the trustee should be made to live up to the responsibility which nearly every purchaser assumes it has, and which it represents to the public as having undertaken, in a sense, by the very advertisement of the designation 'trustee.'

"Such change can come in this State only through action by the Legislature. Trustees have accepted duties under these indentures, slight as they are, relying upon judicial precedents absolving them from exercising ordinary care, and permitting them to insert practically unlimited exculpatory clauses. The rules which have been laid down by the courts can obviously not be altered now by the courts in justice to trust agreements which have been made in reliance upon them. The entire system, however, should be changed by legislation so as to provide more adequate compensation to the trustee, and the imposition of a duty of active vigilance akin to that placed upon ordinary fiduciaries. Legislation to such end, applicable only to real estate trust mortgages, however, or now pending before the Legislature. (Assem. Intro. No. 1889, Print. No. 2279, by Mr. Streit.) Particularly, the right of release or substitution of collateral should be carefully circumscribed. If the trustee itself is not required to assume any duty of vigilance with respect thereto, certificates should be required of disinterested appraisal experts, not only as to earnings but as to value, and, indeed, as to every other item which banking experts consider important in measuring the desirability of collateral."

[12] Cropsey, J. in *Starr v. Chase National Bank*, N. Y. L. J., Sept. 21, 1936, at 771 (Sup. Ct.); Cuff, J., in *Fay v. New York Trust Company*, N. Y. L. J., Oct. 30, 1936, at 1455 (Sup. Ct.).

[13] See, for example, Smith, *A Forgotten Chapter in the Early History of the Corporate Trust Deed* (1927) 61 Am. L. Re *.* 900; Draper, *A Historical Introduction to the Corporate Mortgage* (1930) 2 Rocky Mt. L. Rev. 71. See, also, 7 Fletcher, Cyclopedia Corporations (Perm. Ed. 1931) §3070; 2 Bogert, Trusts and Trustees (1935) §246.

[14] See, e. g . Posner, *Liability of the Trustee under the Corporate Indenture* (1928) 42 Harv. L. Rev. 198; Note, *Immunity Clauses in Corporate Trust Indentures* (1933) 33 Columbia Law Rev. 97. See also "Selected Bibliography," annexed as Appendix G to the Report which is under consideration in the present article.

[15] 1 Bogert, Trusts and Trustees (1935) 9; Matter of Coutts, 140 Misc. 93, 98, 249 N. Y. Supp. 788, 793 (Sup. Ct. 1931).

so in the light of the long established rule that such trustees are "bound to employ such diligence and such prudence in the care and management, as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs." [16] A personal trustee has the direct control of the trust property. For example, usually it decides whether and when any part of the property is to be sold, selects investments for trust moneys, and manages realty when realty is a part of the trust.

It has been stated that while there were isolated instances of corporate trusts in the early 1830's, they had their real beginning in the decade from 1840 to 1850; that in the earliest cases, the documents were in the nature of certificates of deposit or escrow agreements, although as early as 1839 a trust company acted as trustee under an indenture which was substantially a mortgage; and that these instruments have grown "from the unpretentious real estate mortgage, without recitals or covenants, to the largest of all legal documents." [17] Since the early days the great increase in the scope and complexity of corporate trust transactions has led in most cases to corporations superseding individuals as trustees, [18] and to a great expansion in the provisions of these instruments, including those which relate to the corporate trustee. As the complexity of the indenture provisions has grown, so have grown the provisions attempting to clarify the duties which the trustee assumes and those which he does not.

It is still true, however, that corporate trusteeships do not involve general active management. This is necessarily so because, until default, the management and control of the trust estate is in the obligor corporation, not in the trustee. [19] For example, such a trustee, until default, usually cannot sell any part of the property, or select investments for trust moneys, or deal with the realty. [20] Nor has it any function to supervise the management of the trust estate. After default, the trustee's duties become more active; [21] but even then the trustee's action is largely guided by the views of the security holders and when, as the normal consequence of default, the property has come into court, it is the court which manages and controls the trust estate.

To the extent that a corporate trustee accepts active duties, and if the indenture is properly drawn to carry out the intention of the parties, those duties are specified, not generalized, there is a clear statement of the authority upon which the trustee may act, and it is agreed that the trustee is not to have certain duties, such as the duty to attend to the recording of the indenture or to the application of the proceeds of the issue. [22] Judicial opinions differ as to whether a corporate trustee also has implied duties. However, aside from the duties, seldom expressed, to exercise good faith and to refrain from gross negligence, the weight of authority, at least in New York where the question has been most frequently considered, supports the view that no duties will be implied which would conflict with the

[16] King v. Talbot, 40 N. Y. 76, 85 86 (1869) .

[17] Draper, *supra*, note 14, at 79, 85, 89, 91.

[18] 2 BOGERT, TRUSTS AND TRUSTEES (1935) §246.

[19] See 7 Fletcher, Cyclopedia Corporations (Perm. Ed. 1931) § 3127.

[20] A trustee under a corporate mortgage is without authority, before default, to change or compromise the security, unless so authorized in express terms, or by necessary implication. *Guaranty Trust Co. of New York v. Minneapolis & St. Louis R. R.*, 36 F. (2d) 747 (C. C. A. 8th, 1929). See also *Colorado & Southern Ry. v. Blair*, 214 N. Y. 497, 108 N. E. 840 (1915).

[21] *Sturges v. Knapp*, 33 Vt. 1, 51 (1858); *Northampton Trust Co. v. Northampton Traction Co.*, 270 Pa. 199, 112 Atl. 871 (1921); *Colorado & Southern Ry. v. Blair*, 214 N. Y. 497, 108 N. E. 840 (1915).

[22] As to whether the trustee can avail itself of an exculpatory clause for failure to record, see *Bell v. Title Trust & Guarantee Co.*, 292 Pa. 228, 140 Atl. 900 (1928), where there was no covenant to record, and *Benton v. Safe Deposit Bank*, 255 N. Y. 260, 174 N. E. 648 (1931) (the New York court applying Pennsylvania law), where there was an exculpatory clause, no t an express provision to the effect that the trustee was under no duty to record Both cases relieved the trustee of liability. But see the dictum in *Green v. Title Guaranter & Trust Co.*, 223 App. Div. 12, 227 N. Y. Supp. 252 (1st Dep't 1928), *aff'd without opinion*, 248 N. Y. 627, 162 N. E. 552 (1928) to the effect that an exculpatory clause could not excuse the trustee from filing a chattel mortgage because it was the only one who could file it. In *McCauley v. Ridgewood Trust Co.*, 81 N. J. L. 86, 92, 79 Atl. 327, 329 (1911), the court said the exemption clause was waived when the trustee obligated itself by special contract to record the mortgage. Where there was no provision relieving the trustee, it has been stated that the trustee had the duty to record *Miles v. Vivian*, 79 Fed. 848, 851 (C. C. A. 2d, 1897). However modern indentures in practically all cases provide against the duty.

Normally the trustee has no duties in connection with the application of the proceeds of the bonds by the mortgagor, but the trust deed may impose duties with respect to the proceeds. 2 Jones, Bonds and Bond Securities (8th Ed. 1935) § 1052; 7 Fletcher, Cyclopedia Corporations (Perm. Ed. 1931) § 3188, referring to *Dillon v. Barnard*, Fed. Cas. No. 3915 (D. Mass. 1874), *aff'd*, 21 Wall. (U. S.) 430 (1874); *Friskmuth v. Farmers' Loan & Trust Co.*, 95 Fed. 5 (C. C. S. D. N. Y. 1899), *aff'd*, 107 Fed. 169 (C. C. A. 2d, 1901); and *Patterson v. Guardian Trust Co.*, 144 App. Div. 863, 129 N. Y. Supp. 807 (3d Dep't 1911). But compare *Industrial & Realty Financial Corp. v. Continental Bank & Trust Co.*, 242 App. Div. 594, 275 N. Y. Supp. 49 (1st Dep't 1934). Modern indentures almost always provide that the trustee has no duty to see to the application of the proceeds.

terms of the indenture.[12]    The limited nature of the duties of corporate trustees as compared with those of personal trustees has been recognized frequently by the courts and should be thoroughly understood, although apparently it is not.[14]

The difference between the duties of personal trustees and those of corporate trustees is taken into account by the differing bases of compensation.    While it is not suggested that the fees of personal trustees are large, they receive generally a commission based upon the amounts handled.[23]    Before default corporate trustees are compensated by separate fees for acceptance of the trust, for authenticating bonds, and for acting as agents for the payment of interest in cases where they do so.    They may be specially compensated for other special services. However, aside from the more or less standardized fees above mentioned for special services, their only compensation for general ordinary services is the annual so-called "maintenance fee."    In New York this is usually based upon the "Schedule of Fees" originally adopted about 1922, and since revised from time to time, by the Corporate Fiduciaries Association of New York City.    This fee is very moderate,[26] and it has been said that the liabilities which a corporate trustee would assume, if it had active supervision of the trust, "would be altogether out of proportion to the compensation which mortgagors are able or willing to pay."[27]

After default, the activities and responsibilities of the trustee are considerably increased and its compensation becomes greater, but ordinarily only to the extent allowed by the court in which is pending the equity receivership, foreclosure suit, bankruptcy, or reorganization proceeding, in which the remedies for default are usually pursued.    There is no fixed standard of compensation for such services; often trustees are not paid for their services, or reimbursed for their expenses, until long after substantial services have been performed and substantial expenses have been disbursed; and the courts are not inclined to be over-liberal in the compensation allowed.[28]

Although the legally enforceable duties of a corporate trustee are limited, it would be a mistake to assert that such duties are only perfunctory and that in practice it is a mere stakeholder.    Before default, the more important functions (some being legally enforceable duties and others being useful services rendered) which competent trustees perform under usual indentures are the following:

(1) The examination of the indenture before accepting the trust.    Although this examination is principally for the protection of the trustee, the examination has

---

[12] A valuable citation of authorities in support of and opposed to the imposition of implied duties upon the corporate trustee is to be found in Note, *Immunity Clauses in Corporate Trust Indentures* (1933) 33 Columbia Law Rev. 97.    After citing this Note and Mr. Posner's article (*supra* note 14) and after reviewing the decisions in New York and elsewhere, Rosenman, J., in *Hazzard v. Chase National Bank*, 159 Misc. 57, 81, 287 N. Y. Supp. 541, 567 (Sup. Ct. 1936), held that in New York, where the terms of the indenture are clear, no obligations or duties in conflict with them will be implied.    Not long afterwards Cropsey, J., held that corporate trustees have implied duties as well as those expressed in the trust instrument.    *Starr v. Chase National Bank of the City of New York*, N. Y. L. J., September 21, 1936, 771.    It was stated, in the earlier New York litigation upon this subject, that the trustee of a corporate mortgage, in accepting the trust, undertakes to discharge the duty and exercise the care and diligence which would naturally be expected of an intelligent person acting in like circumstances to protect his own mortgage.    *Patterson v. Guardian Trust Co.*, 144 App. Div. 863, 129 N. Y. Supp. 807 (3d Dep't 1911).    Rosenman, J., in the *Hazzard case*, found the *Patterson case* not to have been followed by later authority in New York; and the decisions which he cites support question his conclusion.

[14] See cases cited in *Hazzard v. Chase National Bank*, 159 Misc. 57, 287 N. Y. Supp. 541 (Sup. Ct. 1936). However, in the *Hazzard case* and in the cases cited *supra* note 12, the courts were of the opinion that investors generally still do not understand the limited nature of corporate trustee duties.

[23] Compensation is awarded to personal trustees in New York under Civil Practice Act § 1548 (for *inter vivos* trustees) and the Surrogate's Court Act § 285 (for testamentary trustees).

[26] The latest published schedule is dated November 8, 1933, and states these annual fees as follows:
"For ordinary services as Trustee of unsecured issues—general duties only to be performed by the Trustee the following fees are charged: $100.00 per annum on issues up to $1,000,000, and $30.00 per annum on each million on the next $3,000,000, and $25.00 per annum on each million on the next $4,000,000, and $7.50 per annum on each million on the next $40,000,000, and $2.50 per annum on each million in excess of $50,000,000.
"For ordinary services as Trustee of collateral trust, equipment trust indentures, or real estate mortgages, or other forms of secured issues, the following fees are charged: $150.00 per annum on issues up to $1,000,000, and $50.00 per annum on each million on the next $3,000,000, and $35.00 per annum on each million on the next $4,000,000, and $12.50 per annum on each million on the next $40,000,000, and $5.00 per annum on each million on the next $50,000,000, and $2.50 per annum on each million in excess of $100,000,000."
A schedule showing "Representative Fees of Corporate Trustees" in various cities is attached as Appendix B to the Commission's Report.

[27] See Stetson *loc. cit. supra*, note 3.    See also *Hazzard v. Chase National Bank*, 159 Misc. 57, 287 N. Y. Supp. 541 (Sup. Ct. 1936).    In *Benton v. Safe Deposit Bank*, 255 N. Y. 260, 267, 174 N. E. 648, 650 (1931): "In the absence of any gross or wilful negligence there was nothing immoral about this trustee's agreement. Considering its slight financial interest in the transaction, the bank was merely prudent and cautious in limiting its liability and defining its duties.    The plaintiff could have ascertained all the facts upon inquiry; nothing was hidden or concealed."

[28] The statement by Medill, *Fees and Expenses in a Corporate Reorganization Under Section 77B* (1936) 34 Mich. L. Rev. 331, 344, indicates the tendency of the courts to limit allowances: ". . . In practically every case since the enactment of Section 77B the amount requested as compensation by the various committees, counsel, managers, trustees and others has either been disallowed entirely or reduced in proportions ranging from one-fourth to over three-fourths."
See also *Developments in the Law—Reorganization Under Section 77B of the Bankruptcy Act, 1934-1936* (1936) 49 Harv. L. Rev. 1111, 1199*et seq.*

other purposes which to some extent are for the benefit also of the bondholders, for example, to determine that the indenture provisions are clear, consistent, and practicable for administration.[29] However, it is not intended to suggest that trustees examine indentures to determine the degree of protection afforded and whether they are of such a nature that investors would be wise in buying securities issued thereunder.

(2) The authentication of the bonds by signature to the trustee's certificate thereupon. This authentication is the check against an overissue,[30] and an assurance that the conditions of certification required by the indenture have been complied with. The trustee thus accepts the responsibility of ascertaining that the conditions of certification have been met, and accepts the responsibility resulting from the language of the certificate which, in the case of a mortgage bond, would usually read: "This bond is one of the bonds described in the within mentioned mortgage." Serious liability may result from over-certification or improper certification.[31] It is true also that substantial questions may arise as to whether the form of bonds presented for certification is in accordance with the mortgage; but in most cases such questions would be settled, in connection with the examination of the indenture, before the bonds were presented for certification.

(3) The delivery of the bonds to the issuer. This necessitates in many cases an examination of complicated documents to ascertain whether there has been a proper showing of the facts upon which depends the right to delivery of the bonds.[32]

(4) The authentication and delivery of new bonds in place of lost or mutilated bonds.[33]

(5) The holding and disposition of cash or securities.[34] This may involve, for example, the determination whether the mortgagor has shown its right to the return of such cash or securities, or to the delivery to it of coupons from the bond collateral or of dividends and proxies with respect to the stock collateral.

(6) The delivery to the issuer of "releases" freeing property (usually real estate) from the lien of the mortgage, in compliance with the indenture; and, conversely, the refusal to release property except in compliance with the indenture.[35] This often requires the study of involved instruments presented as authority for the request and frequently calls for the exercise of the trustee's judgment, based on the facts within its knowledge, as to whether or not the mortgagor is in default under any of the many indenture covenants.

(7) The scrutiny of financial and other statements delivered to it by the issuer and, in the event that the statements do not comply with the indenture, the demand for statements which do comply.

(8) The calculation, sometimes intricate, of amounts due periodically to the sinking fund,[36] the receipt of sinking fund payments, or of the proceeds of fire insurance[37] or of condemnation,[38] and the supervision in some cases of the condemnation; and the application of moneys so received to the purchase or redemption of bonds or otherwise,[39] in accordance with the indenture.

(9) The determination whether, in case the mortgagor shall consolidate with or be merged into another corporation or shall sell its properties as a whole to

---

[29] See Page and Gates, The Work of Corporate Trust Departments (1926), 26.

[30] See Doyle v. Chatham & Phenix Nat. Bank, 253 N. Y. 369, 374, 171 N. E. 574, 576 (1930);'Ainsa v. Mercantile Trust Co., 174 Cal. 504, 512, 163 Pac. 898, 901 (1917).

[31] Doyle v. Chatham & Phenix National Bank, 253 N. Y. 369, 171 N. E. 574 (1930); Conover v. Guarantee Trust Co., 88 N. J. Eq. 450, 102 Atl. 844 (Ch. 1917), aff'd on Vice-Chancellor's opinion, 89 N. J. Eq. 584, 106 Atl. 890 (1918). Other cases are cited in 7 Cook, Cyclopedia Corporations (Perm. Ed. 1931) 376. See as to responsibility for negligence in certifying bond Note (1930) 40 Yale L. J. 138–139.

[32] The mortgage may require a certificate from the mortgagor as to the amounts spent on improvements before the trustee shall deliver the bonds to the mortgagor [Polhemus v. Holland Trust Co., 61 N. J. Eq. 654 47 Atl. 417 (1900)] or it may require that the trustee receive statements from the mortgagor of the application of the proceeds before so delivering, see Frishmuth v. Farmers Loan & Trust Co., 95 Fed. 5 (C. C. S. D. N. Y. 1899), aff'd, 107 Fed. 169 (C. C. A. 2d, 1901); Rhinelander v. Farmers Loan & Trust Co., 172 N. Y. 519, 65 N. E. 499 (1902).

[33] In authenticating new bonds, when the old bonds are outstanding, the trustee may incur liability. See Reynolds v. Title Guarantee & Trust Co., 240 N. Y. 257, 267, 148 N. E. 314, 517 (1925); Harvey v. Guaranty Trust Co., 134 Misc. 417, 430, 236 N. Y. Supp. 37, 56 (Sup. Ct. 1929), aff'd, 229 App. Div. 774, 242 N. Y. Supp. 905 (1st Dep't 1930); 256 N. Y. 526, 177 N. E. 125 (1931); Note (1925) 11 Corn. L. Q. 86–89.

[34] Trust indentures may provide for the application by the trustee of the proceeds of sale of a part of the mortgaged premises, and thus give rise to numerous problems. See e. g., Little Rock and F. S. R. Co. v. Huntington, 120 U. S. 160 (1887); Norfolk Southern R. R. v. Guaranty Trust Co., 13 F. (2d) 979 (C. C. A. 4th, 1926). In re Trust of Leeds City Brewery Ltd.'s Debenture Stock Trust Deed [1925] 1 Ch. 532.

[35] See 7 FLETCHER, CYCLOPEDIA CORPORATIONS (Perm. Ed. 1931) § 3181, and cases there cited. See also Browning v. Fidelity Trust Co., 250 Fed. 321 (C. C. A. 3d, 1918), cert. denied, 248 U. S. 564 (1918).

[36] See, for example, the pertinent provision of the mortgage in Equitable Trust Co. of New York v. Green Star S. S. Corp., 291 Fed. 650 (S. D. N. Y. 1922), aff'd, 297 Fed. 1008 (C. C. A. 2d, 1924).

[37] See Schroeder v. Berlin Arcade Real Estate Co., 175 Wis. 79, 184 N. W. 542 (1921).

[38] See Fonda, J. & G. R. R. v. New York Trust Co., 233 App. Div. 443, 254 N. Y. Supp. 266 (3d Dep't. 1931)

[39] The trustee may be confronted with serious problems in the application of such funds. See, e. g., National Trust Co. v. Whicker [1912] A. C. 377; Estabrook v. International Trust Co., 227 Mass. 281, 116 N. E. 486 (1917) Struthers Coal & Coke Co. v. Union Trust Co., 277 Pa. 20, 75 Atl. 986 (1910).

another corporation, the mortgagor has complied with its covenants and the conditions exist under which the successor is entitled to exercise the rights of the original mortgagor.

(10) The satisfaction and discharge of the indenture if facts are shown so requiring.[40]

(11) The keeping of the records of the trust in such a way as to show clearly at all times the numbers and principal amount of bonds which have been delivered to the issuer, the authority under which the bonds were delivered, the numbers and principal amount of bonds retired and the means of retirement, the cash or securities held by the trustee and the source from which received, the cash or securities or releases which the trustee has delivered, the authority for such delivery and, generally, a complete history of the trust. In the case of a large and active trust these records are very voluminous.

The bank which is the trustee often acts as registrar of the bonds or agent of the issuer for the purpose of paying the interest or the principal, or both; but these functions, although naturally and usually performed by the trustee, are not trustee's functions as such.

Trustees perform other services which are not required by the terms of the indenture. To illustrate, where a trustee is acting under an indenture which constitutes a second lien on property held under a prior indenture, the trustee gives notice of its lien to the trustee under the prior indenture. Similarly, if the second indenture should covenant against the issuance of further securities under the prior indenture, the trustee would give notice of such covenant to the trustee under the prior indenture. The trustee under the prior indenture ordinarily would not release the security or issue further bonds after it had received such notice. In order that they may have in their files proper evidence of the authorization of the mortgage, trustees require the filing with them, prior to the execution of the mortgage, of various supporting documents such as certified copies of the mortgagor's charter, by-laws, directors' authorization, stockholders' authorization, approval of any public service commission or other public body having jurisdiction over the issue, and opinion of counsel to the mortgagor that the mortgage gives the lien which it purports to create. They commonly maintain a "tickler system," in which are noted the dates when payments are required to be made, or financial or other statements are required to be filed, by the mortgagor; and in some cases, at least, they advise the mortgagor in advance of the date when performance by the mortgagor is required. Also, banks have substantial expenses which are properly attributable to their corporate trust departments as a part of the general expense of maintaining an audit control system over securities held in vault.[41]

It is apparent that corporate trustees have substantial duties and substantial possible liabilities even prior to default; and that serious questions often arise as to the proper construction of the indenture. It is true that a trustee is entitled to advice of counsel, at the expense of the issuing corporation; but it is the duty and responsibility of the trustee itself to decide doubtful questions.[42]

---

[40] See *Harvey* v. *Guaranty Trust Co.*, 134 Misc. 417; 236 N. Y. Supp. 37 (Sup. Ct. 1929), discussing at length the corporate trustee's liability for wrongfully satisfying the deed of trust; also 7 Fletcher, Cyclopedia Corporations (Perm. Ed. 1931) § 3197.

[41] A valuable discussion as to the functions of corporate trustees and the set-up and administration of a large corporate trust department may be found in Page and Gates, The Work of Corporate Trust Departments (1926). See also Herrick, Trust Departments in Banks and Trust Companies (1925), 263 *et seq.*, and the suggested readings at pp. 274-275.

[42] The Report, at 68, states: "Indeed, it is no exaggeration to say that corporate trustees have been able to remain inactive and to perpetuate the acts which have heretofore described, because astute lawyers have been able to shield them generally from liability for negligence and *all acts or* failures to act *except* for fraud or gross negligence." (Italics added.) This statement is not correct because immunity clauses do not protect a trustee in acting beyond the powers conferred upon it by the indenture. *Hazzard* v. *Chase National Bank*, 159 Misc. 57, 287 N. Y. Supp. 516 (Sup. Ct. 1936); *Doyle* v. *Chatham & Phenix National Bank of the City of N. Y.*, 253 N. Y. 369, 380-381, 171 N. E. 574, 578-579 (1930). Frequently the question presented to the trustee is one of power.

In some instances a trustee may appeal to a court of equity for instructions concerning its powers or duties *i. e.*, when there is an equit[y] in the provisions of a trust deed concerning the trustee's powers or duties or if for other compelling reasons doubt arises as to the character or extent of such powers and duties. 2 Jones, Bonds and Bond Securities (4th Ed. 1935) §1046; *Norfolk Southern Ry.* v. *Guaranty Trust Co.*, 13 F. (2d) 979 (C. C. A. 4th, 1926); *Old Colony Trust Co.* v. *City of Wichita*, 123 Fed. 762 (C. C. Kan. 1903), *aff'd* 132 Fed. 641 (C. C. A. 8th, 1904); *Guardian Trust Co.* v. *White Cliffs Portland Cement & C. Co.*, 109 Fed. 523 (C. C. Ark., 1901); *N. J. Nat. Bank & Trust Co.* v. *Lincoln Mortgage and Title Guaranty Co.*, 105 N. J. Eq. 557, 148 Atl. 713 (Ch. 1930). The right to appeal for instructions is not, however, without its limitations. In *City Bank Farmers Trust Co.* v. *Smith*, 263 N. Y. 292, 295, 189 N. E. 222, 223 (1934), which was a case involving a testamentary trustee, the court held that trustees are not entitled to instructions with reference to questions relating to the administration of a trust where there is room for the exercise of choice or where they are authorized to exercise their discretion. Nor will courts advise trustees upon purely business questions. *Matter of Wander*, 141 Misc. 584, 252, N. Y. Supp. 813 (Surr. Ct. 1931); *Matter of Weisman*, 140 Misc. 360, 363, 250 N. Y. Supp. 500, 502 (Surr. Ct. 1931). A corporate trustee in New York may have a determination of its duty by refusing to take requested action and having the matter submitted to the Appellate Division of the Supreme Court under §546 of the Civil Practice Act. This has been done in several instances

After default, the indentures usually provide that the trustee may take action (declaring due the principal sum not yet due by the terms of the bond, entry, foreclosure by advertisement, foreclosure by suit in equity, the obtaining of a money judgment, and otherwise) without the request of the holders of any specified percentage of the bonds, and that it shall be required to take such action upon the request of such percentage and upon the furnishing to the trustee of indemnity, if so required by it, against its expense and possible liability in complying with the request. The manner of performance by corporate trustees of their duties after default is too large a subject to be summarized, but the subject has been extensively discussed in legal publications previously referred to and to some extent is hereinafter considered.

Corporate trustees perform other services, before and after default, which it is unnecessary to detail; and these services may change with changing conditions. An example is the situation which has arisen from the advent of reorganization proceedings under Section 77 [43] and Section 77B [44] of the Bankruptcy Act. Section 77, sub-section (c), paragraph (7) provides that trustees under indentures may file claims on behalf of the securities outstanding under the indentures, but that "nothing herein shall constitute such trustee or trustees the representative or representatives of such holders for the purpose of accepting or rejecting any plan of reorganization." Under Section 77B, which contains no similar provision, it has been indicated by the Circuit Court of Appeals for the Second Circuit, in the *Allied Owners' Corporation* case,[45] that the trustee cannot vote on behalf of the bondholders for or against the plan. Nevertheless, corporate trustees have, and perform, important functions in reorganization proceedings.[46] Sections 77 and 77B undoubtedly contemplate that the views of the bondholders with respect to a plan shall be expressed by them. However, there may be circumstances under which the trustee should be heard.

In a simple case, no great difficulty will arise; but a trustee, without the advice of experts, usually cannot express views, or even have them, in a complicated situation where the fairness of the plan depends upon such facts as the true value of the security for the bonds. In the case, for example, of a large railroad system, the expense of employing experts would be very substantial. The law has not defined the extent to which the trustee may incur such expenses and be reimbursed therefor. The right to compensation even for its own services in reorganization proceedings has been rather narrowly limited to services in aid of the reorganization, as distinguished from services for the exclusive benefit of a particular class of security holders.[47] In an unreported opinion, the judge in charge of a large railroad reorganization has declined to give instructions to a trustee as to the extent to which it should incur expense in connection with hearings upon the proposed plan.[48] It is reported in the press [49] that the Interstate Commerce Commission is considering making some general provision for trustees' expenses in Section 77 proceedings; and doubtless the subject will be clarified generally by

See, for example, *Irving Trust Co* v. *Hughes*, 239 App. Div. 74, 264 N. Y. Supp. 737 (1st Dep't 1933); *Tucker* v. *Empire Trust Co*, 242 App. Div. 380, 274 N. Y. Supp. 595 (1st Dep't 1934). In a proper case such determination could be had, also, from the Supreme Court by way of declaratory judgment under §473 of the Civil Practice Act. *City Bank Farmers Trust Co.* v. *Smith*, 263 N. Y. 292, 189 N. E. 222 (1934) (acknowledging the right but denying it under the circumstances). However, mortgagors naturally oppose the delay and expense of such proceedings and trustees usually do not insist upon them unless the risk is large.

[43] On the subject of reorganization under Section 77, see Rodgers and Groom, *Reorganization of Railroad Corporations under Section 77 of the Bankruptcy Act* (1933), 33 Columbia Law Rev. 571; Weiner, *Reorganization under Section 77: A Comment* (1933), 33 Columbia Law Rev. 834; Lowenthal, *The Railroad Reorganization Act* (1933), 47 Harv. L. Rev. 18; Douglas, *Protective Committees in Railroad Reorganizations* (1934), 47 Harv. L. Rev. 565; Friendly, *Amendment of the Railroad Reorganization Act* (1936), 36 Columbia Law Rev. 27; Sunderland, *Railroad Reorganizations* (1935), an address before the National Conference on Debtor Relief Laws on December 7, 1935 and privately printed.

[44] On the subject of reorganization under Section 77B, see Gerdes, Corporate Reorganizations (1936); Weiner, *Corporate Reorganizations: Section 77B of the Bankruptcy Act* (1934) 34 Columbia Law Rev. 1173; see Note, *Developments in the Law—Reorganization Under Section 77B of the Bankruptcy Act—1934-1936* (1936) 49 Harv. L. Rev. 1111. See also Sunderland, *A Brief Sketch of the Historical Background and of the Events Leading Up to the Enactment of the New Corporate Bankruptcy Reorganization Act* (1934), 1 Corporate Reorganization 4, 46.

[45] *In re Allied Owners' Corp.*, 74 F. (2d) 201 (C. C. A. 2d, 1934). That decision affirmed an order denying the motion of the trustee to be allowed to vote on behalf of all bondholders upon a proposed plan of reorganization. The court held that the trustee could not vote on behalf of bondholders who were represented in the proceeding by a committee. It reserved the question whether the trustee should be permitted to vote as representing absent bondholders who had not exercised their privilege of voting. However, the opinion indicates that the trustee has no power to substitute its judgment for that of the real creditors; and upon this point it is followed in *Bitker* v. *Hotel Duluth Co.*, 83 F. (2d) 721 (C. C. A. 8th, 1936).

[46] See Israels, *The Mortgage Trustee in Reorganization Proceedings* (1936), 2 Corporate Reorganizations 409.

[47] *In re* The Memphis Street Railway Co., C. C. H. Bankruptcy Service ¶4052 (C. C. A. 6th, June 4, 1936). See also *Teasdale* v. *Sefton National Fibre Can Co.*, 85 F. (2d) 379 (C. C. A. 8th, 1936).

[48] See printed record, in the Matter of Missouri Pacific R. R. (E. D. Mo. 1936) Vol. VII, 3277.

[49] N. Y. Times, Sept. 25, 1936.

judicial decisions or by legislation.[60] However, the trustee is presently in the position either (1) that it may be subjected to criticism for not participating in proceedings regarding the plan, which often it cannot do without being fully advised after large expenditures of time and money, or (2) that after having rendered extensive services and incurred large expenses it may find the court holding that it cannot be reimbursed out of the estate because its services and expenses were not of such nature or amount as to be compensated for in reorganization proceedings. It is probable that in such a case it could recover its reasonable compensation and expenses under the general lien conferred upon it by the indenture,[61] but the author is aware of no decision directly so holding in respect of services rendered in Section 77 or Section 77B proceedings,[62] and, further, there is no present method of determining reasonableness. It seems hardly just to expect the trustee to expend its moneys without regard to whether or not such moneys can be recovered. These questions are presently receiving extensive consideration by trustees and their counsel. Quite recently a trustee in three cases has called meetings of its bondholders and requested their views as to the steps which should be taken in railroad reorganization proceedings.[63] This procedure may be wise and proper; but it does not solve the main question whether the trustee, as a bank, should advance substantial amounts upon the hope that it will recover them. Nevertheless, the current practice is for trustees to scrutinize reorganization plans and to intervene in reorganization proceedings; and in several instances they have objected to plans as unfair to their security holders.[64]

### 2. CRITICISMS OF THE EXISTING SITUATION

These criticisms appear in some cases to be based upon misunderstanding of present corporate trustees' obligations (whether or not amounting to legally enforceable duties), in other cases upon manner of performance of their obligations, and in still other cases upon the existing limitations of their legally enforceable duties.

In the report it is stated that control over the issuer's performance of its obligations with respect to bondholders "has been surrendered to or assumed by the trustee", that the trustee has been invested with the power "to do everything upon which the protection and enforcement of the security of a bondholder depends" and that "Both in law and in practice, this reliance of the security holder upon the trustee for protection of his investment is complete", [65] also that corporate trustees do not exercise the elaborate powers under modern trust indentures "which are the bondholders' only protection; that they have taken virtually all of the powers designed to protect the bondholders, but have rejected any duty to exercise them." [66]

These statements indicate a misconception. Corporate trustees do not and could not assume any function to control the issuer's performance of its many

⁶⁰ The existing situation is noted by the Report in stating, at 66, that it is desirable that "the status of indenture trustees in bankruptcy and receivership proceedings be made explicit both as to their powers to represent bondholders and as to their right to be compensated for the services which they may render in such proceedings in their representative capacity."

⁶¹ Corporate mortgages usually contain a provision that the trustee shall have a prior lien for its compensation and expenses. Such a provision is enforceable. *Fidelity Trust Co.* v. *Hutchinson Chemical & Alkali Co.*, 221 Fed. 63 (C. C. A. 8th, 1915). Even without such a provision it has been held that the trust fund must bear the expenses of its administration. *Trustee* v. *Greenough*, 105 U. S. 527 (1881); *Jessup* v. *Smith*, 223 N. Y. 203, 119 N. E. 403 (1918); Perry, Trusts and Trustees (7th Ed. 1929) §907.

⁶² An intimation that the trustee could recover under the trustee's lien conferred by the mortgage is contained in the unreported opinion in the *Missouri-Pacific case*, supra note 48. In *Fidelity Trust Co.* v. *Hutchinson Chemical and Alkali Co.*, 221 Fed. 63 (C. C. A. 8th, 1915), where a trustee's lien was conferred by the indenture, it was held that the expenses of the trustee and its counsel in a suit for the foreclosure of the mortgage should have been charged upon the proceeds of sale and not against the bondholders at whose instance the suit was brought. In that case, the trustee was performing a clear duty under the mortgage. The decision is applicable to reorganization proceedings if the services performed by the trustee are within the scope of its duties; but in advance of judicial determination of the duties of trustees in Section 77 and Section 77B proceedings, the question whether particular services are within such duties is not settled.

⁶³ These meetings were called by Guaranty Trust Company of New York in *The Denver and Rio Grande Western Railroad Company case* (see N. Y. Herald Tribune, Sept. 18, 1936, N. Y. Times, Sept. 25, 1936), and in the *New York, Westchester & Boston Railway Company case* (see N. Y. Times, Oct. 20, 1936), and in the *Chicago, Indianapolis and Louisville Railway Company case* (see N. Y. Times, Nov. 16, 1936).

⁶⁴ Instances of such objections, whether formal or informal, may be found in the reorganization proceedings affecting Chicago and Eastern Illinois Railway Company, Missouri Pacific Railroad Company and Prudence-Bonds Corporation. Many of the railroad reorganization proceedings have not reached the stage where objections by trustees are appropriate.

⁶⁵ Report, at 3. In *Hazzard* v. *Chase National Bank*, 159 Misc. 57, 83, 287 N. Y. Supp. 541, 569 (Sup. Ct. 1936). The court said that, "Prospective investors are unquestionably induced to purchase debentures, to a great extent, by the name and prestige of the obligor seeking financing, which are capitalized by the obligor seeking financing, in order to sell its securities"; and that by the investors "Reliance is placed almost completely upon the belief that the experience, power, financial acumen and integrity of the trustee will serve as a protection." (Italics added.) In the cases cited supra note 12, the Hazzard opinion is approved and statements are made which are somewhat similar to the statement just quoted from the *Hazzard case*.

⁶⁶ Report, at 4.

general obligations to bondholders (such as the obligation adequately to maintain the property or to comply with negative pledge clauses). Nor is the reliance of the security holder upon the trustee in any sense "complete" or even primary. Any person familiar with the selling of securities would say that, although the name of a reputable trustee may aid the standing of the issuer, investors ordinarily do not otherwise rely to any important extent upon the trustee. Securities issued by borrowing corporations under corporate indentures are marketed in almost all cases by houses which may be termed generally "investment bankers" [57] or "underwriters" or "sellers." Investors extend credit primarily upon the trust estate, if there be one, and the management of the issuing corporation.[58] Investors rely also to a very substantial extent upon the sellers of the securities.[59] This fact is recognized, at one point at least, in the Report.[60]

The Report contains criticisms which are unjust because they imply that corporate trustees fail to exercise functions which, although not legally enforceable duties, they should exercise. For example, in the Report, in connection with negative pledge clauses and the substitution of collateral, it is stated that "A good deal of the fault for inadequate protection of investors may be traced to passivity on the part of the trustees at the time when the indenture is drafted"; that trustees and their counsel ordinarily do not examine the indenture in order to insure protection of the security holders; and that "There is nothing in the law requiring them to do so. And if they insisted that indentures contain provisions for the protection of bondholders, it may be guessed that the business which they obtain from issuers and bankers would decline."[61]

While the Report thus recognizes that trustees do not have the duty to examine indentures in order to protect investors, the implication is that they should do so; and that they do not do so because they fear loss of business by so doing. Such an implication is not a fair one. The trustees are not the sellers of the securities, nor do they profit from the sale thereof except to the very limited extent of their trustees' fees. They have only a "slight financial interest in the transaction."[62] It is the seller who should see that the securities sold are issued under an indenture which is not deceptive or otherwise improper.

The Report also criticizes a trustee because in a case of substitution of collateral the trustee, as well as the issuer and the underwriter, failed to protect investors "from the breadth and flexibility of the substitution clause" and "failed to give any notice that the securities advertised as originally deposited might be withdrawn."[63] The statement that the trustee "failed" implies that it had an obligation. There is no such obligation on the part of the trustees; but such obligation has already been legally imposed upon sellers by the Securities Act of 1933. Prospectuses may not, without severe penalties, contain material misstatements or have material omissions. A prospectus not containing a proper statement as to the possibilities of substitution of collateral or an adequate description of negative pledge clauses would certainly have material omissions.

The Report also implies that corporate trustees do not properly perform existing obligations because in many cases they fail to take action after default without the request of the holders of the percentage of the securities which is required to compel action—it being stated that "instances of trustees taking such action,

[57] Upon the general subject of the issuance and sale of securities, see Willis and Bogen, Investment Banking (unpublished). The authors describe the extensive organization of investment bankers, their analysis of borrowers' capital needs and of market conditions, their extended examination into the security for issues offered to them, their methods of distribution and sale, their close following of the management of issues which they have placed, and generally the various elements which affect the purchase and sale of securities.

[58] Willis and Bogen, op. cit supra note 57, point out that the investor's risk depends largely on the financial policy of the management of the borrowing corporation; that if the corporation builds up reserves, adequately maintains its property and pays dividends only after these requirements have been fulfilled "it is placing a cushion of financial strength between itself and its security holders"; but that "the ordinary risks of the enterprise are multiplied many times over by a policy of alternatingly over-paying dividends and sharply retrenching for the purpose of physical rehabilitation."

[59] In Willis and Bogen, op. cit supra note 57, it is stated, with reference to so-called investment bankers or houses of issue, that they are much concerned with the borrowers' management and keep closely in touch with it; and that "some investors place much stress, in purchasing securities, on the character and reputation of the house of issue." Although this book contains a very full discussion of the purchase of securities (see particularly chapters xvii, xviii and xix) there is not a single reference to reliance by buyers upon the trustee named in the indenture. Furthermore, the authors refer to Standard Statistics Corporation as rating bonds on three fundamental factors, viz., "earning power, asset value and marketability." The authors also refer to the somewhat more elaborate rating guides of the Moody Investors' Service, but no reference to corporate trustees can be found therein. See also Babbitt v. Read, 236 Fed. 42 (C. C. A. 2d, 1916).

[60] Report, at 105: "In the minds of bondholders, default itself creates distrust and suspicion of the houses which originated and sold the bonds. Not much is required to fan this feeling of growing distrust and suspicion into a blazing fire of resentment against the houses of issue which may result in adverse publicity, litigation, and damage to any future business."

[61] Report, at 7-9.

[62] See Benton v. Safe Deposit Bank, 255 N. Y. 260, 261, 174 N. E. 648, 650 (1931).

[63] Report, at 20.

unless and until they are *forced* to do so by bondholders, are not common" [54] (italics added), and that "Trustees have even denied any duty to exercise their power to declare maturity of the securities accelerated" [55] and that the requirement of percentage request (as well as of indemnity to the trustee) "merely places a liberal top-limit upon the conditions to action which the trustee may impose upon security holders." [56]

These and other statements which appear to criticize trustees for not taking, without the percentage request mentioned in the indenture, such important action as precipitation of principal, throwing the issuer into receivership, or foreclosing the mortgage, seem to be based upon the view that trustees presently have some obligation to take such action but that they avoid the obligation by hiding behind the provisions requiring the request of the stated percentage in order to make the obligation enforceable.   Trustees should not be criticized because, without the request, they usually do not precipitate the principal or initiate receivership proceedings or take other action which is likely to be ruinous to the issuer's credit and may be directly contrary to the best interest of the bondholders. This portion of the Report overlooks the very important consideration that indenture provisions contemplating the request of a stated percentage have been repeatedly recognized by the courts as constituting a contract between the security holders, [57] as wise and proper, and as inserted for the benefit of the security holders themselves. [58]

The non-recognition of the underlying purpose of provisions requiring the request of the specified percentage in order to compel trustee's action apparently is the reason for the statement in the Report [59] that the "corporate trustee is generally adequately equipped with powers; its inactivity is the product of its own desires coupled with provisions in the indentures which relieve it of any duty to act."   The inactivity referred to cannot properly be said to arise from the "desires" of the trustee when so plainly it arises from the view, recognized by the United States Supreme Court [50] to be sound, that not the trustee but the specified percentage ordinarily should initiate proceedings vitally affecting the holders as a whole.

The Report [71] also criticizes corporate trustees, at least inferentially, because often they will not take action involving them in expense or possible liability without the indemnity to which under the indenture contract they are expressly entitled.   Instances undoubtedly occur where indemnity is not necessary and should not be required.   As is later stated, trustees frequently impound income or intervene in an existing litigation without indemnity.   Where the trustee has an adequate lien upon the trust estate, indemnity is often waived.   The reasonableness of a request for indemnity depends upon the circumstances of the particular case.   However, a trustee, not otherwise adequately protected, cannot properly be said to have a general obligation to act, and to violate the obligation by not acting, without reasonable indemnity against expenses which it is asked to incur or possible liabilities which it is asked to assume.   It should not be forgotten that corporate trustees are banking institutions which owe a duty to their depositors and stockholders.

The Report contains various criticisms of the manner of performance by corporate trustees of obligations (whether or not amounting to legally enforceable duties) which trustees generally would agree that they have.   These criticisms in some instances are just and in other instances unjust.   Some of them present borderline cases.   Opinions of the public or of public bodies may well vary as to the proper method of performing obligations which the trustee has, just as there are sometimes considerable variances of opinion as between intelligent and well-advised trustees themselves.   Some of these criticisms appear to be well founded; but, outside of the field of "real estate" mortgages (in respect of which trustee practices have differed radically from those prevailing generally under corporate trusts), the Report, as is later shown, does not support any suggestion of general maladministration.   Furthermore, it seems indisputable (although this is neces-

[54] *Id.* at 43.
[55] *Id.* at 43.
[56] *Id.* at 44.
[57] *Seibert* v. *Minneapolis & St. Louis Ry.*, 52 Minn. 148, 53 N. W. 1134 (1893).
[58] See *Chicago and Vincennes R. R.* v. *Fosdick*, 101 U. S. 47, 77–78 (1882); *Crosthwaite* v. *Moline Plow Co.*, 298 Fed. 466, 469 (S. D. N. Y. 1924); *Home Mortgage Co.* v. *Ramsey*, 49 F. (2d) 738, 743 (C. C. A. 4th, 1931); *Rodman* v. *Richfield Oil Co. of California*, 66 F. (2d) 244, 249–250 (C. C. A. 9th, 1933).
[69] Report, at 42.
[70] See *Chicago & Vincennes R. R.* v. *Fosdick* (106 U. S. 47, 77–78 (1882)).
[71] Report at 43, 52–53.

sarily a matter of experience and opinion)[72] that the very few cases which appear to be correct examples of misperformance of obligations which corporate trustees really have are clearly exceptional, not typical, cases. Of course, it is quite to be expected, and entirely proper, that the Report should use striking examples. However, the Report would be accurate and more fair if, after citing extreme instances, it had stated that such instances are in the small minority.[73] It is regrettable that it ends upon such a note as the following:[74]

"Such measures would go far toward curbing the exploitation of investors which has occurred either at the hands of the trustee itself or at the hands of the reorganization and management groups with the knowledge, consent, or acquiescence of a complacent and inactive trustee."

The statement last quoted, particularly because it is a part of the concluding paragraph of the Report, leaves a strong impression that corporate trustees in general are considered by the Commission so likely to be dishonest or incompetent as to render necessary the adoption of legislation to protect investors against "exploitation" by or with the consent of their own trustees. While it is scarcely believable that such an impression could have been intended, the real possibility that the Report does leave this impression should be eliminated in some way if there is to be any fair presentation of the matter to Congress.

If we disregard, for the moment, the administration of "real estate" indentures, the Report completely fails to show any general situation of maladministration. In spite of the great number of corporate trustee administrations which are taking place, the entire Report refers to approximately six modern instances (outside of "real estate" indenture administration) as to which it is asserted that corporate trustee administration—as distinguished from the practices of others or from the weakness of various indenture provisions—has been improper. Of course, the instances to which the Report refers are cited as illustrations and do not purport to include all cases which may have come to the attention of the Commission; but nevertheless if it was intended to show even that maladministration is occurring in a substantial number of cases, an attempt should have been made adequately to support such a charge. The Report cites hardly any decisions in which corporate trustee administrations have been held to be improper. Naturally, when so great a number of administrations by such trustees has occurred there are such decisions; but they are extremely few in number. If it could be said that in a publication dealing with corporate trustees generally, including the most reputable banking institutions in the United States, the Commission was justified in mixing the discussion of corporate trustee practices generally with the practices of trustees under "real estate" indentures, there might be a little more reason for general suggestions of maladministration. However, the securities issued under such indentures form only a trivial part of the securities issued under corporate indentures administered by responsible institutions.[75]

Even in the case of "real estate" indentures, the Report does not assert that cited instances of alleged maladministration are in any way typical of the practice of responsible banks or trust companies. Such banks and trust companies do act as trustees under those indentures; but the Report does not appear to contain a single instance where maladministration thereunder by such banks or trust companies under those indentures is asserted. Many cases are mentioned in the Report of the selection of individuals, as trustees under "real estate"

---

[72] Expressions regarding so large a subject as whether particular practices are usual or unusual necessarily rest upon the particular experience of the writer. The author's experience of some twenty-five years has been in representing various New York trustees. However, the practices of experienced New York trustees may be regarded as fairly typical of the accepted practice in other large cities. Although no statistics are believed to be available, New York companies are believed to be the trustees under a very large majority, as to amounts involved, of all indentures in the United States. Of course, in New York or elsewhere, there may be found instances of incompetent administration, just as in the case of testamentary trustees or in any kind of business. *All opinions expressed in this article are the personal opinions of the writer.*

[73] See Posner *supra* note 14, at 24b "To the credit of these institutions, it must be said that, in practice, their standards of administration have been so much higher than the express requirements of the corporate indenture that comparatively few instances have invoked criticism in the past half century."

[74] Report, at 112.

[75] Replies to inquiries made to banks and trust companies acting as trustees for more than a majority in amount of all outstanding securities of Railroads, Utilities and Industrials indicate that "real estate" securities for which they are trustees do not aggregate over approximately 2% of all securities for which they act.

indentures, who were closely connected with the issuing house.[76] Such cases have nothing whatever to do with the usual administration of corporate trusts by reputable institutions.    Nevertheless, the Report in several places[77] illustrates its criticisms of corporate trustees by referring to the practices of such individual trustees.    Since it deals with corporate trusts as a whole, it is difficult to see why references to administration by the last-mentioned trustees should have been included at all.

In spite of the fact that the concluding paragraph of the Report emphasizes "exploitation" by trustees, the bulk of the Report is devoted to the insistence that corporate trustees be required to undertake much more responsible duties than they presently have.    Similarly, in the report made by the Streit Committee[78] with reference to "real estate" indentures, it is stated[79] that if conflicting positions were eliminated and the trustees were compelled to assumed the obligations of active trustees "there would be practically no need for bondholders' committees."    While the desire, expressed by the Report, to have trustees assume more duties is qualified by the recommendation that they be separated from positions which are considered to involve possible conflicts of interest, the paramount fact in this connection is that the Commission desires the trustees to act as "guardians" for investors.    Since the trustees would still be the same institutions, this would seem to indicate that language concerning "exploitation" was not intended to give the impression which it does.

Other more specific criticisms of performance of the present corporate trustee functions appear to be incorrect.    The Report states that in certain instances wherein mortgagors were required to submit periodical financial statements, trustees have accepted such statements without examination, other than a "cursory" one, as to whether or not they complied with the indenture, or without protest where they did not comply; and, with reference to these practices, that "there is ample evidence that they reflect the attitude and practice of corporate trustees generally."[80]    It may be true that some trustees accept such statements without scrutiny or without calling for proper statements; but this attitude and practice most certainly is not the attitude and practice of corporate trustees generally.[81]

The testimony of a witness before the Commission is quoted to the effect that under the usual indenture provision the trustee may assume that the company is not in default until notified in writing by the holders of a stated percentage in amount of the bonds; and it is stated that "the trustee can shut its eyes to the existence of a default" unless so notified, and that the "language of these clauses is broad enough to relieve the trustee from the necessity of becoming conscious of default even if it controls the issuer and has actual notice of the default."[82]    These statements are too broad if taken as implying that trustees do ignore defaults within their knowledge unless notified by the specified percentage, or if taken as meaning that trustees would be fully protected in thus ignoring defaults.

After knowledge of default, no trustee conversant with its functions would comply with the request of the issuer for action permitted by the indenture only "until default"; and it is extremely doubtful that a trustee would be protected in so doing.[83]    This part of the Report may be limited to its context which criticizes trustees because sometimes they do not notify the issuer or the security holders of defaults of which they know but of which they have not been formally advised by the specified percentage.    It is true that, with respect to affirmative action

---

[76] After citing the very unusual case of a trust company, an 80% interest in which was owned by an under writing house, the Report, at 103, states:
"These affiliations have been even more conspicuous in the real estate bond field.  As we indicated in our report on Committees for the Holders of Real Estate Bonds it was the common practice for the trustee under the bond indenture to be an officer, director, or affiliated bank of the house of issue.  As we stated in that report:
"'Thus in case of 84 Straus issues, secured by properties located in California and in the Pacific northwest and outstanding on February 27, 1931, Straus executive officers were acting as trustees for 77 issues, while trustees for only 7 issues had no apparent connection with the underwriter. . . .  The extent of the underwriter's control over the trustee is indicated by an examination of 137 defaulted issues underwritten by S. W. Straus & Co. of New York.  In all of these issues we find that a Straus official or the Straus National Bank & Trust Co. (of New York) acted as either the original or successor trustee.'"
[77] E. g., Report, at 32-33.
[78] See supra note 7.
[79] See Streit Report, supra note 7, at 47.
[80] Report, at 35, 37, 68.
[81] Inquiry made upon this specific subject to New York corporate trustees, including those having in the aggregate far more than a majority in amount of the corporate trust business in the United States, has produced, without exception, the reply that the trustees, although having no legally enforceable duty to do so, in all cases scrutinize carefully financial statements required by the indentures and call for proper statements if those furnished do not comply with the indentures.
[82] Report, at 37, 38.
[83] Such compliance would involve a lack of power, in which case the trustee is not protected.  See supra note 42.

such as giving notice, trustees exercise their descretion under all of the circumstances. Often, where the taking of such action might have a seriously detrimental effect upon the security, they await the instructions of the specified percentage. There may be forceful arguments on both sides of the question whether they should give such notice. The giving of notice may adversely affect the issuer and through it the security holders; it may lead to application for receivership, or to the institution of reorganization or other proceedings in bankruptcy, when such proceedings are unwise. On the other hand, the failure to give notice may result in the non-institution of such proceedings when they should have been instituted. No general rule can properly be stated, nor does the Report attempt to do so.[54]

The Report criticizes the employment by some trustees of counsel who also are counsel for interests conflicting with the trust or are counsel for a group of the bondholders, such as a bondholders' committee; and indicates that such employment is not unusual.[55] In the author's experience the employment of the counsel for conflicting interests is decidedly rare. Various instances might be cited wherein trustees have declined to employ their regular counsel, whom naturally they would prefer to employ, because such counsel appeared to have a possibly conflicting representation. The experience of the writer is that when trustees are considering the employment of counsel they rarely fail to require, as a necessary condition of the employment, that counsel do not represent conflicting interests. It is a fact that the same trustee is sometimes the trustee under different indentures of the same corporation and that prior to default the same counsel normally would act for the trustee in different capacities. This was particularly true as to old railroad mortgages, such as those of the Missouri, Kansas & Texas Railway Company, and of the Chicago and Northwestern Railway Company,[56] usually covering branches of a large system. In recent years it is much more likely to be the case that there are different trustees under different indentures of the same corporation. However, in some cases the same trustee does act under the different indentures. The listing requirements of the New York Stock Exchange do not prevent a trustee from so acting, provided that it shall file with the Stock Exchange an agreement to resign from any conflicting position which shall thus develop.[57] It may be very desirable, from the viewpoint of expense, familiarity with the property and other practical considerations, that the same trustee should act under different indentures of the same company. The likelihood of any conflict before default is very small; and the employment of the same counsel under several indentures presents a situation only of remote possible future conflict, not of actual conflict with which this portion of the Report is concerned. Where, however, by reason of default or otherwise, the possibility of substantial conflict has become real, the trustee and its counsel usually resign under one or the other of the indentures; and this has long been true, as in the *Missouri, Kansas and Texas case* and the *Chicago and North Western case*,[58] entirely without consideration of Stock Exchange requirements.

While the employment of the counsel for conflicting interests is very unusual, it has been less uncommon in the past for the trustee to employ counsel who also act for the bondholders' committee.[59] In some cases this works well and saves expense; but, because the trustee represents all bondholders, the better view would seem to be that it should not retain counsel who also represent a particular group; and in one case such practice has been judicially disapproved.[90] As the Report

---

[54] The Report states, at 42: "Our conclusion is that to relieve the trustee of all obligation to give notice of defaults is undesirable. Rather it should have the affirmative obligation to take such steps toward advising security holders of impending or actual defaults as are, in view of all the circumstances, reasonable and necessary for their protection. To publicize transient and technical defaults might do irreparable damage to security holders and issuer alike. No rigid and inflexible rule can be prescribed. What is needed is a standard of conduct prescribed by law which requires the trustee to take the same action it would take were it the investor."

This, with its context, amounts to a suggestion not that trustees be required to give notice in all cases, but that they be compelled to exercise their discretion honestly and intelligently, which, beyond any question, they presently do in the great majority of cases.

[54] Report, at 60.

[56] See printed record, *Central Trust Co.* v. *Missouri, Kansas & Texas Ry.* (E. D. Mo. 1933-1936), Vol. I, 287, 463, 695; printed record, In the Matter of Chicago and North Western Ry. (N. D. Ill. 1935-1936), Vol. I, 151, 259.

[57] Stock Listing Requirements, New York Stock Exchange, C. C. H. Stock Exchange Regulation Service Supp., ¶ 11617, provides after making certain "recommendations": "Each mortgage, indenture, or deed of trust *should* be represented by a separate trustee" (italics added). The Exchange interprets (although not in published form) this language as a general recommendation; and, where no likelihood of harm appears, it will list securities, although the same trustee is acting under the different indentures, upon the agreement of the trustee to resign in case that conflict shall appear.

[58] See printed record, *Central Trust Co.* v. *Missouri, Kansas & Texas Ry.* (E. D. Mo. 1933-1936), Vol. I, 390; printed record, *In the Matter of Chicago and North Western Ry.* (N. D. Ill., 1935-1936), Vol. I, 475.

[59] The Report states, at 80, that in 16% of the cases investigated counsel to the committee was counsel to the trustee.

[90] See *U. S. & Mexican Trust Co.* v. *U. S. & Mexican Trust Co. as Trustee*, 250 Fed. 377, 382 (C. C. A. 8th, 1918).

states,[91] there is "respectable authority among trust companies and their counsel that the employment by the trustee of counsel to the committee is undesirable." On the other hand, some trustees feel that they best serve the interests of security holders by avoiding the expense of duplicating counsel, where no real conflict between the committee and the nondepositors is at all probable.[92]

The Report suggests [93] that trustees should promptly intervene in receivership or bankruptcy proceedings of the issuer and should move expeditiously to impound rents and profits. Combined with subsequent references to general "intertia" of corporate trustees and the statement that trustees "normally will not act" unless requested by the specified percentage,[94] the suggestion apparently implies that trustees usually do not intervene or impound income without such request. The author's observation of railroad reorganizations under Section 77, such as the proceedings involving the Missouri Pacific Railroad Company, The New York, New Haven and Hartford Railroad Company, and the Chicago and North Western Railway Company,[95] leads to the belief that it is now the usual practice for trustees, without request or indemnity, to intervene and make demand for the income. In these cases, almost all of the trustees have intervened in the court proceedings, and also before the Interstate Commerce Commission when a reorganization plan has been presented. The court records of reorganization proceedings under Section 77B generally show that the practice is also prevalent therein.[96]

The characterizations by the Report of present trustee duties are not accurate. For example, it states that the trustee is presently nothing more than "a stakeholder and an amanuensis of the group which happens to be dominant." [97] The preceding portion of this article will demonstrate that trustees, even prior to default, undertake very serious responsibilities and perform very substantial services, and that a trustee is not properly described as a mere stakeholder. One court has stated that such a trustee "would seem to occupy middle ground between a mere stakeholder or depositary, on the one hand, and a testamentary trustee, on the other." [98] This is a fair characterization. Nor is the trustee merely an amanuensis of the dominant group. It is true that in most cases the trustee will follow the views of the holders of a majority of the bonds. Certainly there is no impropriety in so doing, even where the indenture does not provide, as frequently it does, that the trustee is bound by the instructions of the majority. A general statement, however, that trustees follow as a matter of course the instructions of the majority, would not be correct. It is not the practice of competent trustees to accept blindly the suggestions or requests of the majority where improperly prejudicial, by reason of illegality or otherwise, to the minority.[99] The respect in which the interest of the majority most frequently conflicts with that of the minority is with reference to the upset price to be fixed by the court in the decree of sale, the upset price being the minimum bid which the court will consider.[100] As a rule, the courts themselves look throughly into the propriety of the proposed upset price; and trustees also give careful consideration

---

[91] Report, at 78

[92] The Report also comments, at 80, upon the fact that in 30% of the cases investigated by the Commission the trustee was represented directly on the committee, and states that the trustee is thus prevented from being an effective representative of all security holders. It has been held that there is no impropriety in the trustee being represented on, or being the depositary for, the bondholders committee [Fidelity Trust Co. v. Washington-Oregon Corp., 217 Fed. 588, 600-601 (W. D. Wash., 1914); Guaranty Trust Co. of New York v. Chicago, M. & St. P. Ry., (5 F. (2d) 434, 440, 441 (N. D. Ill., 1925 and 1926); Palmer v. Bankers Trust Co., 12 F. (2d) 747, 754 (C. C. A. 8th, 1926)] although minority bondholders were permitted to intervene in a case in which the president of the trustees was chairman of the committee, the same counsel acted both for the trustee and for the committee, the trustee institution was also the depositary for the committee, and (this being probably the controlling fact) an actual conflict of interest between the committee and the minority had developed after the formation of the committee. Central Trust Company of New York v. Chicago, Rock Island and Pacific R. R. 218 Fed. 336 (C. C. A. 2d, 1914). The mere fact that one of the members of the committee is an officer of the trustee does not mean that the committee will dominate the trustee. The depositary is merely a mechanical agency.

[93] Report, at 47.

[94] Id. at 61.

[95] See printed records, In the Matter of Missouri Pacific R. R. (E. D. Mo. 1934-1936) 269, 1129, 165, 2063, 2221, 3259, 3357, 3491; In the Matter of New York, New Haven & Hartford R. R. (D. Conn. 1935-1936) 35, 89, 95, 111, 1113, 47, 141, 227, 315; In the Matter of Chicago and North Western Ry. (N. D. Ill. 1935-1936) 151, 259, 775, 783, 815, 841, 935, 691, 431, 511.

[96] See, generally, Israels, op. cit. supra note 45, at 411.

[97] Report, at 70.

[98] See Marshall & Ilsley Bank v. Guaranty Investment Co., 213 Wis. 415, 422, 250 N. W. 862, 864 (1933).

[99] Corporate trustees are thoroughly familiar with the rule stated in Hollister v. Stewart, 111 N. Y. 644; 19 N. E. 782 (1899) that they are "not at liberty to follow the advice or wishes of the majority" without also being responsible to the "minority" for "faithful administration."

[100] See Weiner, Conflicting Functions of the Upset Price in a Corporate Reorganization (1927) 27 Columbia Law Rev. 132.

thereto from the viewpoint of the minority.[101]   However, it should be remembered that the majority, after all, have a strong interest to produce the best results for the bonds; and instances wherein such committees do not use their honest efforts to produce such results are rare.   Minority bondholders are excluded from the benefit of a plan only after long delay, and not even then in proceedings under Section 77 or Section 77B which, when consummated through reorganization by force of the statutes themselves, enure to the benefit of, and bind, all bondholders.   Therefore, it is entirely proper that a trustee in most cases should be guided by the views of the majority.

Existing conditions, and the criticisms thereof in the Report, have been discussed at length because the recommendations contained therein cannot be intelligently considered without an understanding of the present situation.   Suppose, therefore, that the Report had described correctly this situation and that it did not contain statements, implications or suggestions that corporate trustees fail in the performance of existing obligations (whether or not legally enforceable duties) to supervise the performance by issuers generally of their obligations, to protect investors against the terms of the indentures under which their securities are issued, to notify investors as to the possibility of change of their collateral, to precipitate principal or institute foreclosure proceedings or take other action ruinous to the credit of issuers without having the views of their bondholders and without financial protection; that it is the usual practice of these trustees to accept financial statements without scrutiny, to ignore defaults unless formally notified thereof, and to employ counsel representing conflicting interests; that maladministration is common; and that the trustees are mere stakeholders doing little to earn even their present moderate compensation.   We are then in a position properly to consider the recommendations.

### 3. RECOMMENDATIONS TO CONGRESS AS TO CHANGES IN CORPORATE TRUSTEE DUTIES

The Report contains recommendations as follows:[102]

"1. That trustees should be charged with active duties and commensurate responsibilities.

"2. That the trustee be responsible for failure to record, file, or refile the mortgage in the proper recording office and for failure to use reasonable care and diligence in certifying the securities.

"3. That the trustee be responsible for the exercise of such reasonable care as the circumstances permit in checking the application of proceeds of security issues to their avowed purposes.

"4. That the trustee be responsible for the use of reasonable care and diligence in enforcing compliance with negative pledge clauses and provisions for substitution and release of security and in taking appropriate steps to protect the security holders in case the issuer violates or threatens to violate them.

"5. That the trustee be responsible for use of reasonable care and diligence in ascertaining the occurrence of defaults under the indenture and in giving notice thereof to the security holders where such notice is necessary for their protection.

"6. That, when default occurs, the trustee be responsible for failure to take such action, in protection or enforcement of the security; in collection of principal or interest; or in representation of their beneficiaries in legal proceedings, as is reasonable necessary for protection of the investors.

"7. That all exculpatory clauses in indentures incompatible with the foregoing standards of conduct be outlawed.

"As stated, the foregoing recommendations are merely exemplary of the specific reform measures which we think are essential.   They do not include all provisions of trust indentures which should be refashioned in light of the 'legislative determination' of the requirements of the public interest.   But they indicate the quality and degree of a thoroughgoing reform of the present system."

As to the result which would follow from the adoption of the recommendations, the Report concludes:[103]

". . . The result would be that investors would have an active guardian of their interests throughout the entire life of the security.   There would be carried over into the corporate field the standards of fiduciary relationships which have long obtained in personal trusts and with which these professional trustees have had a long and rich experience."

The Report further states [104] that "Certain exemptions from such regulation doubtless can be provided where the character or amount of such security issues are not of true national concern."

[101] See *Israels, supra*, note 45, at 409.
[102] Report, at 70.
[103] *Id.* at 112.
[104] *Id.* at 112.

In making these recommendations, the Report recognizes that corporate trustees are not presently paid for the performance of the duties suggested and that the increase in their duties and responsibilities would "probably" require an increase in their compensation, but states that an informed judgment as to the extent of the increase should be based upon further investigation and study.[105]

The main and comprehensive recommendation, which is hereafter termed the Main Recommendation, is that corporate trustees be transformed into fully active trustees like personal trustees. This recommendation in the author's opinion is unnecessary, impracticable, and contrary to the public interest. The reasons for this opinion follow:

(a) While revolutionary changes are not unwise merely because they are revolutionary, the present system, and the rights, duties and responsibilities arising therefrom, are well understood in the financial world and represent the product of extensive study by, among others, issuers, underwriters and large investors. The Commission cannot intend to imply that all of these persons, by reason of some self-interest, have permitted the long continuance of the present system regardless of its effect upon investors. Even upon the assumption that issuers, as the Commission seems to feel,[106] are generally disposed to give as little security as possible for their issues, the interests of underwriters and of large investors are directly to the contrary. After all, the securities must be marketed. The underwriters desire to sell them. The largest investors are insurance companies, savings banks, and other institutions.[107] It is scarcely to be assumed that, if dissatisfied with present conditions, underwriters and large investors would have failed to express their dissatisfaction most vigorously and effectively because, if losses suffered had resulted substantially from lack of the additional protection now suggested for investors, the sellers (whose business depends upon the quality of issues sold) and the purchasers would be the greatest sufferers. No system is perfect; but it seems plain, in view of the vital importance of stability to the financing of the business of the country,[108] that the present system should not be scrapped, and a new and untried one substituted, in the absence of most sound and powerful reasons.

(b) The Report completely fails to set forth such reasons. The general criticisms of the present system are, as has been stated above, too largely incorrect or, where correct, are too largely based upon exceptional cases.

Disregarding cases of individual and controlled trustees ("real estate" indentures which cases, for the reasons above stated, have no proper place in the Report, it fails to demonstrate the necessity for the recommended change because it fails to show any such extensive investor losses from the present limitations of the trustee duties as distinguished from losses arising out of poor management or adverse business conditions, or due to ineffective negative pledge clauses, over liberal rights to substitute collateral, and other weak indenture provisions which can be eliminated or improved without radical changes.

Even though it properly may be said that investors need additional protection, it is certainly possible, and far wiser, to give it to them without jeopardizing the entire system of corporate trusteeships. The recommendation that investors, instead of having a reasonable degree of further protection, should have a general guardian of their interests, and that corporate trustees should be compelled to accept the guardianship, is impracticable and contrary to the public interest because, even if the compensation of such trustees could be so increased as to be commensurate with the increased duties, it would be difficult, if not impossible, to find responsible corporate trustees which would feel justified in agreeing to act as general guardians of investors.

The new standards, so far as presently proposed, are extremely indefinite and could never be made definite. While the principal general proposed standard is that which now governs personal trustees (the exercise of the same degree of care and diligence which prudent men employ in their own affairs) the duties and

[105] *Id.* at 69, 70.

[106] *Id.* at 10.

[107] Sunderland, *op. cit.*, *supra*, note 43, at 22, estimates that insurance companies and savings banks represent over sixty millions, or over 50%, of the population of this country, holding either insurance policies or savings bank deposits; and that the insurance companies alone have invested in railroad securities something over four billions of dollars, and the savings banks, approximately two billions; other banks, educational institutions and foundations, approximately one billion, making a total of seven billions out of a total bonded indebtedness of the railroads of approximately twelve billions. Willis and Bogen, *op. cit.*, *supra* note 57, say it has been estimated that "well over one-third of all outstanding railroad bonds are held directly by financial institutions."

[108] Moody's Manual of Investments (1936) 9, estimates that the total debt outstanding under indentures of Railroads, Utilities and Industrials at the end of 1935 was $33,390,000,000 (Railroads $11,445,000,000, Utilities $12,023,000,000, Industrials $9,922,000,000). These figures do not include "financial and real estate" corporate bonds.

responsibilities of a corporate trustee could never be known except in a most general way until after a new body of law had been built up. This is particularly true since the trustee would not have control of the trust estate.

It does not appear from the Report that investigation has been made as to whether responsible institutions could act as corporate trustees if the recommendation should be adopted. It seems certain that they could not, except possibly in the event of greatly increased compensation or other financial protection. Responsible banking institutions would not be justified in thus risking their funds which it is their paramount duty to safeguard. Many corporations could not afford to pay such compensation or furnish such financial protection, so that the wealthier corporations might obtain desirable trustees which other corporations now, but could not in the future, obtain; and even if the compensation or financial protection of the trustees were greatly increased, there is strong reason to believe that responsible banking institutions would not feel justified in acting as corporate trustees. It would be impossible to calculate the extent of the risks taken or to have any reasoned assurance that the increased compensation or financial protection would be adequate. The amounts involved in the performance of corporate trust duties are often very great.

The Commission considers that it would be "in the public interest" for corporate trustees to be required to undertake the new duties, but it also feels that it is essential to investors that the corporate trustees be institutions having resources commensurate with the responsibilities.[109] If the belief that institutions having such resources could not accept the proposed duties be correct, the result of the adoption of the legislation imposing such responsibilities would be that investors could not have the essential financial protection.[110] Instances have already occurred, since the passage of the Streit Law, of declinations by responsible trustees of trusts under "real estate" mortgages, as to which the responsibilities required to be incurred are much smaller than those which would be undertaken if, for example, a trustee were to act as proposed under the mortgage of a railroad or other large business enterprise.

The Report does not attempt to demonstrate that the Main Recommendation is practicable from the viewpoint of expense. In fact, the Report does not concern itself with expense, although the cost of corporate trustee administration might be so greatly increased as to make the remedy far worse than any evil which has been shown to exist. The expenses which would result from the carrying out of the Main Recommendation would be tremendous. Reference has been made above to the necessarily large increase in trustees' compensation or other financial protection. Furthermore, if trustees could accept under any circumstances the responsibilities suggested, they manifestly could not accept such responsibilities unless they were authorized, at the expense of the issuers or of the trust estates, to employ legal, engineering, and accounting experts and were permitted to rely upon such experts in discharging the responsibilities. Among the subjects as to which expert advice might be required are the properties securing the issue, the titles to said properties, the prior liens thereon, the recording requirements of the localities in which the properties are situated, the financial condition of the issuer, the truth of its statements furnished as the basis for certification of bonds, substitution of collateral or release of property, the application by the issuer of the proceeds of the issue, the performance by the issuer of its various covenants, the seriousness of defaults and the advisability of publicizing or enforcing them, and the proper treatment of the securities in reorganization depending upon their merits, under the conditions then existing, as compared with other securities of the issuer. To illustrate, suppose that a trustee were required to investigate the truth of the various financial statements furnished by a large corporation which, in the usual course of business, would spend very substantial amounts in keeping its voluminous records and in having them regularly audited by independent accountants.[111] Unless it is to be assumed that corporate bookkeeping and finan-

---

[109] The Report states, at 111: "The protection of investors will require not only that conflicts of interest of trustees be eliminated but also that some safeguards against impecunious and irresponsible trustees be established. This is essential lest the safety of funds be jeopardized and the administration of these vast trusteeships fall into irresponsible hands. Toward that end, provisions should be made that the trustee should be a bank or trust company, organized under state or federal laws, with resources commensurate with the responsibilities of the proposed trusteeship."

[110] See *Marshall & Ilsley Bank case*, 213 Wis. 415, 250 N. W. 862, 864 (1933): "The courts have an obligation to keep pace with the business world, and the imposition of duties and obligations upon a trustee that are more severe than called for will lead to difficulty in securing trustees who will accept the responsibility, and may even destroy the utility of the trust deed as an investment device."

[111] Reports casually selected from among those made under the Securities Exchange Act of 1934 show the following payments to accounting firms:

Remington Rand, Inc., to Price Waterhouse & Co., Inc., $40,736.38 for the fiscal year ending March 31, 1936;

General Motors Corporation to Haskins & Sells $203,961.30 for the year ending December 31, 1935;

Pacific Gas & Electric Company to Haskins & Sells $53,495.12 for the year ending December 31, 1935.

cial statements are generally erroneous or dishonest, it seems highly probable that most of the holders of an issue would feel that the moneys of their issuer were being wasted if the corporate trustee also were to employ its accountants to go over the books and records. In this respect, as in other similar respects, the Report, in its desire to protect small investors, does not consider whether recommendations of greatly increased expenses would be favored by large investors whose views are also of importance.

The Main Recommendation is based to a substantial extent upon an erroneous assumption that, because some investors mistakenly believe that the corporate trustee has the same active duties as a personal trustee, the proper remedy is to change the entire prevailing system and to require corporate trustees to assume such duties rather than to try to remove the misunderstanding. While it is doubtless true that some investors do not understand the duties of corporate trustees, the Report contains no evidence that purchasers ordinarily buy securities in reliance upon the performance by corporate trustees of personal trustee duties. Even so, small investors should be protected against the possibility of loss through deception. But is there any sound reason why the method of removing the misunderstanding should be to throw the corporate trustee system into chaos? If investors now misunderstand the duties of corporate trustees and believe them to be fully "active" trustees, the Commission under the existing Securities Act could require registration statements and prospectuses to contain such statements as the Commission should consider adequate to remove the misunderstanding. This would throw the burden of informing investors as to the limited nature of corporate trustee duties upon the persons who should have the burden, that is, the persons who profit from the sale of the securities. If necessary, the Securities Act could be appropriately amended. If, which seems unlikely, the misunderstanding cannot be adequately cleared away by the use of the Securities Act, then the term "trustee" can be modified. It certainly is not wise to scrap the long established system of corporate trusts in order to remove the misunderstanding.

While the Main Recommendation appears to be entirely unnecessary, impracticable, and contrary to the public interest, it may nevertheless be true that there are particular respects in which the existing system of corporate trusts should be improved. As to the specific recommendations the Report states, as above quoted, that such recommendations are "merely exemplary"; and it appears from the letter transmitting the Report to Congress that the Commission proposes to make further recommendations "for appropriate legislation."[112] However, it is appropriate to consider the specific recommendations so far as they are presently indicated.

At the outset, and before considering separately each of the specific recommendations, it may be said with reference to them generally that, while the Report apparently contemplates employment of experts by trustees, it does not appear to permit to trustees the express right to rely upon experts selected with reasonable care. Unless trustees were thus permitted, it seems apparent that they could not undertake the responsibilities proposed because, if they were to do so, the funds of their depositors and stockholders might be subject to heavy losses if the experts should make mistakes. If the trustees should be allowed to rely upon such experts, they would be undertaking principally the duty to select experts with reasonable care. Trustees, of course, could make such selection; but we should then have the situation that, in addition to extensive investigation by the experts of the borrowing corporations and of the underwriting houses,[113] the trustee would have its experts in the field. After this duplication by the trustee and the building up of large additional costs the situation still would be that the trustee relied upon experts, the only difference being that the trustee had selected another set of experts.

Recommendation (2) above quoted, proposes that the trustee be made responsible for failure to record, file or refile the mortgage (recording, filing and refiling being hereinafter included in the term "recording"). While in some instances, for example, in the case of a mortgage upon a hotel, recording by the trustee would not involve substantial labor or expense, the Report is attempting to prescribe rules of general application. The situation changes completely when the recommendation is applied to mortgages of large railroads, public utility companies, or indus-

[112] See *supra* note 2.

[113] See Willis and Bogen, *op. cit. supra* note 57, c. 8. The examination made by investment bankers before bringing out a security issue involves the use of its buying department, its statistical department, the employment of engineering experts, of legal experts, and of accountants. It has been estimated that the examination thus made in the case of an issue covering large properties is likely to take from three to six months. If these functions were to be performed by corporate trustees also, it is apparent that much delay would necessarily result and expenses would be heavily increased.

trial companies. In such cases, the trustee would be required to make an extensive study of the properties covered and of the recording requirements in many jurisdictions. This would involve substantial expense and much delay unless it were proposed that the trustees' experts should go into the field with the other experts and incur and be paid expenses involved in the proposed bringing out of issues which might never be brought out. If the trustee were not to make its investigations until after the underwriting houses had finished with their investigations, the element of delay would be an important one. Large companies have capable employees who are thoroughly familiar with the mortgaged property, and competent counsel in the local jurisdictions involved. As has been seen above, the underwriting houses also study the properties and the essentials of the security. They necessarily are required to check the recording and the instances wherein investors in fact have suffered losses from failure to record have not been shown to be more than infinitesimal. With regard to this recommendation, therefore, it seems probable that the complaints against the increased expense and delay of corporate trustee administration would greatly exceed in quantity and in merit any complaints against the existing practice.

Recommendation (2) also proposes that the trustee be responsible for failure to use reasonable care and diligence in certifying the securities. They are already under the legal duty not to exceed their powers; and their powers depend upon the showing to them of the existence of the conditions, provided for by the indenture, permitting the certification. However, the intent of this recommendation is that trustees be required to investigate the truth of the documents supplied to them as the basis for certification. In the body of the Report it is stated: [114]

"The conclusion is irresistible that in certifying the bonds, notes or debentures the trustees should be under an obligation to use reasonable care and diligence in ascertaining the truth of the representations of the issuer as to the existence of the conditions on which certification properly can be made. This will in the normal case mean appointment of independent engineers, appraisers or accountants by the trustee to examine the properties or accounts of the issuer."

This recommendation is subject to the same comment: That the expense and delay of such procedure would be completely out of proportion to any losses which have resulted under the present system.

Recommendation (3) proposes that the trustees be responsible for the exercise of reasonable care in checking the application of the proceeds of the securities. In this respect, the Report fails to demonstrate,[115] that the additional expense and delay would be justified by losses to investors under present practice.

Recommendation (4) suggests that the trustee be responsible for reasonable care in enforcing compliance with negative pledge clauses. How could it do so? It is recognized in the body of the Report [116] that this "problem is primarily one of control over the issuer rather than the trustee"; and that perhaps "negative pledge clauses in securities should be outlawed" as deceptive and as affording no real protection to investors. The Report also states [117] that issuers should not be permitted "to whisk away from the reach of investors assets to which they have properly looked for protection of their investment" and that "it is properly the function of corporate trustees to prevent this, as far as possible." Just how corporate trustees could prevent issuers from whisking away their assets does not appear. The Report suggests [118] that trustees "can make measurable progress in eliminating negative pledge clauses which are misleading and deceptive"; and that "trustees should require that they be drafted so as to prevent easy circumvention." In the case of negative pledge clauses, as in other cases to which the Report refers, the main fault in the present situation is in the contents of the indentures. It is reasonable to believe that the corporate trustees would welcome an invitation to consider with the Commission the insertion in indentures of language which would improve them, and that standard provisions might be adopted upon which the principal trustees would insist as a condition of accepting the trusts. However, it is quite a different thing to suggest that trustees should undertake the duty to enforce compliance with negative pledge clauses. The Report also states [119] that trustees "should require information of actions pertinent to performance of the issuer's obligations under the clause; and they should take action promptly to remedy any violation." The suggestion, recently repeated,[120] that trustees should take action to enjoin or remedy violations may be

[114] Report, at 29.
[115] *Id.* at 30.
[116] *Id.* at 15.
[117] *Id.* at 15.
[118] *Id.* at 15–16.
[119] *Id.* at 16.
[120] See Comment, *Protection for Debenture Holders* (1936) 46 Yale L. J. 97.

good in theory, but practicably it is of little, if any, value. In any ordinary case the trustee would not know of the violations until after the harm had been done, unless—which would be most unreasonable—the trustee should be supplied with funds from which through its experts to follow continuously the performance by all such issuers of their covenants. Nor is it apparent how the trustee could require an issuer to get back assets which it had effectively pledged in violation of its covenant, or could force the issuer to reacquire assets with which it had parted; and after the issuer had reached such a condition as to be violating its covenants a suit for damages would not be an effective remedy. Elimination or strengthening of negative pledge clauses would be helpful; but the main reliance of investors must be, as in the case of credit transactions generally, upon the standing of the issuer and not upon the hope that violations can be practicably prevented.

Recommendation (4) also proposes that the trustee be responsible for reasonable care in enforcing compliance with provisions for substitution and release of security and in taking appropriate steps to protect the security holders in the case of violation or threatened violation. The comments which have been made with regard to negative pledge clauses apply generally to this proposal. Very few cases can be pointed out wherein trustees have permitted the substitution or release of security except in accordance with the indenture provisions. This recommendation presents again the view, with which trustees might well agree, that useful improvements may properly be made in the language of many indentures.

Recommendation (5) proposes that the trustee be responsible for the use of reasonable care in ascertaining the occurrence of defaults and giving notice to the security holders "where such notice is necessary for their protection." Unless the occurrence of defaults has come to the knowledge of the trustee in its relations with the company, the trustee cannot know of defaults unless it incurs the great expense of checking by experts the performance by the company of the many covenants usually contained in a modern indenture. The Report itself recognizes [121] that "No rigid and inflexible rule can be prescribed"; and the utility of such a vague recommendation is debatable at best.

Recommendation (6) proposes that the trustee, after default, be responsible for failure to take such action for the protection of the security holders as is "reasonably necessary" for their protection. If an attorney were asked to advise a trustee as to what financial risks it would incur in accepting the trust under an indenture containing such a provision, he would be unable to. Opinions of the various courts to which might be presented suits asserting a trustee's liability for noncompliance with this duty might vary in as many different ways as there are different judges. In respect of this recommendation, also, the Report is completely lacking in any proposal that the trustee should have the right to rely upon the opinion of counsels elected with reasonable care. Reference has been made above to the decisions holding that indenture provisions contemplating the request of the holders of a stated percentage of the bonds are wise and proper and are inserted for the benefit of the security holders themselves.[122] These decisions bring out clearly the difference between the generally accepted view that the stipulated percentage ordinarily should concur in action which may seriously affect the common security and the view so frequently indicated by the Report and embodied in recommendation (6), that trustees after default should substitute their judgment for that of the security holders who are the owners of the investment and as such have the right to exercise their own judgment. Indeed, it may well be doubted whether investors such as life insurance companies or savings banks would consider it proper that the power which they have to make such decisions be transferred to the trustee.[123]

In the body of the Report, it is stated [124] that "the trustee could well be expected to scrutinize the provisions of a reorganization plan, to see that it is fair and that it provides adequate protection to minorities." Most of the trustees under large issues are presently scrutinizing to some extent such plans—from the point of view of all bondholders, minorities as well as majorities. However, the Report itself recognizes [125] that they cannot be expected to participate fully until their status and their right to financial protection shall be clarified and established. Even then there is much doubt as to how extensively trustees should duplicate the labor and expense of efficient committees or other large groups which are endeav-

[121] *Id.* at 42.
[122] See *supra* note 68.
[123] As is pointed out in Sunderland, *op. cit. supra* note 43, at 21, life insurance companies and savings banks are themselves "fiduciaries."
[124] Report, at 63.
[125] *Id.* at 66.

oring in good faith to bring about the best results for the bonds, and generally as to how far trustees should undertake investors' functions. The Commission also suggests [126] that in the case of "voluntary reorganizations," that is, reorganizations outside of court proceedings, "the trustee should be expected actively to represent the minority in negotiating a plan." Many of the comments which have just been made apply to this suggestion but, because of the absence of any such authority as is implied by Sections 77 and 77B, it is much more doubtful that the trustee has any functions in connection with the "negotiating" of a plan of voluntary reorganization.

It is not here suggested that the existing situation cannot be improved. Particularly well founded are the comments in the Report as to the weakness of indenture provisions and the desirability that they be improved. As has been stated above, this might be done by consultation of indenture experts with the Commission and by the agreement of the trustees to require such provisions as should be determined to be proper. It may well be also that trustees might properly perform some further duties. But the proposers of legislation for the enlargement of trustee duties should proceed, in a matter so vitally important, with great care and only after full consultation with the best qualified representatives of corporate trustees, of borrowing corporations, of investment bankers, and of investors—all of whom, by reason of long experience, can give valuable practical help. It may well be, although the author has no information upon the subject, that this is the procedure contemplated by the Commission.

We will have an executive committee meeting of the subcommittee which has this bill under consideration on next Tuesday at 10:30 a. m.

(Whereupon, at 4:45 p. m., the hearing was concluded.)

---

[126] *Id.* at 63.

# REGULATION OF SALE OF SECURITIES

**TUESDAY, JUNE 29, 1937**

United States Senate,
Subcommittee of the Committee on
Banking and Currency,
*Washington, D. C.*

The subcommittee met, pursuant to adjournment on Tuesday, June 22, 1937, in the Banking and Currency Committee room, Senate Office Building, at 11:30 a. m., Senator Robert F. Wagner (chairman) presiding.

Present: Senators Wagner (chairman), Bulkley, and Townsend.

Present also: Senators Barkley, Adams, Hitchcock, and Lodge.

The Chairman. The committee will come to order.

Mr. Buttenwieser, we will be delighted to hear from you.

## STATEMENT OF BENJAMIN J. BUTTENWIESER, CHAIRMAN, INVESTMENT BANKERS ASSOCIATION OF AMERICA SPECIAL COMMITTEE ON TRUST INDENTURES; NEW YORK, N. Y.

The Chairman. Tell us your full name and address, and also your banking associations.

Mr. Buttenwieser. Benjamin J. Buttenwieser; residence, 17 East Seventy-third Street, New York. I am a member of the firm of Kuhn, Loeb & Co., 52 William Street, New York, but I come here as chairman of the Investment Bankers Association of America special committee on trust indentures.

The references in this memorandum, by the way, are to committee print no. 2, which was the only one available to me yesterday.

The Investment Bankers Association of America, through its special committee on trust indentures, desires to record its regret that through the absence of the committee's chairman in California on a business trip and the closing of public hearings on this bill at an earlier date than the special committee had anticipated, it was unable to express to the Senate committee at its public hearings the views of the association with regard to this bill. It therefore takes this means of now conveying these views to the committee.

As it is aware that various other organizations have presented to the committee their opinions of the bill from their own particular viewpoint, this memorandum of the Investment Bankers Association special committee will confine itself to consideration of the bill only from the standpoint of investment bankers and the investing public and corporate borrowers, the interests of all of whom the members of this association are solicitous of safeguarding, and not from the standpoint of any other parties affected by the bill.

185

The CHAIRMAN. May I interrupt you there long enough to ask you to tell us something about this association?

Mr. BUTTENWIESER. The Investment Bankers' Association of America is composed of practically all firms, corporations, and organizations carrying on the so-called investment-banking business, that is, the business of selling securities to the public through public offerings. Its membership, I should assume, is somewhere around four or five thousand firms throughout the country. It represents all sections of the country, and all categories of investment banking, that is, as differentiated from commercial banking, which is represented by the American Bankers' Association.

That, I think, broadly enunciates the difference between investment banking and commercial banking, and the two associations which represent each of those categories.

Does that explain it sufficiently?

The CHAIRMAN. Yes.

Mr. BUTTENWIESER. At the outset the association wishes to emphasize that, for the continued improvement of financing methods and standards and for the protection of investors, it heartily favors any legislation which will better serve and safeguard the important interests which the investment-banking business serves. Consequently it feels that certain provisions of the bill represent decidedly constructive and sound legislation.

However, the association equally feels that in certain other respects the bill is unsound, in that, through the very generality of some of its provisions, it delegates to the Securities and Exchange Commission powers far beyond what the association believes Congress would knowingly delegate to any administrative body of the Government and far in excess of the responsibilities which any such body should feel warranted in assuming.

Specifically we refer to section 7 (m) (1) and (3), page 40, lines 7 to 15 and 18 to 19, wherein it is stated that [reading]:

The indenture to be qualified shall contain such provisions as the Commission shall deem necessary or appropriate in the public interest or for the protection of investors in respect of * * * restrictions or conditions on the release and substitution of any property subject to the lien of the indenture (and) on the issuance of additional indenture securities * * * (and) the definition of what shall constitute a default thereunder.

Senator ADAMS. May I ask you there, is it your understanding of this section of the bill—I may say, as a member of the committee, that I have not seen the bill before this moment—that the law as proposed would give to the Securities and Exchange Commission the right to fix the conditions in a deed of trust or an indenture controlling the manner in which property covered by the original instrument should be released, or under which substitutions could be made, and also could fix the definitions of what should constitute a default?

Mr. BUTTENWIESER. Yes; and particularly the issuance of additional indenture securities, in other words, the issuance of additional securities under that same indenture, or, in fact, the terms of the indenture when it is initially set up, as we read that section of the bill.

Senator ADAMS. How does it reach that—by requiring the submission of the indenture to the Commission before it is executed, or by seeking to reserve the power to modify it after its execution?

Mr. BUTTENWIESER. Submitting it for qualification under the act, and, during that 20-day period, examining its terms, and, if they do

not meet with the approval of the Commission, as we read the bill, refusing to qualify it, at the time when that indenture would otherwise be qualified.

Senator ADAMS. Can the Commission, under the bill, prohibit effectively the issuance of an instrument of encumbrance unless it meets their requirements?

Mr. BUTTENWIESER. As we read the bill, Senator, yes.

We further quote section 8 (n), page 42, lines 20–24 and page 43, lines 6 and 7, wherein it is stated that [reading]:

> The Commission shall have authority from time to time to make, issue, amend, and rescind such rules and regulations and such orders as it may deem necessary or appropriate in the public interest or for the protection of investors  *  *  * and to prescribe or recommend forms of indentures or of any provisions required or permitted to be included therein.

These parts of the bill, together with various similar though not so obvious portions of it, actually empower the Securities and Exchange Commission to dictate the terms, convenants and provisions of any indenture to be registered with it. It would seem extremely doubtful that Congress, one the one hand, intends to grant any such broad, unrestricted powers to any governmental agency, or, on the other hand, that the Securities and Exchange Commission would want to shoulder the broad responsibility of having investors assume, as indeed they would have a right to infer from such provisions of this bill, that the Commission, by so passing on an indenture, had approved its terms, such approval, in effect, being tantamount to formulating the terms of the security to be offered to the investing public. We feel that such assumption would become widespread among investors and would lull them into a false sense of security. Moreover, we feel that, if the Securities and Exchange Commission is to be cloaked with such powers, it is disingenuous for the bill to contain, as it does in section 13, page 49, lines 11 to 16, a statement that [reading]:

> It shall be unlawful for any person in issuing or selling any security to represent or imply in any manner whatsoever  *  *  *  that the Commission has in any way passed upon the merits of or given approval to any trustee, indenture or security.

Senator ADAMS. Do you mind an interruption there?

Mr. BUTTENWIESER. No, indeed.

Senator ADAMS. I am wondering why, in your statement, you say that the submitting of these instruments to the Securities and Exchange Commission, with the assumption that the Commission had approved them, if they were registered, would lull the people into a false sense of security. I was wondering if the fact that the Commission had approved it would not give a sense of security that would not be false.

Mr. BUTTENWIESER. That is my very point, Senator. The public would be led to believe that the Commission had passed on the terms of the security, and, therefore, they would infer from that that they probably passed on its very merits.

Senator BARKLEY. That is not true now of the exercise of the authority of the Securities and Exchange Commission over the issue of securities. The public does not get any idea that the Commission has approved the merits of the issue. They are required to file certain information with the Commission so that the public may obtain that information and make up its own mind, but there is no guaranty, moral or otherwise, attached to it.

Mr. BUTTENWIESER. That is quite right, Senator Barkley.

Senator BARKLEY. This provision requires the indenture to set out certain details, certain facts, certain conditions, which, when set out, entitle it to qualify for registry. That does not carry with it any moral obligation on the part of the Government that it is guaranteeing it, or that it has passed upon the wisdom or the merits of the issue.

Mr. BUTTENWIESER. Senator, that is just the differentiation we seek to make in this memorandum. There is a basic difference in concept, as we see it, between the Securities Act of 1933, as amended, and the bill at present under consideration.

If you would like to have me explain it at this time, I can. If not, the explanation will follow in this memorandum.

Senator BARKLEY. Go ahead with your statement.

Mr. BUTTENWIESER. It seems to us that the conclusion is inescapable that, if the investing public, as it inevitably would, became aware of the broad powers which the Securities and Exchange Commission would have under such sections of this bill as cited above, investors would be warranted in feeling that they had bought a security which was issued under an indenture that had been passed by a national board of quasi-security censors.

It is our considered opinion, based on comprehensive experience and knowledge of countless examples in point, that the formulation of the terms and provisions of a security and the indenture by which it is to be secured are and should be the subject of arm's length discussion and negotiation between the obligor and the investment banker through whom the securities are to be offered to the investing public. The problems of one corporate borrower differ from those of another and every case necessarily differs in matters of substance from the next. Investment bankers who are faithful to the trust reposed in them by the investing public assume the responsibility of designing and obtaining an equitable balance of terms and safeguards which, on the one hand, will best protect and serve the interests of the investing public and, on the other hand, will not be so onerous to the obligor as to render its corporate functioning difficult or impossible. We could cite many instances where provisions of indentures, formulated in an excess of zeal or caution to safeguard the investing public, so shackled the obligor that they proved a boomerang to the investing public in that they seriously undermined the ability of the obligor to obtain credit through normal channels when it was most needed. It is this type of indenture which, under the guise of strengthening the obligation it secures, may very often eventually weaken it.

It is along this line that we feel the preamble to the bill is ill-considered when it recites in section 1 (a) and 1 (a) (5), page 2, lines 1 to 6, and page 5, lines 22 to 25 [reading]:

It is hereby declared that the national public interest and the interest of investors * * * are adversely affected * * * when, by reason of their lack of understanding of the situation and the fact that such securities are publicly offered, such investors are unable to procure the insertion of adequate protective provisions in trust indentures * * *.

The very practicalities of the situation demonstrate that this is not the fact. The investment bankers who purchase an issue of securities from an obligor are the initial investors in such an issue. If for none other than a selfish purpose, they are naturally zealous in their endeavors to have each indenture under which such securities are issued render the greatest possible protection to such securities, so that their

resale to the investing public will be more readily facilitated. A statement such as that cited above can only be based on a mistaken view of the realities of the investment situation. In this regard we believe that the substitution of a governmental agency for an original purchaser, such as the investment banker, in the negotiation of the substantive terms and provisions of a trust indenture, would represent retrogression rather than progress.

It is our sincere belief that the interests of investors are better served when a governmental agency, such as the Securities and Exchange Commission, has determined that the provisions which have been agreed upon between the initial investor—most usually the issuing banker—and the obligor, and their effect in actual practice, are clearly described to the ultimate investor—most usually the investing public—so that the latter is well aware of the type of security which is being purchased and the terms of the indenture under which such a security is being issued. In this connection we feel that a rule similar to that contained in the proposed rules of fair practice of the Investment Bankers Conference, Inc., would adequately meet the situation. This rule reads as follows:

If any issue of securities had a title which is misleading as to the lien, terms or priority of such issue, a member shall state in the prospectus, if any, or, if there is no prospectus, shall disclose in some other manner to each purchaser of such securities the facts with regard thereto.

Senator BARKLEY. Why do you limit that misleading statement to the title, whereas frequently, over an almost unreadable number of pages, facts are not set out?

Mr. BUTTENWIESER. We have amplified that. In the next sentence we recommend going a step further.

We would recommend going one step further and providing, as is the intent of the rule we have quoted, that the lien, terms, priority, and other important provisions of an issue must be clearly disclosed through the prospectus to each purchaser of such a security.

Our other main observation is that we believe this bill renders each indenture which is to be qualified under it the subject of specific approval by the Commission, rather than having it qualified by meeting general rules embodied in the legislation in question. In support of this view we cite the following additional excerpts from the bill:

From section 6 (5) page 16, lines 23 to 25, and page 17, lines 16 to 24 [reading]:

The Commission shall issue an order refusing to permit an application * * * to become effective if it finds that * * * the indenture or any security to be issued thereunder * * * contains any provision * * * the elimination of which is necessary or appropriate in the public interest or for the protection of investors—

and from section 7 (g) and 7 (g) (4), page 33, lines 24 and 25, and page 34, line 6, and page 35, lines 5 to 7 [reading]:

The indenture to be qualified shall contain provisions * * * in respect of * * * the performance by the obligor of such of its other obligations under the indenture as the Commission deems necessary * * *.

We believe that broad, generalized language of this nature is fraught with danger in that the administration of such an act, which must necessarily devolve upon a rather large body of governmental administrators, is susceptible of maladministration and arbitrary rulings. This belief on our part is based on the fact that the bill would vest too

great powers of an undefined nature in the hands of such administrators, rather than by the use of specific language and precise terms enunciate principles within the framework of which such an act is to be administered   In other words, we think an act of this nature should provide for the qualification of indentures along prescribed adjective lines rather than having each indenture the subject of individual substantive rulings.   We point this out not merely in the interest of the members of the Investment Bankers Association but in the broader interest of borrowers under indentures who would have no way of knowing, prior to the time the indenture is qualified, what the form or provisions of the indenture would have to be in order to elicit the approval of the Commission, and thus would be forced to grope in ignorance while formulating their individual indentures and their financial plans in connection with securities to be issued thereunder.   We hope it will be understood that by this observation no criticism, direct or implied, is intended of the Securities and Exchange Commission or its individual members.   If the administration of this act could be concentrated in the hands of the five Commissioners, perhaps some of the doubts expressed herein would be resolved and fears allayed.

It is patent, however, that such direct administration cannot be expected of Commissioners already overburdened with the responsibility of administering three novel and comprehensive laws.   Consequently, the duty of passing judgment on the literally thousands of indentures which would be presented to the Commission for qualification and, thereby, on the terms of the securities to be offered to the public thereunder, would devolve upon a veritable legion of subordinates whom it would be necessary to add to the staff of the Commission and most of whom could not have that breadth of knowledge and experience requisite for the satisfactory performance of so important a role, especially when, as we have indicated, the patterns or precedents to follow in the formulation of such judgments are so indistinct if not, in fact, entirely nonexistent.

In the interest of brevity we have endeavored in this memorandum to point out only what we considered the most basic faults and shortcomings of the bill.   We reiterate that there are parts of it with which our sense of duty to the clientele which we serve dictates our complete agreement; but there are other parts which, while not referred to in this memorandum, that same sense of duty to that clientele and our experience in finance indicate are unsoundly formulated.

Summarizing, we should say that we feel it is sound public policy to entrust to the Commission authority to make certain that the protection which the prospectus represents as being ensured to the indenture security by the indenture under which it is issued is actually so afforded.   We do not, however, feel that Congress should delegate, or that a Governmental commission should assume, the responsibility of passing on the substantive provisions of any indenture.   Though this responsibility may not be apparent from a cursory reading of the bill, a careful analysis of it clearly demonstrates that this is the power with which it vests the Securities and Exchange Commission. It appears to us that through this process the Securities Act of 1933, as amended, is being transformed from an administrative law, whose fundamental concept is provision for adequate disclosure, to an approval law whose underlying principle involves specific approval of

individual indentures of all types of corporations, large and small, and, through that approval, of securities issued by such corporations under such indentures. Such a transition we firmly believe must inevitably lead to lulling the investing public into a false sense of security, and this, of course, is something which we know Congress and the Commission would sedulously seek to avoid.

Our feeling is that there is nothing emergent in the present investment situation to warrant undue haste in the passage of a bill embodying such a drastic change in fundamental public policy involving public reliance on governmental approval of this nature and having such far-reaching effects. We would therefore respectfully suggest a more careful consideration of the implications of this bill and a more detailed study of the practice of other countries in legislation of this nature, with a view to the passage of a bill which would render true protection to investors and at the same time be less deleterious in its effect on the investing public, on corporate obligors, and on the investment-banking business. For such study and consultation the members of the Investment Bankers Association stand entirely ready to place at the disposal of the Senate Committee on Banking and Currency their experience, their facilities, and their unstinted cooperation.

We respectfully submit this, and appreciate your having heard it.

Does that cover your point, Senator Barkley, as to the fundamental difference in concept between the Securities Act of 1933, as amended, and the present bill?

Senator BARKLEY. I understand the point you make.

Mr. BUTTENWIESER. On the one hand, under the Securities Act, there is no representation, implied or direct, that the Commission has passed on any of the information made available. It simply says that it is all set out, and the investor can judge for himself. Under this bill, as we read it, there is a rather direct implication that the Commission will have to pass upon the merits of the provisions of the respective indentures.

Senator HITCHCOCK. In other words, you have reference to the language "which the Commission shall deem adequate"? Is that what you have reference to?

Mr. BUTTENWIESER. Yes; and the other language we have quoted.

Senator BARKLEY. The bill provides that these indentures shall contain certain provisions. That does not necessarily mean that the Commission approves of the indenture, but if it is to be issued, and a trustee is to be appointed, it shall contain the provisions set out in the bill, designed to protect those who had no opportunity to sit in at the inception of the indenture, or with regard to its terms, and who, in many cases, do not take the trouble, or could not understand all the legal phraseology involved in an indenture of many pages. It is provided that the indenture itself shall contain certain provisions. I do not see where that implies that the Commission has approved the issue of the indenture or in any way sanctioned it, so far as its liability or responsibility is concerned. It just simply provides that if those indentures are issued, these stipulations shall be set out in them, so that those who invest their money in the indentures may more readily understand what they are buying.

Senator ADAMS. May I supplement what Senator Barkley has said? I have gathered from your statement that this bill merely has to do

with the form of the indenture, and that that is what is submitted; that is, that there is not submitted any statement as to the property to be covered by the indenture.

Mr. BUTTENWIESER. It is more than just a form, Senator. It is the form and the actual provisions.

Senator ADAMS. Does it in any way submit to the Securities and Exchange Commission the securities which are to be covered by the indenture, either as to whether they are accurately described or whether there is any misrepresentation with reference to them? That is done under the Securities and Exchange Commission now; that is, they now, to a certain extent, pass upon information. That is, the full information is furnished of the financial set-up of the company and the assets which are to be covered, but, as I understand it, this bill has to do with the form of the indenture only.

Mr. BUTTENWIESER. You are quite right. It has to do with the form, but it goes one step further. It has to do with the actual provisions—not merely their form, but the actual provisions to be inserted in such indenture. Take a concrete example, for instance. It is quite usual to have——

Senator HITCHCOCK. Just a minute. If the State has a code saying that you shall do certain things, you do not mean to say that the State of New York, for example, guarantees any indenture that is made according to the provisions of that code, do you?

Mr. BUTTENWIESER. So far as I am aware, we have no code that is analogous to this. Do you refer to the Martin Fraud Act in New York?

Senator HITCHCOCK. Yes.

Mr. BUTTENWIESER. I do not think it is analogous to this. What I was trying to indicate is this: It is quite the common practice to have an indenture—say a first mortgage on a steel plant—which says securities can be issued for 75 percent of the cost or fair value of an addition or improvement. Under this bill, as we read it, it is well within the power of the Securities and Exchange Commission—we do not anticipate that they will use it, of course, but it is there, as we see it—to say, "We think 75 percent on a steel mortgage is too high. You should only have releases up to 66⅔ percent of the cost or fair value." That is the difference between adjective superintendency of it and dictating the substantive provisions of an indenture. That is what we sought to make clear in the memorandum, and we assume it is the latter power that Congress would not want to delegate to any commission.

Senator BARKLEY. I think, if you will examine the new print of the bill, you will find that we have met, to some extent, some of the objections you raise. We have gone over it since the testimony was closed the other day.

I would like to have you look over this committee print No. 3. I think you will find that some of the matters you discuss have been clarified.

Mr. BUTTENWIESER. I am glad they have, because that lends more substance to the points we have made.

Senator TOWNSEND. Would you care to go over this print and drop a line to the members of the committee giving your views on the print as it has been changed?

Mr. BUTTENWIESER. I should be very glad to.

Senator LODGE. You have not yet seen this committee print No. 3?

Mr. BUTTENWIESER. I did see it for a moment, outside the hearing room this morning, but not sufficiently to know whether the points we have raised are adequately covered in that.

I apologize again for having been late on this, because the committee was pretty well scattered.

The CHAIRMAN. We had closed the hearings, but I appreciate the fact that you represent very substantial interests, and we wanted to get the benefit of your views and experience.

Mr. BUTTENWIESER. Thank you very much for permitting me to make known our views.

If there are any other questions, I shall be glad to answer them, or I shall be glad to go over this new print and submit a second memorandum.

Senator LODGE. Will Mr. Buttenweiser have further opportunity to appear before the committee, after he has read the new print?

The CHAIRMAN. Can you not transmit in writing your views, if they are modified as a result of the new print?

Mr. BUTTENWIESER. Yes.

The CHAIRMAN. You can understand that if we continue these hearings indefinitely, we will never get to the point of actual consideration. We have had 4 days of hearings.

Senator BARKLEY. More than that.

Mr. BUTTENWIESER. I can well appreciate that; and, from previous experience before this same committee, I know it gets warm down here.

The CHAIRMAN. We have gone over it pretty thoroughly.

Senator BARKLEY. I hope Mr. Buttenweiser can send a brief memorandum to the committee if he finds any occasion, in the new print, to modify his views. I think he will find it.

Mr. BUTTENWIESER. I hope so.

I assume you have no objection, Senator Barkley, or Senator Lodge, to our submitting suggestions over and beyond that, if we think the points we raise are not adequately covered in your reprint?

Senator BARKLEY. We would like to have these hearings printed as soon as possible, so that members of the committee can have them available to study. This is a very technical bill, as you know, and it takes a considerable amount of study to get into the meat of it. I would not like to have the hearings delayed.

The CHAIRMAN. You are the last witness who has asked to be heard on this proposition, who represents any substantial interest, so that I think we are in a position where we can close the hearings now.

However, I should like to have you read over that committee print No. 3 today, and, if you have any modification of your views, or other views you want to present, send us a memorandum.

Mr. BUTTENWIESER. Very well. We can send it to you by tomorrow, or Thursday at the latest.

Senator LODGE. May I ask one more question? Is it your opinion that this bill would tend to decrease the amount of business that is now being done in the way of financing, and so forth? Would it have a restrictive effect on the total volume?

Mr. BUTTENWIESER. It might, very conceivably. It could have that effect, from quite another viewpoint, not merely investment banking. I can conceive of it having a very substantial effect, through its restrictions, in smaller communities, where it might be

very difficult to meet the various conflicts of interest which have been enunciated in this bill, but which we have not considered particularly, because we know the American Bankers Association has considered them.

Senator BARKLEY. As a matter of fact, if there is any real need for the issue of these debentures for the financing or refinancing of any concern, and the public can more easily obtain information and facts, and understand what they are, would not that tend to greater confidence, and increase rather than restrict the amount of money that might be invested?

Mr. BUTTENWIESER. Senator Barkley, any bill which has as its fundamental concept the greater publicity of all the terms of an indenture or security is a bill which has our wholehearted support. We ardently will champion any bill or any type of legislation which will provide for greater publicity to the investing public, so that the man who buys will know what he is receiving.

Our point is that we think it is unwise and unsound to delegate to any governmental organization the right or power to fix the substantive provisions of any indenture or of any security.

Senator BARKLEY. You do not think Congress could do that? It has to be delegated to somebody, or not exercised at all, because it would be impossible for Congress to sit around the table and help write up every indenture, and fix its terms. If there is any regulation at all of the contents of these indentures, it must be done by somebody to whom the authority is delegated.

Mr. BUTTENWIESER. That is perfectly true; but our point is that we feel that Congress is going as far as it would want to go or should go if it delegates to an organization like the Securities and Exchange Commission, which is eminently qualified to do that, the duty of seeing that the terms that have been agreed upon are adequately portrayed to the investing public; in other words, that there are no jokers in it, and that what the buyer thinks he is getting he is actually purchasing. That is why we feel that the Securities Act has been very beneficial.

The CHAIRMAN. You mean it ought to be limited to approval or disapproval?

Mr. BUTTENWIESER. It ought to be limited, we think, Senator Wagner, to an adequate description of the terms which have been agreed upon between the initial purchaser and the initial seller.

Senator BARKLEY. There is a difference between the nature of these securities and the ordinary stocks issued by corporations to get more money. Here you have the question of the trustee involved, where he or it may have conflicting interests. One of the objects of this bill is to make it the primary duty of the trustee to look after the investors whom he represents. You do not have that same situation in the ordinary issue of stocks, where all that is necessary is for the investor to know the condition of the company or its resources, and all those things. But there may be hidden clauses in one of these long indentures that form a loophole by which the trustee may escape the performance of his real duty or, if there is any conflict between the investor and somebody else, he may have to choose which one he will serve.

Mr. BUTTENWIESER. We are wholeheartedly in accord with that, and you will notice that our memorandum did not touch on any of that, Senator Barkley, because we have not the slightest quarrel with that.

The CHAIRMAN. Thank you very much.

ADDITIONAL MEMORANDUM SUBMITTED BY THE INVESTMENT BANKERS ASSOCIATION OF AMERICA SPECIAL COMMITTEE ON TRUST INDENTURES

The Investment Bankers Association of America, through its special committee on trust indentures, desires to express its appreciation of the courtesy of the Senate committee in having permitted the special committee to convey to the Senate committee the views of the association with regard to this bill and for the further courtesy of asking the special committee to submit a further memorandum conveying its views with regard to the redraft of this bill, namely, committee print No. 3 of June 29, 1937.

While we are gratified to note from careful study of this redraft that it embodies substantial improvements over previous drafts, in that it limits the scope of the matters to be determined by the Securities and Exchange Commission, we regret to note that the chief objection to the bill raised by the Investment Bankers Association in its memorandum of June 28, 1937, as enunciated on page 8 of that memorandum, has not been met; namely, that the Securities Act of 1933, as amended, is being transformed from an administrative law, whose fundamental concept is provision for adequate disclosure, to an approval law whose underlying principle involves specific approval of individual indentures. We do not find that the new draft has changed this aspect of the bill, except, as stated above, to limit somewhat the matters in respect of which the Commission's approval is necessary. The bill still proceeds on the theory of an approval statute and this, we believe, is an unfortunate departure from the concept of previous legislation. We believe that the observations set forth in our previous memorandum with regard to the effect of such a statute continue to apply to the revised bill.

Our other observation with regard to committee print No. 2 has, to some extent, been met by the changes embodied in committee print No. 3, namely, that the Securities and Exchange Commission no longer has, to as great a degree, the powers enumerated on page 2 of our previous memorandum to dictate the terms, covenants, and provisions of any indenture to be registered with it. We believe that the changes made in committee print No. 3 in the redrafting of section 7 (m) has somewhat circumscribed these powers of the Securities and Exchange Commission. However, we feel that the following language in that section still reserves to the Securities and Exchange Commission powers which, if arbitrarily exercised, might be against public policy. We refer to section 7 (n) (p. 41, lines 2 to 5, 8 to 10, 18, and 19) wherein it is stated that—

"The indenture to be qualified shall contain provisions which the Commission shall deem adequate * * * in respect of the following matters; * * * the definition of what shall constitute a default thereunder * * * (and) the duties of the trustee with respect to * * * calling meetings of the indenture security holders."

We have merely enumerated certain parts of this section which we believe fall into that category but there are similar parts which we might cite in this section and elsewhere throughout the bill which we feel should be more precisely limited. Of this type we would again refer to sections 7 (g) and 7 (g) (4) (p. 35, lines 4, 5, and 11, and p. 36, lines 1 to 4) which, as stated on page 6 of our previous memorandum, reads as follows:

"The indenture to be qualified shall contain provisions * * * in respect of * * * the performance by the obligor of such of its other obligations under the indenture as the Commission deems necessary * * *"

We would also again urge, for the reasons set forth in our previous memorandum, a reconsideration of article 5 of the preamble to the bill wherein it recites, in sections I (a) and I (a) (5) (p. 2, lines 1, 2, and 6, and p. 4, lines 3 to 7) that—

"It is hereby declared that the national public interest and the interest of investors * * * are adversely affected * * * when, by reason of their lack of understanding of the situation and the fact that such securities are publicly offered, such investors are unable to procure the insertion of adequate protective provisions in trust indentures * * *."

We urge that this be either eliminated or drastically changed. For the reasons stated in our previous memorandum, we believe the very practicalities of the situation demonstrate that this is not the fact and in support of this view, namely, that the safeguarding of the interests of investors may well be entrusted to the issuing bankers who negotiate the terms of a trust indenture and the securities to be issued under it, we quote the following from an article by Mr. Jesse H. Jones which appeared in the Saturday Evening Post of June 26, 1937:

"The banker whose business it is to make loans to sell is apt to favor the investor at the expense of the borrower * * *."

In this connection we would reiterate the statement contained in our previous memorandum, namely, that "investment bankers who are faithful to the trust reposed in them by the investing public assume the responsibility of designing and obtaining an equitable balance of terms and safeguards which, on the one hand, will best protect and serve the interests of the investing public and, on the other hand, will not be so onerous to the obligor as to render its corporate functioning difficult or impossible."

Summarizing, we regret that, even though we find the redrafted bill as embodied in committee print No. 3 contains some improvement over committee print No. 2, in view of the basic objections set forth herein and in our previous memorandum, we do not feel warranted in approving the bill even in its present revised form. We hope, therefore, that the Committee on Banking and Currency will carefully weigh the views presented in these two memoranda to the effect that an act of this nature should provide for the qualification of indentures along prescribed adjective lines rather than having each indenture the subject of individual substantive rulings and that the fundamental principle of such legislation should be full disclosure rather than approval.

Respectfully submitted.

INVESTMENT BANKERS ASSOCIATION OF AMERICA,
SPECIAL COMMITTEE ON TRUST INDENTURES,
By BENJAMIN J. BUTENWIESER, *Chairman,*
MILTON C. CROSS,
ALLEN N. JONES,
KARL WEISHEIT,
GEORGE D. WOODS.

JULY 1, 1937.

The CHAIRMAN. At the request of Senator Barkley there will be included in the record at this point a copy of committee print No. 3 and an analysis thereof.

(The bill and statement referred to are as follows:)

[S. 2344, 75th Cong., 1st sess., Committee Print No. 3, June 29, 1937]

[Changes from Committee Print No. 2 are indicated by black brackets and italics]

A BILL To provide for the regulation of the sale of certain securities in interstate and foreign commerce *and through the mails, and the regulation of* [and] the trust indentures under which the same are issued, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Trust Indenture Act of 1937."

#### NECESSITY FOR REGULATION

[SECTION] SEC. 1. (a) Upon the basis of facts disclosed by the reports of the Securities and Exchange Commission made to the Congress pursuant to section 211 of the Securities Exchange Act of 1934 and otherwise disclosed and ascertained, it is hereby declared that the national public interest and the interest of investors in notes, bonds, debentures, and evidences of indebtedness publicly offered by the use of means and instruments of transportation and communication in interstate commerce and of the mails are adversely affected—

(1) When the obligor fails to provide a trustee to protect and enforce the rights and to represent the interests of such investors, notwithstanding the fact that (A) individual action by such investors for the purpose of protecting and enforcing their rights is rendered impracticable by reason of the disproportionate expense of taking such action, and (B) concerted action by such investors in their common interest through representatives of their own selection is impeded by reason of the wide dispersion of such investors through many States and the fact that information as to the names and addresses of such investors is controlled by the obligor and underwriters;

(2) When the trustee designated does not have adequate rights and powers, or adequate duties and responsibilities, in connection with matters relating to the protection and enforcement of the rights of such investors; when, notwithstanding the obstacles to concerted action by such investors, and the general and reasonable assumption by such investors that the trustee is under an affirmative duty to take action for the protection and enforcement of their rights, trust indentures generally provide that the trustee shall be

under no duty to take any such action, even in the event of default, unless it receives notice of default, demand for action, and indemnity, from the holders of substantial percentages of the outstanding securities, and generally relieve the trustee from liability even for its own negligent action or failure to act;

(3) When the trustee designated does not have resources commensurate with its responsibilities, or has any relationship to or connection with the obligor or any underwriters of any securities of the obligor, or holds, beneficially or otherwise, any interest in the obligor or any such underwriter, which relationship, connection, or interest involves a material conflict, actual or potential, with the interest of such investors;

(4) When the obligor is not obligated to furnish to the trustee and to such investors adequate current information as to its financial condition and the performance of its obligations with respect to such securities; or when the communication of such information to such investors is impeded by the fact that information as to the names and addresses of the holders of such securities is controlled by the obligor and underwriters; or

(5) When, by reason of their lack of understanding of the situation and the fact that such securities are publicly offered, such investors are unable to procure the insertion of adequate protective provisions in trust indentures, which are commonly prepared by the obligor or underwriters.

(b) Abuses of the character above enumerated have been so widespread that the public offering of such securities, unless regulated, is injurious to the capital markets, to investors, and to the general public; and it is hereby declared to be the policy of this Act, in accordance with which policy all the provisions of this Act shall be interpreted, to meet the problems and eliminate the evils, as enumerated in this section, connected with the public offering of such securities by the use of means and instruments of transportation and communication in interstate commerce and of the mails.

### DEFINITIONS

Sec. 2. When used in this Act, unless the context otherwise requires—

(1) Any term defined in section 2 of the Securities Act of 1933, as heretofore amended, and not otherwise defined in this section, shall have the meaning provided in such section 2.

(2) The term "sale" shall include all transactions included in such term as provided in paragraph (3) of section 2 of the Securities Act of 1933, as heretofore amended, except that a sale of a certificate of interest or participation shall be deemed a sale of the security or securities in which such certificate evidences an interest or participation if and only if such certificate gives the holder thereof the right to convert the same, either immediately or on or after some future date, into such security or securities.

(3) The term "underwriter" means any person who has purchased from an issuer with a view to, or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission.

(4) The term "director" means any director of a corporation or any individual performing similar functions with respect to any person whether incorporated or unincorporated.

(5) The term "executive officer" means the president, every vice president, the cashier, secretary, treasurer and trust officer and any person customarily performing similar functions.

(6) The term "indenture" means any mortgage, deed of trust, trust or other indenture, or similar instrument or agreement (including any supplement or amendment to any of the foregoing), under which securities are outstanding or are to be issued, whether or not any property, real or personal, is or is to be pledged, mortgaged, assigned or conveyed thereunder.

(7) The term "application" or "application for qualification" means the application provided for in section 5, and includes any amendment thereto and any report, document or memorandum accompanying such application or incorporated therein by reference.

(8) The term "indenture to be qualified" means the indenture in respect of which a particular application is filed.

(9) The term "indenture trustee" means each trustee under the indenture to be qualified, and each successor trustee.

(10) The term "indenture security" means any security issued or to be issued under the indenture to be qualified.

(11) The term "obligor" means every person who is liable upon any such security, and, if such security is a certificate of interest or participation, [includes] *means also* every person who is liable upon the security or securities in which such certificate evidences an interest or participation; but such term shall not include the trustee under an indenture under which *certificates of interest or participation,* equipment trust certificates, or like securities are outstanding.

(12) The term "paying agent", when used with respect to any such security, means any person authorized by an obligor thereon to pay the principal of or interest on such security on behalf of such obligor, *or in the case of certificates of interest or participation, on behalf of the trustee.*

(13) The term "State" means any State of the United States.

(14) The term "Commission" means the Securities and Exchange Commission.

(15) *The term "voting security" means any security presently entitling the owner or holder thereof to vote in the direction or management of the affairs of a person, or any security issued under or pursuant to any trust, agreement, or arrangement whereby a trustee or trustees or agent or agents for the owner or holder of such security are presently entitled to vote in the direction or management of the affairs of a person; and a specified per centum of the outstanding voting securities of a "person" means such amount of the outstanding voting securities of such person as entitles the holder or holders thereof to cast such specified per centum of the aggregate votes which the holders of all the outstanding voting securities of such person are entitled to cast in the direction or management of the affairs of such person.*

[(16) The term "voting security" means a security presently entitling the holder or owner thereof to vote for the election of directors.]

(16) The terms "Securities Act of 1933", "Securities Exchange Act of 1934" and "Public Utility Holding Company Act of 1935" shall be deemed to refer, respectively, to such Acts, as heretofore or hereafter amended.

## EXEMPTED SECURITIES AND TRANSACTIONS

SEC. 3. (a) The provisions of this Act shall not apply to any of the following securities:

(1) Any security other than a note, bond, [debenture,] *debenture,* or evidence of indebtedness, whether or not secured, *or* a certificate of interest or participation [in] *therein,* or temporary certificate for, or guarantee of, any of the foregoing.

(2) Any certificate of interest or participation in two or more securities having substantially different rights and privileges, or a temporary certificate for, [or guarantee of,] any such certificate.

(3) Any security which, prior to [January 3, 1938] *or within six months after the enactment of this Act,* has been sold or disposed of by the issuer or bona fide offered to the public, but this exemption shall not apply to any new offering of any such security by an issuer [or underwriter on or after such date] *subsequent to such six months.*

(4) Any security exempted from the provisions of the Securities Act of 1933, by paragraphs 2, 3, 4, 5, 6, 7, 8, or 11 of subsection 3 (a) of such Act, as heretofore amended.

(5) Any security issued under a mortgage indenture as to which a contract of insurance under the National Housing Act is in effect.

(6) *Any note, bond, debenture, or evidence of indebtedness of a foreign government or of a subdivision, department, municipality, agency, or instrumentality thereof.*

[(6)] (7) Any guarantee of any security exempted from the provisions of this Act by this subsection.

(b) The provisions of section 4 shall not apply to any of the transactions exempted, by section 4 of the Securities Act of 1933, as heretofore amended, from the provisions of section 5 of such Act. For the purposes of this subsection the term "underwriter", as used in section 4 of such Act, shall have the meaning provided in paragraph (3) of section 2 of this Act.

(c) The Commission may from time to time by rules and regulations, and subject to such terms and conditions as may be prescribed therein, add any class of securities to the securities exempted in subsection (a) of this section, if it deems that the application of this Act with respect to such securities is not necessary in the public interest and for the protection of investors by reason of the small amount involved and the small amount of securities outstanding and thereafter issuable under the same indenture, or the limited character of the public

offering; but no issue of securities shall be exempted under this subsection where the aggregate amount [of] *at* which such issue is offered to the public exceeds $250,000.

(d) The Commission may, on application by the issuer and after opportunity for hearing there⁀⁀ by order exempt from any one or more provisions of this Act any security i. ᵛ ⁀ r proposed to be issued under an indenture under which, at the time of such issuance, securities referred to in paragraph (3) of subsection (a) of this section are outstanding, if and to the extent that it finds that compliance with such provision or provisions, through the execution of a supplemental indenture or otherwise—

(1) would require by reason of the provisions of the indenture, or of any other indenture or agreement made prior to the [effective date] *enactment* of this Act, or by reason of the provisions of any applicable law, the consent of the holders of securities outstanding thereunder, or

(2) would impose an undue burden on the issuer, having due regard to the public interest and the interests of investors.

### PROHIBITIONS RELATING TO INTERSTATE COMMERCE AND THE MAILS

Sec. 4. (a) Subject to the provisions of section 3, unless a security has been or is to be issued under an indenture as to which an application for qualification is effective, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

(b) Notwithstanding the provisions of the Securities Act of 1933, [on and after January 3, 1938] *subsequent to six months after the enactment of this Act,* no registration statement relating to a security which is subject to the provisions of subsection (a) of this section shall become effective unless such security has been or is to be issued under an indenture as to which an application for qualification is effective.

### APPLICATIONS FOR QUALIFICATION AND THE TAKING EFFECT THEREOF

Sec. 5. (a) An application for qualification of the indenture under which a security has been or is to be issued shall be filed with the Commission by the issuer of such security. Such application shall be in such form, and shall be signed in such manner, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. Such application shall include such of the information and documents as would be required to be filed in order to register such security under the Securities Act of 1933, and such additional information, in such form and detail, and such documents, regarding the applicant, the obligors, the trustees, the paying agents and the underwriters (as such term is defined in subsection (b) of section 7), including prospective obligors, trustees, and underwriters, and the direct or indirect relationships between any of the foregoing, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. [The] *Subject to the provisions of section 10, the* information and documents contained in or filed with any application shall be made available to the public under such regulations as the Commission may prescribe, and copies thereof, photostatic or otherwise, shall be furnished to every applicant therefor at such reasonable charge as the Commission may prescribe.

(b) The filing with the Commission of an application, or of an amendment to an application, shall be deemed to have taken place upon the receipt thereof by the Commission, but unless a registration statement, under the Securities Act of 1933, covering securities issued or to be issued under the indenture to be qualified has been filed prior to or simultaneously with the application, the filing of such application shall not be deemed to have taken place unless it is accompanied or preceded by payment to the Commission of a filing fee in the amount of $100, such payment to be made in cash or by United States postal money order or certified or bank check, or in such other medium of payment as the Commission may authorize by rule and regulation. If a registration statement covering securities issued or to be issued under such indenture is subsequently filed, the amount of the fee so paid shall be credited against the fee required to be paid at

the time of filing such registration statement, and any excess shall be refunded to the applicant. If an amendment is filed prior to the effective date of such application, the application shall be deemed to have been filed when such amendment was filed; except that an amendment filed with the consent of the Commission, prior to the effective date of the application, or filed pursuant to an order of the Commission, shall be treated as a part of the application. Amendments after the effective date of an application may be made upon such terms and conditions as the Commission may prescribe.

(c) The effective date of an application shall be the twentieth day after the filing thereof, unless the Commission prior to such time shall have issued an order to the issuer to show cause why such application should become effective. If an order to show cause under this subsection has been issued, such application shall become effective within such reasonable period of time after an opportunity for hearing upon such order as the Commission shall fix by rules and regulations unless the Commission prior to the expiration of such period shall have issued an order pursuant to section 6 refusing to permit such application to become effective. Whenever the Commission shall issue an order to show cause, it shall cause the same to be served upon the issuer in such manner as the Commission may by rules and regulations prescribe, and accord an opportunity for hearing thereon (at a time fixed by the Commission) within 10 days after such service. *An application may be withdrawn by the applicant at any time prior to the effective date thereof.*

(d) Except as otherwise expressly provided in this Act the making, amendment or rescission of a rule, regulation or order under the provisions of this Act shall not affect the form or interpretation of any indenture as to which qualification became effective prior to the making, amendment or rescission of such rule, regulation or order.

(e) The Commission is hereby empowered to make an investigation in any case in order to determine whether a refusal order should issue under section 6. If the issuer, or any obligor, [underwriter or trustee, including prospective obligors, underwriters and trustees] *or any underwriter, or prospective underwriter, of the securities in respect of which the application is filed, or any trustee or prospective trustee under the indenture to be qualified,* shall fail to cooperate, or shall obstruct or refuse to permit the making of such investigation, such conduct shall be proper ground for the issuance of a refusal order.

REFUSAL ORDERS

SEC. 6. The Commission shall issue an order refusing to permit an application filed pursuant to section 5 to become effective if it finds that —

(1) such application does not conform to the requirements of this Act and the rules and regulations thereunder;

(2) the application includes any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading;

(3) any person designated as trustee under the indenture is not eligible to act as such under subsection (a) of section 7 or has any conflicting interest as defined in subsection (b) of section 7;

(4) the indenture does not conform to the requirements of section 7 and the rules and regulations thereunder; or

(5) the indenture or any security to be issued thereunder contains any provision which limits, qualifies or conflicts with a provision required to be contained in the indenture by this Act or the rules and regulations thereunder; or any provision the inclusion of which is prohibited by this Act or the rules and regulations thereunder; or any provision which is misleading or [deceptive;] *deceptive,* or the elimination of which is necessary or appropriate in the public interest or for the protection of investors [or] to prevent the circumvention or evasion of this Act.

If and when the Commission deems that the objections on which such order was based have been met, the Commission shall enter an order rescinding such refusal order, and the application shall become effective at the date fixed pursuant to subsection (c) of section 5 or upon the date of such rescission, whichever shall be the later.

CONTENTS OF INDENTURE

Persons Eligible for Appointment as Trustee

SEC. 7. (a) (1) The indenture to be qualified shall require that there shall at all times be one or more trustees thereunder, at least one of whom shall at all times be an institution incorporated and doing business under the laws of the

United States or of any State or Territory or of the District of Columbia, which (A) is authorized under such laws to exercise corporate trust powers, and (B) is subject to supervision or examination by Federal, State, Territorial or District authority.

(2) If the Commission deems it necessary or appropriate in the public interest or for the protection of investors, in view of the type of indenture, the amount of securities outstanding and thereafter issuable thereunder, and the duties and responsibilities imposed thereby on the trustee or trustees, the indenture to be qualified shall require that such institutional trustee have at all times a combined capital and surplus of such specified minimum amount as the Commission deems adequate, having due regard to the public interest and the interests of investors. If such institutional trustee publishes reports of condition at least annually, pursuant to law or to the requirements of such supervising or examining authority, the indenture may provide that for the purposes of this paragraph, the combined capital and surplus of such trustee shall be deemed to be its combined capital and surplus as set forth in its most recent [published] report of condition *so published*.

(3) If the indenture to be qualified requires or permits the appointment of one or more co-trustees in addition to such institutional trustee, such indenture shall provide that the rights, powers, duties and obligations conferred or imposed upon the trustees or any of them shall be conferred or imposed upon and exercised or performed by such institutional trustee, or such institutional trustee and such co-trustees jointly, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed, such institutional trustee shall be incompetent or unqualified to perform such act or acts, *in which event such rights, powers, duties and obligations shall be exercised and performed by such co-trustees.*

(4) In the case of certificates of interest or participation, the indenture to be qualified shall require that the indenture trustee or trustees have the legal power to exercise all of the rights, powers and privileges of a holder of the security or securities in which such certificates evidence an interest or participation.

### [DISQUALIFICATION OF TRUSTEE]

#### *Disqualification of Trustee*

(b) The indenture to be qualified shall provide that if the indenture trustee has or shall acquire any conflicting interest as hereinafter defined, (i) such trustee shall, within 90 days after ascertainment of such conflicting interest, either eliminate such conflicting interest or resign, such resignation to become effective upon the appointment of a successor trustee and such successor's acceptance of such appointment, and the obligor shall take prompt steps to have a successor appointed in the manner provided in the indenture, and (ii) subject to the provisions of subsection (l) of this section, any security holder who has been a bona-fide holder of indenture securities for at least six months (on failure of such trustee on the written request of such holder either to resign or to eliminate such conflicting interest, as required by clause (i) of this subsection) may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of such trustee and the appointment of a successor trustee. For the purposes of this subsection, an indenture trustee shall be deemed to have a conflicting interest if

(1) such trustee is trustee under [an] *another* indenture under which any other securities, or certificates of interest or participation in any other securities, of an obligor are outstanding, [other than the indenture to be qualified,] unless (A) the indenture securities are collateral trust notes secured exclusively by securities issued under such other indenture, or (B) such other indenture is a collateral trust indenture secured exclusively by indenture securities, or (C) such obligor has no substantial unmortgaged assets and is engaged primarily in the business of owning, or of owning and developing, real estate, and the indenture to be qualified and such other indenture are secured by wholly separate and distinct parcels of real estate, or (D) such trustee shall sustain the burden of proving, on application to the Commission and after opportunity for hearing thereon, that trusteeship under the indenture to be qualified and such other indenture is not so likely to involve a material conflict of interest as to make it necessary in the public interest or for the protection of investors to disqualify such trustee from acting as such under one of such indentures;

(2) such trustee or any of its directors or executive officers is an obligor or underwriter;

(3) such trustee directly or indirectly controls or is directly or indirectly controlled by or is under direct or indirect common control with an obligor or underwriter, whether by agency, stock ownership or otherwise;

(4) such trustee or any of its directors or executive officers is a director, officer, partner, employee, appointee or representative of an obligor or underwriter, except that (A) one person may be a director and/or executive officer of the trustee and of an obligor, but may not be at the same time an executive officer of both the trustee and of such obligor, and (B) one additional person may be a director and/or executive officer of the trustee and a director of such obligor, if his pecuniary interest in such obligor does not exceed such percentage of the voting securities or such percentage of all other securities, other than indenture securities, of such obligor as the Commission may deem not detrimental to the public interest and the interest of investors, such percentages and the method of calculating the same to be fixed in the indenture, but such percentages in no event to exceed 1 per centum: *Provided, however,* That such additional person may be a director of the trustee and such obligor only so long as the number of directors of the trustee in office is more than nine, and (C) such trustee may be designated to act as trustee under the indenture to be qualified, and in the capacities of transfer agent, registrar, custodian, paying agent, fiscal agent, escrow agent or depositary, or in other similar capacity, by any obligor or underwriter;

(5) 5 per centum or more of the voting securities of such trustee is beneficially owned, individually or collectively, by an obligor or by any director, partner, or executive officer thereof, exclusive of any such securities owned by a person described in clause (A) of paragraph (4) of this subsection in an amount not exceeding 2½ per centum of such securities or owned by a person described in clause (B) of such paragraph (4); or 5 per centum or more of the voting securities of such trustee is beneficially owned, individually or collectively, by an underwriter, or by any director, partner, or executive officer thereof;

(6) such trustee [shall be or become] *is* a creditor, directly or indirectly, secured or unsecured, of an obligor, *otherwise than by the ownership of securities,* except as authorized pursuant to subsection (d) of this section, if the indenture to be qualified is not secured by the pledge or mortgage of property or if any indenture securities outstanding had a maturity at the time of issuance of less than five years;

(7) such trustee is the beneficial owner of 5 per centum or more of the voting securities or 10 per centum or more of any other class of security of an obligor (other than indenture securities *and securities issued under any other indenture under which such trustee is also trustee*) or of 10 per centum or more of any class of security of an underwriter;

(8) such trustee is the beneficial owner of 5 per centum or more of the voting securities of any person who to the knowledge of the trustee owns 10 per centum or more of the voting securities of, or controls directly or indirectly or is under direct or indirect common control with, an obligor;

(9) such trustee is the beneficial owner of 10 per centum or more of any class of security of any person who to the knowledge of the trustee owns 50 per centum or more of the voting securities of an obligor;

(10) such trustee owns, on May 15 in any calendar year, in the capacity of executor, administrator, testamentary or inter vivos trustee, guardian, committee or conservator or in any other similar capacity, an aggregate of 25 per centum or more of the voting securities of any person the beneficial ownership of 5 per centum of which would have constituted a conflicting interest under paragraph (7) or (8) of this subsection, or an aggregate of 25 per centum or more of any class of security the beneficial ownership of 10 per centum of which would have constituted a conflicting interest under paragraph (7) or (9) of this subsection. Promptly after each such May 15, the trustee shall make a check of its holdings of *such* securities as of such May 15. If the obligor fails to make payment in full of principal or interest under the indenture to be qualified when and as the same becomes due and payable, the trustee shall make a prompt check of its holdings of *such* securities as of the date of such default, and all such securities held by the trustee in any of the above-mentioned capacities, with sole or joint control over such securities vested in it, shall thereafter be considered as though beneficially owned by such trustee, for the purposes of paragraphs (7), (8), and (9) of this subsection:

*Provided, however,* That for the purposes of paragraphs (6), (7), (8), (9), and (10) of this subsection, the term "security" shall include only such securities as are

generally known as corporate securities, and the indenture trustee shall not be deemed the owner of (A) any security which it holds as collateral security (as trustee or otherwise), so long as there is no default in the principal obligation for which such security is collateral, or (B) *any security of the obligor which it holds as collateral security, under the indenture to be qualified, irrespective of any default thereunder, or* (C) *any security which it holds as agent for collection, or* [which it holds] as custodian, escrow agent, or depositary, or in any *similar* representative capacity:

*And provided further,* That the indenture to be qualified may contain provisions excluding from the operation of paragraph (10) of this subsection the ownership by the indenture trustee of not more than 25 per centum of any class of security referred to in such paragraph for a period of not more than eighteen months from the date of acquisition thereof, or until a default (as defined in the indenture) shall occur, whichever shall be the sooner, if the trustee became the owner of such security through becoming executor, administrator, or testamentary trustee of an estate which included such security.

For the purposes of this subsection, the term "underwriter" means every person who, within six years prior to the time as of which the determination is made, was an underwriter of any security of an obligor outstanding at such time, except *that for the purposes of* paragraph (2) *of this subsection, underwritings on or before June 16 ,1934, shall be disregarded.*

(e) The indenture to be qualified shall provide that if the indenture trustee shall be, or shall become, *otherwise than by the ownership or acquisition of securities issued under an indenture,* a creditor, directly or indirectly, secured or unsecured, of an obligor, within four months prior to a default in the payment of principal or interest [under the indenture] or subsequent to such a default, then, unless and until such default shall be cured, such trustee shall set apart and hold in a special account for the benefit of the trustee individually and the *indenture* security holders,

   (1) an amount equal to any and all reductions in the amount due and owing upon any [such] claim *as such creditor* in respect of principal or interest, effected after the beginning of such four months' period and valid as against the obligor and its other creditors, except any such reduction resulting from the receipt or disposition of any property described in paragraph (2) of this subsection, or from the exercise of any right of set-off which the trustee could have exercised if a petition in bankruptcy had been filed by or against such obligor at the date of such default; and

   (2) all property received in respect of any *such claim* [of its claims as such creditor,] as security therefor or in satisfaction or composition thereof or otherwise, after the beginning of such four months' period, or an amount equal to the proceeds of any such property, if disposed of, subject, however, to the rights, if any, of the obligor and its other creditors in such property or such proceeds:

*Provided, however,* That nothing herein contained shall affect the right of the trustee to retain for its own account (A) payments made on account of any such claim by persons, other than the obligor, who are liable thereon, and (B) the proceeds of the bona-fide sale of any such claim by the trustee to a third person, *and* (C) *dividends paid on claims filed against the obligor in bankruptcy or receivership or in proceedings for reorganization pursuant to section 77B of the Bankruptcy Act: And provided further,* That nothing herein contained shall affect the right of the trustee to realize, for its own account, upon any *property held by it as* security for any such claim [held by it] prior to the beginning of such four months' period, or to receive payment on such claim against the release of any such security, to the fair value thereof; and property substituted after the beginning of such four months' period for property held as security prior to such date shall, to the extent of the fair value of the property released, have the same status as the property [released:] *released.*

*The indenture to be qualified shall provide that if the creditor relationship does not constitute a conflicting interest within the meaning of paragraph (6) of subsection (b) of this section, (i) the trustee shall not be required to account for any such reduction or for any property so received or the proceeds thereof, if the trustee shall sustain the burden of proving that at the time such property was received or such reduction effected, the trustee had no reasonable cause to believe that a default in the payment of principal or interest would occur within four months, and (ii) the funds and property held in such special account and the proceeds thereof shall be apportioned between the trustee and the indenture security holders in such manner that the trustee and the indenture security holders realize, as a result of payments from such special fund and payments of dividends on claims filed against the obligor in bankruptcy or receivership or in proceedings for reorganization pursuant to section 77B of the Bankruptcy Act, the same*

*percentage of their respective claims, figured before crediting to the claim of the trustee anything on account of the receipt by it from the obligor of the funds and property in such special account and before crediting to the claim of either party dividends on claims filed against the obligor in bankruptcy or receivership or in proceedings for reorganization pursuant to section 77B, but after crediting thereon receipts on account of the indebtedness represented by their respective claims from all sources other than from such dividends and from the funds and property so held in such special account.*

*The indenture to be qualified shall provide further that if the creditor relationship constitutes a conflicting interest within the meaning of paragraph (6) of subsection (b) of this section, the trustee's rights in the funds and property held in such special account and the proceeds thereof shall be subject to the prior payment in full of all sums due and owing under the indenture, but that, subject to such prior payment in full, the trustee shall be subrogated to the rights of the indenture security holders, to the extent that such funds and property are applied to such payment.*

[And provided further, That if the indenture is secured by the mortgage or pledge of property, and the indenture securities outstanding had a maturity at the time of issuance of five years or more, the trustee shall not be required to account for any such reduction or for any property so received or the proceeds thereof, if the trustee shall sustain the burden of proving that at the time such property was received or such reduction effected, the trustee had no reasonable cause to believe that a default in the payment of principal or interest under the indenture would occur within four months.

The indenture to be qualified shall provide that if any securities outstanding under the indenture had a maturity at the time of issuance of less than five years, or if the indenture is not secured by the mortgage or pledge of property, the trustee's rights in the funds and property held in such special account and the proceeds thereof shall be subject to the prior payment in full of all sums due and owing under the indenture, but that, subject to such prior payment in full, the trustee shall be subrogated to the rights of the security holders, to the extent that such funds and property are applied to such payment.   The indenture to be qualified shall provide further that if such indenture is secured by the mortgage or pledge of property, and the securities outstanding thereunder had a maturity at the time of issuance of five years or more, the funds and property held in such special account and the proceeds thereof shall be apportioned between the trustee and the security holders in such manner that the trustee realizes no greater percentage of his claim after deducting therefrom all credits for which he is not required to account than the security holders realize in respect of their deficiency claim against the obligor.]

An indenture trustee who has resigned or been removed shall be subject to the provisions of this subsection as though such resignation or removal had not occurred, unless such resignation or removal occurred more than four months prior to such default, and the receipt of property or reduction of claim which would have given rise to the obligation to account, if such indenture trustee had continued as trustee, occurred more than four months after such resignation or removal.

As use̶ i in this subsection the term "default" shall [include] *mean* any failure to make payment in full of principal or interest [under the indenture when and as the same becomes due and payable] *under any indenture as to which an application for qualification is effective and under which the indenture trustee is trustee, when and as the same becomes due and payable, and the term "indenture security holder" shall mean all holders of securities outstanding under any such indenture under which an uncured default exists.*

(d) The indenture to be qualified may contain provisions excluding from the operation of paragraph (6) of subsection (b) of this section and from the operation of subsection (c) of this section a creditor relationship arising from--

(1) the ownership or acquisition of indenture securities *or securities issued under any other indenture under which such trustee is also trustee,* or any security or securities having a maturity of one year or more at the time of acquisition by the [trustee,] *trustee;* or

(2) advances authorized by a receivership or bankruptcy court of competent jurisdiction, or by the indenture, for the purpose of preserving the property subject to the lien of the indenture, provided that notice of such advance and of the circumstances surrounding the making thereof is given to the *indenture* security holders, at the time and in the manner provided in the indenture; *or*

(3) disbursements made in the ordinary course of business in the capacity of transfer agent, registrar, custodian, paying agent, fiscal agent or depositary, or other similar capacity; or

(4) an indebtedness created as a result of services rendered or premises rented; or an indebtedness created as a result of goods or securities sold in a cash transaction, as such term is defined in the indenture; or

(5) *the ownership of stock or of other securities of a corporation organized under the provisions of Section 25 (a) of the Act approved December 23, 1913, known as the Federal Reserve Act, as amended, which is directly or indirectly a creditor of an obligor.*

The Commission shall by rules and regulations prescribe the definition of the term *"cash transaction"* which shall be included in the indenture.

The indenture to be qualified may contain provisions excluding from the operation of paragraph (6) of subsection (b) of this section, or from the operation of subsection (c) of this section, or both, a creditor relationship arising from the acquisition, ownership, acceptance or negotiation of drafts, bills of exchange, acceptances, or obligations falling within the classification of self-liquidating paper, if and to the extent that the Commission shall by rules and regulations determine that the application of such paragraph (6) or such subsection (c), as the case may be, is not necessary in the public interest or for the protection of investors, having due regard to the respective purposes of such paragraph and such subsection.

### Reports by Obligors

(e) The indenture to be qualified shall contain provisions which the Commission deems adequate, having due regard to the public interest and the interest of investors, requiring each obligor to file with the trustee and the Commission, and to transmit or otherwise make available to the indenture security holders, such annual and other reports, and such information with respect to the performance by such obligor of its obligations under the indenture, in such form and detail as the Commission may from time to time prescribe as necessary or appropriate in the public interest or for the protection of investors by rule or regulation adopted either before or after qualification becomes effective as to such indenture.

### Bondholders' Lists

(f) The indenture to be qualified shall contain provisions which the Commission deems adequate, having due regard to the public interest and the interests of investors, requiring each obligor to furnish or cause to be furnished to the institutional trustee thereunder, at stated intervals, all information in the possession or control of such obligor or of any of its paying agents as to the names and addresses of the indenture security holders, and requiring such trustee *to preserve all such information so furnished to it or received by it in the capacity of paying agent, and* to make the same or the use thereof available to indenture security holders, subject only to such terms and conditions as the Commission deems not detrimental to the public interest or the interests of investors. The disclosure of any such information in accordance with such provision, regardless of the source from which such information was derived, shall not be deemed a violation of any existing law or of any law hereafter enacted which does not specifically refer to this subsection.

### Duties of the Trustee Prior to Default

(g) The indenture to be qualified shall contain provisions imposing upon the indenture trustee such specific duties and obligations prior to default (as such term is defined in such indenture) as the Commission deems consistent with the duties and obligations which a prudent man would assume and perform prior to such a default if he were trustee under such an indenture, including, without limitation, action in respect of the following matters:

(1) the recording, re-recording, filing, and refiling of the indenture [to the extent necessary to establish and preserve the validity and priority thereof or of any lien created or purported to be created thereby as against any person or persons;]

(2) the application of all indenture securities and the proceeds thereof to the purposes specified in the indenture;

(3) the existence of or compliance with all conditions precedent to the authentication and delivery of indenture securities, the release or substitution of any property subject to the lien of the indenture, the satisfaction and discharge of the indenture, and any other action by the trustee under the indenture; and

(4) the performance by the obligor of such of its other obligations under the indenture as the Commission deems necessary or appropriate in the public interest or for the protection of investors.

The indenture to be qualified shall also contain provisions requiring the obligor to provide the indenture trustee with such information, such opinions and certificates of attorneys, accountants, and other experts, and such other documents as the Commission may deem necessary or appropriate to enable the trustee to perform, or to facilitate its performance of, the duties imposed upon it pursuant to this subsection.

### Duties of the Trustee in Case of Default

(h) The indenture to be qualified shall contain provisions requiring the indenture trustee to exercise in case of default (as such term is defined in the indenture) such of the rights and powers vested in it by the indenture, and to use the same degree of care and skill in the exercise as a prudent man would exercise under the circumstances if he were a fiduciary and had the degree of skill which the indenture trustee has, or which, *at the time of the offering of the indenture securities*, the indenture trustee represents itself as having, as indenture trustee, whichever is the higher: *Provided, however,* That the indenture to be qualified may contain provisions —

(1) authorizing the holders of not less than a majority in principal amount of the indenture securities at the time outstanding (A) to direct the method and place of conducting all proceedings at law or in equity for any remedy under the indenture to be qualified, and (B) to direct the indenture trustee to waive any default and its consequences, except that a default in the payment of the principal of any indenture security at the date of maturity specified therein shall not be waived, and except that a default in interest shall not be waived for a total period exceeding one year, nor unless payment of all arrears of interest shall have been made or provided for; and

(2) protecting the indenture trustee in respect of any action taken in good faith in accordance with any direction authorized as provided in paragraph (1) of this subsection.

In determining whether the required proportion in principal amount of the indenture securities outstanding have concurred in any such direction, indenture securities owned by any obligor or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with any obligor shall be disregarded, except that, for the purposes of paragraph (2) of this subsection, only indenture securities which the trustee knows are so owned shall be so disregarded.

### Reliance Upon Certificates and Opinions

(i) The Commission shall permit the inclusion in the indenture to be qualified of one or more provisions authorizing the indenture trustee conclusively to rely as to the truth of the statements *and the correctness of the opinions* contained therein, in the absence of bad faith or gross negligence on the part of such trustee, upon opinions or certificates of attorneys, accountants, or other experts (subject to such requirements as to independence and qualifications and the exercise by the trustee of reasonable care in their selection, and subject to such other terms and conditions, as the Commission may deem necessary or appropriate in the public interest or for the protection of investors), if the Commission deems that such provisions do not materially conflict with the required standard of [care] *conduct* and are not detrimental to the public interest or the interest of investors.

### Exculpatory Clauses

(j) The indenture to be qualified shall not contain any provisions relieving the trustee from liability for its own negligent action or failure to act, or for its own willful misconduct; *but may contain provisions protecting the trustee from liability for any error of judgment made in good faith by a responsible officer or officers of the trustee, unless it shall be proved that the trustee was negligent in ascertaining the pertinent facts; or for any loss arising out of any act or omission in the execution of the trust so long as it acts or omits to act in good faith, unless it shall be proved that the trustee was negligent.*

### Notice of Defaults

(k) The indenture to be qualified shall contain provisions requiring the trustee to give to the indenture security holders, at such time and in such manner as the Commission may deem adequate, having due regard to the public interest and the protection of investors, notice of all defaults known to the trustee: *Provided, however,* That the indenture may provide, except in the case of defaults (to be specified in the indenture) of which the Commission deems it necessary or appro-

priate in the public interest or for the protection of investors that prompt notice be given, that the trustee shall be protected in withholding such notice if and so long as the board of directors or executive committee or a trust committee of directors [or] and/or responsible officers of the trustee in good faith determine the withholding of such notice to be in the interests of the indenture security holders.

## Undertaking for Costs

(l) The indenture to be qualified may contain provisions to the effect that all parties thereto, including the indenture security holders, agree that the court may in its discretion require, in any suit for the enforcement of any right or remedy under such indenture or against the trustee, as trustee, the filing of an undertaking to pay the costs of such suit, and may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant, having due regard to the merits and good faith of the suit or defense: *Provided, however,* That the provisions of this subsection shall not apply to suits instituted by the trustee or to suits instituted by security holders for the enforcement of the payment of the principal of or interest on any indenture security, at or after the respective due dates expressed therein, or to suits instituted by any indenture security holder or group of indenture security holders holding in the aggregate more than 10 per centum in principal amount of the indenture securities outstanding.

## *Release and Substitution; Issuance of Additional Securities; Satisfaction and Discharge*

(m) *Any provisions in the indenture to be qualified with respect to the release and substitution of any property subject to the lien of the indenture, on the issuance of additional indenture securities, and on the satisfaction and discharge of the indenture shall be subject to restrictions and conditions which in the light of the bargain of the parties, the Commission deems adequate, having due regard to the public interest and the interest of investors.*

### *Other Indenture Provisions*

(n) *The indenture to be qualified shall contain provisions which the Commission shall deem adequate, having due regard to the public interest and the interest of investors, in respect to the following matters—*
 (1) *The obligations of the obligors with respect to the recording or filing of the indenture;*
 (2) *The definition of what shall constitute a default thereunder;*
 (3) *The duties of the trustee with respect to (A) giving to the indenture security holders notice of the issuance of additional indenture securities, of the release or substitution of property subject to the lien of the indenture, and of the making of advances to any obligor thereunder, and (B) making reports to the indenture security holders with respect to its qualifications, the properties and funds held by it under the indenture, and its administration of the trust; and (C) calling meetings of the indenture security holders;*
 (4) *The rights and powers of the indenture trustee with respect to (A) entry into possession of the trust estate; (B) the institution of foreclosure proceedings and proceedings for the judicial or other sale of the property subject to the lien of the indenture; (C) obtaining, in its name as such trustee, a judgment for the entire amount due and owing under the indenture; and (D) appearance and intervention in any such proceedings, and filing proofs of claim therein on behalf of the indenture security holders;*
 (5) *Restrictions upon the employment by the indenture trustee of attorneys or other experts who have any interests which are likely materially to conflict with the interests of the indenture security holders.*

## [Other Indenture Provisions]

[(m) The indenture to be qualified shall contain such provisions as the Commission shall deem necessary or appropriate in the public interest or for the protection of investors in respect of the following matters—
 [(1) Restrictions or conditions on the release and substitution of any property subject to the lien of the indenture, on the issuance of additional securities, and on the satisfaction and discharge of the indenture.
 [(2) The obligations of the obligors with respect to the recording or filing of the indenture.
 [(3) The definition of what shall constitute a default thereunder.

(4) The rights, powers, and duties of the indenture trustee, including (A) the giving to the security holders of notice of the release or substitution of property subject to the lien of the indenture and the issuance of additional securities; (B) the making of reports by the indenture trustee to the security holders with respect to its qualifications, the properties and funds held by it under the indenture and its administration of the trust; (C) the rights, powers or duties of the indenture trustee with respect to the institution of foreclosure proceedings, proceedings for the judicial or other sale of the property subject to the lien of the indenture, or for obtaining, in its name as such trustee, a judgement for the entire amount due and owing under the indenture; with respect to entry into possession of the trust estate; with respect to the calling of meetings of the security holders; with respect to keeping itself informed with regard to all bankruptcy, receivership or reorganization proceedings affecting the obligors, and all proceedings affecting the indenture securities or the property subject to the lien of the indenture; with respect to appearance and intervention in any such proceedings, and the filing of proofs of claim therein on behalf of the security holders; and (D) restrictions upon the employment by the indenture trustee of attorneys or other experts who have or have had, or who represent or have represented, interests which are likely materially to conflict with the interests of the security holders.

〖(5)〗 (6) The rights, powers and remedies of the indenture security holders and the manner in which and conditions upon which such rights, powers and remedies may be exercised, including the right and power of the indenture security holders with respect to accountings by the indenture trustee, bringing action to collect the principal of and interest upon the indenture securities at their respective due dates, and calling and holding meetings of the indenture security holders and taking action at such 〖meetings〗 *meetings; and*

〖(6)〗 (7) The qualifications, rights, powers and duties of paying ꜰ  · · including the duty of each paying agent to hold for the benefit of the in.  · . . . . security holders or the trustee all sums held by such paying agent for the paymeꜱ.ꜱ of the interest on and principal of the indenture securities, and to give to the indenture trustee notice of defaults in the performance of the obligations of the obligors.

### RULES, REGULATIONS, AND ORDERS

SEC. 8. (a) The Commission shall have authority from time to time to make, issue, amend, and rescind such rules and regulations and such orders as it may deem necessary or appropriate in the public interest or for the protection of investors 〖and〗 to carry out the provisions of this Act, including rules and regulations defining accounting, technical, and trade terms used in this Act.    Among other things, the Commission shall have authority, for the purposes of this Act, to prescribe the form or forms in which information required in any statement, application, report or other document filed with the Commission shall be set forth, and to prescribe or recommend forms of 〖indentures or of〗 any provisions required or permitted to be included 〖therein〗 *in an indenture, pursuant to section 7.*    For the purpose of its rules or regulations the Commission may classify persons, securities, and other matters within its jurisdiction and prescribe different requirements for different classes of persons, securities, or matters.

(b) Subject to the provisions of the Federal Register Act and regulations heretofore or hereafter prescribed under the authority thereof, the rules and regulations of the Commission shall be effective upon publication in the manner which the Commission shall prescribe, or upon such later date as may be provided in such rules and regulations.

(c) The Commission, by such rules and regulations or order as it deems necessary or appropriate in the public interest or for the protection of investors, may authorize the filing of any information or documents required to be filed with the Commission under this Act, or under the Securities Act of 1933, or under the Securities Exchange Act of 1934, or under the Public Utility Holding Company Act of 1935, by incorporating by reference any information or documents on file with the Commission under this Act or any such Act.    No provision of this Act imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule, regulation or order of the Commission, notwithstanding that such rule, regulation or order may, after such act or omission, be amended or recinded or be determined by judicial or other authority to be invalid for any reason.

## HEARINGS BY COMMISSION

SEC. 9. Hearings may be public and may be held before the Commission, any member or members thereof, or any officer or officers of the Commission designated by it, and appropriate records thereof shall be kept. The Commission may, by such rules and regulations or orders as it deems necessary or appropriate in the public interest or for the protection of investors, provide for the consolidation of proceedings under this Act with proceedings under the Securities Act of 1933, *Securities Exchange Act of 1934* and/or under the Public Utility Holding Company Act *of 1935.*

## SPECIAL POWERS OF THE COMMISSION

SEC. 10. (a) For the purpose of any investigation or any other proceeding which, in the opinion of the Commission, is necessary and proper for the enforcement of this Act, any member of the Commission, or any officer thereof designated by it, is empowered to administer oaths and affirmations, subpena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, contracts, agreements, or other records which the Commission deems relevant or material to the inquiry. Such attendance of witnesses and the production of any such books, papers, correspondence, memoranda, contracts, agreements or other records may be required from any place in the United States or in any Territory at any designated place of investigation or hearing. In addition, the Commission shall have the powers with respect to investigations and hearings, and with respect to the enforcement of, and offenses and violations under, this Act and rules and regulations and orders prescribed under the authority thereof, provided in sections 20, 22 (b), and 22 (c) of the Securities Act of 1933.

(b) The Treasury Department, the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Reserve Banks and the Federal Deposit Insurance Corporation are hereby authorized, under such conditions as they may prescribe, to make available to the Commission, such reports, records, or other information as they may have available with respect to trustees or prospective trustees under indentures for which applications for qualification have been filed with the Commission, and to make through their examiners or other employees, for the use of the Commission, examinations of such trustees or prospective trustees. Every such trustee or prospective trustee shall, as a condition precedent to qualification of such indenture, consent that reports of examinations by Federal, State, Territorial, or District authorities may be furnished by such authorities to the Commission upon request therefor.

Notwithstanding any provision of this Act, no report, record, or other information made available to the Commission under this subsection, no report of an examination made under this subsection for the use of the Commission, no report of an examination made of any trustee or prospective trustee by any Federal, State, Territorial, or District authority having jurisdiction to examine or supervise such trustee, no report made by any such trustee or prospective trustee to any such authority, and no correspondence between any such authority and any such trustee or prospective trustee, *shall be divulged or made known or available by the Commission or any member, officer, agent, or employee thereof, to any person other than a member, officer, agent, or employee of the Commission: Provided, that the Commission may make available to the Attorney General of the United States any information deemed necessary by the Commission, or requested by him, for the purpose of enabling him to perform his duties under this Act.*

(c) Nothing in this Act shall be construed as empowering the Commission to conduct an investigation *or other proceeding* for the purpose of determining whether the provisions of an indenture as to which an application for qualification is effective are being complied with, or to enforce such provisions.

*Any investigation of a prospective trustee, or any proceeding or requirement for the purpose of obtaining information regarding a prospective trustee, under any provision of this Act, shall be limited—*

*(1) to determining whether such prospective trustee is qualified to act as trustee under the provisions of subsection (b) of section 7; and*

*(2) to requiring the inclusion in the application of information with respect to the eligibility of such prospective trustee under paragraph (1) of subsection (a) of such section 7; and*

*(3) to requiring the inclusion in the application of the most recent published report of condition of such prospective trustee, as described in paragraph (2) of such subsection (a), or, if the indenture does not contain the provision with*

*respect to combined capital and surplus authorized by the last sentence of paragraph (2) of subsection (a) of such section 7, in determining whether such prospective trustee is eligible to act as such under such paragraph (2).*

#### COURT REVIEW OF ORDERS; JURISDICTION OF OFFENSES AND SUITS

SEC. 11. (a) Orders of the Commission under this Act shall be subject to review in the same manner, upon the same conditions and to the same extent, as provided in section 9 of the Securities Act of 1933.

(b) Jurisdiction of offenses and violations under, and jurisdiction and venue of suits and actions brought to enforce any liability created by, this Act or any rules or regulations or orders prescribed under the authority thereof shall be as provided in section 22 (a) of the Securities Act of 1933.

#### LIABILITY FOR MISLEADING STATEMENTS

SEC. 12. (a) Any person who shall make or cause to be made any statement in any application, report or document filed with the Commission pursuant to any provisions of this Act, or any rule, regulation or order thereunder, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, or who shall omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, shall be liable to any person (not knowing that such statement was false or misleading or of such omission) who, in reliance upon such statement or omission, shall have purchased or sold a security issued under the indenture to which such application, report or document relates, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading or of such omission. A person seeking to enforce such liability may sue at law or in equity in any court of competent jurisdiction. In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit and assess reasonable costs, including reasonable attorneys' fees against either party litigant, *having due regard to the merits and good faith of the suit or defense.* No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued.

(b) The rights and remedies provided by this Act shall be in addition to any and all other rights and remedies that may exist under the Securities Act of 1933, or the Securities Exchange Act of 1934, or the Public Utility Holding Company Act of 1935, or otherwise at law or in equity; but no person permitted to remain a suit for damages under the provisions of this Act shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.

#### UNLAWFUL REPRESENTATIONS

SEC. 13. It shall be unlawful for any person in issuing or selling any security to represent or imply in any manner whatsoever that any action or failure to act by the Commission in the administration of this Act means that the Commission has in any way passed upon the merits of, or given approval to, any trustee, indenture or security, or any transaction or transactions therein, or that any such action or failure to act with regard to any statement or report filed with or examined by the Commission pursuant to this Act or any rule, regulation, or order thereunder, has the effect of a finding by the Commission that such statement or report is true and accurate on its face or that it is not false or misleading.

#### PENALTIES

SEC. 14. Any person who wilfully violates any provision of this Act or an rule, regulation, or order thereunder, or any person who wilfully, in any application, report or document filed or required to be filed under the provisions of this Act or any rule, regulation, or order thereunder, makes any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined not more than $5,000 or imprisoned not more than five years, or both.

## EFFECT ON EXISTING LAW

SEC. 15. Nothing in this Act shall affect (1) the jurisdiction of the Commission under the Securities Act of 1933, or the Securities Exchange Act of 1934, or the Public Utility Holding Company Act of 1935, over any person, security, or contract, or (2) the rights, obligations, duties or liabilities of any person under such Acts; nor shall anything in this Act affect the jurisdiction of any other commission, board, agency, or officer of the United States or of any State or political subdivision of any State, over any person or security, in so far as such jurisdiction does not conflict with any provision of this Act or any rule, regulation, or order thereunder.

## CONTRARY STIPULATIONS VOID

SEC. 16. Any condition, stipulation, or provision binding any person to waive compliance with any provision of this Act or with any rule, regulation, or order thereunder shall be void.

## SEPARABILITY OF PROVISIONS

SEC. 17. If any provision of this Act or the application of such provision to any person or circumstance shall be held invalid, the remainder of the Act and the application of such provision to persons or circumstances other than those as to which it is held invalid shall not be affected thereby.

## S. 2344, TRUST INDENTURE ACT OF 1937, ANALYSIS OF COMMITTEE PRINT NO. 3

The following is an analysis of committee print no. 3 of the Trust Indenture Act of 1937 (S. 2344) introduced by Senator Barkley on May 6, 1937, and referred to the Committee on Banking and Currency. Committee print no. 3 indicates, by line type and italics, suggested changes in committee print no. 2 of June 10, 1937, which is the print on which the public hearings were held. Minor changes, including typographical corrections, will not be discussed in this analysis.

### TITLE

The change which has been made in the long title is designed merely to call attention to the fact that the bill is based not only on the commerce power but also on the mail power.

### SECTION 1. NECESSITY FOR REGULATION

The words stricken through in subsection (b) of this section have been omitted as being unnecessary.

### SECTION 2. DEFINITIONS

The change made in the last clause of the definition of the term "obligor" (11) is intended to make clear that the trustee under an issue of certificates of interest or participation is not itself to be regarded as an obligor, merely by reason of the fact that it agrees to pay over to the certificate holders moneys received from the obligor on the underyling security or securities. Otherwise the trustee would be disqualified from acting as such by section 7 (b) (2).

The clause added to the definition of the term "paying agent" (12) makes clear that a person who makes principal or interest payments on certificates of interest or participation, on behalf of the trustee thereunder, is also a "paying agent."

The definition of the term "voting security" (15) has been changed to conform to that contained in section 2 (a) (17) of the Public Utility Holding Company Act of 1935. The test now is the right to vote in the direction or management of the affairs of the "person" in question, rather than the right to vote for the election of directors. The new definition makes clear that the expression "percentage of the voting securities" has reference to the voting power, and not to the number of shares.

### SECTION 3. EXEMPTED SECURITIES AND TRANSACTIONS

The changes made in paragraph (1) of subsection (a) are for purposes of clarification only.

The words stricken through in paragraph (2) are unnecessary, in view of the provisions of paragraph (7) thereof.

Under the change made in paragraph (3), the qualification requirements of the Act are to become effective 6 months after its enactment. This change was thought desirable in view of the impossibility of estimating in advance the date of enactment.

The new paragraph (6) exempts obligations of foreign governments and sub-divisions.  Substantially different considerations apply to such issues.

### SECTION 4. PROHIBITIONS RELATING TO INTERSTATE COMMERCE AND THE MAILS

The change made in subsection (b) corresponds to that made in paragraph (3) of subsection (a) of section 3.

### SECTION 5. APPLICATIONS FOR QUALIFICATION AND THE TAKING EFFECT THEREOF

The change made in the last sentence of subsection (a) makes clear that the provisions of that sentence are subject to the restrictions upon disclosure contained in section 10.

The sentence added to subsection (c) specifically confers upon the applicant the right to withdraw its application at any time prior to the effective date thereof.  The Supreme Court of the United States recently held that an "applicant" has that right under the Securities Act.

The last eight words of subsection (d) have been omitted as being unnecessary.

The change made in subsection (e) is designed to make clear what was originally intended, namely, that the term "underwriter", as used in this subsection, means only underwriters of the securities in respect of which the application is filed.  Underwriters of other outstanding securities of the issuer or obligor are not included.

### SECTION 6. REFUSAL ORDERS

The change made in the last clause of paragraph (5) makes clear that the Commission does not have, under this clause, a general power to require the elimination of indenture provisions where it deems such elimination shall be necessary or appropriate in the public interest or for the protection of investors, but that such power is confined to cases in which such elimination is deemed necessary or appropriate to prevent the circumvention or evasion of the act.

### SECTION 7. CONTENTS OF INDENTURE

*Subsection (a): Persons eligible for appointment as trustee.*—The changes and additions made in paragraphs (2) and (3) of this subsection are for purposes of clarification only.

*Subsection (b): Disqualification of trustee.*—The changes made in paragraph (1) of this subsection are also for purposes of clarification.

The purposes of the language eliminated from paragraph (2) are covered by the changes made in the very last sentence of this subsection.

The change made in the first line of paragraph (6) is to conform to the language used in the other paragraphs of this subsection.  The specific exclusion of creditor relationships arising from the ownership of "securities"—which term is defined at a later point in this subsection as meaning "corporate securities"—makes clear that such a creditor relationship does not ipso facto constitute a conflicting interest.  Of course, ownership of such securities is still subject to the percentage limitations contained in paragraphs (7) to (10), inclusive.

The change made in paragraph (7) gives recognition to the fact that if a trustee is permitted by paragraph (1) of this subsection to act as trustee under more than one indenture, there is no reason why the ownership by the trustee of securities issued under any of such indentures should be deemed to constitute a conflicting interest.

The first proviso following paragraph (10) has been changed so as to apply to paragraph (6) as well as to the other paragraphs mentioned in the proviso.  The new clause (B) makes clear that a trustee under a collateral trust indenture under which a principal default has occurred is not to be regarded as having a conflicting interest merely by reason of its holding of other securities as collateral security thereunder.

The change made in the last paragraph of subsection (b) offsets the change made in paragraph (2) of that subsection.

*Subsection (c).*—This is the subsection which is designed to eliminate competition between a trustee, who is also a creditor of the obligor, and the bondholders he represents, during and after the 4-months' period preceding a principal or interest default under the indenture.  It requires the trustee to account for any improvement in its own position after the beginning of such period.  The effect of the new matter inserted in the second line of this subsection is to exclude from the accounting requirement a creditor relationship arising from the ownership or acquisition of securities which are themselves issued under an indenture.

The accounting requirements have been subjected to some simplification and rearrangement but the effect is exactly the same as in the original bill.

The changes made in the last paragraph of the subsection are designed to cover the situation where the trustee is authorized, by paragraph (1) of subsection (b), to act as trustee under two or more indentures, all of which are in default. The accounting requirements then come into operation 4 months prior to the earliest default, and the holders of securities outstanding under all of such indentures are entitled to the benefits thereof.

*Subsection (d).*—The change made in paragraph (1) corresponds to that made in paragraph (7) of subsection (b). If trusteeship under another indenture does not constitute a conflicting interest under paragraph (1) of subsection (b), the trustee should not be subject to the accounting requirements with respect to its holdings of securities issued under such other indenture.

The new paragraph (5) exempts from the loan conflict provisions and the accounting provisions a creditor relationship arising from the ownership of securities of "Edge Act" corporations, which are comparatively few in number and are engaged almost exclusively in the financing of foreign trade.

The substance of the former paragraph (5) of this section is covered by the new final paragraph. The power to exclude "self-liquidating paper" is now expressed in terms of exemption, rather than in terms of definition.

*Subsection (f): Bondholders' lists.*—The changes made in this subsection go far toward meeting some of the objections raised at the hearings. The trustee is now to be under a specific duty to preserve all information as to names and addresses of bondholders furnished to it by the obligor or its paying agents, and any such information received by the trustee itself in the capacity of paying agent.

*Subsection (g): Duties of the trustee prior to default.*—The matter stricken in paragraph (1) of this subsection has been eliminated as being unnecessary.

*Subsection (h): Duties of the trustee in case of default.*—The change made in the opening clause is merely for purposes of clarification. The substance of the former paragraph (3) is covered by the clause added to subsection (j).

*Subsection (i): Reliance upon certificates and opinions.*—The change made in this subsection makes clear that the protection afforded by opinions and certificates of attorneys and other experts extends to the correctness of the opinions expressed therein.

*Subsection (j): Exculpatory clauses.*—The clause added to this subsection covers the ground covered by paragraph (3) of subsection (h), which has been eliminated; it applies the principles of that paragraph to the situation existing prior to default as well as after default; and it makes special provision with respect to losses arising from errors of judgment. If the trustee was not negligent in ascertaining the pertinent facts, it is protected for losses arising from any error of judgment based upon such facts, if such judgment was made in good faith by responsible officers of the trustee.

*Subsection (m): Release and substitution; issuance of additional securities; satisfaction and discharge.*—This subsection covers the territory formerly covered by paragraph (1) of subsection (m). This provision, as revised, makes clear that the Commission is to pass merely upon the adequacy of the restrictions and conditions upon provisions of this class, and is to do so in the light of the bargain of the parties.

*Subsection (n): Other indenture provisions.*—Here again the emphasis is shifted to the adequacy of provisions of the indenture with respect to the matters enumerated in this subsection.

Paragraphs (1) and (2) correspond to paragraphs (2) and (3) of the former subsection (m). Some control over the definition of what shall constitute a default under the indenture is necessary, in order that the gains made by imposing active duties upon the trustee in case of default shall not be nullified by including in the indenture a much more restricted definition of the term "default" than is now properly contained in the better indentures.

Paragraphs (3), (4), and (5) cover the matters covered by paragraph (4) of the former subsection (m). The indenture must contain adequate provisions with regard to the duties of the trustee with respect to the matters enumerated in paragraph (3). Paragraph (4) makes clear what was originally intended, namely, that the Commission is not to attempt to spell out in advance the specific duties of the trustee with respect to the matters enumerated in this paragraph. The general duty of the trustee with respect to these matters is set forth in subsection (h). But the indenture must contain adequate provisions with respect to the trustee's rights and powers with regard to these matters, if the provisions of subsection (h) are not to be nullified by denying to the indenture trustee rights and powers which the better indentures of the present day contain and should contain.

Paragraph (5) takes the place of clause (D) of paragraph (4) of the former subsection (m).

Paragraphs (6) and (7) correspond to paragraphs (5) and (6) of the former subsection (m).

### SECTION 8. RULES, REGULATIONS AND ORDERS

The elimination of the word "and" in the fifth line of subsection (a) makes clear that the Commission's authority to make rules, regulations and orders is confined to rules, regulations and orders to carry out the provisions of the act. The changes made in the last clause of the second sentence deny to the Commission the power to prescribe or recommend forms of indentures, and make clear that the Commission's power to prescribe or recommend forms of indenture provisions is restricted to provisions required or permitted to be included pursuant to section 7. The effect of this clause as revised is to make clear that the Commission has authority to exercise its powers under section 7 by rules and regulations of general application to the classes of indentures and securities affected thereby.

### SECTION 10. SPECIAL POWERS OF THE COMMISSION

The changes suggested in subsections (b) and (c) have been worked out in conference between representatives of the Commission, of the several governmental agencies having supervisory authority over banks, and of the banks themselves.

The changes made in subsection (b) tighten up the provisions with respect to the disclosure of reports made available by the supervisory authorities, communications between trustees or prospective trustees and the supervisory authorities, etc.

The changes made in the last paragraph of subsection (c) limit the Commission's powers of investigation of a prospective trustee to determining whether such trustee is qualified to act as such under the provisions of subsection (b) of section 7, or is eligible to act as such under paragraphs (1) and (2) of subsection (a) of section 7. If the indenture contains the provision authorized by the last sentence of such paragraph (2), the Commission's powers with respect to the determination of the combined capital and surplus of a prospective trustee are confined to requiring that there be furnished a copy of its most recent report of condition published pursuant to law or to the requirements of the appropriate supervisory authority.

### SECTION 12. LIABILITY FOR MISLEADING STATEMENTS

The original provision with respect to undertakings for costs contained in the next to last sentence of subsection (a), was identical with the corresponding provision of section 18 (a) of the Securities Exchange Act of 1934. To this sentence has been added a provision to the effect that if the court in its discretion requires such undertaking or assesses costs, due regard is to be had to the merits or good faith of the suit or defense.

The CHAIRMAN. If there is nothing further, the hearings are closed.

(Whereupon, at 12:10 p. m., the hearings were concluded.)

×