# EXHIBIT G

Speeches

34722

*FOR RELEASE UPON DELIVERY OF THE SPEECH*

"AIMS, PURPOSES AND PHILOSOPHY OF THE BARKLEY BILL"

(S. 2344, as reported, and H.R. 10292)

## ADDRESS

### of

### EDMUND BURKE, JR.

*Assistant Director of the Reorganization Division,
Securities and Exchange Commission*

before

the

## AMERICAN BAR ASSOCIATION

*(Sixty-first Annual Meeting)*

Open Forum on Pending Federal Legislation Involving

Reorganizations and Securities

at the

CLEVELAND AUDITORIUM

Cleveland, Ohio

---

Monday, July 25, 1938 – 2:00 P.M.

The primary purpose of the Barkley Bill--the proposed "Trust Indenture Act of 1938"--is two-fold:

> *First*, to bring all indentures trustees up to the same high level of diligence and loyalty which is now maintained by the more conscientious trust institutions; and

> *Second*, to remedy the defects in indentures which now handicap the efforts of those institutions to render the vigilant and effective service which the protection and enforcement of the rights of investors require.

These objectives are to be accomplished by requiring that all trust indentures filed as part of a registration statement under the Securities Act of 1933 conform to the standards prescribed by the Bill.*

Your Special Committee on Securities Laws and Regulations agrees that the results contemplated by the Bill are in many respects to be desired. It suggests, however, that the subjects of method and possible consequences be fully explored. With that suggestion we at the Securities and Exchange Commission are in full sympathy.

The Bill in its present form is an outgrowth, not only of the Commission's studies of the subject, but also of more than a year of conferences with members of the Senate Banking and Currency Committee, and with committees representing the insurance companies, the mutual savings banks, the American Bankers Association, and the Investment Bankers Association. We should naturally like to avoid consigning the Bill to the Limbo of perpetual study, as some of its more ardent opponents would undoubtedly desire. On the other hand, we are keenly alive to the advantages of a frank and dispassionate exchange of ideas on the subject.

I have particularly in mind the invaluable assistance rendered by the Special Committee on Mortgage Trusteeships of the American Bankers Association. Although the representatives of that committee made clear at the outset that they would have preferred a further opportunity to try to achieve the desired objectives by voluntary action of the trust institutions themselves, nevertheless they gave unreservedly of their time and experience in an earnest endeavor to perfect the bill.

Of course the trust institutions have a more vital interest in this Bill than any other group, except the investing public itself. Every draft was scrutinized by this Special Committee, which was composed of trust officers of institutions located in 12 cities in all sections of the country. Each of these trust officers organized an informal committee in his own district, and the successive prints of the Bill were distributed among all the members of those subcommittees.

---

*With but two exceptions, all of the Securities Act exemptions are carried over into the Barkley Bill. Those exceptions relate to securities issued in exchange for other securities of the same issuer, and securities issued under a plan approved by a court, which are exempted from the Securities Act by sections 3(a)(9) and 3(a)(10) thereof. There is no reason why the indenture under which such securities are issued should not conform to the higher standards prescribed by the Barkley Bill.

As so frequently happens, problems which, when first stated, seemed impossible of solution were often found to disappear when given calm, dispassionate consideration. Or some reasonable middle ground was discovered which, while not quite what either side would have wished, was nevertheless acceptable to both.

All interested parties had a further opportunity to present their views in three weeks of public hearings before the Senate Banking and Currency Committee and in hearings recently held before a sub-committee of the House Committee on Interstate and Foreign Commerce.

As a result, the Bill is now in such form that neither the Special Committee of the American Bankers Association nor the Association itself, opposes its adoption, and at the recent hearings in the House, their representatives declared it to be "workable, practicable and livable". The Bill in its present form has the whole hearted support of the Securities and Exchange Commission and (with a few minor qualifications which should easily be ironed out) of the representatives of insurance companies and mutual savings banks who testified at the hearings. The changes in the original Bill which were suggested by the representatives of the Comptroller of the Currency, the FDIC and the Board of Governors of the Federal Reserve System have been worked into the present Bill. Only a group of investment bankers and a small minority of the trust institutions (all of them located in a single large city) appeared in opposition to the Bill in the House.

Experience such as this fully justifies, I think, the hope and expectation that free and frank discussion of the measure at this session will result in concrete constructive suggestions for its further improvement. In that spirit we have welcomed the work of this Association's Special Committee on Securities Laws and Regulations.

This group has the advantage of having before it the careful outline of the Bill prepared by that Committee.* In view of that fact, I do not think that I need present my own detailed analysis of its provisions. I shall have only a few words of explanation to add to the comments made in your Committee's report, by way of description of the Bill.

I have already outlined the way in which the Barkley Bill has developed into its present form. I should now like to say a few words about the circumstances which led to its introduction.

### Shortcomings of Present-Day Indentures

As you may know, the Securities and Exchange Commission was directed, by section 211 of the Securities Exchange Act of 1934, to make a study of protective and reorganization committees. That undertaking led us to a study of "Trustees under Indentures", and the Commission made an exhaustive report to the Congress upon that subject more than two years ago (June 18, 1936). In the course of its study, the Commission examined more than 400 indentures of issuers of all types, most of them entered into after 1920. In addition, of course, the Commission has had to examine all indentures currently filed with it under the Securities Act of 1933, to determine whether their provisions have been adequately disclosed in the registration statement and prospectus, in the manner required by that Act.

---

*Page 200 and following of the Advance Program.

It is clear, therefore, that in our discussion today we are not dealing with ancient history. The question is not whether the trust indenture of the '80's met the comparatively simple requirements of those times. The question is whether the trust indenture has kept pace in its development with the changes in methods of corporate financing and security distribution; in short, whether the provisions of the modern indenture satisfy the needs of the present day.

The importance of the problem is shown by the fact that more than 40 billions of bonds are now outstanding under trust indentures, and nearly 2-1/2 billions were registered under the Securities Act during the year ended April, 1937.

The Commission's extensive study has shown the prevalence of certain deficiencies in what may be called the "non-business" features of trust indentures. The Commission's study has also shown that these "non-business" deficiencies still persist in indentures now being filed with the Commission under the Securities Act, notwithstanding the disclosure requirements of that Act. The Commission is now powerless to correct them. I can summarize those deficiencies briefly for you, as follows:

 1. Indentures frequently fail to provide the trustee with the necessary tools for making an effective check on the performance of even the more important obligations assumed by the obligor in the indenture.

 2. Indentures commonly fail to require the obligor to make reasonably informative periodic reports to the trustee.

 3. No indentures contain provisions requiring the obligor to file with the trustee information as to the names and addresses of the bondholders, or provisions requiring the trustee to make such information or the use thereof available to the bondholders themselves. Such provisions are an essential part of the necessary machinery for the transmisssion of information to the bondholders, and for the organization of the bondholders for the protection of their own interests.

 The company and its investment bankers now have practically sole access to bondholders' lists. The effect is to deprive the bondholders of control of their own destinies and to vest such control in the company itself and its bankers. Eighty-eight per cent of the 943 protective committees which reported to the SEC obtained their lists from the company or its investment bankers, and naturally enough, such committees were largely composed of persons connected with the company or its investment bankers.

 4. None of the indentures examined imposed upon the trustee any duty to notify the bondholders of the occurrence of even the most serious defaults.

 5. Indentures commonly encourage inaction by the trustee; even where action is imperative, *first*, by absolving the trustee from any duty to act unless it receives formal notice of default, demand for action, and indemnity, from substantial percentages of the bondholders, and *second*, by protecting the trustee from liability even for its own negligence.

 6. Trust indentures rarely contain provisions prohibiting the possession by the trustee of interests which materially conflict with those of the bondholders; not infrequently, indeed, they specifically authorize such conflicting interests.

These, then, are the deficiencies in trust indentures at which the Barkley Bill is directed. That the existence of such deficiencies is inimical to the interests of investors is shown not only by the Commission's report of its studies, but also by many cases in our law reports. In the opinion of the Senate Banking and Currency Committee, and in the opinion of the Commission, the enactment of this Bill will go far toward meeting those deficiencies.

### *Only "Non-Business" Provisions are Affected*

It will be observed that none of these criticisms goes to what may be called the "business" features of a trust indenture. And the Barkley Bill does not affect those "business" features.

The Bill would give the SEC no jurisdiction over such matters as the investment merits of the bonds, the adequacy of the security to be given, the offering price, maturity date, interest rate, etc. In other words, the Commission would have no jurisdiction whatsoever over the strictly "business" features of indentures. This statement can easily be checked by running through the subheadings of section 7 of the Bill, which is the section which establishes the standards to which the indenture must conform. *

The Commission would not have any powers with respect to the enforcement of the provisions of the indenture. Enforcement of the indenture would be left to the trustees and to the bondholders themselves.

The Commission's only function would be to see that the provisions which relate to the protection and enforcement of the rights of the bondholders conform to the statutory standards.

---

* Those subheadings are as follows:

|  | Senate Page | House Page |
|---|---|---|
| (a) Persons Eligible for Appointment as Trustees | 59 | 18 |
| (b) Disqualification of Trustee | 61 | 20 |
| (c) Preferential Collection of Claims against Obligor | 68 | 27 |
| (d) Exclusions from Section 7(c) | 72 | 31 |
| (e) Reports by Obligor and Indenture Trustee | 74 | 33 |
| (f) Bondholders' Lists | 75 | 34 |
| (g) Duties of the Trustee Prior to Default | 76 | 35 |
| (h) Notice of Defaults | 77 | 36 |
| (i) Duties of the Trustee in Case of Default | 78 | 37 |
| (j) Responsibility of the Trustee | 78 | 37 |
| (k) Undertaking for Costs | 79 | 39 |
| (l) Release and Substitution; Issuance of Additional Securities; Satisfaction and Discharge | 81 | 40 |
| (m) Rights, Powers, and Remedies of Indenture Trustees and Indenture Security Holders | 81 | 40 |
| (n) Other Indenture Provisions | 83 | 42 |

The last subsection covers a few comparatively minor matters.

## *Methods of Attaining Objectives*

*Necessity of Reconditioning Indenture:* Instead of attempting to recondition the trust indenture itself and leaving its enforcement to the security holders, some have suggested the substitution of continuing supervision, by the Comptroller of the Currency or the Board of Governors of the Federal Reserve System, over the trustees' actual performance of their functions. It would of course be helpful to have the views of the Comptroller and the Board of Governors as to the desirability and practicability of this proposal. In any event, it seems clear to me that any attempt to meet the problems through the exercise of the visitorial powers of those agencies, or even through an extension of their visitorial powers, would fall far short of the mark, if the trust indenture itself were not refashioned.

At the outset it must be remembered that many of the conditions to which exception has been taken are in strict accordance with the provisions of the typical trust indenture. For example, if a trust indenture specifically provides that a certificate of the issuing company's treasurer shall be conclusive evidence as to the performance of a vital covenant, or if the indenture imposes no obligation upon the issuer with respect to filing periodic reports or with respect to the maintenance of bondholders' lists, it is hard to see how the supervising agency could do anything about it.

On the vital question of the standard of conduct to be observed by the trustee, it seems to me clear that any system of supervision over actual performance would necessarily be *ex post facto*. It would come after the harm had been done. The only sanction would be the drastic remedy of withdrawal of trust powers. Inevitably such a sanction would be very sparingly exercised, and in any event it would be available only in the case of national banks.

Finally, unless the supervisory authority of the Comptroller or the Board of Governors is to be extended to state banks and non-member banks, as the case may be, this suggestion would inevitably result in a lack of uniformity in the treatment of the various classes of trust institutions.

The only solution is a reconditioning of the trust indenture itself.

*Necessity for Regulation of Non-Business Provisions:* The real parties in interest are the investing public and the borrower. This fact is overlooked by those who urge that the determination of the terms of the indenture should be left to the "parties". The underwriter is not the real party in interest. If he ever becomes the owner of the bonds, it is only with the intention of distributing those bonds to the public.

Where bonds are publicly offered, the investing public cannot participate in drafting the elaborate indenture which legally constitutes part of his contract with the borrower. Of course, the protection of the interests of the prospective investors should not be left to the borrower.

The prospective trustee has had little participation in the drafting of that contract in the past, and it is not in a position to exercise any substantial influence over its terms. As Chairman Douglas of the Commission pointed out in his testimony at the House hearings:

"The traditional view is that, generally speaking, it is not the place of the trustee to make any suggestions except on two points: First, whether the provisions of the indenture will 'work' as a purely mechanical matter, and, second, whether the trustee is given adequate powers and immunities. A prospective trustee which made suggestions as to other points would be likely to find that its choice lay between accepting the indenture 'as is', or declining to act as trustee. In the latter case, the borrower could shop around until it found a trust institution which would accept the indenture, notwithstanding the objectionable provisions."

That is the reason why we felt it was impracticable to go along with the suggestion of the Special Committee of the American Bankers Association that the trust institutions endeavor to accomplish the desired results by voluntary effort.

The underwriters alone have been in a position to correct deficiencies in the non-business provisions of trust indentures. It was urged on their behalf, at the hearings in the House, that their presence at the drafting table, and their desire to have a salable security, assures that the investing public will receive adequate protection.

Whatever we may think of the value of the underwriter's services as applied to the "business" features of the indenture, the fact remains that they have not remedied the deficiencies in the *non*-business features, at which the Bill is directed. These deficiencies still persist in indentures now being filed under the Securities Act, notwithstanding the disclosure requirements of that Act. "Disclosure" is not enough. There is apparently no practical way of improving these *non*-business provisions except through prescribing statutory minimum requirements.

The average investor rarely sees the elaborate indenture which constitutes part of his contract. He would not understand it if he did see it. It would be a difficult job to make him understand the inadequacy of the provisions relating to the protection and enforcement of his rights, and how these operate to his great disadvantage. And, needless to say, no serious effort is ordinarily made to make him understand.

When you are trying to sell a security, you don't say much about the prospect of default. Similarly, when you buy a bond, you think more about the *business* features of the bond--the price, the interest rate, the maturity date--than you do about the adequacy of the indenture provisions relating to the protection and enforcement of your rights. And when trouble comes, you are not likely to blame your difficulties on the inadequacy of the indenture which the underwriter drafted for you.

It is worth noting again at this point that the existing deficiencies in these non-business provisions are largely responsible for the extent to which the company and its underwriters now control the destinies of the bondholders. The failure of the underwriters to insist upon the correction of these deficiencies can be justified only on the assumption that, notwithstanding the shortcomings of the indenture, the underwriter can and will adequately protect the interests of the investing public throughout the life of the issue. And their resistance to the correction of those deficiencies must in large part be based upon the theory that the bondholder should continue to rely, and to *have* to rely, almost exclusively on the underwriter for protection. But if, when trouble arises, the underwriting house has ceased to exist, or if it fails to discharge its moral obligation, or if its judgment is in error, these deficiencies constitute a serious handicap to any effort by the bondholders to work out their own salvation.

Under these circumstances, it is misleading to say that the Barkley Bill will deprive the bondholders of their "freedom of contract", or of control of their own destinies. What is impaired is the freedom of issuer and underwriter to devise an indenture which fails to make adequate provision for the protection and enforcement of the bondholders' rights, while effectively placing control over the destinies of the bondholders in the hands of the issuer and underwriter themselves. It is begging the question to deplore the fact that the Bill goes beyond the good old "disclosure" principle of the Securities Act (which, as you may remember, was not so popular itself five years ago) and proceeds on the "approval" theory. The question is whether the situation does not make it necessary to go beyond the disclosure theory, and I think the answer is clear.

Legislative standards for contract terms are not a novelty. Years ago the legislatures of the states were faced with similar problems with respect to the form of insurance policies. They found it necessary, for the protection of the purchasers of such policies, to establish legislative controls over their form. Such regulation is now accepted as a matter of course, and I think insurance company officials would agree that the resulting improvement in the form of insurance policies has been an excellent thing, not only for the purchaser, but for the insurance companies themselves.

Investors in securities issued under indentures are in no better position to protect themselves. This Bill is designed to give them comparable protection.

*Necessity for Flexibility:* It has been objected that under the Bill, each indenture is to be the subject of "separate and independent substantive rulings", i.e., that the Commission will have the power to act by order applicable to a single indenture, as well as by rules and regulations of general application.

Of course, it would be impossible to place indentures of all types into a legislative straitjacket, eliminating delegation entirely. During the six months' period after enactment, the Commission hopes and expects, with the cooperation of all interested parties, to be able to cover large areas of the field by rule and regulation. But it would be undesirable, in fact impossible, to cover the entire field in that way. The power to act by order is one of the essential features of the Bill.

The standards established for the guidance of the Commission are at least as definite as those provided in the other three acts being administered by the Commission, and more definite than a number which the Supreme Court has sustained. A further signpost is provided by section 1(b) of the bill which specifically requires that all of the provisions thereof be interpreted in accordance with the policy of meeting the abuses enumerated in section 1(a). And section 11(a) of the Bill guarantees exactly the same right of appeal from Commission action as exists under the Securities Act.

## Consequences of the Bill

*Prohibitions of Conflicting Interest:* It has been urged that the prohibitions of conflicting interests are arbitrary, artificial and too complicated; that they will not accomplish their purposes.

These provisions are found in section 7(b), which prohibits the trustee from acting as trustee under more than one indenture of the same issuer. It also imposes restrictions upon too close affiliations between the trustee and the issuer or its investment bankers, and upon the ownership by the trustee of substantial amounts of conflicting securities.

Both Senate and House Committees believe that, in the interests of uniformity and ease of administration, "rules of thumb" should be applied to this problem. The Special Committee of the American Bankers Association believes that these provisions are "livable, practical and workable."

The prohibition of conflicting interests is not a novel idea. The New York Stock Exchange will not accept as trustee for a listed bond issue a bank which is trustee under other indentures of the same obligor. It will not accept as trustee a bank in which an officer of the obligor is an executive officer, or a bank which controls or is controlled by the issuer. Affiliations with underwriters are now largely prohibited by the Banking Act of 1933.

*Interference with Management:* It has been urged that the effect of the provisions with respect to the duties of the trustee before default will be to require the trustee to make a daily check of insignificant matters, and to interfere with the management of the issuer's business.

But section 7(g) specifically requires that the provisions with respect to the duties of the trustee before default be worked out against the background of what a prudent man would do. Section 7(j)(1) imposes a similar requirement as to the provisions permitting the trustee to rely on certificates and opinions of attorneys, accountants and other experts.

In other words, the indenture will require the trustee to make only such check as a prudent man would make, in the period before default. If a prudent man would not do a particular thing, the indenture will not require the trustee to do it.

*Risk of Liability upon Trustee:* It has been urged that the duties imposed upon the trustee are so onerous that responsible institutions will be discouraged from acting as trustee; that the risk of liability will jeopardize the interests of depositors, and will force the trustee to take drastic action upon default, even where such action is unwise.

These appear to me to be questions upon which the views of the trust institutions, and of the existing federal regulatory authorities, should be entitled to considerable weight.

These questions were all thoroughly explored by the Special Committee of the American Bankers Association. That committee does not oppose the Bill in its present form, and its position has the approval of the Association itself. The few trust institutions which raised these objections at the hearings before the House Interstate Commerce Committee were all located in a single city, and their position was in the nature of a minority report.

Representatives of the F.D.I.C., the Board of Governors of the Federal Reserve System and the Comptroller of the Currency were present at the Senate Hearings. Some of them were present at the House Hearings. Their suggestions with respect to the original Senate bill have all been met. They would certainly have opposed the present bill if they thought these fears concerning risk of liability were of any substance.

Under section 7(i), the indenture will merely require that the trustee conform to the "prudent man" standard in its actions after default. This is substantially the same standard of conduct as that now required of trustees under so-called "personal" trusts. The prohibition against provisions relieving the trustee from liability for its own negligence is subject to three important qualifications. Under section 7(j), the trustee is protected where it acts in reliance upon proper certificates or opinions, or at the direction of a majority of the bonds, or where it makes an error of judgment after reasonable investigation.

Certainly we should not require that negligence on the part of the trustee be established "beyond a reasonable doubt." That is the burden of proof that rests upon the prosecution in a criminal case, and should not be extended to other fields.

In this connection, I should like to emphasize that the objective of the Barkley Bill is the socially desirable one of insuring that trustees will be diligent and loyal, *not* the vindictive one of subjecting them to monetary liability. The most important objective of the bill will have been achieved if all indenture trustees so conduct themselves as to incur no liability at all. And that happy result can be accomplished through the exercise of reasonable diligence.

You may recall the storm of criticism evoked by the civil liability provisions of the Securities Act. Yet your Special Committee on Securities Laws and Regulations reports that it has reached the conclusion that actual experience with the operation of the penalty provisions of that Act has failed to reveal the need for amendment at this time. I may venture the suggestion that if the same energy which is now devoted to worry about the spectre, or perhaps the recollection, of liability for damages were devoted to raising the standards of trust administration to the high level now maintained by the more conscientious trust institutions, the problem would practically disappear.

*Expense and Delay:* Several of the opponents of the bill urged, at the hearings in the House, that the bill was untimely; that it would cause additional expense and delay in the flotation of securities; that it would hinder the functioning of the capital markets.

The Commission is very much alive to the importance of facilitating the flotation of legitimate securities. It is vitally interested in the restoration of the capital markets, and is engaged in a constant effort to simplify its requirements. By way of example, I may refer to the recent simplification of the Commission's rules respecting the issuance of securities by small established businesses.

Nor is it to be supposed that the institutional investors, the insurance companies and savings banks, the trust institutions generally, and the American Bankers Association would look with favor on this Bill if they thought it would impair the functioning of the capital markets.

The Bill itself refutes the argument that it will result in increased expense and delay:

With very few exceptions, the Bill will apply *only* to trust indentures now required to be filed with the Commission as part of a registration statement, under the Securities Act, covering the bonds to be issued thereunder. Even now, the Commission must examine those indentures to see if their terms have been adequately disclosed. Under the Bill, the Commission would merely have to see to it that the non-business provisions of those indentures conformed to the statutory standards as well.

As I have already pointed out, under section 3(a)(3), the Commission would have six months, after enactment of the Bill, within which to work out rules and regulations, in cooperation with interested parties, standardizing, so far as practicable, the non-business provisions of indentures. Those non-business provisions are now pretty largely standardized, but in the wrong mold. The bill would standardize them in the right mold. This six months' period will eliminate any possibility of delay in connection with the preparation of the necessary rules and regulations.

The machinery for the "qualification" of the indenture, has been carefully geared into the registration machinery of the Securities Act in order to avoid expense and delay. There is the same 20-day "waiting period" under both Acts. Unnecessary duplication of information and documents can be avoided by incorporating them in the application for qualification by reference to the registration statement, and vice versa, pursuant to rules which the Commission is authorized to make under section 8 (c) of the Bill. In any event, the issuer can insure against any possible delay by filing the indenture, together with the information required in the application for qualification, before it files its registration statement under the Securities Act. To the extent that any such information is not available at that time, the Commission will have the power to consent to the filing thereof by amendment, as under the Securities Act, and thus prevent delaying qualification of the indentures.

*Effect on Voluntary Readjustments:* It has been objected that the bill will prevent provisions permitting holders of a majority of a bond issue to waive principal and interest defaults, and that this prohibition will force issuers into bankruptcy.

This objection relates to the limitation upon the powers of a majority of the bonds which is set forth in the "except" clause contained in section 7 (m) (3).

The effect of that exception is to prohibit provisions authorizing a majority to force a non-assenting bondholder to accept a reduction or postponement of his claim for principal, or a reduction of his claim for interest, or a postponement of his claim for interest for more than one year. In other words, the effect of this prohibition will be to limit, to that extent, the control of the majority over the destinies of the individual minority security holder. If an investor buys a $1,000 bond payable on January 1, 1940, the majority cannot turn it into a $500 bond payable in 1960, without his consent, and without resort to the reorganization machinery now provided by law. There is nothing in this provision, however, which would prevent the majority from waiving its own rights.

Until comparatively recently, a provision of this sort was perfectly standard in trust indentures. In many states it is necessary in order to preserve the negotiability of the bonds. In others it is necessary if the bonds are to be legal investments for insurance companies, savings banks and the like. Those institutional investors favor the retention of this prohibition.

*Conclusion*

I realize that I have taken sort of a hop, step and jump over the provisions of the Bill. But if, in the course of your consideration of the measure, any further explanations should prove to be necessary, I shall be glad to endeavor to make them, if time permits.

---oOo---