# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARBLEGATE ASSET MANAGEMENT, LLC,
MARBLEGATE SPECIAL OPPORTUNITIES
MASTER FUND, L.P., MAGNOLIA ROAD
CAPITAL LP, and MAGNOLIA ROAD GLOBAL
CREDIT MASTER FUND L.P.,

                 Plaintiffs,

    -against-

EDUCATION MANAGEMENT CORPORATION,
EDUCATION MANAGEMENT LLC, and
EDUCATION MANAGEMENT FINANCE CORP.,

                Defendants.

Civil Action No. 14-8584 (KPF)

## PLAINTIFFS' REPLY TO SUPPLEMENTAL BRIEF OF DEFENDANTS AND INTERVENOR REGARDING SECTION 316(b) OF THE TRUST INDENTURE ACT

Sean E. O'Donnell
Christopher W. Carty
Lucy C. Malcolm
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: (212) 872-1093
Fax: (212) 872-1002
sodonnell@akingump.com

*Counsel for Plaintiffs Marblegate Asset
Management, LLC and Marblegate Special
Opportunities Master Fund, L.P.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND .................................................................................................................3

    A.    The Proposed Restructuring Was Designed to Coerce Consent .................3

    B.    The Preliminary Injunction Hearing and the Court's Opinion....................4

    C.    The Modified Restructuring.........................................................................5

    D.    Parent EDMC's Counterclaim ....................................................................7

ARGUMENT ....................................................................................................................7

POINT I    The Court Should Enter Final Judgment Consistent with Its Opinion and Find that the Company's Proposed Restructuring—Including the Release of the Parent Guarantee—Would Violate Section 316(b) of the Trust Indenture Act and Section 6.07 of the Indenture ....................................8

    A.    The Court Correctly Analyzed the Release of the Parent Guarantee in the Context of the Intercompany Sale as a Whole...................................8

    B.    The Court Correctly Held that Section 316(b) of the Trust Indenture Act Protects Plaintiffs' Substantive Right to Receive Payment and was Intended to Prevent Non-Consensual, Out-of-Court Debt Restructurings .........................................................................9

    C.    The Legislative History Is Entirely Consistent with the Court's Interpretation of Section 316(b) of the Trust Indenture Act .....................11

        1.    The Legislative History Makes Clear that Section 316(b) Was Intended to Prevent Non-Consensual, Out-of-Court Restructurings .............................................................................12

        2.    Other Legal Authorities Interpret the Purpose of Section 316(b) Similarly....................................................................15

        3.    The Court's Interpretation of Section 316(b) of the Trust Indenture Act Provides Appropriate Rights to Plaintiffs and Other Minority Bondholders.........................................................17

POINT II    Injunctive Relief May Not Be Necessary Based on Defendants and Intervenor's Representations .....................................................................19

CONCLUSION..................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allan v. Moline Plow Co.*,
  14 F.2d 912 (8th Cir. 1926) ....................................................................................14

*Brady v. UBS Fin. Servs., Inc.*,
  538 F.3d 1319 (10th Cir. 2008) ........................................................................15, 16

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
  545 U.S. 546 (2005).................................................................................................10

*MeehanCombs Global Credit Opportunities Funds, LP v. Caesars Entm't Corp.*,
  2015 WL 221055 (S.D.N.Y. 2015)..........................................................................17

*UPIC & Co. v. Kinder-Care Learning Cntrs., Inc.*,
  793 F. Supp. 448 (S.D.N.Y. 1992) .....................................................................10, 15

STATUTES

§ 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa-77bbb ............................ passim

OTHER AUTHORITIES

George W. Shuster, Jr., *The Trust Indenture Act and International Debt Restructurings*,
  14 Am. Bankr. Inst. L. Rev. 431, 438 (2006) ........................................................16

Jonathan C. Lipson, *Governance in the Breach: Controlling Creditor Opportunism*,
  84 S. Cal. L. Rev. 1035, 1054 (2011) .....................................................................15

Mark J. Roe, *The Voting Prohibition in Bond Workouts*,
  97 Yale L.J. 232, 234 (1987) ..................................................................................15

LEGISLATIVE HISTORY

Lees Decl. Ex. B: *Trust Indentures: Hearing on H.R. 10292 Before the Subcomm.
      of the House Comm. on Interstate & Foreign Commerce*,
      75th Cong. (1938) ..................................................................................... passim

Lees Decl. Ex. H: H.R. Rep. 76-1016 (1939) ............................................................12

Lees Decl. Ex. I: S. Rep. No. 76-248 (1939) .............................................................12

# PRELIMINARY STATEMENT[1]

In its Opinion, the Court correctly held that the Proposed Restructuring, as originally conceived with the Intercompany Sale and release of the Parent Guarantee on the unsecured Notes, impaired Plaintiffs'[2] substantive right to receive payment on their Notes in an attempt to effectuate a non-consensual, out-of-court debt restructuring in violation of section 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa-77bbb (the "Trust Indenture Act").

Defendants and Intervenor[3] attack that holding, quoting extensively from the legislative history to establish that section 316(b) of the Trust Indenture Act "was intended 'merely to prohibit provisions authorizing . . . a majority to force a non-assenting security holder to accept a *reduction* or *postponement* of his claim.'" Supp. Br. at 1 (quoting Lees Ex. B. (1938 House Subcomm. Hearings on H.R. 10292) at 35) (emphasis in original). As the Court held, and the record establishes, however, that is exactly what happened here. The Company and a majority of its creditors used the threat of the Intercompany Sale to coerce support for the Proposed Restructuring by "ensuring that . . . dissenters 'will not receive payment on account of their Notes.'" Opinion at 43 (quoting Offering Circular). The Intercompany Sale was thus intended to force Noteholders to agree to the Proposed Restructuring and accept a reduction and postponement of their claim by reducing the claim of any non-consenting Noteholder to zero.

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Court's Amended Opinion and Order dated December 30, 2014 (the "Opinion"). (Dkt. #59). Defendants' and Intervenor's supplemental brief filed on February 9, 2015 is cited as "Supp. Br. __". Exhibits to the Declaration of Alexander B. Lees Accompanying the Supplemental Brief of Defendants and Intervenor are cited as "Lees Ex. __".

[2] Plaintiffs are Marblegate Asset Management, LLC and Marblegate Special Opportunities Master Fund, L.P. ("Plaintiffs"). Former plaintiffs Magnolia Road Capital, LP and Magnolia Road Global Credit Master Fund L.P. settled and voluntarily dismissed their claims. *See* So-Ordered Notice of Voluntary Dismissal dated December 22, 2014. (Dkt. #53).

[3] Defendants are Education Management Corp. ("Parent EDMC"), Education Management LLC and Education Management Finance Corp (collectively, "Defendants"). Education Management LLC and Education Management Finance Corp. together are the "Issuers." Parent EDMC, together with its subsidiaries, is referred to as the "Company." Intervenor is the Steering Committee for the Ad Hoc Committee of Term Loan Lenders ("Intervenor").

The Court, accordingly, correctly concluded that "the Intercompany Sale is precisely the type of debt reorganization that the Trust Indenture Act is designed to preclude." Opinion at 43.

While the Company previously maintained that there was "no reason to believe" that it could amend the restructuring "to permit noteholders such as plaintiffs to continue to receive payment in full on their debt," Declaration of Mick J. Beekhuizen ("Beekhuizen Decl.") at ¶ 37, after the Court issued the Opinion, the Company and its secured lenders amended the restructuring in precisely that way. Mindful of the Court's Opinion, the Company and a majority of its creditors completed one aspect of the Intercompany Sale by transferring the Issuers' assets to newly-created Education Management II LLC ("EDMC II"), but they did not effectuate a release of the Parent Guarantee on Plaintiffs' Notes, and they caused EDMC II to similarly guarantee Plaintiffs' Notes for as long as the Parent Guarantee remains in place.

Now, however, Defendants and Intervenor are attempting to reframe the Trust Indenture Act issue by asking the Court to consider only whether releasing the Parent Guarantee, in a vacuum, would violate section 316(b). Supp. Br. at 2. This is an inappropriate manner by which to examine Plaintiffs' rights. In its Opinion, the Court correctly concluded that the proposed release of the Parent Guarantee and the Intercompany Sale were "inextricably intertwined" and, together, were designed as an out-of-court debt restructuring. Opinion at 33-34, 43. They remain so today, and any attempt by the Company to release the Parent Guarantee now, and thus reduce Plaintiffs' recovery on their Notes to zero, should continue to be analyzed in light of the complete restructuring of the Company's debt.

Defendants' and Intervenor's arguments in the Supplemental Brief do not warrant reconsideration of the Court's previous holding, and the Court should enter final judgment consistent with its well-founded Opinion.

## A.     The Proposed Restructuring Was Designed to Coerce Consent

On August 27, 2014, the Company announced that it had reached an agreement in principle with a majority of its creditors regarding a full restructuring of its debt.[5]  This debt restructuring was memorialized in a restructuring support agreement (the "Restructuring Support Agreement") and the term sheet attached thereto (the "RSA Term Sheet"), both dated September 4, 2014 (the "Proposed Restructuring").[6]  As described more fully in the Opinion, the Restructuring Support Agreement contemplated an out-of-court restructuring of the Company's indebtedness, with two mechanisms for its implementation—one if the Company obtained consent of 100% of its creditors and another if the Company obtained less than 100% creditor consent.[7]

The Company and a majority of its creditors included features in the Proposed Restructuring intended to coerce 100% support.  If the Company failed to obtain unanimous creditor support, the parties agreed to (i) transfer all of the Issuers' assets to newly-created subsidiaries of Parent EDMC (the "Asset Transfer"), and (ii) cause a release of Parent EDMC's guarantee of the Notes (the "Parent Guarantee," and together with the Asset Transfer, the "Intercompany Sale").[8]  In the Court's words, "Defendants were not shy about spelling out the

---

[4] The full factual background is set forth in the Opinion and in Plaintiffs' prior briefing and not repeated here.  Plaintiffs only wish to highlight the facts most pertinent to the arguments herein.

[5] Beekhuizen Decl. at ¶ 23; Defendants' and Intervenors' Preliminary Injunction Hearing Exhibit ("Defs. Ex.") 68 (EDMC Form 8-K and Press Release dated August 27, 2014).

[6] Defs. Exs. 81 (RSA Term Sheet) and 82 (Restructuring Support Agreement).

[7] *See* Opinion at 13-15; 42-43; *see also* Defs. Ex. 82 (Restructuring Support Agreement) at § 4.01(c).

[8] *See* Opinion at 33 ("[T]he Intercompany Sale involves two major elements:  the foreclosure on Education Management LLC's assets by the secured lenders, and the removal of EDMC's Parent Guarantee on the unsecured Notes of Education Management LLC held by Plaintiffs.")

consequences of the Intercompany Sale for those unsecured Noteholders who declined to participate in the Exchange Offer."[9]  The Exchange Offering Circular states:

> **Q: Why is it important that I tender my Notes in the Exchange Offer?** A: . . .  In the event an Intercompany Sale is consummated, Holders who do not tender their Notes in the Exchange Offer will continue to have claims against the Co-Issuers and certain of our subsidiaries that currently guarantee the Notes; however, ***substantially all of our assets will have been transferred to New EM Holdings and will not be available to satisfy the claims of such Holders.  As a result, we anticipate that such Holders will not receive payment on account of their Notes***, including then accrued and unpaid interest, from and after the date the Proposed Restructuring is consummated.[10]

Defendants thus presented Noteholders with a Hobson's choice:  either (i) consent to the Proposed Restructuring and exchange their Notes for equity, or (ii) withhold consent, retain Notes, and get nothing.

## B.     The Preliminary Injunction Hearing and the Court's Opinion

On October 28, 2014, Plaintiffs commenced this litigation by filing their motion for a temporary restraining order and preliminary injunction (the "Preliminary Injunction Motion") and complaint for declaratory and injunctive relief (the "Complaint").  In the Complaint, Plaintiffs asserted two counts:  (i) Count I for a declaration that the Proposed Restructuring, including the Intercompany Sale, violates section 316(b) of the Trust Indenture Act and section 6.07 of the Indenture, and (ii) Count II for injunctive relief.[11]  On November 18 and 19, 2014, the Court held an evidentiary hearing and oral argument on the Preliminary Injunction Motion (the "Preliminary Injunction Hearing").

---

[9] Opinion at 15.

[10] Plaintiffs' Preliminary Injunction Hearing Exhibit ("Pls. Ex.") 1 (Offering Circular) at p. 3 (emphasis added).

[11] Complaint at ¶¶ 40-50.

On December 15, 2014, the Court entered its order denying the Preliminary Injunction Motion and issued its Opinion under seal.[12]  While the Court denied injunctive relief, it held that Plaintiffs had demonstrated a likelihood of success on the merits on Count I of the Complaint.[13]  Specifically, the Court found that the proposed Intercompany Sale, including the release of the Parent Guarantee, violates section 316(b) of the Trust Indenture Act and section 6.07 of the Indenture (which "precisely replicates the protections of section 316(b) of the Trust Indenture Act").[14]  The Court held that section 316(b) protects a creditor's substantive right to receive payment, and its statutory and legislative purpose was to prevent "[e]vasion of judicial scrutiny" of a non-consensual debt-readjustment plan.[15]  The Court further found that the Intercompany Sale and the Parent Guarantee are "inextricably intertwined" and held that "the Intercompany Sale is precisely the type of debt restructuring that the Trust Indenture Act is designed to preclude" because its purpose is to ensure that dissenters to an out-of-court restructuring "will not receive payment on their Notes."[16]  The Court concluded that the release of the Parent Guarantee, in the context of the Intercompany Sale as a whole, would "operate[] . . . to effect a complete impairment of dissenters' right to receive payment."[17]

### C.     The Modified Restructuring

Following the Court's decision, the Company and its creditors supporting the restructuring agreed to modify the restructuring in compliance with the Trust Indenture Act.  On January 5, 2015, the Company announced that it had completed the initial phase of a modified version of its financial restructuring by (i) exchanging the vast majority of its debt for

---

[12] (Dkt. #51.)  The Opinion was later filed with limited redactions on December 30, 2014.  (Dkt. #59.)

[13] Opinion at 33-46.

[14] *Id.* at 34.

[15] *Id.* at 39-40.

[16] *Id.* at 33-34, 43.

[17] *Id.* at 43.

convertible preferred stock and warrants, and (ii) transferring the assets of the Issuers to EDMC II, a newly-formed subsidiary of Parent EDMC.[18]  The secured lenders released the parent guarantee on the Secured Credit Facility "in furtherance of" the Proposed Restructuring; however, the Company, with agreement from its secured lenders, did not effectuate a release of the Parent Guarantee on the Notes.[19]  In addition to not effectuating a release of the Parent Guarantee, the Company, with agreement from its secured lenders, also caused EDMC II to issue its own guarantee on the Notes (the "Transferee Guarantee," and together with the Parent Guarantee, the "Guarantees"), which will remain in place unless the Parent Guarantee is released.[20]

Thus, while the Company maintained during the Preliminary Injunction Hearing that there was "no reason to believe" that it could amend the restructuring "to permit noteholders such as plaintiffs to continue to receive payment in full on their debt,"[21] it was able to accomplish just that, and it restructured its debt without impairing Plaintiffs' right to receive payments on their Notes.  Plaintiffs' Notes remain outstanding and, as the Company represented in its January 5 Letter, "retain the credit support that they had before the litigation commenced."[22]

Additionally, following completion of the initial stage of its restructuring, the Company has the financial capability to pay principal and interest on Plaintiffs' Notes, and should continue to do so as long as the Guarantees remain in place.  Notwithstanding the fact that Plaintiffs'

---

[18] *See* Supp. Ex. 12 (Letter from Defendants to the Court, dated January 5, 2015 (Dkt. #60) (the "January 5 Letter")); Supp. Ex. 13 (EDMC Press Release, dated January 5, 2015).

[19] *See* Supp. Ex. 3 (Release of Guarantors); *see* Supp. Ex. 12 (January 5 Letter) at 2; Stipulation and Order dated February 4, 2015 (Dkt. #70) ("Stipulation") at ¶ 5(c).

[20] *See* Supp. Ex. 12 (January 5 Letter) at 2; Stipulation at ¶ 5(c); Supp. Ex. 2 (Fourth Supplemental Indenture).

[21] Beekhuizen Decl. at ¶ 37.

[22] *See* Supp. Ex. 12 (January 5 Letter) at 2.

approximately $14 million in Notes remain outstanding and subject to the Guarantees, the

Company reduced its funded debt from approximately $1.5 billion to approximately $400

million.[23]  Given the $1.05 billion valuation presented at the Preliminary Injunction Hearing, the

Company's value now far exceeds its debt.[24]  Moreover, in connection with the consummation of

its restructuring, the Company issued a solvency certificate affirming that the Company has

sufficient assets to satisfy its debts, which include Plaintiffs' Notes.[25]

### D.    Parent EDMC's Counterclaim

On January 6, 2015, Defendants filed their Amended Answer and Counterclaim (the

"Counterclaim").[26]  In the Counterclaim, Parent EDMC seeks a declaration that a release of the

Parent Guarantee under section 10.06 of the Indenture will not violate section 316(b) of the Trust

Indenture Act or section 6.07 of the Indenture.[27]

## ARGUMENT

There are three claims before the Court.  First, in Count I of the Complaint, Plaintiffs

seek a declaration that consummation of the Proposed Restructuring, as originally proposed,

including by releasing the Parent Guarantee in furtherance of the Intercompany Sale, violates

section 316(b) of the Trust Indenture Act and section 6.07 of the Indenture.  Second, in its

Counterclaim, Parent EDMC seeks the opposite declaration.  Third, in Count II of the Complaint,

Plaintiffs seek injunctive relief.  For the reasons set forth in section I below, the Court should

enter a final judgment consistent with its Opinion, granting Count I of the Complaint and

denying the Counterclaim.  As discussed in section II below, because a ruling granting Count I of

---

[23] Stipulation at ¶ 5(b).

[24] *See* Defs. Ex. 117 (Expert Report of John A. Taylor); Opinion at 11.  At the Preliminary Injunction Hearing, Intervenor presented the only formal valuation.  Plaintiffs have not taken a position on the value of the Company.

[25] *See* Supp. Ex. 11 (Solvency Certificate); Stipulation at ¶ 5(e).

[26] Dkt. #61.

[27] Counterclaim at ¶¶ 42-49.

the Complaint would bar the Company from releasing the Parent Guarantee, achieving the same effect of an injunction, injunctive relief is likely no longer necessary.

## POINT I

### THE COURT SHOULD ENTER FINAL JUDGMENT CONSISTENT WITH ITS OPINION AND FIND THAT THE COMPANY'S PROPOSED RESTRUCTURING— INCLUDING THE RELEASE OF THE PARENT GUARANTEE—WOULD VIOLATE SECTION 316(B) OF THE TRUST INDENTURE ACT AND SECTION 6.07 OF THE INDENTURE

The Court should enter final judgment on the declarations requested in Count I of the Complaint and the Counterclaim consistent with its holding that the Company's proposed release of the Parent Guarantee, in the context of the restructuring transactions that have been completed to date, would violate section 316(b) of the Trust Indenture Act and section 6.07 of the Indenture.

**A.      The Court Correctly Analyzed the Release of the Parent Guarantee in the Context of the Intercompany Sale as a Whole**

In Parent EDMC's Counterclaim and in the Supplemental Brief, Defendants and Intervenor attempt to reframe the relevant issues, and urge the Court to analyze in a vacuum whether an automatic release of the Parent Guarantee by operation of the Indenture violates the Trust Indenture Act.  *See* Counterclaim at ¶¶ 42-49; Supp. Br. at 2.  The Court should reject their post-hoc reinterpretation of the Proposed Restructuring and Intercompany Sale.

As the Court correctly recognized in its Opinion, the Intercompany Sale and the release of the Parent Guarantee on the Notes are "inextricably intertwined."  Opinion at 33-34.  Indeed, the release of the Parent Guarantee was an important feature of the Intercompany Sale designed to ensure that non-consenting holders "will not receive payment on account of their Notes."  Pls. Ex. 1 (Offering Circular) at 3; *see also* Opinion at 33 (describing the "two major elements" of the Intercompany Sale); Beekhuizen Decl. at ¶¶ 32-34 (describing the steps of the Intercompany Sale, including the release of the Parent Guarantee on the Notes as a result of the secured

lenders' release of their parent guarantee). Indeed, the secured lenders' Release of Guarantors in

the modified restructuring—which would trigger the purported release of the Parent Guarantee

under section 10.06(a)(ii) of the Indenture—makes explicit that it was done "in furtherance of"

the Proposed Restructuring and pursuant to the Restructuring Support Agreement. Supp. Ex. 3

(Release of Guarantors).

Moreover, the Court was correct to consider the release of the Parent Guarantee under

section 10.06 of the Indenture not as "a genuinely adversarial attempt [by the secured lenders] to

safeguard some recovery against a company they have come to regard as unable to pay its debts"

but as a mechanism for forcing non-consenting creditors "to accept a wholesale abandonment of

their right to receive payment." Opinion at 43-45. Indeed, the record establishes that the secured

lenders were not given a parent guarantee until *after* they had already agreed to release it in

furtherance of the Intercompany Sale.[28]

Since the Issuers' assets have already been transferred to EDMC II, any release of the

Parent Guarantee now will undoubtedly impair Plaintiffs' right to receive payment on their Notes

and, thus, effect an out-of-court restructuring on non-consenting creditors.

> **B.    The Court Correctly Held that Section 316(b) of the Trust Indenture Act
> Protects Plaintiffs' Substantive Right to Receive Payment and was Intended
> to Prevent Non-Consensual, Out-of-Court Debt Restructurings**

By arguing that the legislative history establishes that section 316(b) of the Trust

Indenture Act only applies to "core terms" of the Indenture, Defendants and Intervenor attack a

straw man. The Court agreed that section 316(b) is restricted to protecting "core term[s]" of an

---

[28] The Proposed Restructuring was formally agreed to on September 4, 2014, and the secured lenders received their parent guarantee on September 5, 2014, in the Third Amended and Restated Credit Guaranty Agreement. *See* Defs. Ex. 82 (Restructuring Support Agreement); Defs. Ex. 92 (Third Amended and Restated Credit and Guaranty Agreement) at § 1.1 (definition of "Guarantors"). Furthermore, while the secured lenders released their parent guarantee as a technical matter, they simultaneously received a new parent guarantee in the Credit and Guaranty Agreement, dated January 5, 2015. Supp. Ex. 7 (Credit and Guaranty Agreement, 1/5/2015) at § 1.1 (definition of "Guarantors").

indenture, "which are defined as 'one[s] affecting a securityholder's right to receive payment of the principal of or interest on the indenture security on the due dates for such payments.'" Opinion at 38 (quoting *UPIC & Co. v. Kinder-Care Learning Cntrs., Inc.*, 793 F. Supp. 448, 452 (S.D.N.Y. 1992)). But the Court found a "core" versus "non-core" term analysis unhelpful in this case because it does not answer underlying questions of what the "right to receive payment" consists of or what actions affect such a right. Opinion at 37-38. Instead, the Court analyzed whether the "right to receive payment" protected by section 316(b) is substantive or formalistic. *Id.* at 38.

In reaching its conclusion, the Court correctly held that the statutory purpose of section 316(b) was to prevent "[e]vasion of judicial scrutiny" of a non-consensual debt-readjustment plan. *Id.* at 39-40. Contrary to Defendants' and Intervenor's arguments in the Supplemental Brief, the Court's analysis was not limited to the legislative history, but was also based on relevant case law and other authorities. *Id.* at 40-41 ("Yet courts and commentators to consider the legislative purpose and history of the Trust Indenture Act have come to the same conclusion, even while often disparaging the results: that Section 316(b) was intended to force bond restructurings into bankruptcy where unanimous consent could not be obtained.") (citing cases and other authorities).[29]

This statutory purpose of section 316(b) demonstrates that it protects a substantive right to payment. As the Court recognized, if Defendants "were correct that Section 316(b) is limited to preventing formal majority modification of an indenture's payment term, then the case at hand amply demonstrates that the provision would *not* prevent evasion of judicial scrutiny of the

---

[29] Indeed, the Court cautioned against over-reliance on legislative history, noting that "legislative history is itself often murky, ambiguous, and contradictory." Opinion at 35 (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)).

fairness of debt-readjustment plans." *Id.* at 41 (emphasis in original and internal quotations omitted).

Moreover, by applying the statutory purpose of preventing non-consensual, out-of-court restructurings, the Court arrived at the appropriate limiting principal, holding that "[p]ractical and formal modifications of indentures" that do not explicitly change the indenture language regarding a creditor's right to receive payment would, in fact, "impair or affect a bondholder's right to receive payment in violation of the Trust Indenture Act" only "when such modifications effect an involuntary debt restructuring." *Id.* at 42. Here, the purpose of the Intercompany Sale and release of the Parent Guarantee is clearly to "effect an involuntary debt restructuring." As the Court correctly held, the Restructuring Support Agreement makes clear "that the Intercompany Sale is designed as an 'out-of-court restructuring,'" and the Company represented to its regulators that it was "purely a formality" that would not serve a non-restructuring purpose for the Company. *Id.* at 43-44.

## C. The Legislative History Is Entirely Consistent with the Court's Interpretation of Section 316(b) of the Trust Indenture Act

The Court's Opinion and holding regarding the statutory purpose of section 316(b) is also entirely consistent with the legislative history. The legislative history establishes that section 316(b) was intended to prevent out-of-court restructurings that impair non-consenting creditors' right to receive payment, and the legislative history cited by Defendants and Intervenor does not establish otherwise. Additionally, the Court's holding is consistent with other courts and commentators that have analyzed the statutory purpose of section 316(b). Finally, contrary to Defendants' and Intervenor's arguments, enforcing section 316(b) in accordance with its purpose will not provide Plaintiffs with a windfall.

1.     **The Legislative History Makes Clear that Section 316(b) Was Intended to Prevent Non-Consensual, Out-of-Court Restructurings**

Consistent with the Court's Opinion, the legislative history of section 316(b) of the Trust Indenture Act establishes that the statute was intended to prevent debt-readjustment plans from being forced on non-consenting noteholders absent judicial scrutiny. The legislative record makes clear that Congress and the SEC were concerned about the "[e]vasion of judicial scrutiny of the fairness of debt-readjustment plans"—or out-of-court restructurings, such as the Proposed Restructuring. Lees Ex. H (H.R. Rep. 76-1016) at 56; Lees Ex. I (S. Rep. No. 76-248) at 26. The cherry-picked portions of the legislative history quoted throughout the Supplemental Brief do not establish otherwise.

As detailed at length in the Supplemental Brief, SEC Chairman and future Supreme Court Justice William O. Douglas explained that the "effect" of section 316(b) is "***to prohibit*** provisions authorizing . . . ***a majority to force a non-assenting security holder to accept a reduction or postponement of his claim for principal, or a reduction of his claim for interest*** or a postponement thereof for more than 1 year." (Supp. Br. at 5) (emphasis added). This is exactly what Defendants and Intervenor are seeking to do now by releasing the Parent Guarantee to complete the Proposed Restructuring and Intercompany Sale as originally conceived. As the Company threatened in the Offering Circular, if any Noteholder did "not consent to the Proposed Restructuring," the Company would consummate the Intercompany Sale, and "***as a result***" such non-consenting Noteholders "***will not receive payment on account of their Notes***." Pls. Ex. 1 (Offering Circular) at p. 3 (emphasis added). The Company and a majority of its creditors attempted to force Plaintiffs to accept a reduction of their claim for principal and interest by structuring the Proposed Restructuring so that Plaintiffs would receive ***no*** recovery under the Notes absent such consent.

Moreover, as the legislative record makes clear, majority bondholders are free to alter indenture provisions that do not substantively impair the minority's right to receive payment on their notes, and may always vote to amend the majority's own rights under an indenture without violating section 316(b). *See* Lees Ex. B (1938 House Subcomm. Hearings on H.R. 10292) at 36 ("This prohibition does not prevent the majority from binding the dissenters by other changes in the indenture or by waiving defaults and the majority may, of course, *consent to the alteration of its own rights*.") (emphasis added). Here, Defendants and Intervenor could have amended the Indenture to encourage creditor consent to a restructuring without impairing any right to receive payment in violation of section 316(b); and, of course, they could have structured the Restructuring Support Agreement to affect only the rights of consenting creditors. *See* Opinion at 42 (noting that the Court's reading of section 316(b) does not "prevent majority amendment of a significant range of indenture terms, including many that can be used to pressure bondholders into accepting exchange offers."). But the Proposed Restructuring did neither of these things, and instead attempted to compel Noteholders to consent to the restructuring or receive nothing on their Notes, thus running afoul of the minority protections of the Trust Indenture Act.

Additionally, Defendants' and Intervenor's insistence that the Trust Indenture Act protects only against amendments to the specific language of an indenture's payment terms relies, in part, on a misquoting of the legislative record. Throughout the Supplemental Brief, Defendants and Intervenor quote Douglas as stating that section 316(b) "merely restricts the power of the majority to change those particular ph*r*ases of the contract." (Supp. Br. at 1, 5, 11, 14, 16) (emphasis added). In the legislative record, however, Douglas never said "phrases" and instead uses the word "phases." Lees Ex. B (1938 House Subcomm. Hearings on H.R. 10292) at 35. Defendants and Intervenor inserted an "r" into "phases," without explanation, apparently

to correct what they considered a "typo" in the record.  However, there is no indication in the legislative record that Douglas intended to use the word "phrases," and his use of the term "phase"—which can mean "an aspect or part," *Merriam-Webster's Collegiate Dictionary*, at 871 (10th ed. 1993)—is entirely consistent with the Court's interpretation of the Trust Indenture Act.[30]  Indeed, Douglas was likely referring to section 316(b) as protecting the core aspects of an indenture, such as the substantive right to receive payment of principal and interest.

Likewise, Defendants' and Intervenor's argument that section 316(b) was intended to allow noteholders to sue to enforce their right to payment does not rebut the Court's interpretation of the statute.  *See* Supp. Br. at 8-10.  Section 316(b) protects both (i) the right "to receive payment of the principal of and interest on such indenture security," and (ii) the right "to institute suit for the enforcement of any such payment."  Trust Indenture Act § 316(b).  That Congress may have passed the second part of section 316(b) to address the SEC's concern that courts sometimes interpreted so-called "no action" clauses in indentures as barring all suits by minority noteholders, including those to enforce payment, *see* Supp. Br. at 12-13 (discussing *Allan v. Moline Plow Co.*, 14 F.2d 912 (8th Cir. 1926)), does not alter the Court's holding that section 316(b), as a whole, was intended to protect a substantive right to receive payment and prevent non-consensual restructurings from evading judicial scrutiny.  Indeed, the legislative history regarding the right to sue aspect of section 316(b) underscores the importance of the core rights protected by the Trust Indenture Act.

---

[30] Elsewhere in the legislative record, Douglas used the word "phases" consistent with this definition.  For example, when discussing the rights, powers, and remedies of trustees and bondholders under the proposed bill, he twice used the word to describe entire provisions of the bill, not the particular words used in them.  Lees Ex. B (1938 House Subcomm. Hearings on H.R. 10292) at 42 ("Those three **phases** constitute the major substantive provisions of the measure and set flexible safeguards, duties, and responsibilities[.]"; "A third **phase** covered by section 7 includes [reports issued by the obligors and the trustee, and bondholders lists].") (emphasis added).

## 2. Other Legal Authorities Interpret the Purpose of Section 316(b) Similarly

As the Court correctly noted in the Opinion, courts and legal scholars who have considered section 316(b) also recognize that its purpose was to ensure judicial scrutiny over non-consensual, out-of-court restructurings. They acknowledge that Congress not only recognized that section 316(b)'s protections would force more restructurings into court, but also intended and "welcomed the prospect." *UPIC*, 793 F. Supp. at 453; *see also Brady v. UBS Fin. Servs., Inc.*, 538 F.3d 1319, 1325 (10th Cir. 2008) (stating that section 316(b) "was designed to provide judicial scrutiny of debt readjustment plans to ensure their equity," and observing that it often forces out-of-court restructurings into bankruptcy court given the difficulty of achieving unanimous consent); Jonathan C. Lipson, *Governance in the Breach: Controlling Creditor Opportunism*, 84 S. Cal. L. Rev. 1035, 1054 (2011) ("Those who hold bonds subject to the Trust Indenture Act can always effectively thwart a negotiated modification to the core provisions of the bond—maturity date, interest, principal amount—which would, in turn, impair a reorganization outside bankruptcy."); Mark J. Roe, *The Voting Prohibition in Bond Workouts*, 97 Yale L.J. 232, 234 (1987) (noting also that "the principal impetus behind the Trust Indenture Act's prohibition was to require judicial scrutiny in bankruptcy of a recapitalization plan . . . .").

These authorities also hold that the increase in judicial scrutiny of non-consensual, out-of-court debt readjustments was designed to combat the ability of insiders or quasi-insiders to take advantage of other bondholders. *Brady*, 538 F.3d at 1324-25 ("Congress passed the TIA to address concerns of the Securities and Exchange Commission regarding corporate insiders taking advantage of individual investors."); *UPIC*, 793 F. Supp. at 452-53 ("Enactment of Section 316(b) is attributable to the Securities Exchange Commission's concern about the motivation of insiders and quasi-insiders to destroy a bond issue through insider control . . . . In 1939, the

Commission addressed this concern by seeking to have recapitalizations placed under regulatory and judicial control."); Roe, 97 Yale L.J. at 234 ("Douglas and his colleagues at the SEC . . . were convinced that insider machinations would damage bondholders and that the only cure was a bankruptcy proceeding in which the judge scrutinized the recapitalization."). Insiders and quasi-insiders may include not only stockholders, but also other creditor groups with competing interests. *See* Roe, at 251 ("What the insiders lost by forgoing interest or principal payments [on their bonds], they recouped as stockholders [or members of other creditor groups].").

Here, the signatories to the Restructuring Support Agreement included the Company; its secured lenders, the majority of whom held Notes in addition to secured debt; and its shareholders, who continue to hold equity in EDMC following the modified restructuring. It is hard to imagine a more connected group of insiders, all with interests competing with the interests of the minority Noteholders.

Moreover, courts and legal commentators overwhelmingly agree with the Court that the Trust Indenture Act provides substantive protection to minority bondholders who disagree with the terms of a proposed out-of-court restructuring. George W. Shuster, Jr., *The Trust Indenture Act and International Debt Restructurings*, 14 Am. Bankr. Inst. L. Rev. 431, 438 (2006) (noting recognition by courts and commentators that increased judicial oversight of restructurings under section 316(b) was intended to "protect the minority bondholders from disadvantageous decisions of the majority"); *see also Brady*, 538 F.3d at 1325 (quoting Shuster with approval). In fact, another court in this District recently reviewed the rights of minority noteholders under the Trust Indenture Act, cited this Court's Opinion, and came to a similar conclusion. In *MeehanCombs Global Credit Opportunities Funds, LP v. Caesars Entm't Corp.*, Judge

Scheindlin denied a motion to dismiss the claims of minority noteholders alleging that the issuing company was engaging in an improper debt restructuring that would trample the rights of the minority dissenters. 2015 WL 221055, at *5 (S.D.N.Y. Jan. 15, 2015). There, as here, the court recognized that under the Trust Indenture Act, a company cannot avoid judicial scrutiny of a non-consensual debt restructuring which seeks to impair the rights of the minority noteholders. Specifically, Judge Scheindlin found that minority noteholders sufficiently alleged that the challenged transaction was an "impermissible out-of-court debt restructuring achieved through collective action," which was "exactly what TIA section 316(b) was designed to prevent." *Id.*

### 3. The Court's Interpretation of Section 316(b) of the Trust Indenture Act Provides Appropriate Rights to Plaintiffs and Other Minority Bondholders

Further, contrary to Defendants' and Intervenor's allegations, the Court's interpretation of section 316(b) does not mean that the Trust Indenture Act provides absolute protection of a bondholder's practical ability to receive payment on their notes, or insurance that bondholders will always receive a 100% recovery. Instead, it provides meaningful protection that the core right of bondholders to receive payment cannot be impaired without their consent through an out-of-court restructuring. Consummation of the Proposed Restructuring as originally proposed by releasing the Parent Guarantee would not merely affect Plaintiffs' practical ability to recover on their Notes; it would completely foreclose that possibility, eviscerating their right to receive payment. *See* Pls. Ex. 1 (Offering Circular) at p. 3 (stating that if any Noteholder did "not consent to the Proposed Restructuring," the Company would consummate the Intercompany Sale, and "as a result" such non-consenting Noteholders "will not receive payment on account of their Notes"). There can be few clearer examples of an out-of-court restructuring impairing non-consenting creditors' right to receive payment than here.

Nor, as Defendants and Intervenor suggest, does the Court's Opinion provide Plaintiffs with a "windfall." Supp. Br. at 16. It merely grants Plaintiffs' their bargained-for contractual rights, which include the right to receive payment from Issuers with assets and whose debts are guaranteed by Parent EDMC. Again, Plaintiffs do not contend that the Trust Indenture Act ensures that minority noteholders will receive a 100% recovery, but it guards against situations such as the one at bar where an issuer and a majority of its creditors attempt to coerce a minority noteholder into "accepting" less than what is provided for under the note, and the alternative is no recovery at all.

Defendants and Intervenor also appear to argue now that section 316(b) is only intended to encourage court supervision of out-of-court restructurings "when bankruptcy is feasible," and that when "bankruptcy is not feasible," section 316(b) somehow no longer applies. Supp. Br. at 14. There is no support for this interpretation in the language of the statute or its legislative history. Nor is it necessary to disregard section 316(b) to restructure debt where bankruptcy is not an option. As the Court noted in the Opinion, out-of-court restructurings regularly proceed with consent from a majority, but less than 100%, of bondholders, where the few non-consenting bondholders are not impaired. Opinion at 46. In fact, that is exactly what ultimately happened here, as the Company was able to restructure around Plaintiffs' approximately $14 million of Notes.

Finally, Defendants' and Intervenor's argument that, absent the restructuring, Plaintiffs "stood to receive little or no recovery on its unsecured notes" is entirely irrelevant. *See* Supp. Br. at 16. Even if that argument had any merit at the Preliminary Injunction Hearing (which, as discussed in Plaintiffs' prior briefing, it did not), it certainly has no merit today. Today, Plaintiffs hold approximately $14 million of Notes guaranteed by a solvent Company that, according to the

Intervenor's valuation, has over $600 million of equity value. *See* Supp. Ex. 11 (Solvency Certificate); Defs. Ex. 117 (Expert Report of John A. Taylor). The Company has paid interest on the Notes, and is expected to do so going forward unless the Guarantees are released. Thus, release of the Parent Guarantee would undoubtedly impair Plaintiffs' ability to recover on their Notes. *See* Supp. Br. at 17-18 ("[N]ow that the Company as a whole has been substantially de-levered, plaintiffs' ability to recover from the parent company, in the event they succeed on their claims [and the Parent Guarantee is not released], is even stronger than before.").

## POINT II

## INJUNCTIVE RELIEF MAY NOT BE NECESSARY BASED ON DEFENDANTS AND INTERVENOR'S REPRESENTATIONS

Defendants and Intervenor argue that injunctive relief is no longer necessary to protect Plaintiffs' rights because the Fourth Supplemental Indenture ensures "that any release of the parent company's guarantee of the notes would be 'void *ab initio* and of no force or effect to the extent found pursuant to a final judgment of a court of competent jurisdiction to be in violation of the Trust Indenture Act.'" Supp. Br. at 18 (quoting Supp. Ex. 2 (Fourth Supplemental Indenture) at § 2(c)). Plaintiffs understand this to mean that if the Court's final ruling is consistent with its holding that release of the Parent Guarantee would violate section 316(b) of the Trust Indenture Act, then the Company cannot release the Parent Guarantee. Thus, Plaintiffs understand the referenced provision of the Fourth Supplemental Indenture to essentially operate as a *de facto* injunction. Assuming this understanding is correct, injunctive relief is no longer necessary.

Plaintiffs note, however, that the circumstances underlying the Court's balance of the equities analysis in its Opinion have now changed greatly. There is no longer a threat that injunctive relief would "risk the imperilment of a painstakingly negotiated $1.5 billion debt

restructuring" and "spell the end of a company valued . . . at $1.05 billion." Opinion at 30. The restructuring has been consummated around Plaintiffs' Notes, and is no longer threatened by the outcome of this litigation.

## CONCLUSION

For the foregoing reasons and those stated in Plaintiffs' prior pleadings, the Court should enter a final judgment consistent with its Opinion, (i) granting Count I of the Complaint and entering a declaration that the Proposed Restructuring, including the release of the Parent Guarantee in connection with the Intercompany Sale, violates section 316(b) of the Trust Indenture Act and section 6.07 of the Indenture, and (ii) denying Defendant EDMC's Counterclaim.

Dated: March 11, 2015
      New York, New York

                                   /s/ *Sean E. O'Donnell*    
                                 Sean E. O'Donnell
                                 Christopher W. Carty
                                 Lucy C. Malcolm
                                 AKIN GUMP STRAUSS HAUER & FELD LLP
                                 One Bryant Park
                                 New York, New York 10036
                                 Tel: (212) 872-1093
                                 Fax: (212) 872-1002
                                 sodonnell@akingump.com

                                 *Counsel for Plaintiffs Marblegate Asset Management, LLC and Marblegate Special Opportunities Master Fund, L.P.*