UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                              :

MARBLEGATE ASSET MANAGEMENT,    :
LLC, *et al.*,                              :
                              :

                 Plaintiffs,    :      14 Civ. 8584 (KPF)
                              :
          v.                      :     <u>OPINION AND ORDER</u>
                              :
EDUCATION MANAGEMENT CORP., *et al.*, :
                              :
                Defendants. :
                              :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 23, 2015

KATHERINE POLK FAILLA, District Judge:

      This is the second opinion stemming from the restructuring of the debt of

Education Management Corporation, Education Management L.L.C., and

Education Management Finance Corporation (collectively, "EDMC" or

"Defendants").  Defendants, in negotiations with the Steering Committee for the

Ad Hoc Committee of Term Loan Lenders of Education Management (the

"Steering Committee" or "Intervenors"), agreed to a debt restructuring in which

bondholders would receive partial recovery in the form of debt and/or equity.

Marblegate Asset Management, L.L.C., and Marblegate Special Opportunities

Master Fund, L.P. (collectively, "Marblegate" or "Plaintiffs"), dissented from the

restructuring plan, as a result of which, under the restructuring as originally

conceived, they would retain their original claims but be left with no assets as

security for those claims.  Marblegate sought a preliminary injunction under

the Trust Indenture Act of 1939 (the "Trust Indenture Act" or the "Act"), 15

U.S.C. §§ 77aaa-77bbbb; the Court denied the request for injunctive relief in *Marblegate Asset Management* v. *Education Management Corp.*, — F. Supp. 3d —, No. 14 Civ. 8584 (KPF), 2014 WL 7399041 (S.D.N.Y. Dec. 30, 2014) ("*Marblegate I*").  EDMC subsequently carried out the restructuring, while leaving in place mechanisms to pay Marblegate's claims if necessary.  Marblegate now seeks declaratory, monetary, and potentially injunctive relief.  EDMC counterclaims for declaratory relief allowing it to remove the mechanisms put in place to preserve Marblegate's rights.  The Court, having converted the preliminary injunction hearing into a bench trial at the request of the parties and having received supplemental exhibits and briefing, now rules in favor of Plaintiffs for the reasons set forth in this Opinion and Order.

## BACKGROUND[1]

### A.    Factual Background

The Court assumes familiarity with its prior Opinion denying Marblegate's request for a preliminary injunction, but briefly retraces the relevant facts.  The case arises out of EDMC's decision to restructure roughly $1.5 billion in debt.  *Marblegate I,* 2014 WL 7399041, at *3.  EDMC, a for-profit education company, was inhibited from restructuring through bankruptcy by

---

[1]    The facts set forth in this Opinion are taken from the Court's previous Opinion in *Marblegate I*, 2014 WL 7399041; the exhibits and testimony presented at the hearing held on November 18 and 19, 2014, for which the same identifying terminology is used as in *Marblegate I*; the supplemental exhibits submitted by the parties in connection with the instant bench trial ("Supp. Ex. [number]"); and the exhibits to the Lees Declaration submitted with Defendants' and Intervenors' supplement brief ("Lees Decl. Ex. [number]").

For convenience, the parties' supplemental briefs are cited as "Def. Supp. Br." and "Pl. Supp. Br."

its reliance on federal funds distributed through Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1079-1099. *Marblegate I*, 2014 WL 7399041, at *1-2. Declaring bankruptcy would have rendered EDMC ineligible for Title IV funds, depriving it of nearly 80% of its revenue. *Id.*[2] Accordingly, EDMC negotiated an agreement with a group of its largest creditors to carry out the Proposed Restructuring. *Id.* at *6-7.

Prior to the since-consummated restructuring, EDMC's debt consisted of $1.305 billion in secured debt (divided between $220 million drawn from a revolving credit facility and $1.085 in secured term loans) and $217 million in unsecured notes (the "Notes"), for a total debt of $1.553 billion. *Marblegate I*, 2014 WL 7399041, at *3. The instant case focuses on the unsecured Notes, which were qualified under the Trust Indenture Act (Indenture §§ 6.07, 12.01). Although the Notes were unsecured and issued by a subsidiary, Education Management LLC, they were guaranteed by EDMC (the "Parent Guarantee"). *Id.* at *3-4 The Parent Guarantee recited, however, that it could be released either by majority vote of the Noteholders (Indenture § 9.02) or by a corresponding release of the Parent Guarantee by the secured lenders

---

[2]      A stark example of the consequences of such an event was recently provided by Corinthian Colleges, Inc., which, having had its access to Title IV funds suspended in 2014, closed its remaining campuses and filed for bankruptcy over a ten-day span from late April to early May 2015. *See For Profit College Company Files for Bankruptcy*, N.Y. Times, May 5, 2015, at A16.

(Indenture § 10.06),[3] and accordingly the Notes' offering circular cautioned investors not to assign any value to the Parent Guarantee.  *Id.*

The Ad Hoc Committee of Term Loan Lenders with which EDMC negotiated consisted of creditors holding 80.6% of EDMC's secured debt and 80.7% of the Notes; the negotiations were primarily carried out by the Steering Committee, which collectively held 35.8% of EDMC's secured debt and 73.1% of the Notes.  *Marblegate I*, 2014 WL 7399041, at *6.  EDMC and the Steering Committee arrived at the Proposed Restructuring, which would provide secured term loan lenders debt and equity in EDMC amounting to roughly a 55% recovery; holders of Notes would receive equity amounting to roughly a 33% recovery of value.  *Id.*

The Restructuring Support Agreement anticipated 100% voluntary participation by creditors, but contained a stick that would come into effect if any creditors did not consent.  That stick, the Intercompany Sale, would involve several steps:

> (i) the secured lenders would release EDMC's parent guarantee of their loans ... , thus triggering the release of EDMC's parent guarantee of the Notes under Indenture § 10.06; (ii) the secured lenders would exercise their rights under the 2014 Credit Agreement and Article 9 of the Uniform Commercial Code to foreclose on "substantially all the assets" of Defendants; and (iii) the secured lenders would immediately sell these assets back to a new subsidiary of EDMC.  This new subsidiary would then distribute debt and equity to the creditors who had consented to the Restructuring

---

[3]    The Secured Lenders did not have such a guarantee at the time of the issuance of the Notes, but obtained one shortly prior to the restructuring.  *Marblegate I*, 2014 WL 7399041, at *7.

4

> Support Agreement in accordance with that document's
> terms.

*Marblegate I*, 2014 WL 7399041, at *7 (internal footnotes and citations omitted). As EDMC explicitly warned the Noteholders in its Exchange Offer, the result of the Intercompany Sale would be that "substantially all of our assets will have been transferred to New EM Holdings and will not be available to satisfy the claims of [dissenting Noteholders]. As a result, we anticipate that such Holders will not receive payment on account of their Notes." *Id.* (quoting Exchange Offering Circular 3). Thus, although the Intercompany Sale would not formally alter the dissenting Noteholders' right to payment on their Notes, it was unequivocally designed to ensure that they would receive no payment if they dissented from the debt restructuring.

## B.    The Preliminary Injunction Hearing

Marblegate, which held roughly $14 million of Notes, declined to participate in the Exchange Offer, and on October 28, 2014, filed a motion for a temporary restraining order and a preliminary injunction. *Marblegate I*, 2014 WL 7399041, at *8.[4] The parties agreed to halt both the Proposed Restructuring and Marblegate's motion to allow for expedited discovery and briefing prior to a hearing on November 18 and 19, 2014. *Id.*[5] In advance of the hearing, the parties provided the Court with over 400 exhibits, in addition

---

[4]    Marblegate was initially joined by Magnolia Road Capital L.P. and Magnolia Global Credit Master Fund L.P., which subsequently dismissed their claims pursuant to Federal Rule of Civil Procedure 41. (Dkt. #53).

[5]    During this pause, the Steering Committee filed its motion to intervene, which the Court granted pursuant to Federal Rule of Civil Procedure 24(b). (Dkt. #23).

to the affidavits and deposition testimony of six fact witnesses and six experts. After hearing cross-examination and redirect of these witnesses on November 18, and oral argument on November 19, the Court issued its opinion in *Marblegate I* on December 15, filing it publicly on December 30, 2014.  The Court denied the motion for a preliminary injunction due to the adequacy of Plaintiffs' remedies at law, but found that they would likely succeed on the merits of their claims under the Trust Indenture Act.  *See id.* at *10-21.

C.    **Subsequent Developments**

On January 5, 2015, EDMC proceeded with the Intercompany Sale, subject to certain alterations to protect the rights of Marblegate in the event of a final ruling in Plaintiffs' favor.  (*See* Dkt. #60).[6]  The secured creditors foreclosed on the assets of Education Management LLC and sold them to Education Management II LLC, thus reducing EDMC's debts from $1.5 billion to $400 million.  (*Id.*).  However, EDMC refrained from removing the Parent Guarantee from Marblegate's Notes, and amended the Indenture to so allow. (*Id.*).  EDMC then filed its answer to the Complaint, counterclaiming for declaratory relief enabling it to release the Parent Guarantee from the Notes. (Dkt. #61).  Due to these steps, as Plaintiffs allow, injunctive relief is no longer necessary, as a final ruling concerning the legal status of Marblegate's claims

---

[6]    These alterations included a decision by EDMC to refrain from delivering certain documents needed to effectuate the release of the Parent Guarantee, as well as an amendment to the relevant Indenture making clear that EDMC II would continue to guarantee the unsecured notes held by Marblegate until such time as the Parent Guarantee was released.  (Dkt. #60).

will allow it to recover on the Notes to whatever extent is legally warranted. (*See* Pl. Supp. Br. 19).

The parties subsequently entered into a stipulation, endorsed by the Court, retroactively consolidating the preliminary injunction hearing and the record thereof into a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2), and granting an additional period to supplement the record and the briefing. (Dkt. #70). Pursuant to this stipulation, the parties jointly filed 13 supplemental exhibits with the Court on February 3, 2015. Defendants and Intervenors then filed a joint supplemental brief on February 9, 2015 (Dkt. #71), and the briefing was complete with the filing of Plaintiffs' supplemental reply brief on March 11, 2013 (Dkt. #73). The Court now considers whether Section 316(b) of the Trust Indenture Act, 15 U.S.C. § 77ppp(b), entitles Plaintiffs to full payment on their Notes, or whether EDMC may release the Parent Guarantee and leave Plaintiffs to attempt collection from the now asset-free Education Management LLC.

## DISCUSSION

The question put before the Court is straightforward: does a debt restructuring violate Section 316(b) of the Trust Indenture Act when it does not modify any indenture term explicitly governing the right to receive interest or principal on a certain date, yet leaves bondholders no choice but to accept a modification of the terms of their bonds? Examining the text, history, and purpose of the Trust Indenture Act, the Court concludes that the answer is yes.

**A.      Section 316(b) of the Trust Indenture Act**

**1.      Text**

Section 316(b) of the Trust Indenture Act reads in relevant part:

> Notwithstanding any other provision of the indenture to
> be qualified, the right of any holder of any indenture
> security to receive payment of the principal of and
> interest on such indenture security, on or after the
> respective due dates expressed in such indenture
> security, or to institute suit for the enforcement of any
> such payment on or after such respective dates, shall
> not be impaired or affected without the consent of such
> holder[.]

15 U.S.C. § 77ppp(b).  The text poses two questions: what does the "right ... to

receive payment" consist of, and when is it "impaired or affected" without

consent?  Read narrowly, Section 316(b) protects bondholders only against

involuntary modification of their payment terms or their right to sue for

payment; read broadly, it protects bondholders against being forced to accept a

lesser payment than they bargained for, absent a restructuring in bankruptcy.

At least two courts have found that Section 316(b) protects only the legal

right to demand payment, rather than any substantive right to receive it, and

thus that only formal modification of the right to sue or the payment terms

impairs or affects the right to demand payment.  *See YRC Worldwide Inc.* v.

*Deutsche Bank Trust Co. Am.*, No. 10 Civ. 2106 (JWL), 2010 WL 2680336, at *7

(D. Kan. July 1, 2010) ("TIA § 316(b) does not provide a guarantee against the

issuing company's default or its ability to meet its obligations.  Accordingly, the

fact that the deletion of section 5.01 might make it more difficult for holders to

receive payment directly from plaintiff does not mean that the deletion without

8

unanimous consent violates TIA § 316(b)[.]"); *In re Nw. Corp.*, 313 B.R. 595, 600 (Bankr. D. Del. 2004) ("[S]ection 316(b) applies to the holder's *legal* rights and not the holder's *practical* rights to the principal and interest itself ... there is no guarantee against default." (emphases in original)).

Meanwhile, at least two other courts, both in this District, have interpreted the right protected by Section 316(b) to be a broader right to receive payment, and thus held that a debt restructuring that deprives dissenting bondholders of assets against which to recover can violate the Trust Indenture Act. *See MeehanCombs Global Credit Opportunities Funds, LP* v. *Caesars Entm't Corp.*, No. 14 Civ. 7091 (SAS), 2015 WL 221055, at *4-5 (S.D.N.Y. Jan. 15, 2015) (citing *Marblegate I*, 2014 WL 7399041); *Federated Strategic Income Fund* v. *Mechala Grp. Jam. Ltd.*, No. 99 Civ. 10517 (HB), 1999 WL 993648, at *5-7 (S.D.N.Y. Nov. 2, 1999).

The Court, in adopting the latter position in *Marblegate I,* did not rely upon the text alone, finding that it "lends itself to multiple interpretations." 2014 WL 7399041, at *16.  Rather, it looked also to the statutory history and purpose of the Trust Indenture Act, finding that they supported a broad reading meant to inhibit involuntary debt restructurings outside the formal mechanisms of bankruptcy.  *Id.* at *18-19.  Defendants and Intervenors now urge the Court to reconsider that evaluation, arguing that a more extensive analysis of the legislative history supports their narrow reading of Section 316(b).  The Court, having considered the full legislative history provided by

Defendants and Intervenors, continues to find that it supports Plaintiffs' broader reading of Section 316(b).

### 2.    Legislative History

The impetus for the Trust Indenture Act was provided by a 1936 report of the Securities and Exchange Commission (the "1936 SEC Report") (Lees Decl. Ex. J), referenced repeatedly throughout the House and Senate deliberations. *See* 15 U.S.C. § 77bbb(a) (Section 302 of the Trust Indenture Act, citing to the 1936 SEC Report as a basis for the Act).  The primary author of the 1936 SEC Report was William O. Douglas, who would subsequently become a commissioner and then Chairman of the SEC before being appointed an Associate Justice of the United States Supreme Court.  He testified before the Subcommittee of the Senate Committee on Banking and Currency in 1937 in support of the proposed Trust Indenture Act of 1937 (*see* Lees Decl. Ex. F ("1937 Senate Hearings")), and again before the Subcommittee of the House Committee on Interstate and Foreign Commerce in 1938 in support of the proposed Trust Indenture Act of 1938 (*see* Lees Decl. Ex. B ("1938 House Hearings")).  Neither version became law, and an amended version of the Trust Indenture Act was reintroduced in 1939, with substantial changes to the language of what became Section 316(b), and was signed into law on August 3, 1939.  The Court now examines the relevant legislative history over this three-year period, as well as a 1958 SEC manual that Defendants and Intervenors argue sheds light on the proper interpretation of the Act.

10

### a.    The 1936 Report

The SEC compiled its report — of which Part VI, entitled "Trustees Under Indentures," is referred to as the "1936 SEC Report" — pursuant to the Securities Exchange Act of 1934.  (1936 SEC Report at iii).  The 1936 Report touches on issues relevant to Section 316(b) at two places: first, when discussing protection of minority bondholders (*id.* at 61-66), and second, when discussing majority reorganizations (*id.* at 143-51).

Defendants and Intervenors, discussing the 1936 SEC Report's section on minority protection, point out its highlighting of a 1926 Eighth Circuit case in which the terms of an indenture prevented a bondholder from bringing suit for payment at all in the face of a trustee's inaction.  (*See* 1936 SEC Report at 62 (discussing *Allan* v. *Moline Plow Co.*, 14 F.2d 912 (8th Cir. 1926))).  It is true that the Report, among multiple other sources of legislative history, makes clear that such "no-action clauses" were one of the evils that the Trust Indenture Act was intended to address.  But the 1936 SEC Report goes on immediately to note that the problems of minority bondholders are at their height when confronting voluntary restructurings conducted by foreclosure sales outside the supervision of a judicial or administrative process, where the incentives of the majority would be to offer as little as possible in cash or new securities to dissenting bondholders.  (*See id.* at 63-64).  The remedy prescribed by the Report in this section is a more active indenture trustee in reorganization negotiations, but as discussed *infra*, the Trust Indenture Act

11

generally evolved over the course of its legislative history from strengthening the hands of trustees and the SEC to imposing mandatory indenture terms.

Debt restructurings are also discussed at Part B of Appendix C of the Report.  (*See* 1936 SEC Report at 143-51).  The Report noted the problems stemming from requiring unanimous consent of bondholders to reorganize outside bankruptcy: "reorganizers would be faced with the necessity of dealing with a dissenting minority, with the consequences that foreclosure proceedings (and later on, [bankruptcy] proceedings) would be necessary." (*Id.* at 145).  But the Report also noted that provisions allowing majority amendment of security and payment obligations

> give rise to abuses and problems which must be faced if the interests of security holders are not to be made subordinate to the desires and conveniences of the dominant group.  The risk is that if these provisions come into vogue and no controls are set up over them, the next cycle of reorganizations will take place on a voluntary basis without supervision of any court or administrative agency.

(*Id.* at 150).  Acknowledging these competing concerns, the SEC deferred to a future report a full analysis and recommendations (*id.*); it is unclear whether such a report ever materialized.

### b.  The Trust Indenture Act of 1937

#### i.  Text

The proposed Trust Indenture Act of 1937 gave the SEC relatively broad regulatory authority, including allowing it to require that qualified indentures contain language regarding

12

> [t]he rights, powers, and remedies of the indenture
> security holders and the manner in which and
> conditions upon which such rights, powers and
> remedies may be exercised, including the right and
> power of the indenture security holders with respect
> to … bringing action to collect the principal of and
> interest upon the indenture securities at their
> respective due dates[.]

Trust Indenture Act of 1937, S. 2344, 75th Cong. § 7(m)(5) (1st Sess. 1937)

(1937 Senate Hearings at 12).  The language of the 1937 Act is narrower than

the contemporary Section 316(b), focusing on the right to bring an action.

Moreover, it does not automatically protect, but instead merely gives the SEC

authority to require such protections.

### ii.    Testimony and Debate

The congressional record does not shed a great deal of light on the

significance of Section 7(m)(5); both Commissioner Douglas, testifying, and the

SEC, in a report adopted into the record, passed over it fairly briefly.  (*See* 1937

Senate Hearings at 70, 86).  Other portions of the discussion before the Senate

subcommittee, however, suggest a broad concern with debtors taking

advantage of creditors, and are worth noting.  Commissioner Douglas pointed

out the inherent conflict between the interests of issuers and security holders,

explaining that issuers would have several "desire[s] antithetical in principle to

the interests of investors," among them a desire "to have the greatest possible

freedom to withdraw collateral and sell pledged property."  (*Id.* at 24-25).  There

was also a concern raised by Senator Robert Wagner as to whether the Act

would prevent the substitution of worthless collateral for collateral on which a

security holder had relied; Commissioner Douglas noted that the SEC was

empowered to block such provisions, though Senator Wagner and others worried that such protections would be at the SEC's discretion rather than automatic. (*Id.* at 36-39).

### c.     The Trust Indenture Act of 1938

#### i.     Text

The Trust Indenture Act, as it then stood, read in relevant part:

> The indenture to be qualified shall contain provisions which the Commission deems adequate ... with respect to the following matters —
>
> * * *
>
> (3) The rights, powers, and remedies of the indenture security holders and the manner in which and conditions upon which such rights, powers, and remedies may be exercised, including the rights, powers, and remedies of the indenture security holders with respect to (A) accountings by the indenture trustee, (B) *bringing action to collect the principal of and interest upon the indenture securities upon their respective due dates*, and (C) calling and holding meetings of the indenture security holders and taking action at such meetings. The indenture to be qualified may contain provisions authorizing the holders of not less than a majority in principal amount of the indenture securities at the time outstanding to consent to the postponement of any interest payment for a period not exceeding one year from its due date, or to the waiver of any default and its consequences, except a default in the payment of the principal of any indenture security upon the date of maturity specified therein[.]

Trust Indenture Act of 1938, H.R. 10292, 75th Cong. § 7(m)(3) (3rd Sess. 1937) (1938 House Hearings at 12-13) (emphasis added). The structure of the 1938 Act thus largely tracked that of the 1937 Act with regard to this section, giving

the SEC the power to require indenture provisions narrowly tailored to the right to bring suit.

### ii.       Testimony and Debate

Then-SEC Chairman Douglas was the "main proponent" of the 1938 Act during the House hearings held on April 25, 1938.  (*See* Lees Decl. Ex. A ("1939 House Minutes") at 9512).  Accordingly, his testimony on the 1938 Act is given significant attention in the parties' briefing.  Douglas specifically discussed Section 7(m)(3) of the bill in addressing the "bogey" that had been raised about the 1938 Act, namely, "that the bill, by its terms, would impose an impossible requirement of the consent of 100 percent of the bondholders in order to amend it."  (1938 House Hearings at 35).  Douglas stated that there was "absolutely no basis for that contention," and that the 1938 Act would allow indentures to contain provisions for amendment subject only to the exception laid out in Section 7(m)(3):

> The effect of this exception is merely to prohibit provisions authorizing such a majority to force a non-assenting security holder to accept a reduction or postponement of his claim for principal, or a reduction of his claim for interest or a postponement thereof for more than 1 year.  In other words, this provision merely restricts the power of the majority to change those particular phases of the contract.  Evasion of judicial scrutiny of the fairness of debt-readjustment plans is prevented by this exception....  In other words, the bill does place a check or control over the majority forcing on the minorities a debt-readjustment plan.  It does go that far; but it does not prohibit any other restriction or appropriate amendments of the indenture by the consent of the parties.

(*Id.* at 35-36).[7]

Defendants and Intervenors take Douglas's testimony to support a narrow interpretation of Section 7(m)(3), noting that his statements were specifically framed as a response to an overbroad reading of the 1938 Act as prohibiting nearly all amendments. (*See* Def. Supp. Br. 3-5). Plaintiffs respond, and the Court agrees, that Douglas understood Section 7(m)(3) as preventing precisely what was intended in the instant case: a "majority []

---

[7]     Although the Congressional Reports record Douglas as saying that "this provision merely restricts the power of the majority to change those particular *phases* of the contract," Defendants and Intervenors believe that this is a misstatement or typographical error, and that Douglas said or intended to say "phrases." (*See* Def. Supp. Br. 5; Dkt. #74 (letter to Court)). Plaintiffs, understanding "phases" to have a broader meaning than "phrases," urge the Court to accept the statement as transcribed in the official record. (Pl. Br. 13-14).

While the meaning of the Trust Indenture Act does not rest on the presence or absence of a single letter, the Court is inclined to credit the official recording of "phases," in its meaning as an aspect of a problem. *See Webster's New International Dictionary* 1838 (2d ed. 1953) (defining "phase" in part as "[a]ny aspect or side, as of situation or question"); *Webster's Revised Unabridged Dictionary* 1075 (1913) (defining "phase" in part as "[a]ny appearance or aspect of an object of mental apprehension or view; as, the problem has many phases"). In his later writings, then-Justice Douglas repeatedly employed the word "phase" in this sense. *See, e.g., Superintendent of Ins. of State of N.Y.* v. *Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.10 (1971) ("We only hold that the alleged fraud is cognizable under § 10(b) and Rule 10b-5 in the bond sale and we express no opinion as to Manhattan's standing under § 10(b) and Rule 10b-5 on other phases of the complaint."); *Thompson* v. *Tex. Mexican Ry. Co.*, 328 U.S. 134, 143-44 (1946) ("These matters involve not only the interests of the two parties to the trackage agreement but phases of the public interest as well."); *Nebraska* v. *Wyoming*, 325 U.S. 589, 642 (1945) ("We have already considered Wyoming's exception that storage water should have been included in the allocation. We have also considered the other phases of her argument in favor of mass allocation."); *Panhandle E. Pipe Line Co.* v. *Fed. Power Comm'n*, 324 U.S. 635, 639 (1945) ("The Commission … [did not] make an allocation of costs between the regulated and unregulated phases of the business as it did [elsewhere.]"); *Colo. Interstate Gas Co.* v. *Fed. Power Comm'n*, 324 U.S. 581, 588 (1945) ("It is of course immaterial that the revenues from the intrastate sales or the direct industrial sales may exceed their costs, since the authority to regulate those phases of the business is lacking. To the extent, however, that the revenues from the interstate wholesale business exceed the costs allocable to that phase of the business, the interstate wholesale rates are excessive."); *United States* v. *Powers*, 307 U.S. 214, 217 (1939) ("[The Criminal Appeals Act's] substantive phases were not altered one whit or tittle; its sanctions were neither reduced nor increased.… The amendment merely perpetuated the entire Act for another term.").

16

forc[ing] a non-assenting security holder to accept a reduction or postponement of his claim for principal." (*See* Pl. Supp. Br. 12 (quoting 1938 House Hearings at 35-36)).

### iii.    Senate Report

Douglas's testimony was largely incorporated into the Senate's report on the 1938 Act (the "1938 Senate Report"), which understood Section 7(m)(3) as providing an exception to the general allowance of amendments,

> the effect of which is to prohibit provisions authorizing such a majority to force a non-assenting security holder to accept a reduction or postponement of his claim for principal, or a reduction of his claim for interest or a postponement thereof for more than 1 year.  Evasion of judicial scrutiny of the fairness of debt-readjustment plans is prevented by this prohibition....  This prohibition does not prevent the majority from binding dissenters by other changes in the indenture or by a waiver of other defaults, and the majority may of course consent to alterations of its own rights.

S. Rep. No. 75-1619, at 19 (1938) (Lees Decl. Ex. D).  The 1938 Senate Report thus sheds little additional light on the congressional understanding of Section 7(m)(3), except to suggest that its understanding aligned with that of Douglas.

### iv.    Additional Commentary

Defendants and Intervenors additionally point to an address on the 1938 Act by Edmund Burke, who would later testify on behalf of the SEC before the House on the 1939 Act, before the American Bar Association.  (Lees Decl. Ex. G ("Burke Address")).  Burke focused on the concern that Section 7(m)(3) of "the bill will prevent provisions permitting holders of a majority of bond issue to

waive principal and interest defaults, and that this prohibition will force issuers into bankruptcy." (*Id.* at 11).  He reiterated that this provision would

> prohibit provisions authorizing a majority to force a non-assenting bondholder to accept a reduction or postponement of his claim for principal, or a reduction of his claim for interest, or a postponement of his claim for interest for more than one year.  In other words, the effect of this prohibition will be to limit, to that extent, the control of the majority over the destinies of the individual minority security holder.  If an investor buys a $1,000 bond payable on January 1, 1940, the majority cannot turn it into a $500 bond payable in 1960, without his consent, and without resort to the reorganization machinery now provided by law.  There is nothing in this provision, however, which would prevent the majority from waiving its own rights.

(*Id.*).

### d.   The Trust Indenture Act of 1939

### i.   Evolution into Final Version

In contrast to the comparatively minor changes between the 1937 and 1938 Acts, the Trust Indenture Act of 1939 had undergone significant structural revisions when it was first introduced before the House and Senate in January 1939.  Section 7(m) was now relocated to Section 314 (*see* Lees Decl. Ex. C ("February 1939 Senate Hearings") at 19), though the relevant text remained largely the same:

> The indenture to be qualified shall contain provisions which the Commission deems adequate … with respect to the rights, powers, and remedies of the indenture security holders and the manner in which and conditions upon which such rights, powers, and remedies, may be exercised, including the rights, powers, and remedies of the indenture security holders with respect to —

18

* * *

> (b) bringing action to collect the principal of and interest
> upon the indenture securities upon their respective due
> dates[.]

Trust Indenture Act of 1939, S. 477, 76th Cong. § 314(b) (1st Sess. 1939)

(February 1939 Senate Hearings at 14).  As with the 1937 and 1938 Acts, the

initial 1939 Act continued to focus on the right to bring suit, and left it to the

SEC to determine what provisions were necessary.

During hearings before the Senate Subcommittee of the Committee on

Banking and Currency, Senator Robert Taft, among others, expressed concern

about the enormous discretion provided to the SEC, and wondered if it would

not be simpler to set out mandatory indenture provisions in the statute itself.

(February 1939 Senate Hearings at 48).  In response to these concerns, the

initial 1939 Act was altered to convert many the regulatory objectives into

specific statutory requirements, and was reintroduced by Congressman William

Cole in March 1939.  (*See* Lees Decl. Ex. E ("April 1939 House Hearings") at 1).

The relevant statutory text now read:

> The indenture to be qualified shall provide that,
> notwithstanding any other provision thereof, the right of
> any holder of any indenture security to receive payment
> of the principal of and interest on such indenture
> security, on or after the respective due dates expressed
> in such indenture security, or to institute suit for the
> enforcement of any such payment on or after such
> respective dates, shall not be impaired or affected
> without the consent of such holder, except as to a
> postponement of an interest payment consented to as
> provided in subsection (a).

Trust Indenture Act of 1939, H.R. 5220, 76th Cong. § 316(b) (1st Sess. 1939) (April 1939 House Hearings at 31).  This version would become law with two alterations, neither relevant here: relocation of the notwithstanding clause to the beginning of the subsection, and the addition of another exception allowing limitation of the right to initiate suit where such initiation would risk forfeiture of the lien.  *See* 15 U.S.C. § 77ppp(b).[8]

Comparison of the final text of Section 316(b) with the prior versions reveals two significant distinctions.  First, the indenture provisions are mandatory rather than reliant upon the SEC to designate them as such.  Second, and more importantly, the right is no longer expressed as the right to bring an action, but instead as the right "to receive payment," which right could not be "impaired or affected without the consent of such holder."

## ii.    Testimony and Debate on the Final Section 316(b)

The SEC's analysis of Section 316(b) acknowledged these changes, noting that under this subsection "the indenture must provide that, except as to an interest postponement so consented to, the right of any indenture security holder to receive his principal and interest when due and to bring suit therefor may not be impaired without his consent."  (April 1939 House Hearings at 219).  Broadly conceived, however, the section continued to have the same overarching purpose: "Evasion of judicial scrutiny of the fairness of debt-readjustment plans is prevented by this prohibition."  (*Id.*).  From this identity

---

[8]    In addition, the period by which interest payments could be postponed, now contained in Section 316(a), was extended from one year to three years.  *See* 15 U.S.C. § 77ppp(a)(2).

of purpose, along with the incorporation of Douglas's testimony on the 1938 Act, Defendants and Intervenors conclude that the alteration in language was merely intended to convert the grant of authority to the SEC into specific statutory requirements, and thus that "section 316(b), in the form ultimately enacted, was not intended to differ in scope from the proposed language on which Chairman Douglas commented in 1938." (Def. Supp. Br. 7). Though the Court acknowledges the paucity of commentary on the difference between Section 316(b) and its predecessor Sections 314(b), 7(m)(3), and 7(m)(5), it cannot ignore the decidedly different text. Moreover, when the bill was introduced before the full House, Congressman Carl Mapes noted that "[t]he bill which is introduced today … is a very different bill from the one that was introduced originally in the last Congress and quite different from the one that was passed by the Senate in this Congress." (1939 House Minutes at 9513).

Burke also testified before the Senate subcommittee at length on the SEC's behalf. With regard to Section 316(b), he noted that it "seem[ed] to have drawn considerable fire." (April 1939 House Hearings at 284). Burke testified that "[a]ll that the section does is preserve the individual holder's right to bring an action at law to collect his interest and principal in accordance with the terms of his contract, unless he has himself consented to a variation from that contract." (*Id.*). Despite this limiting interpretation of Section 316(b), however, he went on to state,

> When an investor buys a bond, he buys a right *to get* a thousand dollars on a particular date. All that this subsection says is that he shall not be deprived of *that individual right* without his consent. As a matter of fact,

> he cannot be deprived of that right unless the indenture
> specifically so provides.

(*Id.* at 285 (emphases added)).  Burke went on to make clear that majorities

could renegotiate their own rights and agree to reduce or postpone their claims;

they simply could not bind a nonconsenting security holder.  (*Id.*).

### iii.    House and Senate Reports

The House and Senate reports on the 1939 Act were identical to the

SEC's analysis:

> Under subsection (b), the indenture must provide that,
> except as to an interest postponement so consented to,
> the right of any indenture security holder to receive his
> principal when due and to bring suit therefore may not
> be impaired without his consent.  Evasion of judicial
> scrutiny of the fairness of debt-readjustment plans is
> prevented by this prohibition....  This prohibition does
> not prevent the majority from binding dissenters by
> other changes in the indenture or by a waiver of other
> defaults, and the majority may of course consent to
> alterations of its own rights.

H.R. Rep. 76-1016, at 56 (1939); S. Rep. No. 76-248, at 26-27 (1939).

### e.    The 1958 Manual

Defendants and Intervenors point to an SEC manual from June 1958,

prepared for internal use, that analyzed Section 316(b).  (Lees Decl. Ex. K (the

"1958 SEC Manual")).  The Court is not convinced that there is a great deal of

interpretive guidance to be derived from a non-public document, prepared 19

years after the passage of the Act, by an administrative body that was

specifically denied the ability to issue regulations to enforce the relevant

22

statutory provision.[9]  Nevertheless, the Court considers two passages highlighted by Defendants and Intervenors.

First, the 1958 Manual states that "[i]n view of the emphasis upon the right to sue for principal and interest in the legislative history of Section 316(b), the staff has acquiesced in the view that it relates solely to a suit on the bonds and does not accord any right to pursue a remedy under the indenture."  (1958 SEC Manual at 145).  The distinction drawn here, however, is not between the right to sue and the right to receive, but rather between the right to sue for payment on the bonds and the right to pursue other remedies specified within the indenture, such as, in the example provided by the 1958 SEC Manual, appointment of a receiver.  (*See id.* at 145-46; *see also id.* at 148 ("The provision of the indenture prohibiting the holder of an indenture security from bringing action until the trustee has neglected or refused to take action after notice, appears to conflict with Section 316(b) of the Act.  Accordingly, the provision should be restricted to remedies under the indenture and should not impair his right to sue for principal or interest under the indenture security.")).

Defendants and Intervenors point additionally to the Manual's statement that "[t]he provisions of Section 316(b) are regarded available to non-assenters

---

[9]      Given that the SEC has not claimed interpretive authority here, any *Chevron*-style argument is appropriately absent from Defendants' and Intervenors' briefing.  Assuming that the SEC does have some interpretive authority over Section 316(b) of the Trust Indenture Act, and to the extent there is any such interpretation at all present in the 1958 SEC Manual, such an interpretation is purely in the form of a "policy statement," which is "'entitled to respect,' but only to the extent that [it is] persuasive."  *Christensen* v. *Harris Cty.*, 529 U.S. 576 (2000) (quoting *Skidmore* v. *Swift & Co.*, 519 U.S. 452, 461 (1944)).  As explained *infra*, the Court does not find anything in the 1958 SEC Manual purporting to limit Section 316(b) to the formal right to sue; to the extent such an interpretation is present, it is unpersuasive due to its conflict with the text.

to a plan of debt-readjustment so as to accord them the right to sue on their bonds." (1958 SEC Manual at 143). While the SEC's focus in the Manual does appear to have been on the right to sue, nothing in this statement or elsewhere in the Manual indicates that the right protected in Section 316(b) extends *solely* to the right to sue, which reading would read the right "to receive payment" out of the statute.

## B.   Application to the EDMC Restructuring

### 1.   The Trust Indenture Act Should Be Read Broadly

The legislative history weighs in favor of Plaintiffs' reading of Section 316(b) in two regards. First, the textual changes to what became Section 316(b) over the course of its legislative history demonstrate that the Act's protections were broadened from a mere right to sue into a more substantive right. Second, the purpose of the Act, as expressed consistently throughout the legislative history, was to prevent precisely the nonconsensual majoritarian debt restructuring that occurred here, even if the Act's authors did not anticipate precisely the mechanisms through which such a restructuring might occur.

#### a.   Textual Changes

Section 316(b), as enacted, represented a significant break from its predecessor sections in wording. Section 7(m)(5) of the 1937 Act, Section 7(m)(3) of the 1938 Act, and Section 314(b) of the initial 1939 Act each spoke to "bringing action to collect the principal of and interest upon the indenture

securities upon their respective due dates."  Yet Section 316(b), while

maintaining the right to bring suit, added an entirely separate right:

> [T]he right of any holder of any indenture security to
> receive payment of the principal of and interest on such
> indenture security, on or after the respective due dates
> expressed in such indenture security, *or* to institute suit
> for the enforcement of any such payment on or after
> such respective dates, shall not be impaired or affected
> without the consent of such holder.

15 U.S.C. § 77ppp(b) (emphasis added).  Ordinary principles of statutory

interpretation suggest that the first clause cannot be repetitive of the second,

lest the disjunctive "or" be disregarded.  *See Loughrin* v. *United States*, 134 S.

Ct. 2384, 2390 (2014) ("To read the next clause, following the word 'or,' as

somehow repeating that requirement, even while using different words, is to

disregard what 'or' customarily means.  As we have recognized, that term's

'ordinary use is almost always disjunctive, that is, the words it connects are to

be given separate meanings.'" (quoting *United States* v. *Woods*, 134 S. Ct. 557,

567 (2013))).

Moreover, though the legislative history does not reveal a specific intent

to strengthen the protections of Section 316(b), the alteration and expansion of

its protections over the course of its drafting should be assumed to be

intentional, rather than accidental.  *Cf. Doe* v. *Chao*, 540 U.S. 614, 623 (2004)

("The deletion of 'general damages' from the bill is fairly seen, then, as a

deliberate elimination of any possibility of imputing harm and awarding

presumed damages."); *Directv, Inc.* v. *Barczewski*, 604 F.3d 1004, 1007 (7th

Cir. 2010) ("[U]nwillingness to give effect to a change in statutory language

25

unless the legislative history contains a reassuring 'We really mean it!' is incompatible with decisions of the Supreme Court." (citing *Harrison* v. *PPG Indus., Inc.*, 446 U.S. 578, 592 (1980); *Swain* v. *Pressley,* 430 U.S. 372, 378-79 (1977))).  Accordingly, to interpret Section 316(b) as protecting merely the right to sue for payment, and not any substantive right to *receive* such payment, would be unfaithful to the text and the drafting history.

> ### b.   Purpose

Furthermore, while the text of Section 316(b) underwent changes, its purpose — as revealed in the 1936 Report, testimony before Congress in three legislative sessions, and House and Senate reports on the various bills — remained fixed.  As Defendants and Intervenors note, both the SEC and Congress demonstrated concern over no-action clauses that would prohibit minority bondholders from even attempting to enforce their rights; such a concern corresponds to Section 316(b)'s protection of "the right of any holder of any indenture security … to institute suit for the enforcement of any such payment."  15 U.S.C. § 77ppp(b).

Yet proceeding in tandem with such concerns are broader worries that, as the SEC fretted in 1936, "the next cycle of reorganizations will take place on a voluntary basis without supervision of any court or administrative agency," and over the objections of minority bondholders.  (1936 SEC Report at 150).  This concern about debt reorganizations taking place by majority vote, outside of judicial supervision, is echoed in the relevant congressional testimony and reports.  (*See* 1938 House Hearings at 35-36 ("The effect of this exception is

merely to prohibit provisions authorizing such a majority to force a non-assenting security holder to accept a reduction or postponement of his claim for principal, or a reduction of his claim for interest or a postponement thereof for more than 1 year.…  Evasion of judicial scrutiny of the fairness of debt-readjustment plans is prevented by this exception.…  In other words, the bill does place a check or control over the majority forcing on the minorities a debt-readjustment plan."); 1938 Senate Report at 19 ("Evasion of judicial scrutiny of the fairness of debt-readjustment plans is prevented by this prohibition."); H.R. Rep. 76-1016, at 56 (1939) (same); S. Rep. No. 76-248, at 26-27 (1939) (same)).

From the debate surrounding the Trust Indenture Act, it is apparent that its framers understood involuntary reorganizations to operate in a rather straightforward fashion: a majority of the bondholders would simply vote to amend the payment or interest provisions of the indenture.  But, reading the text and the purpose of the legislation fairly, there is no reason to think that the Trust Indenture Act was targeted only at a particular method of restructuring — straightforward amendment — as opposed to an undesirable result: allowing "a majority to force a non-assenting security holder to accept a reduction or postponement of his claim." (1938 House Hearings at 35 (testimony of Chairman Douglas)).  The Trust Indenture Act, by protecting the individual's right to "receive" the bargained-for principal and interest, is broad enough to prevent that result, whether carried out straightforwardly or circuitously.  Accordingly, courts should give effect to the purpose of the Act,

and not allow minority bondholders to be forced to relinquish claims outside of the formal mechanisms of debt restructuring.

### 2. The EDMC Restructuring Violates Section 316(b) of the Trust Indenture Act

As discussed in *Marblegate I*, there is "little question that the Intercompany Sale is precisely the type of debt reorganization that the Trust Indenture Act is designed to preclude." 2014 WL 7399041, at *19. The instruments effecting the reorganization explicitly labeled it as an "out-of-court restructuring" designed to make sure that any dissenting Noteholders "will not receive payment on account of their Notes." *Id.* (quoting Restructuring Support Agreement § 4.01(c); Exchange Offering Circular 7-8). The restructuring, supported and adopted by an overwhelming majority of bondholders, did not directly amend any term explicitly governing any individual bondholder's right to receive payment. Nevertheless, the restructuring gave dissenting bondholders a Hobson's choice: take the common stock, or take nothing. In effect, Marblegate bought a $14 million bond that the majority now attempts to turn into $5 million of stock, with consent procured only by threat of total deprivation, without resort to the reorganization machinery provided by law. (*See* Burke Address at 11 ("[T]he effect of this prohibition will be to limit, to that extent, the control of the majority over the destinies of the individual minority security holder. If an investor buys a $1,000 bond payable on January 1, 1940, the majority cannot turn it into a $500 bond payable in 1960, without his consent, and without resort to the reorganization machinery now provided by law.")).

As contemplated, on January 5, 2015, EDMC's secured lenders foreclosed on the assets of Education Management L.L.C. and sold the assets to Education Management II L.L.C., leaving no assets in Education Management L.L.C. for Marblegate to recover against.  (Supp. Ex. 1).  EDMC now seeks to remove the Parent Guarantee so as to sever the final avenue for Marblegate's recovery.  Such a removal, if sanctioned by the Court, would allow "the next cycle of reorganizations [to] take place on a voluntary basis without supervision of any court or administrative agency" (1936 SEC Report at 150), so long as the mechanism involves foreclosure and asset sale rather than simple amendment.  The Court declines to so enfeeble the Trust Indenture Act, and thus rules in Plaintiffs' favor.

In arriving at its decision, the Court does not opine on the wisdom or fairness of EDMC's Proposed Restructuring plan, or on whether Marblegate's seemingly advantageous position post-restructuring vis-à-vis even secured creditors represents an unjustified windfall, a "tyranny of the minority," or simply an astute investment strategy.  Furthermore, the Court recognizes the potentially troubling implications of the Trust Indenture Act in rewarding holdouts; its arguable obsolescence given the expense and complexity of modern bankruptcy, *see generally* Mark J. Roe, *The Voting Prohibition in Bond Workouts*, 97 Yale L.J. 232 (1987); and the unforeseen interplay between Section 316(b) and Title IV's funding requirements.  And yet, for the many reasons delineated in this and the prior Opinion, the Court finds it beyond

peradventure that Section 316(b) requires the satisfaction of Plaintiff's claims in the factual circumstances of this case.

## CONCLUSION

For the reasons set forth in this Opinion, the Intercompany Sale as envisioned in the Restructuring Support Agreement and since carried out in part would violate Plaintiffs' rights under the Trust Indenture Act.  Pursuant to Section 10.06(c) of the Fourth Supplemental Indenture (Supp. Ex. 2), Education Management Corporation shall guarantee any past and future payments of principal and interest to Marblegate on their respective due dates under the March 5, 2013 Indenture.

The Clerk of Court is directed to enter judgment for Plaintiffs, terminate all pending motion, adjourn all remaining dates, and close the case.

SO ORDERED.

Dated:     June 23, 2015
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge